IN THE
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

**No. 25-2860**

KYLE BEATTY,
Appellant

v.

CLINTON GARDNER and CALVIN IRVIN,
Appellees

**APPENDIX VOLUME III**

Appeal from Order, Decision, and Judgment entered
in the United States District Court for the Middle District of Pennsylvania
at No. 4:23-CV-00364-KMN on August 29, 2025

Joshua J. Cochran, Esquire
Pa. I.D.# 206807
Attorney for Appellant
333 Market Street
Williamsport, PA 17701
Telephone: (570) 321-7554
Email: josh@sz-law.com

VOLUME III – 531 pages

# TABLE OF CONTENTS

APPENDIX

|  | PAGE |
|---|---|
| EXHIBIT L – GARDNER STATEMENT OF FACTS | Appx379-388 |
| EXHIBIT M – GARDNER STATEMENT OF FACTS | Appx389-393 |
| MOTION FOR SUMMARY JUDGMENT BY CALVIN IRVIN | App394-398 |
| STATEMENT OF FACTS BY CALVIN IRVIN | Appx399-421 |
| APPENDIX OF CALVIN IRVIN MOTION FOR SUMMARY JUDGMENT | Appx422-425 |
| EXHIBIT A – IRVIN MOTION FOR SUMMARY JUDGMENT | Appx426 |
| EXHIBT B – IRVIN MOTION FOR SUMMARY JUDGMENT | Appx427 |
| EXHIBIT C – IRVIN MOTION FOR SUMMARY JUDGMENT | Appx428-453 |
| EXHIBIT D – IRVIN MOTION FOR SUMMARY JUDGMENT | Appx454-474 |
| EXHIBIT E – IRVIN MOTION FOR SUMMARY JUDGMENT | Appx475-531 |
| EXHIBIT F – IRVIN MOTION FOR SUMMARY JUDGMENT | Appx532-547 |
| EXHIBIT G – IRVIN MOTION FOR SUMMARY JUDGMENT | Appx548-557 |

EXHIBIT H – IRVIN MOTION FOR SUMMARY JUDGMENT ..... Appx558-571

EXHIBIT I – IRVIN MOTION FOR SUMMARY JUDGMENT ..... Appx572-580

EXHIBIT J – IRVIN MOTION FOR SUMMARY JUDGMENT ..... Appx581-583

EXHIBIT K – IRVIN MOTION FOR SUMMARY JUDGMENT ..... Appx584-585

EXHIBITS A AND B – IRVIN VIDEOS SUBMITTED TO COURT FOR MOTION OF SUMMARY JUDGMENT ..... Appx586

ANSWER TO GARDNER'S STATEMENT OF FACTS BY KYLE BEATTY ..... Appx587-601

BEATTY'S OPPOSITION TO GARDNER'S SUMMARY JUDGMENT EXHIBIT LIST ..... Appx602-603

EXHIBIT A – BEATTY'S ANSWER TO GARDNER'S STATEMENT OF FACTS ..... Appx604

EXHIBIT B – BEATTY'S ANSWER TO GARDNER'S STATEMENT OF FACTS ..... Appx605-826

EXHIBIT C – BEATTY'S ANSWER TO GARDNER'S STATEMENT OF FACTS ..... Appx827-905

CERTIFICATE OF SERVICE

# EXHIBIT L

IN THE COURT OF COMMON PLEAS OF
LYCOMING COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA: No. CR-1281-2021
                      :
                      :
     V              :
                      :
                      :

ANAISE M. LOPEZ       : SUMMARY TRIAL

RECEIVED
AUG 12 2022
DISTRICT ATTORNEY

TRANSCRIPT OF PROCEEDINGS
REQUESTED PORTION OF TRANSCRIPT

BEFORE : Honorable Eric R. Linhardt, Judge

DATE    : August 3, 2022

PLACE   : Courtroom No. 2
         Lycoming County Courthouse
         48 West Third Street
         Williamsport, Pennsylvania 17701

APPEARANCES:

MATTHEW B. WELICKOVITCH, ESQUIRE
District Attorney's Office
Lycoming County Courthouse
48 West Third Street
Williamsport, Pennsylvania 17701
    FOR - COMMONWEALTH

 COPY

GEORGE E. LEPLEY, JR., ESQUIRE
Lepley, Engelman, Yaw & Wilk,
140 East Third Street
Williamsport, Pennsylvania 17701
    FOR - DEFENDANT

Reported and Transcribed by:
Camala Jordan
Official Court Reporter

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

(The following is the requested portion of the transcript from the hearing held on August 3, 2022:)

THE COURT: The Court finds that the evidence is not only clear and credible, but really overwhelming of the Defendant's guilt with regard to both the summary disorderly conduct and the summary harassment.

The argument that Defense Counsel makes that no roach was seized somehow suggesting that Officer Gardner's testimony that he observed marijuana residue and a marijuana roach in the vehicle was somehow a pretext and a lie, the Court does not find credible in the least. The Court finds Officer Gardner's testimony to be credible in that regard.

In addition to which, Defense's argument that somehow the Defendant was cuffed and placed under arrest when they, in counsel's words, did nothing wrong, the Court disagrees with. This entire matter escalated solely because of the Defendant's behavior and her friend's behavior, all of which was unnecessary. The officers had every right to conduct an investigation; and had the Defendant cooperated in that investigation, I imagine that she would have been free to go on her way in probably less than five minutes, but instead, finds herself handcuffed, arrested, taken down to the police station, and charged with a felony. Her behavior, which she apparently still

fails to recognize -- not the police officer's behavior, but her behavior put not only her safety at risk, but the public's safety at risk, and the officers' safety at risk.

Ms. Lopez, you also need to understand that the Court considers all assaults on law enforcement officers to be a serious matter and our legislature finds all assaults on our police officers to be serious matters. That is why our legislature treats police officers as protected parties and enhances the grading for this type of behavior from a misdemeanor to a felony.

Further, the Court considers your utter lack of acceptance of any responsibility for your behavior that day -- you were offered, as reflected in the court file, a misdemeanor plea offer for six months of probation at the time of your preliminary hearing, which you declined. And then ultimately the Commonwealth dropped both the felony and misdemeanor charges and we're still proceeding with a trial on two summary offenses in the face of overwhelming evidence where you effectively offer no defense. Is there anything, Mr. Lepley, that you wish to say before the Court imposes sentence?

**MR. LEPLEY:** I point out that she -- to the best of my knowledge, I think that she has absolutely no prior record whatsoever, is gainfully employed here in town, has relocated. Mr. Beatty is one of the managers at

the Perkins store, so they're not individuals that in general would be involved in criminal conduct and so we would ask the Court to not impose incarceration. If the Court did, to make it house arrest so she can continue to work.

THE COURT: Mr. Welickovitch.

MR. WELICKOVITCH: Yes, Your Honor. So this case obviously preceded my time in the District Attorney's Office. I played no part in any decisions on it. I have no real long history. I was handed the case and said, this is a summary trial. I looked at the evidence, I agreed with Your Honor that it was overwhelming evidence. And we prepared it, we displayed it here for you today. She was found guilty. And we conquer with Your Honor's sentiments with regard to lack of personal responsibility and would trust that Your Honor impose a proper sentence here given the facts, given the conviction.

THE COURT: So for the reasons the Court has already stated, the fact that it takes assaults on police officers seriously, the fact that the Defendant has refused to accept responsibility in the face of overwhelming evidence, the fact that her behavior on that day put herself, the public, and law enforcement officers at risk, the Court believes that any sentence less than some period of incarceration would fail to account for the

seriousness of the Defendant's criminal behavior on that day. And for that reason, the Court will impose the following order:

And now this 3rd of August, 2022, at the time scheduled for summary trial, following trial, the Court finds the Defendant guilty of count three, harassment, a summary offense, and count four, disorderly conduct, a summary offense.

With regard to count three, harassment, the Court imposes a period of incarceration of 14 days in the Lycoming County Prison. The Defendant is eligible for work release/work crew, she is not eligible for electronic monitoring.

With regard to count four, disorderly conduct, the Court imposes a sentence of 14 days incarceration in the Lycoming County Prison. This sentence shall be served consecutively to count three for an aggregate sentence of 28 days incarceration. The Defendant is eligible for work release/work crew, she is not eligible for electronic monitoring.

The Defendant's report date is deferred until Monday, September 5, 2022, at 9:00 a.m. The Defendant shall self-report to the county prison at that time to begin serving her period of incarceration. Should the Defendant file an appeal of this sentence prior to

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

September 5th, the Defendant shall also file a motion for bail pending appeal so that the Court can consider that request. By the Court.

Any questions, Mr. Lepley?

**MR. LEPLEY:** No, Your Honor.

**THE COURT:** Any questions, Ms. Lopez?

**THE DEFENDANT:** No.

**THE COURT:** Any questions, Mr. Welickovitch?

**MR. WELICKOVITCH:** No, Your Honor.

**THE COURT:** Very good. We are adjourned.

**(WHEREUPON, the hearing was concluded.)**

**(This concludes the requested portion of the transcript from the hearing held on August 3, 2022.)**

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

## C E R T I F I C A T E

I hereby certify that the proceedings are contained fully and accurately in the notes taken by me on the hearing of the above case, and that this copy is the correct transcript of the same.

Camala Jordan
Official Court Reporter

The foregoing record of the proceedings upon the hearing of the above case is hereby approved and directed to be filed.

_____          _____, Judge

DATE                        ERIC R. LINHARDT

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

MR. LEPLEY: [2]  3/21 6/4
MR. WELICKOVITCH: [2]  4/6 6/8
THE COURT: [6]  2/2 4/5 4/17 6/5 6/7 6/9
THE DEFENDANT: [1]  6/6

**1**

14 [2]  5/10 5/15

**2**

2022 [4]  2/2 5/4 5/22 6/13
28 [1]  5/18

**3**

3rd [1]  5/4

**5**

5th [1]  6/1

**9**

9:00 a.m [1]  5/22

**A**

a.m [1]  5/22
above [2]  7/4 7/13
absolutely [1]  3/23
accept [1]  4/21
acceptance [1]  3/12
account [1]  4/25
accurately [1]  7/3
addition [1]  2/14
adjourned [1]  6/10
aggregate [1]  5/17
agreed [1]  4/12
all [3]  2/19 3/5 3/6
already [1]  4/19
also [2]  3/4 6/1
any [6]  3/12 4/9 4/24 6/4 6/6 6/8
anything [1]  3/20
apparently [1]  2/25
appeal [2]  5/25 6/2
approved [1]  7/13
are [2]  6/10 7/2
argument [2]  2/7 2/14
arrest [2]  2/15 4/4
arrested [1]  2/24
as [2]  3/8 3/13
ask [1]  4/3
assaults [3]  3/5 3/7 4/19
Attorney's [1]  4/8
August [3]  2/2 5/4 6/13

**B**

bail [1]  6/2
be [6]  2/12 3/6 3/7 4/2 5/16 7/14
Beatty [1]  3/25
because [1]  2/18
been [1]  2/22
before [1]  3/20
begin [1]  5/24
behavior [9]
believes [1]  4/24
best [1]  3/23
both [2]  2/5 3/16

**C**

Camala [1]  7/7
can [2]  4/4 6/2
case [4]  4/8 4/10 7/4 7/13
certify [1]  7/2
charged [1]  2/24

charges [1]  3/19
clear [1]  2/4
Commonwealth [1]  3/16
concluded [1]  6/11
concludes [1]  6/12
conduct [5]  2/6 2/20 4/2 5/7 5/14
conquer [1]  4/14
consecutively [1]  5/17
consider [1]  6/2
considers [2]  3/5 3/11
contained [1]  7/2
continue [1]  4/4
conviction [1]  4/17
cooperated [1]  2/21
copy [1]  7/4
correct [1]  7/4
Counsel [1]  2/7
counsel's [1]  2/16
count [5]  5/6 5/7 5/9 5/14 5/17
county [3]  5/11 5/16 5/23
court [19]
credible [3]  2/4 2/11 2/12
crew [2]  5/12 5/19
criminal [2]  4/2 5/1
cuffed [1]  2/15

**D**

date [2]  5/21 7/17
day [3]  3/13 4/23 5/2
days [3]  5/10 5/15 5/18
decisions [1]  4/9
declined [1]  3/15
Defendant [9]
Defendant's [4]  2/5 2/18 5/1 5/21
defense [2]  2/7 3/19
Defense's [1]  2/14
deferred [1]  5/21
did [2]  2/16 4/4
directed [1]  7/13
disagrees [1]  2/17
disorderly [3]  2/6 5/7 5/14
displayed [1]  4/13
District [1]  4/8
does [1]  2/11
down [1]  2/24
dropped [1]  3/16

**E**

effectively [1]  3/19
electronic [2]  5/12 5/19
eligible [4]  5/11 5/12 5/18 5/19
employed [1]  3/24
enforcement [2]  3/5 4/23
enhances [1]  3/9
entire [1]  2/17
ERIC [1]  7/17
escalated [1]  2/17
every [1]  2/20
evidence [5]  2/3 3/19 4/11 4/12 4/22

**F**

face [2]  3/18 4/21
fact [3]  4/19 4/20 4/22
facts [1]  4/17
fail [1]  4/25
fails [1]  3/1
felony [3]  2/25 3/10 3/16
file [3]  3/13 5/25 6/1
filed [1]  7/14
find [1]  2/11
finds [5]  2/3 2/12 2/23 3/6 5/6
five [1]  2/23

following [3]  2/1 5/3 5/5
foregoing [1]  7/12
found [1]  4/14
four [2]  5/7 5/14
free [1]  2/22
friend's [1]  2/18
fully [1]  7/3
Further [1]  3/11

**G**

gainfully [1]  3/24
Gardner's [2]  2/8 2/12
general [1]  4/2
given [2]  4/17 4/17
go [1]  2/22
good [1]  6/10
grading [1]  3/9
guilt [1]  2/5
guilty [2]  4/14 5/6

**H**

had [2]  2/19 2/20
handcuffed [1]  2/23
handed [1]  4/10
harassment [3]  2/6 5/6 5/9
has [4]  3/23 3/25 4/18 4/20
have [2]  2/22 4/9
he [1]  2/9
hearing [6]  2/2 3/15 6/11 6/13 7/3 7/13
held [2]  2/2 6/13
her [7]
here [3]  3/24 4/13 4/17
hereby [2]  7/2 7/13
herself [2]  2/23 4/23
history [1]  4/10
Honor [5]  4/7 4/12 4/16 6/5 6/9
Honor's [1]  4/14
house [1]  4/4

**I**

imagine [1]  2/21
impose [3]  4/3 4/16 5/2
imposes [3]  3/21 5/10 5/15
incarceration [6]  4/3 4/25 5/10 5/15 5/18 5/24
individuals [1]  4/1
instead [1]  2/23
investigation [2]  2/20 2/21
involved [1]  4/2
is [14]
it [6]  4/4 4/9 4/12 4/13 4/13 4/19

**J**

Jordan [1]  7/7
Judge [1]  7/17

**K**

knowledge [1]  3/23

**L**

lack [2]  3/11 4/15
law [2]  3/5 4/23
least [1]  2/11
legislature [2]  3/6 3/8
Lepley [2]  3/20 6/4
less [2]  2/22 4/24
lie [1]  2/11
LINHARDT [1]  7/17
long [1]  4/10
looked [1]  4/11
Lopez [2]  3/4 6/6
Lycoming [2]  5/11 5/16

**M**

make [1]  4/4
makes [1]  2/7
managers [1]  3/25
marijuana [2]  2/9 2/10
matter [2]  2/17 3/6
matters [1]  3/7
me [1]  7/3
minutes [1]  2/23
misdemeanor [3]  3/10 3/14 3/17
Monday [1]  5/22
monitoring [2]  5/13 5/20
months [1]  3/14
motion [1]  6/1
Mr [1]  6/8
Mr. [4]  3/20 3/25 4/6 6/4
Mr. Beatty [1]  3/25
Mr. Lepley [2]  3/20 6/4
Mr. Welickovitch [1]  4/6
Ms. [2]  3/4 6/6
Ms. Lopez [2]  3/4 6/6
my [2]  3/23 4/8

**N**

need [1]  3/4
no [8]
not [8]
notes [1]  7/3
nothing [1]  2/16
now [1]  5/4

**O**

observed [1]  2/9
obviously [1]  4/8
offense [2]  5/7 5/8
offenses [1]  3/18
offer [2]  3/14 3/19
offered [1]  3/13
Office [1]  4/9
Officer [2]  2/8 2/12
officer's [1]  3/1
officers [6]  2/19 3/5 3/7 3/8 4/20 4/23
officers' [1]  3/3
Official [1]  7/8
one [1]  3/25
only [2]  2/4 3/2
order [1]  5/3
our [3]  3/6 3/7 3/8
out [1]  3/22
overwhelming [4]  2/4 3/18 4/12 4/22

**P**

part [1]  4/9
parties [1]  3/9
pending [1]  6/2
period [3]  4/25 5/10 5/24
Perkins [1]  4/1
personal [1]  4/15
placed [1]  2/15
played [1]  4/9
plea [1]  3/14
point [1]  3/22
police [5]  2/24 3/1 3/7 3/8 4/19
portion [2]  2/1 6/12
preceded [1]  4/8
preliminary [1]  3/15
prepared [1]  4/13
pretext [1]  2/10
prior [2]  3/24 5/25
prison [3]  5/11 5/16 5/23
probably [1]  2/22
probation [1]  3/14

proceeding [1]  5/17
proceedings [2]  7/2 7/12
proper [1]  4/16
protected [1]  3/9
public [1]  4/23
public's [1]  3/3
put [2]  3/2 4/23

**Q**

questions [3]  6/4 6/6 6/8

**R**

real [1]  4/10
really [1]  2/4
reason [1]  5/2
reasons [1]  4/18
recognize [1]  3/1
record [2]  3/24 7/12
reflected [1]  3/13
refused [1]  4/21
regard [5]  2/5 2/13 4/15 5/9 5/14
release [2]  5/12 5/19
release/work [2]  5/12 5/19
relocated [1]  3/25
report [2]  5/21 5/23
Reporter [1]  7/8
request [1]  6/3
requested [2]  2/1 6/12
residue [1]  2/9
responsibility [3]  3/12 4/15 4/21
right [1]  2/20
risk [4]  3/2 3/3 3/3 4/24
roach [2]  2/8 2/10

**S**

safety [3]  3/2 3/3 3/3
said [1]  4/10
same [1]  7/5
say [1]  3/20
scheduled [1]  5/5
seized [1]  2/8
self [1]  5/23
self-report [1]  5/23
sentence [7]
sentiments [1]  4/15
September [2]  5/22 6/1
September 5 [1]  5/22
September 5th [1]  6/1
serious [2]  3/6 3/7
seriously [1]  4/20
seriousness [1]  5/1
served [1]  5/16
serving [1]  5/24
shall [3]  5/16 5/23 6/1
she [8]
Should [1]  5/24
six [1]  3/14
so [6]  4/1 4/2 4/4 4/7 4/18 6/2
solely [1]  2/17
some [1]  4/25
somehow [3]  2/8 2/10 2/15
stated [1]  4/19
station [1]  2/24
still [2]  2/25 3/17
store [1]  4/1
suggesting [1]  2/8
summary [7]

**T**

taken [2]  2/24 7/3
takes [1]  4/19
testimony [2]  2/9 2/12

than [2]  2/23 4/24
that [30]
then [1]  3/16
there [1]  3/19
they [1]  2/16
they're [1]  4/1
think [1]  3/23
this [9]
three [3]  5/6 5/9 5/17
time [4]  3/15 4/8 5/4 5/23
today [1]  4/13
town [1]  3/25
transcript [3]  2/2 6/13 7/5
treats [1]  3/8
trial [4]  3/18 4/11 5/5 5/5
trust [1]  4/16
two [1]  3/18
type [1]  3/9

**U**

ultimately [1]  3/16
under [1]  2/15
understand [1]  3/4
unnecessary [1]  2/19
until [1]  5/21
upon [1]  7/12
utter [1]  3/11

**V**

vehicle [1]  2/10
Very [1]  6/10

**W**

was [8]
way [1]  2/22
we [5]  4/2 4/13 4/13 4/14 6/10
we're [1]  3/17
Welickovitch [2]  4/6 6/8
were [1]  3/13
whatsoever [1]  3/24
when [1]  2/16
where [1]  3/19
WHEREUPON [1]  6/11
which [4]  2/14 2/19 2/25 3/15
why [1]  3/8
will [1]  5/2
wish [1]  3/20
words [1]  2/16
work [5]  4/5 5/12 5/12 5/18 5/19
would [5]  2/22 4/2 4/3 4/16 4/25
wrong [1]  2/16

**Y**

Yes [1]  4/7
you [6]  3/4 3/13 3/15 3/19 3/20 4/13
your [9]

# EXHIBIT M

**OFFICER CLINTON GARDNER-WILLIAMSPORT BUREAU OF POLICE**

**CURRICULUM VITAE-Narcotics Trafficking**

    I, Clinton Gardner, am currently employed by the Williamsport Bureau of Police since November of 2015. I was specially assigned to the Lycoming County Narcotics Enforcement Unit part time for nearly 6 months in 2019 and full time from January of 2020 to September of 2022. I am currently assigned as the Williamsport Police Intelligence Officer and am also a part time task force officer with the FBI. Throughout my career I have focused on investigating narcotics, firearms, violent crime and gang activity. I have attended hundreds of hours of training focusing on these crimes, which has allowed me to conducted countless investigations involving gangs, firearms, narcotics and violent crime. Through these investigations I have seized hundreds of thousands worth of cash and narcotics, dozens of firearms, and multiple vehicles. In conjunction with my work at the state level, I have assisted in federal cases involving firearms and narcotics, and have had multiple of my own cases adopted federally.

    **My training and experience in relation to Narcotics Trafficking/Firearms/ and Gangs consists of the following**: I have completed basic narcotics training in the police academy. I have completed additional trainings in Mastering Search and Seizure, Identifying Criminal Vehicles and Occupants, Patrol Interdiction, Street Gangs and Narcotics, Hidden Compartments and Deceptive Behavior, Interdiction Mastermind, Understanding the World of 1%'s, Planning an Undercover Operation, Interview and Interrogation in relation to narcotics, Money Laundering, Smugglers Inc., and I am Wiretap Class A certified. This amounts to hundreds of hours of training specifically for narcotics and gangs. Although not all of this training is specifically gang oriented, the nexus between guns, narcotics, and illegal currency all directly correlate with gang activity. I have attended several week-long narcotics conference's which provided trainings in the following: High Level Interdiction/Hidden Compartments, Seize the Cash, Flipping Informants, Mastering Interdiction, Criminal Vehicles and Occupants, Tradecraft and Criminal Behavior, Parcel and Motel Interdiction, Signs of Human Trafficking, Drug Identification, Cigarette Smuggling, "The Gun Game", Social Media Investigations, and Constitutional Policing.

    I am currently a member of the Williamsport Special Response Team and have been since Nov. 2017. I have participated in countless search warrants in relation to narcotics and firearms in my duties on this team. I have hundreds of narcotics related arrests which include both misdemeanor and felony arrests. I have assisted in, and conducted, countless narcotics related investigations. I have participated in controlled purchases of narcotics, and have also utilized confidential informants for the purchase of narcotics. I have conducted numerous investigations into gangs and gang members. These investigations include both traditional and non-traditional gang members. Investigations into gang activity that I have been involved with include up to the federal level, and I have had incidents involving traffickers, gangs and firearms adopted/prosecuted by federal agencies. I have authored and served numerous search warrants in relation to narcotics and firearms on residence's, vehicles, cell phones and even body warrants. I have investigated and assisted in a large number of opiate related overdoses, and have utilized Narcan on numerous individuals who have overdosed on opiates.

    Through my experience I have testified in court numerous times as a PWID expert not only in my own cases, but other officers as well. PWID testimony has been conducted at both the magisterial and court of common pleas level. I have also been qualified as a narcotics trafficking expert.

Through my investigations I have had the opportunity to debrief/interview/interrogate countless individuals including drug users and traffickers. Many of these individuals that I have spoken to are gang members. I have interviewed many of these individuals extensively to better understand the inner workings of gangs. Some of the gang members whom I have spoken with have been confidential sources for this officer.

As a result of my investigations of narcotics/firearms and gangs I have had the ability to investigate countless crimes involving the two. I have assisted or conducted investigations involving homicides, shootings, money laundering, and felony drug and gun cases involving gangs. Through these investigations I have become adept at identifying countless gang members simply through apparel, tattoos, social media use, and "tagging".

Based on my aforementioned training and experience I am familiar with the following:

- Through my experience and training I am familiar with a wide array of narcotics, pricing, packaging, preparation/manufacturing, and street language in reference to narcotics.
- Through my training and experience I am familiar with numerous types of narcotics and how they physically affect individuals, both in appearance and demeanor.
- I am aware of how narcotics traffickers use narcotics as a means of control/manipulation/sexual favors and dependence amongst drug users.
- I know from my experience that traffickers are deceptive by craft. Through their tradecraft they learn ways to deceive law enforcement through sophisticated means of both verbal and physical deception. Examples being cover stories, or high level means of concealment.
- Also, through my experience and training, I have developed extensive knowledge of the patterns of trafficking, behaviors and driving habits of traffickers, means of trafficking, counter surveillance techniques, and workings of a residence, or "trap house" which distributes narcotics. These means apply to how gang members operate as well.
- I have developed knowledge of narcotics traffickers using more than one residence, or a storage area, to traffic and store their narcotics from.
- I am familiar through training and experience how narcotics are utilized or transferred in regards to human trafficking.
- I have developed knowledge through my training and experience of the use of firearms in the furtherance of narcotics trafficking. I have arrested numerous individuals for firearms violations, and assisted in numerous firearm related incidents including shootings. Many of these arrests and investigations are gang related.
- Traffickers and gang members frequently illegally possess firearms in order to defend from, or pursue and rob other traffickers of their narcotics and currency. I also know when specifically dealing with gangs, that gang members will commonly possess firearms to protect themselves and fellow members. Gang members will also possess firearms so they are prepared to fire upon rival gangs when an opportunity presents itself.
- I know through my experience that the most common form of communication amongst traffickers is through the utilization of cell phones. Traffickers utilize phones to both communicate to each other as well as to negotiate and arrange transactions with narcotics users.

- I know that narcotics traffickers commonly operate third party vehicles, when they traffic narcotics. This is to help further hinder efforts in identifying them, as well as the vehicle not being able to be forfeit if a trafficker is apprehended in it.
- While utilizing vehicles to further their trafficking efforts I know it is common for traffickers to use natural voids, or create voids within compartments of vehicles in order to conceal narcotics, currency and firearms. Traffickers will also illegally install "traps" in vehicles used to transport contraband, knowing that these types of installed aftermarket compartments are particularly difficult for law enforcement to detect.
- Also, in reference to concealing narcotics, due to more severe sentencing as opposed to simple possession, traffickers go to greater lengths to conceal narcotics on, or within their person, and will dispose of the narcotics immediately if given a chance. They are skilled in ways to conceal narcotics on their person, and deceiving officers in order to destroy evidence.
- I know that when dealing with currency, it is common for traffickers to possess large amounts of currency, specifically larger denominations, in multiple bundles of cash which can be easily accessed. The most common denomination used among traffickers is a twenty-dollar bill. Through my training I am familiar with ways that traffickers and gang members will launder their proceeds to get "clean money".
- I know through my experience that gang members develop specific plans on dealing with law enforcement when utilizing/carrying firearms. These methods can be distraction methods such as members causing a scene or fleeing from a vehicle/area.
- I know from my experience that when a gang member is involved in a shooting incident, that it is common for them to possess a firearm to protect themselves from further incidents.
- I know from my experience that gang members may not necessarily admit their allegiance to a gang, as they know that potential sentencing for crimes involving gang activity may be stronger, or that law enforcement utilizes gang associations as part of their reasonable suspicion for investigations.
- I know from my experience that it is common for traffickers and gang members to boast on social media of their allegiance to a gang and to pose with firearms, narcotics and large amounts of currency.
- I know from my experience that gang members will commonly represent their gang through apparel, tattoos, and social media/entertainment promotions.
- I know from my experience that two of the most lucrative ways of gangs funding themselves is through narcotics and firearms trafficking. The nexus between these two is extremely intimate as one often accompanies the other for reasons stated prior.
- I know from my experience that gang members will commonly acquire firearms through illegal means, such as stolen firearms or straw purchases.
- I know from my experience that in regards to policing and dealing with gang members, the work is inherently dangerous. This danger is increased by the frequency in which they arm themselves, the cohesive, organized nature of a gang, as well as gang members training in their own craft to avoid detection by law enforcement. As a result of this gang members will continuously press and test law enforcement and often times do no respond to commands issued by law enforcement as others may. Many gang members are career offenders, or have been trained by such. Street level gang members, in my experience, are typically better schooled in their craft than the average trafficker.

- Finally, I know through my experience that specifically in Lycoming County gangs are prevalent, with the largest being the local non-traditional 400 gang. This particular gang consists of mostly local younger males and is broken down into multiple sub sets. Through my experience I have also had interactions or identified members of other non-traditional gangs, and traditional gangs such as the Bloods, Crips, Gangster Disciples, Latin Kings, Pagans, Tribe and Riot. Many of these gang members come from source city areas such as Philadelphia, Atlanta and New York City.

These factors are merely highlighting information accrued from my training and experience, and are not limited to just the aforementioned. While I understand that one or more of these factors may not necessarily represent probable cause on their own, from a totality perspective, these factors are crucial in determining if the threshold of probable cause is met in regards to aforementioned crimes.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KYLE BEATTY, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO.  4:23-CV-00364-JKM |
| | : | |
| v. | : | Complaint filed 02/28/2023 |
| | : | |
| CLINTON GARDNER, *et al*., | : | Judge Julia K. Munley |
| | : | |
| Defendants. | : | JURY TRIAL DEMANDED |

**DEFENDANT CALVIN IRVIN'S
MOTION FOR SUMMARY JUDGMENT**

Defendant Calvin Irvin, by and through his attorneys, moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the basis that he is entitled to judgment as a matter of law and fact.  Filed herewith in support of this Motion is a Statement of Material Facts Not in Dispute and associated exhibits.  Defendant Calvin Irvin will file a Brief in support of this Motion within the time period set forth in Local Rule 7.5.

McCORMICK LAW FIRM

By:   /s/ Austin White
        Austin White
        PA I.D. No. 312789
        Stephen C. Hartley
        PA I.D. No. 331271
        Attorneys for Defendant
        Calvin Irvin

        835 West Fourth Street
        Williamsport, PA 17701
        (570) 326-5131
        (570) 326-5529 (fax)
        awhite@mcclaw.com

# CERTIFICATE OF NONCONCURRENCE

I, AUSTIN WHITE, ESQUIRE, assume, given that Defendant Irvin's Motion for Summary Judgment is dispositive, Plaintiff does not does not concur in this Motion.

McCORMICK LAW FIRM

By:  /s/ Austin White
     Austin White
     PA I.D. No. 312789

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a true and correct copy of this document via the Court's CM/ECF system, pursuant to the Federal Rules of Civil Procedure.

McCORMICK LAW FIRM


By: __/s/ Austin White_____
          Austin White
          PA I.D. No. 312789
          Stephen C. Hartley
          PA I.D. No. 331271
          Attorneys for Defendant
          Calvin Irvin


Dated: April 5, 2024

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KYLE BEATTY, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 4:23-CV-00364-JKM |
| | : | |
| v. | : | Complaint filed 02/28/2023 |
| | : | |
| CLINTON GARDNER, *et al.*, | : | Judge Julia K. Munley |
| | : | |
| Defendants. | : | JURY TRIAL DEMANDED |

**ORDER**

AND NOW, this ____ day of _____, 2024, upon consideration

of the Defendant Calvin Irvin's Motion for Summary Judgment, it is hereby

ORDERED that said Motion is GRANTED. Summary judgment is entered in

favor of Defendant Irvin.

BY THE COURT:

_____
Julia K. Munley
United States District Court Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KYLE BEATTY, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO.  4:23-CV-00364-JKM |
| | : | |
| v. | : | Complaint filed 02/28/2023 |
| | : | |
| CLINTON GARDNER, *et al.*, | : | Judge Julia K. Munley |
| | : | |
| Defendants. | : | JURY TRIAL DEMANDED |

**DEFENDANT CALVIN IRVIN'S STATEMENT
OF MATERIAL FACTS NOT IN DISPUTE**

Defendant Calvin Irvin (hereinafter "Irvin" or "Defendant Irvin"), by and through his attorneys, presents the following statement of material facts not in dispute in support of his Motion for Summary Judgment.  Defendant Irvin submits that there is no genuine issue to be tried relative to the facts testified below, and that he is entitled to judgment as a matter of law.

1.      Defendant Irvin is in agreement with, and incorporates by reference, the Undisputed Material Facts Filed by Clinton Gardner, Doc 25, which was filed by Defendant Gardner April 5, 2024, in connection with his Motion for Summary Judgment.

2.      In addition to Defendant Gardner's statement, Defendant Irvin provides the within statement of material facts for further consideration by the Court.

1

3.     At all times relevant to Plaintiffs' Complaint, Defendant Irvin was employed as a detective within the Lycoming County District Attorney's Office. (Doc. 1 at pg. 1).

4.     During the afternoon of August 31, 2021, Defendant Irvin was on patrol in a marked police cruiser, along with Officer Clinton Gardner ("Defendant Gardner" or "Gardner).  (Appendix Ex. C, Gardner dep at pg 7).

5.     Irvin was assisting Gardner, and Gardner was assigned to the Lycoming County District Attorney's Office Narcotics Enforcement Unit ("NEU"), where he focused on narcotics offense, firearms, and large drug crimes. (Appendix Ex. C, Gardner dep at pgs 6-8, 37, 40).

6.     The two were patrolling for narcotics or firearm offenses. (Appendix Ex. C, Gardner dep at pgs 7-8).

7.     While on patrol, Defendants observed Plaintiff Kyle Beatty driving in a high narcotics trafficking area known as "the avenues," which is an area that has a reputation for drug-related activity. (Appendix Ex. C, Gardner dep at pgs 11-12; Appendix Ex. D, Irvin dep at pgs 7, 37).

8.     Upon pulling up next to Plaintiff and Ms. Lopez at a traffic light, Defendants noticed unusual behavior of Plaintiff and Anaise Lopez, specifically their avoidance of eye contact and the hundred-yard stare. (Appendix Ex. C, Gardner dep at pgs 11-12, 25).

2

9.     Their behavior and presence in a drug-area contributed to Defendants' suspicion that they might be involved in drug-related activity. (Appendix Ex. D, Irvin at pg 37; Appendix Ex. C, Gardner dep at pg 25).

10.     Defendants followed Plaintiff from the downtown area to the Turkey Hill on Washington Boulevard, with suspicion based on their observations and their behavior. (Appendix Ex. C, Gardner dep at pgs 10-13; Appendix Ex. D, Irvin dep at pgs 9-12).

11.     The decision to follow Plaintiff's vehicle was influenced by the vehicle's travel from a known narcotics area, its unpersonalized appearance, and the occupants' behaviors while Defendants were near like checking their mirror and other mannerisms. (Appendix Ex. D, Irvin dep at pgs 9-10; Appendix Ex. C, Gardner dep at pgs 11-12).

12.     Plaintiff and Anaise Lopez pulled into a Turkey Hill gas station, and parked at a gas pump and hastily went into the store. (Appendix Ex. C., Gardner dep at pgs 12-13; Appendix Ex. D, Irvin dep at pgs 11-12).

13.     Plaintiff made the choice to pull into the Turkey Hill gas station and park the vehicle. (Appendix Ex. E, Beatty dep at pg 32).

14.     Defendants did not commence a traffic stop or otherwise force Plaintiff to pull over and park at Turkey Hill. (Appendix Ex. E, Beatty dep at pg 32).

3

15. Defendants then pulled in and parked next to the vehicle Plaintiff was driving, but only after Plaintiff had already parked, exited, and headed into the store. (Appendix Ex. D, Irvin dep at pg 12).

16. The police cruiser did not physically block Plaintiff's vehicle from moving forward. (Appendix Ex. E, Beatty dep at pg 32).

17. Defendant Gardner exited the vehicle, and walked over to the vehicle Plaintiff was driving. (Appendix Ex. C, Gardner dep at pg 13).

18. As the windows were down, Gardner immediately smelled the odor of marijuana and observed a spent marijuana roach, and some shake or flakes on the floor. (Appendix Ex. C, Gardner dep at pgs 12-13).

19. The roach was in the driver's door ashtray, which is next to where Plaintiff was sitting as the driver. (Appendix Ex. C, Gardner dep at pg 14).

20. Upon seeing the drug paraphernalia, Gardner then went to get Plaintiff from inside the store and bring him back to the vehicle, to detain him and investigate. (Appendix Ex. C, Gardner dep at pg 16).

21. Gardner directed Irvin over to the vehicle to see the roach from the top of the door, through the window. (Appendix Ex. D, Irvin dep at pg 13).

22. Irvin did indeed observe the marijuana roach in the driver's side door ashtray. (Appendix Ex. D, Irvin dep at pg 13).

4

23. The marijuana roach could be observed from outside the vehicle, from the front windshield. (Appendix Ex. D, Irvin dep at pg 14; Appendix Ex. C, Gardner dep at pg 15).

24. Gardner's observations, Irvin's observations, and their interactions with Plaintiff and Ms. Lopez were captured on body cam footage for each Defendant, which are being provided to the Court for review.

25. The following is a "play-by-play" in terms of what transpired based on Irvin's bodycam footage. All of the below occurs between 1:47 p.m. and 2:08 p.m. on August 31, 2021: (Appendix Ex. A).

    a. Irvin's bodycam video begins at 1:47 p.m., with Irvin being in the passenger side of the squad car.

    b. Irvin exits the squad car.

    c. Defendant Gardner, approaches Plaintiff's vehicle, observes a spent marijuana roach on the driver's door ashtray and flakes of marijuana on the driver's floor.

    d. Defendant Irvin exits the cruiser and approaches to where Defendant Gardner is standing next to the driver's side window of the vehicle Plaintiff was driving.

    e. Gardner points out the marijuana roach/flakes to Irvin.

    f. Irvin approaches the vehicle and observes the marijuana roach/flakes.

5

g.    Lopez exits the store and approaches Gardner and Irvin.

h.    Gardner heads into the store while Irvin stays with Lopez.

i.    When Lopez attempts to follow Gardner into the store, Irvin tells her to stay with him because she is under investigation due to marijuana being in the car.

j.    Gardner returns with Plaintiff Kyle Beatty.

k.    Lopez denies that there is marijuana in the car and begins recording the incident with her cell-phone.

l.    Gardner states that there is a roach in the cupholder and scraps of bud on the driver's side.

m.    Beatty asks if they are going to give him a "ticket."

n.    Gardner states that their options are to consent to him searching the vehicle or that the vehicle would be towed so that law enforcement could apply for a search warrant.

o.    Beatty says "You can search it right now" and Lopez says "there's literally nothing in it." Lopez then tries to get back into the car and Irvin says she cannot.

p.    Lopez then refuses to abide by instructions to separate from Beatty.

q.    As Ms. Lopez's behavior begins to escalate, Gardner and Irvin ask for identification from Plaintiff and Lopez.

6

r.      When they do not respond Irvin asks Plaintiff for his name, to which

Plaintiff replies with "I'm not under arrest."

s.      Plaintiff does not tell the officers his name, instead he then replies to

the request with "All right don't let them search the car."

t.      Lopez then continues yelling and the officers cuff both Lopez and

Beatty.

u.      While cuffed Lopez continues screaming, asking for a sergeant, and a

female cop.

v.      As Lopez and Plaintiff are becoming more hostile, Irvin then does a

search of Beatty incident to having him placed in the back of the

squad car.

w.      Plaintiff and Irvin then have a conversation where Plaintiff says if you

say there's a roach in there, that's the most you're going to find.

x.      Plaintiff is adamant to Irvin that he can get Lopez to agree to allow a

search of her car.

y.      Irvin then places Plaintiff in the back of the squad car, where Plaintiff

finally provides his name.

z.      Plaintiff then tells Irvin that Lopez is his girlfriend, that she is hostile

and upset because she believes her "rights are being violated" but that

7

if Irvin brings Lopez over to him, he can get her to consent to search the car.

aa.    Officer Geary arrives and he and Gardner take Lopez to the other squad car, while Lopez is resisting, yelling "stop touching me" and otherwise being hostile.

bb.    Gardner then returns and says that Lopez is under arrest for aggravated assault of an officer.

cc.    Plaintiff then states "you guys forced this shit; this shit didn't have to happen like this."

dd.    Irvin then explains to Beatty that with the marijuana, the smell, and the actual roach in the car, there was an investigation.

ee.    Plaintiff denies that there was marijuana smell, saying it is getting "blown out by the courts" and asks "when did you smell it, eight blocks ago when you were following us? You didn't smell shit."

ff.    Irvin then asks Plaintiff to lean back into the vehicle so that he can close the door.

gg.    A bystander pumping gas gets into a verbal argument with the officers regarding an unrelated matter involving her daughter being missing.

hh.    Gardner returns to the car Beatty is in, and states that Lopez is under arrest for aggravated assault for kicking Officer Geary.

8

ii. Gardner also states that Plaintiff and Lopez were being detained as a result of a narcotics investigation.

jj. Officer Minier arrives and Gardner explains to him what had transpired.

kk. Gardner then shows Minier where the drugs are visible from the window, pointing his flashlight down.

ll. Plaintiff yells from the squad car "Get out of the car, you ain't allowed to be in there!" to which Irvin responds "No ones in the car, man."

mm. Irvin and Gardner speak for a few minutes outside the vehicle about Plaintiff's identity. Irvin says he thinks Plaintiff said his name was Beatty, first name might be Kyle, but he wasn't sure what Plaintiff said. Gardner then opens the door and asks him for his name.

nn. Plaintiff says you have my ID to which Gardner says he does not.

oo. Plaintiff does not state his name and instead says he does not understand what is happening.

pp. Gardner explains that there is paraphernalia and small amounts of marijuana where Plaintiff was seating in the vehicle, which are misdemeanors in the state of Pennsylvania.

qq. Gardner continues to ask Plaintiff to ID himself which he does not.

9

rr. Gardner then says he will have to arraign Plaintiff as a John Doe until he decides to give the Court his name.

ss. Irvin returns to talk to Plaintiff and Plaintiff tells him to look at his ID which is in his wallet.

tt. Plaintiff then says "I'm not the guy that's like my rights were violated, I'm trying to get you guys in trouble. I just want to go home. I didn't do anything. I get that you probably might have found a roach that isn't mine and I don't care if you write/charge me with it anyway. All that is, is a citation. I'm cool with that..."

uu. Per Plaintiff's direction, Irvin goes to check Plaintiff's wallet for his identification.

vv. Irvin then radios to run Plaintiff's name and date of birth.

ww. Irvin notes that Plaintiff has an ignition interlock license but there is no ignition interlock in the vehicle.

xx. Gardner and Irvin continue to speak with Plaintiff about what transpired. They tell him they are waiting for a tow for the car and will need to take him to the City Hall police station.

yy. Plaintiff explains to Irvin that Lopez is from Boston and that she arrived in Williamsport last night, driving from Boston. He then states that he had a conversation with her that although marijuana may be

10

legal in Boston it is not in Pennsylvania, and that she needs to be careful. He says he is not sure if she had a marijuana roach in the car from last night.

zz.    Gardner and Irvin arrange for a tow of Lopez's car for purposes of a search warrant being applied for.

aaa.    Plaintiff asks Irvin to get his house key off the car key ring, and Irvin does so.

bbb.    Irvin's bodycam is turned off at 2:08 p.m.

26.    Gardner's body cam reflects that Gardner and Irvin left Turkey Hill to transport Plaintiff to the police station, departing at 2:08 p.m. and arriving at the station at approximately 2:12 p.m.

27.    At the station, Irvin's body cam footage, starting at 2:12 p.m., reflects that he sat and spoke with Plaintiff in an interview room for approximately 12 minutes, which conversation started about Lopez and what was transpiring with her, but quickly turned to casual subjects like baseball, sports, hunting, Plaintiff's family, work, and the news.

28.    Gardner then arrived so that Plaintiff could be stripped search incidental to the drug investigation.

11

29. Irvin turned off his camera before the strip search because it was not customary to record such a search. (Appendix Ex. D, Irvin dep at pg 27; Appendix Ex. C, Gardner dep at pg 33).

30. The search took just a few minutes. (Appendix Ex. D, Irvin dep at pgs 29-30; Appendix Ex. C, Gardner dep at pgs 35-36).

31. The strip search was necessary because often a drug trafficker will offer up a smaller offense like a small amount of marijuana, in order to make the officer "go away" in order to prevent a more thorough inquiry. (Appendix Ex. C, Gardner dep at pg 30).

32. For instance, traffickers and users tend to conceal narcotics in their groin area. (Appendix Ex. C, Gardner at 30-31).

33. Thus, when some kind of drugs are found it is common practice for them to incidentally perform a strip search in order to see if they are in fact hiding drugs in that area. (Appendix Ex. C, Gardner dep at pgs 30-31).

34. No contraband was found on Plaintiff. (Appendix Ex. C, Gardner dep at pg 33).

35. Plaintiff was not charged because the primary concern was with Ms. Lopez and aggravated assault against a police officer. (Appendix Ex. C, Gardner dep at pgs 37-38).

12

36.     That crime was the most serious, and as a member of the NEU, Gardner was more concerned with large drug crimes. (Appendix Ex. C, Gardner dep at pgs 37-38).

37.     Gardner explained that there's often times where there are small amounts of paraphernalia that he never charges. (Appendix Ex. C, Gardner dep at pg 37).

38.     Plaintiff was then released shortly after the strip search concluded. (Appendix Ex. C, Gardner dep at pg 41; Appendix Ex. D, Irvin dep at pg 30).

39.     On August 31, 2021, as a result of the altercation at the Turkey Hill, Gardner filed a criminal complaint against Lopez, charging her with felony Aggravated Assault (18 Pa. C.S. § 2702-A3), misdemeanor Simple Assault (18 Pa. C.S. § 2701-A1) and summary Harassment (18 Pa. C.S. § 2709-A1). (See Criminal Complaint, Affidavit of Probable Cause, and Docket Transcript attached hereto as Appendix Exhibits H and I, (Irvin Production 1-8)).

40.     Defendant Gardner applied for and obtained a search warrant to search Lopez's car. (Appendix Ex. C, Gardner dep at pgs 42-43).

41.     Nothing was found as a result of that search. (Appendix Ex. C, Gardner dep at pgs 43-44).

42.     Gardner's Affidavit of Probable Cause for the charges against Lopez reflects the following:

13

## . AFFIDAVIT of PROBABLE CAUSE

On 8/31/2021, DET IRVIN and I were on patrol in a marked police unit, and wearing marked police vests. While in the area of the TURKEY HILL on WASHINGTON BLVD we observed a black in color NISSAN ALTIMA bearing MASSACHUSETTS registration parked at the pumps. Two occupants, a white male and white female exited and went into the store. I parked the patrol unit as to not obstruct the vehicle's exit.

IRVIN and I had observed the vehicle earlier downtown, where the occupants made efforts to ignore our presence, and then observed it shortly after leaving a high narcotics trafficking area in the avenues. The vehicle did not appear to be overly personalized. We followed the vehicle and again the occuptants made clear efforts to act as tho the police were not following. The driver would occasionally look out his window as if looking in the distance, but was clearly checking for police presence. Once the vehicle parked and the two exited, we were directly behind them. They did not look in our direction once. I know from my experience that this TURKEY HILL is a high narcotics trafficking area.

Once I parked I exited the patrol vehicle and walked up to the sedan. I immediately detected the odor of marijuana emmitting from the vehicle. I observed in plain view a marijuana joint, and marjuana flakes in plain view in the vehicle. The female exited the store and immediately confronted us. I went into the store and the male threw his hands up and asked if I wanted to search him. I asked him to exit the store with me which he did.

I explained to the pair what I observed and I explained their options. Initially the female granted consent to search the car but then redacted after I asked the two for ID. IRVIN and I then handcuffed the two, and the female attempted to turn away. Once the two were handcuffed the female refused to listen to any orders, and tried to walk around and scream at officers. Once additional units arrived, PO GEARY and I attempted to place the female in the back of his patrol unit. She nearly had to be carried by GEARY and I to the patrol unit due to her resistance. The female planted her feet and pushed back into us. We had to force her into the back of the patrol unit.

I, PO GARDNER, BEING DULY SWORN ACCORDING TO THE LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

I CERTIFY THAT THIS FILING COMPLIES WITH THE PROVISIONS OF THE *CASE RECORDS PUBLIC ACCESS POLICY OF THE UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA* THAT REQUIRE FILING CONFIDENTIAL INFORMATION AND DOCUMENTS DIFFERENTLY THAN NON-CONFIDENTIAL INFORMATION AND DOCUMENTS.

_____
(Signature of Affiant)

Sworn to me and subscribed before me this __3 1__ day of __August__ __202 1__

_____ Date _____ _____ Magisterial District Judge

My commission expires first Monday of January, __202 1__

Appx412

## AFFIDAVIT of PROBABLE CAUSE CONTINUATION

Once she was in the vehicle she kicked PO GEARY twice. The first kick struck PO GEARY in the left hand, and the second struck PO GEARY on the inner portion of his right arm near his elbow. Due to the females actions a car full of individuals at the pumps were clearly riled up, and one of the occupants continuously yelled at officers and had to be ordered to stop.

At WBP headquarters LOPEZ initially refused to ID herelf and made racist, and demeaning comments towards officers.

Based on the facts and circumstances stated above, I respectfully request that ANAISE MARGARITA LOPEZ be brought before the court to answer to these charges.

(Appendix Ex. I).

43.    Defendant Irvin's report for the altercation reflects the following:

15

SUPPLEMENTAL #1

On August 31, 2021, I, Detective Calvin Irvin, was partnered with Williamsport Bureau of Police Officer Gardner. We were on patrol in a marked police vehicle and wearing marked police vests.

We observed a black Nissan Altima with a Massachusetts registration in the area of 6th Avenue. This area is a high drug trafficking area. The driver and passenger intentionally did not look as us as we passed them. We then followed them to the area of the Turkey Hill, 700 Washington Boulevard, Williamsport. The vehicle parked at the southeast fuel pump. We pulled in and parked as not to obstruct the vehicle's exit. The male driver and female front seat passenger exited the vehicle and entered the store.

I stayed in the patrol car while Ofc. Gardner walked over to the black Nissan Altima. Ofc. Gardner informed me that he smelled the odor of marijuana coming from inside the vehicle and also observed a marijuana joint.

The female then exited the store and confronted us. Ofc. Gardner went inside to make contact with the male driver. The female then started walking to the store and I told her she could not go in and had to stay outside with me. The female then walked towards the black Nissan Altima. I told her that she was not allowed to go in the vehicle. I explained to her that there was marijuana in the vehicle and the she was under investigation.

Ofc. Gardner exited the store with the male, who had his hands placed behind the back of his head. Ofc. Gardner asked for consent to search the car. Initially consent was granted, but revoked after the two were asked for identification. They were both detained at approximately 13:50 hours. Ofc. Gardner asked that I search the male and place him in the rear of our patrol vehicle due to the female attempting to walk around and yelling at officers.

I spoke with the male in the rear of our patrol car. The male did give me his name, Kyle BEATTY. He said that his identification was inside his wallet. I retrieved his wallet that was placed inside the car by Ofc. Gardner. I noticed that his Pennsylvania Driver's License was a Limited License and required an ignition interlock. I heard BEATTY tapping on the window. He then said that he spoke to PennDOT and did not need an ignition interlock since PennDOT was so backed up.

While speaking to BEATTY, a female who was parked behind the black Nissan Altima became irate and was yelling at Officers. The female was then told to stop yelling and not to interject herself in things.

Ofc. Gardner informed me that the female identified as, Anaise LOPEZ, had kicked Ofc. Geary and that she was under arrest. LOPEZ was going to he transported to WBP Headquarters.

Ofc. Gardner and I did transport BEATTY to WBP Headquarters at approximately 14:09 hours. Upon arriving, BEATTY was strip searched and subsequently released. I did request his cell phone number so I could call him and inform him of the time of LOPEZ'S arraignment. BEATTY then left.

Ofc. Gardner did ask LOPEZ if she would be able to assure him that she would not hit him if she would be un-cuffed for fingerprinting purposes. LOPEZ could not guarantee that. LOPEZ was not fingerprinted.

| Signature of Reporting Officer | Badge # 509 | Date 9/9/2021 | Supervisor | Date | Reviewed By | Date 09/09/21 |
|---|---|---|---|---|---|---|
| Case Status ☐ Complete ☐ Active ☐ Arrest Cleared ☐ Unfounded ☐ Inactive ☐ Exceptionally Cleared | | | | | Page 1 of 2 | |

16

> LOPEZ was transported to MDJ Biichle and arraigned. LOPEZ was committed to the Lycoming County Prison.
>
> A body camera was utilized during this interaction and was downloaded into the Axon Evidence system.
>
> Nothing further.

(Appendix Ex. J).

44.     Officer Geary's report for the altercation reflects the following:

Officer Report for Incident 21-08506                                     Page 9 of 11

**Supplement**
PO Z Geary Tue Aug 31 15:04:15 EDT 2021

I responded to the above area for officer requesting assistance with a male and female who were subject of an investigation. Upon arrival PO Gardner and Det. Irvin had each in custody. I observed the female, later identified as Anaise Lopez, standing at the front of her vehicle in handcuffs. PO Gardner was standing in front of her attempting to communicate with her. Lopez was screaming about wanting a female officer. Lopez never stopped screaming while I was on scene and Gardner requested she be put in my unit (65) for transport.

PO Gardner asked her to walk to my car and she refused. I grabbed her right arm and PO Gardner her left arm. Lopez was nearly carried with little assistance from her to my unit. Once at the car Gardner opened the back door so she could be placed in. Lopez braced against the car and attempted to push back against officers. Lopez stated that she would not go in the car. Lopez was picked up and put into the car butt first. Lopez leaned back and began bicycle kicking at myself and officer Gardner. She did land one kick on my left hand / fingers area. Another kick hit me in the right arm in the area of my inner elbow region and pinned my arm against the C pillar. I only received redness on the inner portion of my arm as a result of the kick. During her kicks she lost both of her shoes (Crocs). She kicked at officers approx. 6 or more times.

Lopez was transported on recording back to City Hall for processing. PO Gardner did author charges and arraigned Lopez.

I had no further involvement.

(Appendix Ex. K).

17

45.     On August 3, 2022, a bench trial was held for Lopez before the Court of Common Pleas of Lycoming County, the Honorable Judge Eric R. Linhardt. (Appendix Exs. F and G).

46.     Prior to the start of that trial, the charges of simple and aggravated assault charges were dropped, the Commonwealth amended to include disorderly conduct, and the trial was then held on the charges of disorderly conduct and harassment.  (Appendix Ex. F, page 3).

47.     At trial, Defendant Gardner and Officer Geary testified, in terms of what transpired at Turkey Hill. (Appendix Ex. F, transcript pgs 4-23; and pgs 23-26 respectively).

48.     At the conclusion of the trial, Judge Linhardt ruled from the bench and found Ms. Lopez guilty of both disorderly conduct and harassment, issuing the following ruling:

Appx416

**THE COURT:** The Court finds that the evidence is not only clear and credible, but really overwhelming of the Defendant's guilt with regard to both the summary disorderly conduct and the summary harassment.

The argument that Defense Counsel makes that no roach was seized somehow suggesting that Officer Gardner's testimony that he observed marijuana residue and a marijuana roach in the vehicle was somehow a pretext and a lie, the Court does not find credible in the least. The Court finds Officer Gardner's testimony to be credible in that regard.

In addition to which, Defense's argument that somehow the Defendant was cuffed and placed under arrest when they, in counsel's words, did nothing wrong, the Court disagrees with. This entire matter escalated solely because of the Defendant's behavior and her friend's behavior, all of which was unnecessary. The officers had every right to conduct an investigation; and had the Defendant cooperated in that investigation, I imagine that she would have been free to go on her way in probably less than five minutes, but instead, finds herself handcuffed, arrested, taken down to the police station, and charged with a felony. Her behavior, which she apparently still

19

fails to recognize -- not the police officer's behavior, but her behavior put not only her safety at risk, but the public's safety at risk, and the officers' safety at risk.

Ms. Lopez, you also need to understand that the Court considers all assaults on law enforcement officers to be a serious matter and our legislature finds all assaults on our police officers to be serious matters. That is why our legislature treats police officers as protected parties and enhances the grading for this type of behavior from a misdemeanor to a felony.

Further, the Court considers your utter lack of acceptance of any responsibility for your behavior that day -- you were offered, as reflected in the court file, a misdemeanor plea offer for six months of probation at the time of your preliminary hearing, which you declined. And then ultimately the Commonwealth dropped both the felony and misdemeanor charges and we're still proceeding with a trial on two summary offenses in the face of overwhelming evidence where you effectively offer no defense. Is there anything, Mr. Lepley, that you wish to say before the Court imposes sentence?

(Appendix Ex. G, transcripts pgs 2-3).

20

49. Per the ruling above, Judge Linhardt found credible Defendant Gardner's testimony that he observed a marijuana roach and marijuana residue in the vehicle. (Appendix Ex. G, transcript pg. 2).

50. Judge Linhardt explicitly rejected Lopez's contention that the roach and residue were pretextual or a lie, stating that the contention was "not credible in the least". (Appendix Ex. G, transcript pg. 2).

51. Judge Linhardt further held that "this entire matter escalated solely because of [Ms. Lopez's] behavior and [Plaintiff's] behavior, all of which was unnecessary" and that "the officers had every right to conduct an investigation." (Appendix Ex. G, transcript pg. 2).

52. Accordingly, Ms. Lopez was convicted of two criminal charges related to the Turkey Hill incident involving Plaintiff, the vehicle, defendants Gardner and Irvin, and the subject matter of this lawsuit.

53. On January 3, 2024, Ms. Lopez was sentenced to 10 days confinement for harassment, and 10 days confinement for disorderly conduct, to be served consecutively. (Appendix Ex. H, pg 3).

54. Ms. Lopez served her time in February, 2024. (Appendix Ex. H).

21

Respectfully submitted,

McCORMICK LAW FIRM

By:   /s/ Austin White, Esquire
        Austin White, Esquire
        PA I.D. 312789
        Stephen C. Hartley, Esquire
        PA I.D. 331271
        Attorneys for Defendant
        Calvin Irvin

        835 West Fourth Street
        Williamsport, PA 17701
        (570) 326-5131
        (570) 326-5529 (fax)
        awhite@mcclaw.com
        shartley@mcclaw.com

22

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a true and correct copy of this document via the Court's CM/ECF system, pursuant to the Federal Rules of Civil Procedure.

McCORMICK LAW FIRM


By:  /s/ Austin White

      Austin White
      PA I.D. No. 312789
      Stephen C. Hartley
      PA I.D. No. 331271
      Attorneys for Defendant
      Calvin Irvin


Dated: April 5, 2024

23

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KYLE BEATTY, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 4:23-CV-00364-JKM |
| | : | |
| v. | : | Complaint filed 02/28/2023 |
| | : | |
| CLINTON GARDNER, *et al.*, | : | Judge Julia K. Munley |
| | : | |
| Defendants. | : | JURY TRIAL DEMANDED |

## DEFENDANT CALVIN IRVIN'S APPENDIX IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant, Calvin Irvin, by and through his counsel, files this Appendix in support of his Motion for Summary Judgment (the "Appendix"). The Appendix contains true and correct copies of the following documents:

## EXHIBIT  DOCUMENT

A.    Defendant Calvin Irvin's Axon_Body_3_Video_2021-08-31_1348_X60A0485A footage of the August 31, 2021, incident between Plaintiff, Kyle Beatty and Defendants, beginning at 13:47:35 p.m.

Defendant Calvin Irvin's Axon_Body_3_Video_2021-08 31_1413_X60A0485A footage of the August 31, 2021, incident between Plaintiff, Kyle Beatty and Defendants, beginning at 14:23:36 p.m.

*True and correct copies of Exhibit A videos are being provided by two (2) thumb drives delivered to the Clerk of U.S. District Court, Middle District of Pennsylvania, Williamsport Location.*

B.    Defendant Clinton Gardner's <u>Axon_Body_3_Video_2021-08-31_1355_X60A09928</u> footage of the August 31, 2021, incident between Plaintiff, Kyle Beatty and Defendants, beginning at 13:47:35 p.m.

Defendant Clinton Gardner's <u>Axon_Body_3_Video_2021-08-31_1402_X60A09928</u> footage of the August 31, 2021, incident between Plaintiff, Kyle Beatty and Defendants, beginning at 14:01:53 p.m.

*True and correct copies of Exhibit B videos are being provided by two (2) thumb drives delivered to the Clerk of U.S. District Court, Middle District of Pennsylvania, Williamsport Location.*

C.    Deposition Transcript of Defendant Clinton Gardner

D.    Deposition Transcript of Defendant Calvin Irvin

E.    Deposition Transcript of Plaintiff Kyle Beatty

F.    Transcript of August 3, 2022 Proceedings, case captioned Commonwealth of Pennsylvania v. Anaise M. Lopez, Lycoming County, Docket No. CR-1281-2021

G.    Transcript of ruling in August 3, 2022 Proceedings - Sentencing, case captioned Commonwealth of Pennsylvania v. Anaise M. Lopez, Lycoming County, Docket No. CR-1281-2021

H.    Court of Common Pleas of Lycoming County Criminal Docket for case captioned Commonwealth of Pennsylvania v. Anaise M. Lopez, Lycoming County, Docket No. CR-1281-2021

I.    August 31, 2021, Police Criminal Complaint, Lycoming County, captioned Commonwealth of Pennsylvania v. Anaise Margarita Lopez, and August 31, 2021 Affidavit of Probable Cause

J.    September 9, 2021, Defendant Calvin Irvin's Lycoming County District Attorney's Office Supplemental Report #1

2

K.      August 31, 2021, Officer Geary's Supplement to Officer Report

McCORMICK LAW FIRM

By:   */s/ Austin White*

Austin White
PA I.D. No. 312789
Stephen C. Hartley
PA I.D. No. 331271
Attorneys for Defendant
Calvin Irvin

835 West Fourth Street
Williamsport, PA 17701
(570) 326-5131
(570) 326-5529 (fax)
awhite@mcclaw.com

3

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed

to have consented to electronic service are being served with a true and correct

copy of this document via the Court's CM/ECF system, pursuant to the Federal

Rules of Civil Procedure.

McCORMICK LAW FIRM

By: /s/ Austin White
Austin White
PA I.D. No. 312789
Stephen C. Hartley
PA I.D. No. 331271
Attorneys for Defendant
Calvin Irvin

Dated: April 5, 2024

4

**DEFENDANT CALVIN IRVIN'S APPENDIX IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# <u>EXHIBIT A</u>

**DEFENDANT CALVIN IRVIN'S AXON_BODY_3_VIDEO_2021-08-31_1348_X60A0485A FOOTAGE OF THE AUGUST 31, 2021, INCIDENT BETWEEN PLAINTIFF, KYLE BEATTY AND DEFENDANTS, BEGINNING AT 13:47:35 p.m.**

**and**

**DEFENDANT CALVIN IRVIN'S AXON_BODY_3_VIDEO_2021-08 31_1413_X60A0485A FOOTAGE OF THE AUGUST 31, 2021, INCIDENT BETWEEN PLAINTIFF, KYLE BEATTY AND DEFENDANTS, BEGINNING AT 14:23:36 P.M.**

***True and correct copies of Exhibit A videos are being provided by two (2) thumb drives delivered to the Clerk of U.S. District Court, Middle District of Pennsylvania, Williamsport Location.***

**DEFENDANT CALVIN IRVIN'S APPENDIX IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# <u>EXHIBIT B</u>

**Defendant Clinton Gardner's Axon_Body_3_Video_2021-08-31_1355_X60A09928 footage of the August 31, 2021, incident between Plaintiff, Kyle Beatty and Defendants, beginning at 13:47:35 p.m.**

**and**

**Defendant Clinton Gardner's Axon_Body_3_Video_2021-08-31_1402_X60A09928 footage of the August 31, 2021, incident between Plaintiff, Kyle Beatty and Defendants, beginning at 14:01:53 p.m.**

***\*\*True and correct copies of Exhibit B videos are being provided by two (2) thumb drives delivered to the Clerk of U.S. District Court, Middle District of Pennsylvania, Williamsport Location.***

**DEFENDANT CALVIN IRVIN'S APPENDIX IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

# <u>EXHIBIT C</u>

Case 4:23-cv-00364-DJKM Document 16 Page 54 Filed Date Filed: 12/16/2025

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KYLE BEATTY,                     :
          Plaintiff             :
                                 :
     vs.                  : NO. 4:23-CV-00364
                                 :
CLINTON GARDNER AND CALVIN       :
IRVIN,                           :
          Defendants            :
                                 :

Deposition of:    CLINTON GARDNER

Taken by      :   Plaintiff

Before        :   Loretta C. Berrigan
                  Reporter-Notary Public

Beginning     :   January 22, 2024; 9:00 a.m.

Place         :   Schemery Zicolello
                  333 Market Street
                  Williamsport, Pennsylvania

COUNSEL PRESENT:

     JOSHUA J. COCHRAN, ESQUIRE
     Schemery Zicolello
     333 Market Street
     Williamsport, Pennsylvania  17701
          For - Plaintiff

     AUSTIN WHITE, ESQUIRE
     McCormick Law Firm
     835 West Fourth Street
     Williamsport, Pennsylvania  17701
          For - Defendant Calvin Irvin

     SHAWNA LAUGHLIN, ESQUIRE
     William J. Ferren & Associates
     PO Box 2903
     Hartford, Connecticut  06104
          For - Defendant Clinton Gardner

---

INDEX TO WITNESSES

| FOR - PLAINTIFF | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Clinton Gardner | 3 | — | — | — |

INDEX TO EXHIBITS

| FOR - PLAINTIFF | MARKED | ADMITTED |
|---|---|---|
| Deposition Exhibit No. 1 | 42 | — |
| Deposition Exhibit No. 2 | 43 | — |
| Deposition Exhibit No. 3 | 44 | — |
| Deposition Exhibit No. 4 | 46 | — |

---

STIPULATION

It is hereby stipulated by and between counsel for the respective parties that signing, sealing, certification and filing are hereby waived; and that all objections except as to the form of the question are reserved to the time of trial.

*   *   *

CLINTON GARDNER, called as a witness, having been duly sworn or affirmed, testified as follows:

DIRECT EXAMINATION

BY MR. COCHRAN:

     Q     Good morning, Officer Gardner.  We've just met very recently.  I'm Josh Cochran, I represent the Plaintiff, Kyle Beatty, in a case that he's filed against you and Calvin Irvin as well, who's here today.  I'm going to take your deposition.  Have you ever had your deposition taken before?

     A     No, sir.

     Q     All right.  It's a little bit like testifying in court, except there's no judge.  It's a question and answer session.  I ask the question, you provide the answer to the best of your ability.  If you don't hear or understand a question, I'm happy to rephrase or repeat whatever it might be.  When you do answer it, it is presumed that you understood it, heard it and are answering it to the best of your abilities.  Now we don't want you to guess.  Some of the events that we're talking about were two and a half years ago.  But if you can give us a reasonable estimate to, you know, a fair amount of certainty, do so, but let us know when you're estimating, all right?

     A     Yes, sir.

     Q     One of us speaking at a time so the court reporter can make a record.  And you know, one other thing, if you do need to take a break, you can.  I would just ask that you have answered the question that I posed at that point in time.  If you do need to talk to your attorney, you can do so.  From time to time there may be an objection, and if there is let us discuss it.  Typically you'll be allowed to answer, but if your attorney instructs you not to answer then don't answer.  Can we agree to basically hold all objections except as to the form of the question?

     MS. LAUGHLIN:  Yes, that's fine.

     MR. WHITE:  Yes.

     MR. COCHRAN:  Okay, thank you.

BY MR. COCHRAN:

     Q     I guess we're ready to get started.  Could

---

Ervin Blank Associates, Inc.
107 McCracken Road, Danville, PA  17821
office@ervinblankassociates.com

you give us your full name for the record.

A    Officer Clinton Gardner.

Q    And what is your business address?

A    Is it 245?

Q    I mean, this is a question that we constantly ask all the time.

A    No it's -- it's not. It's 48 -- no, that's the courthouse. It's right here on Third Street, third floor of the Community Theater League.

Q    Okay. Trade and Transit?

A    Trade and Transit One.

Q    Okay. All right.

A    That's not a good start.

Q    Now we're here to talk primarily about the events that occurred on August 31st of 2021, and a lot of it was captured on video and it is what it is. But we're here to fill in the blanks. Your thought processes, what happened before, what may have happened off screen, things like that. Before we get there, did you know Kyle Beatty before that date?

A    I did not.

Q    All right. Did you know the woman that he was with, Anaise Lopez, before that date?

A    No, sir.

Q    All right. Now on that date you were working with Detective Calvin Irvin, correct?

A    Yes, sir.

Q    And how long have you known him?

A    Detective Irvin? My whole career, about.

Q    Okay. Fair enough. And how long have you worked with him?

A    At that point, over a year with the Narcotics Unit. But he was not in the Narcotics Unit. County detective.

Q    Okay. And in terms of your working relationship with him, is either of you a supervisor of the other?

A    No, sir.

Q    Okay. And do you consider him a personal friend?

A    A personal friend?

Q    Yes.

A    Yes.

Q    Okay. How often do you guys get together outside of work? And let's just say in a month.

A    I don't know if we've ever gotten together just the two of us other than like events that are held with law enforcement or whatnot.

Q    Okay. Now let's talk about August 31st of 2021. When did you start your shift on that date?

A    It would have been around 8:00 in the morning.

Q    And were you in uniform?

A    Uniform for me -- I was plainclothes, but the uniform would be a marked police vest.

Q    Okay. And how would you -- and I think you answered part of it. How would you have been identified as a police officer on that date?

A    Through my vest. It was marked. I believe I had my badge on. It says police narcotics on the back, very clearly a police vest. And then operating a marked police vehicle.

Q    And who was driving the police vehicle on this date, you or Detective Irvin?

A    I was.

Q    Okay. Now take me through your shift until you first see Kyle Beatty.

A    I can't. That's too --

Q    Well, can you tell me in general terms what you were doing on that date for your shift?

A    I really can't because our job, or I should say my job, I could go from -- the reason I wore plain clothes was because I could be utilized in the undercover capacity, help in the NEU with surveillance or doing controlled buys of my own. Or when I would throw my vest on it would be more of like a patrol-like function. I don't want to say patrol in the sense of like handling calls, but patrolling specifically for, like, narcotics offenses, firearms offenses, those types.

Q    So what type of offenses are you typically looking for while you're out on patrol?

A    As far as NEU function like I stated, narcotics offenses, firearms. Primarily those two really.

Q    And in terms of narcotics offenses, what kinds of offenses are you looking for there?

A    Anything from, you know, a marijuana roach to, you know, pounds. I've seized various amounts throughout my career.

Q    Do you recall when you would have first seen Kyle Beatty on that date?

A    It was downtown.

Q    Okay. And where abouts?

A    It was, I believe either Third or Fourth Street but I'm not sure a hundred percent estimate.

Q    What was he doing at that point?

A    He was with Ms. Lopez in the black Altima and they were operating the vehicle.

Q    And what were they doing at the time? Were

they driving?

A    No, we were at -- I do remember we were at an intersection. I don't remember which way we were facing because like I said, I can't even remember which street exactly. But I know we were stopped at an intersection and they were just, you know — normally when I look over at people they kind of like either look in or, you know, side eyeing, or like, oh man, there's the police. But they were both just staring forward.

Q    So that was what drew your attention to them?

A    Could you say that again? Sorry.

Q    Was the fact that they were staring forward, was that what drew your attention to them?

A    Not initially. Obviously I was like, oh that's kind of weird, they won't even look over. But yep, it was a factor. Yes.

Q    What were the other factors?

A    It would be when I saw them later.

Q    Okay. But initially, what gets your attention is that you pull up beside them and they're not looking at you, correct?

A    Correct.

Q    Okay. So what happens next?

A    We went about our day and then sometime later we ended up seeing them again.

Q    Where did you see them the second time?

A    To the best of my recollection it was around Williamsport Hospital, like High Street area.

Q    And were you still driving at this point?

A    Yes.

Q    Okay. And what are they doing at this point that you see them again?

A    Traveling eastbound I believe.

Q    Do you recall which road?

A    Like I said, I think it was High Street where we initially saw them. And then obviously they got to the boulevard, but I don't recall which streets in between High and the boulevard that they took.

Q    Okay. And so are you following them at this point or are you just observing them?

A    We were following them yes, behind them.

Q    So when you first -- not first see them. When you see them the second time, are you traveling the same direction as them?

A    Correct.

Q    Okay. And so are you in front of them or behind them?

A    Behind them.

Q    And just right behind them or are there cars between you?

A    I don't recall if there were cars between us at all. I don't believe so.

Q    So what happens next?

A    They had pulled into the Turkey Hill on Washington Boulevard.

Q    So did you follow them over from this High Street time that you see them? Did you follow them the whole way over to the Turkey Hill?

A    Yeah, from around the hospital area to the Turkey Hill.

Q    Okay. Why'd you follow them at this point?

A    A couple of reasons. So that initial, when we were downtown — kind of that hundred yard stare is the best way to put it. And then when we saw them again and got behind them, they were coming from the avenues, which from my experience is a high narcotics trafficking area. I myself have made numerous arrests in that area. I've assisted in numerous arrests and investigations.

Then the vehicle itself, it was not a state tag. Sometimes those can be affiliated with rental vehicles. I don't recall if we ran the vehicle at the time to see if it was a rental or not. The vehicle was kind of a plain Jane looking vehicle, it wasn't overly personalized, which I know in my experience is common with narcotics trafficking. And then as we were following them, just kind of the — looking out the window by Mr. Beatty kind of like, I'm not looking to see if the cops are here but I'm looking to see if the cops are here following us.

Q    Now did you discuss these kind of conclusions or factors in your mind with Detective Irvin during this drive?

A    I don't recall if I discussed them out loud on not.

Q    Was it your decision to follow them or did Detective Irvin participate in that at all?

A    I mean, he was in the car but I don't remember if there was a discussion between us.

Q    Now from the time that you first spotted it to the time you spot it again on High Street and then followed the vehicle over to the Turkey Hill, did you observe any vehicle code violations?

A    No vehicle code violations.

Q    So the vehicle that you're following arrives at the Turkey Hill and what happens next?

A    They exited the vehicle once they pulled into the gas pumps.

Q    Can you describe how they exited?

**13**

A    I would say it was a hasty manner.  When they exited we were close behind and they didn't look back at us at all.  They didn't look in our direction.  They went right into the store.

Q    And did they pull up to a pump or did they park in a parking spot?

A    At a pump.

Q    Like they were going to pump gasoline?

A    I mean, I can't make assumptions of what they were doing.  I can just state where they were parked.

Q    Was it close enough that they could have pumped gasoline?

A    I would say yes.

Q    All right.  So what happens next after they park and walk into the store?

A    I exited my vehicle, walked over to theirs.

Q    What happens next?

A    The windows were down.  I immediately smelled the odor of marijuana emitting from the vehicle and observed a roach -- a spent marijuana roach — which I know to be a roach from my experience.  I've dealt with numerous marijuana arrests, various forms of marijuana paraphernalia.  And then also like, some shake or flakes on the floor.

Q    Where was this roach that you saw?

**14**

A    It was in the driver's door.  Kind of one of those like, ashtrays I guess, like round.  It was on top of that.

Q    Can you describe it for us?

A    The ashtray?

Q    The ashtray.  The size of the roach, the condition.

A    I can't really give a size estimate of the — just like a round ashtray that would fit in a cup holder kind of size.  And then the roach was small.  I can't give a precise estimate on the size.

Q    And then you said shake or flakes on the floor.  What are you referring to in terms of shake or flakes?

A    It's like residual marijuana from the bud.  Just very minute pieces.

Q    And what did that look like?

A    Just speckles, I guess is the best way to put it.

Q    And where was that located precisely?

A    On the driver's floor.

Q    Now to observe -- and let's talk about the roach first.  Did you lean your head into the vehicle at any time to observe that roach?

A    I did lean at one point, I don't recall when.

**15**

But the roach could be observed from outside the vehicle, from the front windshield.

Q    And did you in fact, at any point in time, reach your flashlight and hand and arm down into the car to observe either the roach or the shake or flakes?

A    It crossed the plane of the window but I don't know — I can't remember how far into it.  I can't give an estimate.

Q    But that answer would be yes, correct?

A    Yes.

Q    Okay.  All right.  So let's go back to when you pull up and you observe them go into the store.  Did you have any conversation with Detective Irvin about what you were going to do?

A    If I did, I don't recall it.

Q    Did you see anything else that appeared to be contraband?

A    Other than the flakes and the roach?

Q    Correct.

A    No, sir.

Q    Okay.  Now at this point in time is Mr. Beatty free to go?

A    From when I went into the store?

Q    From the point in time when you have

**16**

testified that you have seen a roach and shake or flakes on the floor, is he free to go?

A    Once I observed the paraphernalia my intention was to go get Mr. Beatty and bring him back to the vehicle to detain him to investigate.

Q    Okay.  So it's fair to say he was not free to go?

A    Correct.  Detained.

Q    And would that logic be the same with respect to Ms. Lopez?

A    Correct.

Q    And what's the basis of this detention?  If you could just describe it for us.

A    Well, probable cause in my mind.  The presence of marijuana paraphernalia, even if they had a medical card, which obviously would have been unknown at the time, that particular means of ingestion is not approved for medical marijuana.

Q    All right.  So what happens next?

A    Ms. Lopez came out, I think was enquiring what was going on.  She stayed with Mr. — or detective Irvin, sorry.  And then I went into the store to find Mr. Beatty.

Q    And what happens when you get into the store?

A    I encountered him near the register.  When

you enter the store the register's kind of there. It would have been like, to the right side of that.

Q    And what happens?

A    He throws his hands up immediately and said something along the lines of searching him.

Q    And did you search him?

A    I believe I performed a pat down, but I did not search him.

Q    And what did that pat down consist of?

A    What do you mean, consist of?

Q    What did it entail? Was it — which areas of his body were searched? How what that search conducted?

A    Flat of my hand, it would — I don't recall exactly the order in which I did it that day. But my typical pat down, the flat of my hand and I'm checking areas common for weapons such as waistband, front and back, pockets, and then down the legs, around the ankles, and then groin area.

Q    Okay. And did you find anything in that search?

A    No, sir.

Q    And so what happens next after that search?

A    I asked him to step out — pat down. I asked him to step outside with me.

Q    And did he?

A    Yes.

Q    Okay. Now a lot of what happens after this for a period of time is captured on body cameras, correct?

A    Yes, sir.

Q    Okay. Did one of them make an effort to record what was happening on their phone?

A    I believe Ms. Beatty initially — and this is my recollection from watching the body cam because I can't recall if it was my camera or Detective Irvin's. But I believe Ms. Lopez did.

Q    Can you describe for me what happened when she did that?

A    I just remember her pulling her phone out, saying she was going to record.

Q    And was she permitted to?

A    No.

Q    Why not?

A    They were detained at that point.

Q    Now was there a conversation out there at the car about searching the vehicle?

A    With the Defendant?

Q    With either Mr. Beatty or Ms. Lopez?

A    Yes, both. Yes.

Q    What can you tell me about that conversation?

A    I don't remember the exact verbiage, but it was explained to them what I observed in the vehicle, and had asked for permission to search. Initially they had said, yeah, go ahead and search.

Q    And did you?

A    No.

Q    Why not?

A    Because then when I asked for IDs they refused to identify.

Q    And what happened after they refused to identify?

A    There was an escalation in their demeanor, specifically with Ms. Lopez and with Mr. Beatty to an extent when I asked about the identifications. So ultimately they were handcuffed.

Q    Okay. And can you describe — by escalation and demeanor, can you tell me what exactly you were basing that impression on?

A    Her yelling. Primarily her kind of moving about the area without listening to us.

Q    Anything that Mr. Beatty did that would have caused you to handcuff him?

A    He was also escalating in demeanor. They were both — I would say they best way to put it was kind of riling each other up.

Q    And what do you recall of Mr. Beatty's involvement?

A    As far as?

Q    As far as participating — you used the term riling.

A    His voice was also kind of escalating throughout. And then also when I asked for IDs, I believe he was the one that said no.

Q    And did he say why he refused?

A    No. Why he did?

Q    Yeah.

A    Sorry. No.

Q    Okay. And in terms of their voices escalating throughout, I mean, what were they saying?

A    I don't recall exactly what they were saying without, again, reviewing the body cam.

Q    And who handcuffs Kyle Beatty?

A    I don't recall if it was Detective Irvin or I.

Q    I believe I had asked you who had handcuffed him. Was it you or Detective Irvin?

A    I don't recall which one of us it was that handcuffed.

Q    Okay. Whose decision was it?

A    I would say that I took lead with that.

Q    All right.  So what happens after — well, let me ask you this.  Was Ms. Lopez handcuffed at the same time?

A    They were, yeah.  I mean they were both handcuffed pretty close together from my recollection.

Q    All right.  And then what happens after they're handcuffed?

A    The yelling actually escalates, specifically from Ms. Lopez.  She's kind of pacing in front of the car and I'm asking her to stop pacing, sit on the hood of the car.  I believe she initially refused.  When I placed her on the hood of the car, Mr. Beatty became escalated with that.

Q    So as I understood your testimony, you placed Ms. Lopez on the hood of the car?

A    Yes.

Q    Okay.  And she's handcuffed at this time, correct?

A    Correct.

Q    All right.  And Mr. Beatty is handcuffed at this point in time, is that correct as well?

A    I believe he was.

Q    All right.  And where is he at this point that you place her on the car?

A    So she was like, kind of like, I think in the middle of the hood of the car, facing me.  And he was to her left.

Q    Was he on the hood or was he standing?

A    I don't recall if he was on the hood or standing.

Q    Was one of Ms. Lopez's concerns that she was being handled by a police officer who wasn't a female?

A    She was asking for a female officer, yes.

Q    And did you guys at any point try to get her one?

A    No.

Q    Why not?

A    There's nothing that requires us to do so.

Q    Did you ever consider that obtaining a female police officer might have deescalated the situation?

A    I don't think that was her real issue in my opinion.

Q    So did you think of that or didn't you think of that?

A    No.  I had no intention, unless I needed a female, of calling a female officer.

Q    So what happens next?

A    I don't remember at what point I called for backup.  And backup eventually comes.  And then we

attempt to place Ms. Beatty in the vehicle.  Essentially —

MS. LAUGHLIN:  Do you mean Lopez?

MR. COCHRAN:  I was going to ask that.

THE WITNESS:  Yeah.  Sorry.  I apologize.  Ms. Lopez in the vehicle.  She resisted and ended up kicking one of the Williamsport officers.

BY MR. COCHRAN:

Q    Okay.  Now you indicated that you had called for backup.  Why did you call for backup?

A    Just to the increasingly hostile situation.  Ms. Lopez was screaming, and Mr. Beatty was also animated.

Q    And who arrived for backup and what -- where did they come from?

A    City officers.  I don't know where they would have come from.  They were patrol officers so they could have been anywhere.

Q    They were city police officers?

A    Yes.  Williamsport city, yes.

Q    All right.  And do you recall what the identities of those officers are?

A    Officer Minier was one.  Stoltzfus, I can't remember if he was a corporal or a sergeant at the time, I'm sorry.  And Officer Geary.

Q    And to your recollection, what was Officer Minier's involvement?

A    I know I had a conversation with him, but I don't recall what all his involvement is.  Or was, sorry.

Q    How about Stoltzfus.  Do you recall what his involvement was?

A    I don't.

Q    How about Officer Geary?

A    Officer Geary was the officer who was helping me with Ms. Lopez to the car.  And he was the one that was kicked.

Q    All right.  So at the time this is going on, the events with, it sounds like Officer Geary and you with Ms. Lopez, what is going on with Kyle Beatty?

A    I don't recall what was going on with him.  I believe that was — I believe he was with Detective Irvin but I can't say for sure.

Q    All right.  Do you recall, at any point, telling Detective Irvin to search Kyle Beatty again and place him in the vehicle?

A    I do remember him being placed in the vehicle.  I don't recall if I said about searching or not.  I do know that he was searched though.

Q    And so why were — let's talk about Kyle

Ervin Blank Associates, Inc.
107 McCracken Road, Danville, PA  17821
office@ervinblankassociates.com

Beatty. Why was Kyle Beatty placed in the vehicle?

A    As this point, again, there -- so can I back up and kind of go through what's running through my mind?

Q    Certainly.

A    We had what I observed downtown with the hundred yard stare. When we picked them back up around the hospital, my observations there with the, you know, are the police following me, are they not. Followed them into the lot, the distancing themselves from the vehicle. Not looking at us. The vehicle itself, with how I described it with, you know, being a plain Jane type vehicle, the out of state plate. His actions when I go into the store and he immediately throws his hands up and says, search me. That is not a typical reaction that I have with any person.

Their confrontational demeanor, both of them. Their refusal to ID. And then the probable cause of marijuana paraphernalia being in an ashtray along with flakes on the driver's floor. So I mean all that in conjunction, in my mind at the time, was more than enough to place him in a vehicle at a minimum.

Q    Was Kyle Beatty arrested at any point in time on that date?

A    I recall saying at one point or another, individuals were under arrest. I know I said about Ms. Lopez with aggravated assault and disorderly conduct. I don't recall specifically anything with Mr. Beatty.

Q    Now do you recall having a conversation with a bystander, an African American woman who was pumping gas, after Mr. Beatty and Ms. Lopez had been placed in vehicles?

A    I wouldn't call it a conversation, but I recall the interaction.

Q    Okay. What can you tell me about that interaction? What happened?

A    I believe that she was yelling as a result of Mr. Beatty and Ms. Lopez's actions. And when I went to address it, she wasn't even concerned about the stop then. And it was something about Williamsport police and her daughter, I believe.

Q    So when you first brought that up, you indicated that you believe she was yelling as a result of, in part at least, of Mr. Beatty's actions. What indicated that to you?

A    There was no other reason for her to interject herself, other than directly after what had occurred with Mr. Beatty and Ms. Lopez.

Q    Did she discuss your actions or interaction with them at all with you?

A    I don't recall.

Q    So she may have but you don't recall?

A    Yeah, I don't recall.

Q    Don't believe she did.

A    The only thing I remember is her saying something about Williamsport police and trying to find her daughter or something along those lines.

Q    Okay. And did you threaten to arrest her at that point in time?

A    In my mind she was obstructing. She had no business interfering with our investigation and escalating a situation further.

Q    So the answer is yes, you did threaten to arrest her?

A    I don't recall if I directly, but as I just described, I believe she was interfering.

Q    And what did you say to her to let her know that she was interfering?

A    I can't give you my exact words. I mean again, two and a half years ago. I know I warned her, but I don't know what I specifically.

Q    And what -- with Mr. Beatty in the car and Ms. Lopez in the car, what are you still investigating at this point in time?

A    I believe we were waiting for the tow for the vehicle.

Q    Anything else going on at this point?

A    Waiting for the tow. Not to my recollection.

Q    Now how does having this conversation with this woman at the pumps, how does that interfere with you waiting for the tow?

A    Because I had -- because of her escalated demeanor and yelling in a public area, I had to go address that behavior.

Q    But the tow truck didn't arrive while you were on scene, did it?

A    I don't recall if we were there when it came or not.

Q    Now did you get this woman's identity?

A    I don't believe I did.

Q    Why not?

A    I just didn't. It was not my primary concern. She -- from my recollection, she stopped after I warned her and that was the issue resolved.

Q    Wouldn't she have been a witness to what had transpired between you, Detective Irvin, Mr. Beatty and Ms. Lopez?

A    I can't recall how long she would or wouldn't

Case 4:23-cv-00036-DKM-MP Document 16 ... Filed 04/05/24 ... Page 361 ... Date Filed 12/16/2025

have been on scene, so no, I didn't think of it.

Q    And so what crime would she have been committing that you would have had probable cause to arrest her for at that point?

MS. LAUGHLIN:  Objection to form.

MR. COCHRAN:  You can answer.

THE WITNESS:  Okay.

MS. LAUGHLIN:  If you can.

THE WITNESS:  Can you repeat that then? Sorry.

BY MR. COCHRAN:

Q    Yes.  At the time that you're having this conversation with this woman, what crime would you have had probable cause to arrest her for?

A    She would have been obstructing and interfering with an investigation by me having to divert my attention to her.

Q    And the investigation would have been what exactly?

A    The ongoing events with Mr. Beatty and Ms. Lopez.

Q    Now at some point you transport Kyle Beatty to the Williamsport Bureau of Police at City Hall Williamsport, correct?

A    I don't remember if I transported him or not,

but yes, he did ultimately end up there.

Q    All right.  And what was your intent in either transporting him or having him transported there?

A    To search him.

Q    Okay.  What kind of search?

A    Strip search.

Q    Why a strip search?

A    So this will be a little bit longer of an answer.  In my experience, specifically with narcotics, it is extremely commonplace for individuals to have something, you know, smaller, like smaller offense.  I've had guys and girls offer up, like, small amounts of marijuana to just essentially make me go away.  Or maybe the initial part of that investigation is just observing paraphernalia or something along those lines and then digging deeper into that.

Often times, in my experience, both traffickers and users, one of the most common places that they conceal narcotics is in their groin area. So as a result of that, it's common practice for both the Narcotics Unit and the city police, specifically when dealing with narcotics offenses, to strip search an individual to uncover if there are additional, you

know, narcotics or what not, like specifically within those areas.  I've done body warrants on individuals that have concealed narcotics within their anus.

Q    Would you agree with me that a strip search is an invasive form of search?

A    I think that's semantics.  I don't know -- for us that's standard.  If you are committing a crime, specifically with narcotics, it's standard procedure for us to strip search you.

Q    Would you agree with me that it would be an uncomfortable situation to be strip searched?

A    I mean, I don't --

MS. LAUGHLIN:  Object to form, but you can answer.

THE WITNESS:  Okay.  I don't enjoy strip searching people, if that's what you're inferring.

BY MR. COCHRAN:

Q    It's not.  I'm talking about the experience of being strip searched.  Would you agree with me that that would be an uncomfortable situation?

A    I can't speak on behalf of another individual's perception of a situation.

Q    Have you ever been strip searched?

A    I've been naked in plenty — in front of a lot of people, and at this point I just — it doesn't

bother me.

Q    But I mean in terms of a strip search by police officers.  Has that ever happened to you?

A    No.

Q    Okay.  Now would you agree with me that the strip search is the third search of Mr. Beatty's person on that date by police?

A    Can you tell me the other two?

MS. LAUGHLIN:  Object to form, but you can answer.

BY MR. COCHRAN:

Q    And the first would be the pat down inside the store, which you conducted.  The second would be the search conducted by Detective Irvin as he's getting ready to put him in the car.  And then the third would be the strip search.

A    I would argue that a pat down is not necessarily a search, but yes, that would have been the third event in regards to that.

Q    Okay.  Who was present for the strip search?

A    I don't recall.  I don't know if I was or not.

Q    So you don't know if you even observed it?

A    I don't recall.

Q    Okay.  Do you know if you performed it?

**Page 33**

A    I very well could have.

Q    Do you recall anything about the strip search?

A    No.  I have strip searched so many people over my career that there really are very few that stick out in my mind.

Q    Did you find any contraband in the strip search?

A    No, sir.

Q    Do you know if the search was filmed or recorded?

A    The search itself, I don't recall if it was filmed or recorded.

Q    Okay.  Are they ever filmed or recorded?

A    Not typically.  But I'm not sure if it was or not.

Q    Okay.  They are sometimes?

A    It depends.  So like, there's been times where we've had combative individuals in there and with that.  But for this specific one I can't recall if it was or not.

(Whereupon, a discussion was held off the record.)

BY MR. COCHRAN:

Q    So since -- is it fair to say you have no

**Page 34**

recollection of the strip search?  No independent recollection.

A    Correct.

Q    All right.  Can you describe for me what your procedure for strip searches is in general terms?

A    In general terms.  Can I describe it how I typically do it?  Because it's not the same exact way every time.

Q    That's what I'm asking for, a typical search.

A    So typically I have the individual like, you know, remove jewelry or whatnot first.  And then shirts come first, followed by pants and socks.  I'll have an individual wiggle their toes so I can see the bottom of their feet.  I'll have an individual open their mouth, lift their tongue so I can check in their mouth.  And then underwear is typically the last thing to go usually.

And then, like with a male — I obviously don't strip search females, I want to make that clear.  With a male, I'll have them lift their genitalia so I can — we can see underneath and then turn around so we see their buttocks.  And then usually squat and cough.

Q    You had mentioned lifting genitalia.  Is that penis and testicles?

**Page 35**

A    Yes.

Q    All right.  And I believe you indicated seeing buttocks.  Do you require them to, pardon the expression, spread them?

A    Yes.

Q    All right.  And I believe you had also indicated that you have them bend over and cough?

A    Yeah.  Squat and cough.

Q    All right.  How long does one of these strip searches, and once again, I'm talking a typical strip search.  How long does it take in your experience?  Let's put it this way.  From the time everyone's present in the room to the time the individual's allowed to leave.

A    To leave or —

MS. LAUGHLIN:  Object to form.

BY MR. COCHRAN:

Q    Leave the room.

A    Or clothe or —

Q    The room where they're strip searched.

A    Well, oftentimes they're strip searched where they're being held.  That's why I was asking.

Q    Okay.  Well let me ask it this way.  How long are they typically disrobed for?

A    Not long.  It's typically brief, but I can't

**Page 36**

give a good time estimate on that.

Q    Five minutes?

A    I would say that would be on the extreme end.

Q    Long or short?

A    Long.

Q    All right.  After this strip search did you fill out any documents indicating date, time, place, individuals?  Who was present, anything like that?

A    For the strip search in particular?

Q    Yeah.

A    No, we don't have any forms or anything that we fill out for strip searches.

Q    So there would have been no written record of his strip search, is that correct?

A    Unless I — other than putting it in a report, no, we don't have any forms that we fill out for strip searches.

Q    Now you never charged Mr. Beatty with any crime as a result of this incident, correct?

A    Correct.

Q    Okay.  Why not?

A    That boils down to what I believe is our power of discretion as a police officer.  There's been times where I've had individuals where I very well could have charged but I did not.  Or I've had

**Ervin Blank Associates, Inc.**
107 McCracken Road, Danville, PA  17821
office@ervinblankassociates.com

37

individuals that I did charge with a lesser offense than what they could have been charged with or charge individuals with charges like -- I'm trying to think of an example. We'll say with a PWID, possession with intent to deliver. There's been times where I only charged the felony and I don't charge the misdemeanors. With this particular case, my primary concern ended up being Ms. Lopez and the aggravated assault against an officer. So to me the other crimes were not as severe I guess. I'm -- my focus in the Narcotics Unit is large drug crimes. And there's often times where I get small amounts of paraphernalia that I never charge.

Q Now this entire event took place in Williamsport, Pennsylvania, correct?

A Yes.

Q And it occurred at the Turkey Hill convenience store, is that correct?

A The Turkey Hill on Washington Boulevard.

Q Okay. And that's a convenience store which obviously sells gas and other personal items. Drinks, things like that, correct?

A Yes.

Q And that people routinely, in fact, stop there to either buy gas or other personal items such

38

as food and drink, is that correct?

A Correct.

Q Now the car that we've discussed in this case, it was impounded until it was searched, is that correct?

A Correct.

Q All right. Were you present for the search of that car?

A Yes.

Q All right. What happened from start to finish? Take me through that search.

A I mean, I searched the car. I searched it like I typically search a car. I don't know what you're asking.

Q Okay. Well, take me through it. Where did you start, where did you finish, what happened in between?

A I usually compartmentalize the vehicle. And I can't really even give a specific order in which I start. Some vehicles I start in the trunk, other vehicles I start in the driver's side. But typically I'll focus on a quadrant of the vehicle and I'll just very heavily search that quadrant, is the best way to put it.

Q Do you recall this vehicle search?

39

A I recall searching the vehicle, but I don't recall specifically the manner in which I searched it.

Q What can you tell me that you recall from the search of this vehicle?

A Observing the roach and the flakes. And I believe there were additional roaches within the cup holder -- or the ashtray I should say, where that roach was. But outside of that, nothing.

Q All right. So you first said observing the roach. Which roach are you referring to there?

A The one I observed in plain view from the gas station.

Q Okay. Can you describe that for us?

A A marijuana roach. It's typically the last bit of what they were ingesting the marijuana with.

Q Okay. And the flakes. Did you find flakes?

A Yeah, they were just the flakes that I had observed earlier.

Q Okay. And you indicated additional roaches. What can you tell me about them?

A Similar to the one I observed on top of the ashtray.

Q And where were they?

A In the ashtray.

Q And where is the ashtray?

40

A In the driver's door.

Q Okay. So these -- so I understand, these are under the one that you believe that you saw initially?

A Yes. So the ashtray, I believe, was one of those like, kind of cup looking ones. I don't know a good way to describe it. Where there's a little bit of depth to it. The one that I saw was on top of that ashtray.

Q Did you seize these items?

A No.

Q Why not?

A It's extremely common for us, especially in the Narcotics Unit, to not seize paraphernalia. If we seized every bit of paraphernalia our evidence locker would be insane because we find a lot. So it's not uncommon to not seize paraphernalia.

Q Okay. So if it wasn't seized then I presume it wasn't tested for anything, correct?

A Correct.

Q All right. Do you have any -- did you take video of the search, photos of the search, photos of the contraband? I mean, was there any record made of it?

A I don't recall.

Q Do you typically photograph or video a search

where you expect to find contraband?

A    I don't typically video, but there are times I take photos.

Q    And so do you believe you took photos or did not take photos?

A    I don't recall.

Q    Where would those photos be if you had taken them?

A    They should be in -- if there are photos they should be in the evidence folder or whatever we have.

(Whereupon, a discussion was held off the record.)

BY MR. COCHRAN:

Q    How long was it from when you and Detective Irvin parked at the service station to when Kyle Beatty was released after the strip search?

A    The gas station?

Q    Yes.

A    I can't give an exact time.

Q    Can you give us an estimate to a reasonable degree of certainty?

A    I really can't.

Q    Okay.

A    That was a while ago.

Q    Now in discovery, and based upon my review of

the video, I see yourself, Calvin Irvin, Tyson Minier, Zachary Geary and Jordan Stoltzfus as law enforcement officers on site. Is that correct?

A    Yes.

Q    All right. Was there any other law enforcement officer on site?

A    I don't recall.

Q    There may have been, you just don't recall?

A    Correct. Yeah, I don't recall.

Q    Now I saw a statement, I believe from Zachary Geary, in discovery. Do you know if there were any other officers -- and I've seen one from you and one from Detective Irvin. Are there any other statements that you're aware of in connection with this incident?

A    From other officers?

Q    From other officers or witnesses.

A    I -- no. Nope.

MR. COCHRAN: Okay. All right. Now I have here an exhibit which I would ask to be marked as 1.

(Whereupon, a document was produced and marked as Deposition Exhibit No. 1 for identification.)

BY MR. COCHRAN:

Q    Is this a copy of the search warrant that you would have obtained to search the vehicle?

A    Yes, sir.

Q    All right. And is -- all right. So as you look at that, does that give you any independent recollection of the search of this vehicle?

A    As far as searching it?

Q    Yes.

A    Yes.

Q    Okay. And the information in that warrant, would that have been information that you put in to further your investigation?

A    Correct.

MR. COCHRAN: Okay. Nothing additional for that. I have here another exhibit which I would ask to be marked as 2.

(Whereupon, a document was produced and marked as Deposition Exhibit No. 2 for identification.)

BY MR. COCHRAN:

Q    Now that is a receipt/inventory of property, is that correct?

A    Yes, sir.

Q    And would that be information that you would have put in?

A    Yes.

Q    All right. And is this after you would have

searched the vehicle?

A    Yes, sir.

Q    Okay. And is it fair to say that that return of search indicates nothing recovered?

A    Correct.

Q    Okay. Now there's a reference on there to a badge, Number 508. Who is that?

A    Dent.

Q    What's his full name? Or her.

A    Kevin Dent.

Q    Kevin Dent. And who is Mr. Dent?

A    He is a narcotics officer.

Q    Okay. Do you know if he was present for that search?

A    I don't recall if he was or not.

MR. COCHRAN: Okay. Now another exhibit. And this is something that we had gotten in discovery, which I would ask to be marked at the next exhibit.

(Whereupon, a document was produced and marked as Deposition Exhibit No. 3 for identification.)

BY MR. COCHRAN:

Q    All right. Now this is entitled Officer Report for incident 21-08506 and it's under the heading Williamsport Bureau of Police. Do you see

that?

A     Yes.

Q     Is this a document that you would have compiled?

A     I mean, I -- it's compiled through our system at the station. But I mean, my report is in here, yes.

Q     Okay. Who would have compiled this report at the station?

A     It could have been Records. I don't know, it depends where the request came from. So I mean, we can print these through our system and it kind of prints stuff related to the case.

Q     Now you're using the term system. Is that a system owned and run by the Williamsport Bureau of Police?

A     I don't know if it's owned, but it's the system we use at the city.

Q     Okay. And when you refer to the station, was that the Williamsport Bureau of Police?

A     Which time did I refer? Sorry —

Q     You said that this was something that would be kept at the station.

A     Oh, yeah. The Williamsport Police would maintain this document.

Q     Okay. All right. And as you look at the narrative on Page 3 of 11 and it stems over onto Page 4 of 11. Does that -- is it fair to say that kind of describes what you recalled about the incident that we've been discussing involving Mr. Beatty?

A     Yes. 3 and 4?

Q     Correct, 3 and 4 of this exhibit.

A     Yes.

Q     Now on Page 4 there's a line for responsible LEO. Does that mean responsible law enforcement officer?

A     Yes.

Q     Okay. Why isn't that signed?

A     I don't know.

Q     Okay. But that would have been you though, correct?

A     Correct.

MR. COCHRAN: Okay. All right. Nothing further on that. Now I have here a — and this is a screen grab and I don't think I have a lot. This will be the next exhibit.

(Whereupon, a document was produced and marked as Deposition Exhibit No. 4 for identification.)

BY MR. COCHRAN:

Q     This is from your body cam at the scene. And this individual shows up in the police station in the morning, I believe, on Detective Irvin's body cam. Then he shows up at the scene where he walks right through the scene and is not challenged. And then he pops up later at the station. Do you recognize that person?

A     Yes.

Q     Who is it?

A     Detective Anderson.

Q     Okay. Why is he there?

A     I don't know.

Q     Okay. Because his name hasn't popped up at any point in time before this. I mean, what was his involvement?

A     With this incident, the — none.

Q     Okay.

A     I mean, he was there but I don't know what his --

Q     Is he a supervisor of yours?

A     No.

Q     Okay. To your knowledge, of Detective Irvin's?

A     Of Supervisor Irvin?

Q     Yes.

A     No.

Q     Okay. And what's his full name, Detective Anderson?

MS. LAUGHLIN: Just what you know.

BY MR COCHRAN:

Q     Yeah, it's just what you know.

A     Rob.

Q     Okay. Robert Anderson?

A     I don't know if it's Rob, that's why I was --

Q     Okay. All right. So just to kind of recap on that, do you have any knowledge why he was there?

A     I can't speculate why.

Q     Do you know if he responded to your call for backup?

A     That's what I mean, I don't know.

MR. COCHRAN: Let me talk with Kyle quickly. I may be largely done with you.

(Whereupon, a recess was taken from 10:04 a.m. until 10:06 a.m.)

AFTER RECESS

MR. COCHRAN: All right. I have nothing further.

THE WITNESS: Okay.

MS. LAUGHLIN: Austin, do you have any questions?

MR. WHITE: No.

MS. LAUGHLIN: I don't have any questions.

MR. COCHRAN: Okay. You're good. Thank you for your time.

(Whereupon, the deposition was concluded at 10:07 a.m.)

---

COUNTY OF LYCOMING          :

COMMONWEALTH OF PENNSYLVANIA

I, Loretta C. Berrigan, the undersigned Notary Public, do hereby certify that personally appeared before me, CLINTON GARDNER; the witness, being by me first duly sworn to testify the truth, the whole truth and nothing but the truth, in answer to the oral questions propounded to him by the attorneys for the respective parties, testified as set forth in the foregoing deposition.

I further certify that before the taking of said deposition, the above witness was duly sworn, that the questions and answers were taken down stenographically by the said Loretta C. Berrigan, court Reporter, Williamsport, Pennsylvania, approved and agreed to, and afterwards reduced to typewriting under the direction of the said Reporter.

In testimony whereof, I have hereunto subscribed my hand this 30th day of January, 2024.

_____
Loretta C. Berrigan
Reporter-Notary Public
My Commission Expires
December 7, 2026

**- 0 -**

**06104** [1]  1:24

**- 1 -**

**17701** [2]  1:18, 21

**- 2 -**

**2021** [2]  5:15; 6:25
**2024** [2]  1:12; 50:20
**2026** [1]  50:25
**21-08506** [1] 44:24
**23-cv-00364** [1] 1:4
**2903** [1]  1:24

**- 3 -**

**30th** [1]  50:20
**31st** [2]  5:15; 6:24

**- A -**

**a.m.** [4]  1:12; 48:19;  49:6
**abilities** [1] 4:3
**ability** [1]  3:24
**abouts** [1] 8:19
**above** [1] 50:13
**actions** [4] 25:14;  26:15, 21;  27:1
**additional** [4] 30:25;  39:6, 19;  43:12
**address** [3] 5:3;  26:16; 28:11

**admitted** [1] 2:14
**affiliated** [1] 11:22
**affirmed** [1] 3:11
**african** [1] 26:7
**afterwards** [1] 50:17
**again** [10] 9:12;  10:1, 8; 11:16;  12:17; 20:17;  24:20; 25:2;  27:22; 35:10
**against** [2] 3:17;  37:9
**aggravated** [2] 26:3;  37:8
**agree** [5]  4:19; 31:4,  10,  19; 32:5
**agreed** [1] 50:17
**ahead** [1]  19:5
**allowed** [2] 4:17;  35:14
**along** [4]  17:5; 25:20;  27:9; 30:17
**altima** [1]  8:23
**american** [1] 26:7
**amount** [1]  4:7
**amounts** [3] 8:14;  30:14; 37:12
**anaise** [1]  5:23
**anderson** [3] 47:10; 48:3, 8
**animated** [1] 23:13
**ankles** [1] 17:19
**answer** [13] 3:23, 24;  4:1, 17,  18,  19; 15:10;  27:15; 29:6;  30:10;

**31:14;  32:10; 50:8**
**answered** [2] 4:13;  7:7
**answering** [1] 4:3
**answers** [1] 50:14
**anus** [1]  31:3
**apologize** [1] 23:5
**appeared** [2] 15:17;  50:6
**approved** [2] 16:18;  50:16
**area** [8]  10:4; 11:10,  18,  19; 17:19;  19:21; 28:10;  30:21
**areas** [3] 17:11, 17;  31:2
**argue** [1] 32:17
**arrest** [5] 26:2;  27:10, 16;  29:4, 14
**arrested** [1] 25:24
**arrests** [3] 11:18,  19; 13:22
**arrive** [1] 28:12
**arrived** [1] 23:14
**arrives** [1] 12:21
**ashtray** [10] 14:5,  6,  9; 25:20;  39:7, 22,  24,  25; 40:4, 8
**ashtrays** [1] 14:2
**assault** [2] 26:3;  37:9
**assisted** [1] 11:19
**associates** [1] 1:23

**assumptions** [1]  13:9
**attempt** [1] 23:1
**attention** [4] 9:11,  14,  21; 29:17
**attorney** [2] 4:15, 18
**attorneys** [1] 50:9
**august** [2] 5:15;  6:24
**austin** [2] 1:20;  48:24
**avenues** [1] 11:17
**aware** [1] 42:14
**away** [1]  30:15

**- B -**

**backup** [6] 22:25;  23:10, 14;  48:14
**badge** [2] 7:10;  44:7
**based** [1] 41:25
**basing** [1] 19:19
**basis** [1]  16:12
**beatty** [34] 1:2;  3:16; 5:20;  7:17; 8:17;  12:4; 15:23;  16:4, 23;  18:9, 24; 19:14,  22; 20:18;  21:13, 21;  23:1, 12; 24:15,  20; 25:1, 24;  26:5, 8,  15,  25; 27:24;  28:24; 29:20,  22; 36:18;  41:16; 46:5

beatty's [3] 20:3; 26:21; 32:6

became [1] 21:13

beginning [1] 1:12

behalf [1] 31:21

behavior [1] 28:11

behind [6] 10:17, 23, 24, 25; 11:16; 13:2

bend [1] 35:7

berrigan [4] 1:11; 50:4, 15, 23

beside [1] 9:21

best [7] 3:24; 4:3; 10:3; 11:15; 14:18; 19:25; 38:23

between [7] 3:2; 10:14; 11:1, 2; 12:15; 28:23; 38:17

black [1] 8:23

blanks [1] 5:17

body [7] 17:12; 18:4, 10; 20:17; 31:2; 47:1, 3

boils [1] 36:22

bother [1] 32:1

bottom [1] 34:14

boulevard [4] 10:13, 14; 11:6; 37:19

break [1] 4:12

brief [1] 35:25

bring [1] 16:4

brought [1] 26:19

bureau [4] 29:23; 44:25; 45:15, 20

business [2] 5:3; 27:13

buttocks [2] 34:22; 35:3

buys [1] 7:25

bystander [1] 26:7

- C -

calls [1] 8:3

calvin [5] 1:6, 22; 3:17; 6:1; 42:1

camera [1] 18:11

cameras [1] 18:4

capacity [1] 7:24

captured [2] 5:16; 18:4

card [1] 16:16

career [3] 6:4; 8:15; 33:5

cars [2] 10:25; 11:2

case [4] 3:16; 37:7; 38:4; 45:13

caused [1] 19:23

certainly [1] 25:5

certainty [2] 4:7; 41:21

certification [1] 3:4

certify [2] 50:5, 12

challenged [1] 47:5

charge [4] 37:1, 2, 6, 13

charged [4] 36:18, 25; 37:2, 6

charges [1] 37:3

check [1] 34:15

checking [1] 17:16

city [6] 23:16, 19, 20; 29:23; 30:23; 45:18

clear [1] 34:19

clearly [1] 7:11

clinton [7] 1:6, 9, 25; 2:3; 3:10; 5:2; 50:6

close [3] 13:2, 11; 21:6

clothe [1] 35:19

clothes [1] 7:23

cochran [26] 1:17; 3:13, 15; 4:23, 24; 23:4, 8; 29:6, 11; 31:17; 32:11; 33:24; 35:17; 41:13; 42:18, 23; 43:12, 18; 44:16, 22; 46:18, 25; 48:5, 16, 21; 49:3

code [2] 12:19, 20

combative [1] 33:19

coming [1] 11:16

commission [1] 50:24

committing [2] 29:3; 31:7

common [5] 12:2; 17:17; 30:20, 22; 40:12

commonplace [1] 30:11

commonwealth [1] 50:2

community [1] 5:9

compartmentalize [1] 38:18

compiled [3] 45:4, 5, 8

conceal [1] 30:21

concealed [1] 31:3

concern [2] 28:20; 37:8

concerned [1] 26:16

concerns [1] 22:7

concluded [1] 49:5

conclusions [1] 12:7

condition [1] 14:7

conduct [1] 26:4

conducted [3] 17:13; 32:13, 14

confrontational [1] 25:18

conjunction [1] 25:22

connecticut [1] 1:24

connection [1] 42:14

consider [2] 6:14; 22:15

consist [2] 17:9, 10

constantly [1] 5:5

contraband [4] 15:18; 33:7; 40:22; 41:1

controlled [1] 7:25

convenience [2] 37:18, 20

conversation [8] 15:14;

18:21; 19:1; 24:3; 26:6, 10; 28:6; 29:13

**cops** [2] 12:5, 6

**copy** [1] 42:24

**corporal** [1] 23:24

**correct** [34] 6:1; 9:22, 23; 10:21; 15:10, 20; 16:8, 11; 18:5; 21:19, 20, 22; 29:24; 34:3; 36:14, 19, 20; 37:15, 18, 22; 38:1, 2, 5, 6; 40:18, 19; 42:3, 9; 43:11, 20; 44:5; 46:7, 16, 17

**cough** [3] 34:23; 35:7, 8

**counsel** [2] 1:16; 3:3

**county** [2] 6:8; 50:1

**couple** [1] 11:13

**court** [4] 1:1; 3:22; 4:10; 50:16

**courthouse** [1] 5:8

**crime** [4] 29:2, 13; 31:8; 36:19

**crimes** [2] 37:9, 11

**cross** [1] 2:2

**crossed** [1] 15:7

**- D -**

**date** [11] 5:20, 23, 25; 6:25; 7:8, 14, 20;

8:17; 25:25; 32:7; 36:7

**daughter** [2] 26:18; 27:9

**dealing** [1] 30:24

**dealt** [1] 13:21

**december** [1] 50:25

**decision** [2] 12:12; 20:25

**deeper** [1] 30:17

**deescalated** [1] 22:16

**defendant** [3] 1:22, 25; 18:23

**defendants** [1] 1:7

**degree** [1] 41:21

**deliver** [1] 37:5

**demeanor** [5] 19:13, 18, 24; 25:18; 28:10

**dent** [4] 44:8, 10, 11

**deposition** [14] 1:9; 2:15, 16, 17, 18; 3:18, 19; 42:21; 43:16; 44:20; 46:23; 49:5; 50:11, 13

**depth** [1] 40:7

**describe** [9] 12:25; 14:4; 16:13; 18:13; 19:17; 34:4, 6; 39:13; 40:6

**described** [2] 25:12; 27:18

**describes** [1] 46:4

**detain** [1] 16:5

**detained** [2] 16:8; 18:20

**detective** [21] 6:1, 4, 9; 7:14;

12:8, 13; 15:14; 16:22; 18:11; 20:19, 22; 24:17, 20; 28:23; 32:14; 41:14; 42:13; 47:3, 10, 22; 48:2

**detention** [1] 16:12

**digging** [1] 30:17

**direct** [2] 2:2; 3:12

**direction** [3] 10:20; 13:3; 50:18

**directly** [2] 26:24; 27:17

**discovery** [3] 41:25; 42:11; 44:17

**discretion** [1] 36:23

**discuss** [3] 4:17; 12:7; 27:1

**discussed** [2] 12:10; 38:3

**discussing** [1] 46:5

**discussion** [3] 12:15; 33:22; 41:11

**disorderly** [1] 26:3

**disrobed** [1] 35:24

**distancing** [1] 25:10

**district** [2] 1:1

**divert** [1] 29:17

**document** [6] 42:20; 43:15; 44:19; 45:3, 25; 46:22

**documents** [1] 36:7

**doesn't** [1] 31:25

**done** [2] 31:2; 48:17

**door** [2] 14:1; 40:1

**down** [11] 13:18; 15:4; 17:7, 16, 18, 24; 32:12, 17; 36:22; 50:14

**downtown** [3] 8:18; 11:14; 25:6

**drew** [2] 9:11, 14

**drink** [1] 38:1

**drinks** [1] 37:21

**drive** [1] 12:9

**driver's** [5] 14:1, 21; 25:21; 38:21; 40:1

**driving** [3] 7:13; 9:1; 10:5

**drug** [1] 37:11

**duly** [3] 3:11; 50:7, 13

**during** [1] 12:8

**- E -**

**eastbound** [1] 10:9

**effort** [1] 18:7

**either** [7] 6:11; 8:20; 9:8; 15:5; 18:24; 30:3; 37:25

**emitting** [1] 13:19

**encountered** [1] 16:25

**ended** [3] 10:1; 23:6; 37:8

enforcement [4] 6:23; 42:2, 6; 46:10
enjoy [1] 31:15
enquiring [1] 16:20
entail [1] 17:11
enter [1] 17:1
entire [1] 37:14
entitled [1] 44:23
escalated [2] 21:14; 28:9
escalates [1] 21:9
escalating [4] 19:24; 20:7, 15; 27:14
escalation [2] 19:13, 17
especially [1] 40:12
esquire [3] 1:17, 20, 23
essentially [2] 23:2; 30:14
estimate [7] 4:6; 8:21; 14:8, 11; 15:9; 36:1; 41:20
estimating [1] 4:8
event [2] 32:19; 37:14
events [5] 4:4; 5:15; 6:22; 24:14; 29:20
eventually [1] 22:25
everyone's [1] 35:12
evidence [2] 40:14; 41:10
exact [4] 19:2; 27:21; 34:7; 41:19
exactly [5] 9:5; 17:15;

19:18; 20:16; 29:19
examination [1] 3:12
example [1] 37:4
except [3] 3:5, 22; 4:20
exhibit [14] 2:15, 16, 17, 18; 42:19, 21; 43:13, 16; 44:16, 18, 20; 46:7, 21, 23
exhibits [1] 2:13
exited [4] 12:23, 25; 13:2, 16
expect [1] 41:1
experience [7] 11:17; 12:1; 13:21; 30:10, 19; 31:18; 35:11
expires [1] 50:24
explained [1] 19:3
expression [1] 35:4
extent [1] 19:15
extreme [1] 36:3
extremely [2] 30:11; 40:12
eyeing [1] 9:8

**- F -**

facing [2] 9:4; 22:2
fact [3] 9:13; 15:3; 37:24
factor [1] 9:17
factors [2] 9:18; 12:8
fair [6] 4:7; 6:5; 16:6;

33:25; 44:3; 46:3
feet [1] 34:14
felony [1] 37:6
female [5] 22:8, 9, 15, 22
females [1] 34:19
ferren [1] 1:23
filed [1] 3:16
filing [1] 3:4
fill [4] 5:17; 36:7, 12, 16
filmed [3] 33:10, 13, 14
fine [1] 4:21
finish [2] 38:11, 16
firearms [2] 8:4, 9
firm [1] 1:20
first [12] 7:17; 8:16; 10:18; 12:16; 14:23; 26:19; 32:12; 34:11, 12; 39:9; 50:7
five [1] 36:2
flakes [11] 13:24; 14:12, 14; 15:6, 19; 16:2; 25:21; 39:5, 16, 17
flashlight [1] 15:4
flat [2] 17:14, 16
floor [6] 5:9; 13:24; 14:13, 21; 16:2; 25:21
focus [2] 37:10; 38:22
folder [1] 41:10
follow [4] 11:7, 8, 12; 12:12

followed [3] 12:18; 25:10; 34:12
following [6] 10:15, 17; 12:3, 6, 21; 25:9
follows [1] 3:11
food [1] 38:1
foregoing [1] 50:11
form [7] 3:5; 4:20; 29:5; 31:5, 13; 32:9; 35:16
forms [3] 13:22; 36:11, 16
forth [1] 50:10
forward [2] 9:10, 13
fourth [2] 1:21; 8:20
free [3] 15:23; 16:2, 6
friend [2] 6:15, 16
front [5] 10:22; 15:2; 17:17; 21:10; 31:24
full [3] 5:1; 44:9; 48:2
function [2] 8:2, 8

**- G -**

gardner [8] 1:6, 9, 25; 2:3; 3:10, 14; 5:2; 50:6
gasoline [2] 13:8, 12
geary [6] 23:25; 24:9, 10, 14; 42:2, 11

general  [3]
7:19;  34:5, 6
genitalia  [2]
34:20, 24
girls [1]  30:13
good  [5]  3:14;
5:13;  36:1;
40:6;  49:3
grab [1]  46:20
groin  [2]
17:19;  30:21
guess [5]  4:4,
25;  14:2, 18;
37:10
guys [3]  6:19;
22:10;  30:13

- H -

half [2]  4:5;
27:22
hall [1]  29:23
hand [4]  15:4;
17:14,  16;
50:20
handcuff  [1]
19:23
handcuffed [8]
19:16;  20:21,
24;  21:3, 6, 8,
18, 21
handcuffs  [1]
20:18
handled  [1]
22:8
handling  [1]
8:3
hands  [2]
17:4;  25:15
happening  [1]
18:8
happy [1]  3:25
hartford  [1]
1:24
hasty [1]  13:1
head [1]  14:23
heading  [1]
44:25
hear [1]  3:25
heard [1]  4:2

heavily  [1]
38:23
held [4]  6:23;
33:22;  35:22;
41:11
help [1]  7:24
helping  [1]
24:10
hereby [3]  3:2,
4;  50:5
hereunto  [1]
50:19
herself  [1]
26:24
high [6]  10:4,
11, 14;  11:7,
17;  12:17
hill [7]  11:5,
9, 11;  12:18,
22;  37:17, 19
hold [1]  4:19
holder  [2]
14:10;  39:7
hood  [6]
21:11, 13, 16;
22:2, 4, 5
hospital  [3]
10:4;  11:10;
25:8
hostile  [1]
23:11
hundred  [3]
8:21;  11:14;
25:7

- I -

identification
[4]  42:22;
43:17;  44:21;
46:24
identifications
[1]  19:15
identified  [1]
7:8
identify  [2]
19:10, 12
identities  [1]
23:22

identity  [1]
28:16
immediately [3]
13:18;  17:4;
25:15
impounded  [1]
38:4
impression  [1]
19:19
incident  [5]
36:19;  42:14;
44:24;  46:4;
47:16
increasingly
[1]  23:11
independent [2]
34:1;  43:3
index [2]  2:1,
13
indicated  [6]
23:9;  26:20,
22;  35:2, 7;
39:19
indicates  [1]
44:4
indicating  [1]
36:7
individual  [5]
30:25;  34:10,
13, 14;  47:2
individual's [2]
31:22;  35:13
individuals  [8]
26:2;  30:11;
31:2;  33:19;
36:8, 24;  37:1
inferring  [1]
31:16
information [3]
43:8, 9, 22
ingesting  [1]
39:15
ingestion  [1]
16:18
initial  [2]
11:13;  30:15
insane  [1]
40:15
inside  [1]
32:12

instructs  [1]
4:18
intent  [2]
30:2;  37:5
intention  [2]
16:4;  22:21
interaction  [3]
26:11, 13;  27:1
interfere  [1]
28:7
interfering  [4]
27:13, 18, 20;
29:16
interject  [1]
26:24
intersection [2]
9:3, 6
invasive  [1]
31:5
inventory  [1]
43:19
investigate  [1]
16:5
investigating
[1]  27:25
investigation
[5]  27:13;
29:16,  18;
30:16;  43:10
investigations
[1]  11:20
involvement [5]
20:3;  24:2, 4,
7;  47:15
involving  [1]
46:5
irvin [20]  1:6,
22;  3:17;  6:1,
4;  7:14;  12:8,
13;  15:14;
16:22;  20:19,
22;  24:18, 20;
28:23;  32:14;
41:15;  42:1,
13;  47:24
irvin's  [3]
18:11;  47:3, 23
issue  [2]
22:17;  28:21

**items** [3] 37:21, 25; 40:9
**itself** [3] 11:21; 25:12; 33:12

## - J -

**jane** [2] 11:25; 25:13
**january** [2] 1:12; 50:20
**jewelry** [1] 34:11
**jordan** [1] 42:2
**josh** [1] 3:15
**joshua** [1] 1:17
**judge** [1] 3:22

## - K -

**kept** [1] 45:23
**kevin** [2] 44:10, 11
**kicked** [1] 24:12
**kicking** [1] 23:7
**kind** [21] 9:7, 16; 11:14, 25; 12:3, 4, 7; 14:1, 10; 17:1; 19:20; 20:1, 7; 21:10; 22:1; 25:3; 30:6; 40:5; 45:12; 46:3; 48:10
**kinds** [1] 8:12
**knowledge** [2] 47:22; 48:11
**known** [1] 6:3
**kyle** [14] 1:2; 3:16; 5:20; 7:17; 8:17; 20:18; 24:15, 20, 25; 25:1, 24; 29:22; 41:15; 48:16

## - L -

**large** [1] 37:11
**largely** [1] 48:17
**last** [2] 34:16; 39:14
**laughlin** [11] 1:23; 4:21; 23:3; 29:5, 8; 31:13; 32:9; 35:16; 48:4, 24; 49:2
**lead** [1] 21:1
**league** [1] 5:9
**lean** [2] 14:23, 25
**least** [1] 26:21
**leave** [3] 35:14, 15, 18
**left** [1] 22:3
**legs** [1] 17:18
**lesser** [1] 37:1
**lift** [2] 34:15, 20
**lifting** [1] 34:24
**line** [1] 46:9
**lines** [3] 17:5; 27:9; 30:17
**listening** [1] 19:21
**located** [1] 14:20
**locker** [1] 40:14
**logic** [1] 16:9
**longer** [1] 30:9
**look** [8] 9:7, 8, 16; 13:2, 3; 14:17; 43:3; 46:1
**looking** [9] 8:7, 12; 9:22; 11:25; 12:3, 4, 5; 25:11; 40:5
**lopez** [22] 5:23; 8:23; 16:10, 20; 18:12, 24;

19:14; 21:3, 10, 16; 23:3, 6, 12; 24:11, 15; 26:3, 8, 25; 27:25; 28:24; 29:21; 37:8
**lopez's** [2] 22:7; 26:15
**loretta** [4] 1:11; 50:4, 15, 23
**loud** [1] 12:10
**lycoming** [1] 50:1

## - M -

**maintain** [1] 45:25
**male** [2] 34:18, 20
**manner** [2] 13:1; 39:2
**marijuana** [12] 8:13; 13:19, 20, 22, 23; 14:15; 16:15, 18; 25:20; 30:14; 39:14, 15
**marked** [11] 2:14; 7:5, 12; 42:19, 21; 43:14, 16; 44:18, 20; 46:23
**market** [2] 1:14, 18
**mccormick** [1] 1:20
**mean** [20] 5:5; 12:14; 13:9; 17:10; 20:15; 21:5; 23:3; 25:21; 27:21; 31:12; 32:2; 38:12; 40:22; 45:5, 6, 11;

46:10; 47:14, 18; 48:15
**means** [1] 16:17
**medical** [2] 16:16, 18
**mentioned** [1] 34:24
**middle** [2] 1:1; 22:2
**might** [2] 4:1; 22:16
**mind** [6] 12:8; 16:14; 25:4, 22; 27:12; 33:6
**minier** [2] 23:23; 42:1
**minier's** [1] 24:2
**minimum** [1] 25:23
**minute** [1] 14:16
**minutes** [1] 36:2
**misdemeanors** [1] 37:7
**month** [1] 6:20
**morning** [3] 3:14; 7:2; 47:3
**most** [1] 30:20
**mouth** [2] 34:15, 16
**moving** [1] 19:20

## - N -

**naked** [1] 31:24
**name** [4] 5:1; 44:9; 47:13; 48:2
**narcotics** [18] 6:7, 8; 7:10; 8:4, 9, 11; 11:17; 12:2; 30:11, 21, 23,

24; 31:1, 3, 8;
37:11; 40:13;
44:12
**narrative** [1]
46:2
**near** [1] 16:25
**necessarily** [1]
32:18
**need** [2] 4:12,
14
**needed** [1]
22:21
**never** [2]
36:18; 37:13
**next** [10] 9:24;
11:4; 12:22;
13:14, 17;
16:19; 17:23;
22:23; 44:18;
46:21
**none** [1] 47:16
**nope** [1] 42:17
**normally** [1]
9:7
**notary** [1] 50:5
**nothing** [7]
22:14; 39:8;
43:12; 44:4;
46:18; 48:21;
50:8
**number** [1]
44:7
**numerous** [3]
11:18, 19;
13:22

— O —

**object** [3]
31:13; 32:9;
35:16
**objection** [2]
4:16; 29:5
**objections** [2]
3:5; 4:20
**observations**
[1] 25:8
**observe** [5]
12:19; 14:22,
24; 15:5, 13

**observed** [9]
13:20; 15:1;
16:3; 19:3;
25:6; 32:23;
39:11, 18, 21
**observing** [4]
10:16; 30:16;
39:5, 9
**obstructing** [2]
27:12; 29:15
**obtained** [1]
42:25
**obtaining** [1]
22:15
**obviously** [5]
9:15; 10:12;
16:16; 34:18;
37:21
**occurred** [3]
5:15; 26:25;
37:17
**odor** [1] 13:19
**offense** [2]
30:13; 37:1
**offenses** [7]
8:4, 5, 6, 9, 11,
12; 30:24
**offer** [1] 30:13
**officer** [20]
3:14; 5:2; 7:8;
22:8, 9, 16, 22;
23:23, 25;
24:1, 9, 10, 14;
36:23; 37:9;
42:6; 44:12,
23; 46:11
**officers** [10]
23:7, 16, 17,
19, 22; 32:3;
42:3, 12, 15, 16
**often** [3] 6:19;
30:19; 37:12
**oftentimes** [1]
35:21
**once** [3] 12:23;
16:3; 35:10
**ones** [1] 40:5
**ongoing** [1]
29:20
**onto** [1] 46:2

**open** [1] 34:14
**operating** [2]
7:11; 8:24
**opinion** [1]
22:18
**oral** [1] 50:9
**order** [2]
17:15; 38:19
**outside** [4]
6:20; 15:1;
17:25; 39:8
**overly** [1] 12:1
**owned** [2]
45:15, 17

— P —

**pacing** [2]
21:10, 11
**page** [3] 46:2,
9
**pants** [1]
34:12
**paraphernalia**
[9] 13:23;
16:3, 15;
25:20; 30:16;
37:12; 40:13,
14, 16
**pardon** [1]
35:3
**park** [2] 13:6,
15
**parked** [2]
13:10; 41:15
**parking** [1]
13:6
**part** [3] 7:7;
26:21; 30:15
**participate** [1]
12:13
**participating**
[1] 20:5
**particular** [3]
16:17; 36:9;
37:7
**parties** [2]
3:3; 50:10
**patrol** [3] 8:2,
7; 23:17

**patrol-like** [1]
8:2
**patrolling** [1]
8:3
**penis** [1] 34:25
**pennsylvania**
[7] 1:1, 14, 18,
21; 37:15;
50:2, 16
**people** [5] 9:7;
31:16, 25;
33:4; 37:24
**percent** [1]
8:21
**perception** [1]
31:22
**performed** [2]
17:7; 32:25
**period** [1] 18:4
**permission** [1]
19:4
**permitted** [1]
18:17
**person** [3]
25:17; 32:7;
47:7
**personal** [4]
6:14, 16;
37:21, 25
**personalized**
[1] 12:1
**personally** [1]
50:5
**phone** [2]
18:8, 15
**photograph** [1]
40:25
**photos** [7]
40:21; 41:3, 4,
5, 7, 9
**picked** [1] 25:7
**pieces** [1]
14:16
**place** [7] 1:13;
21:25; 23:1;
24:21; 25:23;
36:7; 37:14
**placed** [5]
21:13, 15;

24:22; 25:1; 26:8

**places** [1] 30:20

**plain** [4] 7:22; 11:25; 25:13; 39:11

**plainclothes** [1] 7:4

**plaintiff** [6] 1:3, 10, 19; 2:2, 14; 3:16

**plane** [1] 15:7

**plate** [1] 25:13

**plenty** [1] 31:24

**pockets** [1] 17:18

**point** [27] 4:14; 6:7; 8:22; 10:5, 7, 16; 11:12; 14:25; 15:3, 22, 25; 18:20; 21:22, 24; 22:10, 24; 24:19; 25:2, 24; 26:1; 27:11; 28:1, 4; 29:4, 22; 31:25; 47:14

**police** [23] 7:5, 8, 10, 11, 12, 13; 9:9; 22:8, 16; 23:19; 25:9; 26:18; 27:8; 29:23; 30:23; 32:3, 7; 36:23; 44:25; 45:16, 20, 24; 47:2

**popped** [1] 47:13

**pops** [1] 47:6

**posed** [1] 4:14

**possession** [1] 37:4

**pounds** [1] 8:14

**power** [1] 36:23

**practice** [1] 30:22

**precise** [1] 14:11

**precisely** [1] 14:20

**presence** [1] 16:15

**present** [6] 1:16; 32:20; 35:13; 36:8; 38:7; 44:13

**presume** [1] 40:17

**presumed** [1] 4:2

**pretty** [1] 21:6

**primarily** [3] 5:14; 8:9; 19:20

**primary** [2] 28:19; 37:7

**print** [1] 45:12

**prints** [1] 45:13

**probable** [4] 16:14; 25:19; 29:3, 14

**procedure** [2] 31:9; 34:5

**processes** [1] 5:18

**produced** [4] 42:20; 43:15; 44:19; 46:22

**property** [1] 43:19

**propounded** [1] 50:9

**provide** [1] 3:23

**public** [4] 1:11; 28:10; 50:5, 24

**pull** [3] 9:21; 13:5; 15:13

**pulled** [2] 11:5; 12:23

**pulling** [1] 18:15

**pump** [3] 13:5, 7, 8

**pumped** [1] 13:12

**pumping** [1] 26:7

**pumps** [2] 12:24; 28:7

**putting** [1] 36:15

**pwid** [1] 37:4

---

**- Q -**

**quadrant** [2] 38:22, 23

**questions** [4] 48:25; 49:2; 50:9, 14

**quickly** [1] 48:16

---

**- R -**

**reach** [1] 15:4

**reaction** [1] 25:16

**ready** [2] 4:25; 32:15

**real** [1] 22:17

**really** [6] 7:21; 8:10; 14:8; 33:5; 38:19; 41:22

**reason** [2] 7:22; 26:23

**reasonable** [2] 4:6; 41:20

**reasons** [1] 11:13

**recalled** [1] 46:4

**recap** [1] 48:10

**receipt** [1] 43:19

**recently** [1] 3:15

**recess** [2] 48:18, 20

**recognize** [1] 47:6

**recollection** [9] 10:3; 18:10; 21:6; 24:1; 28:5, 20; 34:1, 2; 43:4

**record** [8] 4:11; 5:1; 18:8, 16; 33:23; 36:13; 40:22; 41:12

**recorded** [3] 33:11, 13, 14

**records** [1] 45:10

**recovered** [1] 44:4

**recross** [1] 2:2

**redirect** [1] 2:2

**reduced** [1] 50:17

**refer** [2] 45:19, 21

**reference** [1] 44:6

**referring** [2] 14:13; 39:10

**refusal** [1] 25:19

**refused** [4] 19:10, 11; 20:10; 21:12

**regards** [1] 32:19

**register** [1] 16:25

**register's** [1] 17:1

**related** [1] 45:13

**relationship** [1] 6:11

**released** [1] 41:16

**remember** [12] 9:2, 3, 4;

12:15; 15:8;
18:15; 19:2;
22:24; 23:24;
24:22; 27:7;
29:25
**remove** [1]
34:11
**rental** [2]
11:22, 24
**repeat** [2] 4:1;
29:9
**rephrase** [1]
3:25
**report** [4]
36:16; 44:24;
45:6, 8
**reporter** [3]
4:11; 50:16, 18
**reporter-notary**
[2] 1:11;
50:24
**represent** [1]
3:15
**request** [1]
45:11
**require** [1]
35:3
**requires** [1]
22:14
**reserved** [1]
3:6
**residual** [1]
14:15
**resisted** [1]
23:6
**resolved** [1]
28:21
**respect** [1]
16:9
**respective** [2]
3:3; 50:10
**responded** [1]
48:13
**responsible** [2]
46:9, 10
**result** [4]
26:14, 20;
30:22; 36:19
**return** [1] 44:3

**review** [1]
41:25
**reviewing** [1]
20:17
**right** [40]
3:21; 4:8; 5:8,
12, 22, 25;
10:25; 13:4,
14; 15:12;
16:19; 17:2;
21:2, 7, 21, 24;
23:21; 24:13,
19; 30:2;
34:4; 35:2, 6,
9; 36:6; 38:7,
10; 39:9;
40:20; 42:5,
18; 43:2, 25;
44:23; 46:1,
18; 47:4;
48:10, 21
**riling** [2] 20:1,
6
**roach** [18]
8:13; 13:20,
21, 25; 14:6,
10, 23, 24;
15:1, 5, 19;
16:1; 39:5, 8,
10, 14
**roaches** [2]
39:6, 19
**road** [1] 10:10
**robert** [1] 48:8
**room** [3]
35:13, 18, 20
**round** [2] 14:2,
9
**routinely** [1]
37:24
**running** [1]
25:3

— S —

**says** [2] 7:10;
25:15
**scene** [5]
28:13; 29:1;
47:1, 4, 5

**schemery** [2]
1:13, 17
**screaming** [1]
23:12
**screen** [2]
5:19; 46:20
**sealing** [1] 3:4
**search** [50]
17:6, 8, 12, 21,
23; 19:4, 5;
24:20; 25:15;
30:5, 6, 7, 8,
24; 31:4, 5, 9;
32:2, 6, 14, 16,
18, 20; 33:3,
8, 10, 12;
34:1, 9, 19;
35:11; 36:6, 9,
14; 38:7, 11,
13, 23, 25;
39:4; 40:21,
25; 41:16;
42:24, 25;
43:4; 44:4, 14
**searched** [13]
17:12; 24:24;
31:11, 19, 23;
33:4; 35:20,
21; 38:4, 12;
39:2; 44:1
**searches** [4]
34:5; 35:10;
36:12, 17
**searching** [6]
17:5; 18:22;
24:23; 31:16;
39:1; 43:5
**second** [3]
10:2, 19; 32:13
**seeing** [2]
10:1; 35:3
**seize** [3] 40:9,
13, 16
**seized** [3]
8:14; 40:14, 17
**sells** [1] 37:21
**semantics** [1]
31:6
**sense** [1] 8:3

**sergeant** [1]
23:24
**service** [1]
41:15
**session** [1]
3:23
**severe** [1]
37:10
**shake** [5]
13:24; 14:12,
13; 15:5; 16:1
**shawna** [1]
1:23
**shift** [3] 6:25;
7:16, 20
**shirts** [1]
34:12
**short** [1] 36:4
**shows** [2]
47:2, 4
**side** [3] 9:8;
17:2; 38:21
**signed** [1]
46:13
**signing** [1] 3:3
**similar** [1]
39:21
**site** [2] 42:3, 6
**situation** [6]
22:16; 23:11;
27:14; 31:11,
20, 22
**size** [4] 14:6,
8, 10, 11
**small** [3]
14:10; 30:14;
37:12
**smaller** [2]
30:12
**smelled** [1]
13:18
**socks** [1]
34:12
**sometime** [1]
9:25
**sometimes** [2]
11:22; 33:17
**sorry** [8] 9:12;
16:22; 20:13;

23:5, 25; 24:5; 29:10; 45:21

sounds [1] 24:14

speak [1] 31:21

speaking [1] 4:10

specific [2] 33:20; 38:19

specifically [10] 8:4; 19:14; 21:9; 26:4; 27:23; 30:10, 23; 31:1, 8; 39:2

speckles [1] 14:18

speculate [1] 48:12

spent [1] 13:20

spot [2] 12:17; 13:6

spotted [1] 12:16

spread [1] 35:4

squat [2] 34:22; 35:8

standard [2] 31:7, 8

standing [2] 22:4, 6

stare [2] 11:14; 25:7

staring [2] 9:10, 13

start [7] 5:13; 6:25; 38:10, 16, 20, 21

started [1] 4:25

state [3] 11:21; 13:10; 25:13

statement [1] 42:10

statements [1] 42:13

states [1] 1:1

station [9] 39:12; 41:15, 17; 45:6, 9, 19, 23; 47:2, 6

stayed [1] 16:21

stems [1] 46:2

stenographically [1] 50:15

step [2] 17:24, 25

stick [1] 33:6

still [2] 10:5; 27:25

stipulated [1] 3:2

stipulation [1] 3:1

stoltzfus [3] 23:23; 24:6; 42:2

stop [3] 21:11; 26:17; 37:24

stopped [2] 9:5; 28:20

store [11] 13:4, 15; 15:13, 24; 16:23, 24; 17:1; 25:14; 32:13; 37:18, 20

street [10] 1:14, 18, 21; 5:8; 8:21; 9:5; 10:4, 11; 11:8; 12:17

streets [1] 10:13

strip [29] 30:7, 8, 24; 31:4, 9, 11, 15, 19, 23; 32:2, 6, 16, 20; 33:2, 4, 7; 34:1, 5, 19; 35:9, 10, 20, 21; 36:6, 9,

12, 14, 17; 41:16

stuff [1] 45:13

subscribed [1] 50:20

such [2] 17:17; 37:25

supervisor [3] 6:11; 47:20, 24

surveillance [1] 7:24

sworn [3] 3:11; 50:7, 13

system [5] 45:5, 12, 14, 15, 18

### - T -

taking [1] 50:12

telling [1] 24:20

term [2] 20:5; 45:14

terms [8] 6:10; 7:19; 8:11; 14:13; 20:14; 32:2; 34:5, 6

tested [1] 40:18

testicles [1] 34:25

testified [3] 3:11; 16:1; 50:10

testify [1] 50:7

testifying [1] 3:21

testimony [2] 21:15; 50:19

thank [2] 4:23; 49:3

theater [1] 5:9

theirs [1] 13:16

themselves [1] 25:10

third [6] 5:8, 9; 8:20; 32:6, 16, 19

thought [1] 5:17

threaten [2] 27:10, 15

through [9] 7:9, 16; 25:3; 38:11, 15; 45:5, 12; 47:5

throughout [3] 8:15; 20:8, 15

throw [1] 8:1

throws [2] 17:4; 25:15

times [6] 30:19; 33:18; 36:24; 37:5, 12; 41:2

today [1] 3:18

toes [1] 34:13

together [3] 6:19, 21; 21:6

tongue [1] 34:15

took [4] 10:14; 21:1; 37:14; 41:4

trade [2] 5:10, 11

traffickers [1] 30:20

trafficking [2] 11:18; 12:2

transit [2] 5:10, 11

transpired [1] 28:23

transport [1] 29:22

transported [2] 29:25; 30:3

transporting [1] 30:3

traveling [2] 10:9, 19

trial [1] 3:6

truck [1] 28:12

trunk [1] 38:20

truth [3]  50:7, 8

trying  [2]  27:8;  37:3

turkey  [7]  11:5,  9,  11;  12:18,  22;  37:17, 19

turn [1]  34:21

type [2]  8:6;  25:13

types [1] 8:5

typewriting [1]  50:17

typical  [4]  17:16;  25:16;  34:9;  35:10

typically  [13]  4:17;  8:6;  33:15;  34:7, 16;  35:24, 25;  38:13,  21;  39:14;  40:25;  41:2

tyson [1]  42:1

- U -

ultimately  [2]  19:16;  30:1

uncomfortable [2]  31:11, 20

uncommon  [1]  40:16

uncover  [1]  30:25

under [4]  26:2;  40:3;  44:24;  50:18

undercover [1]  7:24

underneath [1]  34:21

undersigned [1]  50:4

understand [2]  3:25;  40:2

understood [2]  4:2;  21:15

underwear  [1]  34:16

uniform  [3]  7:3, 4, 5

unit [5]  6:8;  30:23;  37:11;  40:13

united [1]  1:1

unknown  [1]  16:17

unless  [2]  22:21;  36:15

used [1]  20:5

users  [1]  30:20

using  [1]  45:14

usually  [3]  34:17,  22;  38:18

utilized  [1]  7:23

- V -

various  [2]  8:14;  13:22

vehicle  [37]  7:12, 13;  8:24;  11:21,  23,  24,  25;  12:18, 19,  20,  21,  23;  13:16,  19;  14:23;  15:2;  16:5;  18:22;  19:3;  23:1, 6;  24:21,  23;  25:1,  11,  13,  23;  28:3;  38:18, 22, 25;  39:1, 4;  42:25;  43:4;  44:1

vehicles  [4]  11:23;  26:9;  38:20, 21

verbiage  [1]  19:2

vest [4]  7:5, 9,  11;  8:1

video [5]  5:16;  40:21,  25;  41:2;  42:1

view [1]  39:11

violations  [2]  12:19, 20

voice [1]  20:7

voices  [1]  20:14

- W -

waistband  [1]  17:17

waiting  [3]  28:2, 5,  8

waived [1]  3:4

walk [1]  13:15

walked  [1]  13:16

walks [1]  47:4

warned  [2]  27:22;  28:21

warrant  [2]  42:24;  43:8

warrants  [1]  31:2

washington [2]  11:6;  37:19

watching  [1]  18:10

weapons  [1]  17:17

weird [1]  9:16

west [1]  1:21

whatnot  [2]  6:23;  34:11

whereof  [1]  50:19

white [3]  1:20;  4:22;  49:1

whole [3]  6:4;  11:9;  50:8

why'd  [1]  11:12

wiggle  [1]  34:13

william  [1]  1:23

williamsport [16]  1:14,  18, 21;  10:4;  23:7,  20;  26:17;  27:8;  29:23,  24;  37:15;  44:25;  45:15,  20,  24;  50:16

window  [2]  12:4;  15:7

windows  [1]  13:18

windshield  [1]  15:2

within  [3]  31:1, 3;  39:6

without  [2]  19:21;  20:17

witness  [9]  3:10;  23:5;  28:22;  29:7, 9;  31:15;  48:23;  50:6, 13

witnesses  [2]  2:1;  42:16

woman  [4]  5:22;  26:7;  28:7;  29:13

woman's  [1]  28:16

words  [1]  27:21

wore [1]  7:22

worked [1]  6:6

written  [1]  36:13

- Y -

yard [2]  11:14;  25:7

year [1]  6:7

years [2]  4:5;  27:22

yelling  [5]  19:20;  21:9;  26:14,  20;  28:10

**yours** [1]
47:20
**yourself** [1]
42:1

---

**- Z -**

**zachary** [2]
42:2, 10
**zicolello** [2]
1:13, 17

**DEFENDANT CALVIN IRVIN'S APPENDIX IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**


# EXHIBIT D

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KYLE BEATTY,                    :
                Plaintiff       :
                                :
        vs.                     : NO. 4:23-CV-00364
                                :
CLINTON GARDNER and CALVIN      :
IRVIN,                          :
                Defendants      :
                                :

        Deposition of:    CALVIN IRVIN

        Taken by    :    Plaintiff

        Before      :    Loretta C. Berrigan
                         Reporter-Notary Public

        Beginning   :    January 22, 2024; 10:08 a.m.

        Place       :    Schemery Zicolello
                         333 Market Street
                         Williamsport, Pennsylvania

COUNSEL PRESENT:

        JOSHUA J. COCHRAN, ESQUIRE
        Schemery Zicolello
        333 Market Street
        Williamsport, Pennsylvania  17701
                For - Plaintiff

        AUSTIN WHITE, ESQUIRE
        McCormick Law Firm
        835 West Fourth Street
        Williamsport, Pennsylvania  17701
                For - Defendant Calvin Irvin

        SHAWNA LAUGHLIN, ESQUIRE
        William J. Ferren & Associates
        PO Box 2903
        Hartford, Connecticut  06104
                For - Defendant Clinton Gardner

## Page 2

INDEX TO WITNESSES

FOR - PLAINTIFF          DIRECT  CROSS  REDIRECT  RECROSS

Calvin Irvin              3      37       38        --


INDEX TO EXHIBITS

FOR - PLAINTIFF                      MARKED ADMITTED

Deposition Exhibit No. 1               35       --

## Page 3

STIPULATION

It is hereby stipulated by and between counsel for the respective parties that signing, sealing, certification and filing are hereby waived; and that all objections except as to the form of the question are reserved to the time of trial.

                *   *   *

CALVIN IRVIN, called as a witness, having been duly sworn or affirmed, testified as follows:

DIRECT EXAMINATION

BY MR. COCHRAN:

Q    Good morning, Detective Irvin.  We've met. I'm Josh Cochran, I represent Kyle Beatty and he's filed a lawsuit against you.  We're here to take your deposition.  Have you ever been deposed before?

A    No, sir.

Q    All right.  Now you did hear me kind of give the instruction to Officer Gardner.  I'm happy to go over it again if you would like or we can just get started if you remember what I told him.

A    I think I'm good.

Q    All right.  Now as I told him, we're here primarily to talk about the events of August 31st of

## Page 4

2021, kind of fill in the blanks so to speak.  A lot of it is on video, but then there's stuff kind of going in the background.  But before we get there, just some background questions.  Prior to August 31st of 2021, did you know Kyle Beatty?

A    No, sir.

Q    Okay.  Did you know Anaise Lopez prior to that date?

A    No, sir.

Q    All right.  Now, did you know Clinton Gardner?

A    Yes.

Q    All right.  And how long have you known him?

A    Probably since he started at the Williamsport Bureau of Police.

Q    Okay.  Would that be back in like 2017?

A    Yeah, whenever that was.  Whenever he started there, yes.

Q    Okay.  And I believe -- would you consider that relationship to be a work relationship or a professional or personal relationship?

A    Both.

Q    Okay.  Have you ever been a supervisor?

A    No, sir.

Q    Okay.  How long have you been working kind of

as a – do you work as a team with him?

A    Occasionally.  Not like a designed team, it's just if he needs help on something, I would help him if someone else wasn't available or vice versa.

Q    Okay.  So it wasn't like you were partners?

A    Correct.

Q    And were you ever his supervisor?

A    No, sir.

Q    Okay.  How often do you guys see each other outside of work?

A    Not often at all, other than functions.

Q    Okay.

A    He doesn't come to my house, I don't go to his house.

Q    All right.  So let's talk about August 31st of 2021.  When did you start your shift on that date?

A    I was probably at the office about – between 7:00 and 7:30.

Q    Okay.  And what is your typical shift?  How long is it?

A    Usually get there between 7:00 and 7:30 and work until 4:00, depending on what goes on that day.

Q    Okay.  And back up to this day.  Were you in uniform on that date?

A    No, sir.

Q    All right.  How were you identified as a police officer on this date?

A    When we went out in the vehicle I would have been wearing a marked police vest with my badge visible, and a marked police car.

Q    Now that badge, who is that issued by?  Your badge.

A    The Lycoming County District Attorney's Office.

Q    And then for Mr. Gardner, if you know, is his badge issued by the DA's office or is it from Williamsport?

A    I believe it would be the Williamsport Bureau Police, where his employer is.

Q    All right.  And you had indicated you were in a marked police car, is that correct?

A    Yes.

Q    And who was driving on this date?

A    Officer Gardner.

Q    All right.  Can you take me through your shift until you see Kyle Beatty for the first time?

A    Couldn't tell you what I did at the office that morning.  I'm not sure of the time that we went out in the vehicle.  I don't know if it was morning, midday, afternoon.  That I don't recall.  At some

point we saw the vehicle Mr. Beatty was driving over in the aves, which would have been – I'm not sure which avenue, referring to First, Second, Third, Fourth, Fifth Avenue, one of those west of Campbell Street.  I don't recall seeing him downtown earlier in the day.  I know Officer Gardner did.  And then we --

Q    So you would have seen him, you personally would have seen him for the first time, you believe, on Campbell Street?

A    On one of the aves west of Campbell Street.

Q    Okay.  And I've heard the term aves and avenues.  What is that?

A    First Ave., Second Ave., Third Ave., Fourth Ave., Fifth Ave., Sixth Ave., Seventh Ave., Eighth Ave.

Q    So the streets?

A    The avenues.  Correct.  They're all directly west.  They run north and south.

Q    Okay.  Do you recall which avenue you would have seen him on?

A    I do not.

Q    Which direction he was going at the time you saw him?

A    He would have been facing north.

Q    Okay.  And which direction would you guys

have been facing?

A    I'm not sure if we were coming east on High Street or if we were traveling north on one of the aves.

Q    Was he in front of you, behind you when you saw him the first time?

A    He would have been somewhere in front of us.  Whether we were traveling east on High Street and he was coming north on one of the aves to High Street or we were south of him on one of the aves facing north.

Q    Okay.  And what draws your attention to Kyle Beatty this first time?

A    Officer Gardner said he saw him downtown earlier and then it was odd that we were over in the aves.  There was a time difference from when Officer Gardner saw him to when we saw him over in the aves.

Q    All right.  So your recollection is that Officer Gardner indicated, he calls your attention to it.  He indicates he saw him earlier and now he's seeing him in the aves?

A    Correct.

Q    Okay.  Anything else?

A    Not that I recall.

Q    All right.  What happens next?

A    We would have been behind him in the area of

Appx456

Case 4:25-cv-00036-DJKM Document 16-mer Page 482 Filed Date Filed: 12/16/2025 1

the hospital on High Street and went to the Turkey Hill on Washington Boulevard.

Q   Were you guys right behind him or were there cars between you?

A   That I don't recall.

Q   Okay.  But you do remember being behind him and following him, correct?

A   Correct.

Q   While you're following him are you and Officer Gardner discussing what you're doing at that time and how it would relate to Mr. Beatty or at least the vehicle he's driving?

A   I don't understand your question.

Q   Did you guys discuss — at the point that you see him for the first time and Officer Gardner calls your attention to him and you guys basically are following him and you're aware of him, are you guys discussing why you're continuing to follow him?

A   I believe we would have been looking for other indicators, if there were any other indicators for criminal activity.  I can't that a hundred percent, but I assume that would have been the conversation.

Q   Okay.  And what would those indicators have been that you were looking for?

A   If they were trying to turn off the road, the plain Jane vehicle, their mannerisms in the vehicle, if they keep checking the mirror, looking behind them. I'm sure there's others.

Q   And who was driving this vehicle that you're following at this point?

A   Mr. Beatty.

Q   Okay.  Do you recall if you guys ran the tags on the car at the point that you're following him?

A   I do not.

Q   All right.  Now you had listed some factors a few minutes ago in terms of other indications of possible criminal behavior.  While you're following this vehicle were you observing any of these indicators?

A   Mr. Beatty and Ms. Lopez looking back in the mirrors.  Other than that, I don't recall if there were others.

Q   Okay.  Did you observe any vehicle code violations from the time that you were following them until they stopped at the Turkey Hill on Washington Boulevard?

A   Not that I recall.

Q   Did you observe any other criminal conduct while you're following them from High Street where you

picked them up until the Turkey Hill — they stop at the Turkey Hill on Washington Boulevard?

A   Not that I recall.

Q   Just so I'm clear, at the time you're following them you don't know the identities of anyone inside that vehicle, is that correct?

A   Correct.

Q   Now you see the car park at the Turkey Hill on Washington Boulevard, is that correct?

A   Yes.

Q   All right.  Where did it park?

A   At the southeastern most pump, facing west. Facing east, my apologies.

Q   And is that a location where people would typically stop to pump gas?

A   Yes, it was right in front of the pump.

Q   Now what was your conversation with Officer Gardner at this point in time as they pull up to the pumps and presumably you guys are still following them?

A   I don't remember the conversation now.

Q   Now what happens in chronological order from when you see the car park?

A   We see the car park.  Mr. Beatty and Mr. Lopez go in the store.  Officer Gardner gets out

of the vehicle, goes over to Ms. Lopez's vehicle.  I believe he sees and smells marijuana.  Motions for me to get out of the car.  And then I think at that point Ms. Lopez came out of the store and Officer Gardner went in the store.

Q   Okay.  Now in terms of him — the events that you've just described, where he gets up, gets out of the car and walks over to the vehicle that Mr. Beatty was driving and had parked.  Did you see him at any point in time put his head inside the vehicle to look down into it?

A   I don't recall if I saw him looking in the vehicle or not.  From where we were parked I don't know if I could have or if I did.

Q   Okay.  So it may have happened but you just don't recall, correct?

A   Correct.  Because where we were parked, we would have been parked to the rear right of the vehicle, behind the vehicle.  So I don't know if the vehicle would have obstructed my view — their vehicle or not.  I don't recall that.

Q   Okay.  And do you recall if you saw Officer Gardner reach his flashlight down into the vehicle to illuminate the interior of that vehicle?

A   I do not.

Q. So you might have, you just don't recall. Is that correct?

A. Possibly, yes.

Q. Now what does he tell you?

A. He as in Officer Gardner?

Q. Yes.

A. He said that he smelled marijuana and he observed a roach in the driver's door.

Q. All right. Did you at any point in time independently confirm those observations?

A. I believe he directed me over and I could see the roach from -- I don't know if I was looking through the windshield or through the top of the door. But I did see the roach.

Q. Can you describe it for me?

A. Marijuana roach. Small. I don't know, half inch in length. Brown. What's left over from marijuana smoking.

Q. Okay. And where was it located?

A. In the driver's door in a -- I guess a little bit smaller than a soda can, but one of the ashtrays that fit in the cup holder. It was on the top of that before it goes down into the actual cup.

Q. Officer Gardner had mentioned that he also saw -- and the term I believe he used was shake or flakes. Did you see any of that?

A. I don't recall if I looked.

Q. As I understand your testimony, you indicate that you did see a roach, or what you believed to be a roach, correct?

A. Yes, sir.

Q. All right. And do you recall how you saw that?

A. With my eyes.

Q. In terms of your vantage point.

A. It was either from outside of the vehicle -- I believe Officer Gardner was to my right. He was -- I guess if the vehicle was facing east, I was standing at the northeast part of the car. He was to my right. So I would have been looking either through the front windshield or through the front of the driver's door.

Q. By the driver's door do you mean the open window from the driver's door?

A. I mean the driver's door where I was standing. So I would have been looking down through the open window or through the front of the windshield. I don't recall which one.

Q. Okay.

A. I don't know if my body cam would show where I was standing at that point or not but --

Q. So what happens next?

A. With?

Q. With respect to -- so you've had this conversation with Officer Gardner. He calls you over. You see what you've described. What happens next?

A. We're going to head over to the store and Ms. Lopez comes out and Mr. Beatty is still in the store. I direct Ms. Lopez to come back over to the vehicle with me because she's under investigation because of the marijuana in the car. And Officer Gardner went inside to get Mr. Beatty.

Q. Is Kyle Beatty free to go at this point?

A. No.

Q. And why not?

A. He was the driver of the vehicle with marijuana directly within his reach there.

Q. Okay. And is Ms. Lopez free to go at this point?

A. No.

Q. Why not?

A. For the same reason.

Q. Okay. Are they under arrest?

A. They're detained right now for further investigation.

Q. Okay. So Ms. Lopez comes out of the convenience store. And what happens next?

A. In regards to -- I take her back over to her vehicle. She immediately starts raising her voice. I guess for lack of a better term, causing a disturbance with her yelling and whatnot. And then shortly thereafter Officer Gardner brings Mr. Beatty out with his -- he walks out with his hands above his head.

Q. Okay. And you had said that Ms. Lopez was raising her voice. What was she discussing or saying at this point?

A. I don't recall. You'd have to look at the body cam for her -- what she said.

Q. Now Mr. Beatty is escorted out of the convenience store by Officer Gardner, correct?

A. Yes.

Q. All right. And what happens -- where is he -- what happens next when he comes out?

A. Everyone is kind of around the front passenger's side of the vehicle. And then Officer Gardner explains to them what's going on. At one point Ms. Lopez pulls out her phone. I think this was before Officer Gardner and Mr. Beatty came out. She pulls out her phone and said she was recording. I explained to her I had a body cam on and everything was recording already. And it was either before or

Case 4:25-cv-00036-DJKM Document 16 Page 484 Filed 04/05/24 Page 2/16/2025

after, I don't remember that. But explained what was going on with the marijuana in the car. And that they could either give -- Ms. Lopez. I believe she was the registered owner of the vehicle. She could give consent for us to search the vehicle or we could tow it and apply for a search warrant. She agreed to consent to the search and then they started walking around.

And then Mr. Beatty told her, that's fine, don't let them search then. And at some point IDs were asked for in that timeframe, which neither one of them gave us.

Q Okay. Now you had indicated that Ms. Lopez pulled out her phone and started recording, is that correct?

A Correct.

Q Was she permitted to continue recording?

A No.

Q Why not?

A Because they were under investigation. They were detained. Not free to leave.

Q And do you recall if you or Officer Gardner stopped her recording?

A I do not recall.

Q Now at some point -- well let me ask you

this. Was Mr. Beatty handcuffed at some point?

A Yes.

Q What happened to lead to that?

A Without watching the body cam, I don't remember what exactly happened. I know they were raising their voices, becoming more upset. And then they were both handcuffed and sat on the hood of the vehicle.

Q Okay. Do you recall what they were saying at this point, when they were upset?

A Words, no. I don't remember exactly.

Q They were both handcuffed and put on the hood of the vehicle, I believe you said?

A Yeah, they were like, leaning with their butts up against the front of the vehicle.

Q Okay. And why were they handcuffed?

A Because of the way they were acting, raising their voices, starting to move around. Going places where they weren't allowed to go.

Q All right. So they're handcuffed and on the hood of the car. What happens next?

A They were eventually -- Ms. Lopez -- I don't remember the exact order of events, but at some point she became argumentative, loud, more than she was. I had leaned Mr. Beatty over the front hood of car and

searched him and then placed him in the rear of my patrol car to take him away from that situation.

Q At the time -- and you described Mr. Beatty, that you leaned him over the front of the car and searched him. Was he handcuffed at that point?

A He was.

Q All right. Describe your search. What did it entail, where did it go, what were you looking for.

A I mean, the body cam would probably have the best video. But I reached around to check his waist, check his pockets, check his groin. Reached down if he had pants or shorts on. Check his ankles, anywhere that he might have anything. I think I took a wallet out of his pocket and placed it on the hood of the car.

Q Did you get any contraband in that search?

A No, sir.

Q Now you had discussed, kind of in this chain of events, the raising of voices. Are you indicating that Mr. Beatty was raising his voice?

A Not as much as Ms. Lopez. Not nearly as much. I mean he definitely wasn't having a casual conversation like you and I, but he wasn't as irate as she was.

Q Okay. Do you recall what he was saying?

A I do not.

Q And so you leaned over the front of the car, you search him. And then I believe you'd indicated you put him in the vehicle that you and Officer Gardner had been driving, correct?

A Correct.

Q And how did that go? Placing him in the vehicle.

A He went over and had a seat in the vehicle. And then I believe I talked to him and then at some point the door was shut and then I went back over and talked to him.

Q Okay. And what can you tell me about that conversation?

A Like what?

Q What happened? Who said what?

A I believe that would be on body cam. Just asking him for his ID. He eventually told me his name. And then he said his ID was in his wallet. I think I went and got his ID out of his wallet and it confirmed who he was. He also had an ignition interlock license, which he argued that was not the case because PennDOT was so backed up because of COVID. I believe just general conversation then and explaining to him that the situation didn't need to go

Ervin Blank Associates, Inc.
107 McCracken Road, Danville, PA 17821
office@ervinblankassociates.com

like that. At some point during that, Ms. Lopez was taken over to the one of the city officer's vehicles where she had kicked Officer Geary and then he was upset about that.

Q Okay. Now you used the term upset. Was this conversation carried on at a conversational level?

A Between him and I?

Q Yes.

A As far as when he got upset about her kicking Officer Geary?

Q And the conversation you had just described with me, where you're talking about IDs and it confirmed who he was and your discussion of the ignition interlock.

A It wasn't as calm as you and I are having right now. I mean, it was elevated a little bit but nothing that was raised to the level of what Ms. Lopez's was.

Q Is it fair to say it wasn't out of the ordinary?

A I think it was out of the ordinary for a general conversation.

Q What about an interaction with police?

A I talk to people daily that don't raise their voice, they talk normal like you and I are. So I think it would be out of the normal.

Q Okay. Now at some point Officer Gardner and you end up talking to an African American woman who is also at the fuel pumps, is that correct?

A Correct.

Q All right. Do you know how long she had been there before you guys talked to her?

A I do not.

Q What happened in that interaction with that woman?

A I remember she was yelling something and then Officer Gardner went over to her, spoke to her at that time. I don't know if I was directly behind him or I went over after I saw him interacting with her. Claiming that her daughter missing. And Officer Gardner explained to her not to interject herself into this.

And then he left and I asked her, I said, was it reported to the police. She said yes. I said, well you need to follow up with whoever took the report. She said, I think it was him, referring to one of the other city officers that was there. And I explained to her that that's probably not the case, it was probably passed on to an agent, you should reach out to them, this isn't the time or place for it.

Q Did you hear Officer Gardner threaten to arrest her at any point in that conversation?

A I don't know if I was right there when he said it or not. But in reviewing the body cam footage, I remember him saying that you can be arrested for obstruction. Whether I remember that myself or not, I don't know.

Q Okay. But this woman's concerns seem to be not specifically related to either Ms. Lopez or Mr. Beatty. It was her child or some relative of her's that was missing?

A They were initially related to the incident, but then once she was approached by Officer Gardner she changed it to, my child is missing, her daughter.

Q What was she saying or how did you know that it was related to the incident involving you two officers and Mr. Beatty and Ms. Lopez?

A I don't remember how I knew that at the time. Probably something she said.

Q But you have no recollection of what that was?

A At this time, no.

Q Did you get that woman's identity?

A No.

Q Okay. Why not?

A It wasn't material to the investigation we were doing there.

Q If she was observing and apparently commenting on the interaction between you guys and Mr. Beatty and Ms. Lopez, wouldn't she have been a witness?

MR. WHITE: Objection to form. You can answer.

THE WITNESS: She could have been a witness. I mean, everyone else that was at the store could have been a witness as well. But I don't know that she was going to provide better information than the body cams we had on.

BY MR. COCHRAN:

Q But she could very well have been a witness?

A Very well could have, yes.

Q Okay. All right. Even though we've identified six law enforcement officers there at a minimum, none of them thought to get her identity, correct?

MR. WHITE: Objection to form. You can answer.

THE WITNESS: I can't speak to what they thought.

BY MR. COCHRAN:

Ervin Blank Associates, Inc.
107 McCracken Road, Danville, PA 17821
office@ervinblankassociates.com

**Page 25**

Q    Now what crime was she committing that she could have been arrested for?

A    Who?

Q    This African American woman that we're discussing.

A    I believe Officer Gardner said obstruction.

Q    All right.

A    That she could be arrested for.

Q    And what would she have been obstructing?

A    Our investigation.

Q    Okay. And what were you investigating at that point in time with both individuals in the car?

A    I don't know that they were in the car at that time or not. That I don't remember.

Q    Okay. But if they were in the car, would you agree with me there wasn't an investigation ongoing at that point?

MR. WHITE: Objection to form, but you can answer.

THE WITNESS: I believe there still would have been an investigation going on because we still had the vehicle to deal with. We still had Mr. Beatty in the back of my vehicle. We still had Ms. Lopez in the back of the city police vehicle. I don't believe the investigation was over at that point.

**Page 26**

BY MR. COCHRAN:

Q    What were you investigating at that point? What facts needed to be resolved?

A    I don't know if his information was ran. I'm not sure about Ms. Lopez's. They still needed to be transported down to the station. The vehicle still needed to be towed.

Q    So it would have been the tow and the transport, is that fair to say?

A    Tow, transport. Yes.

Q    Okay. Now ultimately Mr. Beatty was transported to the Williamsport Bureau of Police at City Hall for a strip search, correct?

A    I believe so, yes.

Q    Okay. Did you have any role in his being strip searched?

A    I don't recall. I remember I was in the room. There was a body cam video that was terminated when Officer -- Officer Gardner came into the room. I was sitting there with Mr. Beatty, I believe, talking. Officer Gardner came in and asked if he was strip searched. I said no. And then I terminated the body camera. But that's -- if I wouldn't have seen that body cam video I wouldn't have even remembered I was there for that.

**Page 27**

Q    Okay. Do you have -- do you know if you performed the strip search or did Officer Gardner?

A    I do not.

Q    Do you know if anyone else was there besides you, Mr. Beatty, and Officer Gardner?

A    I do not.

Q    Okay. Do you know if there was any recording made of the strip search?

A    My body camera was turned off prior to the strip search. I don't know that there was any in the room that were utilized.

Q    Now the strip search is the third search of Mr. Beatty at this point, is that correct?

MS. LAUGHLIN: Object to form. You can answer.

THE WITNESS: As far as search, I was only involved in the first one at the vehicle and then assuming the strip search there.

BY MR. COCHRAN:

Q    Okay. But you would agree with me that there was a pat down of Mr. Beatty conducted in the store by Officer Gardner, correct?

A    If that's what he says, yes.

Q    Now why was Mr. Beatty strip searched?

A    To confirm or deny that there were drugs on

**Page 28**

his person.

Q    And did you find any contraband in that search?

A    No.

Q    Can you describe for me what that search entailed?

A    As far as process, they're uncuffed or unshackled. They stand there and they start handing us garments of clothing, starting with the shirt. And then -- well they take their shoes and socks off. Shirts off. Hand them to an officer to make sure there's no drugs inside them. Pants, same thing. Underwear, same thing. And then arms up, wiggle their fingers, under their armpits. Open their mouth, lift their tongue up. Lift their genitals. Turn around. Spread their cheeks, cough while they're bending over. And then they can get dressed again.

Q    Okay. And by genitals, the lifting would be of the penis and the testicles, correct?

A    Yes.

Q    All right. And you had indicated turning around and spreading. You're referring to spreading the buttocks, correct?

A    Correct.

Q    Okay. And then would the coughing be done

while that is going on?

A    Yes.

Q    Okay. Would you agree with me that this is an embarrassing and stressful process?

MR. WHITE:  Objection. Form. You can answer.

THE WITNESS:  For?

BY MR. COCHRAN:

Q    To be strip searched.

A    I've never been in that situation, being strip searched. I can't say.

Q    Now this process that you've just described for me, is that your recollection of the specific search of Mr. Beatty or is this how a strip search in your experience typically goes?

A    That would typically be how a strip search goes. I do not recall Mr. Beatty's strip search whatsoever.

Q    Do you recall how long the time was that elapsed from the time that he was told to begin removing clothing until he was fully clothed again?

A    I do not recall.

Q    Can you give us a reasonable estimate of the time involved?

A    I guess -- not really. It would be a short time as long as they take their clothes off fairly quickly and then put their clothes back on. Presumably under a minute. It could take longer if you're a larger guy, you have more clothes on or you're not as quick at getting dressed or undressed. But I think normally they don't take very long at all.

Q    Now did you arrest Mr. Beatty at any point in time on August 31st, 2021?

A    As far as charging him with anything?

Q    Did you arrest him?

A    He was detained and taken down for the strip search. And then he was, I believe, released.

Q    Was he charged with any crime as a result of this incident?

A    Not that I'm aware of.

Q    And why not?

A    I don't know what Officer Gardner's thoughts were on that. I know Ms. Lopez was the — when it rose to the level of the aggravated assault, that was the main focus.

Q    Okay. And maybe I should have touched on this. Was this your investigation or was it Officer Gardner's?

A    As far as like, who was the lead on it?

Q    Yes.

A    I'd say Officer Gardner was the lead. I was assisting him.

Q    Okay. And how is that determined?

A    I don't know how it's determined. It's just kind of how it went that day.

Q    Do you know if there was any written record kept of the strip search? Who was there, when it occurred, who was searched, what was found, how long it took. Anything like that?

A    Not that I'm aware of.

Q    Do you recall telling Mr. Beatty or making a comment during the incident, something to the effect of, if it's a roach we'll take care of it?

A    I very well could have, yeah. That wasn't technically our — we don't normally go out and just look for people with roaches.

Q    Why not?

A    Small amount of marijuana possibly, paraphernalia normally.

Q    Now this entire event took place in Williamsport, Pennsylvania, correct?

A    Yes.

Q    All right. And would you agree with me that it occurred at the Turkey Hill convenience store where both gasoline and personal items like food and drink are sold?

A    On Washington Boulevard, yes, sir.

Q    And that people routinely stop there to buy those items and were in fact doing that during this incident?

A    Yes, sir.

Q    Now the vehicle they were driving was impounded until it was searched, correct?

A    I believe so.

Q    All right. Did you have any involvement in that search?

A    Not that I recall, no. I don't believe I was there for the search whatsoever.

Q    All right. So just to clarify, your recollection is that you were not present for the search, correct?

A    Correct.

Q    So you wouldn't have any idea then of what the search of the car entailed or what, if anything, was found, correct?

A    Correct.

Q    And then you also wouldn't know, if there was anything found, whether it was tested or memorialized or anything like that, correct?

A    Correct.

Q  Now so far, to my information, we have, in terms of law enforcement involvement in the incident, yourself, Clinton Gardner, Tyson Minier, Zachary Geary, Jordan Stoltzfus, and there was also a mention of a Detective Anderson.

A  Okay.

Q  Were those people, to your knowledge, present during this incident?

A  I know the Williamsport police officers were. Detective Anderson, I don't recall if he was there or not. I don't remember having interaction with him in relation to our incident. So I guess I don't know.

Q  Okay. Tyson Minier. What can you tell me about his involvement on that date?

A  I don't know what he did at all.

Q  What about Zachary Geary. What can you tell me about his involvement on that date?

A  I believe he assisted Officer Gardner with walking Ms. Lopez to the rear of his — to be placed in his patrol vehicle.

Q  Okay. How about Jordan Stoltzfus. What can you tell me about his involvement?

A  I have no idea.

Q  Okay. And then with respect to Detective Anderson, do you have any knowledge of his involvement at all?

A  No knowledge at all. I don't know if he was there for us or what. Couldn't tell you.

Q  Okay. Is he a supervisor of yours?

A  No.

Q  Is he a coworker?

A  He works for the Narcotics Unit for the District Attorney's Office.

Q  Okay. Now, and I believe it was Exhibit 1 for Officer Gardner's deposition. There was a search warrant and you had looked at that at one point in time. Would you have had any involvement in putting that information into the search warrant?

A  No, sir.

Q  Okay. And the second exhibit was a receipt or inventory of property. Would you have had any involvement in compiling that document or putting information into it?

A  No, sir.

Q  Now there was also, I believe it was Exhibit 4, a photograph which was a screen grab which Officer Gardner believed was Detective Rob Anderson. Are you able to look at that individual and tell me if it is, in fact, who that is?

A  It appears to be.

Q  Okay. And once again, even looking at that, do you have any recollection of what he would have been doing there?

A  No idea whatsoever.

MR. COCHRAN: All right. I have here an exhibit I would ask to be marked as Exhibit 1 for this deposition.

(Whereupon, a document was produced and marked as Deposition Exhibit No. 1 for identification.)

BY MR. COCHRAN:

Q  Now this is a two-page document which appears to be titled Lycoming County District Attorneys Office, Inc. And then there's a number symbol, WBP21-08506 and it says Supplemental 1. Do you see that?

A  I do.

Q  Is this a document that you're familiar with?

A  Yes.

Q  And is that information on these two pages that you would have put in?

A  Yes.

Q  Okay.

A  The only thing you're missing, the CFS report that would have been attached to it.

Q  Okay. And what's the CFS report?

A  Call for service. So it would have been our log through the dispatch center that showed when we were there, if we ran information or ran — I believe it was in — it would be the same information that is in Exhibit 3. It would be the same information that was in Exhibit 3.

Q  Okay.

A  Just in a different format.

Q  Okay. Same information, different format.

A  Theirs gets inputted into their system, I get mine via email and I attach it.

Q  And you would put it into your system?

A  Yes.

Q  Your system would have been with the Lycoming County District Attorneys Office?

A  We don't technically have a system. That's why it's a word document. So there's no system, everything is physical files.

Q  Okay. I think I understand.

A  We're a little behind the times.

MR. COCHRAN: It happens. All right. Let me talk to Kyle for a minute and we may be wrapping up.

(Whereupon, a recess was taken from 10:50 a.m. until 10:53 a.m.)

AFTER RECESS

MR. COCHRAN: All right. I have nothing further.

CROSS-EXAMINATION

BY MS. LAUGHLIN:

Q    I just have a couple of questions for you, Detective Irvin.

A    Okay.

Q    You had talked about first seeing the subject vehicle on the avenues. Is there any significance to the avenues with regard to criminal conduct?

A    I know that the Narcotics Unit is always in that area dealing with drug houses or search warrants for houses. There's a lot of narcotics activity down there that they deal with. I'm not specifically there when they do, but I know the area from that.

Q    And the ashtray that you're talking about that is kind of -- I think you described it as the size of a soda can. Did it have kind of a lid or a top on it?

A    Yes.

Q    Okay. And the roach that was observed was on the top of that lid or cap?

A    Correct. The cap had a hole in the center of it, I'm assuming the size of a cigarette or maybe a hair bigger. It was sitting on the top of that, not down inside the cup.

MS. LAUGHLIN: Those are the only questions I have. Thank you.

REDIRECT EXAMINATION

BY MR. COCHRAN:

Q    Just a couple very brief follow-ups. My understanding is the avenues are public roads, correct?

A    Absolutely.

Q    And that there's public traffic on it, people driving all the time?

A    Yes.

Q    And in this case, you didn't see this car do anything but drive, correct?

A    Correct.

Q    No stops or anything like that?

A    Other than at the appropriate intersection. But I'm assuming, yes.

MR. COCHRAN: Okay. I have nothing further.

MS. LAUGHLIN: No other questions.

MR. COCHRAN: Thank you.

(Whereupon, the deposition was concluded at 10:56 a.m.)

COUNTY OF LYCOMING                        :

COMMONWEALTH OF PENNSYLVANIA

I, Loretta C. Berrigan, the undersigned Notary Public, do hereby certify that personally appeared before me, CALVIN IRVIN; the witness, being by me first duly sworn to testify the truth, the whole truth and nothing but the truth, in answer to the oral questions propounded to him by the attorneys for the respective parties, testified as set forth in the foregoing deposition.

I further certify that before the taking of said deposition, the above witness was duly sworn, that the questions and answers were taken down stenographically by the said Loretta C. Berrigan, court Reporter, Williamsport, Pennsylvania, approved and agreed to, and afterwards reduced to typewriting under the direction of the said Reporter.

In testimony whereof, I have hereunto subscribed my hand this 30th day of January, 2024.

_____
Loretta C. Berrigan
Reporter-Notary Public
My Commission Expires
December 7, 2026

Ervin Blank Associates, Inc.
107 McCracken Road, Danville, PA  17821
office@ervinblankassociates.com

**- 0 -**

06104 [1] 1:24

**- 1 -**

17701 [2] 1:18, 21

**- 2 -**

2017 [1] 4:16
2021 [4] 4:1, 5; 5:16; 30:8
2024 [2] 1:12; 39:20
2026 [1] 39:25
23-cv-00364 [1] 1:4
2903 [1] 1:24

**- 3 -**

30th [1] 39:20
31st [4] 3:25; 4:4; 5:15; 30:8

**- A -**

a.m. [4] 1:12; 36:25; 38:24
able [1] 34:23
above [2] 16:7; 39:13
absolutely [1] 38:10
acting [1] 18:17
activity [2] 9:21; 37:14
actual [1] 13:23
admitted [1] 2:14
affirmed [1] 3:11
african [2] 22:3; 25:4

afternoon [1] 6:25
afterwards [1] 39:17
again [4] 3:21; 28:17; 29:21; 35:1
against [2] 3:16; 18:15
agent [1] 22:24
aggravated [1] 30:19
agree [4] 25:16; 27:20; 29:3; 31:23
agreed [2] 17:6; 39:17
allowed [1] 18:19
always [1] 37:12
american [2] 22:3; 25:4
amount [1] 31:18
anaise [1] 4:7
anderson [4] 33:5, 10, 25; 34:22
ankles [1] 19:12
answer [6] 24:8, 22; 25:19; 27:15; 29:6; 39:8
answers [1] 39:14
apologies [1] 11:13
appeared [1] 39:6
apply [1] 17:6
approached [1] 23:13
appropriate [1] 38:18
approved [1] 39:16

area [3] 8:25; 37:13, 16
argued [1] 20:22
argumentative [1] 18:24
armpits [1] 28:14
arms [1] 28:13
arrest [4] 15:22; 23:2; 30:7, 10
arrested [3] 23:6; 25:2, 8
ashtray [1] 37:17
ashtrays [1] 13:21
assault [1] 30:19
assisted [1] 33:18
assisting [1] 31:2
associates [1] 1:23
assume [1] 9:22
assuming [3] 27:18; 37:25; 38:19
attach [1] 36:12
attached [1] 35:25
attention [3] 8:11, 18; 9:16
attorney's [2] 6:8; 34:8
attorneys [3] 35:13; 36:16; 39:9
august [4] 3:25; 4:4; 5:15; 30:8
austin [1] 1:20
available [1] 5:4
avenue [3] 7:3, 4, 19

avenues [5] 7:12, 17; 37:10, 11; 38:8
aves [9] 7:2, 10, 11; 8:4, 9, 10, 15, 16, 20
aware [3] 9:17; 30:15; 31:10
away [1] 19:2

**- B -**

backed [1] 20:23
background [2] 4:3, 4
badge [4] 6:4, 6, 7, 11
beatty [35] 1:2; 3:15; 4:5; 6:21; 7:1; 8:12; 9:11; 10:7, 16; 11:24; 12:9; 15:7, 11, 12; 16:6, 13, 22; 17:9; 18:1, 25; 19:4, 20; 23:10, 17; 24:5; 25:22; 26:11, 20; 27:5, 13, 21, 24; 29:14; 30:7; 31:11
beatty's [1] 29:17
became [1] 18:24
becoming [1] 18:6
begin [1] 29:20
beginning [1] 1:12
behavior [1] 10:13
behind [8] 8:5, 25; 9:3, 6; 10:3; 12:19; 22:13; 36:21

bending [1] 28:16

berrigan [4] 1:11; 39:4, 15, 23

best [1] 19:10

better [2] 16:4; 24:12

between [6] 3:2; 5:17, 21; 9:4; 21:7; 24:4

bigger [1] 38:1

blanks [1] 4:1

body [12] 14:24; 16:12, 24; 18:4; 19:9; 20:17; 23:4; 24:12; 26:18, 22, 24; 27:9

boulevard [5] 9:2; 10:22; 11:2, 9; 32:2

brief [1] 38:7

brings [1] 16:6

brown [1] 13:17

bureau [3] 4:15; 6:13; 26:12

buttocks [1] 28:23

butts [1] 18:15

- C -

calls [3] 8:18; 9:15; 15:4

calm [1] 21:15

calvin [6] 1:6, 9, 22; 2:3; 3:10; 39:6

camera [2] 26:23; 27:9

campbell [3] 7:4, 9, 10

cams [1] 24:12

care [1] 31:13

carried [1] 21:6

cars [1] 9:4

case [3] 20:23; 22:23; 38:14

casual [1] 19:22

causing [1] 16:4

center [2] 36:3; 37:24

certification [1] 3:4

certify [2] 39:5, 12

chain [1] 19:18

changed [1] 23:14

charged [1] 30:13

charging [1] 30:9

check [4] 19:10, 11, 12

checking [1] 10:3

cheeks [1] 28:16

child [2] 23:10, 14

chronological [1] 11:22

cigarette [1] 37:25

city [4] 21:2; 22:22; 25:24; 26:13

claiming [1] 22:15

clarify [1] 32:14

clear [1] 11:4

clinton [4] 1:6, 25; 4:10; 33:3

clothed [1] 29:21

clothes [3] 30:1, 2, 4

clothing [2] 28:9; 29:21

cochran [15] 1:17; 3:13, 15; 24:14, 25; 26:1; 27:19; 29:8; 35:5, 11; 36:22; 37:2; 38:6, 20, 22

code [1] 10:19

coming [2] 8:2

comment [1] 31:12

commenting [1] 24:4

commission [1] 39:24

committing [1] 25:1

commonwealth [1] 39:2

compiling [1] 34:17

concerns [1] 23:8

concluded [1] 38:23

conduct [2] 10:24; 37:11

conducted [1] 27:21

confirm [2] 13:10; 27:25

confirmed [2] 20:21; 21:13

connecticut [1] 1:24

consent [2] 17:5, 7

consider [1] 4:19

continue [1] 17:17

continuing [1] 9:18

contraband [2] 19:16; 28:2

convenience [3] 16:1, 14; 31:24

conversation [11] 9:23; 11:17, 21; 15:4; 19:23; 20:14, 24; 21:6, 11, 22; 23:2

conversational [1] 21:6

correct [39] 5:6; 6:16; 7:17; 8:21; 9:7, 8; 11:6, 7, 9; 12:16, 17; 13:2; 14:5; 16:14; 17:15, 16; 20:5, 6; 22:4, 5; 24:20; 26:13; 27:13, 22; 28:19, 23, 24; 31:21; 32:8, 16, 17, 20, 21, 24, 25; 37:24; 38:9, 15, 16

cough [1] 28:16

coughing [1] 28:25

counsel [2] 1:16; 3:3

county [4] 6:8; 35:13; 36:16; 39:1

couple [2] 37:6; 38:7

court [2] 1:1; 39:16

covid [1] 20:24

coworker [1] 34:6

crime [2] 25:1; 30:13

criminal [4] 9:21; 10:13, 24; 37:11

cross [1] 2:2

cross-examination [1] 37:4

---

**- D -**

da's [1] 6:11
daily [1] 21:24
date [7] 4:8;
5:16, 24; 6:2,
18; 33:14, 17
daughter [2]
22:15; 23:14
deal [2] 25:22;
37:15
dealing [1]
37:13
december [1]
39:25
defendant [2]
1:22, 25
defendants [1]
1:7
definitely [1]
19:22
deny [1] 27:25
depending [1]
5:22
deposed [1]
3:17
deposition [9]
1:9; 2:15;
3:17; 34:10;
35:7, 9; 38:23;
39:11, 13
describe [3]
13:15; 19:7;
28:5
described [6]
12:7; 15:5;
19:3; 21:11;
29:12; 37:18
designed [1]
5:2
detained [3]
15:23; 17:21;
30:11
detective [6]
3:14; 33:5, 10,
24; 34:22;
37:7
determined [2]
31:3, 4

difference [1]
8:15
different [2]
36:9, 10
direct [3] 2:2;
3:12; 15:8
directed [1]
13:11
direction [3]
7:22, 25; 39:18
directly [3]
7:17; 15:16;
22:13
discuss [1]
9:14
discussed [1]
19:18
discussing [4]
9:10, 18; 16:9;
25:5
discussion [1]
21:13
dispatch [1]
36:3
district [6]
1:1; 6:8; 34:8;
35:13; 36:16
disturbance [1]
16:4
document [5]
34:17; 35:8,
12, 18; 36:18
doesn't [1]
5:13
done [1] 28:25
door [8] 13:8,
13, 20; 14:16,
17, 18, 19;
20:11
down [11]
12:11, 23;
13:23; 14:20;
19:11; 26:6;
27:21; 30:11;
37:14; 38:2;
39:14
downtown [2]
7:5; 8:13
draws [1] 8:11

dressed [2]
28:17; 30:5
drink [1] 31:25
drive [1] 38:15
driver [1]
15:15
driver's [6]
13:8, 20;
14:16, 17, 18,
19
driving [8]
6:18; 7:1;
9:12; 10:5;
12:9; 20:5;
32:7; 38:12
drug [1] 37:13
drugs [2]
27:25; 28:12
duly [3] 3:11;
39:7, 13
during [4]
21:1; 31:12;
32:4; 33:8

---

**- E -**

east [4] 8:2, 8;
11:13; 14:13
effect [1]
31:12
eighth [1] 7:14
either [5]
14:11, 15;
16:25; 17:3;
23:9
elapsed [1]
29:20
elevated [1]
21:16
email [1] 36:12
embarrassing
[1] 29:4
employer [1]
6:14
enforcement
[2] 24:18;
33:2
entail [1] 19:8
entailed [2]
28:6; 32:19

entire [1]
31:20
escorted [1]
16:13
esquire [3]
1:17, 20, 23
estimate [1]
29:23
event [1] 31:20
events [4]
3:25; 12:6;
18:23; 19:19
eventually [2]
18:22; 20:18
exact [1] 18:23
exactly [2]
18:5, 11
examination [2]
3:12; 38:5
except [1] 3:5
exhibit [9]
2:15; 34:9, 15,
20; 35:6, 9;
36:6, 7
exhibits [1]
2:13
experience [1]
29:15
expires [1]
39:24
explained [4]
16:24; 17:1;
22:16, 23
explaining [1]
20:25
explains [1]
16:20
eyes [1] 14:9

---

**- F -**

facing [6]
7:24; 8:1, 10;
11:12, 13;
14:13
fact [2] 32:4;
34:24
factors [1]
10:11
facts [1] 26:3

fair [2] 21:19; 26:9
fairly [1] 30:1
familiar [1] 35:18
ferren [1] 1:23
fifth [2] 7:4, 14
filed [1] 3:16
files [1] 36:19
filing [1] 3:4
fill [1] 4:1
fine [1] 17:9
fingers [1] 28:14
firm [1] 1:20
first [10] 6:21; 7:3, 8, 13; 8:6, 12; 9:15; 27:17; 37:9; 39:7
flakes [1] 14:1
flashlight [1] 12:23
focus [1] 30:20
follow [2] 9:18; 22:20
follow-ups [1] 38:7
following [10] 9:7, 9, 17; 10:6, 9, 13, 20, 25; 11:5, 19
follows [1] 3:11
food [1] 31:25
footage [1] 23:5
foregoing [1] 39:11
form [6] 3:5; 24:7, 21; 25:18; 27:14; 29:5
format [2] 36:9, 10
forth [1] 39:10
found [3] 31:8; 32:20, 23

fourth [3] 1:21; 7:4, 13
free [3] 15:12, 17; 17:21
front [11] 8:5, 7; 11:16; 14:15, 16, 21; 16:18; 18:15, 25; 19:4; 20:2
fuel [1] 22:4
fully [1] 29:21
functions [1] 5:11

- G -

gardner [42] 1:6, 25; 3:20; 4:11; 6:10, 19; 7:6; 8:13, 16, 18; 9:10, 15; 11:18, 25; 12:4, 23; 13:5, 24; 14:12; 15:4, 10; 16:6, 14, 20, 22; 17:22; 20:5; 22:2, 12, 16; 23:1, 13; 25:6; 26:19, 21; 27:2, 5, 22; 31:1; 33:3, 18; 34:22
gardner's [3] 30:17, 23; 34:10
garments [1] 28:9
gasoline [1] 31:25
geary [4] 21:3, 10; 33:4, 16
general [2] 20:24; 21:22
genitals [2] 28:15, 18
goes [5] 5:22; 12:1; 13:23; 29:15, 17

good [2] 3:14, 23
grab [1] 34:21
groin [1] 19:11
guess [5] 13:20; 14:13; 16:4; 29:25; 33:12
guys [10] 5:9; 7:25; 9:3, 14, 16, 17; 10:8; 11:19; 22:7; 24:4

- H -

hair [1] 38:1
half [1] 13:16
hall [1] 26:13
hand [2] 28:11; 39:20
handcuffed [6] 18:1, 7, 12, 16, 20; 19:5
handing [1] 28:8
hands [1] 16:7
happy [1] 3:20
hartford [1] 1:24
head [3] 12:10; 15:6; 16:7
hear [2] 3:19; 23:1
heard [1] 7:11
help [2] 5:3
her's [1] 23:11
hereby [3] 3:2, 4; 39:5
hereunto [1] 39:19
herself [1] 22:16
high [5] 8:2, 8, 9; 9:1; 10:25
hill [6] 9:2; 10:21; 11:1, 2, 8; 31:24
holder [1] 13:22

hole [1] 37:24
hood [5] 18:7, 12, 21, 25; 19:14
hospital [1] 9:1
house [2] 5:13, 14
houses [2] 37:13, 14
hundred [1] 9:21

- I -

idea [3] 32:18; 33:23; 35:4
identification [1] 35:10
identified [2] 6:1; 24:18
identities [1] 11:5
identity [2] 23:23; 24:19
ignition [2] 20:21; 21:14
illuminate [1] 12:24
immediately [1] 16:3
impounded [1] 32:8
inch [1] 13:17
incident [8] 23:12, 16; 30:14; 31:12; 32:5; 33:2, 8, 12
independently [1] 13:10
index [2] 2:1, 13
indicate [1] 14:3
indicated [5] 6:15; 8:18; 17:13; 20:3; 28:21

indicates [1] 8:19

indicating [1] 19:19

indications [1] 10:12

indicators [4] 9:20, 24; 10:15

individual [1] 34:23

individuals [1] 25:12

information [10] 24:12; 26:4; 33:1; 34:13, 18; 35:20; 36:4, 5, 6, 10

inputted [1] 36:11

inside [5] 11:6; 12:10; 15:11; 28:12; 38:2

instruction [1] 3:20

interacting [1] 22:14

interaction [4] 21:23; 22:9; 24:4; 33:11

interior [1] 12:24

interject [1] 22:16

interlock [2] 20:22; 21:14

intersection [1] 38:18

inventory [1] 34:16

investigating [2] 25:11; 26:2

investigation [9] 15:9, 24; 17:20; 24:1; 25:10, 16, 21, 25; 30:22

involved [2] 27:17; 29:24

involvement [8] 32:10; 33:2, 14, 17, 22, 25; 34:12, 17

involving [1] 23:16

irate [1] 19:23

irvin [8] 1:6, 9, 22; 2:3; 3:10, 14; 37:7; 39:6

issued [2] 6:6, 11

items [2] 31:25; 32:4

**- J -**

jane [1] 10:2

january [2] 1:12; 39:20

jordan [2] 33:4, 21

josh [1] 3:15

joshua [1] 1:17

**- K -**

keep [1] 10:3

kept [1] 31:7

kicked [1] 21:3

kicking [1] 21:9

kind [9] 3:19; 4:1, 2, 25; 16:18; 19:18; 31:5; 37:18, 19

knew [1] 23:18

knowledge [3] 33:7, 25; 34:2

known [1] 4:13

kyle [7] 1:2; 3:15; 4:5; 6:21; 8:11; 15:12; 36:23

**- L -**

lack [1] 16:4

larger [1] 30:4

laughlin [5] 1:23; 27:14; 37:5; 38:3, 21

lawsuit [1] 3:16

lead [3] 18:3; 30:24; 31:1

leaned [3] 18:25; 19:4; 20:2

leaning [1] 18:14

least [1] 9:11

leave [1] 17:21

left [2] 13:17; 22:18

length [1] 13:17

level [3] 21:6, 17; 30:19

license [1] 20:22

lift [2] 28:14, 15

lifting [1] 28:18

listed [1] 10:11

located [1] 13:19

location [1] 11:14

longer [1] 30:3

look [4] 12:11; 16:11; 31:16; 34:23

looked [2] 14:2; 34:11

looking [10] 9:19, 25; 10:3, 16; 12:12; 13:12; 14:15, 20; 19:8; 35:1

lopez [21] 4:7; 10:16; 11:25; 12:4; 15:7, 8,

17, 25; 16:8, 21; 17:3, 14; 18:22; 19:21; 21:1; 23:9, 17; 24:5; 25:23; 30:18; 33:19

lopez's [3] 12:1; 21:18; 26:5

loretta [4] 1:11; 39:4, 15, 23

loud [1] 18:24

lycoming [4] 6:8; 35:13; 36:15; 39:1

**- M -**

main [1] 30:20

mannerisms [1] 10:2

marijuana [8] 12:2; 13:7, 16, 18; 15:10, 16; 17:2; 31:18

marked [6] 2:14; 6:4, 5, 16; 35:6, 9

market [2] 1:14, 18

material [1] 24:1

mccormick [1] 1:20

mean [6] 14:17, 19; 19:9, 22; 21:16; 24:10

memorialized [1] 32:23

mention [1] 33:4

mentioned [1] 13:24

midday [1] 6:25

middle [1] 1:1

might [2] 13:1; 19:13

mine [1] 36:12
minier [2] 33:3, 13
minimum [1] 24:19
minute [2] 30:3; 36:23
minutes [1] 10:12
mirror [1] 10:3
mirrors [1] 10:17
missing [4] 22:15; 23:11, 14; 35:24
morning [3] 3:14; 6:23, 24
most [1] 11:12
motions [1] 12:2
mouth [1] 28:14
move [1] 18:18

**- N -**

name [1] 20:19
narcotics [3] 34:7; 37:12, 14
nearly [1] 19:21
need [2] 20:25; 22:20
needed [3] 26:3, 5, 7
needs [1] 5:3
neither [1] 17:11
never [1] 29:10
next [6] 8:24; 15:1, 5; 16:1, 17; 18:21
none [1] 24:19
normal [2] 21:25; 22:1
normally [3] 30:6; 31:15, 19
north [5] 7:18, 24; 8:3, 10

northeast [1] 14:14
notary [1] 39:5
nothing [4] 21:17; 37:2; 38:20; 39:8
number [1] 35:14

**- O -**

object [1] 27:14
objection [4] 24:7, 21; 25:18; 29:5
objections [1] 3:5
observations [1] 13:10
observe [2] 10:19, 24
observed [2] 13:8; 37:22
observing [2] 10:14; 24:3
obstructed [1] 12:20
obstructing [1] 25:9
obstruction [2] 23:6; 25:6
occasionally [1] 5:2
occurred [2] 31:8, 24
office [7] 5:17; 6:9, 11, 22; 34:8; 35:14; 36:16
officer [45] 3:20; 6:2, 19; 7:6; 8:13, 15, 18; 9:10, 15; 11:17, 25; 12:4, 22; 13:5, 24; 14:12; 15:4, 10; 16:6, 14, 19, 22; 17:22; 20:4;

21:3, 10; 22:2, 12, 15; 23:1, 13; 25:6; 26:19, 21; 27:2, 5, 22; 28:11; 30:17, 22; 31:1; 33:18; 34:10, 21
officer's [1] 21:2
officers [4] 22:22; 23:17; 24:18; 33:9
often [2] 5:9, 11
once [2] 23:13; 35:1
ongoing [1] 25:16
open [3] 14:17, 21; 28:14
oral [1] 39:8
order [2] 11:22; 18:23
ordinary [2] 21:20, 21
outside [2] 5:10; 14:11
owner [1] 17:4

**- P -**

pages [1] 35:20
pants [2] 19:12; 28:12
paraphernalia [1] 31:19
park [4] 11:8, 11, 23, 24
parked [4] 12:9, 13, 17, 18
part [1] 14:14
parties [2] 3:3; 39:10
partners [1] 5:5

passed [1] 22:24
passenger's [1] 16:19
patrol [2] 19:2; 33:20
penis [1] 28:19
penndot [1] 20:23
pennsylvania [7] 1:1, 14, 18, 21; 31:21; 39:2, 16
people [6] 11:14; 21:24; 31:16; 32:3; 33:7; 38:11
percent [1] 9:22
performed [1] 27:2
permitted [1] 17:17
person [1] 28:1
personal [2] 4:21; 31:25
personally [2] 7:7; 39:5
phone [3] 16:21, 23; 17:14
photograph [1] 34:21
physical [1] 36:19
picked [1] 11:1
place [3] 1:13; 22:25; 31:20
placed [3] 19:1, 14; 33:19
places [1] 18:18
placing [1] 20:7
plain [1] 10:2
plaintiff [5] 1:3, 10, 19; 2:2, 14

pocket    [1] 19:14

pockets    [1] 19:11

point [31] 7:1; 9:14;   10:6, 9; 11:18;     12:3, 10;       13:9; 14:10,     25; 15:12,     18; 16:10,     21; 17:10,     25; 18:1,   10,   23; 19:5;     20:11; 21:1;     22:2; 23:2;     25:12, 17,  25;   26:2; 27:13;     30:7; 34:11

police    [11] 4:15;  6:2, 4, 5, 14,  16;   21:23; 22:19;   25:24; 26:12;  33:9

possible    [1] 10:13

possibly    [2] 13:3;  31:18

present    [3] 1:16;     32:15; 33:7

presumably [2] 11:19;  30:3

primarily   [1] 3:25

process    [3] 28:7;  29:4, 12

produced    [1] 35:8

professional [1]  4:21

property    [1] 34:16

propounded [1] 39:9

provide    [1] 24:12

public    [5] 1:11;  38:8, 11; 39:5, 24

pull [1]  11:18

pulled    [1] 17:14

pulls    [2] 16:21, 23

pump    [3] 11:12, 15, 16

pumps    [2] 11:19;  22:4

putting    [2] 34:12, 17

---

### - Q -

questions    [6] 4:4;        37:6; 38:3, 21;  39:9, 14

quick [1]  30:5

quickly    [1] 30:2

---

### - R -

raise [1]  21:24

raised    [1] 21:17

raising    [6] 16:3,  9;    18:6, 17;  19:19, 20

reach    [3] 12:23;    15:16; 22:24

reached    [2] 19:10, 11

really    [1] 29:25

rear [3]  12:18; 19:1;  33:19

reason    [1] 15:21

reasonable   [1] 29:23

receipt    [1] 34:15

recess    [2] 36:24;  37:1

recollection [5] 8:17;      23:20;

29:13;    32:15; 35:2

record [1]  31:6

recording    [6] 16:23,     25; 17:14,  17,  23; 27:7

recross [1]  2:2

redirect    [2] 2:2;  38:5

reduced    [1] 39:17

referring    [3] 7:3;     22:21; 28:22

regard    [1] 37:11

regards    [1] 16:2

registered   [1] 17:4

relate [1]  9:11

related    [3] 23:9, 12, 16

relation    [1] 33:12

relationship [3] 4:20, 21

relative    [1] 23:10

released    [1] 30:12

remember  [14] 3:22;       9:6; 11:21;     17:1; 18:5,  11,  23; 22:11;  23:5, 6, 18;     25:14; 26:17;  33:11

remembered [1] 26:24

removing    [1] 29:21

report    [3] 22:21;    35:24; 36:1

reported    [1] 22:19

reporter    [2] 39:16, 18

reporter-notary [2]      1:11; 39:24

represent    [1] 3:15

reserved    [1] 3:6

resolved    [1] 26:3

respect    [2] 15:3;  33:24

respective   [2] 3:3;  39:10

result    [1] 30:13

reviewing    [1] 23:4

right    [35] 3:19,  24;  4:10, 13;   5:15;  6:1, 15,  20;    8:17, 24;       9:3; 10:11;     11:11, 16;      12:18; 13:9;  14:7, 12, 14;     15:23; 16:16;    18:20; 19:7;     21:16; 22:6;     23:3; 24:17;     25:7; 28:21;     31:23; 32:10,    14; 35:5;     36:22; 37:2

roach [8]  13:8, 12,  14,   16; 14:4, 5;  31:13; 37:22

roaches    [1] 31:16

road [1]  10:1

roads [1]  38:8

role [1]  26:15

room    [3] 26:18,    19; 27:11

rose [1]  30:19

routinely    [1] 32:3

## - S -

**says** [2] 27:23; 35:15
**schemery** [2] 1:13, 17
**screen** [1] 34:21
**sealing** [1] 3:4
**search** [30] 17:5, 6, 7, 10; 19:7, 16; 20:3; 26:13; 27:2, 8, 10, 12, 16, 18; 28:3, 5; 29:14, 16, 18; 30:12; 31:7; 32:11, 13, 16, 19; 34:10, 13; 37:13
**searched** [9] 19:1, 5; 26:16, 22; 27:24; 29:9, 11; 31:8; 32:8
**seat** [1] 20:9
**second** [3] 7:3, 13; 34:15
**seeing** [3] 7:5; 8:20; 37:9
**seem** [1] 23:8
**sees** [1] 12:2
**service** [1] 36:2
**seventh** [1] 7:14
**shake** [1] 13:25
**shawna** [1] 1:23
**shift** [3] 5:16, 19; 6:21
**shirt** [1] 28:9
**shirts** [1] 28:11
**shoes** [1] 28:10
**short** [1] 29:25
**shortly** [1] 16:5

**shorts** [1] 19:12
**show** [1] 14:24
**showed** [1] 36:3
**shut** [1] 20:11
**side** [1] 16:19
**significance** [1] 37:10
**signing** [1] 3:3
**sitting** [2] 26:20; 38:1
**situation** [3] 19:2; 20:25; 29:10
**sixth** [1] 7:14
**size** [2] 37:19, 25
**small** [2] 13:16; 31:18
**smaller** [1] 13:21
**smelled** [1] 13:7
**smells** [1] 12:2
**smoking** [1] 13:18
**socks** [1] 28:10
**soda** [2] 13:21; 37:19
**sold** [1] 32:1
**someone** [1] 5:4
**somewhere** [1] 8:7
**south** [2] 7:18; 8:10
**southeastern** [1] 11:12
**speak** [2] 4:1; 24:23
**specific** [1] 29:13
**specifically** [2] 23:9; 37:15
**spoke** [1] 22:12
**spread** [1] 28:16

**spreading** [2] 28:22
**stand** [1] 28:8
**standing** [3] 14:13, 20, 25
**start** [2] 5:16; 28:8
**started** [5] 3:22; 4:14, 17; 17:7, 14
**starting** [2] 18:18; 28:9
**starts** [1] 16:3
**states** [1] 1:1
**station** [1] 26:6
**stenographical ly** [1] 39:15
**still** [8] 11:19; 15:7; 25:20, 21, 22, 23; 26:5, 6
**stipulated** [1] 3:2
**stipulation** [1] 3:1
**stoltzfus** [2] 33:4, 21
**stop** [3] 11:1, 15; 32:3
**stopped** [2] 10:21; 17:23
**stops** [1] 38:17
**store** [10] 11:25; 12:4, 5; 15:6, 7; 16:1, 14; 24:10; 27:21; 31:24
**street** [11] 1:14, 18, 21; 7:5, 9, 10; 8:3, 8, 9; 9:1; 10:25
**streets** [1] 7:16
**stressful** [1] 29:4
**strip** [16] 26:13, 16, 21;

27:2, 8, 10, 12, 18, 24; 29:9, 11, 14, 16, 17; 30:11; 31:7
**stuff** [1] 4:2
**subject** [1] 37:9
**subscribed** [1] 39:20
**supervisor** [3] 4:23; 5:7; 34:4
**supplemental** [1] 35:15
**sworn** [3] 3:11; 39:7, 13
**symbol** [1] 35:14
**system** [5] 36:11, 13, 15, 17, 18

## - T -

**tags** [1] 10:8
**taking** [1] 39:12
**team** [2] 5:1
**technically** [2] 31:15; 36:17
**telling** [1] 31:11
**term** [4] 7:11; 13:25; 16:4; 21:5
**terminated** [2] 26:18, 22
**terms** [4] 10:12; 12:6; 14:10; 33:2
**tested** [1] 32:23
**testicles** [1] 28:19
**testified** [2] 3:11; 39:10
**testify** [1] 39:7
**testimony** [2] 14:3; 39:19

thank [2] 38:4, 22

theirs [1] 36:11

thereafter [1] 16:6

third [3] 7:3, 13; 27:12

thought [2] 24:19, 24

thoughts [1] 30:17

threaten [1] 23:1

through [8] 6:20; 13:13; 14:15, 16, 20, 21; 36:3

timeframe [1] 17:11

times [1] 36:21

titled [1] 35:13

tongue [1] 28:15

took [4] 19:13; 22:20; 31:9, 20

touched [1] 30:21

towed [1] 26:7

traffic [1] 38:11

transport [2] 26:9, 10

transported [2] 26:6, 12

traveling [2] 8:3, 8

trial [1] 3:6

truth [3] 39:7

trying [1] 10:1

turkey [6] 9:1; 10:21; 11:1, 2, 8; 31:24

turn [2] 10:1; 28:15

turned [1] 27:9

turning [1] 28:21

two-page [1] 35:12

typewriting [1] 39:17

typical [1] 5:19

typically [3] 11:15; 29:15, 16

tyson [2] 33:3, 13

- U -

ultimately [1] 26:11

uncuffed [1] 28:7

under [6] 15:9, 22; 17:20; 28:14; 30:3; 39:18

undersigned [1] 39:4

understand [3] 9:13; 14:3; 36:20

underwear [1] 28:13

undressed [1] 30:5

uniform [1] 5:24

unit [2] 34:7; 37:12

united [1] 1:1

unshackled [1] 28:8

upset [5] 18:6, 10; 21:4, 5, 9

used [2] 13:25; 21:5

usually [1] 5:21

utilized [1] 27:11

- V -

vantage [1] 14:10

vehicle [43] 6:3, 24; 7:1; 9:12; 10:2, 5, 14, 19; 11:6; 12:1, 8, 10, 13, 19, 20, 23, 24; 14:11, 13; 15:8, 15; 16:3, 19; 17:4, 5; 18:8, 13, 15; 20:4, 8, 9; 25:22, 23, 24; 26:6; 27:17; 32:7; 33:20; 37:10

vehicles [1] 21:2

versa [1] 5:4

vest [1] 6:4

vice [1] 5:4

video [4] 4:2; 19:10; 26:18, 24

view [1] 12:20

violations [1] 10:20

visible [1] 6:5

voice [4] 16:3, 9; 19:20; 21:25

voices [3] 18:6, 18; 19:19

- W -

waist [1] 19:10

waived [1] 3:4

walking [2] 17:7; 33:19

walks [2] 12:8; 16:7

wallet [3] 19:13; 20:19, 20

warrant [3] 17:6; 34:11, 13

warrants [1] 37:13

washington [5] 9:2; 10:21; 11:2, 9; 32:2

watching [1] 18:4

wbp21-08506 [1] 35:15

wearing [1] 6:4

west [5] 1:21; 7:4, 10, 18; 11:12

whatnot [1] 16:5

whatsoever [3] 29:18; 32:13; 35:4

whereof [1] 39:19

white [5] 1:20; 24:7, 21; 25:18; 29:5

whole [1] 39:7

wiggle [1] 28:13

william [1] 1:23

williamsport [10] 1:14, 18, 21; 4:14; 6:12, 13; 26:12; 31:21; 33:9; 39:16

window [2] 14:18, 21

windshield [3] 13:13; 14:16, 22

within [1] 15:16

without [1] 18:4

witness [12] 3:10; 24:6, 9, 11, 15, 23; 25:20; 27:16; 29:7; 39:6, 13

witnesses [1] 2:1

**woman** [3]
22:3, 10; 25:4
**woman's** [2]
23:8, 23
**word** [1] 36:18
**words** [1]
18:11
**works** [1] 34:7
**wrapping** [1]
36:23
**written** [1]
31:6

## - Y -

**yelling** [2]
16:5; 22:11
**yours** [1] 34:4
**yourself** [1]
33:3

## - Z -

**zachary** [2]
33:3, 16
**zicolello** [2]
1:13, 17

**DEFENDANT CALVIN IRVIN'S APPENDIX IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KYLE BEATTY,          :
          Plaintiff   :
                      :
     vs.              :  NO. 4:23-CV-00364
                      :
CLINTON GARDNER and CALVIN
IRVIN,                :
          Defendants  :
                      :

Deposition of:    KYLE BEATTY

Taken by    :  Defendant Irvin

Before      :  Loretta C. Berrigan
               Reporter-Notary Public

Beginning   :  January 22, 2024; 11:23 a.m.

Place       :  Schemery Zicolello
               333 Market Street
               Williamsport, Pennsylvania

COUNSEL PRESENT:

JOSHUA J. COCHRAN, ESQUIRE
Schemery Zicolello
333 Market Street
Williamsport, Pennsylvania  17701
          For - Plaintiff

AUSTIN WHITE, ESQUIRE
McCormick Law Firm
835 West Fourth Street
Williamsport, Pennsylvania  17701
          For - Defendant Calvin Irvin

SHAWNA LAUGHLIN, ESQUIRE
William J. Ferren & Associates
PO Box 2903
Hartford Connecticut  06104
          For - Defendant Clinton Gardner

---

INDEX TO WITNESSES

| FOR - DEFENDANTS | DIRECT | CROSS | REDIRECT | RECROSS |
| --- | --- | --- | --- | --- |
| Kyle Beatty | 3 | 90 | 124 | — |

INDEX TO EXHIBITS

| FOR - DEFENDANT | MARKED | ADMITTED |
| --- | --- | --- |
| Deposition Exhibit Beatty No. 1 | 27 | — |
| Deposition Exhibit Beatty No. 2 | 66 | — |

---

STIPULATION

It is hereby stipulated by and between counsel for the respective parties that signing, sealing, certification and filing are hereby waived; and that all objections except as to the form of the question are reserved to the time of trial.

*   *   *

KYLE BEATTY, called as a witness, having been duly sworn or affirmed, testified as follows:

DIRECT EXAMINATION

BY MR. WHITE:

Q     Mr. Beatty, my name is Austin White. I'm here representing Detective Irvin. You've sat through the depositions of Detective Irvin, Officer Minier and Officer Gardner already today, correct?

A     Yes.

Q     You understand as far as how this dialogue is going to work as far as us not talking over each other and that we're just here to ask you questions?

A     Yes.

Q     And you're doing great so far. I'm going to start with some background information just so I understand a little bit more about you, your

---

background, and then we're going to move into the events of August 31st, 2021. Can you state your full name, date of birth, and current address.

A     Kyle Beatty. ▓▓▓▓▓. 921 Westminster Drive, Apartment 2A, Williamsport, Pennsylvania 17701.

Q     And do you have a middle name or initial?

A     Yes. My middle name is Thomas.

Q     What is your education history?

A     Completed high school and some college. No degree.

Q     Which high school?

A     Well, I — in 11th grade I took a GED test and scored high enough to get my high school diploma. But I was enrolled at Bishop Neumann in Williamsport.

Q     And where did you go to college for a little bit?

A     Penn College.

Q     What did you study?

A     Business management. General studies the first few.

Q     What was the last year you were in school at Penn College?

A     To the best of my recollection, 2012 maybe.

Q     You didn't graduate with any type of degree or certificate?

A No.

Q Tell me about your employment over the last, let's say, ten years.

A The last ten years. For the last eight years I've been a manager at a local restaurant. In the two, well you said the last ten years so it would only include two more. But for four years previous to that I worked at Penn College as an assistant chef.

Q Which restaurant have you been a manager at?

A Perkins in Williamsport.

Q And are you still the manager there?

A Yes.

Q Have you been the manager there for the last eight years or did you work your way up to that position?

A I was hired as a manager. I cooked there a long time ago, years and years before that. Before Penn College.

Q And what did you do at Penn College when you worked there?

A I started out as just a regular cook and was -- applied and promoted to assistant chef there.

Q So in 2021 -- on August 31st, 2021, you were -- your employment was manager at Perkins in Williamsport?

A Yes.

Q Did you have a set shift during that time frame?

A To the best of my recollection, yes.

Q Tell me, what was that shift?

A I usually worked five 10-hour days. And I believe they were -- I believe it was Wednesday through Sunday or maybe it was Thursday through Monday. It was either one of those. I kind of switched back and forth between those two.

Q What were those hours those 10-hour shifts?

A So usually there's kind of like -- I'm not the only manager there, there's multiple managers there. There's usually -- they have like, an opener, a mid, and a closer. I was usually the closer at that time. It's a 10-hour shift. You usually come in around noon or one, and you stay 'til close.

Q What time's close?

A Close at that time, I think was twelve and one. It's not those hours anymore. They close a lot earlier since COVID happened and things like that.

Q Now when you use the term manager, is that like the store manager or is that an assistant manager or a particular type of --

A So the title is manager, but if you ask me

it's more just like a supervisor. There's a general manager who I would say is actually the manager. I mean he has to do with, you know, the payroll and everything else. I'm kind of just the manager on duty. When I'm there I supervise, but I don't have to do with the full scope of the restaurant.

Q So you report to the general manager?

A Yes.

Q And then you have how many people reporting to you?

A I mean, everybody else in the restaurant. The only person that the managers report to is the general manager, and then, you know, the regional manager I would say, outside the building.

Q So August 31st of 2021, do you remember what day of the week that was?

A I -- to the best of my recollection I think it was a Tuesday.

Q It was a Tuesday.

A Okay.

Q And so would you have been off that day?

A I was off that day, I do remember that.

Q Did you work Monday?

A I can't recall at this time. It was so long ago.

Q Did you usually work the weekends?

A Every -- yeah, always. Unless I requested off, I was always scheduled on weekends.

Q So would it be fair to estimate that the weekend prior, the 28th and the 29th, you would have worked?

A Yes.

Q And you think you worked the 30th?

A I'm not sure.

Q Not sure. Tell me, how do you know Ms. Lopez?

A We met, I think it was about two years prior to this incident happening.

Q Is she from around here?

A No, she is not.

Q Is she from Massachusetts?

A She was actually originally born in Reading, Pennsylvania. And then when she was younger she moved to Boston, Massachusetts, and I'm pretty sure she has resided there most of her life.

Q Does she live here now?

A Yes.

Q Does she live with you?

A Yes.

Q Did you two live together on August 31st,

**Page 9**

2021?

A Yes.

Q How long before that had you moved in together?

A She had really only moved down here for maybe a month or two prior to that. We were kind of still in the slowly-moving process, you know. We had the majority of her stuff but she was still going back to Boston to, you know, finish some things and see friends and, you know, before she officially became Pennsylvania.

Q And how long did you know her before August 31st, 2021?

A Like I said, I believe it was about two years. I believe.

Q And you two were dating at that time?

A Yeah, we've dated on and off for that two-year period.

Q Is she in school or anything? At that time, 2021.

A No.

Q So if I ask you a question, unless I specify another time frame, you can safely assume I'm talking about the day --

A That time.

**Page 10**

Q -- August 31st of 2021. So what were you doing, to the best of your recollection, that day before the incident at Turkey Hill? Run me through your whole day to the best that you can recall.

A I believe we woke up, and it was my day off. Just got food and were hanging out around the house. We decided to go run errands and in the midst of running errands this is what happened.

Q What time did you wake up?

A I don't recall.

Q Did you have a certain time that you usually woke up on your days off? I know some people are a creature of habit.

A I typically wake up in the am before nine or ten. I sometimes wake up at six or seven, eight. Usually that time in the morning.

Q So you said you were running errands. What errands do you recall running that day prior to arriving at Turkey Hill?

A I know we were downtown. We stopped at the -- I can't remember if it's the state representative or the county commissioner's office. There was a dress shop that had just opened up on, I believe 3rd or 4th. We stopped there, she went in and looked and we got in the car. We started driving

**Page 11**

towards the Newberry area, thinking about getting food at this point. And then we realized that a lot of the food is more towards the Strip, the other way. So we started to turn around to go the other way and that's when the incident occurred.

Q So I think you heard some testimony about Officer Gardner and Detective Irvin seeing the vehicle you were in driving around town. Do you recall seeing the police cruiser that Officer Gardner and Detective Irvin were in?

A Yes.

Q Tell me what you recall.

A Specifically when we were at the dress shop downtown, we were parked right in front. I believe it's meter parking and she went inside. I got out of the car and stood next to the car because I didn't want to go in the dress shop. And she wasn't going to be long. I didn't want to pay for the meter because I knew we were leaving. So I just said, I'm just going to stand by the car. If somebody comes I'll just move the car. And that's when they drove by and that was the first time I saw them.

Q So you saw them drive by either 3rd or 4th Street?

A Yeah. They drove right by us. They drove by

**Page 12**

really slow. They were really -- we made eye contact.

Q Is that the first time you saw them?

A That's the first time I saw them, yes.

Q Were you familiar with either of those law enforcement officers before you saw them that day?

A Never seen them before.

Q What did you -- did you have a concern when you saw them at that time?

A No. I just looked at them. They were looking at me and I looked at them.

Q What happened next?

A I stood by the car. They drove by. They stopped at the light and then they kept driving.

Q Do you remember what time this was at?

A I don't recall. I know it was in the afternoon. It was sunny. It was a nice day. It was my day off.

Q So what happened after Ms. Lopez -- I'm assuming Ms. Lopez then came out of the dress shop or did you go in?

A She came out eventually.

Q So she came out of the dress shop and then where did you go?

A We got in the car and started -- it's a one-way street there. I always get 3rd and 4th messed

Ervin Blank Associates, Inc.
107 McCracken Road, Danville, PA 17821
office@ervinblankassociates.com

up. I think that's 4th, going towards Newberry. And so we got in the car. It's a one-way street, we started driving and we were just talking. How'd you like the shop, you want to get some food. This and that kind of stuff.

Q    And you were heading down 4th Street towards Newberry. Where did you go exactly?

A    Just driving down 4th and like I said, we were talking about food and we, you know, we go to a lot of the same places. We always try to go somewhere different. We were discussing that kind of thing. You know, it's always a long process to decide where to eat. And I think I was the first one to say, you know, we're going -- all the food is that way. We got to turn around and there's nothing really in Newberry to eat but like, some sub shops or something. So, you know, I can't do a U-turn, it's a one-way road.

So I took a right and started going that way towards High Street because High Street will run us all the way back towards, you know, the other way, rather than jumping on, I think 3rd, going left. I would have had to go down and got on 3rd and it would have been a one-way all the way back. So I just -- I don't know, I wasn't thinking. It really didn't matter whether to go left or right, we were just going

back. So I just went right and went that way to turn around to get over there on High Street.

Q    Did you and Ms. Lopez decide on where you were going to get food at that time?

A    No, I just think we were just -- just head towards the Strip, you know, where all the food's kind of at and we'll figure it out when we get there kind of thing.

Q    At some point while driving after the dress shop did you see the police cruiser again?

A    Yes.

Q    Tell me what you saw.

A    So after I took the right on, I believe it was Sixth Street, because at the end of Sixth and High there's a gas station and that's how I remember what street we were on. That's the only reason. We pulled up to a stop sign and they pulled up to the stop sign across from us. They weren't behind us. They were across from us.

Q    What do you remember?

A    They stopped at the stop sign, I stopped at the stop sign. I, you know, went to stop at the stop sign, one, two, three, and then you start going straight. They didn't go right away. They sat there for a second and let us pass them. Once we passed

them, they did a U-turn and pulled up behind me.

Q    Did that get -- were you concerned about that?

A    Anaise had said something to me about it when they did it and I said, I mean, we'll be fine, there's nothing -- we don't got anything, we didn't do anything. You know, they're just driving around, I don't know what they're looking for. We'll be all right. So I just kept driving.

Q    They follow you then?

A    They followed us for, I don't know the exact amount of blocks but it was, you know, I would guesstimate from -- I don't know the exact amount of blocks. It was quite a long time, yes.

Q    And at some point did they stop following you?

A    No.

Q    So where did you go?

A    To the gas station.

Q    The Turkey Hill?

A    Yes.

Q    On Washington Boulevard?

A    Yes.

Q    Do you remember the route that you took to get there?

A    Yes.

Q    What was it?

A    So when I got to Sixth and High they were already behind me. They did the U-turn and pulled up right behind me at the stop sign. I took a right on Sixth and High and drove all the way down High Street to -- I don't know what that road is. I don't know what the road is, but High Street comes to a dead end there at that road. I can't remember the name of it. You take a quick right and a left onto, I believe it's Seventh Ave. Seventh Ave only goes for about a block 'til you hit Market Street.

I took a left onto Market Street for half of a block, to a stop sign. Took a right onto Washington Boulevard. And then I drove one, two, three, four, five, six, I think, city blocks before I pulled over at the gas station.

Q    Did you drive Ms. Lopez's car to the dress shop?

A    I don't recall.

Q    Do you recall if she drove at all that morning or were you the only person driving?

A    I don't recall.

Q    But you were driving from the dress shop --

A    Yes. Yep. Sorry.

**Ervin Blank Associates, Inc.**
**107 McCracken Road, Danville, PA  17821**
**office@ervinblankassociates.com**

Case 4:25-2860036-JKM-Bo46 meRt o1 6 me Page 510 Filed D4te57714d:12/1062025 7

**Page 17**

Q    No, that's okay. We've gone through a few depositions so I should probably — we want to make sure that even though you know what I'm about to ask you, you just want to give it a second just so that the court reporter can take it down. It's very easy to get casual and then we start talking over each other. And I'll do the same thing. If I see you're continuing, I'll try to make sure you're done before I go.

You mentioned also something about a state representative office or county. Can you tell me, what's that about?

A    We -- I think it was towards the end of COVID and the DMV was really backed up. And I was just having a hard process with getting things done there. And somebody had told me to reach out to my state representative, or maybe it was the commissioner. And I was trying to do things like that. I had already went back and forth with him a couple times.

Q    Do you recall actually going into the state representative's office?

A    Yeah, I really went there that day.

Q    Do you know who's -- what representative that was?

A    I don't remember his name, no, because I only

**Page 18**

spoke with his secretary that day.

Q    So you went in to -- or, you physically went to the state representative's office and went in the office?

A    I went to the office and I went in the office, yes.

Q    Did Ms. Lopez go in with you?

A    No, she did not.

Q    What was that conversation that you had at the state representative's office?

A    I don't recall the exact — what the meeting was about. It wasn't the first meeting that I had had there.

Q    How long were you there?

A    It was just a few minutes. It was brief.

Q    And was that before the dress shop?

A    That was before the dress shop.

Q    So did you go straight from the state representative's office to the dress shop?

A    Yes.

Q    Did you stop anywhere else before the state representative's office?

A    No.

Q    Why did you stop at the Turkey Hill?

A    I believe I had mentioned to Anaise that the

**Page 19**

police had been following us for a very long time and I started feeling uncomfortable. And I just wanted to stop to see like, if — are they — like coming — just to see what would happen, you know. We needed gas anyway so I was just like, let's just get it and get these guys — see what's going on.

Q    So when you pulled into the Turkey Hill they were still behind you?

A    Yes.

Q    And so were you seeing — were you checking to see if they would pull into the gas station after you?

A    No, we needed gas anyway.

Q    So you pull into the Turkey Hill, to the gas pump. Did you actually pump gas?

A    I did not. I never made it that far.

Q    So you pull in, you park next to the pump, right?

A    Yes.

Q    What was your intent when you pulled into that spot?

A    To pump gas.

Q    So you were going to pay at the pump or pay inside?

A    Pay inside.

**Page 20**

Q    Were you doing that — or were you trying to do that when Officer Gardner came in?

A    Yeah. I had snacks and a drink in my hand as well.

Q    So you were going to pay cash or card?

A    I don't recall what I was going to pay with.

Q    So you get into -- you come to the Turkey Hill. Did you say anything to Ms. Lopez about the police following you when you pulled in?

A    I don't think so, no.

Q    Walk me through what you did from the moment you pulled in to when you first encountered either of the law enforcement officers.

A    Pulled into the gas pump. Turned the car off. Got out of the car. Walked into the store. Grabbed a snack and a drink. I was standing in the line and somebody who looked like a SWAT team member came in with his hand on his gun right up to me.

Q    What was your thought at that moment?

A    I put my hands up. I was kind of afraid.

Q    Why did you put your hands up?

A    You know, there was a lot of things going on in the news at that time, you know, with police brutality and you know, defund the police, and a lot of things like that. And it just was a real tense

Ervin Blank Associates, Inc.
107 McCracken Road, Danville, PA  17821
office@ervinblankassociates.com

**21**

time with police interaction and he didn't look like a police officer to me. He looked like an Army soldier.

Q    Because he was wearing a vest?

A    He looked very tactical, yeah. He had a lot of tactical gear on. He had some kind of like, stuff on.

Q    Did you see Officer Gardner or Detective Irvin looking into the vehicle from inside the store or outside the store?

A    From inside the store.

Q    So you're inside the store. Were you looking out the window watching the vehicle?

A    No.

Q    When did you first notice that they were -- that Gardner was approaching you?

A    When I was standing in the line.

Q    So as far as anything that they did while walking around the vehicle, you didn't personally observe any of that? In the beginning.

A    When Anaise and I were standing in line I don't know what officer it was, but he started walking up to the car and looking around. And that's when Anaise said, I'm going to go outside and see what he wants. And that's when she went outside.

Q    Let me make the question a little bit better

**22**

because it was a pretty bad question. So you're inside the store. Ms. Lopez is inside the store. Before Officer Gardner walked into the store, did you observe anything that they were doing outside?

A    Yes.

Q    What did you observe?

A    I saw an officer walk up to the car and walk around the car, looking in the car.

Q    And was that the same officer who then walked into the store or did the other officer?

A    I don't recall.

Q    Did you have any concerns that they were looking at the car?

A    No.

Q    Did Ms. Lopez say anything to you about the officer looking in the car or around the car, or did she not observe the same thing?

A    She said she was going to go outside and see what they were -- they wanted or were doing.

Q    You said you were buying water and a snack?

A    I believe it was a soda.

Q    Anything else?

A    No.

Q    So we have the body cam footage, and so I'm not going to get too deep into asking you every detail

**23**

of what happened. But can you explain to me, you know, to the best of your recollection, what occurred after Gardner came up to you and you put your hands up?

A    I believe I was forced to come outside. They asked if they could search the car. Originally we had said yes because we just wanted to just go about our day. And I believe it was Gardner, was just being very harassing and provoking and we just felt harassed and intimidated. And I believe that's when one of us decided that we didn't want them to search the car. We just didn't want to cooperate anymore.

We started cooperating because we just were like, just let them do whatever they want, there's nothing wrong. And then he just became kind of a jerk and we were just like, this is crazy, we just feel harassed. We just don't want to participate in this any longer.

Q    What was he doing that was harassing?

A    Just his actions, his language. I can't recall the exact things, but I just felt very uncomfortable and harassed and intimidated.

Q    So they told — one of them said something about there being a roach in the car, right?

A    At some point somebody said that, yes.

**24**

Q    Was there a roach in the car?

A    No.

Q    So you're saying Officer Gardner didn't see a roach?

A    That's what I'm saying.

Q    What do you think he saw?

A    I don't know. I can't speculate what somebody else might have saw.

Q    So Officer Gardner testified that there was some shake on the floor of the vehicle. Was there shake on the floor of the vehicle?

A    No.

Q    Was there an ashtray in the driver's side door?

A    Yes.

Q    What was in that ashtray, if anything?

A    I do not know. It's not my car.

Q    You were driving it though, right?

A    That was the first time I've driven that car in days I believe.

Q    Do you have your own vehicle?

A    No.

Q    Did you smoke cigarettes in August 31 of 2021?

A    Me?

Q Yeah.

A No.

Q Did you smoke marijuana around that time?

A No.

Q Have you ever smoked marijuana?

A Yes.

Q All right. When was the last time you smoked marijuana?

A To the best of my recollection, two months ago.

Q In August of 2021, on that day, August 31st, 2021, did you smoke any marijuana that day?

A No.

Q Did Ms. Lopez smoke any marijuana that day?

A To the best of my recollection, no.

Q Well you were in the vehicle with her from --

A You mean in the vehicle in front of me?

Q Well hold on. I'll break the question down a little bit so you can be sure about what you're answering. So you were -- you drove with her from the dress store to the Washington Boulevard Turkey Hill, right?

A Correct.

Q Did either of you smoke any marijuana in the car during that trip?

A No.

Q Did either of you smoke any marijuana in that vehicle at any time that morning?

A No.

Q Did either of you smoke any marijuana in that vehicle at any time in the preceding week?

A No.

Q So when Offer Gardner testified that he smelled -- that he observed the odor of marijuana coming from the vehicle, you're saying he's not telling the truth?

A Correct.

Q So when Officer Gardner testified that he observed a roach in the driver's side ashtray, you're saying -- it's your testimony that he's not telling the truth?

A Correct.

Q So when Officer Gardner testified that he saw marijuana shake on the floor in the vehicle, it's your testimony that he's not telling the truth?

A Correct.

Q So when Officer Gardner testified that he observed several other marijuana roaches in the vehicle during the search, it's your testimony that he's not telling the truth?

A Correct.

Q I have a packet here of exhibits that are stamped for Mr. Beatty's deposition.

A Yes, sir.

MR. WHITE: We'll just mark this whole thing as Beatty 1.

(Whereupon, a document was produced and marked as Deposition Exhibit Beatty No. 1 for identification.)

BY MR. WHITE:

Q It's stamped at the bottom with a 001, and it's documentation that has already been exchanged in discovery so it's nothing new. Mr. Beatty, you've seen this document that starts on 001. It's the complaint you filed in federal court in this case. Do you recognize it?

A Yes.

Q I'm going to ask you some questions about some of the allegations in this, and I'll refer to the page number and then the paragraph so it's somewhat easy to follow along. The second page, Paragraph 8, alleges that, among other things, Gardner reached through the open window and down into the space between the seat and the steering wheel with his flashlight in order to illuminate the interior of the

vehicle so he could see inside it. Did you personally observe Defendant Gardner doing that from anywhere that you were at the Turkey Hill gas station?

A I saw him walking around the car, looking in the car, yes.

Q But did you see him reaching through the open window down into the space between the seat and steering wheel with his flashlight?

A Do you mean do I remember it from the video or did I physically see --

Q That's exactly the question -- you're explaining it better than I could have asked the question. Do you remember that happening because is this -- I guess, let me rephrase this. Is this allegation here because you observed it when you were inside Turkey Hill or outside Turkey Hill, or because you saw it on the video?

A I saw him. I saw him reach -- go -- lean his head down. Did I see him cross the plane of the window with my eyes? To the best of my recollection, no.

Q So the -- Paragraphs 10 and 12 on that same page reference a roach and weed in the car, and marijuana in the car. It's your testimony that there was no marijuana in the car?

29

A    True.

Q    Did Ms. Lopez smoke marijuana from time to time around August 31st, 2021?

A    Are you asking me did she smoke on the 31st or are you asking me if she smoked from time to time?

Q    I mean, I'm not asking you specifically if she smoked on the 31st, but let's say during the month of August.  Was she a marijuana smoker in your observation?

A    Yes, she has smoked marijuana before.

Q    Is it possible that there — well actually, let me rephrase that.  If you observed her smoking marijuana, how would she smoke marijuana?  If you can recall back in around this time frame.

A    With a pipe.

Q    Around this time frame how would you have smoked marijuana, if you smoked marijuana?

A    With a pipe.

Q    Did you ever roll a joint?

A    No, I don't like -- the tobacco makes me — I'm not a tobacco fan.

Q    Well I didn't say anything about tobacco.  I mean did you ever take a rolling paper and roll a joint?

A    No.  I don't roll.

30

Q    How about rolling a marijuana cigarette with some other type of material?

A    No.  I can't even do it.

Q    Could Ms. Lopez do it?

A    I have seen her do it in the past, yeah.

Q    On the next page, Page 3, Paragraph 19.  And if you need to take a break at any point, just let me know because I don't know how long we've been going.  So Page 3 in 19 -- Paragraph 19 -- it says, in retaliation for his First Amendment speech and in the absence of probable cause and reasonable suspicion, Defendants immediately arrested Plaintiff by seizing him physically and handcuffing him.  Did I read that correctly?

A    I believe so.

Q    What was the First Amendment speech that the officers retaliated against you for?

A    I don't recall the exact words.

Q    Was there something specific that Detective Irvin did to you in retaliation for something you said?

A    They arrested me.

Q    Well I know you're saying they because there's two of them.  But I mean —

A    Detective Irvin was the one that put the

31

handcuffs on me.

Q    All right.  Well how about Officer Gardner, what specifically did he do that was in retaliation for your First Amendment speech?

A    He ordered Detective Irvin to put the handcuffs on me.

Q    And you say here, absence of probable cause and reasonable suspicion.  Is that because it's your testimony that there was no marijuana in the car?

A    Yes.  And the fact that there was no traffic stop.  There was no crime committed.  I was never charged with a crime at all.

Q    So if Detective Gardner did in fact see marijuana in your car, don't you think he had a reason to stop you?

MR. COCHRAN:  Objection to form, but you can answer if you understand.

THE WITNESS:  No.

BY MR. WHITE:

Q    So if he observed marijuana in your car, you're saying he had no right to detain you?

A    He wouldn't have saw — he stopped me before he would have saw it.  How does that make sense.

Q    Well you said you saw him walking around the car from inside —

32

A    He had followed me for ten blocks before that.

Q    Well he didn't stop you, right?

A    I feel like I was stopped.

Q    When did he stop you?

A    When we pulled into that gas station we were being harassed at that time.  I was already feeling harassed from that moment.

Q    Because they were following you?

A    They had been follow — yeah.  They had been following me for many, many blocks without me committing any type of crime or doing anything wrong.

Q    You made the choice to pull into the Turkey Hill, right?

A    Correct.

Q    They didn't pull you over and force you into the Turkey Hill?

A    No, I wasn't forced.

Q    And they didn't block your car when they pulled in, did they?

A    I couldn't go back.  I could go straight, but I couldn't go back.

Q    How were they harassing you when they were -- by following you?

A    I just felt intimidated.

**Ervin Blank Associates, Inc.**
**107 McCracken Road, Danville, PA  17821**
**office@ervinblankassociates.com**

Q Were they following you closely?

A Yes.

Q And you don't feel that law enforcement should be able to follow someone?

A I think if somebody did a crime, yeah, they should definitely, you know, do their due diligence.

Q If you could go to Page 4. At 27 it says, Defendant Irving seized Plaintiff forcefully and slammed him face first on the hood of the car, conducting a second and invasive search of his person, including reaching into his pockets and groin area, and seizing all possessions on his person. Is that your words, forcefully and slammed —

A Yes. Yes. He did that.

Q Did you say anything to him at the time?

A I told him, I believe I said, I'm not resisting.

Q So how was the -- you used the word invasive search. How was that invasive, reaching into your pockets and groin area and seizing all possessions on his person? Unless something else happened.

A I mean, when you touch someone's groin area you kind of rub their private parts. That was invasive to me.

Q Have you ever been arrested before and patted

down, Mr. Beatty? Prior to this incident.

A Yes.

Q Was there anything unusual about the way that Defendant Irvin conducted this, your word, search?

A I have never been slammed on the hood of a car like that before.

Q Well other than the slamming on the car, which is your word --

A Yes.

Q -- as far as how he searched you after he turned you around or slammed you, was there anything unusual about that search?

A Yes, he was aggressive.

Q How was he aggressive?

A He -- pushing, shoving, poking.

Q All right. So I think you talked a little bit about when Defendant Gardner — or when Officer Gardner came into the Turkey Hill. You put your hands up, went outside. We have right now that we just covered a little bit, as far as him putting you in the car and patting you down or searching you. What else do you recall happened after that? From your own recollection, not from -- to the best you can — watching the video.

A What I recall from the point that I was

handcuffed?

Q Yes.

A It was kind of a whirlwind of people just arguing and talking and trying to deescalate the situation between the arguing parties. I was placed -- I was removed from the hood and separated from Anaise and placed in the back of the cruiser.

Q Do you recall talking with Detective Irvin while you were in the back of the cruiser?

A Yes.

Q What do you remember about that conversation?

A To the best of my knowledge, I remembered it was just about — just a lot more calm conversation. He seemed to be more calm when he wasn't around Gardner.

Q What was going through your head at that point when you were in the back of the police cruiser?

A Just a lot of different things. I didn't understand what was going on. I was scared, you know. Afraid.

Q Well what were you afraid of?

A What could happen. Anything could happen.

Q Well you're in the — let's talk about that a little bit. You've been to that Turkey Hill before?

A Yeah.

Q It's the middle of the day, right?

A Yeah.

Q There's people outside?

A Yeah.

Q What were you concerned was going to happen?

A I mean, they could — anything could happen. It could have went — you saw what happened. You know, it went from a conversation to a whole — them twisting it into a fight, you know, somebody could have got hurt even worse, you know. Like they -- they're out of control a little bit, you know. With everything going on in the media, you know, I was thinking more this — somebody could get slammed on the ground. Somebody could get hurt or they could shoot on of us. Who knows what could happen.

Q You were already cuffed at this point?

A Yeah.

Q And you're in the back of the cruiser?

A Yeah.

Q And you were concerned that someone could get shot?

A Yeah, because Anaise was out there and that's basically what happened. They separated me from her so they could do — so they could do what they did to her.

37

Q   What did they do to her?

A   I believe they -- as soon as they put me in the car and got me away from her, the next thing I know they have her under each arm and they're carrying her across the parking lot and they threw her in the car. And Gardner comes walking past my car and says, she just kicked an officer, she's to going jail, we got her. We got them.

Q   You don't think she kicked anyone?

A   I wasn't over there.

Q   You don't feel you did anything wrong during this whole situation?

A   I believe I was trying to deescalate from the moment it happened.

Q   Do you think Ms. Lopez did anything wrong?

A   No.

Q   Ms. Lopez was convicted of two summary offenses, right?

A   I thought it was one, but I might be wrong.

Q   Summary harassment, does that sound right?

A   I mean she was convicted of them, of the summary offense, yes.

Q   After a bench trial, correct?

A   Um --

Q   Bench trial, that's a legal terminology. A

38

trial in front of Judge Linhardt?

A   Yes.

Q   Were you at that trial?

A   Yes. The first one.

Q   You were there watching as Officer Gardner testified and --

A   Yes.

Q   So you're in the back of the police cruiser. Ms. Lopez is in an altercation with other law enforcement. Walk me through what happens after that.

A   I believe, to the best of my knowledge, the car with her in it left. We stayed there for, to the best of my knowledge, a half hour or an hour waiting. They said they were waiting for a tow to tow her car.

Q   Then you were taken to the station?

A   Yes.

Q   So once -- do you remember who was driving you from Turkey Hill to the station?

A   I don't recall.

Q   So eventually you came — you were transported to the station, right?

A   Yes.

Q   And taken into a room with Detective Irvin, does that sound right?

A   Yes.

39

Q   Do you recall anything about your conversations with Detective Irvin at that time?

A   I think he — we weren't talking about the incident. I think he was trying to make small talk, trying to make light of the situation or just get his mind or my mind off of it, I don't know. He was just asking me like, small talk kind of things.

Q   Were you in distress at that time?

A   At that time I had been kidnapped.

Q   Why do you say that?

A   Well I mean, I believe the definition of kidnapping is if you take someone unwillingly from one location to another. And that's exactly what happened to me.

Q   Well you heard Officer Gardner explain that he observed marijuana, he observed the smell of marijuana, he observed shake, and that the intent was the take you to the station for purposes of the strip search. You heard that testimony? I'm not asking if you agree with it, I'm just asking if you heard it.

A   I heard him say those things, yes.

Q   And you disagree that they should have been able to take you to the station. Is that your testimony?

A   I disagree.

40

Q   What should they have done?

A   I asked them multiple times when we were in the back of the police car, if I was being charged with a crime, it I was under arrest. If I was allowed to be let go. I got a mix of no answers to in a while, in a minute. Finally, eventually, I believe it was Irvin to the best of my knowledge, Irvin said, he wants to strip search you and then they'll let you go.

Q   When did he say that?

A   When we were at the Turkey Hill still.

Q   I think you told him you weren't going to sue him, isn't that right?

A   Well at that time I would call that negotiating with your kidnapper. If I was kidnapped I'd say anything for them to let me go.

Q   So when do you think they should have let you go?

A   I don't think I should have been handcuffed and placed in that car. I don't think they had the right to search — I don't think we should have been stopped at all. I don't think any of that should have happened.

Q   And that's because it's your testimony that there wasn't any marijuana in the car?

A   Correct.

Q So you're at the station with Detective Irvin and eventually you're subject to a strip search, right?

A Correct.

Q Tell me, what do you recall of how that started and what occurred during the strip search?

A Once again, I was told I was not allowed to leave. I would not be let go until I was strip searched. I just finally decided to just -- I just wanted to go home. I just decided to do it, you know.

Q Did they ask you if they could strip search you?

A I don't recall. He told me he was going to do it.

Q Did you say no?

A I don't even think I answered him the first time he said it.

Q And who is he?

A .

Q Who performed the strip search? If there's a single person. Now, if there's more than one —

A They were both in the room.

Q So they were both in the room. Did one of them put on gloves?

A I believe Gardner put gloves on. He was the one that went through everything. And I believe, to the best of my knowledge, Irvin just watched.

Q Tell me what actually happened during the strip search.

A They told me to take each article of clothing off.

Q I'm sorry, I just want to make sure I understand, because you're using they. I just want to make sure that if there's a specific person you remember saying something, I'd like you to identify who it was. If not, if it is, one of them told me, I just want it to be clear that they're not both speaking at the same time.

A Okay. So I don't recall which one, but one of them told me to take off one piece of clothing at a time and hand it to them. As I did that, they were kind of like, going through it with their hands and checking it I guess.

Q Do you know what they were looking for?

A Anything that's criminal I guess.

Q They were looking for drugs, right?

A I don't know if they specifically said that.

Q What else could they be looking for?

A Anything to charge me for a crime. Anything. Weapons, drugs. I don't know.

Q So you took off your shirt first?

A I don't recall which item was first.

Q Well just tell me — keep going. I didn't meant to interrupt you, as far as what happened.

A They told me to take off one — one of the officers told me to take off one piece of clothing at a time. As I handed it to them, they were searching the clothing. At a point I was completely nude, standing in front of the two officers. One of the officers asked me to manipulate my hands and my toes. One of the officers asked me to manipulate my penis and, for lack of a better term, balls. To lift then and move them. I don't know if he wanted me to stimulate them for his own gratification. He wanted me to turn around and spread my cheeks and cough, which he asked me to do again because he didn't feel the first time was enough.

At a certain point I was standing there nude after they said I could stand. I was kind of crouched. Coughed, stood up. And they said to wait while they searched my clothes. I stood there nude in front of them for a few minutes while they were like, turning my socks inside out and my everything, just trying to find whatever they were looking for. And then at a certain point one of them told me I could get dressed.

Q As far as the conduct of the search, you just mentioned, you know, there was a manipulating your genitalia. Was that you who did that or are you saying that one of them who did that?

A I was instructed to lift my genitalia, my balls. I was instructed to bend over and spread my cheeks. I was instructed to cough. But I did it all.

Q Neither Gardner nor Irvin touched your genitalia?

A No.

Q Did they touch any other part of your body?

A In the search?

Q Yes.

A No.

Q So the search was them instructing you to remove articles of clothing and to position your body certain ways for them to inspect. Is that a fair characterization?

A It's very close. They definitely instructed me to manipulate parts of my body.

Q Well what does that mean to you? Manipulate parts of your body.

A Touch, stroke, move, spread. Things that don't happen by themselves.

**Ervin Blank Associates, Inc.**
**107 McCracken Road, Danville, PA 17821**
**office@ervinblankassociates.com**

**Page 45**

Q    Well were they asking you to move your genitalia so they could inspect?

A    I don't know why they were asking me to. I don't know what type gratification they got from it.

Q    Well why do you think that they got gratification from this?

A    I felt sexually assaulted in that situation. I hadn't committed a crime. I was handcuffed and moved to a room with two grown men and was told to get naked before I was allowed to leave. That was a sexual assault to me. I know you guys have been downplaying it all day long, that it's just a search and it's very common and it happens all the time. I'm sure that's what their job entails, but that's not in my daily life. I don't get strip searched every day. I don't have to spread my butt cheeks for other men and that, you know, was an assault to me. You can — that's how I take it. I apologize if you guys see it another way.

Q    You feel like they were doing something other than looking for drugs?

A    I feel like they were trying to dehumanize me, humiliate me, harass me even further. Obviously it was the third search and they know I didn't have anything on me.

**Page 46**

Q    Well the third search — the other two searches you're referring to are -- is the first one being the pat down inside the Turkey Hill?

A    Yes.

Q    In front of the cashier and everyone else?

A    Yes.

Q    And then the second one being when Irvin put you on the car hood and did that search, correct?

A    Correct.

Q    Did either of them have a flashlight or anything like that when you were disrobing and manipulating?

A    I don't recall.

Q    You used the word sexual assault. Tell me a little bit more. Why are you using that terminology?

A    It's what it felt like to me.

Q    Neither of them touched you though?

A    I don't believe a sexual assault or somebody getting sexual gratification from something has to involve touching.

Q    So you feel as though one of them or both of them were getting sexual gratification from you being strip searched?

A    I feel like it was dehumanizing, humiliating, and sexually perverse as an assault on me as a person.

**Page 47**

I wasn't — I didn't commit a crime to — and I'm not a lawyer or a police officer. But I didn't commit a crime that I would think would involve me being strip searched for. I just don't understand it. And that's just how I felt. That's how I feel. I'm not, again, a lawyer or a police officer but I didn't want to consent to that. I don't consent to being — anything going on like that.

Q    So is it that your opposition is to strip searches or this particular strip search?

A    This particular strip search.

Q    Have you ever been strip searched before?

A    I have been to jail before.

Q    And when you're committed into jail you get strip searched, correct?

A    Correct.

Q    And how long ago were you in jail where you had a strip search performed on you prior to your incarceration?

A    I think it was in my early 20s, to the best of my knowledge.

Q    If you could go to, in the packet that's in front of you, Page 50. Or actually 49. Mr. Cochran, we have in this packet your discovery responses as they appeared when we received them. But then I have

**Page 48**

also, starting a little bit later, our requests with your responses pasted into them so we can see the answers.

MR. COCHRAN:  The correspondence.

MR. WHITE:  Exactly, just because I didn't want him to have to go flip back and forth. So the complete response is in there just like the complete request. But then later on here around 49 or so they're patched together just for of ease reference.

MR. COCHRAN:  Okay.

MR. WHITE:  But it's copied as images so there's no risk of words being missed or anything like that.

MR. COCHRAN:  Okay

BY MR. WHITE:

Q    So Mr. Beatty, in discovery your attorney provided responses to us to some requests. In particular we had some interrogatories, which are questions that are addressed to you that you've replied to in writing. Starting on Page 49 into Page 50 is interrogatory 9, which asked about times you had been arrested. And you provided, on Page 50, a list that says, I have two DUI, two disorderly conduct, one paraphernalia, and a number of traffic citations, most occurring in Lycoming County. Sentences ranged from

Ervin Blank Associates, Inc.
107 McCracken Road, Danville, PA  17821
office@ervinblankassociates.com

**49**

fines, probation, house arrest, or Lycoming County Jail for less than sixty days. And then you reference 2004 to 2016 as being the time frame. I"m going to ask you a little bit more about these. When were the two DUIs?

A To the best of my knowledge, in my early 20s.

Q Were they back-to-back or different times or what?

A Different times.

Q Were those alcohol or drug DUI?

A Alcohol.

Q And so were you arrested by law enforcement for either of those?

A To the best of my knowledge I don't believe so, and I can tell you what happened both times.

Q That's probably the best way to do it.

A The officer took me to the hospital to get -- to take a test. And then they drove me home afterwards.

Q And is that what happened on both times?

A One time I believe they drove me home and one time they let me go, but neither time did they arrest me and take me to a police station.

Q Were you cuffed for either of those?

A I believe I was cuffed when I was

**50**

transported, yes.

Q Were you searched in any way for either of those?

A Not strip searched. I believe I was patted down.

Q So patted down in connection with being cuffed?

A I believe so.

Q For both times?

A I believe so.

Q Did you receive jail time for either of those DUIs?

A I think the first one was probation. And I believe the second one entailed some -- I can't -- I think I went to PRC and then I got out on house arrest, but I can't be specifically sure.

Q Was that in about 2006?

A To the best of my knowledge, yes.

Q Was your incarceration -- how many days?

A I believe it was under sixty days.

Q And it was a combination of Lycoming County Prison and PRC, which is the Prerelease Center?

A Correct.

Q Do you know how many days you spent in Lycoming County Prison?

**51**

A I do not, not specifically.

Q But like, more than ten days?

A More than ten, less than sixty.

Q So the whole --

A Do you mean my whole life?

Q No, just on this time. That's what I'm talking about.

A Just for the DUI?

Q Yes.

A I believe it was like a -- they give you like, thirty or sixty days I think, it is what they say.

Q You can't recall how many days?

A I can't recall. It was over ten years ago I believe.

Q When you were committed to Lycoming County Prison -- you were, right?

A Yes.

Q They did a strip search on you?

A Yes. If I'm convicted of a crime, sentenced, and guilty, I'm okay with the law doing what they have to do.

Q Do you recall that strip search?

A I do not.

Q Did they -- do you recall anything about it?

**52**

A I recall that it happened, because I know when you go into jail that's what they do. But I don't recall the specifics of it, no.

Q If you can recall, did it involve you doing similar procedures as what Gardner and Irvin had you do while you were in Williamsport Bureau of Police?

A I don't recall the specifics.

Q You don't remember if they made you cough and spread your cheeks?

A I believe -- I know I had to strip naked. I don't recall what else we had to do.

Q How many people did you have to strip naked in front of?

A At the jail?

Q Yes.

A I believe it was one person.

Q Was anyone else in the room when that happened?

A To the best of my knowledge, no.

Q So you're okay with that strip search?

A I believe in the law. And I believe in the system. And I believe that the police are supposed to do what they're supposed to do. Corrections officers are supposed to do what they're supposed to do. But when you haven't done anything wrong, I don't believe

Ervin Blank Associates, Inc.
107 McCracken Road, Danville, PA 17821
office@ervinblankassociates.com

Appx488

they just have the right to do whatever they want to do whenever they feel like doing it. I feel that's offensive. I feel like that's assault. I feel like that's kidnapping.

Q Okay. I'm going to ask you about some of the other items that you listed here. You have two disorderly conduct. Can you tell me about those events? When they were, what you recall. And treat them independently. I'm just reading them off the sheet that says two disorderly conducts.

A I don't recall the specifics of them.

Q You don't remember what you were doing, what you were charged with other than the fact that it was disorderly conduct?

A Yes. To the best of my knowledge yes.

Q And there was two of them?

A I believe there was two, yes.

Q Any idea of how long ago that was? At least can you give me more specific than between 2004 to 2016? If not, that's okay. I'd just figured I'd ask the question.

A I can't be certain, no.

Q And then you have a number of traffic citations, most occurring in Lycoming County. They're just like, speeding, parking tickets?

A Speeding, and I've been pulled over for driving without a license before.

Q How many times has that happened? That you've been cited for something like driving without a license.

A Quite a few.

Q Like how many? More than five or less than five?

A More than five.

Q Do you presently have a driver's license?

A Yes.

Q Was that -- is that unrestricted?

A Yes.

Q How long has it been unrestricted?

A To the best of my knowledge, two years. Two and a half years. Two years.

Q You had an ignition interlock at some point?

A I had the license but I never got the device.

Q So on August 31st, 2021, there was some testimony about, I think you heard before, about you having an ignition interlock license. Is that correct that you had the license?

A That was the only ID I had on me at the time.

Q Did you have an unrestricted license as well at that time?

A I don't recall.

Q You weren't driving with an ignition interlock on August 31st, 2021?

A No.

Q And I think the explanation that was provided by either Gardner or Irvin was that you said something about PennDOT being backed up or something like that. Can you explain to me why it was that you didn't have an ignition interlock system?

A So the way the ignition interlock system works is, once you get a DUI and you're sentenced to get that, you can only get your license back if you get ignition interlock. If you don't own a car, you still can get your license and you don't have to get the ignition interlock because you don't own a car. They can't, I guess like, wait to start your time until you own a car. You know what I mean? If you understand.

Q So you didn't have a car for what time period?

A For a couple years. Two or three years.

Q Do you have a car now?

A No.

Q Have you had a car at all since 2021? Or when was the last — I should ask the question better. When was the last time you owned your own vehicle? And that can be a lease too, it doesn't have —

A To the best of my knowledge, 2013.

Q So the driving with suspended licenses, citations you've referenced, have those been you driving other peoples' vehicles?

A Some, yes.

Q So I have — in 2008 did you have a simple assault misdemeanor 3 that you pled guilty to?

A To the best of my knowledge, I thought that got pleaded down to something smaller than that. But I could be wrong.

Q Did you — were you charged with assault at some point around there?

A I do recall the incident, yes.

Q What was that incident?

A I believe it was an argument.

Q Between you and who?

A I believe an ex-girlfriend.

Q Did you strike her?

A No.

Q What was the — why were you charged?

A She said that I had hit her.

Q You did plead guilty to something related to that event?

**Ervin Blank Associates, Inc.**
107 McCracken Road, Danville, PA 17821
office@ervinblankassociates.com

**57**

A    Eventually, yes.

Q    You can't recall if it was a misdemeanor simple assault or something else?

A    I know simple assault was the original charge, but I thought that I had plead that down. She didn't want to go to court and she didn't want -- she had kind of recanted everything after later on.

Q    And then you mention here one paraphernalia. Was that in about 2015?

A    Yes. I believe that was the last time that I was in some type of police incident before the August 31st incident.

Q    Tell me, what was that charge related to?

A    Paraphernalia.

Q    What was the paraphernalia?

A    I think it was a, like a marijuana pipe or cap or something.

Q    Where did you have it?

A    I believe it was on me. On my person.

Q    And where were you when you encountered law enforcement for that event?

A    In South Williamsport.

Q    Were you driving?

A    Yes.

Q    Were you pulled over?

**58**

A    Yes.

Q    Were you the one who was driving?

A    Yes.

Q    And how did they find the paraphernalia?

A    I think -- I believe, to the best of my recollection, I told them I had it on me. He said he was going to search the car.

Q    And then you plead guilty to a paraphernalia charge?

A    Yes, sir. I believe so.

Q    Whose car were you driving that day?

A    I believe it was my brother's car at that time.

Q    Did you have a license at that time?

A    I don't believe I did.

Q    Any other criminal charges or convictions that we haven't already gone over that you can recall?

A    No, I think you went over everything.

Q    Did you ever get charged with criminal mischief?

A    Possibly.

Q    2018?

A    Doesn't sound familiar to be honest with you. Was I sentenced or convicted of anything?

Q    I'm asking if you recall anything.

**59**

A    I don't recall it. I mean --

Q    That's okay. All we can do -- I don't want you to guess, speculate, or do anything other than tell the truth that you can recall. If you could turn to Page 23. Let me know when you're there.

A    I believe I'm there.

Q    This is a transcript of proceedings in front of Judge Linhardt, Lycoming County. Date, August 3, 2022, for the case Commonwealth of Pennsylvania v. -- how do I pronounce her name?

A    Anaise.

Q    Anaise Lopez, CR1281-2021. And on the following page, Page 24, it starts with the Court, with Judge Linhardt ruling from the bench on Ms. Lopez's bench trial. Where you in the courtroom on this day?

A    I believe I was, yes.

Q    And I want to read some of Judge Linhardt's ruling from the bench and ask you some questions about it. Do you need a break for a second? If you need a break it's better for you to take a break before we go into a question.

A    Yeah.

(Whereupon, a recess was taken from 12:42 a.m. until 12:48 a.m.)

**60**

AFTER RECESS

BY MR. WHITE:

Q    We were on Page 24. So Mr. Beatty, I am reading from Judge Linhardt's -- the transcript of what Judge Linhardt ruled from the bench on August 3, 2022. And he says, the Court finds that the evidence is not only clear and credible, but really overwhelming of the Defendant's guilt with regard to both the summary disorderly conduct and the summary harassment. So Ms. Lopez was convicted of both of those. Is that your recollection as well?

A    On that date, that is what happened. I know she appealed that. But that is what happened on that date.

Q    Okay. Did she serve jail time for that?

A    No, she has not yet.

Q    Is she supposed to?

A    So she appealed this and won the appeal. She was just resentenced to, I believe it's twenty or eighteen days.

Q    Has she appealed that?

A    No.

Q    So as far as her -- she has a conviction that requires her to serve some sort of sentence, is that correct?

**Ervin Blank Associates, Inc.**
**107 McCracken Road, Danville, PA  17821**
**office@ervinblankassociates.com**

A     Well I think she still has thirty days or a few days from the time she -- of the second trial to appeal. But she hasn't yet.

Q     When did that second trial occur?

A     January 3rd.

Q     You're talking about a sentencing hearing, is that right?

A     Yeah. It just happened this year on January 3rd, 2024.

Q     And so as far as what's still being considered, it's limited to -- and if you don't know any of this then feel fee to say, I have no idea. But as far as what's still going on in her case, it has to do with how much -- what her punishment is, not whether or not she's guilty, is that correct?

A     I believe so.

Q     I'm going to continue here. It says, the argument that defense counsel makes that no roach was seized, somehow suggesting that Officer Gardner's testimony that he observed marijuana residue and a marijuana roach in the vehicle was somehow a pretext and a lie the Court does not find credible in the least. The Court finds Officer Gardner's testimony to be credible in that regard. So Judge Linhardt determined that Officer Gardner's observation of

marijuana roach and residue in the car was credible, right?

A     That's what he decided, yes.

Q     And you disagree with that?

A     Yes.

Q     Because you say there was no marijuana in the car?

A     Yes.

Q     And then I'm going to continue here. In addition to which, defense's argument that somehow the Defendant was cuffed and placed under arrest when they, in counsel's words, did nothing wrong, the Court disagrees with. The entire matter escalated solely because of the Defendant's behavior and her friend's behavior, all of which was unnecessary. You understand that Judge Linhardt determined -- you're the friend here, right?

A     I would assume.

Q     And Judge Linhardt here is explaining that your behavior and Ms. Lopez's behavior was unnecessary?

A     That's what he wrote. Or said.

Q     Do you disagree with that?

A     Yes.

Q     Then it continues, the officers had every

right to conduct an investigation. Do you disagree with that?

A     Yes.

Q     Why?

A     Probable cause.

Q     Explain what you mean by that.

A     I don't believe they had probable cause to stop us, harass us, conduct an investigation.

Q     Because there was no marijuana in the car based on your testimony?

A     Because there was no reason to make a U-turn and pull up behind me. Because there was no reason to follow me for fifteen blocks. Because when I walk into a store there's no reason to go search my car. I didn't commit a crime.

Q     But nobody stopped you, right? I mean we already went over this.

A     Nobody —

Q     Nobody stopped your vehicle?

A     Nobody stopped my vehicle, correct.

Q     Mr. Beatty, I'll ask that you turn to the compiled interrogatory responses which begin on Page 40. Which again, these are, just so the record is clear, preceded by your actual interrogatory responses, which are then pasted into these

interrogatories for purposes of — ease of reference. Are you at that Page 40?

A     Yes.

Q     And then from there I'm going to ask you about some of these answers, starting with the answer to Question 1 on Page 44. Let me know when you're there.

A     Okay.

Q     All right. It says your response to the question about a detailed description of your injuries. You say — I understand you already explained to me your feelings on having been kidnapped and sexually assaulted. I'd like you to continue down that page a little bit and where it says, I have suffered embarrassment before strangers, my peers, witnesses, and even my own girlfriend, and anxiety, and a loss of my own personal security, and an intense and generalized fear of authority in general, and police officers in particular. Fear of retaliation and continued harassment causes me intense daily anxiety and worry. I'm going to ask you some questions about some of those words used in there. Suffered embarrassment before strangers, can you explain that to me?

A     I mean, on the day in question everybody at

the gas pump was watching all that stuff happen to us.

Q    So the strangers you're referring to here are the people who observed what happened?

A    I mean, those strangers. It was in the paper, everyone in the community read it, you know. Just — where I worked I had people who I only knew through I'm a manager here, you're a customer. And then they come in and say, hey, I saw your name in the paper.

Q    But it didn't say you were charged with anything, right?

A    It's still very embarrassing. It implied a lot of things. They implied that we were doing a lot of wrong things and the police had the right to do whatever they wanted to us.

Q    But it didn't say anything about you being strip searched or anything like that, right?

A    No, but the criminal activity. I mean —

Q    Well the newspaper, if there's a newspaper article —

A    That was embarrassing. There was multiple articles as well.

MR. WHITE:  Can we mark this? I think this was provided by -- was this provided by you, Mr. Cochran?

MR. COCHRAN:  It might be.

MR. WHITE:  I think it was in your disclosures.

MR. COCHRAN:  It could be.

MR. WHITE:  We'll mark this as Beatty 2.

(Whereupon, a document was produced and marked as Deposition Exhibit Beatty No. 2 for identification.)

BY MR. WHITE:

Q    Mr. Beatty, can you take a look at this article? It appears to be from the Sun Gazette, under the police blotter. There's an article titled, Assault Charges Lodged Against Massachusetts Woman. Is that the newspaper article you're referring to?

A    This is one of them, yes.

Q    Was there another one?

A    They've covered the case a few times.

Q    Does this article mention you by name at all?

A    I think this is the first article that came out. I don't believe it does.

Q    So this is about Ms. Lopez, correct?

A    This -- yes. It says, Assault Charges Lodged Against Massachusetts Woman.

Q    So your recollection is that there's some article out there that does mention you by name?

A    I'm not sure if my name is in which article or what.

Q    Would this article embarrass you?

A    To the people who know who her boyfriend is, yes.

Q    So not strangers?

A    Does this article embarrass me to strangers?

Q    Yes.

A    No.

Q    So if somebody knew who she is and knows who you are relative to her, then that article embarrasses you?

A    Yes.

Q    But it doesn't say you did anything wrong in that article, correct?

A    It implies that we did a lot of things wrong.

Q    Well it doesn't say anything about you at all, right?

A    In this article?

Q    Yes.

A    No. But did you — no, not in this article.

(Whereupon, a discussion was held off the record.)

BY MR. WHITE:

Q    Mr. Beatty, there are articles written about you having filed this lawsuit, correct?

A    I believe so.

Q    Are you claiming that you've been injured from the news articles about this lawsuit?

A    No. Those articles, I believe, came out years after the incident. After they had already had other articles about it.

Q    So tell me how you've been embarrassed between your peers and your girlfriend. Because I think you covered witnesses already, people who are there, and I think you talked about strangers already. But in this answer here you say your peers and your own girlfriend, you've suffered embarrassment. Tell me how that is.

A    Just having to deal with the whole situation. Being in the implication that we committed — that I committed some type of crime, that I had argued with police -- whatever they implied, you know, affected --

Q    But no one's ever said — no one's ever charged you with anything, right?

A    Was I charged with a crime?

Q    For this event.

A    No.

Q    And no one has ever written a news article that says you were charged with a crime at this event,

correct?

A That says I was charged with a crime?

Q Correct.

A To my knowledge, no.

Q So who is it that has -- has anyone ever said anything to you about you having committed a crime relative to this August 31, 2021, event?

A Yeah.

Q Like who?

A Like customers at my job, employees at my job, other managers at my job, family members, friends. I saw a friend's dad just a couple months ago, I hadn't seen him in ten years. It was the first thing he said to me.

Q What did he say?

A He said, I see all that stuff going on with you and the police, what's going on.

Q He's referring to the lawsuit though, right?

A He's referring to the whole situation.

Q Well what does that mean?

A To being harassed, detained.

Q Well I want to understand. How are you separating in your head the embarrassment or anxiety as referenced in this response that may be in connection with new articles that are written about a

federal lawsuit you filed versus publication of information about Ms. Lopez's trial?

A I guess where I think we're having a miscommunication is you're assuming that this article is the only reason anyone would have anything to say about this whole incident. Word of mouth, people talking, I heard this happened, I heard this happened, I heard this happened. It doesn't have to be in the paper for it to be news.

Q Has anyone told you that they heard this happened --

A Yes.

Q I mean, tell me some of these people who have talked --

A Coworkers, my managers, my boss.

Q All right. So people at --

A Anaise used to work at Perkins with me when this happened. So they obviously knew we were together, okay. It's not like I'm drawing at straws and pulling -- how did they figure this out kind of thing.

Q You say that you've suffered anxiety. What type of anxiety and how was it caused by either Irvin or Gardner?

A I mean to this day -- I'll be honest with

you. If somebody committed a crime against me, I don't know if I would call the police or not. Because I'm scared of how they would twist something or what they would do because I know from experience that they don't do what they're supposed to do. They don't follow the letter of the law. They don't look for the truth.

Q Is that from your experience for this one event?

A This is for this specific event.

Q And not from your experience with law enforcement through the charges and convictions that we discussed before?

A No. I actually used to defend the police, believe it or not. I said if you didn't do anything wrong they won't bug you. I used to have arguments with my friends. They would tell me, oh, the police did this to this guy and the police did this to this guy. And I said, well, what was he doing, what did he do wrong, you know.

I used to defend the police until something like this happened to me. And then I saw the other side of it where they're just people who make mistakes and do whatever they want. They don't have to follow the law unless they want to. There is no oversight

really. This is the only oversight we have. This is the only thing that can reinstill faith in a system that I did believe in. Just because I've been on both sides of it doesn't mean I didn't believe in it. Any time I was stopped by a police officer I did whatever they asked me to do. Any time I was told to go to jail, I went to jail. I didn't fight anyone, I didn't argue with anyone. I did what I was supposed to -- what they told me to do.

When something's not right you don't just go with it. You try to stand up and get some faith back and believe in the system. What they did wasn't right. That's not police work.

Q What part of what they did wasn't right? I just want to know what it is that -- what are you focusing on here when you tell me --

A Everything. Everything from just -- everything from following me to that gas station, from stopping me, from harassing us to assaulting us. From kidnapping me to making me -- every single thing should never have happened. Not one of those things.

I shouldn't even have -- neither of us should even have been approached that day. We're just out driving around. What crime did we commit.

Q So on Number 2 you were asked to identify any

health care provider who provided you care for any of the injuries you allege were caused by Irvin or Gardner. And your response was none. You have not received any type of medical care or anything like that, correct?

A    Correct.

Q    So you've not seen a doctor, psychiatrist, therapist, any of those types of professionals?

A    Correct.

Q    You've explained that you're suffering emotional embarrassment, anxiety. You don't trust the police. Why haven't you seen a medical provider for any of that?

A    I don't have insurance. I don't normally see medical providers. It's not something that I normally do.

Q    Are you full time at Perkins?

A    Insurance is offered to me, but I don't take it.

Q    You don't have, like, a Marketplace plan or something like that?

A    I'm not familiar with what that is.

Q    You have listed here that you do not take any medication prescribed related to this lawsuit, is that right?

A    Correct.

Q    You've never been diagnosed with any type of mental health condition, depression, bipolar, anything like that?

A    Correct.

Q    And for the five years previous to August 31st, 2021, you had not seen a healthcare provider or anything like that?

A    No. I don't have insurance. I don't go to the doctor.

Q    You don't have a primary care physician?

A    I don't.

Q    When was the last time you had a primary care physician?

A    When I was a child. I'm a pretty healthy guy, I don't go to the doctor. If I'm sick I usually just wait a week and wait for it to go away. I mean, if I'm sick for a couple weeks I might go to the emergency room and they usually tell me the same thing. You have a viral infection, we can't do anything for you, go home.

Q    On Page 46, Number 6. You were asked about each individual you know who might have information related to the embarrassments of your complaint. You response spills onto Page 47. There are a number of

officers listed here. I'm not going to ask you about those, I think we've already covered that. But you also identify that there are several additional witnesses that you intend to call, including a female at the fuel pumps who was confronted and threatened, and a male who was seen walking through the area. Is the female at the fuel pumps the person who Gardner and Irvin were testifying about, the African American woman?

A    To the best of my knowledge, it is.

Q    Have you ever spoken to her since August 31st, 2021?

A    No, I have not.

Q    Do you have any idea who she is?

A    To the best of any knowledge, I don't.

Q    And then the male who was seen walking through the area where the incident occurred, do you know who that is?

A    I believe I found out today that that was a plainclothes officer, but I may be wrong.

Q    So the —

A    It might be a different person.

Q    So that may be — the person who you're identifying here might be Detective Anderson, is that what your understanding is —

A    That's what I believe I learned today.

Q    Because the person who you're identifying here in this response is the person who was in that still shot?

A    I believe so.

Q    No, I mean is that the person you're referring to? Whether or not that's Detective Anderson, that person who you're identifying here, the male seen walking through the area, is the person who's depicted in that freeze frame?

A    Yes.

Q    Okay. Where is 921 Westminster Drive? You seem to know Williamsport pretty well based on your testimony.

A    It's in the Loyalsock side.

Q    Is it in Loyalsock Township?

A    Yeah.

Q    So that's east of the city, right?

A    Yeah, it's not in the Williamsport Police jurisdiction. I won't live there.

Q    How long have you lived at 921 Westminster Drive?

A    I believe five years. Since before this.

Q    Five years before 2021?

A    No, I've lived there for five years. I've

77

lived there before this incident is what I was saying.

Q You moved there because you didn't want to be in the Williamsport Police jurisdiction?

A No, but I won't move back into the Williamsport Police jurisdiction is what I meant to be saying.

Q Your -- the convictions and incidents with law enforcement that we discussed a little earlier as far as your paraphernalia charge, your DUIs, the various traffic citations. Were all of those with Williamsport Police?

A I believe a few are with the state police.

Q Any -- I thought I heard you say something about South Williamsport at some point.

A There was -- that was the only one in South Williamsport.

Q So you've had encounters with South Williamsport law enforcement, right?

A One time, yes.

Q Which resulted in a conviction or?

A A summary offense.

Q A summary offense. And Pennsylvania State Police?

A Yes.

Q And Williamsport?

78

A Yes.

Q Any other law enforcement who has ever charged you with something?

A I don't believe so, no.

Q On Page 53 there's a question, Number 16, that says itemized damages you claim were incurred by a result of this incident. I'm paraphrasing. But your response is, Plaintiff has suffered general damages, emotional distress, harm to his reputation, fear, anxiety, anguish, and embarrassment as a result of the officers' actions. What harm have you suffered to your reputation?

A I mean again, everybody at my work and a lot of people I personally know know about this case. Know what's happened, happening, and a lot of them are more -- especially when it comes to my job -- are kinds of, for lack of a better term, on the side of the law. Like they can't do any wrong kind of thing. And you know, they just believe how I used to believe to be honest with you. If you didn't do the crime you won't do the time.

I just believed in the police and I believed in the system and the law. Like, listen, it's got to be there. There's some really bad people in this word. We got families that could get hurt, and it's

79

just like, they believe in that system and they will just never believe that I didn't do something wrong that day, that I didn't deserve what I got and all these things. I'll never go anywhere in that company. I'll never go up.

Q But you didn't lose your job, did you?

A I mean, pretty close. They talked to me about this incident, yeah.

Q Is it because you filed the lawsuit?

A No. It was when it happened.

Q Well you weren't charged with anything?

A No, but like I said, they know me and my girlfriend.

Q Was she working there around August 31st, 2021?

A Yeah. I had got her a job. When she moved here -- I'm am manager there. I got her a job as a server. I said, you know, until you find something just do this.

Q How long had she been working there before this?

A Not long, maybe a week or two. That was it. That was like, her first impression.

Q And did she get fired then?

A She did get fired eventually, yeah.

80

Q Was it for -- when you say eventually, when did she get fired?

A It was a couple -- it wasn't -- she didn't get fired because of this, but you know, just never had -- that was their first impression of her after that.

Q What'd she get fired for?

A I think she got into an argument with the manager. I wasn't the manager that day, I had already left for the day. She was there with someone else.

Q Was it the general manager or someone on your level?

A On my level. Another person on my level.

Q So she didn't get fired because of the criminal charges against her?

A No.

Q And you still work there?

A Yeah.

Q Not been demoted?

A No.

Q You said you're not going to have any room to grow with the company.

A No.

Q Is that what you said?

A Yeah.

**Ervin Blank Associates, Inc.**
**107 McCracken Road, Danville, PA 17821**
**office@ervinblankassociates.com**

81

Q    Well the only place you could go is general manager, right?

A    General manager, regional manager. I would have loved to have been a regional manager.

Q    Have you applied for any positions at Perkins since August of 2021?

A    No.

Q    Have you applied for work anywhere else since this event?

A    I did get a part-time job since this happened, yeah. I work two jobs now.

Q    Where is the part-time job?

A    I work part-time at Amazon.

Q    What do you do there?

A    So the Amazon in our area is not like a fulfillment center. It's just a delivery station, kind of think UPS, FedEx. So we just unpack long haul trucks and put them into the small trucks so they can deliver packages.

Q    So you do warehouse work?

A    Pretty much, yeah.

Q    How many hours a week are you doing that?

A    It's really short, I only work maybe one or two days a week. And the shifts are anywhere from four hours to -- they even have like, two hour shifts

82

sometimes if you want.

Q    You haven't applied anywhere else other than that?

A    I've applied at a couple places, yeah.

Q    Like where?

A    I applied for a job at Red Lobster, I didn't get it.

Q    When was that?

A    I actually applied there twice. It was last summer and just recently they were hiring for manager again and I applied.

Q    Which is a -- was it a general manager position?

A    No, it's just a manager position.

Q    Did you get an interview?

A    The first time, not the second time.

Q    So you got an interview your first application?

A    Yeah.

Q    And when was that?

A    I don't know the exact date. It was last summer.

Q    On the next page the question was, itemize all other -- it's Page 54, I'm sorry. The question was, itemize all other items of expense and loss which

83

you claim were incurred by you or on your behalf as a result of this incident. It's correct that you said, Plaintiff has suffered no additional items of expense and loss?

A    Correct.

Q    So the only damages that you're seeking in this case are the general damages -- which you've not explained although I'll certainly give you an opportunity to -- emotional distress, harm to reputation, fear, anxiety, anguish, and embarrassment, correct?

A    Correct.

Q    What are general damages? And if that's a legal term from your lawyer, that's fine. I don't want you to talk about anything you and he talked about. But if you have some understanding independent of that, feel free to explain it to me.

A    Do you want me to explain the list or just general damages?

Q    I think you've given -- why don't we start with just general damages.

A    That's a term that me and my lawyer --

Q    Okay. Explain the other items on that list to the extent you haven't already covered it, because I think you went over the embarrassment and anxiety

84

already. It's on Page 53 at the bottom.

A    I mean, do you want me to go one by one or tell you how you feel or --

Q    Tell me how you feel and why you're claiming these damages.

A    I mean, these are -- this is -- these are the feelings I have from this incident. These are the feelings that I have every day from this incident. You know, these guys come in here and they downplay it, they're laughing and joking the whole time. You know why, because it didn't really affect their life. It's business as usual for them.

For me, I have two locks on my door. I lock my door when I leave, I lock my door when I'm home. I lock the deadbolt when I'm home, when I'm at my house. You know why? I'm not scared of robbers or intruders. I'm scared of the police. I'm scared something happened with this case or they forgot something, or something with her, just something -- they're just going to show up one day. And you know what, whether that door's locked or not doesn't mean they can't come in. I'm literally scared when I see them. I start sweating. I've been sweating all day long.

Like, I'm afraid because I don't have to do something for them to do something to me. Anything

could happen. That could kick my door down one day and kill me in my house and then say I attacked them when they had a legal warrant for some crazy reason. Because they could just make it up. Like, those are the type of fears that I have. Those are the type of things I think about. And you guys think, well, that's probably crazy. Is it? It probably is crazy. I probably shouldn't have those thought because I've never have them my whole life until this happened.

And I've been involved with the police before this and I've never had these thoughts. I never thought, my safety or this or that or retaliation against my family members or any kind of thing like that until this incident happened. Because this is different from any other police interaction that I've ever had. That's what I don't think everything understands. It's not business as usual to me, this was a lot different. This was scary. I think people downplay it because they think like, this is -- all that happened with this. It could have went way past that.

And the fact that it didn't I am very thankful for. And the fact that she's safe, because I told her to move down here. She lived in Boston for thirty years, never had any police interaction in her

whole life. You know, maybe talked to a police, but never had any like, police like that. And I think the reasons things went that way that day is because they weren't trying to deescalate the situation. We're trying to deescalate, just talk to them and they're just -- whatever they thought was going on, they just like, locked on target, and just went after us.

And it was just -- it's embarrassing when you see people you haven't known for ten years and that's the first thing they want to talk about. You know, it's embarrassing when the day after this happens your landlord comes up to you and says, what's going on. And it's like, I don't know. I don't have an answer for these people. I don't know what's going on. I don't know what happened, I don't know why it happened. I don't know what I could have done to make them not of harassed us.

That's the other kinds of things that go through my -- what did I do wrong. Like, I have like, anxiety and fear that this thing is going to happen again because I don't even know what I did. I just was driving a car. I could be driving a car tomorrow and they pull up behind me and the same thing happens.

And because I'm so jittery and anxiety, then they think something's really going on and then, you

know, anything could happen. It's just -- I'm never going to be the same person again because of what happened that day. It changed my whole outlook on the police, on the justice system. And I've been on both sides before. It's just not -- I'm not going to be regular. I'm going to carry that with me forever and that's not okay, that's not what should have happened. I shouldn't have those kind of feelings when I'm in my own home, that I'm not safe. If I'm a victim of a crime I should be able to call somebody who everyone says is here to help us, and get help, but I can't because fear of retaliation, fear of just anything. I just don't --

Q    Well you're in Montoursville State Police jurisdiction, right?

A    Correct.

Q    You're telling me that you feel that you can't call the Montoursville State Police if you have an issue?

A    I think I would weigh my options. I think -- I really do. I really think I would weigh, you know -- is it worth maybe getting -- I don't know what's going to happen to me. Like, what was the crime. Can I just move on from it because the police might be worse than the crime.

Q    Well what would make you feel that Montoursville State Police would have --

A    Just -- I just -- the last interaction I had with police just doesn't make me feel safe around the police in general. And I know it's like, you know, they're not -- everyone's not all the same. And that's why I tried my hardest to just be like, all right, it's just, you know, something's going on in Williamsport. Just stay out of Williamsport, you know what I mean.

But it still makes me feel like you just can't reach out to them because it's also a small -- if we didn't have all this going on I would have already left Pennsylvania. I don't even want to be here anymore. They all know each other, they're all friends. Gardner's brother's the DA, he just became a judge. He came up under Linhardt, who is a judge who used to be the DA. I mean, they're all friends.

Q    Well it's a small community, right?

A    I know that. I'm not saying that they can't be friends. I'm just saying it's not that they don't talk and they don't all know the situation and everyone knows what's going on.

Q    Well Mr. Beatty, you have testified about your damages, you've given us some information as far

**Ervin Blank Associates, Inc.**
**107 McCracken Road, Danville, PA  17821**
**office@ervinblankassociates.com**

as the injuries you're alleging. And starting on Page 64, we had asked for any documents supporting or reflecting the damages you incurred, starting with Number 9 into Number 10, 11, 12, 13, through 13. We've asked for documentation about your damages and you have responded that you have no documentary evidence to support any of your damages in this case. Is that correct?

A    That's correct.

Q    So you don't have any diaries, notes or anything like that reflecting your injuries?

A    Nope.

Q    No doctor's bills, no expenses like that?

A    I do not.

Q    And then on 14 we asked for any instant -- this is on Page 66. In request 14 we asked if you had any instant messages, social media messages, text messages, emails, anything else with Ms. Lopez about this lawsuit, her criminal case. And you respond none?

A    That's correct.

Q    You've not exchanged a single message with Ms. Lopez about any of this?

A    Well on August 31st they confiscated her phone for over a month, so it was tough for us to communicate through cell phone or text or anything like that.

Q    How about after that?

A    I mean, after that we kind of already talked about it face to face for so long that I don't think we had anything to message with each other about.

MR. WHITE:  Okay.  I don't have anything further.

CROSS-EXAMINATION

BY MS. LAUGHLIN:

Q    I'm going to have some followup questions, Mr. Beatty. My name is Shawna Laughlin and I represent Officer Clinton Gardner with the suit that you have filed. Would you like to take a break before I go into my questions?

A    No thank you.

Q    I'm probably going to jump around a little bit because Attorney White has covered a lot of the questions that I would have asked. However, you might not understand what I'm talking about or what I'm asking because I'm jumping around. If that happens, let me know. I will explain, repeat, rephrase the question as you need, okay?

A    Okay.

Q    If I ask you a question and you provide an answer I'm going to assume you heard it, you understood it, and you answered it truthfully, is that fair?

A    Yes.

Q    Okay. You had said that the day of this incident you had stopped at either a state representative's office or the county commissioner's office. What location had you gone to?

A    I do not know the exact address.

Q    What's the approximate address? Do you know the street?

A    It's like a block from the courthouse, on the corner there. I think -- not right on the corner. It's next to Otto's Bookstore but I don't know -- 4th and something.

Q    Is that going towards Market or away?

A    Away from Market towards the Newberry area.

Q    And you said you had already been in touch with someone there and that wasn't your first meeting. What was your business with either the state representative or the county commissioner?

A    They were helping me maneuver through PennDOT. They were really backed up.

Q    What was your issue with PennDOT that you needed help with?

A    They were -- I was trying to get my nonrestricted license.

Q    So on the date of this incident you still had the restricted license?

A    I still had the card in my possession, yes.

Q    You had testified earlier that you did not know what was in the ashtray that was in the vehicle, correct?

A    I don't know if I said that earlier.

Q    All right. Were you aware there was a cup sized ashtray in the cup holder on the driver's side door on the day of this incident?

A    Yes, there was.

Q    And was it an accurate description that it was about the size of a soda can, had a lid on it with a hole in the middle that was maybe a little larger than a cigarette?

A    I believe so.

Q    Okay. Do you know if there was anything in that ashtray on that date of the incident we're here about?

A    I know there was no marijuana in that car.

Q    How do you know that?

A    Because I was not charged with possession of marijuana.

Ervin Blank Associates, Inc.
107 McCracken Road, Danville, PA  17821
office@ervinblankassociates.com

Q    So you're basing the fact that there was nothing in the car because you weren't charged?

A    No, I know there wasn't and that's how I can guarantee it.

Q    Did you watch the body cam footage? There were several different videos that were exchanged in this matter.

A    Ever?

Q    Correct.

A    Yes, I have watched the body cam footage.

Q    And did you hear Anaise admit to there being a roach in the vehicle that she had smoked two days prior when she was in Boston, where she believes it to be legal?

A    Not to my recollection.

Q    Okay. So if there is a video saying — with Anaise saying that there's a roach in the car, would that change your mind that there was marijuana in the vehicle? Or you still stick to the story that there was nothing there?

A    I stick to the truth, that there was no marijuana in the car.

Q    You were asked about what was your speech, your First Amendment speech that was being retaliated against. And you said, I don't recall the exact words. But how about the gist of your conversation or your words. What did it have to deal with?

A    I'm not a lawyer so I don't know exactly what you're not -- I don't know the -- I know what we were talking about, but I don't know what the police are not allowed to do or not do. I'm not a lawyer or a police officer.

Q    Okay. So what were you talking about that you feel you were retaliated against on the day of this incident?

A    Asking for people to record. Asking if we can record. When she asked for a female officer. When we asked for a supervisor. When we were handcuffed immediately after asking for things. When I asked for what was their probable — why we were being stopped or anything. Just —

Q    You would agree with me that the Turkey Hill where this took place is a public place?

A    Yes.

Q    People go there to get gas, buy snacks, drinks, things like that, right?

A    Yes.

Q    And you really don't have a sense of privacy when you're at Turkey Hill, right? I mean, your actions are out in the open, you car's out in the open, right?

A    Yes, it's a public place.

Q    And you left your window down when you went into the store, right?

A    Yeah, because I really wasn't worried about anything. I hadn't committed a crime, I didn't have anything on me. I wasn't really worried about hiding evidence at that point.

Q    And when you were driving from downtown over to the Turkey Hill, those were all public streets, right?

A    Yes.

Q    You're allowed to drive on, right?

A    Yes.

Q    Police are allowed to drive on?

A    Yes.

Q    Now you talked about, and I think you said it several times about, you know, you did nothing wrong, you have nothing to hide. But you were driving a vehicle that did not have an ignition interlock system, correct?

A    Correct.

Q    And that is something that, with the current license you had at that time, you should have had when driving that vehicle?

A    To the best of my knowledge, no.

Q    Why not?

A    Because I had already received letters from PennDOT saying I was allowed to have my license back. Like, my license was good but because PennDOT was closed you couldn't get your license back. That's why I was working with the state representative.

Q    So you received a letter that said that you could get a license that didn't have that restriction on it, correct?

A    Correct.

Q    And at that time, the date of this incident, August 31st of 2021, you had not gotten the license that didn't include that restriction, correct?

A    Did I have it in my possession, no. The state representative was getting it for me.

Q    Did he have it in his possession?

A    No.

Q    Okay. So had it been issued at that point in time?

A    To the best of my knowledge, no.

Q    Okay. So at the time that you were driving Anaise's vehicle, it should have had, based on what your license in your possession on that day, it should have had an ignition interlock system?

MR. COCHRAN: Object to form. You can answer.

THE WITNESS: To the best of my knowledge, no.

BY MS. LAUGHLIN:

Q     And because of a letter you got, is that correct?

A     I'm not a lawyer or a police officer. I know that at the time they were saying that anything going on with PennDOT, the police aren't giving you a tough time about because they know you can't go to PennDOT because PennDOT's closed.

Q     Who told you that?

A     The state representative told me that.

Q     What's the state representative look like?

A     I didn't meet -- I believe his name was Mussare. I didn't meet him.

Q     When there was the pat down done inside the Turkey Hill by Officer Gardner, was that any different from another pat down that you had received with your previous encounters with police officers?

A     I don't recall.

Q     You had mentioned about Detective Irvin's demeanor when it was you and him when you were in the back of the vehicle, that it seemed more calm when he wasn't around Officer Gardner. Do you recall that?

A     Yes.

Q     Now at that time where you were having that conversation that you said was calm with Detective Irvin, Anaise Lopez was also not around, correct?

A     She was within ten feet of us but she was not right next to Irvin and I, correct.

Q     You believed -- you had testified earlier that you were at Turkey Hill for a half hour to an hour before being taken to the station?

A     Are you talking about from the time we arrived or from the time I was cuffed and put in the back?

Q     You gave the answer that you stayed a half hour to an hour before you were taken to the station. So what were you referencing?

A     I believe I was referencing once I was handcuffed and they took the vehicle that Anaise was in drove away. I believe we still sat there for about a half hour or longer waiting for the tow. And then they actually gave up and just took me to the station. The tow must have eventually came for the car, but I never watched the car get towed.

Q     Did you check the timing at all on the body cam footage to show when you were handcuffed and then the time that you arrived at the station?

A     No. I'm just giving a roundabout guess kind of time answer when it comes to time lengths of the incident.

Q     And I know you've said that -- or, you have a belief that the officers are not being truthful. Do you have any reason to doubt that the body cam footage or the timing on it is incorrect?

A     I believe it's correct, yeah. I don't doubt it, it's a video.

Q     Now you said -- you gave us a definition of kidnapping, which was moving a person from one place to another without their permission.

A     Yeah, against their will. I believe that's close to the definition.

Q     And so is it your opinion that any time an officer arrests someone or detains someone to get further information that they're being kidnapped?

A     If the officer didn't have cause, yeah, they are.

Q     Okay. And I know you talk about you -- you said you're not a lawyer, you're not in law enforcement. But you're using a lot of different words that are related to the law and law enforcement, like probable cause. Do you know what the definition of probable cause is?

A     I'm not a lawyer, I don't know the exact definition.

Q     Do you know a roundabout definition?

A     I have an idea, yeah.

Q     Okay. What is it?

A     I believe it's -- they have to have some type of evidence, some type of probable reason to stop you, harass you, whatever they're going to do. I might be wrong about it, but I think that's what it is.

Q     Did you ever hear of the term reasonable suspicion?

A     I have heard the term.

Q     Okay. And do you know what that means?

A     I can come up with what I think it means, but I don't know if that -- I don't know the definition. I don't know how it relates to probable cause or police conduct. I don't know.

Q     I want to turn your attention to the strip search. You had mentioned a couple of times that you don't know if they wanted you to manipulate your genitalia to stimulate them. And when you're talking about to stimulate them, you're talking about the officers that were present for the strip search?

A     I'm saying -- I didn't -- when they -- I'm

Case 4:23-cv-00036-DLKM Document 16 Page 512 Filed 12/16/2025 7

manipulating myself. I said I don't know if it's for their gratification.

Q Okay. And what would lead you to believe that they want you to manipulate your genitalia for their gratification?

A What made me think that was the fact that there was no other reason for me to be there and be naked and being searched and doing those things. They didn't, to my knowledge, have a reason to have me there.

Q Do you believe they did anything that was out of the normal realm for police officers during a strip search?

A I don't know what a normal strip search is like. I don't know what they're supposed to do or not supposed to do. I don't know how long it's supposed to take. I don't know if there's supposed to be one officer, two officers. I don't know if they're supposed to record it so there can be no he said, she said afterwards. I don't know.

Q Okay. And you don't recall your prior strip search when you went to jail, so you don't know how it compares to the one from this case?

A It was so long ago I don't remember the specifics of it.

Q In the packet that you were provided by Attorney White, on Page 49, your answer to interrogatory Number 8 is what I want to look at. In that answer you say that the Defendants seized, treated, and handled them inappropriately. It's two words but I think it's supposed to be one word. In what way did the Defendants handle you or Ms. Lopez inappropriately?

A I guess what I would -- all of the things they did, if they didn't have the right to do it, then it was all inappropriate.

Q But if they had the right to do it then it wasn't inappropriate based on that statement, correct?

A No, not completely.

Q Explain that.

A I mean, that's part of it, that's the start. I mean, you can't -- if they didn't have any reason or anything they -- they shouldn't even have started it. That's just the tip of the iceberg. One they start it, they were aggressive the whole time. They were demeaning. They were doing things that were just harassing.

You know, there's -- you could -- like they were talking today. They were real polite to everyone, were real nice. I don't know those guys,

I've never met them before. They were completely different people. Neither one of those officers were deescalating in a situation. I was the only one that seemed to be deescalating everyone there. Or trying to.

Q Do you know what a police officer is supposed to do in that situation where you have two people suspected of drugs and one of them not complying, yelling, not listening --

MR. COCHRAN: Object --

BY MS. LAUGHLIN:

Q -- and another who refuses to ID himself?

A I mean, they could have called for a supervisor. They could have called for help, you know, if they were so worried or distressed. But they didn't do any of that. They didn't even take any witness statements to support their side of the story. They didn't want any witness statements because it wouldn't have supported their side of the story.

Q When you were incarcerated before, are you able -- were you able to shower on your own or did you have to shower with others?

A I believe there was a stall, so it was like you showered by yourself. But I think there wasn't a curtain on the stall. I may be wrong about that.

Q You've had some other interactions with the police for the DUIs, paraphernalia, numerous traffic violations. On any of those occasions did you ever refuse to provide ID or ID yourself?

A No, I cooperated fully every time.

Q When you had the paraphernalia charge, you said that resulted out of being pulled over.

A Yes.

Q What were you pulled over for?

A I believe I went on a one way the wrong way. I turned right on a one way.

Q And you had said it was for a marijuana pipe or a cap?

A It's like a pipe but it's called a cap, yeah.

Q Okay. With regard to Ms. Lopez's appeal, do you know whether that was to appeal the charges she was found guilty of or to appeal the sentence that she was given?

A I don't know the specifics of her exact -- when it comes to that with her lawyer. That's between her and her lawyer.

Q You had talked about seeing multiple articles about the subject incident. Where were these articles?

A I believe when it first happened there was an

article in the Sun Gazette and on Northcentral.com and

I think on Pennlive.com. Then I think a few months

later when there was some motion in her case there was

some more articles. It's usually the Sun Gazette and

Northcentral PA that put out the articles. I think

PennLive only covered it one time.

Q    And where you mentioned in these other

articles by name?

A    I don't know exactly if I was -- I don't know

if I was named in every one or any of them. I don't

recall.

Q    You had said that people had asked you about

this, so customers employees, managers, family

members, friends, your friends' dads. What are the

names of the customers who have asked you about this?

A    I don't know their -- off the top of my head

I couldn't give you their names. This is stuff that's

happened over a two-year period on and off.

Q    Who are the employees that have asked you

about it? What are their names?

A    Frank, Josh, Greg, Jeff, Jerry, Warren,

Jamie. I mean, just work people.

Q    What's Frank's last name?

A    Colbalarge.

Q    Can you spell that?

A    I don't know how to spell Colbalarge.

Q    Is he still at Perkins?

A    Yeah, he's the general manager. That's my

boss.

Q    Okay. And Josh, what's his last name?

A    I guess I -- I don't see why this is --

MR. COCHRAN: They're entitled to whatever

evidence would be out there pertaining to damages.

And if there have been conversations between your

damages and this incident, then they're entitled to

explore who would have --

THE WITNESS: His last name is Seagraves.

BY MS. LAUGHLIN:

Q    Does he still work at Perkins?

A    Yes.

Q    Okay. How about Greg, what's his last name?

A    Treese.

Q    What was that?

A    Treese.

Q    Can you tell that?

A    I don't know.

Q    Is he still at Perkins?

A    Yeah. Most of these people are all still at

Perkins.

Q    What is Jeff's last name?

A    Thomas.

Q    Is he still at Perkins?

A    Yeah.

Q    What about Jerry. Last name?

A    Moser.

Q    Still at Perkins?

A    Yep.

Q    Warren. What's Warren's last name?

A    Houseschnedt.

Q    Still at Perkins?

A    Yep.

Q    Jamie. Male or female?

A    Female.

Q    What's her last name?

A    Burton.

Q    Still at Perkins?

A    Yep.

Q    And you talked about your manager, Frank.

Were there any other managers who have asked you about

this incident?

A    Greg's a manager and Josh is a manager.

Q    Who was the friend's dad that asked you about

it?

A    Roger Hubbard.

Q    Does he live here in Williamsport?

A    Yeah. He lives in Southside.

Q    Do you know what street?

A    Valley Street.

Q    You talked about having anxiety, and I know

you talked about sweating here today. Any other

symptoms with regard to anxiety that you experience?

A    Just like sweating, paranoia. Like, you

know, just like, mind racing, shaking, just being

uncomfortable, fear.

Q    You commented that you wouldn't -- you won't

live in the city police jurisdiction. When did that

opinion start?

A    Ever since this happened.

Q    You said you were close to losing your job

after this incident and that they had called you in to

talk to you. Who was that that --

A    I don't believe I ever said I was close to

losing my job. He said that and I said, they did talk

to me about this. They talked to me about it, yeah.

Q    Okay. So let me back up, you keep

interrupting. You got to -- I know it's tough when

we're going back and forth, but you got to wait until

I completely finish my question before you give your

answer. So you're saying now that you were not close

to losing your job?

109

A    I never said -- I don't believe I said those words.

Q    Okay. Well that's not my question now. We can look at the transcript after we get it, you can go through it and see what you did say.

A    Okay.

Q    But is it your testimony right now that you were not close to losing your job because of this incident?

A    I am not -- I am not losing my job because of this incident.

Q    Okay.

A    You're kind of -- I'm getting lost in your questions a little bit here.

Q    Okay. I'll make it simple.

A    Okay.

Q    At any time since the date of this incident, were you at risk of losing your job because of the incident?

A    No.

Q    Okay. You said you were called in to talk about it?

A    Yes.

Q    And who was that that called you in?

A    Frank.

110

Q    And was there anybody else present?

A    I don't believe so. I think we were just -- it was him and I in the office I believe.

Q    And is there any kind of disciplinary action against you because of this incident from work?

A    No.

Q    Was there anything notated in your file?

A    No.

Q    Okay. Because of this incident you had indicated that you're not going to be able to go anywhere in the company?

A    No.

Q    And so how is that if it's not documented anywhere, you weren't in jeopardy of losing your job?

A    Just the damage of my reputation.

Q    You talked about being worried about what the police are going to do in a future situation. Were you worried about what the police would do when you passed Officer Gardner on the side of a road responding to -- or during a traffic stop when you yelled curse words at him out the window?

A    Excuse me?

Q    Were you worried about police actions when you drove past Officer Gardner when he was on the side of the road with a traffic stop and you yelled curse

111

words at him after this incident?

MR. COCHRAN: Object to form.

MS. LAUGHLIN: You can answer.

MR. COCHRAN: You can answer if you recall.

THE WITNESS: I don't recall.

BY MS. LAUGHLIN:

Q    Your landlord that came up to you and asked you about what had happened, what's your landlord's name?

A    What's his name. Rennie Rodarmel. I always pronounce his name wrong.

Q    And where does Rennie live?

A    I don't know where Rennie lives.

Q    How do you contact Rennie?

A    I live above his business. He owns an Allstate agency.

Q    Okay. Do you have a Facebook account?

A    Yeah.

Q    Have you posted anything about this incident or Ms. Lopez's charges on your Facebook page?

A    No, I don't believe I have.

Q    Have you posted anything on your Facebook page about your feelings about police officers now?

A    No. I never have.

Q    Have you posted anything on Facebook about

112

this lawsuit?

A    No. I never have.

Q    Does Ms. Lopez smoke cigarettes?

A    Sometimes, yeah.

Q    Did she smoke cigarettes at the time of this incident on August 31st of 2021?

A    Sometimes, yeah.

Q    You may have already answered this, but when Officer Gardner entered Turkey Hill and said hello to you, why did you immediately put your hands up and say, do you want to search me?

A    I think it was two reasons. One, I was a little scared and startled. He looked -- again, he did not look like a police officer. He looked very, you know like, SWAT team, narcotics officer, tactical kind of guy. It was a little, kind of like, coming right up -- I didn't know if he -- I thought he was coming right up to put hands on me. I didn't know he was coming up to say, come follow me. I thought he was coming right up. So I was just like, search me, I don't care. I don't got nothing on me, I didn't do nothing wrong. Do whatever you want.

Q    And is that normally how you respond to police officers?

A    No. He scared me.

Q    And then once you were walking out of the Turkey Hill back to the car, you had your hands up or on the top of your head. Why did you have those in that position?

A    I wanted everyone -- everyone -- the police, witnesses, to see that I'm not struggling with this guy. I'm not arguing with this guy. I've got my hands above my head. That way if he did something to me, slammed me on the ground, whatever happened, there was no he said, she said, that I moved a way certain way, touched him, did anything. I was scared. I was literally scared.

Q    And when you were talking to Ms. Lopez during this interaction you had said something about, don't, they will throw you on the ground. Do you remember that?

A    I believe I remember something like that.

Q    Why would you say that?

A    Because I knew -- I kind of thought I knew what was going on at that point.

Q    And what was that?

A    That they were looking for a reason to charge us with a crime. And that reason was going to be, if you move right now they're going to slam you on the ground, say you assaulted them, you resisted arrest, you did that. And then they'll charge you with whatever and then that's the way it's going to go. They're going to write the story at this point. They say how it goes, then you have to prove whether it happened later. That's what we're doing right now.

Q    You had made the comment that they were out of pocket. What does that mean?

A    I believe I said that.

Q    What does that mean?

A    It's kind of like slang for like, acting crazy.

Q    When the officers asked you to ID yourself, why did you refuse?

A    Because at that point they had asked to search the car and I think we were kind of just like, just let them search the car because we just want to go about our day and we didn't do anything wrong. And then once they started like, asking us for ID, asking for all these things, I'm just like, you know what, I'm not cooperating anymore. I feel like I'm being harassed. We didn't do anything wrong for even -- come up and talk to me.

But when they did come up and talk to me, I tried to cooperate. I said, go ahead and search the car. But now it's this, that, and the other -- you want to search me now too, no. If you're going to do it, just do it. Because they did it anyway. But I'm not going to consent to it and say you guys can.

Q    So you don't think that the officers had a right to ask you to ID yourself?

A    No, we weren't doing anything wrong.

Q    You don't think they had a right to pat you down?

A    No, I don't believe so.

Q    And then it was you that told Ms. Lopez to revoke the permission to search the vehicle, right?

A    Yeah, because I didn't want to be cooperative anymore. I didn't feel like -- you know, if you come up to me and you ask me something and you're nice, and you know -- that's how I was raised, I'll help you. But if you come to me and you're yelling and all these things, and you're harassing and doing all that, I'm going to help you. Do whatever you want, but I'm not helping you do it.

Q    Throughout the interaction you would agree that Ms. Lopez was yelling at the officers?

A    I'll agree that her voice was elevated, yeah.

Q    And you were telling her to shhh and to stop. You told her to sit on the car as the officers told her to do?

A    Yeah. I knew what they were -- what was going to happen. I literally told you guys what was going to happen about five minutes before it happened.

Q    So why were you telling her to shhh and to stop and to sit down?

A    Because she's never been around the police before. She doesn't know how they are. She doesn't know that they're going to twist everything you do, use everything you do against you. That you just moving left and right, they consider that assault. You just attacked them, you just gestured some type of way. I said, just stand still, they're going -- it's not going -- you know, it'll all be over, I thought. But I was wrong.

Q    But at this time, back in August 31st of 2021, that was the time where you still believed in the police, that they did what was right?

A    Yeah. I was kind of like, we didn't do anything wrong so eventually they will let us go.

Q    But you're telling me that you were telling her to shhh, to stop, and to sit on the car because you saw what they were doing and that you saw that they were going to twist things around and you use it against you?

A    Yeah.

**117**

Q    At a time when you still believed the police did what they're supposed to?

A    Yeah, I believe in them that they -- you know, we need the police to stop crime. But I also know that they will harass you. I just was watching it happen.

Q    You also told Detective Irvin that if he let you talk to her, you'd be able to calm her down. Do you recall that?

A    Yeah.

Q    And so you agree she was not calm during this interaction?

A    No. That was -- it was pretty -- it was a pretty crazy situation and I don't think she's ever been in any situation like that. I think, you know, it was really surprising to her that that's how the police are, you know. I think she just thought, you know, you didn't do anything wrong, you would be okay. And I just thought, you know, eventually we will. This is probably going to go on for about twenty or thirty minutes and then they'll let us go when they find out that we didn't do anything wrong. It just didn't go that way.

Q    Now you had also said something to, I don't remember if it was Irvin or Gardner that, well, if

**118**

there's a roach in there that would be the most that's in there. Do you recall saying that?

A    I think I said something along those lines.

Q    So why would you think there'd be a roach in there?

A    Because I have a police officer telling me he visually sees a roach in there. So I said, if you see a roach in there just charge me with it, which they never did.

Q    And you said that Ms. Lopez -- you described her as a hostile woman. Do you recall that?

A    Yeah, I think at that time I was trying to negotiate with my kidnappers again, you know. He seemed like he was trying to do a little good cop, bad cop thing. So he was coming over there good coping me. So I was trying to be like, hey buddy, you know women, let's just -- you know, if I can talk to her I can calm her down. I was just trying to get these guys to let us go, we didn't do anything wrong. There was no crime that they stopped us for. The only crime that happened was a result of the stop.

Then there was an argument and it got out of control. That's the only crime that happened. So if we weren't stopped there would have been no argument and no crime kind of thing is what I was trying to

**119**

talk to Irvin about. I think even at a point he was kind of like, you know, we're going to calm her down or something. I don't even know what.

Q    Then after that point is when she kicked an officer?

A    I wasn't over there, I just saw them dragging her across the parking lot.

Q    You also say that she's -- misses her rights get violated. What do you mean by that?

A    Again, I was just trying to talk to them and kind of like, buddy-buddy a little bit, kind of good cop, bad cop on their side like, hey guys, I know, yeah, she's like that. Let me go talk to her, this and that. I'm just trying to negotiate with these guys that got us handcuffed and just try and get them to let us go because we didn't really do any -- at that point, you know, I think they were still arguing. It wasn't really like they had dragged her across the parking lot yet. I might be wrong about that but.

Q    So you were saying what you thought they wanted to hear?

A    I was negotiating, yeah.

Q    And so is Ms. Lopez a misses her rights get violated person?

A    No, I mean I don't think she's ever sued

**120**

anyone or done anything like that. I don't think she's ever done like, a march for people or anything like that. I don't know.

Q    And you had previously told Ms. Lopez that marijuana is not legal in Pennsylvania like it is in Massachusetts and that she needs to put it away before she gets here?

A    Yeah I mean, I think -- we definitely had the conversation before she moved down here that, you know, up there in had been medical for a long time, and it had just became recreational up there. So I said, when you move down here everything's different. It's not like that down here. They're not cool with it. You know, you just leave it at home and you do your thing. If you want to get a medical card when you get down here, that's your choice. But you know, it's a different state. You know, you lived there your whole life. It's different here.

Q    And she had driven in the night prior from Massachusetts?

A    The night -- I believe, from the best of my recollection, the night before she had arrived, yes.

Q    And the key ring that had the keys to the vehicle that were in the vehicle, at one point Detective Irvin went and removed your house key and

**Ervin Blank Associates, Inc.**
**107 McCracken Road, Danville, PA 17821**
**office@ervinblankassociates.com**

your work key from that key ring. Do you remember that?

A       I believe I -- he did go get keys from me, yes.

Q       And other keys on that, you had indicated in the video, were Ms. Lopez's keys?

A       I believe so. That's what the video says.

Q       Why was your work key and your house key on a key ring with Ms. Lopez's keys?

A       Because we only had one car at that time so all the keys were on the same car thing.

Q       When you were in the back of the police vehicle waiting for them to come back and say what was going to happen, there were points in time when you were laying down in the back seat, kind of spread out, relaxed, right?

A       Yeah.

Q       And having a conversation with them when they would open the door, you still continued to lay back?

A       Yeah.

Q       You were whistling at one point when they opened the door?

A       Yeah. I -- probably, maybe. I was kind of losing it in there.

Q       What do you mean losing it?

A       I mean, it was tough watching them do that to her, being locked in there and you couldn't, like, help, you couldn't say anything, nobody can even hear you, you're locked in there. I mean, it was frustrating watching all that happen and you can't even -- you got no say, you can't help, you know. It was tough. I was --

Q       So you were worried about Anaise?

A       I was -- I mean, I went through a ray of emotions in the back seat of that car. I mean, I was worried, I was like laugh -- like, I can't even believe this. I gotta laugh, like, I can't believe this. Then I laid back and I'm like, you know what, I'm not worried because I didn't do anything wrong, they're going to let me out of this car in about ten minutes because I didn't do anything.

And then he's like, well are you going to tell me about the drugs and all this. And I said, does it look like I'm worried, I'm laying here. I'm not worried about nothing because there's nothing in that car. And that's what that not worried, laying back was about. And then I figure out, they're not gonna let me go. They're not letting me go at all. They're taking me down to the station next. Okay, here we go. This is going to be --

Q       And so on the trip to City Hall then, your conversation with the officers consisted of asking about the vehicle that got left behind. That's what you were concerned about, right?

A       I don't recall.

Q       Because nobody had stayed back with it?

A       That sounds familiar because the window was open and I feel like I was worried about that.

Q       And then when you got to the station and you were in the interview room, you were concerned about what was going to happen with Anaise and whether you would get to see her?

A       Yeah, because what Gardner had said that they were charging her with, I knew was really bad. So I was like, I don't know if I'm going to get to see her before they take her to jail and she's probably going to be in there for a really long time because of what he was saying.

Q       And while you were waiting in the interview room you were talking to Detective Irvin. You guys had talked about baseball, the new Y with the soccer fields, the dome, what you do in your free time, work --

A       Yeah.

Q       -- laughing and joking about your daughter. You talked about the COVID shutdown and the mask mandate. Do you remember that?

A       Yeah, I remember talking about some stuff like that. I think I said that before.

MS. LAUGHLIN:  I don't have any other questions.

REDIRECT EXAMINATION

BY MR. WHITE:

Q       I have a follow-up. Mr. Beatty, did you do community service -- 25 hours of community service -- sometime in 2019 as a result of a guilty plea?

A       Can you tell me what it was for?

Q       I'm looking at the criminal docket 1606-2018, Commonwealth of Pennsylvania v. Kyle Thomas Beatty. This reflects a guilty plea by you entered on March 19th, 2019, for a misdemeanor 3 criminal mischief, damage to property, Judge Marc Lovecchio and your attorney, Kyle Rude. Does that refresh your recollection?

A       Yes, it does. I do recall that.

Q       Can you tell me what that was about?

A       It was a traffic accident.

Q       Tell me a little bit more. What does that mean?

A       I don't recall exactly -- somebody hit my

**Page 125**

truck and him and I had a back and forth, and I think I kicked or punched his truck. Or car.

Q At a traffic -- like a fender bender?

A Yeah.

Q You then were charged for that?

A Yes.

Q By the Montoursville State Police?

A Yes. You were right. I totally forgot about that.

Q You did 25 hours of community service?

A I thought I just paid a fine to be honest with you.

Q I'm just reading the --

A Yeah.

Q -- docket. And you were on probation for a year for that. Does that sound right?

A Yeah.

Q Do you remember the name of the person who you got into that altercation with?

A I do not recall.

Q Was it someone you knew before the fender bender?

A No, it was a stranger. I know that.

Q Where did that happen?

A At a Dunkin' Donuts.

**Page 126**

Q Whose car were you driving?

A I believe it was my girlfriend's at the time. I think.

Q What was her name?

A Chazlyn Gavigan.

Q Can you spell that?

A Like, the whole thing?

Q Yeah.

A C-H-A-Z-L-Y-N. And the last name is G-A-V-I-G-A-N.

Q She from around here?

A I think she lives in Lewisburg now.

Q Did you have a license at that time? Unrestricted?

A I don't recall, but the car was parked when we were hit.

Q So she was with you in the car?

A Yeah.

Q Were you driving?

A No.

MR. WHITE: I don't have any other questions.

MS. LAUGHLIN: I don't have any other questions.

MR. COCHRAN: All right. I think we're good then.

**Page 127**

MR. WHITE: Thank you.

(Whereupon, the deposition was concluded at 2:22 p.m.)

**Page 128**

COUNTY OF LYCOMING :

COMMONWEALTH OF PENNSYLVANIA

I, Loretta C. Berrigan, the undersigned Notary Public, do hereby certify that personally appeared before me, KYLE BEATTY; the witness, being by me first duly sworn to testify the truth, the whole truth and nothing but the truth, in answer to the oral questions propounded to him by the attorneys for the respective parties, testified as set forth in the foregoing deposition.

I further certify that before the taking of said deposition, the above witness was duly sworn, that the questions and answers were taken down stenographically by the said Loretta C. Berrigan, court Reporter, Williamsport, Pennsylvania, approved and agreed to, and afterwards reduced to typewriting under the direction of the said Reporter.

In testimony whereof, I have hereunto subscribed my hand this 30th day of January, 2024.

_____
Loretta C. Berrigan
Reporter-Notary Public
My Commission Expires
December 7, 2026

**- 0 -**

**06104** [1] 1:24

**- 1 -**

**10-hour** [3] 6:6, 11, 16
**11th** [1] 4:12
**1606-2018** [1] 124:13
**17701** [3] 1:18, 21; 4:5
**1986** [1] 4:4
**19th** [1] 124:16

**- 2 -**

**2004** [2] 49:3; 53:19
**2006** [1] 50:17
**2008** [1] 56:8
**2012** [1] 4:23
**2013** [1] 56:3
**2015** [1] 57:9
**2016** [2] 49:3; 53:20
**2018** [1] 58:22
**2019** [2] 124:11, 16
**2021** [24] 4:2; 5:23; 7:15; 9:1, 13, 20; 10:1; 24:24; 25:11, 12; 29:3; 54:19; 55:3, 24; 69:7; 74:7; 75:12; 76:24; 79:15; 81:6; 96:13; 112:6; 116:16
**2022** [2] 59:9; 60:6
**2024** [3] 1:12; 61:9; 128:20
**2026** [1] 128:25
**23-cv-00364** [1] 1:4

**28th** [1] 8:5
**2903** [1] 1:24
**29th** [1] 8:5

**- 3 -**

**30th** [2] 8:8; 128:20
**31st** [20] 4:2; 5:23; 7:15; 8:25; 9:13; 10:1; 25:11; 29:3, 4, 7; 54:19; 55:3; 57:12; 74:7; 75:12; 79:14; 89:24; 96:13; 112:6; 116:15

**- A -**

**a.m.** [3] 1:12; 59:25
**able** [7] 33:4; 39:23; 87:10; 103:21; 110:10; 117:8
**above** [3] 111:15; 113:8; 128:13
**absence** [2] 30:11; 31:7
**accident** [1] 124:22
**account** [1] 111:17
**accurate** [1] 92:14
**acting** [1] 114:10
**action** [1] 110:4
**actions** [4] 23:20; 78:11; 94:25; 110:23
**activity** [1] 65:18
**actual** [1] 63:24

**addition** [1] 62:10
**additional** [2] 75:3; 83:3
**address** [3] 4:3; 91:9, 10
**addressed** [1] 48:19
**admit** [1] 93:11
**admitted** [1] 2:14
**affect** [1] 84:11
**affected** [1] 68:18
**affirmed** [1] 3:11
**afraid** [4] 20:20; 35:20, 21; 84:24
**african** [1] 75:8
**afternoon** [1] 12:16
**afterwards** [3] 49:19; 101:20; 128:17
**again** [12] 14:10; 41:7; 43:16; 47:5; 63:23; 78:13; 82:11; 86:21; 87:2; 112:13; 118:13; 119:10
**against** [12] 30:17; 66:13, 23; 71:1; 80:15; 85:13; 93:25; 94:9; 99:14; 110:5; 116:9, 24
**agency** [1] 111:16
**aggressive** [3] 34:13, 14; 102:20
**agree** [5] 39:20; 94:17;

**115:20, 22;** 117:11
**agreed** [1] 128:17
**ahead** [1] 114:24
**alcohol** [2] 49:10, 11
**allegation** [1] 28:15
**allegations** [1] 27:19
**allege** [1] 73:2
**alleges** [1] 27:22
**alleging** [1] 89:1
**allowed** [7] 40:4; 41:7; 45:10; 94:6; 95:13, 15; 96:4
**allstate** [1] 111:16
**along** [2] 27:21; 118:3
**altercation** [2] 38:9; 125:19
**always** [6] 8:2, 3; 12:25; 13:10, 12; 111:10
**amazon** [2] 81:13, 15
**amendment** [4] 30:10, 16; 31:4; 93:24
**american** [1] 75:8
**among** [1] 27:22
**amount** [2] 15:12, 13
**anaise** [15] 15:4; 18:25; 21:20, 23; 35:7; 36:22; 59:11, 12; 70:17; 93:11, 17; 98:5, 18; 122:8; 123:11

anaise's [1]
96:23
anderson [2]
75:24; 76:8
anguish [2]
78:10; 83:10
answer [14]
31:17; 64:5;
68:12; 86:13;
91:1; 97:2;
98:14; 99:3;
102:2, 4;
108:24; 111:3,
4; 128:8
answered [3]
41:16; 91:2;
112:8
answering [1]
25:20
answers [4]
40:5; 48:3;
64:5; 128:14
anxiety [13]
64:16, 21;
69:23; 70:22,
23; 73:11;
78:10; 83:10,
25; 86:20, 24;
108:4, 6
anyway [3]
19:5, 13; 115:2
apartment [1]
4:5
apologize [1]
45:18
appeal [5]
60:18; 61:3;
104:15, 16, 17
appealed [3]
60:13, 18, 21
appeared [2]
47:25; 128:6
application [1]
82:18
applied [8]
5:22; 81:5, 8;
82:2, 4, 6, 9,
11
approached [1]
72:23

approaching
[1] 21:15
approved [1]
128:16
approximate [1]
91:10
area [9] 11:1;
33:11, 20, 22;
75:6, 17; 76:9;
81:15; 91:17
argue [1] 72:8
argued [1]
68:17
arguing [4]
35:4, 5; 113:7;
119:17
argument [6]
56:17; 61:18;
62:10; 80:8;
118:22, 24
arguments [1]
71:16
army [1] 21:2
arrest [6]
40:4; 49:1, 22;
50:16; 62:11;
113:25
arrested [5]
30:12, 22;
33:25; 48:22;
49:12
arrests [1]
99:17
arrived [3]
98:12; 99:1;
120:22
arriving [1]
10:19
article [18]
42:5; 65:20;
66:11, 12, 14,
18, 19, 25;
67:1, 3, 7, 11,
15, 19, 21;
68:24; 70:4;
105:1
articles [12]
44:17; 65:22;
67:25; 68:4, 5,
7; 69:25;

104:22, 24;
105:4, 5, 8
ashtray [6]
24:13, 16;
26:14; 92:7,
11, 20
assault [13]
45:11, 17;
46:14, 18, 25;
53:3; 56:9, 13;
57:3, 4; 66:13,
22; 116:10
assaulted [3]
45:7; 64:13;
113:25
assaulting [1]
72:19
assistant [3]
5:8, 22; 6:23
associates [1]
1:23
assume [3]
9:23; 62:18;
91:1
assuming [2]
12:19; 70:4
attacked [2]
85:2; 116:11
attention [1]
100:19
attorney [4]
48:16; 90:18;
102:2; 124:18
attorneys [1]
128:9
august [25]
4:2; 5:23;
7:15; 8:25;
9:12; 10:1;
24:23; 25:11;
29:3, 8; 54:19;
55:3; 57:11;
59:8; 60:5;
69:7; 74:6;
75:11; 79:14;
81:6; 89:24;
96:13; 112:6;
116:15
austin [2]
1:20; 3:14

authority [1]
64:18
aware [1]
92:10
away [7]
14:24; 37:3;
74:17; 91:16,
17; 98:19;
120:6

- B -

back-to-back
[1] 49:7
backed [3]
17:14; 55:7;
91:23
background [2]
3:24; 4:1
balls [2]
43:12; 44:7
baseball [1]
123:21
based [4]
63:10; 76:13;
96:23; 102:13
basing [1]
93:1
beatty [24]
1:2, 9; 2:3, 15,
16; 3:10, 14;
4:4; 27:6, 8,
13; 34:1;
48:16; 60:3;
63:21; 66:5, 7,
10; 67:25;
88:24; 90:12;
124:9, 14;
128:6
beatty's [1]
27:3
became [4]
9:10; 23:15;
88:16; 120:11
begin [1]
63:22
beginning [2]
1:12; 21:19
behalf [1] 83:1

behavior [4] 62:14, 15, 20

behind [8] 14:18; 15:1; 16:4, 5; 19:8; 63:12; 86:23; 123:3

belief [1] 99:6

believes [1] 93:13

bench [6] 37:23, 25; 59:14, 15, 19; 60:5

bend [1] 44:7

bender [2] 125:3, 22

berrigan [4] 1:11; 128:4, 15, 23

best [32] 4:23; 6:4; 7:17; 10:2, 4; 23:2; 25:9, 15; 28:20; 34:23; 35:12; 38:11, 13; 40:7; 42:2; 47:20; 49:6, 14, 16; 50:18; 52:19; 53:15; 54:15; 56:3, 10; 58:5; 75:10, 15; 96:1, 21; 97:3; 120:21

better [6] 21:25; 28:12; 43:12; 55:25; 59:21; 78:17

between [10] 3:2; 6:10; 27:24; 28:7; 35:5; 53:19; 56:18; 68:9; 104:20; 106:9

bills [1] 89:13

bipolar [1] 74:3

birth [1] 4:3

bishop [1] 4:14

block [4] 16:11, 14; 32:19; 91:12

blocks [6] 15:12, 14; 16:16; 32:1, 11; 63:13

blotter [1] 66:12

body [9] 22:24; 44:12, 17, 21, 23; 93:5, 10; 98:24; 99:7

bookstore [1] 91:14

born [1] 8:17

boss [2] 70:15; 106:4

boston [4] 8:19; 9:9; 85:24; 93:13

bottom [2] 27:11; 84:1

boulevard [3] 15:22; 16:15; 25:21

boyfriend [1] 67:4

break [6] 25:18; 30:7; 59:20, 21; 90:14

brief [1] 18:15

brother's [2] 58:12; 88:16

brutality [1] 20:24

buddy [1] 118:16

buddy-buddy [1] 119:11

building [1] 7:14

bureau [1] 52:6

burton [1] 107:15

business [5] 4:19; 84:12; 85:17; 91:20; 111:15

butt [1] 45:16

buying [1] 22:20

---

**- C -**

c-h-a-z-l-y-n [1] 126:9

calm [8] 35:13, 14; 97:25; 98:4; 117:8, 11; 118:18; 119:2

calvin [2] 1:6, 22

car's [1] 94:25

card [3] 20:5; 92:5; 120:15

care [6] 73:1, 4; 74:11, 13; 112:21

carry [1] 87:6

carrying [1] 37:4

case [11] 27:15; 59:9; 61:13; 66:17; 78:14; 83:7; 84:18; 89:7, 19; 101:23; 105:3

cash [1] 20:5

cashier [1] 46:5

casual [1] 17:6

caused [2] 70:23; 73:2

causes [1] 64:20

cell [1] 90:1

center [2] 50:22; 81:16

certain [6] 10:11; 43:18, 25; 44:18; 53:22; 113:10

certainly [1] 83:8

certificate [1] 4:25

certification [1] 3:4

certify [2] 128:5, 12

change [1] 93:18

changed [1] 87:3

characterizatio n [1] 44:19

charge [9] 42:24; 57:5, 13; 58:9; 77:9; 104:6; 113:22; 114:1; 118:8

charged [16] 31:12; 40:3; 53:13; 56:13, 22; 58:19; 65:10; 68:20, 21, 25; 69:2; 78:3; 79:11; 92:24; 93:2; 125:5

charges [7] 58:16; 66:13, 22; 71:12; 80:15; 104:16; 111:20

charging [1] 123:14

chazlyn [1] 126:5

check [1] 98:24

checking [2] 19:10; 42:18

cheeks [4] 43:15; 44:8; 45:16; 52:9

chef [2] 5:8, 22

child [1] 74:15

choice [2] 32:13; 120:16

cigarette [2] 30:1; 92:17

cigarettes [3] 24:23; 112:3, 5

citations [4] 48:24; 53:24; 56:5; 77:10

cited [1] 54:4

city [4] 16:16; 76:18; 108:11; 123:1

claim [2] 78:6; 83:1

claiming [2] 68:3; 84:4

clear [3] 42:12; 60:7; 63:24

clinton [3] 1:6, 25; 90:13

close [11] 6:17, 18, 19, 20; 44:20; 79:7; 99:15; 108:14, 17, 24; 109:8

closed [2] 96:6; 97:12

closely [1] 33:1

closer [2] 6:15

clothes [1] 43:21

clothing [5] 42:5, 15; 43:6, 8; 44:17

cochran [15] 1:17; 31:16; 47:23; 48:4, 10, 14; 65:25; 66:1, 4; 97:1; 103:10; 106:7; 111:2, 4; 126:24

colbalarge [2] 105:24; 106:1

college [7] 4:9, 15, 17, 22; 5:8, 18, 19

combination [1] 50:21

coming [7] 19:3; 26:10; 112:16, 18, 19, 20; 118:15

comment [1] 114:6

commented [1] 108:10

commission [1] 128:24

commissioner [2] 17:17; 91:21

commissioner's [2] 10:22; 91:7

commit [4] 47:1, 2; 63:15; 72:24

committed [9] 31:11; 45:8; 47:14; 51:16; 68:16, 17; 69:6; 71:1; 95:6

committing [1] 32:12

common [1] 45:13

commonwealth [3] 59:9; 124:14; 128:2

communicate [1] 90:1

community [5] 65:5; 88:19; 124:10; 125:10

company [3] 79:4; 80:22; 110:11

compares [1] 101:23

compiled [1] 63:22

complaint [2] 27:15; 74:24

complete [2] 48:7

completed [1] 4:9

completely [4] 43:8; 102:14; 103:1; 108:23

complying [1] 103:8

concern [1] 12:7

concerned [5] 15:2; 36:5, 20; 123:4

concerns [1] 22:12

concluded [1] 127:2

condition [1] 74:3

conduct [8] 44:2; 48:23; 53:7, 14; 60:9; 63:1, 8; 100:18

conducted [1] 34:4

conducting [1] 33:10

conducts [1] 53:10

confiscated [1] 89:24

confronted [1] 75:5

connecticut [1] 1:24

connection [2] 50:6; 69:25

consent [3] 47:7; 115:3

consider [1] 116:10

considered [1] 61:11

consisted [1] 123:2

contact [2] 12:1; 111:14

continue [3] 61:17; 62:9; 64:13

continued [2] 64:20; 121:19

continues [1] 62:25

continuing [1] 17:8

control [2] 36:11; 118:23

conversation [9] 18:9; 35:11, 13; 36:8; 94:1; 98:4; 120:9; 121:18; 123:2

conversations [2] 39:2; 106:9

convicted [5] 37:17, 21; 51:20; 58:24; 60:10

conviction [2] 60:23; 77:20

convictions [3] 58:16; 71:12; 77:7

cook [1] 5:21

cooked [1] 5:16

cool [1] 120:13

cooperate [2] 23:12; 114:24

cooperated [1] 104:5

cooperating [2] 23:13; 114:20

cooperative [1] 115:12

copied [1] 48:11

coping [1] 118:15

corner [2] 91:13

correct [49] 3:17; 25:23; 26:12, 17, 21; 27:1; 32:15; 37:23; 40:25; 41:4; 46:8, 9;

47:15, 16; 50:23; 54:21; 60:25; 61:15; 63:20; 66:21; 67:15; 68:1; 69:1, 3; 73:5, 6, 9; 74:1, 5; 83:2, 5, 11, 12; 87:16; 89:8, 9, 21; 92:8; 93:9; 95:21, 22; 96:10, 11, 14; 97:7; 98:5, 7; 99:9; 102:13

**corrections** [1] 52:23

**correctly** [1] 30:14

**correspondenc e** [1] 48:4

**cough** [3] 43:15; 44:8; 52:8

**coughed** [1] 43:20

**counsel** [3] 1:16; 3:3; 61:18

**counsel's** [1] 62:12

**county** [12] 10:22; 17:11; 48:25; 49:1; 50:21, 25; 51:16; 53:24; 59:8; 91:7, 21; 128:1

**couple** [7] 17:19; 55:21; 69:12; 74:18; 80:3; 82:4; 100:20

**court** [10] 1:1; 17:5; 27:15; 57:6; 59:13; 60:6; 61:22, 23; 62:12; 128:16

**courthouse** [1] 91:12

**courtroom** [1] 59:15

**covered** [7] 34:20; 66:17; 68:10; 75:2; 83:24; 90:18; 105:6

**covid** [3] 6:21; 17:13; 124:1

**coworkers** [1] 70:15

**cr1281-2021** [1] 59:12

**crazy** [6] 23:16; 85:3, 7; 114:11; 117:14

**creature** [1] 10:13

**credible** [4] 60:7; 61:22, 24; 62:1

**crime** [29] 31:11, 12; 32:12; 33:5; 40:4; 42:24; 45:8; 47:1, 3; 51:20; 63:15; 68:17, 21, 25; 69:2, 6; 71:1; 72:24; 78:20; 87:10, 24, 25; 95:6; 113:23; 117:4; 118:20, 23, 25

**criminal** [8] 42:20; 58:16, 19; 65:18; 80:15; 89:19; 124:13, 16

**cross** [2] 2:2; 28:19

**cross-examinat ion** [1] 90:9

**crouched** [1] 43:20

**cruiser** [7] 11:9; 14:10;

35:7, 9, 17; 36:18; 38:8

**cuffed** [6] 36:16; 49:24, 25; 50:7; 62:11; 98:12

**current** [2] 4:3; 95:23

**curse** [2] 110:21, 25

**curtain** [1] 103:25

**customer** [1] 65:7

**customers** [3] 69:10; 105:13, 15

## - D -

**dads** [1] 105:14

**daily** [2] 45:15; 64:20

**damage** [2] 110:15; 124:17

**damages** [14] 78:6, 9; 83:6, 7, 13, 19, 21; 84:5; 88:25; 89:3, 5, 7; 106:8, 10

**date** [9] 4:3; 59:8; 60:12, 14; 82:21; 92:3, 20; 96:12; 109:17

**dated** [1] 9:17

**dating** [1] 9:16

**daughter** [1] 123:25

**days** [15] 6:6; 10:12; 24:20; 49:2; 50:19, 20, 24; 51:2, 11, 13; 60:20; 61:1, 2; 81:24; 93:12

**dead** [1] 16:8

**deadbolt** [1] 84:15

**deal** [2] 68:15; 94:2

**december** [1] 128:25

**decide** [2] 13:12; 14:3

**decided** [5] 10:7; 23:11; 41:9, 10; 62:3

**deep** [1] 22:25

**deescalate** [4] 35:4; 37:13; 86:4, 5

**deescalating** [2] 103:3, 4

**defend** [2] 71:14, 21

**defendant** [9] 1:10, 22, 25; 2:14; 28:2; 33:8; 34:4, 17; 62:11

**defendant's** [2] 60:8; 62:14

**defendants** [5] 1:7; 2:2; 30:12; 102:4, 7

**defense** [1] 61:18

**defense's** [1] 62:10

**definitely** [3] 33:6; 44:20; 120:8

**definition** [7] 39:11; 99:11, 15, 25; 100:3, 4, 16

**defund** [1] 20:24

**degree** [2] 4:10, 24

**dehumanize** [1] 45:22

**dehumanizing** [1] 46:24

**deliver** [1] 81:19

**delivery** [1]
81:16

**demeaning** [1]
102:21

**demeanor** [1]
97:24

**demoted** [1]
80:19

**depicted** [1]
76:10

**deposition** [9]
1:9; 2:15, 16;
27:3, 8; 66:7;
127:2; 128:11,
13

**depositions** [2]
3:16; 17:2

**depression** [1]
74:3

**described** [1]
118:10

**description** [2]
64:10; 92:14

**deserve** [1]
79:3

**detail** [1]
22:25

**detailed** [1]
64:10

**detain** [1]
31:21

**detained** [1]
69:21

**detains** [1]
99:17

**detective** [20]
3:15, 16; 11:7,
9; 21:7;
30:19, 25;
31:5, 13; 35:8;
38:23; 39:2;
41:1; 75:24;
76:7; 97:23;
98:4; 117:7;
120:25; 123:20

**determined** [2]
61:25; 62:16

**device** [1]
54:18

**diagnosed** [1]
74:2

**dialogue** [1]
3:19

**diaries** [1]
89:10

**different** [14]
13:11; 35:18;
49:7, 9; 75:22;
85:15, 18;
93:6; 97:19;
99:23; 103:2;
120:12, 17, 18

**diligence** [1]
33:6

**diploma** [1]
4:13

**direct** [2] 2:2;
3:12

**direction** [1]
128:18

**disagree** [5]
39:22, 25;
62:4, 23; 63:1

**disagrees** [1]
62:13

**disciplinary** [1]
110:4

**disclosures** [1]
66:3

**discovery** [3]
27:13; 47:24;
48:16

**discussed** [2]
71:13; 77:8

**discussing** [1]
13:11

**discussion** [1]
67:22

**disorderly** [5]
48:23; 53:7,
10, 14; 60:9

**disrobing** [1]
46:11

**distress** [3]
39:8; 78:9;
83:9

**distressed** [1]
103:15

**district** [2] 1:1

**docket** [2]
124:13; 125:15

**doctor** [3]
73:7; 74:10, 16

**doctor's** [1]
89:13

**document** [3]
27:7, 14; 66:6

**documentary**
[1] 89:6

**documentation**
[2] 27:12;
89:5

**documented** [1]
110:13

**documents** [1]
89:2

**doesn't** [10]
56:2; 58:23;
67:14, 17;
70:8; 72:4;
84:21; 88:4;
116:7

**dome** [1]
123:22

**done** [8] 17:8,
15; 40:1;
52:25; 86:16;
97:18; 120:1, 2

**donuts** [1]
125:25

**door** [8] 24:14;
84:13, 14;
85:1; 92:12;
121:19, 22

**door's** [1]
84:21

**doubt** [2] 99:7,
9

**down** [35] 9:5;
13:6, 8, 22;
16:6; 17:5;
25:18; 27:23;
28:7, 19; 34:1,
21; 46:3;
50:5, 6; 56:11;
57:5; 64:13;
85:1, 24; 95:3;
97:18, 20;
115:8; 116:5;

**117:8; 118:18;**
119:2; 120:9,
12, 13, 16;
121:15;
122:24; 128:14

**downplay** [2]
84:9; 85:19

**downplaying**
[1] 45:12

**downtown** [3]
10:20; 11:14;
95:9

**dragged** [1]
119:18

**dragging** [1]
119:6

**drawing** [1]
70:19

**dress** [12]
10:23; 11:13,
17; 12:19, 22;
14:9; 16:18,
24; 18:16, 17,
19; 25:21

**dressed** [1]
44:1

**drink** [2] 20:3,
16

**drinks** [1]
94:21

**drive** [7] 4:5;
11:23; 16:18;
76:12, 22;
95:13, 15

**driven** [2]
24:19; 120:19

**driver's** [4]
24:13; 26:14;
54:10; 92:11

**driving** [29]
10:25; 11:8;
12:13; 13:3, 8;
14:9; 15:7, 9;
16:22, 24;
24:18; 38:17;
54:2, 4; 55:2;
56:4, 6; 57:23;
58:2, 11;
72:24; 86:22;
95:9, 19, 25;

96:22;    126:1,
19
drove    [12]
11:21,    25;
12:12;    16:6,
15, 21;   25:20;
49:18,    21;
98:19;  110:24
drug [1]  49:10
drugs    [5]
42:21,    25;
45:21;   103:8;
122:18
duis [4]   49:5;
50:12;    77:9;
104:2
duly [3]   3:11;
128:7, 13
dunkin    [1]
125:25
during    [11]
6:2;    25:25;
26:24;    29:7;
37:11;    41:6;
42:3;   101:12;
110:20;
113:13;  117:11
duty [1]  7:5

- E -

early    [2]
47:20;  49:6
ease [2]   48:9;
64:1
east [1]  76:18
easy [2]   17:5;
27:21
education   [1]
4:8
eight [3]   5:4,
14;  10:15
eighteen   [1]
60:20
either    [16]
6:9;    11:23;
12:4;    20:12;
25:24;  26:2, 5;
46:10;   49:13,
24;   50:2, 11;

55:6;    70:23;
91:6, 20
elevated   [1]
115:22
emails    [1]
89:18
embarrass  [2]
67:3, 7
embarrassed
[1]  68:8
embarrasses
[1]  67:11
embarrassing
[4]   65:12, 21;
86:8, 11
embarrassment
[8]   64:15, 23;
68:13;   69:23;
73:11;   78:10;
83:10, 25
embarrassment
s [1]  74:24
emergency  [1]
74:19
emotional   [3]
73:11;    78:9;
83:9
emotions   [1]
122:10
employees  [3]
69:10;   105:13,
19
employment [2]
5:2, 24
encountered
[2]    20:12;
57:20
encounters  [2]
77:17;  97:21
enforcement
[12]    12:5;
20:13;   33:3;
38:10;   49:12;
57:21;   71:12;
77:8, 18;  78:2;
99:23, 24
enrolled   [1]
4:14
entailed   [1]
50:14

entails   [1]
45:14
entered   [2]
112:9;  124:15
entire   [1]
62:13
entitled   [2]
106:7, 10
errands    [4]
10:7, 8, 17, 18
escalated   [1]
62:13
especially  [1]
78:16
esquire    [3]
1:17, 20, 23
estimate   [1]
8:4
event    [8]
56:25;    57:21;
68:22,    25;
69:7;  71:9, 10;
81:9
events [2]  4:2;
53:8
eventually [10]
12:21;    38:20;
40:6;    41:2;
57:1;    79:25;
80:1;    98:22;
116:19;  117:19
everybody  [3]
7:11;    64:25;
78:13
everyone's  [1]
88:6
everything's
[1]  120:12
evidence   [5]
60:6;    89:7;
95:8;    100:8;
106:8
ex-girlfriend
[1]  56:19
exact    [10]
15:11,    13;
18:11;    23:21;
30:18;    82:21;
91:9;    93:25;
100:2;  104:19

exactly   [7]
13:7;    28:11;
39:13;    48:5;
94:3;    105:9;
124:25
examination [2]
3:12;  124:7
except [1]  3:5
exchanged  [3]
27:12;    89:22;
93:6
excuse    [1]
110:22
exhibit    [4]
2:15, 16;  27:8;
66:7
exhibits   [2]
2:13;  27:2
expense    [2]
82:25;  83:3
expenses   [1]
89:13
experience  [4]
71:4,  8,  11;
108:6
expires    [1]
128:24
explain    [10]
23:1;    39:15;
55:8;    63:6;
64:24;    83:17,
18, 23;   90:22;
102:15
explained   [3]
64:12;   73:10;
83:8
explaining  [2]
28:12;  62:19
explanation [1]
55:5
explore    [1]
106:11
extent    [1]
83:24
eyes [1]  28:20

- F -

face [3]   33:9;
90:5

facebook [4] 111:17, 20, 22, 25

fact [7] 31:10, 13; 53:13; 85:22, 23; 93:1; 101:6

fair [3] 8:4; 44:18; 91:3

faith [2] 72:2, 11

familiar [4] 12:4; 58:23; 73:22; 123:7

families [1] 78:25

family [3] 69:11; 85:13; 105:13

fear [8] 64:18, 19; 78:10; 83:10; 86:20; 87:12; 108:9

fears [1] 85:5

federal [2] 27:15; 70:1

fedex [1] 81:17

feeling [2] 19:2; 32:7

feelings [5] 64:12; 84:7; 87:8; 111:23

feet [1] 98:6

felt [6] 23:9, 21; 32:25; 45:7; 46:16; 47:5

female [5] 75:4, 7; 94:12; 107:12, 13

fender [2] 125:3, 21

ferren [1] 1:23

fields [1] 123:22

fifteen [1] 63:13

fight [2] 36:9; 72:7

figure [3] 14:7; 70:20; 122:22

figured [1] 53:20

file [1] 110:7

filed [5] 27:15; 68:1; 70:1; 79:9; 90:14

filing [1] 3:4

finally [2] 40:6; 41:9

finds [2] 60:6; 61:23

fine [3] 15:5; 83:14; 125:11

fines [1] 49:1

finish [2] 9:9; 108:23

fired [6] 79:24, 25; 80:2, 4, 7, 14

firm [1] 1:20

first [31] 4:20; 11:22; 12:2, 3; 13:13; 18:12; 20:12; 21:14; 24:19; 30:10, 16; 31:4; 33:9; 38:4; 41:16; 43:1, 2, 17; 46:2; 50:13; 66:19; 69:13; 79:23; 80:5; 82:16, 17; 86:10; 91:19; 93:24; 104:25; 128:7

five [10] 6:6; 16:16; 54:7, 8, 9; 74:6; 76:23, 24, 25; 116:3

flashlight [3] 27:25; 28:8; 46:10

flip [1] 48:6

floor [3] 24:10, 11; 26:19

focusing [1] 72:16

follow [8] 15:10; 27:21; 32:10; 33:4; 63:13; 71:6, 24; 112:19

follow-up [1] 124:9

followed [2] 15:11; 32:1

following [9] 15:15; 19:1; 20:9; 32:9, 11, 24; 33:1; 59:13; 72:18

follows [1] 3:11

followup [1] 90:11

food [7] 10:6; 11:1, 3; 13:4, 9, 14; 14:4

food's [1] 14:6

footage [5] 22:24; 93:5, 10; 98:25; 99:7

force [1] 32:16

forced [2] 23:5; 32:18

forcefully [2] 33:8, 13

foregoing [1] 128:11

forever [1] 87:6

forgot [2] 84:18; 125:8

form [4] 3:5; 31:16; 97:1; 111:2

forth [6] 6:10; 17:19; 48:6; 108:22; 125:1; 128:10

found [2] 75:19; 104:17

four [3] 5:7; 16:15; 81:25

fourth [1] 1:21

frame [6] 6:3; 9:23; 29:14, 16; 49:3; 76:10

frank [3] 105:21; 107:18; 109:25

frank's [1] 105:23

free [2] 83:17; 123:22

freeze [1] 76:10

friend [1] 62:17

friend's [3] 62:14; 69:12; 107:22

friends [8] 9:10; 69:12; 71:17; 88:16, 18, 21; 105:14

front [9] 11:14; 25:17; 38:1; 43:9, 22; 46:5; 47:23; 52:13; 59:7

frustrating [1] 122:5

fuel [2] 75:5, 7

fulfillment [1] 81:16

full [3] 4:2; 7:6; 73:17

fully [1] 104:5

future [1] 110:17

---

**- G -**

g-a-v-i-g-a-n [1] 126:10

gardner [42] 1:6, 25; 3:17; 11:7, 9; 20:2; 21:7, 15; 22:3; 23:3, 8; 24:3, 9; 26:8, 13, 18, 22; 27:22;

28:2; 31:2, 13; 34:17, 18; 35:15; 37:6; 38:5; 39:15; 41:25; 44:9; 52:5; 55:6; 70:24; 73:3; 75:7; 90:13; 97:19; 98:1; 110:19, 24; 112:9; 117:25; 123:13

**gardner's** [4] 61:19, 23, 25; 88:16

**gavigan** [1] 126:5

**gazette** [3] 66:11; 105:1, 4

**gear** [1] 21:5

**general** [16] 4:19; 7:1, 7, 13; 64:18; 78:8; 80:11; 81:1; 82:12; 83:7, 13, 19, 21; 88:5; 106:3

**generalized** [1] 64:18

**genitalia** [6] 44:4, 6, 10; 45:2; 100:22; 101:4

**gestured** [1] 116:11

**girlfriend** [4] 64:16; 68:9, 13; 79:13

**girlfriend's** [1] 126:2

**gist** [1] 94:1

**given** [3] 83:20; 88:25; 104:18

**giving** [2] 97:10; 99:2

**gloves** [2] 41:24, 25

**goes** [2] 16:11; 114:4

**gone** [3] 17:1; 58:17; 91:8

**gonna** [1] 122:23

**good** [5] 96:5; 118:14, 15; 119:11; 126:24

**gotta** [1] 122:12

**grabbed** [1] 20:16

**grade** [1] 4:12

**graduate** [1] 4:24

**gratification** [7] 43:14; 45:4, 6; 46:19, 22; 101:2, 5

**great** [1] 3:23

**greg** [2] 105:21; 106:16

**greg's** [1] 107:21

**groin** [3] 33:11, 20, 22

**ground** [4] 36:14; 113:9, 15, 25

**grow** [1] 80:22

**grown** [1] 45:9

**guarantee** [1] 93:4

**guess** [9] 28:14; 42:18, 20; 55:16; 59:3; 70:3; 99:2; 102:9; 106:6

**guesstimate** [1] 15:13

**guilt** [1] 60:8

**guilty** [8] 51:21; 56:9, 24; 58:8; 61:15; 104:17; 124:11, 15

**guys** [12] 19:6; 45:11, 18;

84:9; 85:6; 102:25; 115:3; 116:2; 118:19; 119:12, 15; 123:20

---

**- H -**

**habit** [1] 10:13

**half** [6] 16:13; 38:13; 54:16; 98:9, 14, 20

**hall** [1] 123:1

**hand** [4] 20:3, 18; 42:16; 128:20

**handcuffed** [7] 35:1; 40:18; 45:8; 94:14; 98:18, 25; 119:15

**handcuffing** [1] 30:13

**handcuffs** [2] 31:1, 6

**handed** [1] 43:7

**handle** [1] 102:7

**handled** [1] 102:5

**hands** [10] 20:20, 21; 23:3; 34:18; 42:17; 43:10; 112:10, 18; 113:2, 8

**hanging** [1] 10:6

**happening** [3] 8:13; 28:13; 78:15

**harass** [4] 45:23; 63:8; 100:9; 117:5

**harassed** [8] 23:9, 17, 22; 32:7, 8; 69:21; 86:17; 114:21

**harassing** [6] 23:9, 19; 32:23; 72:19; 102:22; 115:17

**harassment** [3] 37:20; 60:10; 64:20

**hard** [1] 17:15

**hardest** [1] 88:7

**harm** [3] 78:9, 11; 83:9

**hartford** [1] 1:24

**haul** [1] 81:17

**head** [7] 14:5; 28:19; 35:16; 69:23; 105:16; 113:3, 8

**heading** [1] 13:6

**health** [2] 73:1; 74:3

**healthcare** [1] 74:7

**healthy** [1] 74:15

**hear** [4] 93:11; 100:11; 119:21; 122:3

**heard** [13] 11:6; 39:15, 19, 20, 21; 54:20; 70:7, 8, 10; 77:13; 91:1; 100:13

**hearing** [1] 61:6

**held** [1] 67:22

**hello** [1] 112:9

**help** [8] 87:11; 91:25; 103:14; 115:15, 18; 122:3, 6

**helping** [2] 91:22; 115:19

**hereby** [3] 3:2, 4; 128:5

**hereunto** [1] 128:19

hide [1] 95:19
hiding [1] 95:7
high [12] 4:9, 11, 13; 13:19; 14:2, 14; 16:3, 6, 8
hill [25] 10:3, 19; 15:20; 18:24; 19:7, 14; 20:8; 25:21; 28:3, 16; 32:14, 17; 34:18; 35:24; 38:18; 40:10; 46:3; 94:18, 24; 95:10; 97:19; 98:9; 112:9; 113:2
himself [1] 103:12
hired [1] 5:16
hiring [1] 82:10
history [1] 4:8
hold [1] 25:18
holder [1] 92:11
hole [1] 92:16
home [8] 41:10; 49:18, 21; 74:21; 84:14, 15; 87:9; 120:14
honest [4] 58:23; 70:25; 78:20; 125:11
hood [4] 33:9; 34:5; 35:6; 46:8
hospital [1] 49:17
hostile [1] 118:11
hour [8] 38:13; 81:25; 98:9, 10, 15, 20
hours [6] 6:11, 20; 81:22, 25; 124:10; 125:10

house [7] 10:6; 49:1; 50:15; 84:15; 85:2; 120:25; 121:8
houseschnedt [1] 107:9
how'd [1] 13:3
hubbard [1] 107:24
humiliate [1] 45:23
humiliating [1] 46:24
hurt [3] 36:10, 14; 78:25

- I -

iceberg [1] 102:19
idea [4] 53:18; 61:12; 75:14; 100:5
identification [2] 27:9; 66:8
identify [3] 42:10; 72:25; 75:3
identifying [3] 75:24; 76:2, 8
ignition [9] 54:17, 21; 55:2, 9, 10, 13, 15; 95:20; 96:25
illuminate [1] 27:25
images [1] 48:11
immediately [3] 30:12; 94:14; 112:10
implication [1] 68:16
implied [3] 65:12, 13; 68:18
implies [1] 67:16

impression [2] 79:23; 80:5
inappropriate [2] 102:11, 13
inappropriately [2] 102:5, 8
incarcerated [1] 103:20
incarceration [2] 47:19; 50:19
incident [39] 8:13; 10:3; 11:5; 34:1; 39:4; 56:15, 16; 57:11, 12; 68:6; 70:6; 75:17; 77:1; 78:7; 79:8; 83:2; 84:7, 8; 85:14; 91:6; 92:3, 12, 20; 94:10; 96:12; 99:4; 104:23; 106:10; 107:20; 108:15; 109:9, 11, 17, 19; 110:5, 9; 111:1, 19; 112:6
incidents [1] 77:7
include [2] 5:7; 96:14
including [2] 33:11; 75:4
incorrect [1] 99:8
incurred [3] 78:6; 83:1; 89:3
independent [1] 83:16
independently [1] 53:9
index [2] 2:1, 13
indicated [2] 110:10; 121:5

individual [1] 74:23
infection [1] 74:20
information [5] 3:24; 70:2; 74:23; 88:25; 99:18
initial [1] 4:6
injured [1] 68:3
injuries [4] 64:11; 73:2; 89:1, 11
inside [14] 11:15; 19:24, 25; 21:8, 10, 11; 22:2; 28:1, 16; 31:25; 43:23; 46:3; 97:18
inspect [2] 44:18; 45:2
instant [2] 89:15, 17
instructed [4] 44:6, 7, 8, 20
instructing [1] 44:16
insurance [3] 73:14, 18; 74:9
intend [1] 75:4
intense [2] 64:17, 20
intent [2] 19:20; 39:17
interaction [7] 21:1; 85:15, 25; 88:3; 113:14; 115:20; 117:12
interactions [1] 104:1
interior [1] 27:25
interlock [9] 54:17, 21; 55:3, 9, 10, 13, 15; 95:20; 96:25

interrogatories [2] 48:18; 64:1

interrogatory [4] 48:21; 63:22, 24; 102:3

interrupt [1] 43:4

interrupting [1] 108:21

interview [4] 82:15, 17; 123:10, 19

intimidated [3] 23:10, 22; 32:25

intruders [1] 84:16

invasive [4] 33:10, 18, 19, 24

investigation [2] 63:1, 8

involve [3] 46:20; 47:3; 52:4

involved [1] 85:10

irvin [33] 1:6, 10, 22; 3:15, 16; 11:7, 10; 21:8; 30:20, 25; 31:5; 34:4; 35:8; 38:23; 39:2; 40:7; 41:1; 42:2; 44:9; 46:7; 52:5; 55:6; 70:23; 73:2; 75:8; 98:5, 7; 117:7, 25; 119:1; 120:25; 123:20

irvin's [1] 97:23

irving [1] 33:8

issue [2] 87:19; 91:24

issued [1] 96:19

it'll [1] 116:13

item [1] 43:2

itemize [2] 82:23, 25

itemized [1] 78:6

items [4] 53:6; 82:25; 83:3, 23


- J -

jail [13] 37:7; 47:13, 14, 17; 49:2; 50:11; 52:2, 14; 60:15; 72:7; 101:22; 123:16

jamie [2] 105:22; 107:12

january [4] 1:12; 61:5, 8; 128:20

jeff [1] 105:21

jeff's [1] 106:25

jeopardy [1] 110:14

jerk [1] 23:15

jerry [2] 105:21; 107:4

jittery [1] 86:24

jobs [1] 81:11

joint [2] 29:19, 24

joking [2] 84:10; 123:25

josh [3] 105:21; 106:5; 107:21

joshua [1] 1:17

judge [12] 38:1; 59:8, 14, 18; 60:4, 5; 61:24; 62:16, 19; 88:17; 124:17

jump [1] 90:17

jumping [2] 13:21; 90:21

jurisdiction [5] 76:20; 77:3, 5; 87:15; 108:11

justice [1] 87:4


- K -

keep [2] 43:3; 108:20

kept [2] 12:13; 15:9

keys [6] 120:23; 121:3, 5, 6, 9, 11

kick [1] 85:1

kicked [4] 37:7, 9; 119:4; 125:2

kidnapped [4] 39:9; 40:14; 64:12; 99:18

kidnapper [1] 40:14

kidnappers [1] 118:13

kidnapping [4] 39:12; 53:4; 72:20; 99:12

kill [1] 85:2

kind [38] 6:9, 12; 7:4; 9:6; 13:5, 11; 14:6, 7; 20:20; 21:5; 23:15; 33:23; 35:3; 39:7; 42:17; 43:19; 57:7; 70:20; 78:18; 81:17; 85:13; 87:8; 90:4; 99:2; 109:13; 110:4; 112:16; 113:19; 114:10, 15; 116:18;

118:25; 119:2, 11; 121:15, 23

kinds [2] 78:17; 86:18

knew [9] 11:19; 65:6; 67:10; 70:18; 113:19; 116:1; 123:14; 125:21

knowledge [21] 35:12; 38:11, 13; 40:7; 42:2; 47:21; 49:6, 14; 50:18; 52:19; 53:15; 54:15; 56:3, 10; 69:4; 75:10, 15; 96:1, 21; 97:3; 101:9

known [1] 86:9

knows [3] 36:15; 67:10; 88:23

kyle [8] 1:2, 9; 2:3; 3:10; 4:4; 124:14, 18; 128:6


- L -

lack [2] 43:12; 78:17

laid [1] 122:13

landlord [2] 86:12; 111:7

landlord's [1] 111:8

language [1] 23:20

larger [1] 92:16

last [23] 4:21; 5:2, 4, 6, 13; 25:7; 55:25; 56:1; 57:10; 74:13; 82:9, 21; 88:3; 105:23; 106:5, 12, 16, 25;

107:4, 8, 14; 126:9

laugh [2] 122:11, 12

laughing [2] 84:10; 123:25

laughlin [10] 1:23; 90:10, 12; 97:5; 103:11; 106:13; 111:3, 6; 124:5; 126:22

lawsuit [8] 68:1, 4; 69:18; 70:1; 73:24; 79:9; 89:19; 112:1

lawyer [11] 47:2, 6; 83:14, 22; 94:3, 6; 97:8; 99:22; 100:2; 104:20, 21

laying [3] 121:15; 122:19, 21

lead [1] 101:3

lean [1] 28:18

learned [1] 76:1

lease [1] 56:2

least [2] 53:18; 61:23

leave [4] 41:8; 45:10; 84:14; 120:14

leaving [1] 11:19

left [10] 13:21, 25; 16:10, 13; 38:12; 80:10; 88:14; 95:3; 116:10; 123:3

legal [5] 37:25; 83:14; 85:3; 93:14; 120:5

lengths [1] 99:3

less [3] 49:2; 51:3; 54:7

letter [3] 71:6; 96:8; 97:6

letters [1] 96:3

letting [1] 122:23

level [3] 80:12, 13

lewisburg [1] 126:12

license [20] 54:2, 5, 10, 18, 21, 22, 24; 55:12, 14; 58:14; 92:2, 4; 95:24; 96:4, 5, 6, 9, 13, 24; 126:13

licenses [1] 56:4

life [7] 8:20; 45:15; 51:5; 84:11; 85:9; 86:1; 120:18

lift [2] 43:12; 44:6

light [2] 12:13; 39:5

limited [1] 61:11

line [3] 20:17; 21:16, 20

lines [1] 118:3

linhardt [8] 38:1; 59:8, 14; 60:5; 61:24; 62:16, 19; 88:17

linhardt's [2] 59:18; 60:4

list [3] 48:22; 83:18, 23

listed [3] 53:6; 73:23; 75:1

listen [1] 78:23

listening [1] 103:9

literally [3] 84:22; 113:12; 116:2

live [8] 8:21, 23, 25; 76:20; 107:25; 108:11; 111:12, 15

lived [5] 76:21, 25; 77:1; 85:24; 120:17

lives [3] 108:1; 111:13; 126:12

lobster [1] 82:6

local [1] 5:5

location [2] 39:13; 91:8

lock [3] 84:13, 14, 15

locked [4] 84:21; 86:7; 122:2, 4

locks [1] 84:13

lodged [2] 66:13, 22

longer [2] 23:18; 98:20

look [8] 21:1; 66:10; 71:6; 97:15; 102:3; 109:4; 112:14; 122:19

looked [8] 10:25; 12:9, 10; 20:17; 21:2, 4; 112:13, 14

looking [16] 12:10; 15:8; 21:8, 11, 22; 22:8, 13, 16; 28:4; 42:19, 21, 23; 43:24; 45:21; 113:22; 124:13

lopez [28] 8:11; 12:18,

19; 14:3; 18:7; 20:8; 22:2, 15; 25:14; 29:2; 30:4; 37:15, 17; 38:9; 59:12; 60:10; 66:21; 89:18, 23; 98:5; 102:7; 112:3; 113:13; 115:10, 21; 118:10; 119:23; 120:4

lopez's [8] 16:18; 59:15; 62:20; 70:2; 104:15; 111:20; 121:6, 9

loretta [4] 1:11; 128:4, 15, 23

lose [1] 79:6

losing [9] 108:14, 18, 25; 109:8, 10, 18; 110:14; 121:24, 25

loss [3] 64:17; 82:25; 83:4

lost [1] 109:13

lovecchio [1] 124:17

loved [1] 81:4

loyalsock [2] 76:15, 16

lycoming [8] 48:25; 49:1; 50:21, 25; 51:16; 53:24; 59:8; 128:1

--- M ---

majority [1] 9:8

makes [3] 29:20; 61:18; 88:11

male [4] 75:6, 16; 76:9; 107:12
management [1] 4:19
manager [33] 5:5, 9, 11, 13, 16, 24; 6:13, 22, 23, 25; 7:2, 4, 7, 13, 14; 65:7; 79:17; 80:9, 11; 81:2, 3, 4; 82:10, 12, 14; 106:3; 107:18, 21
managers [6] 6:13; 7:12; 69:11; 70:15; 105:13; 107:19
mandate [1] 124:2
maneuver [1] 91:22
manipulate [6] 43:10, 11; 44:21, 22; 100:21; 101:4
manipulating [3] 44:3; 46:12; 101:1
marc [1] 124:17
march [2] 120:2; 124:15
marijuana [39] 25:3, 5, 8, 12, 14, 24; 26:2, 5, 9, 19, 23; 28:24, 25; 29:2, 8, 10, 13, 17; 30:1; 31:9, 14, 20; 39:16, 17; 40:24; 57:16; 61:20, 21; 62:1, 6; 63:9; 92:22, 25; 93:18, 22; 104:12; 120:5

mark [3] 27:5; 65:23; 66:5
marked [3] 2:14; 27:8; 66:7
market [6] 1:14, 18; 16:12, 13; 91:16, 17
marketplace [1] 73:20
mask [1] 124:1
massachusetts [6] 8:16, 19; 66:13, 23; 120:6, 20
material [1] 30:2
matter [3] 13:25; 62:13; 93:7
mccormick [1] 1:20
mean [51] 7:3, 11; 15:5; 25:17; 28:9; 29:6, 23; 30:24; 33:22; 36:6; 37:21; 39:11; 44:22; 51:5; 55:17; 59:1; 63:6, 16; 64:25; 65:4, 18; 69:20; 70:13, 25; 72:4; 74:17; 76:6; 78:13; 79:7; 84:2, 6, 21; 88:10, 18; 90:4; 94:24; 102:16, 17; 103:13; 105:22; 114:7, 9; 119:9, 25; 120:8; 121:25; 122:1, 4, 9, 10; 124:24
means [2] 100:14, 15

meant [2] 43:4; 77:5
media [2] 36:12; 89:17
medical [5] 73:4, 12, 15; 120:10, 15
medication [1] 73:24
meet [2] 97:16, 17
meeting [3] 18:11, 12; 91:19
member [1] 20:17
members [3] 69:11; 85:13; 105:14
mental [1] 74:3
mention [3] 57:8; 66:18, 25
mentioned [6] 17:10; 18:25; 44:3; 97:23; 100:20; 105:7
message [2] 89:22; 90:6
messages [3] 89:17, 18
messed [1] 12:25
meter [2] 11:15, 18
middle [5] 1:1; 4:6, 7; 36:1; 92:16
midst [1] 10:7
might [11] 24:8; 37:19; 66:1; 74:18, 23; 75:22, 24; 87:25; 90:19; 100:9; 119:19
mind [4] 39:6; 93:18; 108:8
minier [1] 3:16
minute [1] 40:6

minutes [5] 18:15; 43:22; 116:3; 117:21; 122:16
mischief [2] 58:20; 124:16
miscommunication [1] 70:4
misdemeanor [3] 56:9; 57:2; 124:16
missed [1] 48:12
misses [2] 119:8, 23
mistakes [1] 71:23
moment [4] 20:11, 19; 32:8; 37:14
monday [2] 6:9; 7:23
month [3] 9:6; 29:7; 89:25
months [3] 25:9; 69:12; 105:2
montoursville [4] 87:14, 18; 88:2; 125:7
morning [3] 10:16; 16:22; 26:3
moser [1] 107:5
most [5] 8:20; 48:24; 53:24; 106:23; 118:1
motion [1] 105:3
mouth [1] 70:6
move [10] 4:1; 11:20; 43:13; 44:24; 45:1; 77:4; 85:24; 87:24; 113:24; 120:12
moved [8] 8:18; 9:3, 5; 45:9; 77:2;

79:16; 113:10; 120:9

**moving** [2] 99:12; 116:10

**multiple** [4] 6:13; 40:2; 65:21; 104:22

**mussare** [1] 97:17

**must** [1] 98:22

- N -

**naked** [4] 45:10; 52:10, 12; 101:8

**name** [28] 3:14; 4:3, 6, 7; 16:9; 17:25; 59:10; 65:8; 66:18, 25; 67:1; 90:12; 97:16; 105:8, 23; 106:5, 12, 16, 25; 107:4, 8, 14; 111:9, 10, 11; 125:18; 126:4, 9

**named** [1] 105:10

**names** [3] 105:15, 17, 20

**narcotics** [1] 112:15

**need** [5] 30:7; 59:20; 90:23; 117:4

**needed** [3] 19:4, 13; 91:25

**needs** [1] 120:6

**negotiate** [2] 118:13; 119:14

**negotiating** [2] 40:14; 119:22

**neither** [5] 44:9; 46:17; 49:22; 72:22; 103:2

**neumann** [1] 4:14

**never** [24] 12:6; 19:16; 31:11; 34:5; 54:18; 72:21; 74:2; 79:2, 4, 5; 80:4; 85:9, 11, 25; 86:2; 87:1; 98:23; 103:1; 109:1; 111:24; 112:2; 116:6; 118:9

**newberry** [5] 11:1; 13:1, 7, 15; 91:17

**news** [4] 20:23; 68:4, 24; 70:9

**newspaper** [3] 65:19; 66:14

**next** [9] 11:16; 12:11; 19:17; 30:6; 37:3; 82:23; 91:14; 98:7; 122:24

**nice** [3] 12:16; 102:25; 115:14

**night** [3] 120:19, 21, 22

**nine** [1] 10:14

**nobody** [6] 63:16, 18, 19, 20; 122:3; 123:6

**none** [2] 73:3; 89:20

**nonrestricted** [1] 92:2

**noon** [1] 6:17

**nope** [1] 89:12

**normal** [2] 101:12, 14

**normally** [3] 73:14, 15; 112:23

**northcentral** [1] 105:5

**northcentral.co m** [1] 105:1

**notary** [1] 128:5

**notated** [1] 110:7

**notes** [1] 89:10

**nothing** [14] 13:15; 15:6; 23:15; 27:13; 62:12; 93:2, 20; 95:18, 19; 112:21, 22; 122:20; 128:8

**notice** [1] 21:14

**nude** [3] 43:8, 18, 21

**number** [10] 27:20; 48:24; 53:23; 72:25; 74:22, 25; 78:5; 89:4; 102:3

**numerous** [1] 104:2

- O -

**object** [3] 97:1; 103:10; 111:2

**objection** [1] 31:16

**objections** [1] 3:5

**observation** [2] 29:9; 61:25

**observe** [5] 21:19; 22:4, 6, 17; 28:2

**observed** [11] 26:9, 14, 23; 28:15; 29:12; 31:20; 39:16, 17; 61:20; 65:3

**obviously** [2] 45:23; 70:18

**occasions** [1] 104:3

**occur** [1] 61:4

**occurred** [4] 11:5; 23:2; 41:6; 75:17

**occurring** [2] 48:25; 53:24

**odor** [1] 26:9

**offense** [3] 37:22; 77:21, 22

**offenses** [1] 37:18

**offensive** [1] 53:3

**offer** [1] 26:8

**offered** [1] 73:18

**office** [13] 10:22; 17:11, 21; 18:3, 4, 5, 6, 10, 19, 22; 91:7, 8; 110:3

**officer** [48] 3:16, 17; 11:7, 9; 20:2; 21:2, 7, 21; 22:3, 7, 9, 10, 16; 24:3, 9; 26:13, 18, 22; 31:2; 34:17; 37:7; 38:5; 39:15; 47:2, 6; 49:17; 61:19, 23, 25; 72:5; 75:20; 90:13; 94:7, 12; 97:8, 19; 98:1; 99:17, 19; 101:18; 103:6; 110:19, 24; 112:9, 14, 15; 118:6; 119:5

**officers** [25] 12:5; 20:13; 30:17; 43:6, 9, 10, 11; 52:23; 62:25; 64:19; 75:1; 78:11; 97:21; 99:6; 100:24;

101:12, 18; 103:2; 111:23; 112:24; 114:12; 115:4, 21, 24; 123:2
**officially** [1] 9:10
**once** [7] 14:25; 38:17; 41:7; 55:11; 98:17; 113:1; 114:18
**one's** [2] 68:19
**one-way** [4] 12:25; 13:2, 17, 23
**onto** [4] 16:10, 13, 14; 74:25
**open** [6] 27:23; 28:6; 94:25; 95:1; 121:19; 123:8
**opened** [2] 10:23; 121:22
**opener** [1] 6:14
**opinion** [2] 99:16; 108:12
**opportunity** [1] 83:9
**opposition** [1] 47:9
**options** [1] 87:20
**oral** [1] 128:8
**order** [1] 27:25
**ordered** [1] 31:5
**original** [1] 57:4
**originally** [2] 8:17; 23:6
**otto's** [1] 91:14
**outlook** [1] 87:3
**outside** [10] 7:14; 21:9, 23, 24; 22:4, 18; 23:5; 28:16; 34:19; 36:3

**oversight** [2] 71:25; 72:1
**overwhelming** [1] 60:8
**owned** [1] 56:1
**owns** [1] 111:15

- P -

**p.m.** [1] 127:3
**packages** [1] 81:19
**packet** [4] 27:2; 47:22, 24; 102:1
**page** [30] 27:20, 21; 28:23; 30:6, 9; 33:7; 47:23; 48:20, 22; 59:5, 13; 60:3; 63:22; 64:2, 6, 14; 74:22, 25; 78:5; 82:23, 24; 84:1; 89:1, 16; 102:2; 111:20, 23
**paid** [1] 125:11
**paper** [4] 29:23; 65:5, 9; 70:9
**paragraph** [4] 27:20, 21; 30:6, 9
**paragraphs** [1] 28:22
**paranoia** [1] 108:7
**paraphernalia** [9] 48:24; 57:8, 14, 15; 58:4, 8; 77:9; 104:2, 6
**paraphrasing** [1] 78:7
**park** [1] 19:17
**parked** [2] 11:14; 126:15

**parking** [5] 11:15; 37:5; 53:25; 119:7, 19
**part** [3] 44:12; 72:14; 102:16
**part-time** [3] 81:10, 12, 13
**participate** [1] 23:17
**particular** [5] 6:24; 47:10, 11; 48:18; 64:19
**parties** [3] 3:3; 35:5; 128:10
**parts** [3] 33:23; 44:21, 23
**pass** [1] 14:25
**passed** [2] 14:25; 110:19
**past** [4] 30:5; 37:6; 85:20; 110:24
**pasted** [2] 48:2; 63:25
**patched** [1] 48:9
**patted** [3] 33:25; 50:4, 6
**patting** [1] 34:21
**payroll** [1] 7:3
**peers** [3] 64:15; 68:9, 12
**penis** [1] 43:11
**penn** [5] 4:17, 22; 5:8, 18, 19
**penndot** [7] 55:7; 91:23, 24; 96:4, 5; 97:10, 11
**penndot's** [1] 97:12
**pennlive** [1] 105:6
**pennlive.com.** [1] 105:2

**pennsylvania** [14] 1:1, 14, 18, 21; 4:5; 8:18; 9:11; 59:9; 77:22; 88:14; 120:5; 124:14; 128:2, 16
**people** [26] 7:9; 10:12; 35:3; 36:3; 52:12; 65:3, 6; 67:4; 68:10; 70:6, 13, 16; 71:23; 78:14, 24; 85:18; 86:9, 14; 94:11, 20; 103:2, 7; 105:12, 22; 106:23; 120:2
**peoples** [1] 56:6
**performed** [2] 41:20; 47:18
**period** [3] 9:18; 55:20; 105:18
**perkins** [13] 5:10, 24; 70:17; 73:17; 81:5; 106:2, 14, 22, 24; 107:2, 6, 10, 16
**permission** [2] 99:13; 115:11
**person** [23] 7:12; 16:22; 33:10, 12, 21; 41:21; 42:9; 46:25; 52:16; 57:19; 75:7, 22, 23; 76:2, 3, 6, 8, 9; 80:13; 87:2; 99:12; 119:24; 125:18
**personal** [1] 64:17

personally [4] 21:18; 28:1; 78:14; 128:5

pertaining [1] 106:8

perverse [1] 46:25

phone [2] 89:25; 90:1

physically [3] 18:2; 28:10; 30:13

physician [2] 74:11, 14

piece [2] 42:15; 43:6

pipe [5] 29:15, 18; 57:16; 104:12, 14

place [6] 1:13; 81:1; 94:18; 95:2; 99:12

placed [4] 35:6, 7; 40:19; 62:11

places [2] 13:10; 82:4

plainclothes [1] 75:20

plaintiff [6] 1:3, 19; 30:12; 33:8; 78:8; 83:3

plan [1] 73:20

plane [1] 28:19

plea [2] 124:11, 15

plead [3] 56:24; 57:5; 58:8

pleaded [1] 56:11

pled [1] 56:9

pocket [1] 114:7

pockets [2] 33:11, 20

point [24] 11:2; 14:9; 15:15; 23:25;

30:7; 34:25; 35:17; 36:16; 43:8, 18, 25; 54:17; 56:14; 77:14; 95:8; 96:19; 113:20; 114:3, 14; 119:1, 4, 17; 120:24; 121:21

points [1] 121:14

poking [1] 34:15

police [76] 11:9; 14:10; 19:1; 20:9, 23, 24; 21:1, 2; 35:17; 38:8; 40:3; 47:2, 6; 49:23; 52:6, 22; 57:11; 64:19; 65:14; 66:12; 68:18; 69:17; 71:2, 14, 17, 18, 21; 72:5, 13; 73:12; 76:19; 77:3, 5, 11, 12, 23; 78:22; 84:17; 85:10, 15, 25; 86:1, 2; 87:4, 14, 18, 24; 88:2, 4, 5; 94:5, 7; 95:15; 97:8, 10, 21; 100:18; 101:12; 103:6; 104:2; 108:11; 110:17, 18, 23; 111:23; 112:14, 24; 113:5; 116:6, 17; 117:1, 4, 17; 118:6; 121:12; 125:7

polite [1] 102:24

position [5] 5:15; 44:17;

82:13, 14; 113:4

positions [1] 81:5

possession [5] 92:5, 24; 96:15, 17, 24

possessions [2] 33:12, 20

possible [1] 29:11

possibly [1] 58:21

posted [3] 111:19, 22, 25

preceded [1] 63:24

preceding [1] 26:6

prerelease [1] 50:22

prescribed [1] 73:24

present [3] 1:16; 100:24; 110:1

presently [1] 54:10

pretext [1] 61:21

pretty [8] 8:19; 22:1; 74:15; 76:13; 79:7; 81:21; 117:13, 14

previous [3] 5:7; 74:6; 97:21

previously [1] 120:4

primary [2] 74:11, 13

prison [3] 50:22, 25; 51:17

privacy [1] 94:23

private [1] 33:23

probable [9] 30:11; 31:7; 63:5, 7; 94:15; 99:25; 100:1, 8, 17

probation [3] 49:1; 50:13; 125:15

procedures [1] 52:5

proceedings [1] 59:7

process [3] 9:7; 13:12; 17:15

produced [2] 27:7; 66:6

professionals [1] 73:8

promoted [1] 5:22

pronounce [2] 59:10; 111:11

property [1] 124:17

propounded [1] 128:9

prove [1] 114:4

provide [2] 90:25; 104:4

provided [7] 48:17, 22; 55:5; 65:24; 73:1; 102:1

provider [3] 73:1, 12; 74:7

providers [1] 73:15

provoking [1] 23:9

psychiatrist [1] 73:7

public [6] 1:11; 94:18; 95:2, 10; 128:5, 24

publication [1] 70:1

pull [7] 19:11, 14, 17; 32:13, 16; 63:12; 86:23
pulled [16] 14:16, 17; 15:1; 16:4, 16; 19:7, 20; 20:9, 12, 14; 32:6, 20; 54:1; 57:25; 104:7, 9
pulling [1] 70:20
pump [7] 19:15, 17, 22, 23; 20:14; 65:1
pumps [2] 75:5, 7
punched [1] 125:2
punishment [1] 61:14
purposes [2] 39:18; 64:1
pushing [1] 34:15
putting [1] 34:20

**- Q -**

questions [14] 3:21; 27:18; 48:19; 59:19; 64:22; 90:11, 15, 19; 109:14; 124:6; 126:21, 23; 128:9, 14
quick [1] 16:10
quite [2] 15:14; 54:6

**- R -**

racing [1] 108:8
raised [1] 115:15

ranged [1] 48:25
rather [1] 13:21
reach [3] 17:16; 28:18; 88:12
reached [1] 27:22
reaching [3] 28:6; 33:11, 19
read [3] 30:13; 59:18; 65:5
reading [4] 8:17; 53:9; 60:4; 125:13
real [3] 20:25; 102:24, 25
realized [1] 11:2
really [24] 9:5; 12:1; 13:15, 24; 17:14, 22; 60:7; 72:1; 78:24; 81:23; 84:11; 86:25; 87:21; 91:23; 94:23; 95:5, 7; 117:16; 119:16, 18; 123:14, 17
realm [1] 101:12
reason [14] 14:16; 31:14; 63:11, 12, 14; 70:5; 85:3; 99:7; 100:8; 101:7, 9; 102:17; 113:22, 23
reasonable [3] 30:11; 31:8; 100:11
reasons [2] 86:3; 112:12
recanted [1] 57:7
receive [1] 50:11

received [5] 47:25; 73:4; 96:3, 8; 97:20
recently [1] 82:10
recess [2] 59:24; 60:1
recognize [1] 27:16
recollection [15] 4:23; 6:4; 7:17; 10:2; 23:2; 25:9, 15; 28:20; 34:23; 58:6; 60:11; 66:24; 93:15; 120:22; 124:19
record [5] 63:23; 67:23; 94:11, 12; 101:19
recreational [1] 120:11
recross [1] 2:2
redirect [2] 2:2; 124:7
reduced [1] 128:17
refer [1] 27:19
reference [4] 28:23; 48:9; 49:2; 64:1
referenced [2] 56:5; 69:24
referencing [2] 98:16, 17
referring [6] 46:2; 65:2; 66:14; 69:18, 19; 76:7
reflecting [2] 89:3, 11
reflects [1] 124:15
refresh [1] 124:18
refuse [2] 104:4; 114:13
refuses [1] 103:12

regard [4] 60:8; 61:24; 104:15; 108:6
regional [3] 7:13; 81:3, 4
regular [2] 5:21; 87:6
reinstill [1] 72:2
related [5] 56:24; 57:13; 73:24; 74:24; 99:24
relates [1] 100:17
relative [2] 67:11; 69:7
relaxed [1] 121:16
remember [24] 7:15, 22; 10:21; 12:14; 14:15, 20; 15:24; 16:9; 17:25; 28:9, 13; 35:11; 38:17; 42:10; 52:8; 53:12; 101:24; 113:15, 17; 117:25; 121:1; 124:2, 3; 125:18
remembered [1] 35:12
remove [1] 44:17
removed [2] 35:6; 120:25
rennie [4] 111:10, 12, 13, 14
repeat [1] 90:22
rephrase [3] 28:14; 29:12; 90:22
replied [1] 48:20

report [2] 7:7, 12

reporter [3] 17:5; 128:16, 18

reporter-notary [2] 1:11; 128:24

reporting [1] 7:9

represent [1] 90:13

representative [9] 10:22; 17:11, 17, 23; 91:21; 96:7, 16; 97:14, 15

representative's [6] 17:21; 18:3, 10, 19, 22; 91:7

representing [1] 3:15

reputation [4] 78:9, 12; 83:10; 110:15

request [2] 48:8; 89:16

requested [1] 8:2

requests [2] 48:1, 17

requires [1] 60:24

resentenced [1] 60:19

reserved [1] 3:6

resided [1] 8:20

residue [2] 61:20; 62:1

resisted [1] 113:25

resisting [1] 33:17

respective [2] 3:3; 128:10

respond [2] 89:19; 112:23

responded [1] 89:6

responding [1] 110:20

response [7] 48:7; 64:9; 69:24; 73:3; 74:25; 76:3; 78:8

responses [5] 47:24; 48:2, 17; 63:22, 25

restaurant [4] 5:5, 9; 7:6, 11

restricted [1] 92:4

restriction [2] 96:9, 14

result [5] 78:7, 10; 83:2; 118:21; 124:11

resulted [2] 77:20; 104:7

retaliated [3] 30:17; 93:24; 94:9

retaliation [6] 30:10, 20; 31:3; 64:19; 85:12; 87:12

revoke [1] 115:11

right [86] 11:14, 25; 13:18, 25; 14:1, 13, 24; 15:9; 16:5, 10, 14; 19:18; 20:18; 23:24; 24:18; 25:7, 22; 31:2, 21; 32:3, 14; 34:16, 19; 36:1; 37:18, 20; 38:21, 24; 40:12, 20; 41:3; 42:21; 51:17; 53:1; 61:7; 62:2, 17; 63:1, 16; 64:9;

65:11, 14, 17; 67:18; 68:20; 69:18; 70:16; 72:10, 13, 14; 73:25; 76:18; 77:18; 81:2; 87:15; 88:8, 19; 91:13; 92:10; 94:21, 24; 95:1, 4, 11, 13; 98:7; 102:10, 12; 104:11; 109:7; 112:17, 18, 20; 113:24; 114:5; 115:5, 7, 11; 116:10, 17; 121:16; 123:4; 125:8, 16; 126:24

rights [2] 119:8, 23

ring [3] 120:23; 121:1, 9

risk [2] 48:12; 109:18

roach [14] 23:24; 24:1, 4; 26:14; 28:23; 61:18, 21; 62:1; 93:12, 17; 118:1, 4, 7, 8

roaches [1] 26:23

road [6] 13:17; 16:7, 8, 9; 110:19, 25

robbers [1] 84:16

rodarmel [1] 111:10

roger [1] 107:24

roll [3] 29:19, 23, 25

rolling [2] 29:23; 30:1

room [9] 38:23; 41:22, 23; 45:9; 52:17; 74:19; 80:21; 123:10, 20

roundabout [2] 99:2; 100:4

route [1] 15:24

rude [1] 124:18

ruled [1] 60:5

ruling [2] 59:14, 19

running [3] 10:8, 17, 18

- S -

safe [3] 85:23; 87:9; 88:4

safely [1] 9:23

safety [1] 85:12

says [16] 30:9; 33:7; 37:6; 48:23; 53:10; 60:6; 61:17; 64:9, 14; 66:22; 68:25; 69:2; 78:6; 86:12; 87:11; 121:7

scared [10] 35:19; 71:3; 84:16, 17, 22; 112:13, 25; 113:11, 12

scary [1] 85:18

scheduled [1] 8:3

schemery [2] 1:13, 17

school [5] 4:9, 11, 13, 21; 9:19

scope [1] 7:6

scored [1] 4:13

**seagraves** [1] 106:12

**sealing** [1] 3:4

**search** [42] 23:6, 11; 26:24; 33:10, 19; 34:4, 12; 39:19; 40:8, 20; 41:2, 6, 11, 20; 42:4; 44:2, 13, 16; 45:12, 24; 46:1, 8; 47:10, 11, 18; 51:19, 23; 52:20; 58:7; 63:14; 100:20, 24; 101:13, 14, 22; 112:11, 20; 114:15, 16, 24; 115:1, 11

**searched** [12] 34:10; 41:9; 43:21; 45:15; 46:23; 47:4, 12, 15; 50:2, 4; 65:17; 101:8

**searches** [2] 46:2; 47:10

**searching** [2] 34:21; 43:7

**seat** [4] 27:24; 28:7; 121:15; 122:10

**second** [10] 14:25; 17:4; 27:21; 33:10; 46:7; 50:14; 59:20; 61:2, 4; 82:16

**secretary** [1] 18:1

**security** [1] 64:17

**seeing** [4] 11:7, 8; 19:10; 104:22

**seeking** [1] 83:6

**seem** [1] 76:13

**sees** [1] 118:7

**seized** [3] 33:8; 61:19; 102:4

**seizing** [3] 30:12; 33:12, 20

**sense** [2] 31:23; 94:23

**sentence** [2] 60:24; 104:17

**sentenced** [3] 51:20; 55:11; 58:24

**sentences** [1] 48:25

**sentencing** [1] 61:6

**separated** [2] 35:6; 36:23

**separating** [1] 69:23

**serve** [2] 60:15, 24

**server** [1] 79:18

**service** [3] 124:10; 125:10

**seven** [1] 10:15

**seventh** [2] 16:11

**several** [4] 26:23; 75:3; 93:6; 95:18

**sexual** [5] 45:11; 46:14, 18, 19, 22

**sexually** [3] 45:7; 46:25; 64:13

**shake** [4] 24:10, 11; 26:19; 39:17

**shaking** [1] 108:8

**shawna** [2] 1:23; 90:12

**sheet** [1] 53:10

**shhh** [3] 115:23; 116:4, 21

**shift** [3] 6:2, 5, 16

**shifts** [3] 6:11; 81:24, 25

**shirt** [1] 43:1

**shoot** [1] 36:15

**shop** [12] 10:23; 11:13, 17; 12:19, 22; 13:4; 14:10; 16:19, 24; 18:16, 17, 19

**shops** [1] 13:16

**short** [1] 81:23

**shot** [2] 36:21; 76:4

**shoving** [1] 34:15

**show** [2] 84:20; 98:25

**shower** [2] 103:21, 22

**showered** [1] 103:24

**shutdown** [1] 124:1

**sick** [2] 74:16, 18

**side** [11] 24:13; 26:14; 71:23; 76:15; 78:17; 92:11; 103:17, 19; 110:19, 24; 119:12

**sides** [2] 72:4; 87:5

**sign** [7] 14:17, 21, 22, 23; 16:5, 14

**signing** [1] 3:3

**similar** [1] 52:5

**simple** [4] 56:8; 57:3, 4; 109:15

**single** [3] 41:21; 72:20; 89:22

**situation** [13] 35:5; 37:12; 39:5; 45:7; 68:15; 69:19; 86:4; 88:22; 103:3, 7; 110:17; 117:14, 15

**sixth** [4] 14:14; 16:3, 6

**sixty** [4] 49:2; 50:20; 51:3, 11

**size** [1] 92:15

**sized** [1] 92:11

**slam** [1] 113:24

**slammed** [6] 33:9, 13; 34:5, 11; 36:13; 113:9

**slamming** [1] 34:7

**slang** [1] 114:10

**slow** [1] 12:1

**slowly-moving** [1] 9:7

**small** [5] 39:4, 7; 81:18; 88:12, 19

**smaller** [1] 56:11

**smell** [1] 39:16

**smelled** [1] 26:9

**smoke** [12] 24:23; 25:3, 12, 14, 24; 26:2, 5; 29:2, 4, 13; 112:3, 5

**smoked** [8] 25:5, 7; 29:5, 7, 10, 17; 93:12

smoker [1] 29:8

smoking [1] 29:12

snack [2] 20:16; 22:20

snacks [2] 20:3; 94:20

soccer [1] 123:21

social [1] 89:17

socks [1] 43:23

soda [2] 22:21; 92:15

soldier [1] 21:2

solely [1] 62:13

someone [9] 33:4; 36:20; 39:12; 80:10, 11; 91:19; 99:17; 125:21

something's [3] 72:10; 86:25; 88:8

sometime [1] 124:11

sometimes [4] 10:15; 82:1; 112:4, 7

somewhat [1] 27:20

somewhere [1] 13:10

soon [1] 37:2

sorry [3] 16:25; 42:7; 82:24

sort [1] 60:24

sound [4] 37:20; 38:24; 58:23; 125:16

sounds [1] 123:7

south [4] 57:22; 77:14, 15, 17

southside [1] 108:1

space [2] 27:23; 28:7

speaking [1] 42:13

specific [4] 30:19; 42:9; 53:19; 71:10

specifically [6] 11:13; 29:6; 31:3; 42:22; 50:16; 51:1

specifics [5] 52:3, 7; 53:11; 101:25; 104:19

specify [1] 9:22

speculate [2] 24:7; 59:3

speech [5] 30:10, 16; 31:4; 93:23, 24

speeding [2] 53:25; 54:1

spell [3] 105:25; 106:1; 126:6

spent [1] 50:24

spills [1] 74:25

spoke [1] 18:1

spoken [1] 75:11

spot [1] 19:21

spread [6] 43:15; 44:7, 24; 45:16; 52:9; 121:15

stall [2] 103:23, 25

stamped [2] 27:3, 11

stand [4] 11:20; 43:19; 72:11; 116:12

standing [5] 20:16; 21:16, 20; 43:9, 18

start [9] 3:24; 14:23; 17:6; 55:16; 83:20; 84:22; 102:16, 19; 108:12

started [12] 5:21; 10:25; 11:4; 12:24; 13:3, 18; 19:2; 21:21; 23:13; 41:6; 102:18; 114:18

starting [5] 48:1, 20; 64:5; 89:1, 3

startled [1] 112:13

starts [2] 27:14; 59:13

state [22] 4:2; 10:21; 17:10, 16, 20; 18:3, 10, 18, 21; 77:12, 22; 87:14, 18; 88:2; 91:6, 20; 96:7; 97:14, 15; 120:17; 125:7

statement [1] 102:13

statements [2] 103:17, 18

states [1] 1:1

station [21] 14:15; 15:19; 16:17; 19:11; 28:3; 32:6; 38:15, 18, 21; 39:18, 23; 41:1; 49:23; 72:18; 81:16; 98:10, 15, 21; 99:1; 122:24; 123:9

stay [2] 6:17; 88:9

stayed [3] 38:12; 98:14; 123:6

steering [2] 27:24; 28:8

stenographically [1] 128:15

stick [2] 93:19, 21

still [30] 5:11; 9:6; 19:8; 40:10; 55:14; 61:1, 10, 13; 65:12; 76:4; 80:17; 88:11; 92:3, 5; 93:19; 98:19; 106:2, 14, 22, 23; 107:2, 6, 10, 16; 116:12, 16; 117:1; 119:17; 121:19

stimulate [3] 43:14; 100:22, 23

stipulated [1] 3:2

stipulation [1] 3:1

stood [4] 11:16; 12:12; 43:20, 21

stop [25] 14:17, 21, 22; 15:15; 16:5, 14; 18:21, 24; 19:3; 31:11, 15; 32:3, 5; 63:8; 100:8; 110:20, 25; 115:23; 116:5, 21; 117:4; 118:21

stopped [16] 10:20, 24; 12:13; 14:21; 31:22; 32:4; 40:21; 63:16, 19, 20; 72:5; 91:6; 94:16; 118:20, 24

stopping [1] 72:19

store [13] 6:23; 20:15; 21:8, 9, 10, 11; 22:2, 3, 10; 25:21; 63:14; 95:4

story [4] 93:19; 103:17, 19; 114:3

straight [3] 14:24; 18:18; 32:21

stranger [1] 125:23

strangers [7] 64:15, 23; 65:2, 4; 67:6, 7; 68:11

straws [1] 70:19

street [19] 1:14, 18, 21; 11:24; 12:25; 13:2, 6, 19; 14:2, 14, 16; 16:6, 8, 12, 13; 91:11; 108:2, 3

streets [1] 95:10

strike [1] 56:20

strip [31] 11:3; 14:6; 39:18; 40:8; 41:2, 6, 8, 11, 20; 42:4; 45:15; 46:23; 47:3, 10, 11, 12, 15, 18; 50:4; 51:19, 23; 52:10, 12, 20; 65:17; 100:19, 24; 101:12, 14, 21

stroke [1] 44:24

struggling [1] 113:6

studies [1] 4:19

study [1] 4:18

stuff [7] 9:8; 13:5; 21:5; 65:1; 69:16; 105:17; 124:3

subject [2] 41:2; 104:23

subscribed [1] 128:20

sued [1] 119:25

suffered [7] 64:15, 23; 68:13; 70:22; 78:8, 11; 83:3

suffering [1] 73:10

suggesting [1] 61:19

suit [1] 90:13

summary [7] 37:17, 20, 22; 60:9; 77:21, 22

summer [2] 82:10, 22

sunday [1] 6:8

sunny [1] 12:16

supervise [1] 7:5

supervisor [3] 7:1; 94:13; 103:14

support [2] 89:7; 103:17

supported [1] 103:19

supporting [1] 89:2

supposed [15] 52:22, 23, 24; 60:17; 71:5; 72:8; 101:15, 16, 17, 19; 102:6; 103:6; 117:2

surprising [1] 117:16

suspected [1] 103:8

suspended [1] 56:4

suspicion [3] 30:11; 31:8; 100:12

swat [2] 20:17; 112:15

sweating [4] 84:23; 108:5, 7

switched [1] 6:10

sworn [3] 3:11; 128:7, 13

symptoms [1] 108:6

system [10] 52:22; 55:9, 10; 72:2, 12; 78:23; 79:1; 87:4; 95:21; 96:25

---

- T -

tactical [3] 21:4, 5; 112:15

taking [2] 122:24; 128:12

target [1] 86:7

team [2] 20:17; 112:15

telling [10] 26:11, 15, 20, 25; 87:17; 115:23; 116:4, 20; 118:6

tense [1] 20:25

term [7] 6:22; 43:12; 78:17; 83:14, 22; 100:11, 13

terminology [2] 37:25; 46:15

test [2] 4:12; 49:18

testified [11] 3:11; 24:9; 26:8, 13, 18, 22; 38:6;

88:24; 92:6; 98:8; 128:10

testify [1] 128:7

testifying [1] 75:8

testimony [16] 11:6; 26:15, 20, 24; 28:24; 31:9; 39:19, 24; 40:23; 54:20; 61:20, 23; 63:10; 76:14; 109:7; 128:19

text [2] 89:17; 90:1

thank [2] 90:16; 127:1

thankful [1] 85:23

themselves [1] 44:25

therapist [1] 73:8

there'd [1] 118:4

they've [1] 66:17

thinking [3] 11:1; 13:24; 36:13

third [2] 45:24; 46:1

thirty [4] 51:11; 61:1; 85:25; 117:21

thomas [3] 4:7; 107:1; 124:14

thought [16] 20:19; 37:19; 56:10; 57:5; 77:13; 85:8, 12; 86:6; 112:17, 19; 113:19; 116:13; 117:17, 19; 119:20; 125:11

**thoughts** [1] 85:11

**threatened** [1] 75:5

**three** [3] 14:23; 16:15; 55:21

**threw** [1] 37:5

**through** [23] 3:15; 6:8; 10:3; 17:1; 20:11; 27:23; 28:6; 35:16; 38:10; 42:1, 17; 65:7; 71:12; 75:6, 17; 76:9; 86:19; 89:4; 90:1; 91:22; 109:5; 122:9

**throughout** [1] 115:20

**throw** [1] 113:15

**thursday** [1] 6:8

**tickets** [1] 53:25

**time's** [1] 6:18

**times** [12] 17:19; 40:2; 48:21; 49:7, 9, 15, 20; 50:9; 54:3; 66:17; 95:18; 100:20

**timing** [2] 98:24; 99:8

**title** [1] 6:25

**titled** [1] 66:12

**tobacco** [3] 29:20, 21, 22

**today** [5] 3:17; 75:19; 76:1; 102:24; 108:5

**toes** [1] 43:10

**together** [4] 8:25; 9:4; 48:9; 70:19

**tomorrow** [1] 86:22

**took** [12] 4:12; 13:18; 14:13; 15:24; 16:5, 13, 14; 43:1; 49:17; 94:18; 98:18, 21

**totally** [1] 125:8

**touch** [4] 33:22; 44:12, 24; 91:18

**touched** [3] 44:9; 46:17; 113:11

**touching** [1] 46:20

**tough** [5] 89:25; 97:10; 108:21; 122:1, 7

**towards** [10] 11:1, 3; 13:1, 6, 19, 20; 14:6; 17:13; 91:16, 17

**towed** [1] 98:23

**town** [1] 11:8

**township** [1] 76:16

**traffic** [9] 31:10; 48:24; 53:23; 77:10; 104:2; 110:20, 25; 124:22; 125:3

**transcript** [3] 59:7; 60:4; 109:4

**transported** [2] 38:21; 50:1

**treat** [1] 53:8

**treated** [1] 102:5

**treese** [2] 106:17, 19

**trial** [9] 3:6; 37:23, 25; 38:1, 3; 59:15; 61:2, 4; 70:2

**tried** [2] 88:7; 114:24

**trip** [2] 25:25; 123:1

**truck** [2] 125:1, 2

**trucks** [2] 81:18

**true** [1] 29:1

**trust** [1] 73:11

**truth** [10] 26:11, 16, 20, 25; 59:4; 71:7; 93:21; 128:7, 8

**truthful** [1] 99:6

**truthfully** [1] 91:2

**trying** [19] 17:18; 20:1; 35:4; 37:13; 39:4, 5; 43:24; 45:22; 86:4, 5; 92:1; 103:4; 118:12, 14, 16, 18, 25; 119:10, 14

**tuesday** [2] 7:18, 19

**turkey** [25] 10:3, 19; 15:20; 18:24; 19:7, 14; 20:7; 25:21; 28:3, 16; 32:13, 17; 34:18; 35:24; 38:18; 40:10; 46:3; 94:17, 24; 95:10; 97:19; 98:9; 112:9; 113:2

**turn** [7] 11:4; 13:15; 14:1; 43:15; 59:4; 63:21; 100:19

**turned** [3] 20:14; 34:11; 104:11

**turning** [1] 43:23

**twelve** [1] 6:19

**twenty** [2] 60:19; 117:20

**twice** [1] 82:9

**twist** [3] 71:3; 116:8, 23

**twisting** [1] 36:9

**two-year** [2] 9:18; 105:18

**type** [15] 4:24; 6:24; 30:2; 32:12; 45:4; 57:11; 68:17; 70:23; 73:4; 74:2; 85:5; 100:7, 8; 116:11

**types** [1] 73:8

**typewriting** [1] 128:17

**typically** [1] 10:14

**- U -**

**u-turn** [4] 13:17; 15:1; 16:4; 63:11

**uncomfortable** [3] 19:2; 23:22; 108:9

**under** [7] 37:4; 40:4; 50:20; 62:11; 66:11; 88:17; 128:18

**undersigned** [1] 128:4

**understand** [11] 3:19, 25; 31:17; 35:19; 42:8; 47:4; 55:18; 62:16; 64:11; 69:22; 90:20

**understands** [1] 85:17

understood [1] 91:2

united [1] 1:1

unless [4] 8:2; 9:22; 33:21; 71:25

unnecessary [2] 62:15, 21

unpack [1] 81:17

unrestricted [4] 54:12, 14, 24; 126:14

unusual [2] 34:3, 12

unwillingly [1] 39:12

used [9] 33:18; 46:14; 64:22; 70:17; 71:14, 16, 21; 78:19; 88:18

using [3] 42:8; 46:15; 99:23

usual [2] 84:12; 85:17

usually [11] 6:6, 12, 14, 15, 16; 8:1; 10:11, 16; 74:16, 19; 105:4

— V —

valley [1] 108:3

various [1] 77:10

vehicle [32] 11:7; 21:8, 12, 18; 24:10, 11, 21; 25:16, 17; 26:3, 6, 10, 19, 24; 28:1; 56:1; 61:21; 63:19, 20; 92:7; 93:12, 19; 95:20, 25; 96:23; 97:25;

98:18; 115:11; 120:24; 121:13; 123:3

vehicles [1] 56:6

versus [1] 70:1

vest [1] 21:3

victim [1] 87:9

video [7] 28:9, 17; 34:24; 93:16; 99:10; 121:6, 7

videos [1] 93:6

violated [2] 119:9, 24

violations [1] 104:3

viral [1] 74:20

visually [1] 118:7

voice [1] 115:22

— W —

wait [5] 43:20; 55:16; 74:17; 108:22

waiting [5] 38:13, 14; 98:20; 121:13; 123:19

waived [1] 3:4

wake [3] 10:9, 14, 15

walk [5] 20:11; 22:7; 38:10; 63:13

walked [3] 20:15; 22:3, 9

walking [9] 21:18, 21; 28:4; 31:24; 37:6; 75:6, 16; 76:9; 113:1

wants [2] 21:24; 40:8

warehouse [1] 81:20

warrant [1] 85:3

warren [2] 105:21; 107:8

warren's [1] 107:8

washington [3] 15:22; 16:14; 25:21

watch [1] 93:5

watched [3] 42:2; 93:10; 98:23

watching [7] 21:12; 34:24; 38:5; 65:1; 117:5; 122:1, 5

water [1] 22:20

ways [1] 44:18

weapons [1] 42:25

wearing [1] 21:3

wednesday [1] 6:7

weed [1] 28:23

week [6] 7:16; 26:6; 74:17; 79:22; 81:22, 24

weekend [1] 8:5

weekends [2] 8:1, 3

weeks [1] 74:18

weigh [2] 87:20, 21

west [1] 1:21

westminster [3] 4:4; 76:12, 21

what'd [1] 80:7

wheel [2] 27:24; 28:8

whereof [1] 128:19

whirlwind [1] 35:3

whistling [1] 121:21

white [21] 1:20; 3:13, 14; 27:5, 10; 31:19; 48:5, 11, 15; 60:2; 65:23; 66:2, 5, 9; 67:24; 90:7, 18; 102:2; 124:8; 126:21; 127:1

whole [17] 10:4; 27:5; 36:8; 37:12; 51:4, 5; 68:15; 69:19; 70:6; 84:10; 85:9; 86:1; 87:3; 102:20; 120:18; 126:7; 128:7

william [1] 1:23

williamsport [22] 1:14, 18, 21; 4:5, 14; 5:10, 25; 52:6; 57:22; 76:13, 19; 77:3, 5, 11, 14, 16, 18, 25; 88:9; 107:25; 128:16

window [7] 21:12; 27:23; 28:7, 20; 95:3; 110:21; 123:7

within [1] 98:6

without [4] 32:11; 54:2, 4; 99:13

witness [9] 3:10; 31:18; 97:3; 103:17, 18; 106:12; 111:5; 128:6, 13

witnesses [5] 2:1; 64:16; 68:10; 75:4; 113:6

woke [2] 10:5, 12

woman [4] 66:13, 23; 75:9; 118:11

women [1] 118:17

word [7] 33:18; 34:4, 8; 46:14; 70:6; 78:25; 102:6

words [12] 30:18; 33:13; 48:12; 62:12; 64:22; 94:1, 2; 99:24; 102:6; 109:2; 110:21; 111:1

worked [6] 5:8, 20; 6:6; 8:6, 8; 65:6

works [1] 55:11

worried [13] 95:5, 7; 103:15; 110:16, 18, 23; 122:8, 11, 14, 19, 20, 21; 123:8

worry [1] 64:21

worse [2] 36:10; 87:25

worth [1] 87:22

write [1] 114:3

writing [1] 48:20

written [3] 67:25; 68:24; 69:25

wrong [33] 23:15; 32:12; 37:11, 15, 19; 52:25; 56:12; 62:12; 65:14; 67:14, 16; 71:16, 20; 75:20; 78:18;

79:2; 86:19; 95:18; 100:10; 103:25; 104:10; 111:11; 112:22; 114:17, 21; 115:6; 116:14, 19; 117:18, 22; 118:19; 119:19; 122:14

wrote [1] 62:22

- Y -

year [3] 4:21; 61:8; 125:16

years [24] 5:3, 4, 6, 7, 14, 17; 8:12; 9:15; 51:14; 54:15, 16; 55:21; 68:6; 69:13; 74:6; 76:23, 24, 25; 85:25; 86:9

yelled [2] 110:21, 25

yelling [3] 103:9; 115:16, 21

younger [1] 8:18

yourself [4] 103:24; 104:4; 114:12; 115:5

- Z -

zicolello [2] 1:13, 17

**DEFENDANT CALVIN IRVIN'S APPENDIX IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT F

Case 4:23-cr-00036-DJM-Dot ... Document 46 ... Page 615 ... Filed Date Filed: 12/16/2025

# IN THE COURT OF COMMON PLEAS OF
## LYCOMING COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA : No. CR-1281-2021

               :

               :

V                :

               :

               :

ANAISE M. LOPEZ       : SUMMARY TRIAL

RECEIVED

SEP 1 6 2022

DISTRICT ATTORNEY

### TRANSCRIPT OF PROCEEDINGS

**BEFORE** : Honorable Eric R. Linhardt, Judge

**DATE** : August 3, 2022

**PLACE** : Courtroom No. 2; 2:15 p.m.
Lycoming County Courthouse
48 West Third Street
Williamsport, Pennsylvania 17701

**APPEARANCES:**

MATTHEW B. WELICKOVITCH, ESQUIRE
District Attorney's Office
Lycoming County Courthouse
48 West Third Street
Williamsport, Pennsylvania 17701
      FOR - COMMONWEALTH



COPY

GEORGE E. LEPLEY, JR., ESQUIRE
Lepley, Engelman, Yaw & Wilk, LLC
140 East Third Street
Williamsport, Pennsylvania 17701
      FOR - DEFENDANT

Reported and Transcribed by:
Camala Jordan
Official Court Reporter

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

INDEX TO WITNESS

| FOR - COMMONWEALTH | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| OFFICER CLINTON GARDNER | | | | |
| By Mr. Welickovitch | 5 | -- | -- | -- |
| By Mr. Lepley | -- | 19 | -- | -- |
| OFFICER ZACHARY GEARY | | | | |
| By Mr. Welickovitch | 23 | -- | -- | -- |
| By Mr. Lepley | -- | -- | -- | -- |

INDEX TO EXHIBITS

| FOR - COMMONWEALTH | MARKED | ADMITTED |
|---|---|---|
| Commonwealth's Exhibit No. 1 | 16 | 26 |

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

---

P R O C E E D I N G S

THE COURT: This is the time scheduled for a non-jury summary trial in the matter of the Commonwealth versus -- is it Anaise or Anaise?

THE DEFENDANT: Anaise.

THE COURT: Anaise Lopez. It is docketed at 01281 of 2021. The Defendant had been charged in a three count information with aggravated assault, simple assault and harassment. It's my understanding that the Commonwealth is not pursuing either counts one or two and is instead pursuing solely count three, summary harassment.

MR. WELICKOVITCH: We have an amended information, Your Honor, that --

THE COURT: Very good.

MR. WELICKOVITCH: -- we filed earlier. Actually, my understanding in reviewing the notes is that the agreement was to proceed under summary harassment as well as summary disorderly conduct, so the information reflects that.

THE COURT: Do you have an amended information?

MR. WELICKOVITCH: Yes.

THE COURT: It's not for some reason in my file.

MR. WELICKOVITCH: Do you need the back page?

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

---

4

THE COURT: No, that's fine. When was the amended information filed?

MR. WELICKOVITCH: I just had them to do it this morning.

THE COURT: Very good. Attorney Lepley, do you or your client have any objection to the amended information reflecting count three, harassment, and count four, disorderly conduct, both summary offenses?

MR. LEPLEY: No, Your Honor that was part and parcel of a previous agreement.

THE COURT: Okay. Very good. Are you ready to proceed?

MR. WELICKOVITCH: We are, Your Honor.

THE COURT: Okay. I don't know if it's necessary, but you're free to make an opening statement before you call your first witness.

MR. WELICKOVITCH: That will be okay, Your Honor.

THE COURT: Very good.

MR. WELICKOVITCH: Commonwealth would call Officer Clinton Gardner to the stand.

OFFICER CLINTON GARDNER, called as a witness, being duly sworn, testified as follows:

THE COURT: Mr. Welickovitch.

DIRECT EXAMINATION

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

---

5

BY MR. WELICKOVITCH:

Q    Good afternoon, Officer Gardner. Where are you currently employed?

A    Williamsport Bureau of Police.

Q    How long have you worked there?

A    Almost eight years.

Q    Do you have any additional law enforcement background?

A    I do. I've been specially assigned to the narcotics unit for the past two and a half years and I recently started a new assignment as intelligence officer.

Q    Okay. And that's all for Williamsport City Police?

A    That's all for Williamsport City Police as well.

Q    Okay. Were you on duty on August 31st of last year?

A    Yes.

Q    What were you doing?

A    I was on patrol with Detective Irvin.

Q    And when you say patrol, what's the nature of that? What are you looking for? What are you doing?

A    With the narcotics unit, primarily narcotics offenses, violent crime, firearms.

Q    Do you recall what time of day -- what shift were you working that day?

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

A First shift.

Q And where were you at here in the city?

A I mean, we were patrolling everywhere, but for this particular incident we ended up at Turkey Hill on Washington Boulevard.

Q Okay. Prior to that, did you notice anything that I guess you would classify as suspicious during your shift?

A Yeah. Initially when we were -- I believe we were just kind of starting out, I don't know if for the day or we were heading back out, but we were downtown and we observed a black in color Nissan Altima with Massachusetts tags at one of the intersections beside us.

Q Okay. And what about that did you find maybe suspicious or did you pay attention to?

A I just initially -- a lot of people when we pull up beside them, they look over and waive or say hi or do something, but with the two individuals in this vehicle there was no reaction; they just kind of sat there like in a 100-yard stare type of thing.

Q Were you in a marked vehicle?

A Yes.

Q Were you wearing a uniform?

A Outer carrier, marked vests, but plain clothes.

Q You noticed that the vehicle -- what did you do

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

---

after that, after you noticed that vehicle?

A At that point, we hadn't followed it or anything and we ended up observing the vehicle later on. I don't recall initially where, but then we followed the vehicle for multiple blocks until we got to Turkey Hill.

Q Okay. And do you recall roughly what time this was occurring?

A It was during the day. I don't recall exactly what time.

Q Okay. What was the vehicle's -- did you follow the vehicle? Did you follow it's path of travel?

A Yeah. As I said, not initially from when we first observed it, but later -- I believe we saw it later coming out of the avenues and I think initially we picked them up on High Street near the hospital and followed them from that area to Turkey Hill on the Boulevard.

Q On Washington Boulevard?

A Yes.

Q So there was some gap in time between the first?

A Yeah, there was a gap in time from downtown until he saw the vehicle later. We hadn't been following it prior to seeing it. I believe the first, again, was around the hospital.

Q Okay. And so where did you state that the car came to a stop at?

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

---

A Turkey Hill on Washington Boulevard.

Q Okay. Was it busy that time of day?

A Yes.

Q Where did the vehicle stop at?

A At the gas pumps on the southeastern pump.

Q Okay.

A There were, I believe, four pumps. It would have been on the southeastern one.

Q Where did you and Detective Irvin come in at?

A Parallel -- we parked parallel to the vehicle.

Q Okay. What did you see? Did you see -- could you tell if there was -- how many passengers were in the vehicle at this point?

A Yeah. As I stated before, there were two. Two exited the vehicle. When they exited -- again, as I stated earlier, like most people when they see a marked police car, they look at it or do something. They pretended like we weren't even there. They got out of the vehicle and beelined straight for Turkey Hill for the entrance.

Q Do you see one or both of the occupants of that vehicle here today?

A Yes.

Q Okay. Could you -- is one of those occupants the Defendant, Ms. Anaise Lopez?

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

---

A Yes.

Q Okay. Do you see her here today?

A Yes. She's in the white jacket/top at the defense table.

MR. WELICKOVITCH: Okay. I ask the Court to note identification.

THE COURT: Defendant's been identified.

BY MR. WELICKOVITCH:

Q What did you do after they exited the vehicle? Where did they go?

A They went inside the store.

Q Okay. What did you then do?

A I exited the vehicle -- well, as I said, I parked parallel to the vehicle kind of right next to it, but not in a way that it would obstruct them from leaving the pumps if they chose to do so. I exited my vehicle, approached the vehicle parked at the pumps. There was no one inside of it. When I got up next to the vehicle, the window is down, I immediately detected the odor of marijuana. While looking through the vehicle from outside vantage point, I observed, from my training and experience, hundreds of narcotics related arrests, specifically, numerous marijuana arrests, what appeared to be a spent marijuana roach in a kind of like ash -- cup holder in the driver's door.

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

Q What did you do as a result of those observations?

A I first notified Detective Irvin what I smelled and observed and then it was shortly after that that Ms. Lopez exited the store.

Q Okay. Did you have any interaction with her?

A Very briefly initially. I asked Detective Irvin to stay with her while I went inside the store with the male.

Q Okay. And did you do that?

A Yes.

Q Okay. And did you make contact with the male?

A Yes.

Q And what did you do with him?

A When I entered the store, he was at the cash register, immediately put his hands up and said something along the lines of search me. I just did a quick pat-down and then asked him to come outside with me.

Q Okay. So you made observations in the vehicle. Did you have a plan as to how you wanted to approach this?

A Yes.

Q What was it?

A When I have these types of interactions if I observe paraphernalia or narcotics or some type of contraband in plain view, I typically, if the occupants are out of the vehicle but within view, try to get them

back to where the vehicle is so that I can both question and identify them.

Q And did you do that?

A Yes.

Q Okay. How did they respond?

A Well, after I brought the male outside, the two were both towards the front of the vehicle. Both were initially cooperative, but then it kind of escalated from there the more questions I asked.

Q When you say escalated, what do you mean?

A Their demeanor, specifically Ms. Lopez began to yell, became argumentative as well as the male did. I explained to them the process of consent for if they would allow consent to search the car or that I would tow it. And then when I asked for ID is when they said they didn't want to do anything. At that point, they were both detained via handcuffs when they refused to identify themselves.

Q Okay. At some point did you call more law enforcement in?

A Yes. I believe after they were handcuffed, I called for additional law enforcement.

Q Did anyone else arrive?

A Yes.

Q Do you recall who arrived?

A Officer Geary arrived, Corporal Stoltzfus arrived, and I believe Officer Minier also arrived.

Q And the reason they were called in?

A Just due to the argumentative nature. Ms. Lopez, I had asked her several times to remain still and she refused. She was kind of walking around handcuffed. I actually had to place her on the hood of the vehicle. Mr. Beatty as well. When I got -- grabbed her, he kind of jumped up, so he got placed on the vehicle by Detective Irvin. So due to the rising nature of the incident, that's why I called for additional back up.

Q Now, I think you stated that it was busy, but was this causing any disturbance with other individuals in the parking lot?

A Yes. After Ms. Lopez was placed in custody and taken to the vehicle, she -- due to her yelling and us -- Officer Geary and I basically having to drag her to the car, there was a vehicle -- another vehicle parked at the pump. I believe that individual was heard yelling throughout our interaction. And then also after she was placed in the vehicle, I had to address another female individual for attempting to interfere. She was yelling things that weren't even related. Initially asked about this and then was yelling something about finding her daughter.

Q Okay. How many law enforcement vehicles were in that parking lot at that point?

A There was ours and I believe two city -- at least two more city units, perhaps three. I don't recall where Officer Minier parked.

Q Is that a particularly large parking lot?

A It's a reasonably sized parking lot, yeah. I mean, it's a gas station. It's got quite a few stalls, four pumps.

Q Was the presence of three law enforcement vehicles hindering or causing any issues with --

A I mean, we were taking up the whole parking lot because we were in a line almost out to Railway Street I would say.

Q Okay. And the reason -- initially it would have been just one vehicle, but you -- the other vehicles were summoned due to what again?

A As I stated, Ms. Lopez's demeanor, her yelling, every time I tried to grab her and direct her to the vehicle, her pulling away from me screaming that she wanted a female officer that I couldn't touch her. And then also Mr. Beatty getting riled up, I believe, as a result of that.

Q Now, you already mentioned it, but was there some -- was there at one point a decision made to

transport the two or one of the two to police headquarters?

A   Yes.  For one being from their disorderliness just to get them out and out of the way.  They failed to -- they both refused initially to ID, so just to get them in the car and get them down to the police station and handle it there rather than out in public.

Q   Did Ms. Lopez willingly get into the police cruiser?

A   No.

Q   Did you -- during -- could you describe the process of getting her into the police cruiser?

A   Yes.  When Officer Geary arrived, I asked if we could put her in the back of his vehicle.  At that point, she said, at least once, I think multiple times, don't touch me.  We almost had to drag her to the vehicle.  Once we got her to the vehicle to put her in, she refused to get in and planted her feet.

Q   Sorry.  Go ahead.

A   Once she was in the vehicle, she kicked out multiple times at Officer Geary striking him several times in the arm.

Q   You observed that?

A   Yes.

Q   Struck him with what?  What part of her body?

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

A   Her feet.

Q   Okay.  Do you recall if she was looking in the direction of the officer when she did that?

A   Yes.

Q   In your interactions with her did she appear lucid?

A   Yes.

Q   Did you hear her say anything after the kick?

A   I believe she stated that she was trying to kick her shoes off.

Q   Is that what it appeared to be to you?

A   No.

MR. LEPLEY:  Objection.

THE COURT:  Well, it goes -- it's his opinion based on his observation.  You're certainly welcome to cross-examine him on that.

BY MR. WELICKOVITCH:

Q   Was she eventually transported away?

A   Yes.

Q   Did you remain on the -- on scene?

A   Briefly.  I think until either the tow showed up or someone could take over to watch the vehicle for a tow.

Q   I think you already mentioned, but you had interaction with another member of the public at that point?

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

---

16

A   Yes.

Q   And that was?

A   Another female at the gas pumps.

Q   Okay.  And her demeanor was?

A   Heightened.  She was yelling.

Q   Were you -- did you have any interactions with Ms. Lopez back at the police station?

A   Yes.

Q   Did she make any statements regarding the incident that had occurred?

A   As in -- in regards to?  I mean, I debriefed her biographically to acquire a name and whatnot.  Initially, she still refused to ID, but then she made remarks such as like -- along the lines of, you white people don't know how to spell Latina names.  Something along those lines.  Remarks such as those.

Q   Okay.  Now, were you wearing a body camera throughout the exchange you just testified to?

A   Yes.

Q   Have you had an opportunity to review that body cam footage prior to today?

A   Yes.

Q   I'm gonna show you what I'm marking as Commonwealth's Exhibit One.

(WHEREUPON, Commonwealth's Exhibit No. 1 was

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

---

17

marked for identification.)

BY MR. WELICKOVITCH:

Q   It's already up on the screen.  Is that image an accurate reflection of the footage that you reviewed?

A   Yes.

Q   And is this in fact -- would this in fact be the beginning of the footage that was captured from your body cam on that day?

A   Yes.

MR. WELICKOVITCH:  Your Honor, at this point I would move to admit Exhibit One and ask to play the video.

THE COURT:  Any objection?

MR. LEPLEY:  No, Your Honor.

BY MR. WELICKOVITCH:

Q   Okay.  Just for the record, this location is what you testified to?

A   Yes, sir.

Q   Turkey Hill on Washington Boulevard?

A   Yes, sir.

Q   Okay.  Who is this individual -- who is the individual in the frame right now, you can see that arm?

A   That is Detective Irvin, my partner that day.

Q   Okay.  And is there audio for this?

A   Yes.  I don't recall exactly when it kicks in, but it should be soon.

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

Q    Okay.

(WHEREUPON, Commonwealth's Exhibit No. 1 was played.)

BY MR. WELICKOVITCH:

Q    And for reference, this vehicle that you're in front of, who's vehicle is that?

A    Ms. Lopez's.

Q    Okay.  And this individual here, who's that?

A    That's Ms. Lopez.

Q    Okay.

A    Sorry.  There should be audio by now.

Q    At this point?  Well, it was playing fine.  I'm gonna rewind it.  Oh, you know what, it's because I was getting a beep I bet you.  Okay.  We should be good now.

(WHEREUPON, Commonwealth's Exhibit No. 1 was played.)

BY MR. WELICKOVITCH:

Q    Officer Gardner, are you familiar with the term out of pocket?

A    Yes.

Q    What does that mean?

A    It's slang for acting crazy or not acting right.

Q    Okay.

(WHEREUPON, Commonwealth's Exhibit No. 1 was played.)

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

---

19

BY MR. WELICKOVITCH:

Q    Now, just briefly, Officer Gardner, do you hear anything in the background?

A    Yeah.  As I stated earlier, there's a car parked behind the Altima and there's a female kind of yelling and I believe that she was yelling towards that female earlier in the video.

Q    Okay.

(WHEREUPON, Commonwealth's Exhibit No. 1 was played.)

MR. WELICKOVITCH:  I have no further questions for this witness at this time.

THE COURT:  Cross-examination, Mr. Lepley?

CROSS-EXAMINATION

BY MR. LEPLEY:

Q    Did you prepare a search warrant for the vehicle?

A    Yes.

Q    And have you reviewed it recently?

A    I have not.  The search warrant itself?

Q    Yes.

A    Not the search warrant, no.

MR. LEPLEY:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. LEPLEY:

Q    Just ask you in general to review it, especially

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

---

20

the last page.  The inventory sheet.

A    Yes.

Q    Does it say whether anything was recovered?

A    No, I did not take anything from the vehicle.

Q    You didn't seize anything?

A    No.

Q    And would it be fair so say then that there was no lab report of anything?

A    Correct.

Q    Now, on the video just before they're cuffed, it appeared that they were being asked for consent to search and they were refusing.  It may have been that -- I don't think I heard anything where they were refusing to give their ID or identify themselves.  Was that there -- did you hear that?

A    Yeah.  I believe when I asked for ID, they said about not giving ID or not doing something earlier in the video and then that's when they were handcuffed.

Q    But you also heard -- did you hear she was told she was under arrest for disorderly conduct?

A    Later in the video, yes.

Q    So when they were cuffed, what were they being arrested for?

A    They were only being detained at that point.

Q    You don't recall hearing them being told they were

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

---

21

being arrested?

A    I don't recall telling them they were being arrested until I made mention of the disorderly conduct after.

Q    So when they were being cuffed, it was to detain them?

A    Yes.

Q    Why was that at that point that they needed to be cuffed?

A    Well, there's multiple factors.  At this point, there was plain view paraphernalia in the vehicle and they were already emotionally starting to escalate, as well as not providing identification; so my thoughts are I have at least narcotics paraphernalia, people who don't want to identify themselves, and it's common in my experience that when people don't want to identify themselves that there's a reason such as having warrants.

Q    Eventually -- there were no warrants, correct?

A    Correct.

Q    And you said paraphernalia.  Are you referring to just that -- what you perceived to be or thought was a roach or an end of a roach?

A    To her own admission, a roach, yes.

Q    And -- but you still didn't seize it or do any lab test?

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

A    No.

Q    Would you be able to pinpoint on the video where you asked for ID and they refused?

A    Can you rewind it?

Q    I mean, if you can give the time frame to Mr. Welickovitch.

MR. WELICKOVITCH:  Well, it's -- we can probably -- it's probably very close to here.

(WHEREUPON, Commonwealth's Exhibit No. 1 was played.)

THE WITNESS:  We asked for ID multiple times there between both he and I.  She said no I think several times and then he just out right ignored the question I believe.

BY MR. LEPLEY:

Q    That's where you were referring to, that spot though?

A    Yes.  And when he said no to the consent as well.

Q    Is there a particular reason you didn't take what you thought was the roach?

A    As far as I was concerned, it was the least of my concerns at that point now after the charge she was already looking at.  I believe I took photos, but I saw no need to take the roach after she admitted it was a roach.

Q    That was your interpretation of her comment,

---

correct?

A    It was pretty cut and dry.  She said I smoked marijuana two days ago and it's a roach.

MR. LEPLEY:  No further questions.

THE COURT:  Any redirect?

MR. WELICKOVITCH:  No redirect, Your Honor.

THE COURT:  Thank you.  You may step down.

THE WITNESS:  Thank you, sir.

MR. WELICKOVITCH:  Commonwealth would call Officer Geary.  Officer Zach Geary.

OFFICER ZACHARY GEARY, called as a witness, being duly sworn, testified as follows:

### DIRECT EXAMINATION

BY MR. WELICKOVITCH:

Q    Officer Geary, good afternoon.

A    Good afternoon.

Q    Where are you employed?

A    Williamsport Bureau of Police.

Q    How long have you been employed there?

A    Since February 10th, 2015.

Q    Okay.  Were you on duty on August 31st of last year?

A    Yes, I was.

Q    What shift do you -- do you recall what shift you were working?

---

24

A    I believe day shift.

Q    Okay.  Were you summoned to any location by other law enforcement?

A    Yeah.  County law enforcement agency was called for assistance.

Q    Do you remember what the nature of the call was?

A    It was -- they were just calling for assistance at that point in time, I believe.

Q    Okay.  Where did you go to?

A    To the Turkey Hill on Washington Boulevard.

Q    What did you see when you got there?

A    When I pulled in initially I saw Officer Gardner with a female who was screaming pretty loudly.

Q    Okay.  At some point did you assist in the detaining of any suspects?

A    No.  I believe both individuals were already detained at the time I got there.

Q    Okay.  How about this, did you assist in transporting any detained individuals to your vehicle?

A    Yeah.  Officer Gardner asked if I would be able to help transport her as they were going to transport the other individual.

Q    When you say her, who are you referring to?

A    Anaise Lopez I believe is how you say her name. Sorry if I butchered that.

---

25

Q    Do you see her in the courtroom?

A    Yeah.  She's seated to my left next to her counsel.

Q    Okay.  Was Ms. Lopez compliant?

A    No.  Not -- not at all.

Q    What did you -- I mean, you -- did you take part in placing her into the police vehicle?

A    Yeah.  So Officer Gardner asked her to walk to my vehicle to which she refused.  Officer Gardner and I had to basically carry her to the vehicle.  Once to the vehicle, she refused to get in the vehicle, pushed herself away from the vehicle towards us trying to tell us that she was not going in the vehicle.  At that time she was lifted into the vehicle and sat down on the seat.

Q    Okay.  What happened after that?

A    She immediately started like bicycle kicking at myself and Officer Gardner.

Q    Did she strike you?

A    Yeah.  She hit me once in my hand and once on my inner elbow.

Q    What part of her made contact with you?

A    I believe it was her left foot.

Q    Okay.  Was she looking in your direction when she kicked you?

A    Yes.

Q    And in your estimation did Ms. Lopez's actions prolong the police interaction on that day?

A    Yes.

Q    When you arrived, was that establishment busy on that day, the Turkey Hill?

A    Yeah.  There were vehicles in the parking lot and the fuel pumps.

Q    And if you could estimate roughly how long were you on scene for?

A    I -- estimate probably between five and ten minutes.

Q    Okay.  But you weren't there at the beginning, correct?

A    No, I was not.

MR. WELICKOVITCH:  I have no further questions.

MR. LEPLEY:  No questions.

THE COURT:  Thank you, officer.

MR. WELICKOVITCH:  Commonwealth would rest, Your Honor.  We would just move -- well, we already have moved I guess -- we would -- Commonwealth --

THE COURT:  The video exhibit one -- Commonwealth's Exhibit One will be admitted.

(WHEREUPON, Commonwealth's Exhibit No. 1 was admitted into the record.)

THE COURT:  Commonwealth rests.

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

---

MR. LEPLEY:  Can I have a moment?

THE COURT:  Certainly.

MR. LEPLEY:  I'm not gonna present any testimony, Your Honor.

THE COURT:  Okay.  Defense rests?

MR. LEPLEY:  Yes.

THE COURT:  Closing argument, Mr. Lepley?

MR. LEPLEY:  I guess the argument would be while certainly Ms. Lopez could have comported herself in a better manner, they hadn't committed any crime.  There's no -- I would submit they hadn't committed any crime.  The officer testified that he saw in a cup holder in the driver's door, but they never confiscated it, they never took it -- took possession of it, there's no lab report or anything else.

And when they're being cuffed, they're arrested at that point.  And I would submit that there was no basis to arrest them at that point.  Yeah, they were belligerent and they were acting in a manner that probably could have been handled better and would have made the police interaction much more peaceful, but I would submit that under the circumstances, they had done nothing wrong to be cuffed and arrested at that point.

And I would submit that it was more -- she was not placed in the car, it was more or less she was forcibly

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

---

28

thrown into the car.  And under the circumstances, I would submit that she should be found not guilty of the summary charges.  Both the summary charges.

THE COURT:  Mr. Welickovitch.

MR. WELICKOVITCH:  Yes, Your Honor.  Your Honor, we -- in reviewing the -- just even in reviewing the -- the jury instructions here for these matters, we believe that we've met our burden beyond a reasonable doubt for both offenses.

The scene that we're presented with here is a public place.  It's a parking lot of a gas station in the middle of the day, relatively highly trafficked gas station.  That at root here is really a basic investigation into drug activity that Mr. Gardner -- Officer Gardner makes his observation, the smell, the odor, makes an observation of a roach in the ashtray or in the cup holder and then proceeds to try and question to talk to the two occupants of the vehicle who had diverted their gaze toward him and who had exited quickly to go inside the store.

He has that interaction with them.  As you can see from the video, the interaction quickly escalates and we believe that it escalates because of what the Defendant and the other individual decided to do, which was to make it more of an issue than it really needed to be by raising

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

---

29

their voices, by using profanity, by making questions -- you know, questioning the police conduct here in this matter.

All of this created a substantial disturbance in this public area.  As testified to that it was causing other individuals to raise their voice, to begin being vociferous.  It caused Officer Gardner to summon back up law enforcement, which at that point now you have in a busy parking lot at a commercial business three police cruisers in that parking lot, again, in the middle of the day with people going in and out of it.

The kick is what the kick is.  Under harassment the theory we were proceeding under is that she kicked, that she intended to kick.  The testimony that we brought out was that she was looking in the direction of the officer, Officer Geary, when she kicked her foot at him, that she was lucid, she was not acting -- she was not acting maybe negligently here, but she was either acting intentionally or recklessly.  That her intent there was either to harass, annoy, or alarm that officer.  Subject him to aggression, pressure, intimidation is some of the -- that's part of the definition of harass.  Which caused a public inconvenience, served no legitimate purpose.

There's other options that she could have taken if

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

she believed that this was improper action on the police by way of a suppression motion, by way of civil rights, she could speak to a civil rights attorney and determine whether or not there's any case there for the police behavior, but the answer is not to cause the disturbance that she caused on that particular day at that particular time, which escalated when it most probably would have been the charge for simple paraphernalia, if not -- yeah, it would have been a paraphernalia charge. It all of a sudden became heightened once she made physical contact with that officer by kicking Officer Geary, who testified he was struck twice with her foot.

So, Your Honor, we believe we met our burden on both charges and would ask the Court to find the Defendant, Ms. Lopez, guilty.

**(The remainder of the hearing held on August 3, 2022, has been previously transcribed and filed under separate cover.)**

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

---

C E R T I F I C A T E

I hereby certify that the proceedings are contained fully and accurately in the notes taken by me on the hearing of the above case, and that this copy is the correct transcript of the same.

Camala Jordan
Camala Jordan
Official Court Reporter

The foregoing record of the proceedings upon the hearing of the above case is hereby approved and directed to be filed.

_____            _____, Judge
DATE                          ERIC R. LINHARDT

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

BY MR. LEPLEY: [3] 19/14 19/23 22/14
BY MR. WELICKOVITCH: [9] 4/25 9/7 15/16 17/1 17/13 18/3 18/16 18/25 23/13
MR. LEPLEY: [10] 4/8 15/12 17/12 19/21 23/3 26/15 26/25 27/2 27/5 27/7
MR. WELICKOVITCH: [17] 3/12 3/15 3/21 3/24 4/2 4/12 4/16 4/19 9/4 17/9 19/10 22/6 23/5 23/8 26/14 26/17 28/4
THE COURT: [25] 3/1 3/5 3/14 3/20 3/22 3/25 4/4 4/10 4/13 4/18 4/23 9/6 15/13 17/11 19/12 19/22 23/4 23/6 26/16 26/20 26/24 27/1 27/4 27/6 28/3
THE DEFENDANT: [1] 3/4
THE WITNESS: [2] 22/10 23/7

**0**

01281 [1] 3/7

**1**

100-yard [1] 6/20
10th [1] 23/20
16 [1] 2/14
19 [1] 2/4

**2**

2015 [1] 23/20
2021 [1] 3/7
2022 [1] 30/17
23 [1] 2/5
26 [1] 2/14

**3**

31st [2] 5/15 23/21

**A**

able [2] 22/2 24/20
about [5] 6/14 12/23 12/24 20/17 24/18
above [2] 31/4 31/14
accurate [1] 17/4
accurately [1] 31/3
acquire [1] 16/12
acting [6] 18/22 18/22 27/19 29/17 29/18 29/18
action [1] 30/1
actions [1] 26/1
activity [1] 28/14
actually [2] 3/17 12/7
additional [3] 5/7 11/22 12/11
address [1] 12/21
admission [1] 21/23
admit [1] 17/11
admitted [4] 2/13 22/24 26/22 26/24
after [13] 7/1 7/1 9/9 10/3 11/6 11/21 12/15 12/20 15/8 21/4 22/22 22/24 25/15
afternoon [3] 5/2 23/15 23/16
again [4] 7/22 8/15 13/17 29/10
agency [1] 24/4
aggravated [1] 3/8
aggression [1] 29/21
ago [1] 23/3
agreement [2] 3/18 4/10
ahead [1] 14/19
alarm [1] 29/20
all [5] 5/12 5/14 25/5 29/4 30/9
allow [1] 11/14
almost [3] 5/6 13/13 14/16

along [3] 10/19 16/14 16/15
already [7] 13/24 15/23 17/3 21/12 22/23 24/16 26/19
also [4] 12/2 12/20 13/22 20/19
Altima [2] 6/12 19/5
amended [4] 3/13 3/21 4/2 4/6
Anaise [6] 3/4 3/4 3/5 3/6 8/25 24/24
annoy [1] 29/20
another [4] 12/18 12/21 15/24 16/3
answer [1] 30/5
any [17] 4/6 5/7 10/5 12/13 13/11 16/6 16/9 17/12 21/24 23/5 24/2 24/15 24/19 27/3 27/10 27/11 30/4
anyone [1] 11/23
anything [11] 6/6 7/2 11/16 15/8 19/3 20/3 20/4 20/5 20/8 20/13 27/15
appear [1] 15/5
appeared [3] 9/23 15/11 20/11
approach [2] 10/19 19/22
approached [1] 9/17
approved [1] 31/14
are [12] 4/11 4/13 5/2 5/21 5/21 10/25 18/18 21/13 21/20 23/17 24/23 31/2
area [2] 7/16 29/5
argument [2] 27/7 27/8
argumentative [2] 11/12 12/4
arm [2] 14/22 17/21
around [2] 7/23 12/6
arrest [2] 20/20 27/18
arrested [5] 20/23 21/1 21/3 27/16 27/23
arrests [2] 9/22 9/23
arrive [1] 11/23
arrived [6] 11/25 12/1 12/1 12/2 14/13 26/4
as [34]
ash [1] 9/24
ashtray [1] 28/16
ask [4] 9/5 17/11 19/25 30/14
asked [13] 10/6 10/17 11/9 11/15 12/5 12/23 14/13 20/11 20/16 22/3 22/11 24/20 25/8
assault [2] 3/8 3/8
assigned [1] 5/9
assignment [1] 5/11
assist [2] 24/14 24/18
assistance [2] 24/5 24/7
attempting [1] 12/22
attention [1] 6/15
attorney [2] 4/5 30/3
audio [2] 17/23 18/11
August [3] 5/15 23/21 30/16
August 31st [2] 5/15 23/21
avenues [1] 7/14
away [3] 13/20 15/18 25/12

**B**

back [7] 3/25 6/11 11/1 12/11 14/14 16/7 29/7
background [2] 5/8 19/3
based [1] 15/15
basic [1] 28/13
basically [2] 12/17 25/10
basis [1] 27/17
be [18] 4/17 9/24 15/11 17/6 17/25 18/11 18/14 20/7 21/8 21/21 22/2 24/20 26/22 27/8 27/22 28/2 28/25 31/15
Beatty [2] 12/8 13/22
became [2] 11/12 30/10

because [3] 13/13 18/13 28/23
beelined [1] 8/19
been [12] 3/7 5/9 7/21 8/8 9/7 13/16 20/12 23/19 27/20 30/8 30/9 30/17
beep [1] 18/14
before [3] 4/16 8/14 20/10
began [1] 11/11
begin [1] 29/6
beginning [2] 17/7 26/12
behavior [1] 30/5
behind [1] 19/5
being [12] 4/23 14/3 20/11 20/22 20/24 20/25 21/1 21/2 21/5 23/12 27/16 29/6
believe [22] 6/9 7/13 7/22 8/7 11/21 12/2 12/19 13/3 13/22 15/9 19/6 20/16 22/14 22/23 24/1 24/8 24/16 24/24 25/22 28/8 28/23 30/13
believed [1] 30/1
belligerent [1] 27/18
beside [2] 6/13 6/17
bet [1] 18/14
better [2] 27/10 27/20
between [3] 7/19 22/12 26/10
beyond [1] 28/8
bicycle [1] 25/16
biographically [1] 16/12
black [1] 6/12
blocks [1] 7/5
body [4] 14/25 16/17 16/20 17/7
both [12] 4/8 8/21 11/1 11/7 11/7 11/16 14/5 22/12 24/16 28/3 28/9 30/14
Boulevard [6] 6/5 7/16 7/17 8/1 17/18 24/10
briefly [3] 10/6 15/21 19/2
brought [2] 11/6 29/14
burden [2] 28/8 30/13
Bureau [2] 5/4 23/18
business [1] 29/9
busy [4] 8/2 12/12 26/4 29/9
butchered [1] 24/25

**C**

call [5] 4/16 4/20 11/19 23/9 24/6
called [6] 4/22 11/22 12/3 12/11 23/11 24/4
calling [1] 24/7
cam [2] 16/21 17/8
Camala [1] 31/7
came [1] 7/25
camera [1] 16/17
can [7] 11/1 17/21 22/4 22/5 22/7 27/1 28/21
captured [1] 17/7
car [8] 7/24 8/17 11/14 12/18 14/6 19/4 27/25 28/1
carrier [1] 6/24
carry [1] 25/10
case [3] 30/4 31/4 31/14
cash [1] 10/14
cause [1] 30/5
caused [3] 29/7 29/23 30/6
causing [3] 12/13 13/11 29/5
certainly [3] 15/15 27/2 27/9
certify [1] 31/2
charge [3] 22/22 30/8 30/9
charged [1] 3/7
charges [3] 28/3 28/3 30/14
chose [1] 9/16
circumstances [2] 27/22 28/1
city [5] 5/12 5/14 6/2 13/3 13/4

**C**

civil [2] 30/2 30/3
classify [1] 6/7
client [1] 4/6
CLINTON [3] 2/3 4/21 4/22
close [1] 22/8
Closing [1] 27/7
clothes [1] 6/24
color [1] 6/12
come [2] 8/9 10/17
coming [1] 7/13
comment [1] 22/25
commercial [1] 29/9
committed [2] 27/10 27/11
common [1] 21/15
COMMONWEALTH [9] 2/2 2/13 3/3
  3/10 4/20 23/9 26/18 26/20 26/25
Commonwealth's [10] 2/14 16/24 16/25
  18/2 18/15 18/24 19/9 22/9 26/22
  26/23
compliant [1] 25/4
comported [1] 27/9
concerned [1] 22/21
concerns [1] 22/22
conduct [5] 3/19 4/8 20/20 21/3 29/2
confiscated [1] 27/13
consent [4] 11/13 11/14 20/11 22/18
contact [3] 10/11 25/21 30/10
contained [1] 31/2
contraband [1] 10/24
cooperative [1] 11/8
copy [1] 31/4
Corporal [1] 12/1
correct [6] 20/9 21/18 21/19 23/1 26/13
  31/4
could [10] 8/11 8/24 14/11 14/14 15/22
  26/8 27/9 27/19 29/25 30/3
couldn't [1] 13/21
counsel [1] 25/3
count [4] 3/8 3/11 4/7 4/7
counts [1] 3/10
County [1] 24/4
Court [3] 9/5 30/14 31/8
courtroom [1] 25/1
cover [1] 30/18
crazy [1] 18/22
created [1] 29/4
crime [3] 5/23 27/10 27/11
cross [4] 2/2 15/16 19/13 19/14
Cross-examination [2] 19/13 19/14
cross-examine [1] 15/16
cruiser [2] 14/9 14/12
cruisers [1] 29/10
cuffed [6] 20/10 20/22 21/5 21/9 27/16
  27/23
cup [3] 9/24 27/12 28/17
currently [1] 5/3
custody [1] 12/15
cut [1] 23/2

**D**

DATE [1] 31/18
daughter [1] 12/25
day [13] 5/24 5/25 6/10 7/8 8/2 17/8
  17/22 24/1 26/2 26/5 28/12 29/11 30/6
days [1] 23/3
debriefed [1] 16/11
decided [1] 28/24
decision [1] 13/25
Defendant [4] 3/7 8/25 28/23 30/15

Defendant's [1] 3/7
defense [2] 9/3 27/5
definition [1] 29/22
demeanor [3] 11/11 13/18 16/4
describe [1] 14/11
detain [1] 21/5
detained [4] 11/17 20/24 24/17 24/19
detaining [1] 24/15
detected [1] 9/19
Detective [6] 5/19 8/9 10/2 10/6 12/9
  17/22
determine [1] 30/3
did [46]
didn't [4] 11/15 20/5 21/24 22/19
direct [4] 2/2 4/25 13/19 23/13
directed [1] 31/14
direction [3] 15/3 25/23 29/15
disorderliness [1] 14/3
disorderly [4] 3/19 4/8 20/20 21/3
disturbance [3] 12/13 29/4 30/5
diverted [1] 28/18
do [31]
docketed [1] 3/6
does [2] 18/21 20/3
doing [3] 5/18 5/21 20/17
don't [13] 4/14 6/10 7/3 7/8 13/4 14/15
  16/14 17/24 20/12 20/25 21/2 21/14
  21/16
done [1] 27/22
door [2] 9/25 27/13
doubt [1] 28/9
down [5] 9/19 10/16 14/6 23/7 25/14
downtown [2] 6/11 7/20
drag [2] 12/17 14/16
driver's [2] 9/25 27/13
drug [1] 28/14
dry [1] 23/2
due [4] 12/4 12/10 12/16 13/17
duly [2] 4/23 23/12
during [3] 6/7 7/8 14/11
duty [2] 5/15 23/21

**E**

earlier [5] 3/16 8/16 19/4 19/6 20/17
eight [1] 5/6
either [4] 3/10 15/21 29/18 29/20
elbow [1] 25/20
else [2] 11/23 27/15
emotionally [1] 21/12
employed [3] 5/3 23/17 23/19
end [1] 21/22
ended [2] 6/4 7/3
enforcement [8] 5/7 11/20 11/22 13/1
  13/10 24/3 24/4 29/8
entered [1] 10/14
entrance [1] 8/20
ERIC [1] 31/18
escalate [1] 21/12
escalated [3] 11/8 11/10 30/7
escalates [2] 28/22 28/23
especially [1] 19/25
establishment [1] 26/4
estimate [2] 26/8 26/10
estimation [1] 26/1
even [3] 8/18 12/23 28/6
eventually [2] 15/18 21/18
every [1] 13/19
everywhere [1] 6/3
exactly [2] 7/8 17/24
examination [4] 4/25 19/13 19/14 23/13

example [1] 13/16
exchange [1] 16/18
exhibit [12] 2/14 16/24 16/25 17/11
  18/2 18/15 18/24 19/9 22/9 26/21
  26/22 26/23
EXHIBITS [1] 2/12
exited [7] 8/15 8/15 9/9 9/13 9/16 10/4
  28/19
experience [2] 9/22 21/15
explained [1] 11/13

**F**

fact [2] 17/6 17/6
factors [1] 21/10
failed [1] 14/4
fair [1] 20/7
familiar [1] 18/18
far [1] 22/21
February [1] 23/20
February 10th [1] 23/20
feet [2] 14/18 15/1
female [6] 12/21 13/21 16/3 19/5 19/6
  24/13
few [1] 13/8
file [1] 3/24
filed [4] 3/16 4/2 30/17 31/15
find [2] 6/14 30/14
finding [1] 12/24
fine [2] 4/1 18/12
firearms [1] 5/23
first [6] 4/16 6/1 7/12 7/19 7/22 10/2
five [1] 26/10
follow [2] 7/10 7/11
followed [3] 7/2 7/4 7/15
following [1] 7/21
follows [2] 4/23 23/12
foot [3] 25/22 29/16 30/12
footage [3] 16/21 17/4 17/7
forcibly [1] 27/25
foregoing [1] 31/13
found [1] 28/2
four [3] 4/8 8/7 13/9
frame [2] 17/21 22/5
free [1] 4/15
front [2] 11/7 18/6
fuel [1] 26/7
fully [1] 31/3
further [3] 19/11 23/4 26/15

**G**

gap [2] 7/19 7/20
GARDNER [14] 2/3 4/21 4/22 5/2
  18/18 19/2 24/12 24/20 25/8 25/9
  25/17 28/14 28/15 29/7
gas [5] 8/5 13/8 16/3 28/11 28/12
gaze [1] 28/19
GEARY [11] 2/5 12/1 12/17 14/13
  14/21 23/10 23/10 23/11 23/15 29/16
  30/11
general [1] 19/25
get [7] 10/25 14/4 14/5 14/6 14/8 14/18
  25/11
getting [3] 13/22 14/12 18/14
give [2] 20/13 22/5
giving [1] 20/17
go [4] 9/10 14/19 24/9 28/19
goes [1] 15/14
going [3] 24/21 25/13 29/11
gonna [3] 16/23 18/13 27/3
good [8] 3/15 4/5 4/11 4/19 5/2 18/14

**G**

good... [2] 23/15 23/16
got [9] 7/5 8/18 9/18 12/8 12/9 13/8 14/17 24/11 24/17
grab [1] 13/19
grabbed [1] 12/8
guess [3] 6/7 26/20 27/8
guilty [2] 28/2 30/15

**H**

had [13] 3/7 4/3 12/5 12/7 12/21 14/16 15/23 16/10 16/20 25/9 27/22 28/18 28/19
hadn't [4] 7/2 7/21 27/10 27/11
half [1] 5/10
hand [1] 25/19
handcuffed [3] 11/21 12/6 20/18
handcuffs [1] 11/17
handle [1] 14/6
handled [1] 27/20
hands [1] 10/15
happened [1] 25/15
harass [2] 29/20 29/22
harassment [5] 3/9 3/12 3/18 4/7 29/12
has [2] 28/21 30/17
have [28] 3/13 3/21 4/6 5/5 5/7 8/7 10/5 10/19 10/22 13/15 16/6 16/20 19/11 19/18 19/19 20/12 21/13 23/19 26/15 26/19 27/1 27/9 27/19 27/20 29/8 29/25 30/7 30/9
having [2] 12/17 21/17
he [10] 7/21 10/14 12/8 12/9 22/12 22/13 22/18 27/12 28/21 30/12
heading [1] 6/11
headquarters [1] 14/2
hear [4] 15/8 19/2 20/15 20/19
heard [3] 12/19 20/13 20/19
hearing [4] 20/25 30/16 31/3 31/14
heightened [2] 16/5 30/10
held [1] 30/16
help [1] 24/21
her [42]
here [10] 6/2 8/22 9/2 18/8 22/8 28/7 28/10 28/13 29/2 29/18
hereby [2] 31/2 31/14
herself [2] 25/11 27/9
hi [1] 6/17
High [1] 7/15
highly [1] 28/12
Hill [8] 6/4 7/5 7/16 8/1 8/19 17/18 24/10 26/5
him [8] 10/13 10/17 14/21 14/25 15/16 28/19 29/16 29/21
hindering [1] 13/11
his [5] 10/15 14/14 15/14 15/15 28/15
hit [1] 25/19
holder [3] 9/25 27/12 28/17
Honor [13] 3/14 4/9 4/13 4/18 17/10 17/13 19/22 23/6 26/19 27/4 28/5 28/6 30/13
hood [1] 12/7
hospital [2] 7/15 7/23
how [10] 5/5 8/12 10/19 11/5 13/1 16/15 23/19 24/18 24/24 26/8
hundreds [1] 9/22

**I**

I'm [4] 16/23 16/23 18/12 27/3
I've [1] 5/9
ID [8] 11/15 14/5 16/13 20/14 20/16

identification [3] 9/6 17/1 21/13
identified [1] 9/7
identify [5] 11/2 11/17 20/14 21/15 21/16
ignored [1] 22/13
image [1] 17/3
immediately [3] 9/19 10/15 25/16
improper [1] 30/1
incident [3] 6/4 12/10 16/9
inconvenience [1] 29/23
INDEX [2] 2/1 2/12
individual [7] 12/19 12/22 17/20 17/21 18/8 24/22 28/24
individuals [5] 6/18 12/13 24/16 24/19 29/6
information [6] 3/8 3/14 3/19 3/21 4/2 4/7
initially [12] 6/9 6/16 7/4 7/12 7/14 10/6 11/8 12/23 13/15 14/5 16/12 24/12
inner [1] 25/20
inside [4] 9/11 9/18 10/7 28/20
instead [1] 3/11
instructions [1] 28/7
intelligence [1] 5/11
intended [1] 29/14
intent [1] 29/19
intentionally [1] 29/19
interaction [7] 10/5 12/20 15/24 26/2 27/21 28/21 28/22
interactions [3] 10/22 15/5 16/6
interfere [1] 12/22
interpretation [1] 22/25
intersections [1] 6/13
intimidation [1] 29/21
inventory [1] 20/1
investigation [1] 28/14
Irvin [6] 5/19 8/9 10/2 10/6 12/10 17/22
is [31]
issue [1] 28/25
issues [1] 13/11
it [57]
it's [16] 3/9 3/23 4/14 7/11 13/7 13/8 13/8 15/14 17/3 18/13 18/22 21/15 22/7 22/8 23/3 28/11
itself [1] 19/19

**J**

jacket [1] 9/3
jacket/top [1] 9/3
Jordan [1] 31/7
Judge [1] 31/18
jumped [1] 12/9
jury [2] 3/3 28/7
just [19] 4/3 6/10 6/16 6/19 10/16 12/4 13/16 14/3 14/5 16/18 17/15 19/2 19/25 20/10 21/21 22/13 24/7 26/19 28/6

**K**

kick [5] 15/8 15/9 29/12 29/12 29/14
kicked [4] 14/20 25/24 29/13 29/16
kicking [2] 25/16 30/11
kicks [1] 17/24
kind [8] 6/10 6/19 9/14 9/24 11/8 12/6 12/18 19/5
know [5] 4/14 6/10 16/14 18/13 29/2

**L**

lab [3] 20/8 21/24 27/14

largely [1] 13/6
last [3] 5/15 20/1 23/21
later [5] 7/3 7/13 7/13 7/21 20/21
Latina [1] 16/15
law [8] 5/7 11/19 11/22 13/1 13/10 24/3 24/4 29/8
least [4] 13/3 14/15 21/14 22/21
leaving [1] 9/15
left [2] 25/2 25/22
legitimate [1] 29/23
Lepley [5] 2/4 2/6 4/5 19/13 27/7
less [1] 27/25
lifted [1] 25/14
like [6] 6/19 8/16 8/18 9/24 16/14 25/16
line [1] 13/13
lines [3] 10/16 16/14 16/15
LINHARDT [1] 31/18
location [2] 17/15 24/2
long [3] 5/5 23/19 26/8
look [2] 6/17 8/17
looking [6] 5/21 9/20 15/2 22/23 25/23 29/15
Lopez [13] 3/6 8/25 10/4 11/11 12/4 12/15 14/8 16/7 18/9 24/24 25/4 27/9 30/15
Lopez's [3] 13/18 18/7 26/1
lot [10] 6/16 12/14 13/2 13/6 13/7 13/12 26/6 28/11 29/9 29/10
loudly [1] 24/13
lucid [2] 15/6 29/17

**M**

made [7] 10/18 13/25 16/13 21/3 25/21 27/20 30/10
make [4] 4/15 10/11 16/9 28/24
makes [2] 28/15 28/16
making [1] 29/1
male [4] 10/8 10/11 11/6 11/12
manner [2] 27/10 27/19
many [2] 8/12 13/1
marijuana [4] 9/20 9/23 9/24 23/3
marked [5] 2/13 6/21 6/24 8/16 17/1
marking [1] 16/23
Massachusetts [1] 6/12
matter [2] 3/3 29/3
matters [1] 28/7
may [4] 19/22 19/23 20/12 23/7
maybe [2] 6/14 29/18
me [6] 10/16 10/17 13/20 14/16 25/19 31/3
mean [8] 6/3 11/10 13/8 13/12 16/11 18/21 22/5 25/6
member [1] 15/24
mention [1] 21/3
mentioned [2] 13/24 15/23
met [2] 28/8 30/13
middle [2] 28/12 29/10
Minier [2] 12/2 13/5
minutes [1] 26/11
moment [1] 27/1
more [7] 11/9 11/19 13/4 27/21 27/24 27/25 28/25
morning [1] 4/4
most [2] 8/16 30/7
motion [1] 30/2
move [2] 17/11 26/19
moved [1] 26/20
Mr [5] 2/3 2/4 2/5 2/6 22/5
Mr. [7] 4/24 12/8 13/22 19/13 27/7 28/4 28/14

## M

Mr. Beatty [2] 12/8 13/22
Mr. Gardner [1] 28/14
Mr. Lepley [2] 19/13 27/7
Mr. Welickovitch [2] 4/24 28/4
Ms [2] 18/9 26/1
Ms. [12] 8/25 10/4 11/11 12/4 12/15 13/18 14/8 16/7 18/7 25/4 27/9 30/15
Ms. Anaise [1] 8/25
Ms. Lopez [9] 10/4 11/11 12/4 12/15 14/8 16/7 25/4 27/9 30/15
Ms. Lopez's [2] 13/18 18/7
much [1] 27/21
multiple [5] 7/5 14/15 14/21 21/10 22/11
my [13] 3/9 3/17 3/23 9/16 9/21 17/22 21/13 21/15 22/21 25/2 25/8 25/19 25/19
myself [1] 25/17

## N

name [2] 16/12 24/24
names [1] 16/15
narcotics [6] 5/10 5/22 5/22 9/22 10/23 21/14
nature [4] 5/20 12/4 12/10 24/6
near [1] 7/15
necessary [1] 4/15
need [2] 3/25 22/24
needed [2] 21/8 28/25
negligently [1] 29/18
never [2] 27/13 27/13
new [1] 5/11
next [3] 9/14 9/18 25/2
Nissan [1] 6/12
no [36]
non [1] 3/3
non-jury [1] 3/3
not [23] 3/10 3/23 7/12 9/14 18/22 19/19 19/21 20/4 20/17 20/17 21/13 25/5 25/5 25/13 26/14 27/3 27/24 28/2 29/17 29/17 30/4 30/5 30/8
note [1] 9/6
notes [2] 3/17 31/3
nothing [1] 27/22
notice [1] 6/6
noticed [2] 6/25 7/1
notified [1] 10/2
now [10] 12/12 13/24 16/17 17/21 18/11 18/14 19/2 20/10 22/22 29/8
numerous [1] 9/23

## O

objection [3] 4/6 15/13 17/12
observation [3] 15/15 28/15 28/16
observations [2] 10/1 10/18
observe [1] 10/23
observed [5] 6/12 7/13 9/21 10/3 14/23
observing [1] 7/3
obstruct [1] 9/15
occupants [4] 8/21 8/24 10/24 28/18
occurred [1] 16/10
occurring [1] 7/7
odor [2] 9/19 28/16
off [1] 15/10
offenses [3] 4/8 5/23 28/9
officer [34]
Official [1] 31/8
Oh [1] 18/13
okay [47]

once [1] 14/14 14/20 25/10 25/19
25/19 30/10
one [14] 3/10 6/13 8/8 8/21 8/24 9/18 13/16 13/25 14/1 14/3 16/24 17/11 26/21 26/22
only [1] 20/24
opening [1] 4/15
opinion [1] 15/14
opportunity [1] 16/20
options [1] 29/25
other [7] 12/13 13/16 24/2 24/22 28/24 29/6 29/25
our [3] 12/20 28/8 30/13
ours [1] 13/3
out [14] 6/10 6/11 7/14 8/18 10/25 13/13 14/4 14/4 14/7 14/20 18/19 22/13 29/11 29/15
Outer [1] 6/24
outside [3] 9/20 10/17 11/6
over [2] 6/17 15/22
own [1] 21/23

## P

page [2] 3/25 20/1
parallel [3] 8/10 8/10 9/14
paraphernalia [6] 10/23 21/11 21/14 21/20 30/8 30/9
parcel [1] 4/10
parked [6] 8/10 9/13 9/17 12/18 13/5 19/4
parking [9] 12/14 13/2 13/6 13/7 13/12 26/6 28/11 29/9 29/10
part [5] 4/9 14/25 25/6 25/21 29/22
particular [4] 6/4 22/19 30/6 30/6
particularly [1] 13/6
partner [1] 17/22
passengers [1] 8/12
past [1] 5/10
pat [1] 10/16
pat-down [1] 10/16
path [1] 7/11
patrol [2] 5/19 5/20
patrolling [1] 6/3
pay [1] 6/15
peaceful [1] 27/21
people [6] 6/16 8/16 16/14 21/14 21/16 29/11
perceived [1] 21/21
perhaps [1] 13/4
photos [1] 22/23
physical [1] 30/10
picked [1] 7/14
pinpoint [1] 22/2
place [2] 12/7 28/11
placed [4] 12/9 12/15 12/21 27/25
placing [1] 25/7
plain [3] 6/24 10/24 21/11
plan [1] 10/19
planted [1] 14/18
play [1] 17/11
played [5] 18/3 18/16 18/25 19/10 22/10
playing [1] 18/12
pocket [1] 18/19
point [21] 7/2 8/13 9/21 11/16 11/19 13/2 13/25 14/14 15/25 17/10 18/12 20/24 21/8 21/10 22/22 24/8 24/14 27/17 27/18 27/23 29/8
police [17] 5/4 5/13 5/14 8/17 14/1 14/6 14/8 14/12 16/7 23/18 25/7 26/2 27/20

possession [1] 27/14
prepare [1] 19/16
presence [1] 13/10
present [1] 27/3
presented [1] 28/10
pressure [1] 29/21
pretended [1] 8/18
pretty [2] 23/2 24/13
previous [1] 4/10
previously [1] 30/17
primarily [1] 5/22
prior [3] 6/6 7/22 16/21
probably [5] 22/8 22/8 26/10 27/19 30/7
proceed [2] 3/18 4/12
proceeding [1] 29/13
proceedings [2] 31/2 31/13
proceeds [1] 28/17
process [2] 11/13 14/12
profanity [1] 29/1
prolong [1] 26/2
providing [1] 21/13
public [5] 14/7 15/24 28/11 29/5 29/23
pull [1] 6/16
pulled [1] 24/12
pulling [1] 13/20
pump [2] 8/5 12/19
pumps [7] 8/5 8/7 9/16 9/17 13/9 16/3 26/7
purpose [1] 29/24
pursuing [2] 3/10 3/11
pushed [1] 25/11
put [3] 10/15 14/14 14/17

## Q

question [3] 11/1 22/13 28/17
questioning [1] 29/2
questions [6] 11/9 19/11 23/4 26/15 26/16 29/1
quick [1] 10/16
quickly [2] 28/19 28/22
quite [1] 13/8

## R

Railway [1] 13/13
raise [1] 29/6
raising [1] 28/25
rather [1] 14/7
reaction [1] 6/19
ready [1] 4/11
really [2] 28/13 28/25
reason [5] 3/23 12/3 13/15 21/17 22/19
reasonable [1] 28/8
reasonably [1] 13/7
recall [11] 5/24 7/4 7/6 7/8 11/25 13/4 15/2 17/24 20/25 21/2 23/24
recently [2] 5/11 19/18
recklessly [1] 29/19
record [3] 17/15 26/24 31/13
recovered [1] 20/3
RECROSS [1] 2/2
redirect [3] 2/2 23/5 23/6
reference [1] 18/5
referring [3] 21/20 22/16 24/23
reflecting [1] 4/7
reflection [1] 17/4
reflects [1] 3/20
refused [8] 11/17 12/6 14/5 14/17 16/13 22/3 25/9 25/11
refusing [2] 20/12 20/13

| | | |
|---|---|---|
| **R** | 25/8 30/13 | that [115] |
| regarding [1] 16/9 | solely [1] 3/11 | that's [8] 4/1 5/12 5/14 12/11 18/9 |
| regards [1] 16/11 | some [7] 3/23 7/19 10/23 11/19 13/25 | 20/18 22/16 29/22 |
| register [1] 10/15 | 24/14 29/21 | their [6] 11/11 14/3 20/14 28/19 29/1 |
| related [2] 9/22 12/23 | someone [1] 15/22 | 29/6 |
| relatively [1] 28/12 | something [6] 6/18 8/17 10/15 12/24 | them [16] 4/3 6/17 7/14 7/15 9/15 |
| remain [2] 12/5 15/20 | 16/15 20/17 | 10/25 11/2 11/13 14/4 14/5 14/6 20/25 |
| remainder [1] 30/16 | soon [1] 17/25 | 21/2 21/6 27/18 28/21 |
| remarks [2] 16/13 16/16 | Sorry [3] 14/19 18/11 24/25 | themselves [4] 11/18 20/14 21/15 |
| remember [1] 24/6 | southeastern [2] 8/5 8/8 | 21/16 |
| report [2] 20/8 27/14 | speak [1] 30/3 | then [14] 7/4 9/12 10/3 10/17 11/8 |
| Reporter [1] 31/8 | specially [1] 5/9 | 11/15 12/20 12/24 13/22 16/13 20/7 |
| respond [1] 11/5 | specifically [2] 9/23 11/11 | 20/18 22/13 28/17 |
| rest [1] 26/18 | spell [1] 16/15 | theory [1] 29/13 |
| rests [2] 26/25 27/5 | spent [1] 9/24 | there [32] |
| result [2] 10/1 13/23 | spot [1] 22/16 | there's [8] 19/4 19/5 21/10 21/16 27/10 |
| review [2] 16/20 19/25 | stalls [1] 13/8 | 27/14 29/25 30/4 |
| reviewed [2] 17/4 19/18 | stand [1] 4/21 | these [2] 10/22 28/7 |
| reviewing [3] 3/17 28/6 28/6 | stare [1] 6/20 | they [44] |
| rewind [2] 18/13 22/4 | started [2] 5/11 25/16 | they're [3] 20/10 27/16 27/16 |
| right [4] 9/14 17/21 18/22 22/13 | starting [2] 6/10 21/12 | thing [1] 6/20 |
| rights [2] 30/2 30/3 | state [1] 7/24 | things [1] 12/23 |
| riled [1] 13/22 | stated [6] 8/14 8/16 12/12 13/18 15/9 | think [7] 7/14 12/12 14/15 15/21 15/23 |
| rising [1] 12/10 | 19/4 | 20/13 22/12 |
| roach [9] 9/24 21/22 21/22 21/23 22/20 | statement [1] 4/15 | this [27] 3/2 4/4 6/4 6/18 7/6 8/13 10/19 |
| 22/24 22/24 23/3 28/16 | statements [1] 16/9 | 12/13 12/24 17/6 17/6 17/10 17/15 |
| root [1] 28/13 | station [5] 13/8 14/6 16/7 28/11 28/13 | 17/20 17/23 18/5 18/8 18/12 19/12 |
| roughly [2] 7/6 26/8 | stay [1] 10/7 | 19/12 21/10 24/18 29/2 29/4 29/5 30/1 |
| | step [1] 23/7 | 31/4 |
| **S** | still [3] 12/5 16/13 21/24 | those [4] 8/24 10/1 16/15 16/16 |
| said [10] 7/12 9/13 10/15 11/15 14/15 | Stoltzfus [1] 12/1 | though [1] 22/17 |
| 20/16 21/20 22/12 22/18 23/2 | stop [2] 7/25 8/4 | thought [2] 21/21 22/20 |
| same [1] 31/5 | store [5] 9/11 10/4 10/7 10/14 28/20 | thoughts [1] 21/13 |
| sat [2] 6/19 25/14 | straight [1] 8/19 | three [6] 3/7 3/11 4/7 13/4 13/10 29/9 |
| saw [5] 7/13 7/21 22/23 24/12 27/12 | Street [2] 7/15 13/13 | through [1] 9/20 |
| say [9] 5/20 6/17 11/10 13/14 15/8 20/3 | strike [1] 25/18 | throughout [2] 12/20 16/18 |
| 20/7 24/23 24/24 | striking [1] 14/21 | thrown [1] 28/1 |
| scene [3] 15/20 26/9 28/10 | struck [2] 14/25 30/12 | time [14] 3/2 5/24 7/6 7/9 7/19 7/20 8/2 |
| scheduled [1] 3/2 | Subject [1] 29/20 | 13/19 19/12 22/5 24/8 24/17 25/13 |
| screaming [2] 13/20 24/13 | submit [5] 27/11 27/17 27/21 27/24 | 30/7 |
| screen [1] 17/3 | 28/2 | times [6] 12/5 14/15 14/21 14/21 22/11 |
| search [6] 10/16 11/14 19/16 19/19 | substantial [1] 29/4 | 22/13 |
| 19/21 20/11 | such [3] 16/13 16/16 21/17 | today [3] 8/22 9/2 16/21 |
| seat [1] 25/14 | sudden [1] 30/10 | told [2] 20/19 20/25 |
| seated [1] 25/2 | summary [7] 3/3 3/11 3/18 3/19 4/8 | took [3] 22/23 27/14 27/14 |
| see [9] 8/11 8/11 8/16 8/21 9/2 17/21 | 28/2 28/3 | top [1] 9/3 |
| 24/11 25/1 28/21 | summon [1] 29/7 | touch [2] 13/21 14/16 |
| seeing [1] 7/22 | summoned [2] 13/17 24/2 | tow [3] 11/14 15/21 15/22 |
| seize [2] 20/5 21/24 | suppression [1] 30/2 | toward [1] 28/19 |
| separate [1] 30/18 | suspects [1] 24/15 | towards [3] 11/7 19/6 25/12 |
| served [1] 29/23 | suspicious [2] 6/7 6/15 | trafficked [1] 28/12 |
| several [3] 12/5 14/21 22/12 | sworn [2] 4/23 23/12 | training [1] 9/21 |
| she [52] | | transcribed [1] 30/17 |
| She's [2] 9/3 25/2 | **T** | transcript [1] 31/4 |
| sheet [1] 20/1 | table [1] 9/4 | transport [3] 14/1 24/21 24/21 |
| shift [6] 5/24 6/1 6/8 23/24 23/24 24/1 | tags [1] 6/13 | transported [1] 15/18 |
| shoes [1] 15/10 | take [5] 15/22 20/4 22/19 22/24 25/6 | transporting [1] 24/19 |
| shortly [1] 10/3 | taken [3] 12/16 29/25 31/3 | travel [1] 7/11 |
| should [4] 17/25 18/11 18/14 28/2 | taking [1] 13/12 | trial [1] 3/3 |
| show [1] 16/23 | talk [1] 28/18 | tried [1] 13/19 |
| showed [1] 15/21 | tell [2] 8/12 25/12 | try [2] 10/25 28/17 |
| simple [2] 3/8 30/8 | telling [1] 21/2 | trying [2] 15/9 25/12 |
| Since [1] 23/20 | ten [1] 26/10 | Turkey [8] 6/4 7/5 7/16 8/1 8/19 17/18 |
| sir [3] 17/17 17/19 23/8 | term [1] 18/18 | 24/10 26/5 |
| sized [1] 13/7 | test [1] 21/25 | twice [1] 30/12 |
| slang [1] 18/22 | testified [7] 4/23 16/18 17/16 23/12 | two [12] 3/10 5/10 6/18 8/14 8/14 11/6 |
| smell [1] 28/15 | 27/12 29/5 30/11 | 13/3 13/4 14/1 14/1 23/3 28/18 |
| smelled [1] 10/2 | testimony [2] 27/4 29/14 | type [2] 6/20 10/23 |
| smoked [1] 23/2 | than [2] 14/7 28/25 | types [1] 10/22 |
| so [15] 3/19 7/19 7/24 9/16 10/18 11/1 | | |

**T**

typically [1] 10/24

**U**

under [7] 3/18 20/20 27/22 28/1 29/12
 29/13 30/17
understanding [2] 3/9 3/17
uniform [1] 6/23
unit [2] 5/10 5/22
units [1] 13/4
until [4] 7/5 7/20 15/21 21/3
up [13] 6/4 6/17 7/3 7/14 9/18 10/15
 12/9 12/11 13/12 13/22 15/21 17/3
 29/7
upon [1] 31/13
us [4] 6/13 12/16 25/12 25/12
using [1] 29/1

**V**

vantage [1] 9/21
vehicle [53]
vehicle's [1] 7/10
vehicles [4] 13/1 13/10 13/16 26/6
versus [1] 3/4
very [6] 3/15 4/5 4/11 4/19 10/6 22/8
vests [1] 6/24
via [1] 11/17
video [8] 17/11 19/7 20/10 20/18 20/21
 22/2 26/21 28/22
view [3] 10/24 10/25 21/11
violent [1] 5/23
vociferous [1] 29/7
voice [1] 29/6
voices [1] 29/1

**W**

waive [1] 6/17
walk [1] 25/8
walking [1] 12/6
want [3] 11/16 21/14 21/16
wanted [2] 10/19 13/21
warrant [3] 19/16 19/19 19/21
warrants [2] 21/17 21/18
was [92]
Washington [5] 6/5 7/17 8/1 17/18
 24/10
watch [1] 15/22
way [4] 9/15 14/4 30/2 30/2
we [39]
we're [1] 28/10
we've [1] 28/8
wearing [2] 6/23 16/17
welcome [1] 15/15
Welickovitch [5] 2/3 2/5 4/24 22/6 28/4
well [13] 3/19 5/14 9/13 11/6 11/12
 12/8 15/14 18/12 21/10 21/12 22/7
 22/18 26/19
went [2] 9/11 10/7
were [49]
weren't [3] 8/18 12/23 26/12
what [39]
what's [1] 5/20
whatnot [1] 16/12
when [32]
where [14] 5/2 6/2 7/4 7/24 8/4 8/9
 9/10 11/1 13/4 20/13 22/2 22/16 23/17
 24/9
WHEREUPON [7] 16/25 18/2 18/15
 18/24 19/9 22/9 26/23
whether [2] 20/3 30/4

which [5] 25/9 26/24 29/8 29/22 30/7
while [3] 9/20 10/7 27/9
white [2] 9/3 16/14
who [9] 11/25 17/20 17/20 21/14 24/13
 24/23 28/18 28/19 30/11
who's [2] 18/6 18/8
whole [1] 13/12
why [2] 12/11 21/8
will [2] 4/17 26/22
Williamsport [4] 5/4 5/12 5/14 23/18
willingly [1] 14/8
window [1] 9/19
within [1] 10/25
witness [5] 2/1 4/16 4/22 19/12 23/11
worked [1] 5/5
working [2] 5/25 23/25
would [27] 4/20 6/7 8/7 9/15 11/13
 11/14 13/14 13/15 17/6 17/11 20/7
 22/2 23/9 24/20 26/18 26/19 26/20
 27/8 27/11 27/17 27/20 27/21 27/24
 28/1 30/7 30/9 30/14
wrong [1] 27/22

**Y**

yard [1] 6/20
yeah [15] 6/9 7/12 7/20 8/14 13/7 19/4
 20/16 24/4 24/20 25/2 25/8 25/19 26/6
 27/18 30/8
year [2] 5/16 23/22
years [2] 5/6 5/10
yell [1] 11/12
yelling [8] 12/16 12/19 12/22 12/24
 13/18 16/5 19/5 19/6
yes [43]
you [131]
you're [3] 4/15 15/15 18/5
your [22] 3/14 4/6 4/9 4/13 4/16 4/17
 6/7 15/5 17/7 17/10 17/13 19/22 22/25
 23/6 24/19 25/23 26/1 26/19 27/4 28/5
 28/5 30/13

**Z**

Zach [1] 23/10
ZACHARY [2] 2/5 23/11

**DEFENDANT CALVIN IRVIN'S APPENDIX IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT G

Case 4:25-2860036 Docket No. 46 Filed 22:71 Filed Date 57:14 Pa 12/16/2025 Page 16/20 50

# IN THE COURT OF COMMON PLEAS OF
# LYCOMING COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA: No. CR-1281-2021

                      :

                      :

     V                :

                      :

                      :

ANAISE M. LOPEZ       : SUMMARY TRIAL

RECEIVED
AUG 12 2022
DISTRICT ATTORNEY

## TRANSCRIPT OF PROCEEDINGS
## REQUESTED PORTION OF TRANSCRIPT

**BEFORE** : Honorable Eric R. Linhardt, Judge

**DATE** : August 3, 2022

**PLACE** : Courtroom No. 2
Lycoming County Courthouse
48 West Third Street
Williamsport, Pennsylvania 17701

APPEARANCES:

MATTHEW B. WELICKOVITCH, ESQUIRE
District Attorney's Office
Lycoming County Courthouse
48 West Third Street
Williamsport, Pennsylvania 17701
    FOR - COMMONWEALTH


COPY

GEORGE E. LEPLEY, JR., ESQUIRE
Lepley, Engelman, Yaw & Wilk,
140 East Third Street
Williamsport, Pennsylvania 17701
    FOR - DEFENDANT

Reported and Transcribed by:
Camala Jordan
Official Court Reporter

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

Appx549

2

(The following is the requested portion of the transcript from the hearing held on August 3, 2022:)

THE COURT: The Court finds that the evidence is not only clear and credible, but really overwhelming of the Defendant's guilt with regard to both the summary disorderly conduct and the summary harassment.

The argument that Defense Counsel makes that no roach was seized somehow suggesting that Officer Gardner's testimony that he observed marijuana residue and a marijuana roach in the vehicle was somehow a pretext and a lie, the Court does not find credible in the least. The Court finds Officer Gardner's testimony to be credible in that regard.

In addition to which, Defense's argument that somehow the Defendant was cuffed and placed under arrest when they, in counsel's words, did nothing wrong, the Court disagrees with. This entire matter escalated solely because of the Defendant's behavior and her friend's behavior, all of which was unnecessary. The officers had every right to conduct an investigation; and had the Defendant cooperated in that investigation, I imagine that she would have been free to go on her way in probably less than five minutes, but instead, finds herself handcuffed, arrested, taken down to the police station, and charged with a felony. Her behavior, which she apparently still

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

fails to recognize -- not the police officer's behavior, but her behavior put not only her safety at risk, but the public's safety at risk, and the officers' safety at risk.

Ms. Lopez, you also need to understand that the Court considers all assaults on law enforcement officers to be a serious matter and our legislature finds all assaults on our police officers to be serious matters. That is why our legislature treats police officers as protected parties and enhances the grading for this type of behavior from a misdemeanor to a felony.

Further, the Court considers your utter lack of acceptance of any responsibility for your behavior that day -- you were offered, as reflected in the court file, a misdemeanor plea offer for six months of probation at the time of your preliminary hearing, which you declined. And then ultimately the Commonwealth dropped both the felony and misdemeanor charges and we're still proceeding with a trial on two summary offenses in the face of overwhelming evidence where you effectively offer no defense. Is there anything, Mr. Lepley, that you wish to say before the Court imposes sentence?

MR. LEPLEY: I point out that she -- to the best of my knowledge, I think that she has absolutely no prior record whatsoever, is gainfully employed here in town, has relocated. Mr. Beatty is one of the managers at

the Perkins store, so they're not individuals that in general would be involved in criminal conduct and so we would ask the Court to not impose incarceration. If the Court did, to make it house arrest so she can continue to work.

THE COURT: Mr. Welickovitch.

MR. WELICKOVITCH: Yes, Your Honor. So this case obviously preceded my time in the District Attorney's Office. I played no part in any decisions on it. I have no real long history. I was handed the case and said, this is a summary trial. I looked at the evidence, I agreed with Your Honor that it was overwhelming evidence. And we prepared it, we displayed it here for you today. She was found guilty. And we conquer with Your Honor's sentiments with regard to lack of personal responsibility and would trust that Your Honor impose a proper sentence here given the facts, given the conviction.

THE COURT: So for the reasons the Court has already stated, the fact that it takes assaults on police officers seriously, the fact that the Defendant has refused to accept responsibility in the face of overwhelming evidence, the fact that her behavior on that day put herself, the public, and law enforcement officers at risk, the Court believes that any sentence less than some period of incarceration would fail to account for the

seriousness of the Defendant's criminal behavior on that day. And for that reason, the Court will impose the following order:

And now this 3rd of August, 2022, at the time scheduled for summary trial, following trial, the Court finds the Defendant guilty of count three, harassment, a summary offense, and count four, disorderly conduct, a summary offense.

With regard to count three, harassment, the Court imposes a period of incarceration of 14 days in the Lycoming County Prison. The Defendant is eligible for work release/work crew, she is not eligible for electronic monitoring.

With regard to count four, disorderly conduct, the Court imposes a sentence of 14 days incarceration in the Lycoming County Prison. This sentence shall be served consecutively to count three for an aggregate sentence of 28 days incarceration. The Defendant is eligible for work release/work crew, she is not eligible for electronic monitoring.

The Defendant's report date is deferred until Monday, September 5, 2022, at 9:00 a.m. The Defendant shall self-report to the county prison at that time to begin serving her period of incarceration. Should the Defendant file an appeal of this sentence prior to

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

September 5th, the Defendant shall also file a motion for bail pending appeal so that the Court can consider that request. By the Court.

Any questions, Mr. Lepley?

**MR. LEPLEY:** No, Your Honor.

**THE COURT:** Any questions, Ms. Lopez?

**THE DEFENDANT:** No.

**THE COURT:** Any questions, Mr. Welickovitch?

**MR. WELICKOVITCH:** No, Your Honor.

**THE COURT:** Very good. We are adjourned.

**(WHEREUPON, the hearing was concluded.)**

**(This concludes the requested portion of the transcript from the hearing held on August 3, 2022.)**

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

## CERTIFICATE

I hereby certify that the proceedings are contained fully and accurately in the notes taken by me on the hearing of the above case, and that this copy is the correct transcript of the same.

*Camala Jordan*

Camala Jordan
Official Court Reporter

The foregoing record of the proceedings upon the hearing of the above case is hereby approved and directed to be filed.

_____                    _____, Judge
DATE                                 ERIC R. LINHARDT

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

MR. LEPLEY: [2]  3/21 6/4
MR. WELICKOVITCH: [2]  4/6 6/8
THE COURT: [6]  2/2 4/5 4/17 6/5 6/7 6/9
THE DEFENDANT: [1]  6/6

**1**

14 [2]  5/10 5/15

**2**

2022 [4]  2/2 5/4 5/22 6/13
28 [1]  5/18

**3**

3rd [1]  5/4

**5**

5th [1]  6/1

**9**

9:00 a.m [1]  5/22

**A**

a.m [1]  5/22
above [2]  7/4 7/13
absolutely [1]  3/23
accept [1]  4/21
acceptance [1]  3/12
account [1]  4/25
accurately [1]  7/3
addition [1]  2/14
adjourned [1]  6/10
aggregate [1]  5/17
agreed [1]  4/12
all [3]  2/19 3/5 3/6
already [1]  4/19
also [2]  3/4 6/1
any [6]  3/12 4/9 4/24 6/4 6/6 6/8
anything [1]  3/20
apparently [1]  2/25
appeal [2]  5/25 6/2
approved [1]  7/13
are [2]  6/10 7/2
argument [2]  2/7 2/14
arrest [2]  2/15 4/4
arrested [1]  2/24
as [2]  3/8 3/13
ask [1]  4/3
assaults [3]  3/5 3/7 4/19
Attorney's [1]  4/8
August [3]  2/2 5/4 6/13

**B**

bail [1]  6/2
be [6]  2/12 3/6 3/7 4/2 5/16 7/14
Beatty [1]  3/25
because [1]  2/18
been [1]  2/22
before [1]  3/20
begin [1]  5/24
behavior [9]
believes [1]  4/24
best [1]  3/23
both [2]  2/5 3/16

**C**

Camala [1]  7/7
can [2]  4/4 6/2
case [4]  4/8 4/10 7/4 7/13
certify [1]  7/2
charged [1]  2/24

charges [1]  3/7
clear [1]  2/4
Commonwealth [1]  3/16
concluded [1]  6/11
concludes [1]  6/12
conduct [5]  2/6 2/20 4/2 5/7 5/14
conquer [1]  4/14
consecutively [1]  5/17
consider [1]  6/2
considers [2]  3/5 3/11
contained [1]  7/2
continue [1]  4/4
conviction [1]  4/17
cooperated [1]  2/21
copy [1]  7/4
correct [1]  7/4
Counsel [1]  2/7
counsel's [1]  2/16
count [5]  5/6 5/7 5/9 5/14 5/17
county [3]  5/11 5/16 5/23
court [19]
credible [3]  2/4 2/11 2/12
crew [2]  5/12 5/19
criminal [2]  4/2 5/1
cuffed [1]  2/15

**D**

date [2]  5/21 7/17
day [3]  3/13 4/23 5/2
days [3]  5/10 5/15 5/18
decisions [1]  4/9
declined [1]  3/15
Defendant [9]
Defendant's [4]  2/5 2/18 5/1 5/21
defense [2]  2/7 3/19
Defense's [1]  2/14
deferred [1]  5/21
did [2]  2/16 4/4
directed [1]  7/13
disagrees [1]  2/17
disorderly [3]  2/6 5/7 5/14
displayed [1]  4/13
District [1]  4/8
does [1]  2/11
down [1]  2/24
dropped [1]  3/16

**E**

effectively [1]  3/19
electronic [2]  5/12 5/19
eligible [4]  5/11 5/12 5/18 5/19
employed [1]  3/24
enforcement [2]  3/5 4/23
enhances [1]  3/9
entire [1]  2/17
ERIC [1]  7/17
escalated [1]  2/17
every [1]  2/20
evidence [5]  2/3 3/19 4/11 4/12 4/22

**F**

face [2]  3/18 4/21
fact [3]  4/19 4/20 4/22
facts [1]  4/17
fail [1]  4/25
fails [1]  3/1
felony [3]  2/25 3/10 3/16
file [3]  3/13 5/25 6/1
filed [1]  7/14
find [1]  2/11
finds [5]  2/3 2/12 2/23 3/6 5/6
five [1]  2/23

following [3]  2/1 5/3 5/5
foregoing [1]  7/12
found [1]  4/14
four [2]  5/7 5/14
free [1]  2/22
friend's [1]  2/18
fully [1]  7/3
Further [1]  3/11

**G**

gainfully [1]  3/24
Gardner's [2]  2/8 2/12
general [1]  4/2
given [2]  4/17 4/17
go [1]  2/22
good [1]  6/10
grading [1]  3/9
guilt [1]  2/5
guilty [2]  4/14 5/6

**H**

had [2]  2/19 2/20
handcuffed [1]  2/23
handed [1]  4/10
harassment [3]  2/6 5/6 5/9
has [4]  3/23 3/25 4/18 4/20
have [2]  2/22 4/9
he [1]  2/9
hearing [6]  2/2 3/15 6/11 6/13 7/3 7/13
held [2]  2/2 6/13
her [7]
here [3]  3/24 4/13 4/17
hereby [2]  7/2 7/13
herself [2]  2/23 4/23
history [1]  4/10
Honor [5]  4/7 4/12 4/16 6/5 6/9
Honor's [1]  4/14
house [1]  4/4

**I**

imagine [1]  2/21
impose [3]  4/3 4/16 5/2
imposes [3]  3/21 5/10 5/15
incarceration [6]  4/3 4/25 5/10 5/15 5/18 5/24
individuals [1]  4/1
instead [1]  2/23
investigation [2]  2/20 2/21
involved [1]  4/2
is [14]
it [6]  4/4 4/9 4/12 4/13 4/13 4/19

**J**

Jordan [1]  7/7
Judge [1]  7/17

**K**

knowledge [1]  3/23

**L**

lack [2]  3/11 4/15
law [2]  3/5 4/23
least [1]  2/11
legislature [2]  3/6 3/8
Lepley [2]  3/20 6/4
less [2]  2/22 4/24
lie [1]  2/11
LINHARDT [1]  7/17
long [1]  4/10
looked [1]  4/11
Lopez [2]  3/4 6/6
Lycoming [2]  5/11 5/16

**M**

make [1] 4/4
makes [1] 2/7
managers [1] 3/25
marijuana [2] 2/9 2/10
matter [2] 2/17 3/6
matters [1] 3/7
me [1] 7/3
minutes [1] 2/23
misdemeanor [3] 3/10 3/14 3/17
Monday [1] 5/22
monitoring [2] 5/13 5/20
months [1] 3/14
motion [1] 6/1
Mr [1] 6/8
Mr. [4] 3/20 3/25 4/6 6/4
Mr. Beatty [1] 3/25
Mr. Lepley [2] 3/20 6/4
Mr. Welickovitch [1] 4/6
Ms. [2] 3/4 6/6
Ms. Lopez [2] 3/4 6/6
my [2] 3/23 4/8

**N**

need [1] 3/4
no [8]
not [8]
notes [1] 7/3
nothing [1] 2/16
now [1] 5/4

**O**

observed [1] 2/9
obviously [1] 4/8
offense [2] 5/7 5/8
offenses [1] 3/18
offer [2] 3/14 3/19
offered [1] 3/13
Office [1] 4/9
Officer [2] 2/8 2/12
officer's [1] 3/1
officers [6] 2/19 3/5 3/7 3/8 4/20 4/23
officers' [1] 3/3
Official [1] 7/8
one [1] 3/25
only [2] 2/4 3/2
order [1] 5/3
our [3] 3/6 3/7 3/8
out [1] 3/22
overwhelming [4] 2/4 3/18 4/12 4/22

**P**

part [1] 4/9
parties [1] 3/9
pending [1] 6/2
period [3] 4/25 5/10 5/24
Perkins [1] 4/1
personal [1] 4/15
placed [1] 2/15
played [1] 4/9
plea [1] 3/14
point [1] 3/22
police [5] 2/24 3/1 3/7 3/8 4/19
portion [2] 2/1 6/12
preceded [1] 4/8
preliminary [1] 3/15
prepared [1] 4/13
pretext [1] 2/10
prior [2] 3/24 5/25
prison [3] 5/11 5/16 5/23
probably [1] 2/22
probation [1] 3/14

proceeding [1] 3/17
proceedings [2] 7/2 7/12
proper [1] 4/16
protected [1] 3/9
public [1] 4/23
public's [1] 3/3
put [2] 3/2 4/23

**Q**

questions [3] 6/4 6/6 6/8

**R**

real [1] 4/10
really [1] 2/4
reason [1] 5/2
reasons [1] 4/18
recognize [1] 3/1
record [2] 3/24 7/12
reflected [1] 3/13
refused [1] 4/21
regard [5] 2/5 2/13 4/15 5/9 5/14
release [2] 5/12 5/19
release/work [2] 5/12 5/19
relocated [1] 3/25
report [2] 5/21 5/23
Reporter [1] 7/8
request [1] 6/3
requested [2] 2/1 6/12
residue [1] 2/9
responsibility [3] 3/12 4/15 4/21
right [1] 2/20
risk [4] 3/2 3/3 3/3 4/24
roach [2] 2/8 2/10

**S**

safety [3] 3/2 3/3 3/3
said [1] 4/10
same [1] 7/5
say [1] 3/20
scheduled [1] 5/5
seized [1] 2/8
self [1] 5/23
self-report [1] 5/23
sentence [7]
sentiments [1] 4/15
September [2] 5/22 6/1
September 5 [1] 5/22
September 5th [1] 6/1
serious [2] 3/6 3/7
seriously [1] 4/20
seriousness [1] 5/1
served [1] 5/16
serving [1] 5/24
shall [3] 5/16 5/23 6/1
she [8]
Should [1] 5/24
six [1] 3/14
so [6] 4/1 4/2 4/4 4/7 4/18 6/2
solely [1] 2/17
some [1] 4/25
somehow [3] 2/8 2/10 2/15
stated [1] 4/19
station [1] 2/24
still [2] 2/25 3/17
store [1] 4/1
suggesting [1] 2/8
summary [7]

**T**

taken [2] 2/24 7/3
takes [1] 4/19
testimony [2] 2/9 2/12

than [2] 2/23 4/24
that [30]
then [1] 3/16
there [1] 3/19
they [1] 2/16
they're [1] 4/1
think [1] 3/23
this [9]
three [3] 5/6 5/9 5/17
time [4] 3/15 4/8 5/4 5/23
today [1] 4/13
town [1] 3/25
transcript [3] 2/2 6/13 7/5
treats [1] 3/8
trial [4] 3/18 4/11 5/5 5/5
trust [1] 4/16
two [1] 3/18
type [1] 3/9

**U**

ultimately [1] 3/16
under [1] 2/15
understand [1] 3/4
unnecessary [1] 2/19
until [1] 5/21
upon [1] 7/12
utter [1] 3/11

**V**

vehicle [1] 2/10
Very [1] 6/10

**W**

was [8]
way [1] 2/22
we [5] 4/2 4/13 4/13 4/14 6/10
we're [1] 3/17
Welickovitch [2] 4/6 6/8
were [1] 3/13
whatsoever [1] 3/24
when [1] 2/16
where [1] 3/19
WHEREUPON [1] 6/11
which [4] 2/14 2/19 2/25 3/15
why [1] 3/8
will [1] 5/2
wish [1] 3/20
words [1] 2/16
work [5] 4/5 5/12 5/12 5/18 5/19
would [5] 2/22 4/2 4/3 4/16 4/25
wrong [1] 2/16

**Y**

Yes [1] 4/7
you [6] 3/4 3/13 3/15 3/19 3/20 4/13
your [9]

**DEFENDANT CALVIN IRVIN'S APPENDIX IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# <u>EXHIBIT H</u>

Case 4:25-cv-00036-1KM Document 6 Page 184 Filed Date Filed: 12/16/2024

# COURT OF COMMON PLEAS OF LYCOMING COUNTY

## DOCKET



**Docket Number: CP-41-CR-0001281-2021**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Anaise Margarita Lopez

Page 1 of 13

## CASE INFORMATION

Cross Court Docket Nos: 1214 MDA 2022

| | |
|---|---|
| Judge Assigned: Butts, Nancy L. | Date Filed: 10/04/2021    Initiation Date: 08/31/2021 |
| OTN: R 169852-4    LOTN: | Originating Docket No: MJ-29102-CR-0000296-2021 |
| Initial Issuing Authority: The Honorable Aaron S. Biichle | Final Issuing Authority: The Honorable Aaron S. Biichle |
| Arresting Agency: Williamsport City Police Dept | Arresting Officer: Gardner, Clinton J. |
| Complaint/Citation No.: 21-08506 | Incident Number: |
| County: Lycoming | Township: Williamsport City |
| Case Local Number Type(s) | Case Local Number(s) |

## STATUS INFORMATION

| Case Status: | Closed | Status Date | Processing Status | Complaint Date: | 08/31/2021 |
|---|---|---|---|---|---|
| | | 01/03/2024 | Sentenced/Penalty Imposed | | |
| | | 11/13/2023 | Awaiting PSI | | |
| | | 11/13/2023 | Awaiting Sentencing | | |
| | | 11/09/2023 | Appeal Decided | | |
| | | 09/15/2022 | Awaiting Appellate Court Decision | | |
| | | 08/30/2022 | Awaiting Appellate Court Decision | | |
| | | 08/03/2022 | Sentenced/Penalty Imposed | | |
| | | 08/03/2022 | Awaiting Sentencing | | |
| | | 08/03/2022 | Awaiting Pre-Trial Conference | | |
| | | 07/19/2022 | Awaiting Trial | | |
| | | 10/19/2021 | Awaiting Pre-Trial Conference | | |
| | | 10/15/2021 | Awaiting Formal Arraignment | | |
| | | 10/04/2021 | Awaiting Filing of Information | | |

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Arraignments & ARDs | 10/18/2021 | 1:30 pm | Courtroom No. 4 | Judge Marc F. Lovecchio | Scheduled |
| Criminal Status | 11/29/2021 | 9:00 am | Courtroom No. 3 | Judge Ryan M. Tira | Scheduled |
| Criminal Pre-Trials | 12/14/2021 | 9:00 am | Courtroom No. 1 | President Judge Nancy L. Butts | Scheduled |
| Guilty Plea | 12/17/2021 | 1:30 pm | Courtroom No. 4 | Judge Kenneth D. Brown | Continued |
| Guilty Plea | 02/08/2022 | 1:30 pm | Courtroom No. 4 | Judge Kenneth D. Brown | Scheduled |
| Criminal Status | 05/02/2022 | 9:00 am | | | Scheduled |
| Criminal Pre-Trials | 06/07/2022 | 9:00 am | Courtroom No. 1 | President Judge Nancy L. Butts | Scheduled |
| Criminal Trial | 08/03/2022 | 9:00 am | Courtroom No. 2 | Judge Eric R. Linhardt | Scheduled |
| Sentencing | 01/03/2024 | 3:00 pm | Courtroom No. 2 | Judge Eric R. Linhardt | Scheduled |

CPCMS 9082                                                                                              Printed: 04/02/2024

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in  18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF LYCOMING COUNTY

## DOCKET



**Docket Number: CP-41-CR-0001281-2021**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Anaise Margarita Lopez

Page 2 of 13

## DEFENDANT INFORMATION

| Date Of Birth: | ▇▇▇▇ | City/State/Zip: Williamsport, PA 17701 |
|---|---|---|

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Lopez, Anaise Margarita |

## BAIL INFORMATION

**Lopez, Anaise Margarita**                                                **Nebbia Status: None**

| Bail Action | Date | Bail Type | Originating Court | Percentage | Amount |
|---|---|---|---|---|---|
| Set | 08/31/2021 | Monetary | Magisterial District Court | | $25,000.00 |

| Surety Type | Surety Name | Posting Status | Posting Date | Security Type | Security Amt |
|---|---|---|---|---|---|
| Professional Surety | Eroh, Jonathan Keith | Posted | 09/01/2021 | Surety Bonds | $25,000.00 |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 3 | 3 | S | 18 § 2709 §§ A1 | Harassment - Subject Other to Physical Contact | 08/31/2021 | R 169852-4 |
| 4 | 4 | S | 18 § 5503 §§ A4 | Disorderly Conduct Hazardous/Physi Off | 08/31/2021 | R 169852-4 |
| 99,999 | 2 | M2 | 18 § 2701 §§ A1 | Simple Assault | 08/31/2021 | R 169852-4 |
| 99,999 | 1 | F2 | 18 § 2702 §§ A3 | Aggravated Assault - Attempts to cause or causes BI to designated individuals | 08/31/2021 | R 169852-4 |

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition |
|---|---|---|
| Sequence/Description | Offense Disposition | Grade | Section |
| Sentencing Judge | Sentence Date | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | Start Date |
| Sentence Conditions | | |

**Waived for Court (Lower Court)**          Defendant Was Present

| Lower Court Disposition | 09/30/2021 | Not Final | |
|---|---|---|---|
| 3 / Harassment - Subject Other to Physical Contact | Waived for Court (Lower Court) | S | 18 § 2709 §§ A1 |
| 99,999 / Aggravated Assault – Attempts to cause or causes BI to designated individuals | Waived for Court (Lower Court) | F2 | 18 § 2702 §§ A3 |
| 99,999 / Simple Assault | Waived for Court (Lower Court) | M2 | 18 § 2701 §§ A1 |

**Proceed to Court (Arraignment Waived)**          Defendant Was Not Present

| Information Filed | 08/03/2022 | Not Final | |
|---|---|---|---|
| 3 / Harassment - Subject Other to Physical Contact | Proceed to Court | S | 18 § 2709 §§ A1 |
| 4 / Disorderly Conduct Hazardous/Physi Off | Added by Information | S | 18 § 5503 §§ A4 |
| 99,999 / Aggravated Assault – Attempts to cause or causes BI to designated individuals | Withdrawn | F2 | 18 § 2702 §§ A3 |

CPCMS 9082                                                                                                         Printed: 04/02/2024

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF LYCOMING COUNTY

## DOCKET



**Docket Number: CP-41-CR-0001281-2021**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Anaise Margarita Lopez

Page 3 of 13

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition | | |
|---|---|---|---|---|
| Sequence/Description | Offense Disposition | Grade | Section | |
| Sentencing Judge | Sentence Date | Credit For Time Served | | |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | Start Date | | |
| Sentence Conditions | | | | |
| 99,999 / Simple Assault | Withdrawn | M2 | 18 § 2701 §§ A1 | |

**Guilty**

| | | | | |
|---|---|---|---|---|
| Trial | 08/03/2022 | Final Disposition | | |
| 3 / Harassment - Subject Other to Physical Contact | Guilty | S | 18 § 2709 §§ A1 | |
| Linhardt, Eric R. | 08/03/2022 | | | |
| Confinement | Min of 14.00 Days | 09/05/2022 | | |
| | Max of 14.00 Days | | | |
| | Other | | | |
| Linhardt, Eric R. | 01/03/2024 | 2 Days | | |
| Confinement | Min of 10.00 Days | 02/19/2024 | | |
| | Max of 10.00 Days | | | |
| | Other | | | |
| Work Release Authorized. | | | | |
| 4 / Disorderly Conduct Hazardous/Physi Off | Guilty | S | 18 § 5503 §§ A4 | |
| Linhardt, Eric R. | 08/03/2022 | | | |
| Confinement | Min of 14.00 Days | 09/05/2022 | | |
| | Max of 14.00 Days | | | |
| | Other | | | |
| Linhardt, Eric R. | 01/03/2024 | | | |
| Confinement | Min of 10.00 Days | 02/19/2024 | | |
| | Max of 10.00 Days | | | |
| | Other | | | |
| Work Release Authorized. | | | | |
| 99,999 / Aggravated Assault - Attempts to cause or causes BI to designated individuals | Withdrawn | F2 | 18 § 2702 §§ A3 | |
| Linhardt, Eric R. | 08/03/2022 | | | |
| Linhardt, Eric R. | 01/03/2024 | | | |
| 99,999 / Simple Assault | Withdrawn | M2 | 18 § 2701 §§ A1 | |
| Linhardt, Eric R. | 08/03/2022 | | | |
| Linhardt, Eric R. | 01/03/2024 | | | |

**LINKED SENTENCES:**

**Link 1**

CP-41-CR-0001281-2021 - Seq. No. 4 (18 § 5503 §§ A4) - Confinement is Consecutive to

CP-41-CR-0001281-2021 - Seq. No. 3 (18 § 2709 §§ A1) - Confinement

CPCMS 9082

Printed: 04/02/2024

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF LYCOMING COUNTY

## DOCKET



Docket Number: CP-41-CR-0001281-2021

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Anaise Margarita Lopez

Page 4 of 13

| COMMONWEALTH INFORMATION | | ATTORNEY INFORMATION | |
|---|---|---|---|
| Name: | Matthew Bernard Welickovitch | Name: | Kyle W. Rude |
| | District Attorney | | Private |
| Supreme Court No: | 320290 | Supreme Court No: | 069015 |
| Phone Number(s): | | Rep. Status: | Active |
| 570-327-2456 | (Phone) | Phone Number(s): | |
| Address: | | 570-321-7554 | (Phone) |
| Lycoming County District Attorney | | Address: | |
| 48 W Third St | | Schemery Zicolello Pc | |
| Williamsport, PA 17001 | | 333 Market St | |
| | | Williamsport, PA 17701-6329 | |
| Name: | K. Michael Sullivan | | |
| | Assistant District Attorney | Representing: Lopez, Anaise Margarita | |
| Supreme Court No: | 066309 | | |
| Phone Number(s): | | | |
| 570-327-2491 | (Phone) | | |
| Address: | | | |
| Lycoming County Da's Office | | | |
| 48 W Third St | | | |
| Williamsport, PA 17701 | | | |

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 08/31/2021 | | Biichle, Aaron S. |
| Bail Set - Lopez, Anaise Margarita | | | |
| 1 | 09/01/2021 | | Eroh, Jonathan Keith |
| Bail Posted - Lopez, Anaise Margarita | | | |
| 1/1 | 10/04/2021 | | MDJ-29-1-02 |
| Original Papers Received from Lower Court | | | |
| Sullivan, K. Michael | | | |
| 10/04/2021 | eService | | Served |
| 2/3 | 10/04/2021 | | MDJ-29-1-02 |
| Confidential Information Form | | | |
| Lepley, George Edward Jr. | | | |
| 10/04/2021 | eService | | Served |
| Sullivan, K. Michael | | | |
| 10/04/2021 | eService | | Served |
| 3/1 | 10/15/2021 | | Commonwealth of Pennsylvania |
| Information Filed | | | |

CPCMS 9082

Printed: 04/02/2024

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Case 4:23-cv-00036-1KM Document 6 Page 818 Filed Date Filed: 12/16/2024

# COURT OF COMMON PLEAS OF LYCOMING COUNTY

## DOCKET



Docket Number: CP-41-CR-0001281-2021

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Anaise Margarita Lopez

Page 5 of 13

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |
| Lepley, George Edward Jr. | | | |
| 10/15/2021 | eService | | Served |
| Sullivan, K. Michael | | | |
| 10/15/2021 | eService | | Served |
| | | | |
| 4/1 | 10/19/2021 | | Lepley, George Edward Jr. |
| Informal Request for Pre-Trial Discovery and Inspection | | | |
| Sullivan, K. Michael | | | |
| 10/20/2021 | eService | | Served |
| | | | |
| 5/2 | 10/19/2021 | | Lepley, George Edward Jr. |
| Waiver of Appearance at Arraignment | | | |
| Sullivan, K. Michael | | | |
| 10/20/2021 | eService | | Served |
| | | | |
| 6/1 | 10/26/2021 | | Lovecchio, Marc F. |
| Order Scheduling Guilty Plea/ARD | | | |
| Lepley, George Edward Jr. | | | |
| 10/27/2021 | eService | | Served |
| Sullivan, K. Michael | | | |
| 10/27/2021 | eService | | Served |
| | | | |
| 7/1 | 12/15/2021 | | Butts, Nancy L. |
| Pre-Trial Order of Court - Scheduled for Guilty Plea | | | |
| Lepley, George Edward Jr. | | | |
| 12/16/2021 | eService | | Served |
| Sullivan, K. Michael | | | |
| 12/16/2021 | eService | | Served |
| | | | |
| 8/1 | 12/21/2021 | | Brown, Kenneth D. |
| Pre-Trial Order of Court- Guilty Plea Scheduled | | | |
| Lepley, George Edward Jr. | | | |
| 12/22/2021 | eService | | Served |
| Sullivan, K. Michael | | | |
| 12/22/2021 | eService | | Served |

CPCMS 9082

Printed: 04/02/2024

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in  18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF LYCOMING COUNTY

## DOCKET



**Docket Number: CP-41-CR-0001281-2021**

## CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Anaise Margarita Lopez

Page 6 of 13

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |

| | | | |
|---|---|---|---|
| 9/1 | 01/04/2022 | | Brown, Kenneth D. |
| Amended Order Granting Motion for Continuance for Guilty Plea | | | |
| Lepley, George Edward Jr. | | | |
| 01/04/2022 | eService | | Served |
| Sullivan, K. Michael | | | |
| 01/04/2022 | eService | | Served |
| | | | |
| 10/1 | 03/01/2022 | | Brown, Kenneth D. |
| Court Ordered - Listed for Status - Pre-Trial Scheduled | | | |
| Lepley, George Edward Jr. | | | |
| 03/01/2022 | eService | | Served |
| Sullivan, K. Michael | | | |
| 03/01/2022 | eService | | Served |
| | | | |
| 11/1 | 06/15/2022 | | Butts, Nancy L. |
| Pre-Trial Order of Court - Schedule Non-Jury Trial | | | |
| Lepley, George Edward Jr. | | | |
| 06/15/2022 | eService | | Served |
| Sullivan, K. Michael | | | |
| 06/15/2022 | eService | | Served |
| | | | |
| 12/1 | 08/02/2022 | | Linhardt, Eric R. |
| Order Granting Motion for Continuance | | | |
| Lepley, George Edward Jr. | | | |
| 08/04/2022 | eService | | Served |
| Welickovitch, Matthew Bernard | | | |
| 08/04/2022 | eService | | Served |
| | | | |
| 13/1 | 08/03/2022 | | Gardner, Ryan C. |
| Information Filed (Arraignment Waived) | | | |
| Lepley, George Edward Jr. | | | |
| 08/03/2022 | eService | | Served |
| Welickovitch, Matthew Bernard | | | |
| 08/03/2022 | eService | | Served |
| | | | |
| 2 | 08/03/2022 | | Linhardt, Eric R. |
| Guilty | | | |

CPCMS 9082

Printed: 04/02/2024

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Case 4:23-28600-36 Doc 16 Page 819 Filed 04/05/14 Filed Date 12/16/2025

# COURT OF COMMON PLEAS OF LYCOMING COUNTY

## DOCKET



**Docket Number: CP-41-CR-0001281-2021**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Anaise Margarita Lopez

Page 7 of 13

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |

Lepley, George Edward Jr.

| 08/12/2022 | eService | | Served |
|---|---|---|---|

Welickovitch, Matthew Bernard

| 08/12/2022 | eService | | Served |
|---|---|---|---|

| 14/3 | 08/03/2022 | | Linhardt, Eric R. |
|---|---|---|---|

Order - Sentence/Penalty Imposed

Lepley, George Edward Jr.

| 08/12/2022 | eService | | Served |
|---|---|---|---|

Welickovitch, Matthew Bernard

| 08/12/2022 | eService | | Served |
|---|---|---|---|

| 1 | 08/12/2022 | | Court of Common Pleas - Lycoming County |
|---|---|---|---|
| | | | Heap, Thomas D. |

Itemized Account of Fines, Costs, Fees, and Restitution

| 2 | 08/12/2022 | | Court of Common Pleas - Lycoming County |
|---|---|---|---|

Penalty Assessed

| A/3 | 08/12/2022 | | Linhardt, Eric R. |
|---|---|---|---|

Transcript of Proceedings Held on August 3, 2022 - Summary Trial

Lepley, George Edward Jr.

| 08/16/2022 | eService | | Served |
|---|---|---|---|

Welickovitch, Matthew Bernard

| 08/16/2022 | eService | | Served |
|---|---|---|---|

| 15/1 | 08/22/2022 | | Lopez, Anaise Margarita |
|---|---|---|---|

Request for Transcripts

Lepley, George Edward Jr.

| 08/22/2022 | eService | | Served |
|---|---|---|---|

Welickovitch, Matthew Bernard

| 08/22/2022 | eService | | Served |
|---|---|---|---|

| B/1 | 08/29/2022 | | Linhardt, Eric R. |
|---|---|---|---|

Transcript of Proceedings Held on August 3, 2022 - Summary Trial

Lepley, George Edward Jr.

CPCMS 9082

Printed: 04/02/2024

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Case 4:23-cr-00036-LKU Document 16 Page 8:19 Filed Date Filed: 12/16/2025

# COURT OF COMMON PLEAS OF LYCOMING COUNTY

## DOCKET



Docket Number: CP-41-CR-0001281-2021

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Anaise Margarita Lopez

Page 8 of 13

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By | |
|---|---|---|---|---|
| Service To | | Service By | | |
| Issue Date | Service Type | Status Date | Service Status | |
| 08/29/2022 | eService | | Served | |
| Welickovitch, Matthew Bernard | | | | |
| 08/29/2022 | eService | | Served | |
| | | | | |
| 16/1 | 08/30/2022 | | Rude, Kyle W. | |
| Notice of Appeal to the Superior Court | | | | |
| Lepley, George Edward Jr. | | | | |
| 08/30/2022 | eService | | Served | |
| Welickovitch, Matthew Bernard | | | | |
| 08/30/2022 | eService | | Served | |
| Superior Court of Pennsylvania - Middle District | | | | |
| 08/30/2022 | Certified | 08/31/2022 | Accepted | |
| | | | | |
| 17/2 | 08/30/2022 | | Rude, Kyle W. | |
| Entry of Appearance | | | | |
| Lepley, George Edward Jr. | | | | |
| 08/30/2022 | eService | | Served | |
| Welickovitch, Matthew Bernard | | | | |
| 08/30/2022 | eService | | Served | |
| | | | | |
| 18/3 | 08/30/2022 | | Rude, Kyle W. | |
| Motion for Bail Pending Appeal | | | | |
| Lepley, George Edward Jr. | | | | |
| 08/31/2022 | eService | | Served | |
| Welickovitch, Matthew Bernard | | | | |
| 08/31/2022 | eService | | Served | |
| | | | | |
| 19/1 | 09/02/2022 | | Linhardt, Eric R. | |
| Concise Statement Order | | | | |
| Lepley, George Edward Jr. | | | | |
| 09/02/2022 | eService | | Served | |
| Welickovitch, Matthew Bernard | | | | |
| 09/02/2022 | eService | | Served | |
| | | | | |
| 1 | 09/06/2022 | | Superior Court of Pennsylvania - Middle District | |
| Docketing Statement from Superior Court - 1214 MDA 2022 | | | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in  18 Pa.C.S. Section 9183.

Appx566

# COURT OF COMMON PLEAS OF LYCOMING COUNTY

## DOCKET



**Docket Number: CP-41-CR-0001281-2021**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Anaise Margarita Lopez

Page 9 of 13

### ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |
| Lepley, George Edward Jr. | | | |
| 09/06/2022 | eService | | Served |
| Welickovitch, Matthew Bernard | | | |
| 09/06/2022 | eService | | Served |

| 20/2 | 09/06/2022 | | Linhardt, Eric R. |
|---|---|---|---|
| Order Granting Motion for Bail Pending Appeal | | | |
| Lepley, George Edward Jr. | | | |
| 09/08/2022 | eService | | Served |
| Welickovitch, Matthew Bernard | | | |
| 09/08/2022 | eService | | Served |

| 1 | 09/12/2022 | | Superior Court of Pennsylvania - Middle District |
|---|---|---|---|
| Docketing Statement from Superior Court | | | |
| Lepley, George Edward Jr. | | | |
| 09/12/2022 | eService | | Served |
| Welickovitch, Matthew Bernard | | | |
| 09/12/2022 | eService | | Served |

| 23/3 | 09/15/2022 | | Rude, Kyle W. |
|---|---|---|---|
| Concise Statement of the Matters Complained on Appeal | | | |
| Lepley, George Edward Jr. | | | |
| 09/15/2022 | eService | | Served |
| Welickovitch, Matthew Bernard | | | |
| 09/15/2022 | eService | | Served |

| 24/1 | 09/19/2022 | | Court of Common Pleas - Lycoming County |
|---|---|---|---|
| Sheriff's Return Filed | | | |
| Lepley, George Edward Jr. | | | |
| 09/20/2022 | eService | | Served |
| Welickovitch, Matthew Bernard | | | |
| 09/20/2022 | eService | | Served |

| 25/1 | 09/21/2022 | | Superior Court of Pennsylvania - Middle District |
|---|---|---|---|
| Superior Court Order - Correction of Sentence Date | | | |

CPCMS 9082

Printed: 04/02/2024

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in  18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF LYCOMING COUNTY

| DOCKET |
|:---:|



**Docket Number: CP-41-CR-0001281-2021**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Anaise Margarita Lopez

Page 10 of 13

| ENTRIES |
|:---:|

| Sequence Number | CP Filed Date | Document Date | Filed By | |
|---|---|---|---|---|
| Service To | | Service By | | |
| Issue Date | Service Type | Status Date | Service Status | |
| Lepley, George Edward Jr. | | | | |
| 09/21/2022 | eService | | Served | |
| Superior Court of Pennsylvania - Middle District | | | | |
| 09/21/2022 | Certified | | | |
| Welickovitch, Matthew Bernard | | | | |
| 09/21/2022 | eService | | Served | |
| | | | | |
| 26/1 | 10/25/2022 | | Linhardt, Eric R. | |
| Opinion Pursuant to PA Rule of Appellate Procedure 1925(a) | | | | |
| Lepley, George Edward Jr. | | | | |
| 10/25/2022 | eService | | Served | |
| Welickovitch, Matthew Bernard | | | | |
| 10/25/2022 | eService | | Served | |
| 1 | 10/26/2022 | | Heap, Thomas D. | |
| Certificate and Transmittal of Record to Appellate Court | | | | |
| Lepley, George Edward Jr. | | | | |
| 10/26/2022 | eService | | Served | |
| Welickovitch, Matthew Bernard | | | | |
| 10/26/2022 | eService | | Served | |
| 2 | 10/26/2022 | | Heap, Thomas D. | |
| Exit Case Documents to Superior Court | | | | |
| Lepley, George Edward Jr. | | | | |
| 10/26/2022 | eService | | Served | |
| Welickovitch, Matthew Bernard | | | | |
| 10/26/2022 | eService | | Served | |
| Superior Court of Pennsylvania - Middle District | | | | |
| 10/26/2022 | Certified | 10/31/2022 | Accepted | |
| 1 | 12/07/2022 | | Court of Common Pleas - Lycoming County | |
| Delinquency Notice Filed - 38 Days Overdue | | | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF LYCOMING COUNTY

## DOCKET



**Docket Number: CP-41-CR-0001281-2021**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Anaise Margarita Lopez

Page 11 of 13

### ENTRIES

| Sequence Number | CP Filed Date | Document Date | | Filed By |
|---|---|---|---|---|
| 1 | 01/11/2023 | | | Court of Common Pleas - Lycoming County |
| Delinquency Notice Filed - 73 Days Overdue | | | | |
| 1 | 08/03/2023 | | | Court of Common Pleas - Lycoming County |
| Delinquency Notice Filed - 277 Days Overdue | | | | |
| 1 | 09/07/2023 | | | Court of Common Pleas - Lycoming County |
| Delinquency Notice Filed - 312 Days Overdue | | | | |
| 1 | 11/09/2023 | | | Superior Court of Pennsylvania - Middle District |
| Certificate of Remittal/Remand of Record | | | | |
| Lepley, George Edward Jr. | | | | |
| 11/13/2023 | eService | | Served | |
| Welickovitch, Matthew Bernard | | | | |
| 11/13/2023 | eService | | Served | |
| 2 | 11/09/2023 | | | Superior Court of Pennsylvania - Middle District |
| Superior Court Decision - Remanded for Resentencing | | | | |
| 2 | 11/13/2023 | | | Linhardt, Eric R. |
| Order Scheduling Hearing | | | | |
| Lepley, George Edward Jr. | | | | |
| 11/14/2023 | eService | | Served | |
| Welickovitch, Matthew Bernard | | | | |
| 11/14/2023 | eService | | Served | |
| 1 | 12/19/2023 | | | Linhardt, Eric R. |
| Order Denying Motion for Continuance | | | | |
| Lepley, George Edward Jr. | | | | |
| 12/19/2023 | eService | | Served | |
| Welickovitch, Matthew Bernard | | | | |
| 12/19/2023 | eService | | Served | |
| 1 | 01/03/2024 | | | Linhardt, Eric R. |
| Order - Resentence/Penalty Imposed | | | | |
| Lepley, George Edward Jr. | | | | |

CPCMS 9082

Printed: 04/02/2024

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Case 4:25-2860364-JKM Document 16mer Page 195 led Date Filed: 12/16/2025 14

# COURT OF COMMON PLEAS OF LYCOMING COUNTY

## DOCKET



# CRIMINAL DOCKET
**Court Case**

Commonwealth of Pennsylvania

v.

Anaise Margarita Lopez

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By | |
|---|---|---|---|---|
| Service To | | Service By | | |
| Issue Date | Service Type | Status Date | Service Status | |
| 01/08/2024 | eService | | Served | |
| Welickovitch, Matthew Bernard | | | | |
| 01/08/2024 | eService | | Served | |
| | | | | |
| 1 | 01/11/2024 | | Linhardt, Eric R. | |
| Amended Sentencing Order | | | | |
| Lepley, George Edward Jr. | | | | |
| 01/11/2024 | eService | | Served | |
| Welickovitch, Matthew Bernard | | | | |
| 01/11/2024 | eService | | Served | |

## PAYMENT PLAN SUMMARY

| Payment Plan No | Payment Plan Freq. | Next Due Date | Active | Overdue Amt |
|---|---|---|---|---|
| Responsible Participant | | | Suspended | Next Due Amt |
| 41-2022-P000000659 | Monthly | 03/20/2024 | Yes | $50.00 |
| Lopez, Anaise Margarita | | | No | $50.00 |

| Payment Plan History: | Receipt Date | Payor Name | Participant Role | Amount |
|---|---|---|---|---|

---

Printed: 04/02/2024

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in  18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF LYCOMING COUNTY

## DOCKET



Docket Number: CP-41-CR-0001281-2021

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Anaise Margarita Lopez

Page 13 of 13

## CASE FINANCIAL INFORMATION

Last Payment Date: 11/07/2023      Total of Last Payment: -$76.00

| Lopez, Anaise Margarita<br>Defendant | Assessment | Payments | Adjustments | Non Monetary Payments | Balance |
|---|---|---|---|---|---|
| **Costs/Fees** | | | | | |
| ATJ | $6.00 | $0.00 | $0.00 | $0.00 | $6.00 |
| CJES | $2.50 | $0.00 | $0.00 | $0.00 | $2.50 |
| Commonwealth Cost - HB627 (Act 167 of 1992) | $9.40 | $0.00 | $0.00 | $0.00 | $9.40 |
| County Court Cost (Act 204 of 1976) | $34.70 | $0.00 | $0.00 | $0.00 | $34.70 |
| Crime Victims Compensation (Act 96 of 1984) | $35.00 | $0.00 | $0.00 | $0.00 | $35.00 |
| Domestic Violence Compensation (Act 44 of 1988) | $10.00 | $0.00 | $0.00 | $0.00 | $10.00 |
| JCPS | $21.25 | $0.00 | $0.00 | $0.00 | $21.25 |
| Judicial Computer Project | $8.00 | $0.00 | $0.00 | $0.00 | $8.00 |
| OAG - JCP | $2.50 | $0.00 | $0.00 | $0.00 | $2.50 |
| State Court Costs (Act 204 of 1976) | $9.40 | $0.00 | $0.00 | $0.00 | $9.40 |
| Victim Witness Service (Act 111 of 1998) | $25.00 | $0.00 | $0.00 | $0.00 | $25.00 |
| Clerk of Courts (7) (Lycoming) | $29.50 | $0.00 | $0.00 | $0.00 | $29.50 |
| Automation Fund (Lycoming) | $5.00 | $0.00 | $0.00 | $0.00 | $5.00 |
| Misc Copy Fee (Lycoming) | $0.50 | ($0.50) | $0.00 | $0.00 | $0.00 |
| Superior Court Appeal (Lycoming) | $76.00 | ($76.00) | $0.00 | $0.00 | $0.00 |
| Sheriff (9-83) (Lycoming) | $9.00 | $0.00 | $0.00 | $0.00 | $9.00 |
| DA Process Fee (Lycoming) | $15.40 | $0.00 | $0.00 | $0.00 | $15.40 |
| Drug Screens (Lycoming) | $15.00 | $0.00 | $0.00 | $0.00 | $15.00 |
| Costs/Fees Totals: | $314.15 | ($76.50) | $0.00 | $0.00 | $237.65 |
| Grand Totals: | $314.15 | ($76.50) | $0.00 | $0.00 | $237.65 |

** - Indicates assessment is subrogated

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in  18 Pa.C.S. Section 9183.

Appx571

**DEFENDANT CALVIN IRVIN'S APPENDIX IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT I

COMMONWEALTH OF
PENNSYLVANIA
COUNTY OF:LYCOMING

Magisterial District Number: 29-1-02
MDJ: Hon. AARON BIICHLE
Address: 48 W 3RD ST
WILLIAMSPORT, PA 17701
Telephone: (570)327-2275

# POLICE CRIMINAL COMPLAINT
## COMMONWEALTH OF PENNSYLVANIA
### VS.

DEFENDANT: *(NAME and ADDRESS):*

ANAISE          MARGARITA        LOPEZ
*First Name*      *Middle Name*      *Last Name*          *Gen.*

442 BROADWAY
EVERETT MASSACHUSETTS 02149

### NCIC Extradition Code Type

| | | | |
|---|---|---|---|
| ☐ 1-Felony Full | ☐ 5-Felony Pend. | ☐ C-Misdemeanor Surrounding States | ☐ Distance: ____ |
| ☒ 2-Felony Ltd. | ☐ 6-Felony Pend. Extradition Determ. | ☐ D-Misdemeanor No Extradition | |
| ☐ 3-Felony Surrounding States | ☐ A-Misdemeanor Full | ☐ E-Misdemeanor Pending | |
| ☐ 4-Felony No Ext. | ☐ B-Misdemeanor Limited | ☐ F-Misdemeanor Pending Extradition Determ. | |

### DEFENDANT IDENTIFICATION INFORMATION

| Docket Number | Date Filed | OTN/LiveScan Number | Complaint/Incident Number | Request Lab Services? |
|---|---|---|---|---|
| CR-296-21 | 08/31/2021 | R169852-4 | 21-08506 | ☐ YES ☒ NO |

| GENDER | DOB ▓▓▓▓ | POB PA | | Add'l DOB / / | Co-Defendant(s) ☐ |
|---|---|---|---|---|---|
| ☐ Male | First Name | Middle Name | Last Name | | Gen. |
| ☒ Female | AKA | | | | |

| RACE | ☒ White | ☐ Asian | ☐ Black | ☐ Native American | ☐ Unknown |
|---|---|---|---|---|---|
| ETHNICITY | ☒ Hispanic | ☐ Non-Hispanic | | ☐ Unknown | |

| HAIR COLOR | ☐ GRY (Gray) | ☐ RED (Red/Aubn.) | ☐ SDY (Sandy) | ☐ BLU (Blue) | ☐ PLE (Purple) | ☒ BRO (Brown) |
|---|---|---|---|---|---|---|
| | ☐ BLK (Black) | ☐ ONG (Orange) | ☐ WHI (White) | ☐ XXX (Unk./Bald) | ☐ GRN (Green) | ☐ PNK (Pink) |
| | ☒ BLN (Blonde / Strawberry) | | | | | |

| EYE COLOR | ☐ BLK (Black) | ☐ BLU (Blue) | ☒ BRO (Brown) | ☒ GRN (Green) | ☐ GRY (Gray) |
|---|---|---|---|---|---|
| | ☐ HAZ (Hazel) | ☐ MAR (Maroon) | ☐ PNK (Pink) | ☐ MUL (Multicolored) | ☐ XXX (Unknown) |

| DNA | ☐ YES ☒ NO | DNA Location | | WEIGHT (lbs.) |
|---|---|---|---|---|
| FBI Number | | MNU Number | | 140 |
| Defendant Fingerprinted | ☐ YES ☐ NO | | | Ft. HEIGHT In. |
| Fingerprint Classification: | | | | 5 | 2 |

### DEFENDANT VEHICLE INFORMATION

| Plate # | State | Hazmat ☐ | Registration Sticker (MM/YY) / | Comm'l Veh. Ind. ☐ | School Veh. ☐ | Oth. NCIC Veh. Code | Reg. same as Def. |
|---|---|---|---|---|---|---|---|
| VIN | | Year | Make | Model | Style | Color | ☐ |

Office of the attorney for the Commonwealth ☐ Approved ☐ Disapproved because:_____

(The attorney for the Commonwealth may require that the complaint, arrest warrant affidavit, or both be approved by the attorney for the Commonwealth prior to filing. See Pa.R.Crim.P. 507).

APPROVED VIA PHONE M. WADE _____    08/31/2021
(Name of the attorney for the Commonwealth)    (Signature of the attorney for the Commonwealth)    (Date)

I, PO GARDNER                                    #44291         RECEIVED
(Name of the Affiant)    (PSP/MPOETC -Assigned Affiant ID Number & Badge #)

of WILLIAMSPORT POLICE/NEU                       PA0410500       AUG 3 1 2021
(Identify Department or Agency Represented and Political Subdivision)    (Police Agency ORI Number)
do hereby state: (check appropriate box)                          BY:_____
1. ☒ I accuse the above named defendant who lives at the address set forth above
   ☐ I accuse the defendant whose name is unknown to me but who is described as _____

   ☐ I accuse the defendant whose name and popular designation or nickname are unknown to me and whom I have
   therefore designated as John Doe or Jane Doe
   with violating the penal laws of the Commonwealth of Pennsylvania at [301]    RAILWAY ST AND
WASHINGTON BLVD (TURKEY HILL PARKING LOT) WILLIAMSPORT PA 17701
   (Subdivision Code)    (Place-Political Subdivision)

   in LYCOMING County    [41]    on or about 8/31/2021
   (County Code)    (Offense Date)

AOPC 412A – Rev. 07/18                                           Page 1 of 34

# POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: 08/31/2021 | OTN/LiveScan Number | | Complaint/Incident Number 21-08506 |
|---|---|---|---|---|
| Defendant Name | First: ANAISE | Middle: MARGARITA | | Last: LOPEZ |

The acts committed by the accused are described below with each Act of Assembly or statute allegedly violated, if appropriate. When there is more than one offense, each offense should be numbered chronologically.

(Set forth a *brief* summary of the facts sufficient to advise the defendant of the nature of the offense(s) charged. A citation to the statute(s) allegedly violated, without more, is not sufficient. In a summary case, you must cite the specific section(s) and subsection(s) of the statute(s) or ordinance(s) allegedly violated.)

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|

| ☒ | 1 | 2702 | A3 | of the | 18 | 1 | F2 | | |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data (if applicable) | Accident Number | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): AGGRAVATED ASSAULT OF A POLICE OFFICER

Acts of the accused associated with this Offense: TO WIT: The defendant did kick PO GEARY of the WILLIAMSPORT POLICE two times. The first kick struck GEARY'S hand and the second struck his inner elbow.

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|

| ☐ | 2 | 2701 | A1 | of the | 18 | 1 | M2 | | |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data (if applicable) | Accident Number | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): SIMPLE ASSAULT

Acts of the accused associated with this Offense: TO WIT: The defendant did kick PO GEARY of the WILLIAMSPORT POLICE two times. The first kick struck GEARY'S hand and the second struck his inner elbow.

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|

| ☐ | 3 | 2709 | A1 | of the | 18 | 1 | SUM | | |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data (if applicable) | Accident Number | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): HARASSMENT

Acts of the accused associated with this Offense: TO WIT: The defendant did kick PO GEARY of the WILLIAMSPORT POLICE two times. The first kick struck GEARY'S hand and the second struck his inner elbow.

AOPC 412A – Rev. 07/18

Page 2 of 4

## POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: 08/31/2021 | OTN/LiveScan Number | | Complaint/Incident Number 21-08506 |
|---|---|---|---|---|
| Defendant Name | First: ANAISE | Middle: MARGARITA | | Last: LOPEZ |

The acts committed by the accused are described below with each Act of Assembly or statute allegedly violated, if appropriate. When there is more than one offense, each offense should be numbered chronologically.

(Set forth a *brief* summary of the facts sufficient to advise the defendant of the nature of the offense(s) charged. A citation to the statute(s) allegedly violated, without more, is not sufficient. In a summary case, you must cite the specific section(s) and subsection(s) of the statute(s) or ordinance(s) allegedly violated.)

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | Number of Victims Age 60 or Older _____ | | |
|---|---|---|---|---|---|---|

| ☐ | 4 | 5503 | A1 | of the | 18 | 1 | SUM | | |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data (if applicable) | Accident Number | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): DISORDERLY CONDUCT

Acts of the accused associated with this Offense: TO WIT: The defendant was screaming, making unreasonable noise, resisted arrest, and kicked an officer several times. As a result of this it causeed a disturbance in the parking lot which caused others to begin to yell at officers.

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | Number of Victims Age 60 or Older _____ | | |
|---|---|---|---|---|---|---|

| ☐ | 5 | 5104 | A | of the | 18 | 1 | M2 | | |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data (if applicable) | Accident Number | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): RESISTING ARREST

Acts of the accused associated with this Offense: TO WIT:The defendant would not allow officers to place her in the back of a patrol unit, and she had to be forced. The female kicked an officer several times after being placed in the back.

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | Number of Victims Age 60 or Older _____ | | |
|---|---|---|---|---|---|---|

| ☐ | | | | of the | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data (if applicable) | Accident Number | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance):

Acts of the accused associated with this Offense:

AOPC 412A – Rev. 07/18

Page 3 of 4

## POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed:<br>08/31/2021 | OTN/LiveScan Number | | Complaint/Incident Number<br>21-08506 |
|---|---|---|---|---|
| Defendant Name | First:<br>ANAISE | | Middle:<br>MARGARITA | Last:<br>LOPEZ |

2. I ask that a warrant of arrest or a summons be issued and that the defendant be required to answer the charges I have made.

3. I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 Pa.C.S. § 4904) relating to unsworn falsification to authorities.

4. This complaint consists of the preceding page(s) numbered 1 through 4.

5. I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

The acts committed by the accused, as listed and hereafter, were against the peace and dignity of the Commonwealth of Pennsylvania and were contrary to the Act(s) of the Assembly, or in violation of the statutes cited.
**(Before a warrant of arrest can be issued, an affidavit of probable cause must be completed, sworn to before the issuing authority, and attached.)**

AUG 31 _____ 2021 _____          _____
(Date)                            (Year)              (Signature of Affiant)

AND NOW, on this date _____8/31/2021_____ I certify that the complaint has been properly completed and verified.

An affidavit of probable cause must be completed before a warrant can be issued.

___29-1-02___          _____
(Magisterial District Court Number)        (Issuing Authority)

Appx576

## POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: 08/31/2021 | OTN/LiveScan Number | | Complaint/Incident Number |
|---|---|---|---|---|
| Defendant Name | First: ANNAISE | Middle: MARGARITA | | Last: LOPEZ |

## AFFIDAVIT of PROBABLE CAUSE

On 8/31/2021, DET IRVIN and I were on patrol in a marked police unit, and wearing marked police vests. While in the area of the TURKEY HILL on WASHINGTON BLVD we observed a black in color NISSAN ALTIMA bearing MASSACHUSETTS registration parked at the pumps. Two occupants, a white male and white female exited and went into the store. I parked the patrol unit as to not obstruct the vehicle's exit.

IRVIN and I had observed the vehicle earlier downtown, where the occupants made efforts to ignore our presence, and then observed it shortly after leaving a high narcotics trafficking area in the avenues. The vehicle did not appear to be overly personalized. We followed the vehicle and again the occuptants made clear efforts to act as tho the police were not following.The driver would occasionally look out his window as if looking in the distance, but was clearly checking for police presence. Once the vehicle parked and the two exited, we were directly behind them. They did not look in our direction once. I know from my experience that this TURKEY HILL is a high narcotics trafficking area.

Once I parked I exited the patrol vehicle and walked up to the sedan. I immediately detected the odor of marijuana emmitting from the vehicle. I observed in plain view a marijuana joint, and marjuana flakes in plain view in the vehicle. The female exited the store and immediately confronted us. I went into the store and the male threw his hands up and asked if I wanted to search him. I asked him to exit the store with me which he did.

I explained to the pair what I observed and I explained their options. Initially the female granted consent to search the car but then redacted after I asked the two for ID. IRVIN and I then handcuffed the two, and the female attempted to turn away. Once the two were handcuffed the female refused to listen to any orders, and tried to walk around and scream at officers. Once additional units arrived, PO GEARY and I attempted to place the female in the back of his patrol unit. She nearly had to be carried by GEARY and I to the patrol unit due to her resistance. The female planted her feet and pushed back into us. We had to force her into the back of the patrol unit.

I, PO GARDNER, BEING DULY SWORN ACCORDING TO THE LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

I CERTIFY THAT THIS FILING COMPLIES WITH THE PROVISIONS OF THE *CASE RECORDS PUBLIC ACCESS POLICY OF THE UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA THAT REQUIRE FILING* CONFIDENTIAL INFORMATION AND DOCUMENTS DIFFERENTLY THAN NON-CONFIDENTIAL INFORMATION AND DOCUMENTS.

_____
(Signature of Affiant)

Sworn to me and subscribed before me this **3 1** day of **August** **2021**

_____
Date                                   Magisterial District Judge

My commission expires  first Monday of January, **2021**

Appx577

 **POLICE CRIMINAL COMPLAINT**
AFFIDAVIT CONTINUATION PAGE

| Docket Number: | Date Filed: 8/31/2021 | OTN/LiveScan Number | Complaint/Incident Number 21-08506 |
|---|---|---|---|
| Defendant Name: | First: ANAISE | Middle: MARGARITA | Last: LOPEZ |

## AFFIDAVIT of PROBABLE CAUSE CONTINUATION

Once she was in the vehicle she kicked PO GEARY twice. The first kick struck PO GEARY in the left hand, and the second struck PO GEARY on the inner portion of his right arm near his elbow. Due to the females actions a car full of individuals at the pumps were clearly riled up, and one of the occupants continuously yelled at officers and had to be ordered to stop.

At WBP headquarters LOPEZ initially refused to ID herelf and made racist, and demeaning comments towards officers.

Based on the facts and circumstances stated above, I respectfully request that ANAISE MARGARITA LOPEZ be brought before the court to answer to these charges.

_____
(Signature of Affiant)

AOPC 411C – Rev. 07/10

Page 1 of 2

# Magisterial District Judge 29-1-02

## DOCKET TRANSCRIPT



Docket Number: MJ-29102-CR-0000296-2021

# Criminal Docket

Commonwealth of Pennsylvania
v.
Anaise Margarita Lopez

Page 1 of 2

### CASE INFORMATION

| | | | |
|---|---|---|---|
| Judge Assigned: | Magisterial District Judge Aaron S. Biichle | Issue Date: | 08/31/2021 |
| OTN: | R 169852-4 | File Date: | 08/31/2021 |
| Arresting Agency: | Williamsport City Police Dept | Arrest Date: | |
| Complaint No.: | 21-08506 | Incident No.: | |
| Disposition: | | Disposition Date: | |
| County: | Lycoming | Township: | Williamsport City |
| Case Status: | Active | | |

### STATUS INFORMATION

| Case Status | Status Date | Processing Status |
|---|---|---|
| Active | 08/31/2021 | Awaiting Preliminary Hearing |

### CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Preliminary Arraignment | 08/31/2021 | 3:55 pm | | Magisterial District Judge Aaron S. Biichle | Scheduled |
| Preliminary Hearing | 09/09/2021 | 1:45 pm | | Magisterial District Judge Aaron S. Biichle | Scheduled |

### CONFINEMENT

| Confinement Location | Confinement Type | Confinement Reason | Confinement Date | Confinement End Date |
|---|---|---|---|---|
| **Case Confinement** Lycoming County Prison | County Jail | Unable to Post Bail | 08/31/2021 | |

### DEFENDANT INFORMATION

| | | | |
|---|---|---|---|
| Name: | Lopez, Anaise Margarita | Sex: | Female |
| Date of Birth: | ▮▮▮▮▮▮▮ | Race: | White |
| Address(es): | | | |
| Home | | | |
| 442 Broadway Everett, MA 02149 | | | |

| | |
|---|---|
| Advised of His Right to Apply for Assignment of Counsel? | No |
| Public Defender Requested by the Defendant? | No |
| Application Provided for Appointment of Public Defender? | No |
| Has the Defendant Been Fingerprinted? | No |

MDJS 1200

Printed: 08/31/2021   4:27 pm

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assumes any liability for inaccurate or delayed data, errors or omissions on these docket sheets. Docket sheet information should not be used in place of a criminal history background check, which can only be provided by the Pennsylvania State Police. Employers who do not comply with the provisions of the Criminal History Record Information Act (18 Pa.C.S. Section 9101 et seq.) may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Appx579

# Magisterial District Judge 29-1-02

Docket Number: MJ-29102-CR-0000296-2021

## Criminal Docket

Commonwealth of Pennsylvania
v.
Anaise Margarita Lopez

Page 2 of 2



### CASE PARTICIPANTS

| Participant Type | Participant Name | OTN/LOTN | Docket Number | Was Sworn In? | Has Testified? |
|---|---|---|---|---|---|
| Prosecution | Commonwealth of Pennsylvania | | | | |
| Arresting Officer | Gardner, Clinton J. | | | | |
| Defendant | Lopez, Anaise Margarita | | | | |

### BAIL

**Bail Set:**                                                                                                **Nebbia Status: None**

| Bail Action Type | Bail Action Date | Bail Type | Percentage | Amount |
|---|---|---|---|---|
| Set | 08/31/2021 | Monetary | | $25,000.00 |

### CHARGES

| # | Charge | Grade | Description | Offense Dt. | Disposition |
|---|---|---|---|---|---|
| 1 | 18 § 2702 §§ A3 | F2 | Aggravated Assault - Attempts to cause or causes BI to designated individuals | 08/31/2021 | |
| 2 | 18 § 2701 §§ A1 | M2 | Simple Assault | 08/31/2021 | |
| 3 | 18 § 2709 §§ A1 | S | Harassment - Subject Other to Physical Contact | 08/31/2021 | |

### DOCKET ENTRY INFORMATION

| Filed Date | Entry | Filer | Applies To |
|---|---|---|---|
| 08/31/2021 | Commitment Printed - Unable to Post Bail | Magisterial District Court 29-1-02 | Anaise Margarita Lopez, Defendant |
| 08/31/2021 | Bail Set | Magisterial District Court 29-1-02 | Anaise Margarita Lopez, Defendant |
| 08/31/2021 | Preliminary Hearing Scheduled | Magisterial District Court 29-1-02 | Anaise Margarita Lopez, Defendant |
| 08/31/2021 | Preliminary Arraignment Scheduled | Magisterial District Court 29-1-02 | Anaise Margarita Lopez, Defendant |
| 08/31/2021 | Criminal Complaint Filed | Magisterial District Court 29-1-02 | |

August 31, 2021
Date

Magisterial District Judge Blichle

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assumes any liability for inaccurate or delayed data, errors or omissions on these docket sheets. Docket sheet information should not be used in place of a criminal history background check, which can only be provided by the Pennsylvania State Police. Employers who do not comply with the provisions of the Criminal History Record Information Act (18 Pa.C.S. Section 9101 et seq.) may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

**DEFENDANT CALVIN IRVIN'S APPENDIX IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT J

On August 31, 2021, I, Detective Calvin Irvin, was partnered with Williamsport Bureau of Police Officer Gardner. We were on patrol in an unmarked police vehicle and wearing marked police shirts.

We observed a black Nissan Altima with a Massachusetts registration in the area of 6th Avenue. This area is a high drug trafficking area. The driver and passenger intentionally did not look as us as we passed them. We then followed them to the area of the Turkey Hill, 700 Washington Boulevard, Williamsport. The vehicle parked at the southeast fuel pump. We pulled in and parked as not to obstruct the vehicle's exit. The male driver and female front seat passenger exited the vehicle and entered the store.

I stayed in the patrol car while Ofc. Gardner walked over to the black Nissan Altima. Ofc. Gardner informed me that he smelled the odor of marijuana coming from inside the vehicle and also observed a marijuana joint.

The female then exited the store and confronted us. Ofc. Gardner went inside to make contact with the male driver. The female then started walking to the store and I told her she could not go in and had to stay outside with me. The female then walked towards the black Nissan Altima. I told her that she was not allowed to go in the vehicle. I explained to her that there was marijuana in the vehicle and the she was under investigation.

Ofc. Gardner exited the store with the male, who had his hands placed behind the back of his head. Ofc. Gardner asked for consent to search the car. Initially consent was granted, but revoked after the two were asked for identification. They were both detained at approximately 13:50 hours. Ofc. Gardner asked that I search the male and place him in the rear of our patrol vehicle due to the female attempting to walk around and yelling at officers.

I spoke with the male in the rear of our patrol car. The male did give me his name, Kyle BEATTY. He said that his identification was inside his wallet. I retrieved his wallet that was placed inside the car by Ofc. Gardner. I noticed that his Pennsylvania Driver's License was a Limited License and required an ignition interlock. I heard BEATTY tapping on the window. He then said that he spoke to PennDOT and did not need an ignition interlock since PennDOT was so backed up.

While speaking to BEATTY, a female who was parked behind the black Nissan Altima became irate and was yelling at Officers. The female was then told to stop yelling and not to interject herself in things.

Ofc. Gardner informed me that the female identified as, Anaise LOPEZ, had kicked Ofc. Geary and that she was under arrest. LOPEZ was going to be transported to WBP Headquarters.

Ofc. Gardner and I did transport BEATTY to WBP Headquarters at approximately 14:09 hours. Upon arriving, BEATTY was strip searched and subsequently released. I did request his cell phone number so I could call him and inform him of the time of LOPEZ'S arraignment. BEATTY then left.

Ofc. Gardner did ask LOPEZ if she would be able to assure him that she would not hit him if she would be un-cuffed for fingerprinting purposes. LOPEZ could not guarantee that. LOPEZ was not fingerprinted.

| Signature of Reporting Officer | Badge # | Date | Supervisor | Date | Reviewed By | Date |
|---|---|---|---|---|---|---|
|  | 509 | 9/9/2021 |  |  |  | 09/09/21 |

| Case Status | | | | |
|---|---|---|---|---|
| ☐ Complete   ☐ Active   ☐ Arrest Cleared | | | | Page 1 of 2 |
| ☐ Unfounded   ☐ Inactive   ☐ Exceptionally Cleared | | | | |

Prison.

A body camera was utilized during this interaction and was downloaded into the Axon Evidence system.

Nothing further.

[ATTACHMENTS – CFS REPORT]

| Signature of Reporting Officer | Badge # | Date | Supervisor | Date | Reviewed By | Date |
|---|---|---|---|---|---|---|
| | 509 | 9/9/2021 | | | | 09/09/21 |
| **Case Status** | | | | | Page 2 of 2 | |
| ☑ Complete ☐ Active ☐ Arrest Cleared | | | | | | |
| ☐ Unfounded ☐ Inactive ☐ Exceptionally Cleared | | | | | | |

**DEFENDANT CALVIN IRVIN'S APPENDIX IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# <u>EXHIBIT K</u>

## Supplement

PO Z Geary Tue Aug 31 15:04:15 EDT 2021

I responded to the above area for officer requesting assistance with a male and female who were subject of an investigation. Upon arrival PO Gardner and Det. Irvin had each in custody. I observed the female, later identified as Anaise Lopez, standing at the front of her vehicle in handcuffs. PO Gardner was standing in front of her attempting to communicate with her. Lopez was screaming about wanting a female officer. Lopez never stopped screaming while I was on scene and Gardner requested she be put in my unit (65) for transport.

PO Gardner asked her to walk to my car and she refused. I grabbed her right arm and PO Gardner her left arm. Lopez was nearly carried with little assistance from her to my unit. Once at the car Gardner opened the back door so she could be placed in. Lopez braced against the car and attempted to push back against officers. Lopez stated that she would not go in the car. Lopez was picked up and put into the car butt first. Lopez leaned back and began bicycle kicking at myself and officer Gardner. She did land one kick on my left hand / fingers area. Another kick hit me in the right arm in the area of my inner elbow region and pinned my arm against the C pillar. I only received redness on the inner portion of my arm as a result of the kick. During her kicks she lost both of her shoes (Crocs). She kicked at officers approx. 6 or more times.

Lopez was transported on recording back to City Hall for processing. PO Gardner did author charges and arraigned Lopez.

I had no further involvement.

10/18/21



JOANNE C. LUDWIKOWSKI
ANN S. PEPPERMAN
BRIAN J. BLUTH
J. MICHAEL WILEY
AUSTIN WHITE
CHRISTOPHER H. KENYON
ELIZABETH A. WHITE
HON. MARC F. LOVECCHIO (RET.)
WILLIAM E. BANEY
STEPHEN C. HARTLEY

# McCORMICK
## LAW FIRM

835 West Fourth Street
Williamsport, PA 17701
(570) 326-5131 • (570) 326-5529 fax
www.mcclaw.com

SINCE 1862

OF COUNSEL:

J. DAVID SMITH

HON. E. EUGENE YAW
PA SENATE

C. EDWARD S. MITCHELL

GARY L. WEBER

N. RANDALL SEES

RICHARD F. SCHLUTER
RETIRED

EMILIE P. ERTEL
BUSINESS MANAGER

**FILED
WILLIAMSPORT**

APR 0 5 2024

EA

DEPUTY CLERK

***VIA HAND-DELIVERY***
Clerk of Court
U.S. District Court
Middle District of Pennsylvania
Herman T. Schneebeli Federal Bldg. & U.S. Courthouse
240 West Third Street
Suite 218
Williamsport, PA 17701

**RE:   Kyle Beatty v. Clinton Gardner, *et al.*
U.S. District Court, MDPA Docket No. 4:23-CV-00364-JKM**

Dear Clerk of Court:

On this date Defendant Calvin Irvin filed, by and through his attorneys, a Motion for Summary Judgment (Doc. 26), a Statement of Material Facts Not In Dispute (Doc.27), and an Appendix in Support of Motion for Summary Judgment with Exhibits (Doc.28, 1-11), in the above referenced matter.

Defendant Irvin's Appendix in Support of Motion for Summary Judgment includes as Exhibit A *Defendant Calvin Irvin's Axon_Body_3_Video_2021-08-31_1348_X60A0485A & Axon_Body_3_Video_2021-08 31_1413_X60A0485A* videos; and as Exhibit B *Defendant Clinton Gardner's Axon_Body_3_Video_2021-08-31_1355_X60A09928 & Axon_Body_3_Video_2021-08-31_1402_X60A09928* of the August 31, 2021 incident between Plaintiff Beatty and Defendants.

Enclosed, pursuant to the Clerk's direction, are two (2) thumb drives containing true and correct copies of Exhibit A and Exhibit B videos.

If you should have any questions concerning the enclosed, please contact me at your convenience.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KYLE BEATTY            :      NO.   4:23-CV-00364

                         :

v.                    :      JUDGE MUNLEY

                         :

CLINTON GARDNER and    :      CIVIL ACTION - LAW
CALVIN IRVIN            :      JURY TRIAL DEMANDED

## <u>COUNTER STATEMENT OF FACTS—MSJ of GARDNER</u>

1.     Admitted

2.     Admitted.

3.     Admitted that the vehicle was registered to Anaise Lopez, a Massachusetts resident.   <u>Exhibit B, at 8:14-20</u>.

4.     Denied.    The vehicle was owned by Anaise Lopez and was personalized to her individual tastes, which included but is not limited to a rosary displayed from the rear-view mirror, which is evident upon sight of the vehicle.   <u>Exhibit A (videos)</u>.

5.     Admitted.    Plaintiff and his girlfriend were running errands in Williamsport and had stopped at a local politician's office and at a dress shop.   <u>Exhibit B, at 10:20-24, 17:10-18:23</u>.

6.     Denied.    Plaintiff was standing outside the vehicle waiting for his girlfriend when the Defendant police officers drove by, and Plaintiff made eye contact with them.   <u>Exhibit B, at 11:13-12:13</u>.    Later while police were following Plaintiff's car,

1

Defendant Irvin noticed Plaintiff and Ms. Lopez looking back at them in the mirrors of the car.   Exhibit D, at 10:13-18.

7.      Denied.   Plaintiff and Ms. Lopez were never seen leaving a high narcotics trafficking area.   Rather, they left the dress shop and drove west on 4th Street towards Newberry to get lunch when they decided to go east where food options were more varied.   So, they turned right and drove to High Street, turned right on High Street and drove east.   Exhibit B, at 12:24-14:2.   The "avenues" are public roads, with public traffic on them, and the Defendants did not observe Plaintiff's vehicle do anything but drive within all bounds of the law.   Exhibit D, at 38:7-19.

8.      Denied.   Plaintiff observed the officers pull up to a stop sign on High Street traveling in the opposite direction from Plaintiff, let Plaintiff's vehicle pass them, and then do a U-turn, following his vehicle for a number of blocks before Plaintiff turned into the Turkey Hill convenience store on Washington Boulevard and parked at the fuel pumps to buy gas, snacks, and drinks.   Exhibit B, at 14:9-16:17, 19:10-20:4. Plaintiff committed no vehicle code violations or other criminal conduct while police were following him.   Exhibit C, at 12: 16-20; Exhibit D, at 10:19-11:3.

9.      Admitted.

10.      Admitted.

2

11.     Admitted.    By way of further answer, Plaintiff and his girlfriend entered the convenience store to buy gas, snacks, and drinks.    Exhibit B, at 19:10-20:4.

12.     Admitted.

13.     Denied.    Plaintiff and his girlfriend entered the convenience store to buy gas, snacks, and drinks.    At no time prior to Plaintiff and his girlfriend entering the convenience store did police attempt to interact with them.    Exhibit B, at 19:10-20:4, 20:11-18.

14.     Denied.    The police officers were well aware that the Turkey Hill is a convenience store where people routinely, day after day, hour after hour, stop to buy gas, snacks, and drinks, just as Plaintiff and his girlfriend did on that date.    Exhibit C, at 37:17-38:2; Exhibit D, at 31:23-32:6; Exhibit G, at 9:11-15.

15.     Admitted.

16.     Denied.    There was no marijuana, marijuana joint, marijuana flakes, paraphernalia, or other drugs or residue within the vehicle, no marijuana had been smoked in the vehicle, and no "odor of marijuana coming from the vehicle."    Exhibit A (videos); Exhibit B, at 25:11-27:1; Exhibit C, at 38:3-6, 43:19-44:4; Exhibit F (Receipt Inventory of Property Seized).    Additionally, police officer Tyson Minier, who was allegedly shown the alleged marijuana joint and flakes was unable to confirm ever seeing them.    Exhibit G, at 8:10-9:7.

3

17.     Denied.    There was no marijuana, marijuana joint, marijuana flakes, paraphernalia, or other drugs or residue within the vehicle, no marijuana had been smoked in the vehicle, and no "odor of marijuana coming from the vehicle."    Exhibit A (videos); Exhibit B, at 25:11-27:1; Exhibit C, at 38:3-6, 43:19-44:4; Exhibit F (Receipt Inventory of Property Seized).    Additionally, police officer Tyson Minier, who was allegedly shown the alleged marijuana joint and flakes was unable to confirm ever seeing them.    Exhibit G, at 8:10-9:7.

18.     Denied.    There was no marijuana, marijuana joint, marijuana flakes, paraphernalia, or other drugs or residue within the vehicle, no marijuana had been smoked in the vehicle, and no "odor of marijuana coming from the vehicle."    Exhibit A (videos); Exhibit B, at 25:11-27:1; Exhibit C, at 38:3-6, 43:19-44:4; Exhibit F (Receipt Inventory of Property Seized).    Additionally, police officer Tyson Minier, who was allegedly shown the alleged marijuana joint and flakes was unable to confirm ever seeing them.    Exhibit G, at 8:10-9:7.

19.     Denied.    There was no marijuana, marijuana joint, marijuana flakes, paraphernalia, or other drugs or residue within the vehicle, no marijuana had been smoked in the vehicle, and no "odor of marijuana coming from the vehicle."    Exhibit A (videos); Exhibit B, at 25:11-27:1; Exhibit C, at 38:3-6, 43:19-44:4; Exhibit F (Receipt Inventory of Property Seized). Additionally, police officer Tyson Minier,

4

who was allegedly shown the alleged marijuana joint and flakes was unable to confirm ever seeing them.   Exhibit G, at 8:10-9:7. By way of further answer, on body cam videos, Officer Gardner clearly reached his head, his arm and hand, and his illuminated flashlight into the vehicle through the open window on a number of occasions in an attempt to illuminate the interior of the vehicle in order to be able to see into it.   Exhibit A (videos), video 1, at 19-22; video 2, at 1:00-1:08; video 3, at :17-20, 8:40-8:46.

20.     Denied.   There was no marijuana, marijuana joint, marijuana flakes, paraphernalia, or other drugs or residue within the vehicle, no marijuana had been smoked in the vehicle, and no "odor of marijuana coming from the vehicle."   Exhibit A (videos); Exhibit B, at 25:11-27:1; Exhibit C, at 38:3-6, 43:19-44:4; Exhibit F (Receipt Inventory of Property Seized).    Additionally, police officer Tyson Minier, who was allegedly shown the alleged marijuana joint and flakes was unable to confirm ever seeing them.   Exhibit G, at 8:10-9:7.

21.     Admitted that Gardner seized Plaintiff in the convenience store as he approached counter to check out and searched Plaintiff, informing him that he was to come out and "chat" with him.   Exhibit A (videos), video 1, at 0:40-1:20.   Gardner and Irvin had already seized Plaintiff's girlfriend outside the store near the car as she exited the store.   Exhibit A (videos), video 1, at 0:30- 0:40, video 3, at 0:30-0:52.

Appx591

22. Denied. Plaintiff exited the store as instructed by Gardner, but when Plaintiff attempted to stop and ask why he was being held, Gardner placed his hand on Plaintiff, and instructed him "over here" motioning him over to the car where Plaintiff's girlfriend was also being held. Exhibit A (videos).

23. Admitted that Plaintiff's girlfriend indicated officers could search the vehicle while they were being held in the absence of reasonable suspicion or probable cause. Exhibit A (videos). Plaintiff and his girlfriend again reiterated to the officers that there was no marijuana, roach, or other drug paraphernalia in the vehicle. Exhibit A (videos).

24. Admitted only that Plaintiff suggested to his girlfriend that she revoke consent to the search, because they had done nothing wrong and were being treated as someone who had. Exhibit A (videos); Exhibit B, at 115:10-19.

25. Denied. In response to being told to identify himself, Plaintiff simply stated. "I'm not under arrest," and immediately thereafter was arrested and handcuffed by the Defendants. Exhibit A (videos).

26. This concerns an individual other than Plaintiff, but to the extent a response is deemed required, it is denied. Ms. Lopez was asserting her rights after being arrested without justification, and the police officers became angry with that. Exhibit A (videos), video 1, at 4:42-4:46.

6

27.     This concerns an individual other than Plaintiff, but to the extent a response is deemed required, it is denied.    Ms. Lopez was asserting her rights after being arrested without justification, and the police officers became angry with that.    Exhibit A (videos), video 1, at 4:42-4:46.

28.     This concerns an individual other than Plaintiff, but to the extent a response is deemed required, it is denied.    Ms. Lopez repeatedly denied any contraband being in the vehicle, until she misspoke in this one incident immediately after being illegally handcuffed and arrested.    Exhibit A (videos), video 1, at 0:30-1:40, 1:44-1:50, 2:30-2:40, video 3, at 0:30-1:25, 2:33-2:48, 3:00-3:16.    Plaintiff repeatedly denied any drugs or paraphernalia being in the vehicle. Exhibit A (videos), video 3, at 4:11-4:26, 4:50-4:54, 6:18-6:39, 8:55-9:00.    And in fact, no contraband was in the vehicle. Exhibit A (videos); Exhibit B, at 25:11-27:1; Exhibit C, at 38:3-6, 43:19-44:4; Exhibit F (Receipt Inventory of Property Seized).

29.     Denied.    Plaintiff cooperated at all times.    Exhibit A (videos). Detective Irvin in fact stated to Plaintiff "It's not you.    You're being cool, okay?" as he was arresting Plaintiff and placing him in the police vehicle.    Exhibit A (videos) video 3, at 4:00-4:05.

30.     Denied.    Plaintiff was searched again by Irvin at Gardner's instruction and placed in the car in retaliation for asking the police officers to stop touching his

7

Appx593

girlfriend and for commenting to Gardner, "You're real tough" in a conversational tone, after Gardner pushed Plaintiff who was still handcuffed back onto the hood of the car.    Exhibit A (videos) video 1, at 3:35-4:30, video 3, at 3:30-4:30.

31.    This concerns an individual other than Plaintiff, but to the extent a response is deemed required, it is denied.    Gardner and another police officer dragged Ms. Lopez to the car by her handcuffed arms despite her offer to walk on her own and threw her bodily into the vehicle.    Exhibit A (videos), video 1, at 5:25-5:40, video 3, at 5:20-5:35.

32.    This concerns an individual other than Plaintiff, but to the extent a response is deemed required, it is denied.    Gardner and another police officer dragged Ms. Lopez to the car by her handcuffed arms despite her offer to walk on her own and threw her bodily into the vehicle.    Exhibit A (videos), video 1, at 5:25-5:40, video 3, at 5:20-5:35.

33.    This concerns an individual other than Plaintiff, but to the extent a response is deemed required, it is denied.    Gardner and another police officer dragged Ms. Lopez to the car by her handcuffed arms despite her offer to walk on her own and threw her bodily into the vehicle.    Exhibit A (videos), video 1, at 5:25-5:40, video 3, at 5:20-5:35.

8

34. This concerns an individual other than Plaintiff, but to the extent a response is deemed required, it is denied. After being thrown bodily into the vehicle, to demonstrate her frustration with how she was being treated, Ms. Lopez kicked in the direction of the door, and the officer responded by saying "Oh. agg. assault. Thank you." Exhibit A (videos) video 1, at 5:40-5:43.

35. Denied. After Ms. Lopez was being transported from the scene and while Plaintiff was still handcuffed and inside the police car, and police were waiting for a tow truck to arrive, a woman, who was pumping gas, said "Officers, can you help me. My daughter has been missing for a month." And she asked them why they were not looking for her daughter who had been missing for a month. Defendant Gardner immediately threatened to arrest her for "obstruction" for "interfering in my investigation". Exhibit A (videos), video 1, at 6:40-7:15; Exhibit C, at 26:6-29:21. Defendants did not bother to get this woman's identification or contact information despite her having witnessed this police interaction involving Plaintiff and Ms. Lopez. Exhibit C, at 26:6- 29:21.

36. Denied. Plaintiff and Ms. Lopez were handcuffed at the time that backup was called, and were engaging in no criminal activity. Exhibit A (videos).

37. This concerns an individual other than Plaintiff, but it is important to note that neither Ms. Lopez nor Plaintiff was ever charged with any drug related offenses

9

as a result of this interaction and no "illegal narcotics, and related packaging materials, scales, means of ingestion, and measuring devices. Specifically, marijuana and marijuana related paraphernalia" was ever seized from the vehicle after it was searched at the police impound lot.  Exhibit A (videos); Exhibit B, at 25:11-27:1; Exhibit C, at 38:3-6, 43:19-44:4; Exhibit F (Receipt Inventory of Property Seized), Exhibit E, (Application for Search Warrant).   Additionally, police officer Tyson Minier, who was allegedly shown the alleged marijuana joint and flakes was unable to confirm ever seeing them.  Exhibit G, at 8:10-9:7.

38.      Admitted.  Exhibit B, at 54:17-55:18.   However, Defendants only discovered this fact after Plaintiff had been arrested and placed into the police car. Exhibit A (videos), video 3, at 14:45-15:35. They did not know the identity of Plaintiff until after he had been arrested and placed in the police car.   Exhibit A (videos), video 3, at 4:30-4:42.

39.   Admitted.

40.   Admitted.

41.   Admitted.

42.   Admitted.   That Plaintiff was transported to the Williamsport Bureau of Police Department at City Hall and held there, while handcuffed, until Defendants subjected him to a humiliating and invasive strip search in violation of his

10

constitutional rights and in violation of the Williamsport Bureau of Police strip search policy. Exhibit A (videos), video 4; Exhibit H (Strip Search Policy).

43.     Denied.    The strip search was done without reasonable suspicion or probable cause and in violation of the Plaintiff's constitutional rights and Williamsport police policy and was done to retaliate against his First Amendment protected speech. Exhibit A (videos), video 4; Exhibit B, at 38:-40:10, 40:13-47:8; Exhibit H (Strip Search Policy).

44.     Admitted.    Plaintiff had no contraband nor did the vehicle.    Exhibit F.

45.     Admitted that Plaintiff was released some time after the strip search.

46.     Admitted.    By way of further answer, neither Ms. Lopez nor Plaintiff was ever charged with any drug related offenses as a result of this interaction and no "illegal narcotics, and related packaging materials, scales, means of ingestion, and measuring devices. Specifically, marijuana and marijuana related paraphernalia" was ever seized from the vehicle after it was searched at the police impound lot.    Exhibit A (videos); Exhibit B, at 25:11-27:1; Exhibit F (Receipt Inventory of Property Seized), Exhibit E, (Application for Search Warrant).

47.     Admitted.    The "items to be searched for and seized" were specifically listed as "any and all illegal narcotics, and related packaging material, scales, means

11

of ingestion and measuring devices. Specifically, marijuana and marijuana related paraphernalia." Exhibit E, (Application for Search Warrant).

48. Admitted. By way of further answer, there was no marijuana, marijuana joint, marijuana flakes, paraphernalia, or other drugs or residue within the vehicle, no marijuana had been smoked in the vehicle, and no "odor of marijuana coming from the vehicle." Exhibit A (videos); Exhibit B, at 25:11-27:1; Exhibit F (Receipt Inventory of Property Seized). Additionally, police officer Tyson Minier, who was allegedly shown the alleged marijuana joint and flakes was unable to confirm ever seeing them. Exhibit G, at 8:10-9:7.

49. Denied. there was no marijuana, marijuana joint, marijuana flakes, paraphernalia, or other drugs or residue within the vehicle, no marijuana had been smoked in the vehicle, and no "odor of marijuana coming from the vehicle." Exhibit A (videos); Exhibit B, at 25:11-27:1; Exhibit F (Receipt Inventory of Property Seized). Additionally, police officer Tyson Minier, who was allegedly shown the alleged marijuana joint and flakes was unable to confirm ever seeing them. Exhibit G, at 8:10-9:7. Defendant Gardner's self-serving testimony is entitled to no weight, whether at summary judgment or at trial.

50. This concerns an individual other than Plaintiff and is completely irrelevant and scandalous to the present matter, but to the extent a response is deemed required, it is admitted.

51. This concerns an individual other than Plaintiff and is completely irrelevant and scandalous to the present matter and should be disregarded and stricken, but to the extent a response is deemed required, it is admitted.

52. This concerns an individual other than Plaintiff and is completely irrelevant and scandalous to the present matter and should be disregarded and stricken, but to the extent a response is deemed required, it is admitted.

53. This concerns an individual other than Plaintiff and is completely irrelevant and scandalous to the present matter and should be disregarded and stricken, but to the extent a response is deemed required, it is admitted. Notably, the defense did not present any evidence at that hearing.

54. This concerns an individual other than Plaintiff and is completely irrelevant and scandalous to the present matter and should be disregarded and stricken, but to the extent a response is deemed required, it is admitted.

55. Denied.   Plaintiff also objects in that the proffered document is a self-serving and unsworn document containing hearsay and should be excluded on this basis from any consideration by the Court under Rule 56 (c)(2).

13

**SCHEMERY ZICOLELLO**


By: /s/*Joshua J. Cochran*
Joshua J. Cochran
ID No. 206807
Attorney for Plaintiff
333 Market Street
Williamsport, PA 17701
Phone: (570) 321-7554
Email: josh@sz-law.com

14

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

KYLE BEATTY     :  NO. 4:23-CV-00364
            :
v.          :  JUDGE MUNLEY
            :
CLINTON GARDNER and  :  CIVIL ACTION - LAW
CALVIN IRVIN     :  JURY TRIAL DEMANDED

**CERTIFICATE OF SERVICE**

Joshua J. Cochran certifies that Plaintiff's Counter Statement of Facts – MSJ of Gardner has been served upon the following individual and in the manner indicated below on this 25th day of April 2024:

VIA ELECTRONIC FILING

Shawna Laughlin, Esquire
William J. Ferren & Associates
slaughli@travelers.com
*Attorney for Defendant Clinton Gardner*

Austin White, Esquire
Stephen Hartley, Esquire
McCormick Law Firm
awhite@mcclaw.com
shartley@mcclaw.com
*Attorneys for Defendant Calvin Irvin*

**SCHEMERY ZICOLELLO**

By: /s/*Joshua J. Cochran*
   Joshua J. Cochran
   ID No. 206807
   Attorney for Plaintiff
   333 Market Street
   Williamsport, PA 17701
   Phone: (570) 321-7554
   Email: josh@sz-law.com

15

# IN THE UNITED STATES DISTRICT COURT

# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KYLE BEATTY | : | NO. 4:23-CV-00364 |
| | : | |
| v. | : | JUDGE MUNLEY |
| | : | |
| CLINTON GARDNER and | : | CIVIL ACTION - LAW |
| CALVIN IRVIN | : | JURY TRIAL DEMANDED |

## PLAINTIFF'S OPPOSITION TO DEFENDANT GARDNER'S SUMMARY JUDGMENT EXHIBIT LIST

Exhibit "A"      Videos

1. Gardner 1.mp4
2. Gardner 2.mp4
3. Irvin 1.mp4
4. Irvin 2.mp4
5. Gardner 3.mp4

*True and correct copies of Exhibit "A" videos are being provided by two thumb drives delivered to the Clerk of U.S. District Court, Middle District of Pennsylvania, Williamsport Location.*

Exhibit "B"      Transcript of Deposition of Kyle Beatty

Exhibit "C"      Transcript of Deposition of Clinton Gardner

Exhibit "D"      Transcript of Deposition of Calvin Irvin

Exhibit "E"      Warrant/Affidavit of Probable Cause

Exhibit "F"      Receipt Inventory of Property Seized

Exhibit "G"      Transcript of Deposition of Tyson Minier

Exhibit "H"      Application for Search Warrant

Exhibit "I"      Strip Search Policy of Williamsport

Exhibit "J"          Ignition Interlock Letter

# EXHIBIT A

1. Gardner 1.mp4
2. Gardner 2.mp4
3. Irvin 1.mp4
4. Irvin 2.mp4
5. Gardner 3.mp4

*True and correct copies of Exhibit "A" videos are being provided by two thumb drives delivered to the Clerk of U.S. District Court, Middle District of Pennsylvania, Williamsport Location.*

Case 4:25-cv-00364-DCK Document 116-1 Filed 04/25/24 Page 6 of 22

# EXHIBIT B

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KYLE BEATTY,                         :
                    Plaintiff
                                     :

        vs.                          :   NO. 4:23-CV-00364

                                     :

CLINTON GARDNER and CALVIN
IRVIN,                               :
                    Defendants
                                     :


        Deposition of:  KYLE BEATTY

        Taken by       :  Defendant Irvin

        Before         :  Loretta C. Berrigan
                          Reporter-Notary Public

        Beginning      :  January 22, 2024; 11:23 a.m.

        Place          :  Schemery Zicolello
                          333 Market Street
                          Williamsport, Pennsylvania


COUNSEL PRESENT:

    JOSHUA J. COCHRAN, ESQUIRE
    Schemery Zicolello
    333 Market Street
    Williamsport, Pennsylvania  17701
        For - Plaintiff

    AUSTIN WHITE, ESQUIRE
    McCormick Law Firm
    835 West Fourth Street
    Williamsport, Pennsylvania  17701
        For - Defendant Calvin Irvin

    SHAWNA LAUGHLIN, ESQUIRE
    William J. Ferren & Associates
    PO Box 2903
    Hartford Connecticut  06104
        For - Defendant Clinton Gardner

ERVIN BLANK ASSOCIATES, INC.

```
                        INDEX TO WITNESSES

FOR - DEFENDANTS            DIRECT    CROSS    REDIRECT    RECROSS

Kyle Beatty                    3        90        124        --
```

```
                        INDEX TO EXHIBITS

FOR - DEFENDANT                             MARKED    ADMITTED

Deposition Exhibit Beatty No. 1               27         --

Deposition Exhibit Beatty No. 2               66         --
```

ERVIN BLANK ASSOCIATES, INC.

3

                        STIPULATION

        It is hereby stipulated by and between

counsel for the respective parties that signing,

sealing, certification and filing are hereby waived;

and that all objections except as to the form of the

question are reserved to the time of trial.


                    *       *       *



        KYLE BEATTY, called as a witness, having been

duly sworn or affirmed, testified as follows:

                    DIRECT EXAMINATION

BY MR. WHITE:

    Q    Mr. Beatty, my name is Austin White.  I'm

here representing Detective Irvin.  You've sat through

the depositions of Detective Irvin, Officer Minier and

Officer Gardner already today, correct?

    A    Yes.

    Q    You understand as far as how this dialogue is

going to work as far as us not talking over each other

and that we're just here to ask you questions?

    A    Yes.

    Q    And you're doing great so far.  I'm going to

start with some background information just so I

understand a little bit more about you, your

ERVIN BLANK ASSOCIATES, INC.

Appx608

4

background, and then we're going to move into the events of August 31st, 2021. Can you state your full name, date of birth, and current address.

A Kyle Beatty. 05/02/1986. 921 Westminster Drive, Apartment 2A, Williamsport, Pennsylvania 17701.

Q And do you have a middle name or initial?

A Yes. My middle name is Thomas.

Q What is your education history?

A Completed high school and some college. No degree.

Q Which high school?

A Well, I -- in 11th grade I took a GED test and scored high enough to get my high school diploma. But I was enrolled at Bishop Neumann in Williamsport.

Q And where did you go to college for a little bit?

A Penn College.

Q What did you study?

A Business management. General studies the first few.

Q What was the last year you were in school at Penn College?

A To the best of my recollection, 2012 maybe.

Q You didn't graduate with any type of degree or certificate?

5

A    No.

Q    Tell me about your employment over the last, let's say, ten years.

A    The last ten years.  For the last eight years I've been a manager at a local restaurant.  In the two, well you said the last ten years so it would only include two more.  But for four years previous to that I worked at Penn College as an assistant chef.

Q    Which restaurant have you been a manager at?

A    Perkins in Williamsport.

Q    And are you still the manager there?

A    Yes.

Q    Have you been the manager there for the last eight years or did you work your way up to that position?

A    I was hired as a manager.  I cooked there a long time ago, years and years before that.  Before Penn College.

Q    And what did you do at Penn College when you worked there?

A    I started out as just a regular cook and was -- applied and promoted to assistant chef there.

Q    So in 2021 -- on August 31st, 2021, you were -- your employment was manager at Perkins in Williamsport?

ERVIN BLANK ASSOCIATES, INC.

6

A    Yes.

Q    Did you have a set shift during that time frame?

A    To the best of my recollection, yes.

Q    Tell me, what was that shift?

A    I usually worked five 10-hour days.  And I believe they were -- I believe it was Wednesday through Sunday or maybe it was Thursday through Monday.  It was either one of those.  I kind of switched back and forth between those two.

Q    What were those hours those 10-hour shifts?

A    So usually there's kind of like -- I'm not the only manager there, there's multiple managers there.  There's usually -- they have like, an opener, a mid, and a closer.  I was usually the closer at that time.  It's a 10-hour shift.  You usually come in around noon or one, and you stay 'til close.

Q    What time's close?

A    Close at that time, I think was twelve and one.  It's not those hours anymore.  They close a lot earlier since COVID happened and things like that.

Q    Now when you use the term manager, is that like the store manager or is that an assistant manager or a particular type of --

A    So the title is manager, but if you ask me

7

it's more just like a supervisor.  There's a general manager who I would say is actually the manager.  I mean he has to do with, you know, the payroll and everything else.  I'm kind of just the manager on duty.  When I'm there I supervise, but I don't have to do with the full scope of the restaurant.

Q    So you report to the general manager?

A    Yes.

Q    And then you have how many people reporting to you?

A    I mean, everybody else in the restaurant. The only person that the managers report to is the general manager, and then, you know, the regional manager I would say, outside the building.

Q    So August 31st of 2021, do you remember what day of the week that was?

A    I -- to the best of my recollection I think it was a Tuesday.

Q    It was a Tuesday.

A    Okay.

Q    And so would you have been off that day?

A    I was off that day, I do remember that.

Q    Did you work Monday?

A    I can't recall at this time.  It was so long ago.

ERVIN BLANK ASSOCIATES, INC.

Appx612

8

Q    Did you usually work the weekends?

A    Every -- yeah, always.  Unless I requested off, I was always scheduled on weekends.

Q    So would it be fair to estimate that the weekend prior, the 28th and the 29th, you would have worked?

A    Yes.

Q    And you think you worked the 30th?

A    I'm not sure.

Q    Not sure.  Tell me, how do you know Ms. Lopez?

A    We met, I think it was about two years prior to this incident happening.

Q    Is she from around here?

A    No, she is not.

Q    Is she from Massachusetts?

A    She was actually originally born in Reading, Pennsylvania.  And then when she was younger she moved to Boston, Massachusetts, and I'm pretty sure she has resided there most of her life.

Q    Does she live here now?

A    Yes.

Q    Does she live with you?

A    Yes.

Q    Did you two live together on August 31st,

ERVIN BLANK ASSOCIATES, INC.

9

2021?

A   Yes.

Q   How long before that had you moved in together?

A   She had really only moved down here for maybe a month or two prior to that.  We were kind of still in the slowly-moving process, you know.  We had the majority of her stuff but she was still going back to Boston to, you know, finish some things and see friends and, you know, before she officially became Pennsylvania.

Q   And how long did you know her before August 31st, 2021?

A   Like I said, I believe it was about two years.  I believe.

Q   And you two were dating at that time?

A   Yeah, we've dated on and off for that two-year period.

Q   Is she in school or anything?  At that time, 2021.

A   No.

Q   So if I ask you a question, unless I specify another time frame, you can safely assume I'm talking about the day --

A   That time.

ERVIN BLANK ASSOCIATES, INC.

Q    -- August 31st of 2021.  So what were you doing, to the best of your recollection, that day before the incident at Turkey Hill?  Run me through your whole day to the best that you can recall.

A    I believe we woke up, and it was my day off. Just got food and were hanging out around the house. We decided to go run errands and in the midst of running errands this is what happened.

Q    What time did you wake up?

A    I don't recall.

Q    Did you have a certain time that you usually woke up on your days off?  I know some people are a creature of habit.

A    I typically wake up in the am before nine or ten.  I sometimes wake up at six or seven, eight. Usually that time in the morning.

Q    So you said you were running errands.  What errands do you recall running that day prior to arriving at Turkey Hill?

A    I know we were downtown.  We stopped at the -- I can't remember if it's the state representative or the county commissioner's office. There was a dress shop that had just opened up on, I believe 3rd or 4th.  We stopped there, she went in and looked and we got in the car.  We started driving

11

towards the Newberry area, thinking about getting food at this point. And then we realized that a lot of the food is more towards the Strip, the other way. So we started to turn around to go the other way and that's when the incident occurred.

Q So I think you heard some testimony about Officer Gardner and Detective Irvin seeing the vehicle you were in driving around town. Do you recall seeing the police cruiser that Officer Gardner and Detective Irvin were in?

A Yes.

Q Tell me what you recall.

A Specifically when we were at the dress shop downtown, we were parked right in front. I believe it's meter parking and she went inside. I got out of the car and stood next to the car because I didn't want to go in the dress shop. And she wasn't going to be long. I didn't want to pay for the meter because I knew we were leaving. So I just said, I'm just going to stand by the car. If somebody comes I'll just move the car. And that's when they drove by and that was the first time I saw them.

Q So you saw them drive by either 3rd or 4th Street?

A Yeah. They drove right by us. They drove by

12

really slow.  They were really -- we made eye contact.

Q    Is that the first time you saw them?

A    That's the first time I saw them, yes.

Q    Were you familiar with either of those law enforcement officers before you saw them that day?

A    Never seen them before.

Q    What did you -- did you have a concern when you saw them at that time?

A    No.  I just looked at them.  They were looking at me and I looked at them.

Q    What happened next?

A    I stood by the car.  They drove by.  They stopped at the light and then they kept driving.

Q    Do you remember what time this was at?

A    I don't recall.  I know it was in the afternoon.  It was sunny.  It was a nice day.  It was my day off.

Q    So what happened after Ms. Lopez -- I'm assuming Ms. Lopez then came out of the dress shop or did you go in?

A    She came out eventually.

Q    So she came out of the dress shop and then where did you go?

A    We got in the car and started -- it's a one-way street there.  I always get 3rd and 4th messed

13

up.  I think that's 4th, going towards Newberry.  And so we got in the car.  It's a one-way street, we started driving and we were just talking.  How'd you like the shop, you want to get some food.  This and that kind of stuff.

Q  And you were heading down 4th Street towards Newberry.  Where did you go exactly?

A  Just driving down 4th and like I said, we were talking about food and we, you know, we go to a lot of the same places.  We always try to go somewhere different.  We were discussing that kind of thing.  You know, it's always a long process to decide where to eat.  And I think I was the first one to say, you know, we're going -- all the food is that way.  We got to turn around and there's nothing really in Newberry to eat but like, some sub shops or something.  So, you know, I can't do a U-turn, it's a one-way road.

So I took a right and started going that way towards High Street because High Street will run us all the way back towards, you know, the other way, rather than jumping on, I think 3rd, going left.  I would have had to go down and got on 3rd and it would have been a one-way all the way back.  So I just -- I don't know, I wasn't thinking.  It really didn't matter whether to go left or right, we were just going

ERVIN BLANK ASSOCIATES, INC.

14

back.  So I just went right and went that way to turn around to get over there on High Street.

Q   Did you and Ms. Lopez decide on where you were going to get food at that time?

A   No, I just think we were just -- just head towards the Strip, you know, where all the food's kind of at and we'll figure it out when we get there kind of thing.

Q   At some point while driving after the dress shop did you see the police cruiser again?

A   Yes.

Q   Tell me what you saw.

A   So after I took the right on, I believe it was Sixth Street, because at the end of Sixth and High there's a gas station and that's how I remember what street we were on.  That's the only reason.  We pulled up to a stop sign and they pulled up to the stop sign across from us.  They weren't behind us.  They were across from us.

Q   What do you remember?

A   They stopped at the stop sign, I stopped at the stop sign.  I, you know, went to stop at the stop sign, one, two, three, and then you start going straight.  They didn't go right away.  They sat there for a second and let us pass them.  Once we passed

15

them, they did a U-turn and pulled up behind me.

Q    Did that get -- were you concerned about that?

A    Anaise had said something to me about it when they did it and I said, I mean, we'll be fine, there's nothing -- we don't got anything, we didn't do anything.  You know, they're just driving around, I don't know what they're looking for.  We'll be all right.  So I just kept driving.

Q    They follow you then?

A    They followed us for, I don't know the exact amount of blocks but it was, you know, I would guesstimate from -- I don't know the exact amount of blocks.  It was quite a long time, yes.

Q    And at some point did they stop following you?

A    No.

Q    So where did you go?

A    To the gas station.

Q    The Turkey Hill?

A    Yes.

Q    On Washington Boulevard?

A    Yes.

Q    Do you remember the route that you took to get there?

ERVIN BLANK ASSOCIATES, INC.

16

A    Yes.

Q    What was it?

A    So when I got to Sixth and High they were already behind me.  They did the U-turn and pulled up right behind me at the stop sign.  I took a right on Sixth and High and drove all the way down High Street to -- I don't know what that road is.  I don't know what the road is, but High Street comes to a dead end there at that road.  I can't remember the name of it. You take a quick right and a left onto, I believe it's Seventh Ave.  Seventh Ave only goes for about a block 'til you hit Market Street.

I took a left onto Market Street for half of a block, to a stop sign.  Took a right onto Washington Boulevard.  And then I drove one, two, three, four, five, six, I think, city blocks before I pulled over at the gas station.

Q    Did you drive Ms. Lopez's car to the dress shop?

A    I don't recall.

Q    Do you recall if she drove at all that morning or were you the only person driving?

A    I don't recall.

Q    But you were driving from the dress shop --

A    Yes.  Yep.  Sorry.

ERVIN BLANK ASSOCIATES, INC.

17

Q   No, that's okay.  We've gone through a few depositions so I should probably -- we want to make sure that even though you know what I'm about to ask you, you just want to give it a second just so that the court reporter can take it down.  It's very easy to get casual and then we start talking over each other.  And I'll do the same thing.  If I see you're continuing, I'll try to make sure you're done before I go.

You mentioned also something about a state representative office or county.  Can you tell me, what's that about?

A   We -- I think it was towards the end of COVID and the DMV was really backed up.  And I was just having a hard process with getting things done there. And somebody had told me to reach out to my state representative, or maybe it was the commissioner.  And I was trying to do things like that.  I had already went back and forth with him a couple times.

Q   Do you recall actually going into the state representative's office?

A   Yeah, I really went there that day.

Q   Do you know who's -- what representative that was?

A   I don't remember his name, no, because I only

ERVIN BLANK ASSOCIATES, INC.

spoke with his secretary that day.

Q    So you went in to -- or, you physically went to the state representative's office and went in the office?

A    I went to the office and I went in the office, yes.

Q    Did Ms. Lopez go in with you?

A    No, she did not.

Q    What was that conversation that you had at the state representative's office?

A    I don't recall the exact -- what the meeting was about.  It wasn't the first meeting that I had had there.

Q    How long were you there?

A    It was just a few minutes.  It was brief.

Q    And was that before the dress shop?

A    That was before the dress shop.

Q    So did you go straight from the state representative's office to the dress shop?

A    Yes.

Q    Did you stop anywhere else before the state representative's office?

A    No.

Q    Why did you stop at the Turkey Hill?

A    I believe I had mentioned to Anaise that the

police had been following us for a very long time and I started feeling uncomfortable.  And I just wanted to stop to see like, if -- are they -- like coming -- just to see what would happen, you know.  We needed gas anyway so I was just like, let's just get it and get these guys -- see what's going on.

Q   So when you pulled into the Turkey Hill they were still behind you?

A   Yes.

Q   And so were you seeing -- were you checking to see if they would pull into the gas station after you?

A   No, we needed gas anyway.

Q   So you pull into the Turkey Hill, to the gas pump.  Did you actually pump gas?

A   I did not.  I never made it that far.

Q   So you pull in, you park next to the pump, right?

A   Yes.

Q   What was your intent when you pulled into that spot?

A   To pump gas.

Q   So you were going to pay at the pump or pay inside?

A   Pay inside.

20

Q    Were you doing that -- or were you trying to do that when Officer Gardner came in?

A    Yeah.  I had snacks and a drink in my hand as well.

Q    So you were going to pay cash or card?

A    I don't recall what I was going to pay with.

Q    So you get into -- you come to the Turkey Hill.  Did you say anything to Ms. Lopez about the police following you when you pulled in?

A    I don't think so, no.

Q    Walk me through what you did from the moment you pulled in to when you first encountered either of the law enforcement officers.

A    Pulled into the gas pump.  Turned the car off.  Got out of the car.  Walked into the store. Grabbed a snack and a drink.  I was standing in the line and somebody who looked like a SWAT team member came in with his hand on his gun right up to me.

Q    What was your thought at that moment?

A    I put my hands up.  I was kind of afraid.

Q    Why did you put your hands up?

A    You know, there was a lot of things going on in the news at that time, you know, with police brutality and you know, defund the police, and a lot of things like that.  And it just was a real tense

21

time with police interaction and he didn't look like a police officer to me. He looked like an Army soldier.

Q Because he was wearing a vest?

A He looked very tactical, yeah. He had a lot of tactical gear on. He had some kind of like, stuff on.

Q Did you see Officer Gardner or Detective Irvin looking into the vehicle from inside the store or outside the store?

A From inside the store.

Q So you're inside the store. Were you looking out the window watching the vehicle?

A No.

Q When did you first notice that they were -- that Gardner was approaching you?

A When I was standing in the line.

Q So as far as anything that they did while walking around the vehicle, you didn't personally observe any of that? In the beginning.

A When Anaise and I were standing in line I don't know what officer it was, but he started walking up to the car and looking around. And that's when Anaise said, I'm going to go outside and see what he wants. And that's when she went outside.

Q Let me make the question a little bit better

22

because it was a pretty bad question. So you're inside the store. Ms. Lopez is inside the store. Before Officer Gardner walked into the store, did you observe anything that they were doing outside?

A    Yes.

Q    What did you observe?

A    I saw an officer walk up to the car and walk around the car, looking in the car.

Q    And was that the same officer who then walked into the store or did the other officer?

A    I don't recall.

Q    Did you have any concerns that they were looking at the car?

A    No.

Q    Did Ms. Lopez say anything to you about the officer looking in the car or around the car, or did she not observe the same thing?

A    She said she was going to go outside and see what they were -- they wanted or were doing.

Q    You said you were buying water and a snack?

A    I believe it was a soda.

Q    Anything else?

A    No.

Q    So we have the body cam footage, and so I'm not going to get too deep into asking you every detail

of what happened.  But can you explain to me, you know, to the best of your recollection, what occurred after Gardner came up to you and you put your hands up?

A    I believe I was forced to come outside.  They asked if they could search the car.  Originally we had said yes because we just wanted to just go about our day.  And I believe it was Gardner, was just being very harassing and provoking and we just felt harassed and intimidated.  And I believe that's when one of us decided that we didn't want them to search the car. We just didn't want to cooperate anymore.

We started cooperating because we just were like, just let them do whatever they want, there's nothing wrong.  And then he just became kind of a jerk and we were just like, this is crazy, we just feel harassed.  We just don't want to participate in this any longer.

Q    What was he doing that was harassing?

A    Just his actions, his language.  I can't recall the exact things, but I just felt very uncomfortable and harassed and intimidated.

Q    So they told -- one of them said something about there being a roach in the car, right?

A    At some point somebody said that, yes.

ERVIN BLANK ASSOCIATES, INC.

Q   Was there a roach in the car?

A   No.

Q   So you're saying Officer Gardner didn't see a roach?

A   That's what I'm saying.

Q   What do you think he saw?

A   I don't know.  I can't speculate what somebody else might have saw.

Q   So Officer Gardner testified that there was some shake on the floor of the vehicle.  Was there shake on the floor of the vehicle?

A   No.

Q   Was there an ashtray in the driver's side door?

A   Yes.

Q   What was in that ashtray, if anything?

A   I do not know.  It's not my car.

Q   You were driving it though, right?

A   That was the first time I've driven that car in days I believe.

Q   Do you have your own vehicle?

A   No.

Q   Did you smoke cigarettes in August 31 of 2021?

A   Me?

Q    Yeah.

A    No.

Q    Did you smoke marijuana around that time?

A    No.

Q    Have you ever smoked marijuana?

A    Yes.

Q    All right.  When was the last time you smoked marijuana?

A    To the best of my recollection, two months ago.

Q    In August of 2021, on that day, August 31st, 2021, did you smoke any marijuana that day?

A    No.

Q    Did Ms. Lopez smoke any marijuana that day?

A    To the best of my recollection, no.

Q    Well you were in the vehicle with her from --

A    You mean in the vehicle in front of me?

Q    Well hold on.  I'll break the question down a little bit so you can be sure about what you're answering.  So you were -- you drove with her from the dress store to the Washington Boulevard Turkey Hill, right?

A    Correct.

Q    Did either of you smoke any marijuana in the car during that trip?

26

A    No.

Q    Did either of you smoke any marijuana in that vehicle at any time that morning?

A    No.

Q    Did either of you smoke any marijuana in that vehicle at any time in the preceding week?

A    No.

Q    So when Offer Gardner testified that he smelled -- that he observed the odor of marijuana coming from the vehicle, you're saying he's not telling the truth?

A    Correct.

Q    So when Officer Gardner testified that he observed a roach in the driver's side ashtray, you're saying -- it's your testimony that he's not telling the truth?

A    Correct.

Q    So when Officer Gardner testified that he saw marijuana shake on the floor in the vehicle, it's your testimony that he's not telling the truth?

A    Correct.

Q    So when Officer Gardner testified that he observed several other marijuana roaches in the vehicle during the search, it's your testimony that he's not telling the truth?

ERVIN BLANK ASSOCIATES, INC.

27

A    Correct.

Q    I have a packet here of exhibits that are stamped for Mr. Beatty's deposition.

A    Yes, sir.

MR. WHITE:  We'll just mark this whole thing as Beatty 1.

(Whereupon, a document was produced and marked as Deposition Exhibit Beatty No. 1 for identification.)

BY MR. WHITE:

Q    It's stamped at the bottom with a 001, and it's documentation that has already been exchanged in discovery so it's nothing new.  Mr. Beatty, you've seen this document that starts on 001.  It's the complaint you filed in federal court in this case.  Do you recognize it?

A    Yes.

Q    I'm going to ask you some questions about some of the allegations in this, and I'll refer to the page number and then the paragraph so it's somewhat easy to follow along.  The second page, Paragraph 8, alleges that, among other things, Gardner reached through the open window and down into the space between the seat and the steering wheel with his flashlight in order to illuminate the interior of the

28

vehicle so he could see inside it.  Did you personally observe Defendant Gardner doing that from anywhere that you were at the Turkey Hill gas station?

A    I saw him walking around the car, looking in the car, yes.

Q    But did you see him reaching through the open window down into the space between the seat and steering wheel with his flashlight?

A    Do you mean do I remember it from the video or did I physically see --

Q    That's exactly the question -- you're explaining it better than I could have asked the question.  Do you remember that happening because is this -- I guess, let me rephrase this.  Is this allegation here because you observed it when you were inside Turkey Hill or outside Turkey Hill, or because you saw it on the video?

A    I saw him.  I saw him reach -- go -- lean his head down.  Did I see him cross the plane of the window with my eyes?  To the best of my recollection, no.

Q    So the -- Paragraphs 10 and 12 on that same page reference a roach and weed in the car, and marijuana in the car.  It's your testimony that there was no marijuana in the car?

ERVIN BLANK ASSOCIATES, INC.

29

A    True.

Q    Did Ms. Lopez smoke marijuana from time to time around August 31st, 2021?

A    Are you asking me did she smoke on the 31st or are you asking me if she smoked from time to time?

Q    I mean, I'm not asking you specifically if she smoked on the 31st, but let's say during the month of August.  Was she a marijuana smoker in your observation?

A    Yes, she has smoked marijuana before.

Q    Is it possible that there -- well actually, let me rephrase that.  If you observed her smoking marijuana, how would she smoke marijuana?  If you can recall back in around this time frame.

A    With a pipe.

Q    Around this time frame how would you have smoked marijuana, if you smoked marijuana?

A    With a pipe.

Q    Did you ever roll a joint?

A    No, I don't like -- the tobacco makes me -- I'm not a tobacco fan.

Q    Well I didn't say anything about tobacco.  I mean did you ever take a rolling paper and roll a joint?

A    No.  I don't roll.

30

Q    How about rolling a marijuana cigarette with some other type of material?

A    No.  I can't even do it.

Q    Could Ms. Lopez do it?

A    I have seen her do it in the past, yeah.

Q    On the next page, Page 3, Paragraph 19.  And if you need to take a break at any point, just let me know because I don't know how long we've been going. So Page 3 in 19 -- Paragraph 19 -- it says, in retaliation for his First Amendment speech and in the absence of probable cause and reasonable suspicion, Defendants immediately arrested Plaintiff by seizing him physically and handcuffing him.  Did I read that correctly?

A    I believe so.

Q    What was the First Amendment speech that the officers retaliated against you for?

A    I don't recall the exact words.

Q    Was there something specific that Detective Irvin did to you in retaliation for something you said?

A    They arrested me.

Q    Well I know you're saying they because there's two of them.  But I mean --

A    Detective Irvin was the one that put the

ERVIN BLANK ASSOCIATES, INC.

handcuffs on me.

Q    All right.  Well how about Officer Gardner, what specifically did he do that was in retaliation for your First Amendment speech?

A    He ordered Detective Irvin to put the handcuffs on me.

Q    And you say here, absence of probable cause and reasonable suspicion.  Is that because it's your testimony that there was no marijuana in the car?

A    Yes.  And the fact that there was no traffic stop.  There was no crime committed.  I was never charged with a crime at all.

Q    So if Detective Gardner did in fact see marijuana in your car, don't you think he had a reason to stop you?

MR. COCHRAN:  Objection to form, but you can answer if you understand.

THE WITNESS:  No.

BY MR. WHITE:

Q    So if he observed marijuana in your car, you're saying he had no right to detain you?

A    He wouldn't have saw -- he stopped me before he would have saw it.  How does that make sense.

Q    Well you said you saw him walking around the car from inside --

ERVIN BLANK ASSOCIATES, INC.

32

A    He had followed me for ten blocks before that.

Q    Well he didn't stop you, right?

A    I feel like I was stopped.

Q    When did he stop you?

A    When we pulled into that gas station we were being harassed at that time.  I was already feeling harassed from that moment.

Q    Because they were following you?

A    They had been follow -- yeah.  They had been following me for many, many blocks without me committing any type of crime or doing anything wrong.

Q    You made the choice to pull into the Turkey Hill, right?

A    Correct.

Q    They didn't pull you over and force you into the Turkey Hill?

A    No, I wasn't forced.

Q    And they didn't block your car when they pulled in, did they?

A    I couldn't go back.  I could go straight, but I couldn't go back.

Q    How were they harassing you when they were -- by following you?

A    I just felt intimidated.

ERVIN BLANK ASSOCIATES, INC.

Q    Were they following you closely?

A    Yes.

Q    And you don't feel that law enforcement should be able to follow someone?

A    I think if somebody did a crime, yeah, they should definitely, you know, do their due diligence.

Q    If you could go to Page 4.  At 27 it says, Defendant Irving seized Plaintiff forcefully and slammed him face first on the hood of the car, conducting a second and invasive search of his person, including reaching into his pockets and groin area, and seizing all possessions on his person.  Is that your words, forcefully and slammed --

A    Yes.  Yes.  He did that.

Q    Did you say anything to him at the time?

A    I told him, I believe I said, I'm not resisting.

Q    So how was the -- you used the word invasive search.  How was that invasive, reaching into your pockets and groin area and seizing all possessions on his person?  Unless something else happened.

A    I mean, when you touch someone's groin area you kind of rub their private parts.  That was invasive to me.

Q    Have you ever been arrested before and patted

34

down, Mr. Beatty?  Prior to this incident.

A    Yes.

Q    Was there anything unusual about the way that Defendant Irvin conducted this, your word, search?

A    I have never been slammed on the hood of a car like that before.

Q    Well other than the slamming on the car, which is your word --

A    Yes.

Q    -- as far as how he searched you after he turned you around or slammed you, was there anything unusual about that search?

A    Yes, he was aggressive.

Q    How was he aggressive?

A    He -- pushing, shoving, poking.

Q    All right.  So I think you talked a little bit about when Defendant Gardner -- or when Officer Gardner came into the Turkey Hill.  You put your hands up, went outside.  We have right now that we just covered a little bit, as far as him putting you in the car and patting you down or searching you.  What else do you recall happened after that?  From your own recollection, not from -- to the best you can -- watching the video.

A    What I recall from the point that I was

ERVIN BLANK ASSOCIATES, INC.

35

handcuffed?

Q    Yes.

A    It was kind of a whirlwind of people just arguing and talking and trying to deescalate the situation between the arguing parties.  I was placed -- I was removed from the hood and separated from Anaise and placed in the back of the cruiser.

Q    Do you recall talking with Detective Irvin while you were in the back of the cruiser?

A    Yes.

Q    What do you remember about that conversation?

A    To the best of my knowledge, I remembered it was just about -- just a lot more calm conversation. He seemed to be more calm when he wasn't around Gardner.

Q    What was going through your head at that point when you were in the back of the police cruiser?

A    Just a lot of different things.  I didn't understand what was going on.  I was scared, you know. Afraid.

Q    Well what were you afraid of?

A    What could happen.  Anything could happen.

Q    Well you're in the -- let's talk about that a little bit.  You've been to that Turkey Hill before?

A    Yeah.

ERVIN BLANK ASSOCIATES, INC.

36

Q    It's the middle of the day, right?

A    Yeah.

Q    There's people outside?

A    Yeah.

Q    What were you concerned was going to happen?

A    I mean, they could -- anything could happen. It could have went -- you saw what happened. You know, it went from a conversation to a whole -- them twisting it into a fight, you know, somebody could have got hurt even worse, you know. Like they -- they're out of control a little bit, you know. With everything going on in the media, you know, I was thinking more this -- somebody could get slammed on the ground. Somebody could get hurt or they could shoot on of us. Who knows what could happen.

Q    You were already cuffed at this point?

A    Yeah.

Q    And you're in the back of the cruiser?

A    Yeah.

Q    And you were concerned that someone could get shot?

A    Yeah, because Anaise was out there and that's basically what happened. They separated me from her so they could do -- so they could do what they did to her.

ERVIN BLANK ASSOCIATES, INC.

37

Q    What did they do to her?

A    I believe they -- as soon as they put me in the car and got me away from her, the next thing I know they have her under each arm and they're carrying her across the parking lot and they threw her in the car.  And Gardner comes walking past my car and says, she just kicked an officer, she's to going jail, we got her.  We got them.

Q    You don't think she kicked anyone?

A    I wasn't over there.

Q    You don't feel you did anything wrong during this whole situation?

A    I believe I was trying to deescalate from the moment it happened.

Q    Do you think Ms. Lopez did anything wrong?

A    No.

Q    Ms. Lopez was convicted of two summary offenses, right?

A    I thought it was one, but I might be wrong.

Q    Summary harassment, does that sound right?

A    I mean she was convicted of them, of the summary offense, yes.

Q    After a bench trial, correct?

A    Um --

Q    Bench trial, that's a legal terminology.  A

38

trial in front of Judge Linhardt?

A    Yes.

Q    Were you at that trial?

A    Yes.  The first one.

Q    You were there watching as Officer Gardner testified and --

A    Yes.

Q    So you're in the back of the police cruiser. Ms. Lopez is in an altercation with other law enforcement.  Walk me through what happens after that.

A    I believe, to the best of my knowledge, the car with her in it left.  We stayed there for, to the best of my knowledge, a half hour or an hour waiting. They said they were waiting for a tow to tow her car.

Q    Then you were taken to the station?

A    Yes.

Q    So once -- do you remember who was driving you from Turkey Hill to the station?

A    I don't recall.

Q    So eventually you came -- you were transported to the station, right?

A    Yes.

Q    And taken into a room with Detective Irvin, does that sound right?

A    Yes.

ERVIN BLANK ASSOCIATES, INC.

Q Do you recall anything about your conversations with Detective Irvin at that time?

A I think he -- we weren't talking about the incident. I think he was trying to make small talk, trying to make light of the situation or just get his mind or my mind off of it, I don't know. He was just asking me like, small talk kind of things.

Q Were you in distress at that time?

A At that time I had been kidnapped.

Q Why do you say that?

A Well I mean, I believe the definition of kidnapping is if you take someone unwillingly from one location to another. And that's exactly what happened to me.

Q Well you heard Officer Gardner explain that he observed marijuana, he observed the smell of marijuana, he observed shake, and that the intent was the take you to the station for purposes of the strip search. You heard that testimony? I'm not asking if you agree with it, I'm just asking if you heard it.

A I heard him say those things, yes.

Q And you disagree that they should have been able to take you to the station. Is that your testimony?

A I disagree.

Q    What should they have done?

A    I asked them multiple times when we were in the back of the police car, if I was being charged with a crime, it I was under arrest.  If I was allowed to be let go.  I got a mix of no answers to in a while, in a minute.  Finally, eventually, I believe it was Irvin to the best of my knowledge, Irvin said, he wants to strip search you and then they'll let you go.

Q    When did he say that?

A    When we were at the Turkey Hill still.

Q    I think you told him you weren't going to sue him, isn't that right?

A    Well at that time I would call that negotiating with your kidnapper.  If I was kidnapped I'd say anything for them to let me go.

Q    So when do you think they should have let you go?

A    I don't think I should have been handcuffed and placed in that car.  I don't think they had the right to search -- I don't think we should have been stopped at all.  I don't think any of that should have happened.

Q    And that's because it's your testimony that there wasn't any marijuana in the car?

A    Correct.

41

Q   So you're at the station with Detective Irvin and eventually you're subject to a strip search, right?

A   Correct.

Q   Tell me, what do you recall of how that started and what occurred during the strip search?

A   Once again, I was told I was not allowed to leave.  I would not be let go until I was strip searched.  I just finally decided to just -- I just wanted to go home.  I just decided to do it, you know.

Q   Did they ask you if they could strip search you?

A   I don't recall.  He told me he was going to do it.

Q   Did you say no?

A   I don't even think I answered him the first time he said it.

Q   And who is he?

A   .

Q   Who performed the strip search?  If there's a single person.  Now, if there's more than one --

A   They were both in the room.

Q   So they were both in the room.  Did one of them put on gloves?

A   I believe Gardner put gloves on.  He was the

ERVIN BLANK ASSOCIATES, INC.

42

one that went through everything.  And I believe, to the best of my knowledge, Irvin just watched.

Q   Tell me what actually happened during the strip search.

A   They told me to take each article of clothing off.

Q   I'm sorry, I just want to make sure I understand, because you're using they.  I just want to make sure that if there's a specific person you remember saying something, I'd like you to identify who it was.  If not, if it is, one of them told me, I just want it to be clear that they're not both speaking at the same time.

A   Okay.  So I don't recall which one, but one of them told me to take off one piece of clothing at a time and hand it to them.  As I did that, they were kind of like, going through it with their hands and checking it I guess.

Q   Do you know what they were looking for?

A   Anything that's criminal I guess.

Q   They were looking for drugs, right?

A   I don't know if they specifically said that.

Q   What else could they be looking for?

A   Anything to charge me for a crime.  Anything.  Weapons, drugs.  I don't know.

ERVIN BLANK ASSOCIATES, INC.

Q    So you took off your shirt first?

A    I don't recall which item was first.

Q    Well just tell me -- keep going.  I didn't meant to interrupt you, as far as what happened.

A    They told me to take off one -- one of the officers told me to take off one piece of clothing at a time.  As I handed it to them, they were searching the clothing.  At a point I was completely nude, standing in front of the two officers.  One of the officers asked me to manipulate my hands and my toes. One of the officers asked me to manipulate my penis and, for lack of a better term, balls.  To lift then and move them.  I don't know if he wanted me to stimulate them for his own gratification.  He wanted me to turn around and spread my cheeks and cough, which he asked me to do again because he didn't feel the first time was enough.

At a certain point I was standing there nude after they said I could stand.  I was kind of crouched.  Coughed, stood up.  And they said to wait while they searched my clothes.  I stood there nude in front of them for a few minutes while they were like, turning my socks inside out and my everything, just trying to find whatever they were looking for.  And then at a certain point one of them told me I could

get dressed.

Q   As far as the conduct of the search, you just mentioned, you know, there was a manipulating your genitalia.  Was that you who did that or are you saying that one of them who did that?

A   I was instructed to lift my genitalia, my balls.  I was instructed to bend over and spread my cheeks.  I was instructed to cough.  But I did it all.

Q   Neither Gardner nor Irvin touched your genitalia?

A   No.

Q   Did they touch any other part of your body?

A   In the search?

Q   Yes.

A   No.

Q   So the search was them instructing you to remove articles of clothing and to position your body certain ways for them to inspect.  Is that a fair characterization?

A   It's very close.  They definitely instructed me to manipulate parts of my body.

Q   Well what does that mean to you?  Manipulate parts of your body.

A   Touch, stroke, move, spread.  Things that don't happen by themselves.

45

Q    Well were they asking you to move your genitalia so they could inspect?

A    I don't know why they were asking me to.  I don't know what type gratification they got from it.

Q    Well why do you think that they got gratification from this?

A    I felt sexually assaulted in that situation. I hadn't committed a crime.  I was handcuffed and moved to a room with two grown men and was told to get naked before I was allowed to leave.  That was a sexual assault to me.  I know you guys have been downplaying it all day long, that it's just a search and it's very common and it happens all the time.  I'm sure that's what their job entails, but that's not in my daily life.  I don't get strip searched every day. I don't have to spread my butt cheeks for other men and that, you know, was an assault to me.  You can -- that's how I take it.  I apologize if you guys see it another way.

Q    You feel like they were doing something other than looking for drugs?

A    I feel like they were trying to dehumanize me, humiliate me, harass me even further.  Obviously it was the third search and they know I didn't have anything on me.

46

Q    Well the third search -- the other two searches you're referring to are -- is the first one being the pat down inside the Turkey Hill?

A    Yes.

Q    In front of the cashier and everyone else?

A    Yes.

Q    And then the second one being when Irvin put you on the car hood and did that search, correct?

A    Correct.

Q    Did either of them have a flashlight or anything like that when you were disrobing and manipulating?

A    I don't recall.

Q    You used the word sexual assault.  Tell me a little bit more.  Why are you using that terminology?

A    It's what it felt like to me.

Q    Neither of them touched you though?

A    I don't believe a sexual assault or somebody getting sexual gratification from something has to involve touching.

Q    So you feel as though one of them or both of them were getting sexual gratification from you being strip searched?

A    I feel like it was dehumanizing, humiliating, and sexually perverse as an assault on me as a person.

ERVIN BLANK ASSOCIATES, INC.

47

I wasn't -- I didn't commit a crime to -- and I'm not a lawyer or a police officer. But I didn't commit a crime that I would think would involve me being strip searched for. I just don't understand it. And that's just how I felt. That's how I feel. I'm not, again, a lawyer or a police officer but I didn't want to consent to that. I don't consent to being -- anything going on like that.

Q    So is it that your opposition is to strip searches or this particular strip search?

A    This particular strip search.

Q    Have you ever been strip searched before?

A    I have been to jail before.

Q    And when you're committed into jail you get strip searched, correct?

A    Correct.

Q    And how long ago were you in jail where you had a strip search performed on you prior to your incarceration?

A    I think it was in my early 20s, to the best of my knowledge.

Q    If you could go to, in the packet that's in front of you, Page 50. Or actually 49. Mr. Cochran, we have in this packet your discovery responses as they appeared when we received them. But then I have

ERVIN BLANK ASSOCIATES, INC.

also, starting a little bit later, our requests with your responses pasted into them so we can see the answers.

MR. COCHRAN:  The correspondence.

MR. WHITE:  Exactly, just because I didn't want him to have to go flip back and forth.  So the complete response is in there just like the complete request.  But then later on here around 49 or so they're patched together just for of ease reference.

MR. COCHRAN:  Okay.

MR. WHITE:  But it's copied as images so there's no risk of words being missed or anything like that.

MR. COCHRAN:  Okay

BY MR. WHITE:

Q    So Mr. Beatty, in discovery your attorney provided responses to us to some requests.  In particular we had some interrogatories, which are questions that are addressed to you that you've replied to in writing.  Starting on Page 49 into Page 50 is interrogatory 9, which asked about times you had been arrested.  And you provided, on Page 50, a list that says, I have two DUI, two disorderly conduct, one paraphernalia, and a number of traffic citations, most occurring in Lycoming County.  Sentences ranged from

49

fines, probation, house arrest, or Lycoming County Jail for less than sixty days.  And then you reference 2004 to 2016 as being the time frame.  I"m going to ask you a little bit more about these.  When were the two DUIs?

A     To the best of my knowledge, in my early 20s.

Q     Were they back-to-back or different times or what?

A     Different times.

Q     Were those alcohol or drug DUI?

A     Alcohol.

Q     And so were you arrested by law enforcement for either of those?

A     To the best of my knowledge I don't believe so, and I can tell you what happened both times.

Q     That's probably the best way to do it.

A     The officer took me to the hospital to get -- to take a test.  And then they drove me home afterwards.

Q     And is that what happened on both times?

A     One time I believe they drove me home and one time they let me go, but neither time did they arrest me and take me to a police station.

Q     Were you cuffed for either of those?

A     I believe I was cuffed when I was

Case 4:25-cv-00364-DKM    Document 16    Page: 280    Date Filed: 12/15/2025

50

transported, yes.

Q   Were you searched in any way for either of those?

A   Not strip searched.  I believe I was patted down.

Q   So patted down in connection with being cuffed?

A   I believe so.

Q   For both times?

A   I believe so.

Q   Did you receive jail time for either of those DUIs?

A   I think the first one was probation.  And I believe the second one entailed some -- I can't -- I think I went to PRC and then I got out on house arrest, but I can't be specifically sure.

Q   Was that in about 2006?

A   To the best of my knowledge, yes.

Q   Was your incarceration -- how many days?

A   I believe it was under sixty days.

Q   And it was a combination of Lycoming County Prison and PRC, which is the Prerelease Center?

A   Correct.

Q   Do you know how many days you spent in Lycoming County Prison?

ERVIN BLANK ASSOCIATES, INC.

51

A    I do not, not specifically.

Q    But like, more than ten days?

A    More than ten, less than sixty.

Q    So the whole --

A    Do you mean my whole life?

Q    No, just on this time.  That's what I'm talking about.

A    Just for the DUI?

Q    Yes.

A    I believe it was like a -- they give you like, thirty or sixty days I think, it is what they say.

Q    You can't recall how many days?

A    I can't recall.  It was over ten years ago I believe.

Q    When you were committed to Lycoming County Prison -- you were, right?

A    Yes.

Q    They did a strip search on you?

A    Yes.  If I'm convicted of a crime, sentenced, and guilty, I'm okay with the law doing what they have to do.

Q    Do you recall that strip search?

A    I do not.

Q    Did they -- do you recall anything about it?

ERVIN BLANK ASSOCIATES, INC.

A    I recall that it happened, because I know when you go into jail that's what they do.  But I don't recall the specifics of it, no.

Q    If you can recall, did it involve you doing similar procedures as what Gardner and Irvin had you do while you were in Williamsport Bureau of Police?

A    I don't recall the specifics.

Q    You don't remember if they made you cough and spread your cheeks?

A    I believe -- I know I had to strip naked.  I don't recall what else we had to do.

Q    How many people did you have to strip naked in front of?

A    At the jail?

Q    Yes.

A    I believe it was one person.

Q    Was anyone else in the room when that happened?

A    To the best of my knowledge, no.

Q    So you're okay with that strip search?

A    I believe in the law.  And I believe in the system.  And I believe that the police are supposed to do what they're supposed to do.  Corrections officers are supposed to do what they're supposed to do.  But when you haven't done anything wrong, I don't believe

53

they just have the right to do whatever they want to do whenever they feel like doing it.  I feel that's offensive.  I feel like that's assault.  I feel like that's kidnapping.

Q   Okay.  I'm going to ask you about some of the other items that you listed here.  You have two disorderly conduct.  Can you tell me about those events?  When they were, what you recall.  And treat them independently.  I'm just reading them off the sheet that says two disorderly conducts.

A   I don't recall the specifics of them.

Q   You don't remember what you were doing, what you were charged with other than the fact that it was disorderly conduct?

A   Yes.  To the best of my knowledge yes.

Q   And there was two of them?

A   I believe there was two, yes.

Q   Any idea of how long ago that was?  At least can you give me more specific than between 2004 to 2016?  If not, that's okay.  I'd just figured I'd ask the question.

A   I can't be certain, no.

Q   And then you have a number of traffic citations, most occurring in Lycoming County.  They're just like, speeding, parking tickets?

54

A    Speeding, and I've been pulled over for driving without a license before.

Q    How many times has that happened?  That you've been cited for something like driving without a license.

A    Quite a few.

Q    Like how many?  More than five or less than five?

A    More than five.

Q    Do you presently have a driver's license?

A    Yes.

Q    Was that -- is that unrestricted?

A    Yes.

Q    How long has it been unrestricted?

A    To the best of my knowledge, two years.  Two and a half years.  Two years.

Q    You had an ignition interlock at some point?

A    I had the license but I never got the device.

Q    So on August 31st, 2021, there was some testimony about, I think you heard before, about you having an ignition interlock license.  Is that correct that you had the license?

A    That was the only ID I had on me at the time.

Q    Did you have an unrestricted license as well at that time?

ERVIN BLANK ASSOCIATES, INC.

Appx659

55

A    I don't recall.

Q    You weren't driving with an ignition interlock on August 31st, 2021?

A    No.

Q    And I think the explanation that was provided by either Gardner or Irvin was that you said something about PennDOT being backed up or something like that. Can you explain to me why it was that you didn't have an ignition interlock system?

A    So the way the ignition interlock system works is, once you get a DUI and you're sentenced to get that, you can only get your license back if you get ignition interlock. If you don't own a car, you still can get your license and you don't have to get the ignition interlock because you don't own a car. They can't, I guess like, wait to start your time until you own a car. You know what I mean? If you understand.

Q    So you didn't have a car for what time period?

A    For a couple years. Two or three years.

Q    Do you have a car now?

A    No.

Q    Have you had a car at all since 2021? Or when was the last -- I should ask the question better.

When was the last time you owned your own vehicle? And that can be a lease too, it doesn't have --

A    To the best of my knowledge, 2013.

Q    So the driving with suspended licenses, citations you've referenced, have those been you driving other peoples' vehicles?

A    Some, yes.

Q    So I have -- in 2008 did you have a simple assault misdemeanor 3 that you pled guilty to?

A    To the best of my knowledge, I thought that got pleaded down to something smaller than that.  But I could be wrong.

Q    Did you -- were you charged with assault at some point around there?

A    I do recall the incident, yes.

Q    What was that incident?

A    I believe it was an argument.

Q    Between you and who?

A    I believe an ex-girlfriend.

Q    Did you strike her?

A    No.

Q    What was the -- why were you charged?

A    She said that I had hit her.

Q    You did plead guilty to something related to that event?

57

A    Eventually, yes.

Q    You can't recall if it was a misdemeanor simple assault or something else?

A    I know simple assault was the original charge, but I thought that I had plead that down.  She didn't want to go to court and she didn't want -- she had kind of recanted everything after later on.

Q    And then you mention here one paraphernalia. Was that in about 2015?

A    Yes.  I believe that was the last time that I was in some type of police incident before the August 31st incident.

Q    Tell me, what was that charge related to?

A    Paraphernalia.

Q    What was the paraphernalia?

A    I think it was a, like a marijuana pipe or cap or something.

Q    Where did you have it?

A    I believe it was on me.  On my person.

Q    And where were you when you encountered law enforcement for that event?

A    In South Williamsport.

Q    Were you driving?

A    Yes.

Q    Were you pulled over?

ERVIN BLANK ASSOCIATES, INC.

A    Yes.

Q    Were you the one who was driving?

A    Yes.

Q    And how did they find the paraphernalia?

A    I think -- I believe, to the best of my recollection, I told them I had it on me.  He said he was going to search the car.

Q    And then you plead guilty to a paraphernalia charge?

A    Yes, sir.  I believe so.

Q    Whose car were you driving that day?

A    I believe it was my brother's car at that time.

Q    Did you have a license at that time?

A    I don't believe I did.

Q    Any other criminal charges or convictions that we haven't already gone over that you can recall?

A    No, I think you went over everything.

Q    Did you ever get charged with criminal mischief?

A    Possibly.

Q    2018?

A    Doesn't sound familiar to be honest with you. Was I sentenced or convicted of anything?

Q    I'm asking if you recall anything.

ERVIN BLANK ASSOCIATES, INC.

A    I don't recall it.  I mean --

Q    That's okay.  All we can do -- I don't want you to guess, speculate, or do anything other than tell the truth that you can recall.  If you could turn to Page 23.  Let me know when you're there.

A    I believe I'm there.

Q    This is a transcript of proceedings in front of Judge Linhardt, Lycoming County.  Date, August 3, 2022, for the case Commonwealth of Pennsylvania v. -- how do I pronounce her name?

A    Anaise.

Q    Anaise Lopez, CR1281-2021.  And on the following page, Page 24, it starts with the Court, with Judge Linhardt ruling from the bench on Ms. Lopez's bench trial.  Where you in the courtroom on this day?

A    I believe I was, yes.

Q    And I want to read some of Judge Linhardt's ruling from the bench and ask you some questions about it.  Do you need a break for a second?  If you need a break it's better for you to take a break before we go into a question.

A    Yeah.

(Whereupon, a recess was taken from 12:42 a.m. until 12:48 a.m.)

60

AFTER RECESS

BY MR. WHITE:

Q   We were on Page 24.  So Mr. Beatty, I am reading from Judge Linhardt's -- the transcript of what Judge Linhardt ruled from the bench on August 3, 2022.  And he says, the Court finds that the evidence is not only clear and credible, but really overwhelming of the Defendant's guilt with regard to both the summary disorderly conduct and the summary harassment.  So Ms. Lopez was convicted of both of those.  Is that your recollection as well?

A   On that date, that is what happened.  I know she appealed that.  But that is what happened on that date.

Q   Okay.  Did she serve jail time for that?

A   No, she has not yet.

Q   Is she supposed to?

A   So she appealed this and won the appeal.  She was just resentenced to, I believe it's twenty or eighteen days.

Q   Has she appealed that?

A   No.

Q   So as far as her -- she has a conviction that requires her to serve some sort of sentence, is that correct?

ERVIN BLANK ASSOCIATES, INC.

61

A    Well I think she still has thirty days or a few days from the time she -- of the second trial to appeal.  But she hasn't yet.

Q    When did that second trial occur?

A    January 3rd.

Q    You're talking about a sentencing hearing, is that right?

A    Yeah.  It just happened this year on January 3rd, 2024.

Q    And so as far as what's still being considered, it's limited to -- and if you don't know any of this then feel fee to say, I have no idea.  But as far as what's still going on in her case, it has to do with how much -- what her punishment is, not whether or not she's guilty, is that correct?

A    I believe so.

Q    I'm going to continue here.  It says, the argument that defense counsel makes that no roach was seized, somehow suggesting that Officer Gardner's testimony that he observed marijuana residue and a marijuana roach in the vehicle was somehow a pretext and a lie the Court does not find credible in the least.  The Court finds Officer Gardner's testimony to be credible in that regard.  So Judge Linhardt determined that Officer Gardner's observation of

ERVIN BLANK ASSOCIATES, INC.

Appx666

62

marijuana roach and residue in the car was credible, right?

A    That's what he decided, yes.

Q    And you disagree with that?

A    Yes.

Q    Because you say there was no marijuana in the car?

A    Yes.

Q    And then I'm going to continue here.  In addition to which, defense's argument that somehow the Defendant was cuffed and placed under arrest when they, in counsel's words, did nothing wrong, the Court disagrees with.  The entire matter escalated solely because of the Defendant's behavior and her friend's behavior, all of which was unnecessary.  You understand that Judge Linhardt determined -- you're the friend here, right?

A    I would assume.

Q    And Judge Linhardt here is explaining that your behavior and Ms. Lopez's behavior was unnecessary?

A    That's what he wrote.  Or said.

Q    Do you disagree with that?

A    Yes.

Q    Then it continues, the officers had every

63

right to conduct an investigation.  Do you disagree with that?

A    Yes.

Q    Why?

A    Probable cause.

Q    Explain what you mean by that.

A    I don't believe they had probable cause to stop us, harass us, conduct an investigation.

Q    Because there was no marijuana in the car based on your testimony?

A    Because there was no reason to make a U-turn and pull up behind me.  Because there was no reason to follow me for fifteen blocks.  Because when I walk into a store there's no reason to go search my car.  I didn't commit a crime.

Q    But nobody stopped you, right?  I mean we already went over this.

A    Nobody --

Q    Nobody stopped your vehicle?

A    Nobody stopped my vehicle, correct.

Q    Mr. Beatty, I'll ask that you turn to the compiled interrogatory responses which begin on Page 40.  Which again, these are, just so the record is clear, preceded by your actual interrogatory responses, which are then pasted into these

64

interrogatories for purposes of -- ease of reference. Are you at that Page 40?

A    Yes.

Q    And then from there I'm going to ask you about some of these answers, starting with the answer to Question 1 on Page 44.  Let me know when you're there.

A    Okay.

Q    All right.  It says your response to the question about a detailed description of your injuries.  You say -- I understand you already explained to me your feelings on having been kidnapped and sexually assaulted.  I'd like you to continue down that page a little bit and where it says, I have suffered embarrassment before strangers, my peers, witnesses, and even my own girlfriend, and anxiety, and a loss of my own personal security, and an intense and generalized fear of authority in general, and police officers in particular.  Fear of retaliation and continued harassment causes me intense daily anxiety and worry.  I'm going to ask you some questions about some of those words used in there. Suffered embarrassment before strangers, can you explain that to me?

A    I mean, on the day in question everybody at

ERVIN BLANK ASSOCIATES, INC.

65

the gas pump was watching all that stuff happen to us.

Q So the strangers you're referring to here are the people who observed what happened?

A I mean, those strangers. It was in the paper, everyone in the community read it, you know. Just -- where I worked I had people who I only knew through I'm a manager here, you're a customer. And then they come in and say, hey, I saw your name in the paper.

Q But it didn't say you were charged with anything, right?

A It's still very embarrassing. It implied a lot of things. They implied that we were doing a lot of wrong things and the police had the right to do whatever they wanted to us.

Q But it didn't say anything about you being strip searched or anything like that, right?

A No, but the criminal activity. I mean --

Q Well the newspaper, if there's a newspaper article --

A That was embarrassing. There was multiple articles as well.

MR. WHITE: Can we mark this? I think this was provided by -- was this provided by you, Mr. Cochran?

MR. COCHRAN: It might be.

MR. WHITE: I think it was in your disclosures.

MR. COCHRAN: It could be.

MR. WHITE: We'll mark this as Beatty 2.

(Whereupon, a document was produced and marked as Deposition Exhibit Beatty No. 2 for identification.)

BY MR. WHITE:

Q   Mr. Beatty, can you take a look at this article?  It appears to be from the Sun Gazette, under the police blotter.  There's an article titled, Assault Charges Lodged Against Massachusetts Woman. Is that the newspaper article you're referring to?

A   This is one of them, yes.

Q   Was there another one?

A   They've covered the case a few times.

Q   Does this article mention you by name at all?

A   I think this is the first article that came out.  I don't believe it does.

Q   So this is about Ms. Lopez, correct?

A   This -- yes.  It says, Assault Charges Lodged Against Massachusetts Woman.

Q   So your recollection is that there's some article out there that does mention you by name?

67

A    I'm not sure if my name is in which article or what.

Q    Would this article embarrass you?

A    To the people who know who her boyfriend is, yes.

Q    So not strangers?

A    Does this article embarrass me to strangers?

Q    Yes.

A    No.

Q    So if somebody knew who she is and knows who you are relative to her, then that article embarrasses you?

A    Yes.

Q    But it doesn't say you did anything wrong in that article, correct?

A    It implies that we did a lot of things wrong.

Q    Well it doesn't say anything about you at all, right?

A    In this article?

Q    Yes.

A    No.  But did you -- no, not in this article.

         (Whereupon, a discussion was held off the record.)

BY MR. WHITE:

Q    Mr. Beatty, there are articles written about

ERVIN BLANK ASSOCIATES, INC.

68

you having filed this lawsuit, correct?

     A    I believe so.

     Q    Are you claiming that you've been injured from the news articles about this lawsuit?

     A    No.  Those articles, I believe, came out years after the incident.  After they had already had other articles about it.

     Q    So tell me how you've been embarrassed between your peers and your girlfriend.  Because I think you covered witnesses already, people who are there, and I think you talked about strangers already.  But in this answer here you say your peers and your own girlfriend, you've suffered embarrassment.  Tell me how that is.

     A    Just having to deal with the whole situation. Being in the implication that we committed -- that I committed some type of crime, that I had argued with police -- whatever they implied, you know, affected --

     Q    But no one's ever said -- no one's ever charged you with anything, right?

     A    Was I charged with a crime?

     Q    For this event.

     A    No.

     Q    And no one has ever written a news article that says you were charged with a crime at this event,

ERVIN BLANK ASSOCIATES, INC.

69

correct?

A    That says I was charged with a crime?

Q    Correct.

A    To my knowledge, no.

Q    So who is it that has -- has anyone ever said anything to you about you having committed a crime relative to this August 31, 2021, event?

A    Yeah.

Q    Like who?

A    Like customers at my job, employees at my job, other managers at my job, family members, friends.  I saw a friend's dad just a couple months ago, I hadn't seen him in ten years.  It was the first thing he said to me.

Q    What did he say?

A    He said, I see all that stuff going on with you and the police, what's going on.

Q    He's referring to the lawsuit though, right?

A    He's referring to the whole situation.

Q    Well what does that mean?

A    To being harassed, detained.

Q    Well I want to understand.  How are you separating in your head the embarrassment or anxiety as referenced in this response that may be in connection with new articles that are written about a

ERVIN BLANK ASSOCIATES, INC.

70

federal lawsuit you filed versus publication of information about Ms. Lopez's trial?

A    I guess where I think we're having a miscommunication is you're assuming that this article is the only reason anyone would have anything to say about this whole incident.  Word of mouth, people talking, I heard this happened, I heard this happened, I heard this happened.  It doesn't have to be in the paper for it to be news.

Q    Has anyone told you that they heard this happened --

A    Yes.

Q    I mean, tell me some of these people who have talked --

A    Coworkers, my managers, my boss.

Q    All right.  So people at --

A    Anaise used to work at Perkins with me when this happened.  So they obviously knew we were together, okay.  It's not like I'm drawing at straws and pulling -- how did they figure this out kind of thing.

Q    You say that you've suffered anxiety.  What type of anxiety and how was it caused by either Irvin or Gardner?

A    I mean to this day -- I'll be honest with

71

you.  If somebody committed a crime against me, I don't know if I would call the police or not.  Because I'm scared of how they would twist something or what they would do because I know from experience that they don't do what they're supposed to do.  They don't follow the letter of the law.  They don't look for the truth.

Q    Is that from your experience for this one event?

A    This is for this specific event.

Q    And not from your experience with law enforcement through the charges and convictions that we discussed before?

A    No.  I actually used to defend the police, believe it or not.  I said if you didn't do anything wrong they won't bug you.  I used to have arguments with my friends.  They would tell me, oh, the police did this to this guy and the police did this to this guy.  And I said, well, what was he doing, what did he do wrong, you know.

I used to defend the police until something like this happened to me.  And then I saw the other side of it where they're just people who make mistakes and do whatever they want.  They don't have to follow the law unless they want to.  There is no oversight

72

really.  This is the only oversight we have.  This is the only thing that can reinstill faith in a system that I did believe in.  Just because I've been on both sides of it doesn't mean I didn't believe in it.  Any time I was stopped by a police officer I did whatever they asked me to do.  Any time I was told to go to jail, I went to jail.  I didn't fight anyone, I didn't argue with anyone.  I did what I was supposed to -- what they told me to do.

When something's not right you don't just go with it.  You try to stand up and get some faith back and believe in the system.  What they did wasn't right.  That's not police work.

Q    What part of what they did wasn't right?  I just want to know what it is that -- what are you focusing on here when you tell me --

A    Everything.  Everything from just -- everything from following me to that gas station, from stopping me, from harassing us to assaulting us.  From kidnapping me to making me -- every single thing should never have happened.  Not one of those things.

I shouldn't even have -- neither of us should even have been approached that day.  We're just out driving around.  What crime did we commit.

Q    So on Number 2 you were asked to identify any

73

health care provider who provided you care for any of the injuries you allege were caused by Irvin or Gardner.  And your response was none.  You have not received any type of medical care or anything like that, correct?

A    Correct.

Q    So you've not seen a doctor, psychiatrist, therapist, any of those types of professionals?

A    Correct.

Q    You've explained that you're suffering emotional embarrassment, anxiety.  You don't trust the police.  Why haven't you seen a medical provider for any of that?

A    I don't have insurance.  I don't normally see medical providers.  It's not something that I normally do.

Q    Are you full time at Perkins?

A    Insurance is offered to me, but I don't take it.

Q    You don't have, like, a Marketplace plan or something like that?

A    I'm not familiar with what that is.

Q    You have listed here that you do not take any medication prescribed related to this lawsuit, is that right?

ERVIN BLANK ASSOCIATES, INC.

74

A    Correct.

Q    You've never been diagnosed with any type of mental health condition, depression, bipolar, anything like that?

A    Correct.

Q    And for the five years previous to August 31st, 2021, you had not seen a healthcare provider or anything like that?

A    No.  I don't have insurance.  I don't go to the doctor.

Q    You don't have a primary care physician?

A    I don't.

Q    When was the last time you had a primary care physician?

A    When I was a child.  I'm a pretty healthy guy, I don't go to the doctor.  If I'm sick I usually just wait a week and wait for it to go away.  I mean, if I'm sick for a couple weeks I might go to the emergency room and they usually tell me the same thing.  You have a viral infection, we can't do anything for you, go home.

Q    On Page 46, Number 6.  You were asked about each individual you know who might have information related to the embarrassments of your complaint.  You response spills onto Page 47.  There are a number of

ERVIN BLANK ASSOCIATES, INC.

75

officers listed here.  I'm not going to ask you about those, I think we've already covered that.  But you also identify that there are several additional witnesses that you intend to call, including a female at the fuel pumps who was confronted and threatened, and a male who was seen walking through the area.  Is the female at the fuel pumps the person who Gardner and Irvin were testifying about, the African American woman?

A    To the best of my knowledge, it is.

Q    Have you ever spoken to her since August 31st, 2021?

A    No, I have not.

Q    Do you have any idea who she is?

A    To the best of any knowledge, I don't.

Q    And then the male who was seen walking through the area where the incident occurred, do you know who that is?

A    I believe I found out today that that was a plainclothes officer, but I may be wrong.

Q    So the --

A    It might be a different person.

Q    So that may be -- the person who you're identifying here might be Detective Anderson, is that what your understanding is --

ERVIN BLANK ASSOCIATES, INC.

76

A    That's what I believe I learned today.

Q    Because the person who you're identifying here in this response is the person who was in that still shot?

A    I believe so.

Q    No, I mean is that the person you're referring to?  Whether or not that's Detective Anderson, that person who you're identifying here, the male seen walking through the area, is the person who's depicted in that freeze frame?

A    Yes.

Q    Okay.  Where is 921 Westminster Drive?  You seem to know Williamsport pretty well based on your testimony.

A    It's in the Loyalsock side.

Q    Is it in Loyalsock Township?

A    Yeah.

Q    So that's east of the city, right?

A    Yeah, it's not in the Williamsport Police jurisdiction.  I won't live there.

Q    How long have you lived at 921 Westminster Drive?

A    I believe five years.  Since before this.

Q    Five years before 2021?

A    No, I've lived there for five years.  I've

ERVIN BLANK ASSOCIATES, INC.

77

lived there before this incident is what I was saying.

Q   You moved there because you didn't want to be in the Williamsport Police jurisdiction?

A   No, but I won't move back into the Williamsport Police jurisdiction is what I meant to be saying.

Q   Your -- the convictions and incidents with law enforcement that we discussed a little earlier as far as your paraphernalia charge, your DUIs, the various traffic citations.  Were all of those with Williamsport Police?

A   I believe a few are with the state police.

Q   Any -- I thought I heard you say something about South Williamsport at some point.

A   There was -- that was the only one in South Williamsport.

Q   So you've had encounters with South Williamsport law enforcement, right?

A   One time, yes.

Q   Which resulted in a conviction or?

A   A summary offense.

Q   A summary offense.  And Pennsylvania State Police?

A   Yes.

Q   And Williamsport?

ERVIN BLANK ASSOCIATES, INC.

78

A    Yes.

Q    Any other law enforcement who has ever charged you with something?

A    I don't believe so, no.

Q    On Page 53 there's a question, Number 16, that says itemized damages you claim were incurred by a result of this incident. I'm paraphrasing. But your response is, Plaintiff has suffered general damages, emotional distress, harm to his reputation, fear, anxiety, anguish, and embarrassment as a result of the officers' actions. What harm have you suffered to your reputation?

A    I mean again, everybody at my work and a lot of people I personally know know about this case. Know what's happened, happening, and a lot of them are more -- especially when it comes to my job -- are kinds of, for lack of a better term, on the side of the law. Like they can't do any wrong kind of thing. And you know, they just believe how I used to believe to be honest with you. If you didn't do the crime you won't do the time.

I just believed in the police and I believed in the system and the law. Like, listen, it's got to be there. There's some really bad people in this word. We got families that could get hurt, and it's

79

just like, they believe in that system and they will just never believe that I didn't do something wrong that day, that I didn't deserve what I got and all these things. I'll never go anywhere in that company. I'll never go up.

Q But you didn't lose your job, did you?

A I mean, pretty close. They talked to me about this incident, yeah.

Q Is it because you filed the lawsuit?

A No. It was when it happened.

Q Well you weren't charged with anything?

A No, but like I said, they know me and my girlfriend.

Q Was she working there around August 31st, 2021?

A Yeah. I had got her a job. When she moved here -- I'm am manager there. I got her a job as a server. I said, you know, until you find something just do this.

Q How long had she been working there before this?

A Not long, maybe a week or two. That was it. That was like, her first impression.

Q And did she get fired then?

A She did get fired eventually, yeah.

Q   Was it for -- when you say eventually, when did she get fired?

A   It was a couple -- it wasn't -- she didn't get fired because of this, but you know, just never had -- that was their first impression of her after that.

Q   What'd she get fired for?

A   I think she got into an argument with the manager.  I wasn't the manager that day, I had already left for the day.  She was there with someone else.

Q   Was it the general manager or someone on your level?

A   On my level.  Another person on my level.

Q   So she didn't get fired because of the criminal charges against her?

A   No.

Q   And you still work there?

A   Yeah.

Q   Not been demoted?

A   No.

Q   You said you're not going to have any room to grow with the company.

A   No.

Q   Is that what you said?

A   Yeah.

81

Q    Well the only place you could go is general manager, right?

A    General manager, regional manager.  I would have loved to have been a regional manager.

Q    Have you applied for any positions at Perkins since August of 2021?

A    No.

Q    Have you applied for work anywhere else since this event?

A    I did get a part-time job since this happened, yeah.  I work two jobs now.

Q    Where is the part-time job?

A    I work part-time at Amazon.

Q    What do you do there?

A    So the Amazon in our area is not like a fulfillment center.  It's just a delivery station, kind of think UPS, FedEx.  So we just unpack long haul trucks and put them into the small trucks so they can deliver packages.

Q    So you do warehouse work?

A    Pretty much, yeah.

Q    How many hours a week are you doing that?

A    It's really short, I only work maybe one or two days a week.  And the shifts are anywhere from four hours to -- they even have like, two hour shifts

ERVIN BLANK ASSOCIATES, INC.

82

sometimes if you want.

Q    You haven't applied anywhere else other than that?

A    I've applied at a couple places, yeah.

Q    Like where?

A    I applied for a job at Red Lobster, I didn't get it.

Q    When was that?

A    I actually applied there twice.  It was last summer and just recently they were hiring for manager again and I applied.

Q    Which is a -- was it a general manager position?

A    No, it's just a manager position.

Q    Did you get an interview?

A    The first time, not the second time.

Q    So you got an interview your first application?

A    Yeah.

Q    And when was that?

A    I don't know the exact date.  It was last summer.

Q    On the next page the question was, itemize all other -- it's Page 54, I'm sorry.  The question was, itemize all other items of expense and loss which

ERVIN BLANK ASSOCIATES, INC.

83

you claim were incurred by you or on your behalf as a result of this incident. It's correct that you said, Plaintiff has suffered no additional items of expense and loss?

A    Correct.

Q    So the only damages that you're seeking in this case are the general damages -- which you've not explained although I'll certainly give you an opportunity to -- emotional distress, harm to reputation, fear, anxiety, anguish, and embarrassment, correct?

A    Correct.

Q    What are general damages? And if that's a legal term from your lawyer, that's fine. I don't want you to talk about anything you and he talked about. But if you have some understanding independent of that, feel free to explain it to me.

A    Do you want me to explain the list or just general damages?

Q    I think you've given -- why don't we start with just general damages.

A    That's a term that me and my lawyer --

Q    Okay. Explain the other items on that list to the extent you haven't already covered it, because I think you went over the embarrassment and anxiety

84

already.  It's on Page 53 at the bottom.

A    I mean, do you want me to go one by one or tell you how you feel or --

Q    Tell me how you feel and why you're claiming these damages.

A    I mean, these are -- this is -- these are the feelings I have from this incident.  These are the feelings that I have every day from this incident.  You know, these guys come in here and they downplay it, they're laughing and joking the whole time.  You know why, because it didn't really affect their life.  It's business as usual for them.

For me, I have two locks on my door.  I lock my door when I leave, I lock my door when I'm home.  I lock the deadbolt when I'm home, when I'm at my house.  You know why?  I'm not scared of robbers or intruders.  I'm scared of the police.  I'm scared something happened with this case or they forgot something, or something with her, just something -- they're just going to show up one day.  And you know what, whether that door's locked or not doesn't mean they can't come in.  I'm literally scared when I see them.  I start sweating.  I've been sweating all day long.

Like, I'm afraid because I don't have to do something for them to do something to me.  Anything

ERVIN BLANK ASSOCIATES, INC.

could happen. That could kick my door down one day and kill me in my house and then say I attacked them when they had a legal warrant for some crazy reason. Because they could just make it up. Like, those are the type of fears that I have. Those are the type of things I think about. And you guys think, well, that's probably crazy. Is it? It probably is crazy. I probably shouldn't have those thought because I've never have them my whole life until this happened.

And I've been involved with the police before this and I've never had these thoughts. I never thought, my safety or this or that or retaliation against my family members or any kind of thing like that until this incident happened. Because this is different from any other police interaction that I've ever had. That's what I don't think everything understands. It's not business as usual to me, this was a lot different. This was scary. I think people downplay it because they think like, this is -- all that happened with this. It could have went way past that.

And the fact that it didn't I am very thankful for. And the fact that she's safe, because I told her to move down here. She lived in Boston for thirty years, never had any police interaction in her

Case4:25-cv-00364-DKM Document16 Page:316 Filed 04/25/24 Page 167 of 522

86

whole life.  You know, maybe talked to a police, but never had any like, police like that.  And I think the reasons things went that way that day is because they weren't trying to deescalate the situation.  We're trying to deescalate, just talk to them and they're just -- whatever they thought was going on, they just like, locked on target, and just went after us.

And it was just -- it's embarrassing when you see people you haven't known for ten years and that's the first thing they want to talk about.  You know, it's embarrassing when the day after this happens your landlord comes up to you and says, what's going on. And it's like, I don't know.  I don't have an answer for these people.  I don't know what's going on.  I don't know what happened, I don't know why it happened.  I don't know what I could have done to make them not of harassed us.

That's the other kinds of things that go through my -- what did I do wrong.  Like, I have like, anxiety and fear that this thing is going to happen again because I don't even know what I did.  I just was driving a car.  I could be driving a car tomorrow and they pull up behind me and the same thing happens.

And because I'm so jittery and anxiety, then they think something's really going on and then, you

ERVIN BLANK ASSOCIATES, INC.

know, anything could happen.  It's just -- I'm never going to be the same person again because of what happened that day.  It changed my whole outlook on the police, on the justice system.  And I've been on both sides before. It's just not -- I'm not going to be regular.  I'm going to carry that with me forever and that's not okay, that's not what should have happened. I shouldn't have those kind of feelings when I'm in my own home, that I'm not safe.  If I'm a victim of a crime I should be able to call somebody who everyone says is here to help us, and get help, but I can't because fear of retaliation, fear of just anything.  I just don't --

Q    Well you're in Montoursville State Police jurisdiction, right?

A    Correct.

Q    You're telling me that you feel that you can't call the Montoursville State Police if you have an issue?

A    I think I would weigh my options.  I think -- I really do.  I really think I would weigh, you know -- is it worth maybe getting -- I don't know what's going to happen to me.  Like, what was the crime.  Can I just move on from it because the police might be worse than the crime.

88

Q    Well what would make you feel that Montoursville State Police would have --

A    Just -- I just -- the last interaction I had with police just doesn't make me feel safe around the police in general.  And I know it's like, you know, they're not -- everyone's not all the same.  And that's why I tried my hardest to just be like, all right, it's just, you know, something's going on in Williamsport.  Just stay out of Williamsport, you know what I mean.

But it still makes me feel like you just can't reach out to them because it's also a small -- if we didn't have all this going on I would have already left Pennsylvania.  I don't even want to be here anymore.  They all know each other, they're all friends.  Gardner's brother's the DA, he just became a judge.  He came up under Linhardt, who is a judge who used to be the DA.  I mean, they're all friends.

Q    Well it's a small community, right?

A    I know that.  I'm not saying that they can't be friends.  I'm just saying it's not that they don't talk and they don't all know the situation and everyone knows what's going on.

Q    Well Mr. Beatty, you have testified about your damages, you've given us some information as far

ERVIN BLANK ASSOCIATES, INC.

89

as the injuries you're alleging.  And starting on Page 64, we had asked for any documents supporting or reflecting the damages you incurred, starting with Number 9 into Number 10, 11, 12, 13, through 13. We've asked for documentation about your damages and you have responded that you have no documentary evidence to support any of your damages in this case. Is that correct?

A    That's correct.

Q    So you don't have any diaries, notes or anything like that reflecting your injuries?

A    Nope.

Q    No doctor's bills, no expenses like that?

A    I do not.

Q    And then on 14 we asked for any instant -- this is on Page 66.  In request 14 we asked if you had any instant messages, social media messages, text messages, emails, anything else with Ms. Lopez about this lawsuit, her criminal case.  And you respond none?

A    That's correct.

Q    You've not exchanged a single message with Ms. Lopez about any of this?

A    Well on August 31st they confiscated her phone for over a month, so it was tough for us to

Case 4:25-cv-00364-DKM Document 16 Filed 04/15/25 Page 51 of 75

90

communicate through cell phone or text or anything like that.

    Q   How about after that?

    A   I mean, after that we kind of already talked about it face to face for so long that I don't think we had anything to message with each other about.

        MR. WHITE:  Okay.  I don't have anything further.

                  CROSS-EXAMINATION

BY MS. LAUGHLIN:

    Q   I'm going to have some followup questions, Mr. Beatty.  My name is Shawna Laughlin and I represent Officer Clinton Gardner with the suit that you have filed.  Would you like to take a break before I go into my questions?

    A   No thank you.

    Q   I'm probably going to jump around a little bit because Attorney White has covered a lot of the questions that I would have asked.  However, you might not understand what I'm talking about or what I'm asking because I'm jumping around.  If that happens, let me know.  I will explain, repeat, rephrase the question as you need, okay?

    A   Okay.

    Q   If I ask you a question and you provide an

answer I'm going to assume you heard it, you understood it, and you answered it truthfully, is that fair?

A    Yes.

Q    Okay.  You had said that the day of this incident you had stopped at either a state representative's office or the county commissioner's office.  What location had you gone to?

A    I do not know the exact address.

Q    What's the approximate address?  Do you know the street?

A    It's like a block from the courthouse, on the corner there.  I think -- not right on the corner.  It's next to Otto's Bookstore but I don't know -- 4th and something.

Q    Is that going towards Market or away?

A    Away from Market towards the Newberry area.

Q    And you said you had already been in touch with someone there and that wasn't your first meeting.  What was your business with either the state representative or the county commissioner?

A    They were helping me maneuver through PennDOT.  They were really backed up.

Q    What was your issue with PennDOT that you needed help with?

Case: 25-2860  Document: 16  Page: 322  Date Filed: 12/16/2025

A   They were -- I was trying to get my nonrestricted license.

Q   So on the date of this incident you still had the restricted license?

A   I still had the card in my possession, yes.

Q   You had testified earlier that you did not know what was in the ashtray that was in the vehicle, correct?

A   I don't know if I said that earlier.

Q   All right.  Were you aware there was a cup sized ashtray in the cup holder on the driver's side door on the day of this incident?

A   Yes, there was.

Q   And was it an accurate description that it was about the size of a soda can, had a lid on it with a hole in the middle that was maybe a little larger than a cigarette?

A   I believe so.

Q   Okay.  Do you know if there was anything in that ashtray on that date of the incident we're here about?

A   I know there was no marijuana in that car.

Q   How do you know that?

A   Because I was not charged with possession of marijuana.

Q   So you're basing the fact that there was nothing in the car because you weren't charged?

A   No, I know there wasn't and that's how I can guarantee it.

Q   Did you watch the body cam footage?  There were several different videos that were exchanged in this matter.

A   Ever?

Q   Correct.

A   Yes, I have watched the body cam footage.

Q   And did you hear Anaise admit to there being a roach in the vehicle that she had smoked two days prior when she was in Boston, where she believes it to be legal?

A   Not to my recollection.

Q   Okay.  So if there is a video saying -- with Anaise saying that there's a roach in the car, would that change your mind that there was marijuana in the vehicle?  Or you still stick to the story that there was nothing there?

A   I stick to the truth, that there was no marijuana in the car.

Q   You were asked about what was your speech, your First Amendment speech that was being retaliated against.  And you said, I don't recall the exact

94

words.  But how about the gist of your conversation or your words.  What did it have to deal with?

A    I'm not a lawyer so I don't know exactly what you're not -- I don't know the -- I know what we were talking about, but I don't know what the police are not allowed to do or not do.  I'm not a lawyer or a police officer.

Q    Okay.  So what were you talking about that you feel you were retaliated against on the day of this incident?

A    Asking for people to record.  Asking if we can record.  When she asked for a female officer. When we asked for a supervisor.  When we were handcuffed immediately after asking for things.  When I asked for what was their probable -- why we were being stopped or anything.  Just --

Q    You would agree with me that the Turkey Hill where this took place is a public place?

A    Yes.

Q    People go there to get gas, buy snacks, drinks, things like that, right?

A    Yes.

Q    And you really don't have a sense of privacy when you're at Turkey Hill, right?  I mean, your actions are out in the open, you car's out in the

ERVIN BLANK ASSOCIATES, INC.

95

open, right?

     A    Yes, it's a public place.

     Q    And you left your window down when you went into the store, right?

     A    Yeah, because I really wasn't worried about anything.  I hadn't committed a crime, I didn't have anything on me.  I wasn't really worried about hiding evidence at that point.

     Q    And when you were driving from downtown over to the Turkey Hill, those were all public streets, right?

     A    Yes.

     Q    You're allowed to drive on, right?

     A    Yes.

     Q    Police are allowed to drive on?

     A    Yes.

     Q    Now you talked about, and I think you said it several times about, you know, you did nothing wrong, you have nothing to hide.  But you were driving a vehicle that did not have an ignition interlock system, correct?

     A    Correct.

     Q    And that is something that, with the current license you had at that time, you should have had when driving that vehicle?

96

A    To the best of my knowledge, no.

Q    Why not?

A    Because I had already received letters from PennDOT saying I was allowed to have my license back. Like, my license was good but because PennDOT was closed you couldn't get your license back.  That's why I was working with the state representative.

Q    So you received a letter that said that you could get a license that didn't have that restriction on it, correct?

A    Correct.

Q    And at that time, the date of this incident, August 31st of 2021, you had not gotten the license that didn't include that restriction, correct?

A    Did I have it in my possession, no.  The state representative was getting it for me.

Q    Did he have it in his possession?

A    No.

Q    Okay.  So had it been issued at that point in time?

A    To the best of my knowledge, no.

Q    Okay.  So at the time that you were driving Anaise's vehicle, it should have had, based on what your license in your possession on that day, it should have had an ignition interlock system?

97

MR. COCHRAN:  Object to form.  You can answer.

THE WITNESS:  To the best of my knowledge, no.

BY MS. LAUGHLIN:

Q    And because of a letter you got, is that correct?

A    I'm not a lawyer or a police officer.  I know that at the time they were saying that anything going on with PennDOT, the police aren't giving you a tough time about because they know you can't go to PennDOT because PennDOT's closed.

Q    Who told you that?

A    The state representative told me that.

Q    What's the state representative look like?

A    I didn't meet -- I believe his name was Mussare.  I didn't meet him.

Q    When there was the pat down done inside the Turkey Hill by Officer Gardner, was that any different from another pat down that you had received with your previous encounters with police officers?

A    I don't recall.

Q    You had mentioned about Detective Irvin's demeanor when it was you and him when you were in the back of the vehicle, that it seemed more calm when he

wasn't around Officer Gardner. Do you recall that?

A    Yes.

Q    Now at that time where you were having that conversation that you said was calm with Detective Irvin, Anaise Lopez was also not around, correct?

A    She was within ten feet of us but she was not right next to Irvin and I, correct.

Q    You believed -- you had testified earlier that you were at Turkey Hill for a half hour to an hour before being taken to the station?

A    Are you talking about from the time we arrived or from the time I was cuffed and put in the back?

Q    You gave the answer that you stayed a half hour to an hour before you were taken to the station. So what were you referencing?

A    I believe I was referencing once I was handcuffed and they took the vehicle that Anaise was in drove away. I believe we still sat there for about a half hour or longer waiting for the tow. And then they actually gave up and just took me to the station. The tow must have eventually came for the car, but I never watched the car get towed.

Q    Did you check the timing at all on the body cam footage to show when you were handcuffed and then

99

the time that you arrived at the station?

A    No.  I'm just giving a roundabout guess kind of time answer when it comes to time lengths of the incident.

Q    And I know you've said that -- or, you have a belief that the officers are not being truthful.  Do you have any reason to doubt that the body cam footage or the timing on it is incorrect?

A    I believe it's correct, yeah.  I don't doubt it, it's a video.

Q    Now you said -- you gave us a definition of kidnapping, which was moving a person from one place to another without their permission.

A    Yeah, against their will.  I believe that's close to the definition.

Q    And so is it your opinion that any time an officer arrests someone or detains someone to get further information that they're being kidnapped?

A    If the officer didn't have cause, yeah, they are.

Q    Okay.  And I know you talk about you -- you said you're not a lawyer, you're not in law enforcement.  But you're using a lot of different words that are related to the law and law enforcement, like probable cause.  Do you know what the definition

100

of probable cause is?

A    I'm not a lawyer, I don't know the exact definition.

Q    Do you know a roundabout definition?

A    I have an idea, yeah.

Q    Okay.  What is it?

A    I believe it's -- they have to have some type of evidence, some type of probable reason to stop you, harass you, whatever they're going to do.  I might be wrong about it, but I think that's what it is.

Q    Did you ever hear of the term reasonable suspicion?

A    I have heard the term.

Q    Okay.  And do you know what that means?

A    I can come up with what I think it means, but I don't know if that -- I don't know the definition. I don't know how it relates to probable cause or police conduct.  I don't know.

Q    I want to turn your attention to the strip search.  You had mentioned a couple of times that you don't know if they wanted you to manipulate your genitalia to stimulate them.  And when you're talking about to stimulate them, you're talking about the officers that were present for the strip search?

A    I'm saying -- I didn't -- when they -- I'm

manipulating myself. I said I don't know if it's for their gratification.

Q Okay. And what would lead you to believe that they want you to manipulate your genitalia for their gratification?

A What made me think that was the fact that there was no other reason for me to be there and be naked and being searched and doing those things. They didn't, to my knowledge, have a reason to have me there.

Q Do you believe they did anything that was out of the normal realm for police officers during a strip search?

A I don't know what a normal strip search is like. I don't know what they're supposed to do or not supposed to do. I don't know how long it's supposed to take. I don't know if there's supposed to be one officer, two officers. I don't know if they're supposed to record it so there can be no he said, she said afterwards. I don't know.

Q Okay. And you don't recall your prior strip search when you went to jail, so you don't know how it compares to the one from this case?

A It was so long ago I don't remember the specifics of it.

Q   In the packet that you were provided by Attorney White, on Page 49, your answer to interrogatory Number 8 is what I want to look at.  In that answer you say that the Defendants seized, treated, and handled them inappropriately.  It's two words but I think it's supposed to be one word.  In what way did the Defendants handle you or Ms. Lopez inappropriately?

A   I guess what I would -- all of the things they did, if they didn't have the right to do it, then it was all inappropriate.

Q   But if they had the right to do it then it wasn't inappropriate based on that statement, correct?

A   No, not completely.

Q   Explain that.

A   I mean, that's part of it, that's the start. I mean, you can't -- if they didn't have any reason or anything they -- they shouldn't even have started it. That's just the tip of the iceberg.  One they start it, they were aggressive the whole time.  They were demeaning.  They were doing things that were just harassing.

You know, there's -- you could -- like they were talking today.  They were real polite to everyone, were real nice.  I don't know those guys,

ERVIN BLANK ASSOCIATES, INC.

I've never met them before.  They were completely different people.  Neither one of those officers were deescalating in a situation.  I was the only one that seemed to be deescalating everyone there.  Or trying to.

Q   Do you know what a police officer is supposed to do in that situation where you have two people suspected of drugs and one of them not complying, yelling, not listening --

MR. COCHRAN:  Object --

BY MS. LAUGHLIN:

Q   -- and another who refuses to ID himself?

A   I mean, they could have called for a supervisor.  They could have called for help, you know, if they were so worried or distressed.  But they didn't do any of that.  They didn't even take any witness statements to support their side of the story. They didn't want any witness statements because it wouldn't have supported their side of the story.

Q   When you were incarcerated before, are you able -- were you able to shower on your own or did you have to shower with others?

A   I believe there was a stall, so it was like you showered by yourself.  But I think there wasn't a curtain on the stall.  I may be wrong about that.

ERVIN BLANK ASSOCIATES, INC.

104

Q    You've had some other interactions with the police for the DUIs, paraphernalia, numerous traffic violations.  On any of those occasions did you ever refuse to provide ID or ID yourself?

A    No, I cooperated fully every time.

Q    When you had the paraphernalia charge, you said that resulted out of being pulled over.

A    Yes.

Q    What were you pulled over for?

A    I believe I went on a one way the wrong way. I turned right on a one way.

Q    And you had said it was for a marijuana pipe or a cap?

A    It's like a pipe but it's called a cap, yeah.

Q    Okay.  With regard to Ms. Lopez's appeal, do you know whether that was to appeal the charges she was found guilty of or to appeal the sentence that she was given?

A    I don't know the specifics of her exact -- when it comes to that with her lawyer.  That's between her and her lawyer.

Q    You had talked about seeing multiple articles about the subject incident.  Where were these articles?

A    I believe when it first happened there was an

ERVIN BLANK ASSOCIATES, INC.

105

article in the Sun Gazette and on Northcentral.com and I think on Pennlive.com. Then I think a few months later when there was some motion in her case there was some more articles. It's usually the Sun Gazette and Northcentral PA that put out the articles. I think PennLive only covered it one time.

Q  And where you mentioned in these other articles by name?

A  I don't know exactly if I was -- I don't know if I was named in every one or any of them. I don't recall.

Q  You had said that people had asked you about this, so customers employees, managers, family members, friends, your friends' dads. What are the names of the customers who have asked you about this?

A  I don't know their -- off the top of my head I couldn't give you their names. This is stuff that's happened over a two-year period on and off.

Q  Who are the employees that have asked you about it? What are their names?

A  Frank, Josh, Greg, Jeff, Jerry, Warren, Jamie. I mean, just work people.

Q  What's Frank's last name?

A  Colbalarge.

Q  Can you spell that?

ERVIN BLANK ASSOCIATES, INC.

A    I don't know how to spell Colbalarge.

Q    Is he still at Perkins?

A    Yeah, he's the general manager.  That's my boss.

Q    Okay.  And Josh, what's his last name?

A    I guess I -- I don't see why this is --

MR. COCHRAN:  They're entitled to whatever evidence would be out there pertaining to damages. And if there have been conversations between your damages and this incident, then they're entitled to explore who would have --

THE WITNESS:  His last name is Seagraves.

BY MS. LAUGHLIN:

Q    Does he still work at Perkins?

A    Yes.

Q    Okay.  How about Greg, what's his last name?

A    Treese.

Q    What was that?

A    Treese.

Q    Can you tell that?

A    I don't know.

Q    Is he still at Perkins?

A    Yeah.  Most of these people are all still at Perkins.

Q    What is Jeff's last name?

107

A    Thomas.

Q    Is he still at Perkins?

A    Yeah.

Q    What about Jerry.  Last name?

A    Moser.

Q    Still at Perkins?

A    Yep.

Q    Warren.  What's Warren's last name?

A    Houseschnedt.

Q    Still at Perkins?

A    Yep.

Q    Jamie.  Male or female?

A    Female.

Q    What's her last name?

A    Burton.

Q    Still at Perkins?

A    Yep.

Q    And you talked about your manager, Frank. Were there any other managers who have asked you about this incident?

A    Greg's a manager and Josh is a manager.

Q    Who was the friend's dad that asked you about it?

A    Roger Hubbard.

Q    Does he live here in Williamsport?

ERVIN BLANK ASSOCIATES, INC.

108

A    Yeah.  He lives in Southside.

Q    Do you know what street?

A    Valley Street.

Q    You talked about having anxiety, and I know you talked about sweating here today.  Any other symptoms with regard to anxiety that you experience?

A    Just like sweating, paranoia.  Like, you know, just like, mind racing, shaking, just being uncomfortable, fear.

Q    You commented that you wouldn't -- you won't live in the city police jurisdiction.  When did that opinion start?

A    Ever since this happened.

Q    You said you were close to losing your job after this incident and that they had called you in to talk to you.  Who was that that --

A    I don't believe I ever said I was close to losing my job.  He said that and I said, they did talk to me about this.  They talked to me about it, yeah.

Q    Okay.  So let me back up, you keep interrupting.  You got to -- I know it's tough when we're going back and forth, but you got to wait until I completely finish my question before you give your answer.  So you're saying now that you were not close to losing your job?

ERVIN BLANK ASSOCIATES, INC.

A    I never said -- I don't believe I said those words.

Q    Okay.  Well that's not my question now.  We can look at the transcript after we get it, you can go through it and see what you did say.

A    Okay.

Q    But is it your testimony right now that you were not close to losing your job because of this incident?

A    I am not -- I am not losing my job because of this incident.

Q    Okay.

A    You're kind of -- I'm getting lost in your questions a little bit here.

Q    Okay.  I'll make it simple.

A    Okay.

Q    At any time since the date of this incident, were you at risk of losing your job because of the incident?

A    No.

Q    Okay.  You said you were called in to talk about it?

A    Yes.

Q    And who was that that called you in?

A    Frank.

Q    And was there anybody else present?

A    I don't believe so.  I think we were just -- it was him and I in the office I believe.

Q    And is there any kind of disciplinary action against you because of this incident from work?

A    No.

Q    Was there anything notated in your file?

A    No.

Q    Okay.  Because of this incident you had indicated that you're not going to be able to go anywhere in the company?

A    No.

Q    And so how is that if it's not documented anywhere, you weren't in jeopardy of losing your job?

A    Just the damage of my reputation.

Q    You talked about being worried about what the police are going to do in a future situation.  Were you worried about what the police would do when you passed Officer Gardner on the side of a road responding to -- or during a traffic stop when you yelled curse words at him out the window?

A    Excuse me?

Q    Were you worried about police actions when you drove past Officer Gardner when he was on the side of the road with a traffic stop and you yelled curse

111

words at him after this incident?

MR. COCHRAN:  Object to form.

MS. LAUGHLIN:  You can answer.

MR. COCHRAN:  You can answer if you recall.

THE WITNESS:  I don't recall.

BY MS. LAUGHLIN:

Q    Your landlord that came up to you and asked you about what had happened, what's your landlord's name?

A    What's his name.  Rennie Rodarmel.  I always pronounce his name wrong.

Q    And where does Rennie live?

A    I don't know where Rennie lives.

Q    How do you contact Rennie?

A    I live above his business.  He owns an Allstate agency.

Q    Okay.  Do you have a Facebook account?

A    Yeah.

Q    Have you posted anything about this incident or Ms. Lopez's charges on your Facebook page?

A    No, I don't believe I have.

Q    Have you posted anything on your Facebook page about your feelings about police officers now?

A    No.  I never have.

Q    Have you posted anything on Facebook about

112

this lawsuit?

A    No.  I never have.

Q    Does Ms. Lopez smoke cigarettes?

A    Sometimes, yeah.

Q    Did she smoke cigarettes at the time of this incident on August 31st of 2021?

A    Sometimes, yeah.

Q    You may have already answered this, but when Officer Gardner entered Turkey Hill and said hello to you, why did you immediately put your hands up and say, do you want to search me?

A    I think it was two reasons.  One, I was a little scared and startled.  He looked -- again, he did not look like a police officer.  He looked very, you know like, SWAT team, narcotics officer, tactical kind of guy.  It was a little, kind of like, coming right up -- I didn't know if he -- I thought he was coming right up to put hands on me.  I didn't know he was coming up to say, come follow me.  I thought he was coming right up.  So I was just like, search me, I don't care.  I don't got nothing on me, I didn't do nothing wrong.  Do whatever you want.

Q    And is that normally how you respond to police officers?

A    No.  He scared me.

ERVIN BLANK ASSOCIATES, INC.

113

Q   And then once you were walking out of the Turkey Hill back to the car, you had your hands up or on the top of your head.  Why did you have those in that position?

A   I wanted everyone -- everyone -- the police, witnesses, to see that I'm not struggling with this guy.  I'm not arguing with this guy.  I've got my hands above my head.  That way if he did something to me, slammed me on the ground, whatever happened, there was no he said, she said, that I moved a way certain way, touched him, did anything.  I was scared.  I was literally scared.

Q   And when you were talking to Ms. Lopez during this interaction you had said something about, don't, they will throw you on the ground.  Do you remember that?

A   I believe I remember something like that.

Q   Why would you say that?

A   Because I knew -- I kind of thought I knew what was going on at that point.

Q   And what was that?

A   That they were looking for a reason to charge us with a crime.  And that reason was going to be, if you move right now they're going to slam you on the ground, say you assaulted them, you resisted arrest,

114

you did that.  And then they'll charge you with whatever and then that's the way it's going to go. They're going to write the story at this point.  They say how it goes, then you have to prove whether it happened later.  That's what we're doing right now.

Q   You had made the comment that they were out of pocket.  What does that mean?

A   I believe I said that.

Q   What does that mean?

A   It's kind of like slang for like, acting crazy.

Q   When the officers asked you to ID yourself, why did you refuse?

A   Because at that point they had asked to search the car and I think we were kind of just like, just let them search the car because we just want to go about our day and we didn't do anything wrong.  And then once they started like, asking us for ID, asking for all these things, I'm just like, you know what, I'm not cooperating anymore.  I feel like I'm being harassed.  We didn't do anything wrong for even -- come up and talk to me.

But when they did come up and talk to me, I tried to cooperate.  I said, go ahead and search the car.  But now it's this, that, and the other -- you

ERVIN BLANK ASSOCIATES, INC.

115

want to search me now too, no. If you're going to do it, just do it. Because they did it anyway. But I'm not going to consent to it and say you guys can.

Q So you don't think that the officers had a right to ask you to ID yourself?

A No, we weren't doing anything wrong.

Q You don't think they had a right to pat you down?

A No, I don't believe so.

Q And then it was you that told Ms. Lopez to revoke the permission to search the vehicle, right?

A Yeah, because I didn't want to be cooperative anymore. I didn't feel like -- you know, if you come up to me and you ask me something and you're nice, and you know -- that's how I was raised, I'll help you. But if you come to me and you're yelling and all these things, and you're harassing and doing all that, I'm going to help you. Do whatever you want, but I'm not helping you do it.

Q Throughout the interaction you would agree that Ms. Lopez was yelling at the officers?

A I'll agree that her voice was elevated, yeah.

Q And you were telling her to shhh and to stop. You told her to sit on the car as the officers told her to do?

ERVIN BLANK ASSOCIATES, INC.

116

A    Yeah.  I knew what they were -- what was going to happen.  I literally told you guys what was going to happen about five minutes before it happened.

Q    So why were you telling her to shhh and to stop and to sit down?

A    Because she's never been around the police before.  She doesn't know how they are.  She doesn't know that they're going to twist everything you do, use everything you do against you.  That you just moving left and right, they consider that assault. You just attacked them, you just gestured some type of way.  I said, just stand still, they're going -- it's not going -- you know, it'll all be over, I thought. But I was wrong.

Q    But at this time, back in August 31st of 2021, that was the time where you still believed in the police, that they did what was right?

A    Yeah.  I was kind of like, we didn't do anything wrong so eventually they will let us go.

Q    But you're telling me that you were telling her to shhh, to stop, and to sit on the car because you saw what they were doing and that you saw that they were going to twist things around and you use it against you?

A    Yeah.

ERVIN BLANK ASSOCIATES, INC.

Appx721

117

Q   At a time when you still believed the police did what they're supposed to?

A   Yeah, I believe in them that they -- you know, we need the police to stop crime.  But I also know that they will harass you.  I just was watching it happen.

Q   You also told Detective Irvin that if he let you talk to her, you'd be able to calm her down.  Do you recall that?

A   Yeah.

Q   And so you agree she was not calm during this interaction?

A   No.  That was -- it was pretty -- it was a pretty crazy situation and I don't think she's ever been in any situation like that.  I think, you know, it was really surprising to her that that's how the police are, you know.  I think she just thought, you know, you didn't do anything wrong, you would be okay.  And I just thought, you know, eventually we will.  This is probably going to go on for about twenty or thirty minutes and then they'll let us go when they find out that we didn't do anything wrong.  It just didn't go that way.

Q   Now you had also said something to, I don't remember if it was Irvin or Gardner that, well, if

118

there's a roach in there that would be the most that's in there. Do you recall saying that?

A I think I said something along those lines.

Q So why would you think there'd be a roach in there?

A Because I have a police officer telling me he visually sees a roach in there. So I said, if you see a roach in there just charge me with it, which they never did.

Q And you said that Ms. Lopez -- you described her as a hostile woman. Do you recall that?

A Yeah, I think at that time I was trying to negotiate with my kidnappers again, you know. He seemed like he was trying to do a little good cop, bad cop thing. So he was coming over there good coping me. So I was trying to be like, hey buddy, you know women, let's just -- you know, if I can talk to her I can calm her down. I was just trying to get these guys to let us go, we didn't do anything wrong. There was no crime that they stopped us for. The only crime that happened was a result of the stop.

Then there was an argument and it got out of control. That's the only crime that happened. So if we weren't stopped there would have been no argument and no crime kind of thing is what I was trying to

119

talk to Irvin about.  I think even at a point he was kind of like, you know, we're going to calm her down or something.  I don't even know what.

Q    Then after that point is when she kicked an officer?

A    I wasn't over there, I just saw them dragging her across the parking lot.

Q    You also say that she's -- misses her rights get violated.  What do you mean by that?

A    Again, I was just trying to talk to them and kind of like, buddy-buddy a little bit, kind of good cop, bad cop on their side like, hey guys, I know, yeah, she's like that.  Let me go talk to her, this and that.  I'm just trying to negotiate with these guys that got us handcuffed and just try and get them to let us go because we didn't really do any -- at that point, you know, I think they were still arguing. It wasn't really like they had dragged her across the parking lot yet.  I might be wrong about that but.

Q    So you were saying what you thought they wanted to hear?

A    I was negotiating, yeah.

Q    And so is Ms. Lopez a misses her rights get violated person?

A    No, I mean I don't think she's ever sued

ERVIN BLANK ASSOCIATES, INC.

Appx724

anyone or done anything like that. I don't think she's ever done like, a march for people or anything like that. I don't know.

Q And you had previously told Ms. Lopez that marijuana is not legal in Pennsylvania like it is in Massachusetts and that she needs to put it away before she gets here?

A Yeah I mean, I think -- we definitely had the conversation before she moved down here that, you know, up there in had been medical for a long time, and it had just became recreational up there. So I said, when you move down here everything's different. It's not like that down here. They're not cool with it. You know, you just leave it at home and you do your thing. If you want to get a medical card when you get down here, that's your choice. But you know, it's a different state. You know, you lived there your whole life. It's different here.

Q And she had driven in the night prior from Massachusetts?

A The night -- I believe, from the best of my recollection, the night before she had arrived, yes.

Q And the key ring that had the keys to the vehicle that were in the vehicle, at one point Detective Irvin went and removed your house key and

121

your work key from that key ring.  Do you remember that?

A    I believe I -- he did go get keys from me, yes.

Q    And other keys on that, you had indicated in the video, were Ms. Lopez's keys?

A    I believe so.  That's what the video says.

Q    Why was your work key and your house key on a key ring with Ms. Lopez's keys?

A    Because we only had one car at that time so all the keys were on the same car thing.

Q    When you were in the back of the police vehicle waiting for them to come back and say what was going to happen, there were points in time when you were laying down in the back seat, kind of spread out, relaxed, right?

A    Yeah.

Q    And having a conversation with them when they would open the door, you still continued to lay back?

A    Yeah.

Q    You were whistling at one point when they opened the door?

A    Yeah.  I -- probably, maybe.  I was kind of losing it in there.

Q    What do you mean losing it?

A    I mean, it was tough watching them do that to her, being locked in there and you couldn't, like, help, you couldn't say anything, nobody can even hear you, you're locked in there.  I mean, it was frustrating watching all that happen and you can't even -- you got no say, you can't help, you know.  It was tough.  I was --

Q    So you were worried about Anaise?

A    I was -- I mean, I went through a ray of emotions in the back seat of that car.  I mean, I was worried, I was like laugh -- like, I can't even believe this.  I gotta laugh, like, I can't believe this.  Then I laid back and I'm like, you know what, I'm not worried because I didn't do anything wrong, they're going to let me out of this car in about ten minutes because I didn't do anything.

And then he's like, well are you going to tell me about the drugs and all this.  And I said, does it look like I'm worried, I'm laying here.  I'm not worried about nothing because there's nothing in that car.  And that's what that not worried, laying back was about.  And then I figure out, they're not gonna let me go.  They're not letting me go at all. They're taking me down to the station next. Okay, here we go. This is going to be --

Q   And so on the trip to City Hall then, your conversation with the officers consisted of asking about the vehicle that got left behind.  That's what you were concerned about, right?

A   I don't recall.

Q   Because nobody had stayed back with it?

A   That sounds familiar because the window was open and I feel like I was worried about that.

Q   And then when you got to the station and you were in the interview room, you were concerned about what was going to happen with Anaise and whether you would get to see her?

A   Yeah, because what Gardner had said that they were charging her with, I knew was really bad.  So I was like, I don't know if I'm going to get to see her before they take her to jail and she's probably going to be in there for a really long time because of what he was saying.

Q   And while you were waiting in the interview room you were talking to Detective Irvin.  You guys had talked about baseball, the new Y with the soccer fields, the dome, what you do in your free time, work --

A   Yeah.

Q   -- laughing and joking about your daughter.

124

You talked about the COVID shutdown and the mask mandate.  Do you remember that?

A    Yeah, I remember talking about some stuff like that.  I think I said that before.

MS. LAUGHLIN:  I don't have any other questions.

REDIRECT EXAMINATION

BY MR. WHITE:

Q    I have a follow-up.  Mr. Beatty, did you do community service -- 25 hours of community service -- sometime in 2019 as a result of a guilty plea?

A    Can you tell me what it was for?

Q    I'm looking at the criminal docket 1606-2018, Commonwealth of Pennsylvania v. Kyle Thomas Beatty.  This reflects a guilty plea by you entered on March 19th, 2019, for a misdemeanor 3 criminal mischief, damage to property, Judge Marc Lovecchio and your attorney, Kyle Rude.  Does that refresh your recollection?

A    Yes, it does.  I do recall that.

Q    Can you tell me what that was about?

A    It was a traffic accident.

Q    Tell me a little bit more.  What does that mean?

A    I don't recall exactly -- somebody hit my

ERVIN BLANK ASSOCIATES, INC.

125

truck and him and I had a back and forth, and I think I kicked or punched his truck.  Or car.

Q    At a traffic -- like a fender bender?

A    Yeah.

Q    You then were charged for that?

A    Yes.

Q    By the Montoursville State Police?

A    Yes.  You were right.  I totally forgot about that.

Q    You did 25 hours of community service?

A    I thought I just paid a fine to be honest with you.

Q    I'm just reading the --

A    Yeah.

Q    -- docket.  And you were on probation for a year for that.  Does that sound right?

A    Yeah.

Q    Do you remember the name of the person who you got into that altercation with?

A    I do not recall.

Q    Was it someone you knew before the fender bender?

A    No, it was a stranger.  I know that.

Q    Where did that happen?

A    At a Dunkin' Donuts.

126

Q    Whose car were you driving?

A    I believe it was my girlfriend's at the time. I think.

Q    What was her name?

A    Chazlyn Gavigan.

Q    Can you spell that?

A    Like, the whole thing?

Q    Yeah.

A    C-H-A-Z-L-Y-N.  And the last name is G-A-V-I-G-A-N.

Q    She from around here?

A    I think she lives in Lewisburg now.

Q    Did you have a license at that time? Unrestricted?

A    I don't recall, but the car was parked when we were hit.

Q    So she was with you in the car?

A    Yeah.

Q    Were you driving?

A    No.

MR. WHITE:  I don't have any other questions.

MS. LAUGHLIN:  I don't have any other questions.

MR. COCHRAN:  All right.  I think we're good then.

ERVIN BLANK ASSOCIATES, INC.

127

MR. WHITE:  Thank you.

(Whereupon, the deposition was concluded at 2:22 p.m.)

COUNTY OF LYCOMING          :

COMMONWEALTH OF PENNSYLVANIA :

I, Loretta C. Berrigan, the undersigned Notary Public, do hereby certify that personally appeared before me, KYLE BEATTY; the witness, being by me first duly sworn to testify the truth, the whole truth and nothing but the truth, in answer to the oral questions propounded to him by the attorneys for the respective parties, testified as set forth in the foregoing deposition.

I further certify that before the taking of said deposition, the above witness was duly sworn, that the questions and answers were taken down stenographically by the said Loretta C. Berrigan, court Reporter, Williamsport, Pennsylvania, approved and agreed to, and afterwards reduced to typewriting under the direction of the said Reporter.

In testimony whereof, I have hereunto subscribed my hand this 30th day of January, 2024.

_____
Loretta C. Berrigan
Reporter-Notary Public
My Commission Expires
December 7, 2026

ERVIN BLANK ASSOCIATES, INC.

Appx733

- 0 -

06104 [1] 1:24

- 1 -

10-hour [3] 6:6, 11, 16
11th [1] 4:12
1606-2018 [1] 124:13
17701 [3] 1:18, 21; 4:5
1986 [1] 4:4
19th [1] 124:16

- 2 -

2004 [2] 49:3; 53:19
2006 [1] 50:17
2008 [1] 56:8
2012 [1] 4:23
2013 [1] 56:3
2015 [1] 57:9
2016 [2] 49:3; 53:20
2018 [1] 58:22
2019 [2] 124:11, 16
2021 [24] 4:2; 5:23; 7:15; 9:1, 13, 20; 10:1; 24:24; 25:11, 12; 29:3; 54:19; 55:3, 24; 69:7; 74:7; 75:12; 76:24; 79:15; 81:6; 96:13; 112:6; 116:16
2022 [2] 59:9; 60:6
2024 [3] 1:12; 61:9; 128:20
2026 [1] 128:25
23-cv-00364 [1] 1:4

28th [1] 8:5
2903 [1] 1:24
29th [1] 8:5

- 3 -

30th [2] 8:8; 128:20
31st [20] 4:2; 5:23; 7:15; 8:25; 9:13; 10:1; 25:11; 29:3, 4, 7; 54:19; 55:3; 57:12; 74:7; 75:12; 79:14; 89:24; 96:13; 112:6; 116:15

- A -

a.m. [3] 1:12; 59:25
able [7] 33:4; 39:23; 87:10; 103:21; 110:10; 117:8
above [3] 111:15; 113:8; 128:13
absence [2] 30:11; 31:7
accident [1] 124:22
account [1] 111:17
accurate [1] 92:14
acting [1] 114:10
action [1] 110:4
actions [4] 23:20; 78:11; 94:25; 110:23
activity [1] 65:18
actual [1] 63:24

addition [1] 62:10
additional [2] 75:3; 83:3
address [3] 4:3; 91:9, 10
addressed [1] 48:19
admit [1] 93:11
admitted [1] 2:14
affect [1] 84:11
affected [1] 68:18
affirmed [1] 3:11
afraid [4] 20:20; 35:20, 21; 84:24
african [1] 75:8
afternoon [1] 12:16
afterwards [3] 49:19; 101:20; 128:17
again [12] 14:10; 41:7; 43:16; 47:5; 63:23; 78:13; 82:11; 86:21; 87:2; 112:13; 118:13; 119:10
against [12] 30:17; 66:13, 23; 71:1; 80:15; 85:13; 93:25; 94:9; 99:14; 110:5; 116:9, 24
agency [1] 111:16
aggressive [3] 34:13, 14; 102:20
agree [5] 39:20; 94:17;

115:20, 22; 117:11
agreed [1] 128:17
ahead [1] 114:24
alcohol [2] 49:10, 11
allegation [1] 28:15
allegations [1] 27:19
allege [1] 73:2
alleges [1] 27:22
alleging [1] 89:1
allowed [7] 40:4; 41:7; 45:10; 94:6; 95:13, 15; 96:4
allstate [1] 111:16
along [2] 27:21; 118:3
altercation [2] 38:9; 125:19
always [6] 8:2, 3; 12:25; 13:10, 12; 111:10
amazon [2] 81:13, 15
amendment [4] 30:10, 16; 31:4; 93:24
american [1] 75:8
among [1] 27:22
amount [2] 15:12, 13
anaise [15] 15:4; 18:25; 21:20, 23; 35:7; 36:22; 59:11, 12; 70:17; 93:11, 17; 98:5, 18; 122:8; 123:11

anaise's [1]
96:23
anderson [2]
75:24; 76:8
anguish [2]
78:10; 83:10
answer [14]
31:17; 64:5;
68:12; 86:13;
91:1; 97:2;
98:14; 99:3;
102:2, 4;
108:24; 111:3,
4; 128:8
answered [3]
41:16; 91:2;
112:8
answering [1]
25:20
answers [4]
40:5; 48:3;
64:5; 128:14
anxiety [13]
64:16, 21;
69:23; 70:22,
23; 73:11;
78:10; 83:10,
25; 86:20, 24;
108:4, 6
anyway [3]
19:5, 13; 115:2
apartment [1]
4:5
apologize [1]
45:18
appeal [5]
60:18; 61:3;
104:15, 16, 17
appealed [3]
60:13, 18, 21
appeared [2]
47:25; 128:6
application [1]
82:18
applied [8]
5:22; 81:5, 8;
82:2, 4, 6, 9,
11
approached [1]
72:23

approaching
[1] 21:15
approved [1]
128:16
approximate [1]
91:10
area [9] 11:1;
33:11, 20, 22;
75:6, 17; 76:9;
81:15; 91:17
argue [1] 72:8
argued [1]
68:17
arguing [4]
35:4, 5; 113:7;
119:17
argument [6]
56:17; 61:18;
62:10; 80:8;
118:22, 24
arguments [1]
71:16
army [1] 21:2
arrest [6]
40:4; 49:1, 22;
50:16; 62:11;
113:25
arrested [5]
30:12, 22;
33:25; 48:22;
49:12
arrests [1]
99:17
arrived [3]
98:12; 99:1;
120:22
arriving [1]
10:19
article [18]
42:5; 65:20;
66:11, 12, 14,
18, 19, 25;
67:1, 3, 7, 11,
15, 19, 21;
68:24; 70:4;
105:1
articles [12]
44:17; 65:22;
67:25; 68:4, 5,
7; 69:25;

104:22, 24;
105:4, 5, 8
ashtray [6]
24:13, 16;
26:14; 92:7,
11, 20
assault [13]
45:11, 17;
46:14, 18, 25;
53:3; 56:9, 13;
57:3, 4; 66:13,
22; 116:10
assaulted [3]
45:7; 64:13;
113:25
assaulting [1]
72:19
assistant [3]
5:8, 22; 6:23
associates [1]
1:23
assume [3]
9:23; 62:18;
91:1
assuming [2]
12:19; 70:4
attacked [2]
85:2; 116:11
attention [1]
100:19
attorney [4]
48:16; 90:18;
102:2; 124:18
attorneys [1]
128:9
august [25]
4:2; 5:23;
7:15; 8:25;
9:12; 10:1;
24:23; 25:11;
29:3, 8; 54:19;
55:3; 57:11;
59:8; 60:5;
69:7; 74:6;
75:11; 79:14;
81:6; 89:24;
96:13; 112:6;
116:15
austin [2]
1:20; 3:14

authority [1]
64:18
aware [1]
92:10
away [7]
14:24; 37:3;
74:17; 91:16,
17; 98:19;
120:6

---

- B -

back-to-back
[1] 49:7
backed [3]
17:14; 55:7;
91:23
background [2]
3:24; 4:1
balls [2]
43:12; 44:7
baseball [1]
123:21
based [4]
63:10; 76:13;
96:23; 102:13
basing [1]
93:1
beatty [24]
1:2, 9; 2:3, 15,
16; 3:10, 14;
4:4; 27:6, 8,
13; 34:1;
48:16; 60:3;
63:21; 66:5, 7,
10; 67:25;
88:24; 90:12;
124:9, 14;
128:6
beatty's [1]
27:3
became [4]
9:10; 23:15;
88:16; 120:11
begin [1]
63:22
beginning [2]
1:12; 21:19
behalf [1] 83:1

behavior [4]
62:14, 15, 20
behind [8]
14:18; 15:1;
16:4, 5; 19:8;
63:12; 86:23;
123:3
belief [1] 99:6
believes [1]
93:13
bench [6]
37:23, 25;
59:14, 15, 19;
60:5
bend [1] 44:7
bender [2]
125:3, 22
berrigan [4]
1:11; 128:4,
15, 23
best [32] 4:23;
6:4; 7:17;
10:2, 4; 23:2;
25:9, 15;
28:20; 34:23;
35:12; 38:11,
13; 40:7;
42:2; 47:20;
49:6, 14, 16;
50:18; 52:19;
53:15; 54:15;
56:3, 10; 58:5;
75:10, 15;
96:1, 21; 97:3;
120:21
better [6]
21:25; 28:12;
43:12; 55:25;
59:21; 78:17
between [10]
3:2; 6:10;
27:24; 28:7;
35:5; 53:19;
56:18; 68:9;
104:20; 106:9
bills [1] 89:13
bipolar [1]
74:3
birth [1] 4:3

bishop [1]
4:14
block [4]
16:11, 14;
32:19; 91:12
blocks [6]
15:12, 14;
16:16; 32:1,
11; 63:13
blotter [1]
66:12
body [9] 22:24;
44:12, 17, 21,
23; 93:5, 10;
98:24; 99:7
bookstore [1]
91:14
born [1] 8:17
boss [2] 70:15;
106:4
boston [4]
8:19; 9:9;
85:24; 93:13
bottom [2]
27:11; 84:1
boulevard [3]
15:22; 16:15;
25:21
boyfriend [1]
67:4
break [6]
25:18; 30:7;
59:20, 21;
90:14
brief [1] 18:15
brother's [2]
58:12; 88:16
brutality [1]
20:24
buddy [1]
118:16
buddy-buddy
[1] 119:11
building [1]
7:14
bureau [1]
52:6
burton [1]
107:15

business [5]
4:19; 84:12;
85:17; 91:20;
111:15
butt [1] 45:16
buying [1]
22:20

---

- C -

c-h-a-z-l-y-n
[1] 126:9
calm [8] 35:13,
14; 97:25;
98:4; 117:8,
11; 118:18;
119:2
calvin [2] 1:6,
22
car's [1] 94:25
card [3] 20:5;
92:5; 120:15
care [6] 73:1,
4; 74:11, 13;
112:21
carry [1] 87:6
carrying [1]
37:4
case [11]
27:15; 59:9;
61:13; 66:17;
78:14; 83:7;
84:18; 89:7,
19; 101:23;
105:3
cash [1] 20:5
cashier [1]
46:5
casual [1] 17:6
caused [2]
70:23; 73:2
causes [1]
64:20
cell [1] 90:1
center [2]
50:22; 81:16
certain [6]
10:11; 43:18,
25; 44:18;
53:22; 113:10

certainly [1]
83:8
certificate [1]
4:25
certification
[1] 3:4
certify [2]
128:5, 12
change [1]
93:18
changed [1]
87:3
characterizatio
n [1] 44:19
charge [9]
42:24; 57:5,
13; 58:9;
77:9; 104:6;
113:22; 114:1;
118:8
charged [16]
31:12; 40:3;
53:13; 56:13,
22; 58:19;
65:10; 68:20,
21, 25; 69:2;
78:3; 79:11;
92:24; 93:2;
125:5
charges [7]
58:16; 66:13,
22; 71:12;
80:15; 104:16;
111:20
charging [1]
123:14
chazlyn [1]
126:5
check [1]
98:24
checking [2]
19:10; 42:18
cheeks [4]
43:15; 44:8;
45:16; 52:9
chef [2] 5:8,
22
child [1] 74:15
choice [2]
32:13; 120:16

cigarette [2] 30:1; 92:17

cigarettes [3] 24:23; 112:3, 5

citations [4] 48:24; 53:24; 56:5; 77:10

cited [1] 54:4

city [4] 16:16; 76:18; 108:11; 123:1

claim [2] 78:6; 83:1

claiming [2] 68:3; 84:4

clear [3] 42:12; 60:7; 63:24

clinton [3] 1:6, 25; 90:13

close [11] 6:17, 18, 19, 20; 44:20; 79:7; 99:15; 108:14, 17, 24; 109:8

closed [2] 96:6; 97:12

closely [1] 33:1

closer [2] 6:15

clothes [1] 43:21

clothing [5] 42:5, 15; 43:6, 8; 44:17

cochran [15] 1:17; 31:16; 47:23; 48:4, 10, 14; 65:25; 66:1, 4; 97:1; 103:10; 106:7; 111:2, 4; 126:24

colbalarge [2] 105:24; 106:1

college [7] 4:9, 15, 17, 22; 5:8, 18, 19

combination [1] 50:21

coming [7] 19:3; 26:10; 112:16, 18, 19, 20; 118:15

comment [1] 114:6

commented [1] 108:10

commission [1] 128:24

commissioner [2] 17:17; 91:21

commissioner's [2] 10:22; 91:7

commit [4] 47:1, 2; 63:15; 72:24

committed [9] 31:11; 45:8; 47:14; 51:16; 68:16, 17; 69:6; 71:1; 95:6

committing [1] 32:12

common [1] 45:13

commonwealth [3] 59:9; 124:14; 128:2

communicate [1] 90:1

community [5] 65:5; 88:19; 124:10; 125:10

company [3] 79:4; 80:22; 110:11

compares [1] 101:23

compiled [1] 63:22

complaint [2] 27:15; 74:24

complete [2] 48:7

completed [1] 4:9

completely [4] 43:8; 102:14; 103:1; 108:23

complying [1] 103:8

concern [1] 12:7

concerned [5] 15:2; 36:5, 20; 123:4

concerns [1] 22:12

concluded [1] 127:2

condition [1] 74:3

conduct [8] 44:2; 48:23; 53:7, 14; 60:9; 63:1, 8; 100:18

conducted [1] 34:4

conducting [1] 33:10

conducts [1] 53:10

confiscated [1] 89:24

confronted [1] 75:5

connecticut [1] 1:24

connection [2] 50:6; 69:25

consent [3] 47:7; 115:3

consider [1] 116:10

considered [1] 61:11

consisted [1] 123:2

contact [2] 12:1; 111:14

continue [3] 61:17; 62:9; 64:13

continued [2] 64:20; 121:19

continues [1] 62:25

continuing [1] 17:8

control [2] 36:11; 118:23

conversation [9] 18:9; 35:11, 13; 36:8; 94:1; 98:4; 120:9; 121:18; 123:2

conversations [2] 39:2; 106:9

convicted [5] 37:17, 21; 51:20; 58:24; 60:10

conviction [2] 60:23; 77:20

convictions [3] 58:16; 71:12; 77:7

cook [1] 5:21

cooked [1] 5:16

cool [1] 120:13

cooperate [2] 23:12; 114:24

cooperated [1] 104:5

cooperating [2] 23:13; 114:20

cooperative [1] 115:12

copied [1] 48:11

coping [1] 118:15

corner [2] 91:13

correct [49] 3:17; 25:23; 26:12, 17, 21; 27:1; 32:15; 37:23; 40:25; 41:4; 46:8, 9;

Appx737

47:15, 16; 50:23; 54:21; 60:25; 61:15; 63:20; 66:21; 67:15; 68:1; 69:1, 3; 73:5, 6, 9; 74:1, 5; 83:2, 5, 11, 12; 87:16; 89:8, 9, 21; 92:8; 93:9; 95:21, 22; 96:10, 11, 14; 97:7; 98:5, 7; 99:9; 102:13

**corrections** [1] 52:23

**correctly** [1] 30:14

**correspondenc e** [1] 48:4

**cough** [3] 43:15; 44:8; 52:8

**coughed** [1] 43:20

**counsel** [3] 1:16; 3:3; 61:18

**counsel's** [1] 62:12

**county** [12] 10:22; 17:11; 48:25; 49:1; 50:21, 25; 51:16; 53:24; 59:8; 91:7, 21; 128:1

**couple** [7] 17:19; 55:21; 69:12; 74:18; 80:3; 82:4; 100:20

**court** [10] 1:1; 17:5; 27:15; 57:6; 59:13; 60:6; 61:22, 23; 62:12; 128:16

**courthouse** [1] 91:12

**courtroom** [1] 59:15

**covered** [7] 34:20; 66:17; 68:10; 75:2; 83:24; 90:18; 105:6

**covid** [3] 6:21; 17:13; 124:1

**coworkers** [1] 70:15

**cr1281-2021** [1] 59:12

**crazy** [6] 23:16; 85:3, 7; 114:11; 117:14

**creature** [1] 10:13

**credible** [4] 60:7; 61:22, 24; 62:1

**crime** [29] 31:11, 12; 32:12; 33:5; 40:4; 42:24; 45:8; 47:1, 3; 51:20; 63:15; 68:17, 21, 25; 69:2, 6; 71:1; 72:24; 78:20; 87:10, 24, 25; 95:6; 113:23; 117:4; 118:20, 23, 25

**criminal** [8] 42:20; 58:16, 19; 65:18; 80:15; 89:19; 124:13, 16

**cross** [2] 2:2; 28:19

**cross-examinat ion** [1] 90:9

**crouched** [1] 43:20

**cruiser** [7] 11:9; 14:10;

35:7, 9, 17; 36:18; 38:8

**cuffed** [6] 36:16; 49:24, 25; 50:7; 62:11; 98:12

**current** [2] 4:3; 95:23

**curse** [2] 110:21, 25

**curtain** [1] 103:25

**customer** [1] 65:7

**customers** [3] 69:10; 105:13, 15

- D -

**dads** [1] 105:14

**daily** [2] 45:15; 64:20

**damage** [2] 110:15; 124:17

**damages** [14] 78:6, 9; 83:6, 7, 13, 19, 21; 84:5; 88:25; 89:3, 5, 7; 106:8, 10

**date** [9] 4:3; 59:8; 60:12, 14; 82:21; 92:3, 20; 96:12; 109:17

**dated** [1] 9:17

**dating** [1] 9:16

**daughter** [1] 123:25

**days** [15] 6:6; 10:12; 24:20; 49:2; 50:19, 20, 24; 51:2, 11, 13; 60:20; 61:1, 2; 81:24; 93:12

**dead** [1] 16:8

**deadbolt** [1] 84:15

**deal** [2] 68:15; 94:2

**december** [1] 128:25

**decide** [2] 13:12; 14:3

**decided** [5] 10:7; 23:11; 41:9, 10; 62:3

**deep** [1] 22:25

**deescalate** [4] 35:4; 37:13; 86:4, 5

**deescalating** [2] 103:3, 4

**defend** [2] 71:14, 21

**defendant** [9] 1:10, 22, 25; 2:14; 28:2; 33:8; 34:4, 17; 62:11

**defendant's** [2] 60:8; 62:14

**defendants** [5] 1:7; 2:2; 30:12; 102:4, 7

**defense** [1] 61:18

**defense's** [1] 62:10

**definitely** [3] 33:6; 44:20; 120:8

**definition** [7] 39:11; 99:11, 15, 25; 100:3, 4, 16

**defund** [1] 20:24

**degree** [2] 4:10, 24

**dehumanize** [1] 45:22

**dehumanizing** [1] 46:24

**deliver** [1] 81:19

delivery [1]
81:16
demeaning [1]
102:21
demeanor [1]
97:24
demoted [1]
80:19
depicted [1]
76:10
deposition [9]
1:9; 2:15, 16;
27:3, 8; 66:7;
127:2; 128:11,
13
depositions [2]
3:16; 17:2
depression [1]
74:3
described [1]
118:10
description [2]
64:10; 92:14
deserve [1]
79:3
detail [1]
22:25
detailed [1]
64:10
detain [1]
31:21
detained [1]
69:21
detains [1]
99:17
detective [20]
3:15, 16; 11:7,
9; 21:7;
30:19, 25;
31:5, 13; 35:8;
38:23; 39:2;
41:1; 75:24;
76:7; 97:23;
98:4; 117:7;
120:25; 123:20
determined [2]
61:25; 62:16
device [1]
54:18

diagnosed [1]
74:2
dialogue [1]
3:19
diaries [1]
89:10
different [14]
13:11; 35:18;
49:7, 9; 75:22;
85:15, 18;
93:6; 97:19;
99:23; 103:2;
120:12, 17, 18
diligence [1]
33:6
diploma [1]
4:13
direct [2] 2:2;
3:12
direction [1]
128:18
disagree [5]
39:22, 25;
62:4, 23; 63:1
disagrees [1]
62:13
disciplinary [1]
110:4
disclosures [1]
66:3
discovery [3]
27:13; 47:24;
48:16
discussed [2]
71:13; 77:8
discussing [1]
13:11
discussion [1]
67:22
disorderly [5]
48:23; 53:7,
10, 14; 60:9
disrobing [1]
46:11
distress [3]
39:8; 78:9;
83:9
distressed [1]
103:15
district [2] 1:1

docket [2]
124:13; 125:15
doctor [3]
73:7; 74:10, 16
doctor's [1]
89:13
document [3]
27:7, 14; 66:6
documentary
[1] 89:6
documentation
[2] 27:12;
89:5
documented [1]
110:13
documents [1]
89:2
doesn't [10]
56:2; 58:23;
67:14, 17;
70:8; 72:4;
84:21; 88:4;
116:7
dome [1]
123:22
done [8] 17:8,
15; 40:1;
52:25; 86:16;
97:18; 120:1, 2
donuts [1]
125:25
door [8] 24:14;
84:13, 14;
85:1; 92:12;
121:19, 22
door's [1]
84:21
doubt [2] 99:7,
9
down [35] 9:5;
13:6, 8, 22;
16:6, 17:5;
25:18; 27:23;
28:7, 19; 34:1,
21; 46:3;
50:5, 6; 56:11;
57:5; 64:13;
85:1, 24; 95:3;
97:18, 20;
115:8; 116:5;

117:8; 118:18;
119:2; 120:9,
12, 13, 16;
121:15;
122:24; 128:14
downplay [2]
84:9; 85:19
downplaying
[1] 45:12
downtown [3]
10:20; 11:14;
95:9
dragged [1]
119:18
dragging [1]
119:6
drawing [1]
70:19
dress [12]
10:23; 11:13,
17; 12:19, 22;
14:9; 16:18,
24; 18:16, 17,
19; 25:21
dressed [1]
44:1
drink [2] 20:3,
16
drinks [1]
94:21
drive [7] 4:5;
11:23; 16:18;
76:12, 22;
95:13, 15
driven [2]
24:19; 120:19
driver's [4]
24:13; 26:14;
54:10; 92:11
driving [29]
10:25; 11:8;
12:13; 13:3, 8;
14:9; 15:7, 9;
16:22, 24;
24:18; 38:17;
54:2, 4; 55:2;
56:4, 6; 57:23;
58:2, 11;
72:24; 86:22;
95:9, 19, 25;

96:22; 126:1, 19

drove [12] 11:21, 25; 12:12; 16:6, 15, 21; 25:20; 49:18, 21; 98:19; 110:24

drug [1] 49:10

drugs [5] 42:21, 25; 45:21; 103:8; 122:18

duis [4] 49:5; 50:12; 77:9; 104:2

duly [3] 3:11; 128:7, 13

dunkin [1] 125:25

during [11] 6:2; 25:25; 26:24; 29:7; 37:11; 41:6; 42:3; 101:12; 110:20; 113:13; 117:11

duty [1] 7:5

- E -

early [2] 47:20; 49:6

ease [2] 48:9; 64:1

east [1] 76:18

easy [2] 17:5; 27:21

education [1] 4:8

eight [3] 5:4, 14; 10:15

eighteen [1] 60:20

either [16] 6:9; 11:23; 12:4; 20:12; 25:24; 26:2, 5; 46:10; 49:13, 24; 50:2, 11;

55:6; 70:23; 91:6, 20

elevated [1] 115:22

emails [1] 89:18

embarrass [2] 67:3, 7

embarrassed [1] 68:8

embarrasses [1] 67:11

embarrassing [4] 65:12, 21; 86:8, 11

embarrassment [8] 64:15, 23; 68:13; 69:23; 73:11; 78:10; 83:10, 25

embarrassments [1] 74:24

emergency [1] 74:19

emotional [3] 73:11; 78:9; 83:9

emotions [1] 122:10

employees [3] 69:10; 105:13, 19

employment [2] 5:2, 24

encountered [2] 20:12; 57:20

encounters [2] 77:17; 97:21

enforcement [12] 12:5; 20:13; 33:3; 38:10; 49:12; 57:21; 71:12; 77:8, 18; 78:2; 99:23, 24

enrolled [1] 4:14

entailed [1] 50:14

entails [1] 45:14

entered [2] 112:9; 124:15

entire [1] 62:13

entitled [2] 106:7, 10

errands [4] 10:7, 8, 17, 18

escalated [1] 62:13

especially [1] 78:16

esquire [3] 1:17, 20, 23

estimate [1] 8:4

event [8] 56:25; 57:21; 68:22, 25; 69:7; 71:9, 10; 81:9

events [2] 4:2; 53:8

eventually [10] 12:21; 38:20; 40:6; 41:2; 57:1; 79:25; 80:1; 98:22; 116:19; 117:19

everybody [3] 7:11; 64:25; 78:13

everyone's [1] 88:6

everything's [1] 120:12

evidence [5] 60:6; 89:7; 95:8; 100:8; 106:8

ex-girlfriend [1] 56:19

exact [10] 15:11, 13; 18:11; 23:21; 30:18; 82:21; 91:9; 93:25; 100:2; 104:19

exactly [7] 13:7; 28:11; 39:13; 48:5; 94:3; 105:9; 124:25

examination [2] 3:12; 124:7

except [1] 3:5

exchanged [3] 27:12; 89:22; 93:6

excuse [1] 110:22

exhibit [4] 2:15, 16; 27:8; 66:7

exhibits [2] 2:13; 27:2

expense [2] 82:25; 83:3

expenses [1] 89:13

experience [4] 71:4, 8, 11; 108:6

expires [1] 128:24

explain [10] 23:1; 39:15; 55:8; 63:6; 64:24; 83:17, 18, 23; 90:22; 102:15

explained [3] 64:12; 73:10; 83:8

explaining [2] 28:12; 62:19

explanation [1] 55:5

explore [1] 106:11

extent [1] 83:24

eyes [1] 28:20

- F -

face [3] 33:9; 90:5

facebook [4] 111:17, 20, 22, 25

fact [7] 31:10, 13; 53:13; 85:22, 23; 93:1; 101:6

fair [3] 8:4; 44:18; 91:3

faith [2] 72:2, 11

familiar [4] 12:4; 58:23; 73:22; 123:7

families [1] 78:25

family [3] 69:11; 85:13; 105:13

fear [8] 64:18, 19; 78:10; 83:10; 86:20; 87:12; 108:9

fears [1] 85:5

federal [2] 27:15; 70:1

fedex [1] 81:17

feeling [2] 19:2; 32:7

feelings [5] 64:12; 84:7; 87:8; 111:23

feet [1] 98:6

felt [6] 23:9, 21; 32:25; 45:7; 46:16; 47:5

female [5] 75:4, 7; 94:12; 107:12, 13

fender [2] 125:3, 21

ferren [1] 1:23

fields [1] 123:22

fifteen [1] 63:13

fight [2] 36:9; 72:7

figure [3] 14:7; 70:20; 122:22

figured [1] 53:20

file [1] 110:7

filed [5] 27:15; 68:1; 70:1; 79:9; 90:14

filing [1] 3:4

finally [2] 40:6; 41:9

finds [2] 60:6; 61:23

fine [3] 15:5; 83:14; 125:11

fines [1] 49:1

finish [2] 9:9; 108:23

fired [6] 79:24, 25; 80:2, 4, 7, 14

firm [1] 1:20

first [31] 4:20; 11:22; 12:2, 3; 13:13; 18:12; 20:12; 21:14; 24:19; 30:10, 16; 31:4; 33:9; 38:4; 41:16; 43:1, 2, 17; 46:2; 50:13; 66:19; 69:13; 79:23; 80:5; 82:16, 17; 86:10; 91:19; 93:24; 104:25; 128:7

five [10] 6:6; 16:16; 54:7, 8, 9; 74:6; 76:23, 24, 25; 116:3

flashlight [3] 27:25; 28:8; 46:10

flip [1] 48:6

floor [3] 24:10, 11; 26:19

focusing [1] 72:16

follow [8] 15:10; 27:21; 32:10; 33:4; 63:13; 71:6, 24; 112:19

follow-up [1] 124:9

followed [2] 15:11; 32:1

following [9] 15:15; 19:1; 20:9; 32:9, 11, 24; 33:1; 59:13; 72:18

follows [1] 3:11

followup [1] 90:11

food [7] 10:6; 11:1, 3; 13:4, 9, 14; 14:4

food's [1] 14:6

footage [5] 22:24; 93:5, 10; 98:25; 99:7

force [1] 32:16

forced [2] 23:5; 32:18

forcefully [2] 33:8, 13

foregoing [1] 128:11

forever [1] 87:6

forgot [2] 84:18; 125:8

form [4] 3:5; 31:16; 97:1; 111:2

forth [6] 6:10; 17:19; 48:6; 108:22; 125:1; 128:10

found [2] 75:19; 104:17

four [3] 5:7; 16:15; 81:25

fourth [1] 1:21

frame [6] 6:3; 9:23; 29:14, 16; 49:3; 76:10

frank [3] 105:21; 107:18; 109:25

frank's [1] 105:23

free [2] 83:17; 123:22

freeze [1] 76:10

friend [1] 62:17

friend's [3] 62:14; 69:12; 107:22

friends [8] 9:10; 69:12; 71:17; 88:16, 18, 21; 105:14

front [9] 11:14; 25:17; 38:1; 43:9, 22; 46:5; 47:23; 52:13; 59:7

frustrating [1] 122:5

fuel [2] 75:5, 7

fulfillment [1] 81:16

full [3] 4:2; 7:6; 73:17

fully [1] 104:5

future [1] 110:17

### - G -

g-a-v-i-g-a-n [1] 126:10

gardner [42] 1:6, 25; 3:17; 11:7, 9; 20:2; 21:7, 15; 22:3; 23:3, 8; 24:3, 9; 26:8, 13, 18, 22; 27:22;

28:2; 31:2, 13; 34:17, 18; 35:15; 37:6; 38:5; 39:15; 41:25; 44:9; 52:5; 55:6; 70:24; 73:3; 75:7; 90:13; 97:19; 98:1; 110:19, 24; 112:9; 117:25; 123:13

**gardner's** [4] 61:19, 23, 25; 88:16

**gavigan** [1] 126:5

**gazette** [3] 66:11; 105:1, 4

**gear** [1] 21:5

**general** [16] 4:19; 7:1, 7, 13; 64:18; 78:8; 80:11; 81:1; 82:12; 83:7, 13, 19, 21; 88:5; 106:3

**generalized** [1] 64:18

**genitalia** [6] 44:4, 6, 10; 45:2; 100:22; 101:4

**gestured** [1] 116:11

**girlfriend** [4] 64:16; 68:9, 13; 79:13

**girlfriend's** [1] 126:2

**gist** [1] 94:1

**given** [3] 83:20; 88:25; 104:18

**giving** [2] 97:10; 99:2

**gloves** [2] 41:24, 25

**goes** [2] 16:11; 114:4

**gone** [3] 17:1; 58:17; 91:8

**gonna** [1] 122:23

**good** [5] 96:5; 118:14, 15; 119:11; 126:24

**gotta** [1] 122:12

**grabbed** [1] 20:16

**grade** [1] 4:12

**graduate** [1] 4:24

**gratification** [7] 43:14; 45:4, 6; 46:19, 22; 101:2, 5

**great** [1] 3:23

**greg** [2] 105:21; 106:16

**greg's** [1] 107:21

**groin** [3] 33:11, 20, 22

**ground** [4] 36:14; 113:9, 15, 25

**grow** [1] 80:22

**grown** [1] 45:9

**guarantee** [1] 93:4

**guess** [9] 28:14; 42:18, 20; 55:16; 59:3; 70:3; 99:2; 102:9; 106:6

**guesstimate** [1] 15:13

**guilt** [1] 60:8

**guilty** [8] 51:21; 56:9, 24; 58:8; 61:15; 104:17; 124:11, 15

**guys** [12] 19:6; 45:11, 18;

84:9; 85:6; 102:25; 115:3; 116:2; 118:19; 119:12, 15; 123:20

---

**- H -**

**habit** [1] 10:13

**half** [6] 16:13; 38:13; 54:16; 98:9, 14, 20

**hall** [1] 123:1

**hand** [4] 20:3, 18; 42:16; 128:20

**handcuffed** [7] 35:1; 40:18; 45:8; 94:14; 98:18, 25; 119:15

**handcuffing** [1] 30:13

**handcuffs** [2] 31:1, 6

**handed** [1] 43:7

**handle** [1] 102:7

**handled** [1] 102:5

**hands** [10] 20:20, 21; 23:3; 34:18; 42:17; 43:10; 112:10, 18; 113:2, 8

**hanging** [1] 10:6

**happening** [3] 8:13; 28:13; 78:15

**harass** [4] 45:23; 63:8; 100:9; 117:5

**harassed** [8] 23:9, 17, 22; 32:7, 8; 69:21; 86:17; 114:21

**harassing** [6] 23:9, 19; 32:23; 72:19; 102:22; 115:17

**harassment** [3] 37:20; 60:10; 64:20

**hard** [1] 17:15

**hardest** [1] 88:7

**harm** [3] 78:9, 11; 83:9

**hartford** [1] 1:24

**haul** [1] 81:17

**head** [7] 14:5; 28:19; 35:16; 69:23; 105:16; 113:3, 8

**heading** [1] 13:6

**health** [2] 73:1; 74:3

**healthcare** [1] 74:7

**healthy** [1] 74:15

**hear** [4] 93:11; 100:11; 119:21; 122:3

**heard** [13] 11:6; 39:15, 19, 20, 21; 54:20; 70:7, 8, 10; 77:13; 91:1; 100:13

**hearing** [1] 61:6

**held** [1] 67:22

**hello** [1] 112:9

**help** [8] 87:11; 91:25; 103:14; 115:15, 18; 122:3, 6

**helping** [2] 91:22; 115:19

**hereby** [3] 3:2, 4; 128:5

**hereunto** [1] 128:19

hide [1] 95:19

hiding [1] 95:7

high [12] 4:9, 11, 13; 13:19; 14:2, 14; 16:3, 6, 8

hill [25] 10:3, 19; 15:20; 18:24; 19:7, 14; 20:8; 25:21; 28:3, 16; 32:14, 17; 34:18; 35:24; 38:18; 40:10; 46:3; 94:18, 24; 95:10; 97:19; 98:9; 112:9; 113:2

himself [1] 103:12

hired [1] 5:16

hiring [1] 82:10

history [1] 4:8

hold [1] 25:18

holder [1] 92:11

hole [1] 92:16

home [8] 41:10; 49:18, 21; 74:21; 84:14, 15; 87:9; 120:14

honest [4] 58:23; 70:25; 78:20; 125:11

hood [4] 33:9; 34:5; 35:6; 46:8

hospital [1] 49:17

hostile [1] 118:11

hour [8] 38:13; 81:25; 98:9, 10, 15, 20

hours [6] 6:11, 20; 81:22, 25; 124:10; 125:10

house [7] 10:6; 49:1; 50:15; 84:15; 85:2; 120:25; 121:8

houseschnedt [1] 107:9

how'd [1] 13:3

hubbard [1] 107:24

humiliate [1] 45:23

humiliating [1] 46:24

hurt [3] 36:10, 14; 78:25

- I -

iceberg [1] 102:19

idea [4] 53:18; 61:12; 75:14; 100:5

identification [2] 27:9; 66:8

identify [3] 42:10; 72:25; 75:3

identifying [3] 75:24; 76:2, 8

ignition [9] 54:17, 21; 55:2, 9, 10, 13, 15; 95:20; 96:25

illuminate [1] 27:25

images [1] 48:11

immediately [3] 30:12; 94:14; 112:10

implication [1] 68:16

implied [3] 65:12, 13; 68:18

implies [1] 67:16

impression [2] 79:23; 80:5

inappropriate [2] 102:11, 13

inappropriately [2] 102:5, 8

incarcerated [1] 103:20

incarceration [2] 47:19; 50:19

incident [39] 8:13; 10:3; 11:5; 34:1; 39:4; 56:15, 16; 57:11, 12; 68:6; 70:6; 75:17; 77:1; 78:7; 79:8; 83:2; 84:7, 8; 85:14; 91:6; 92:3, 12, 20; 94:10; 96:12; 99:4; 104:23; 106:10; 107:20; 108:15; 109:9, 11, 17, 19; 110:5, 9; 111:1, 19; 112:6

incidents [1] 77:7

include [2] 5:7; 96:14

including [2] 33:11; 75:4

incorrect [1] 99:8

incurred [3] 78:6; 83:1; 89:3

independent [1] 83:16

independently [1] 53:9

index [2] 2:1, 13

indicated [2] 110:10; 121:5

individual [1] 74:23

infection [1] 74:20

information [5] 3:24; 70:2; 74:23; 88:25; 99:18

initial [1] 4:6

injured [1] 68:3

injuries [4] 64:11; 73:2; 89:1, 11

inside [14] 11:15; 19:24, 25; 21:8, 10, 11; 22:2; 28:1, 16; 31:25; 43:23; 46:3; 97:18

inspect [2] 44:18; 45:2

instant [2] 89:15, 17

instructed [4] 44:6, 7, 8, 20

instructing [1] 44:16

insurance [3] 73:14, 18; 74:9

intend [1] 75:4

intense [2] 64:17, 20

intent [2] 19:20; 39:17

interaction [7] 21:1; 85:15, 25; 88:3; 113:14; 115:20; 117:12

interactions [1] 104:1

interior [1] 27:25

interlock [9] 54:17, 21; 55:3, 9, 10, 13, 15; 95:20; 96:25

interrogatories
[2]      48:18;
64:1
interrogatory
[4]      48:21;
63:22,    24;
102:3
interrupt   [1]
43:4
interrupting [1]
108:21
interview   [4]
82:15,    17;
123:10, 19
intimidated [3]
23:10,     22;
32:25
intruders   [1]
84:16
invasive    [4]
33:10,  18,  19,
24
investigation
[2]  63:1, 8
involve    [3]
46:20;     47:3;
52:4
involved    [1]
85:10
irvin [33]   1:6,
10,  22;    3:15,
16;   11:7,  10;
21:8;      30:20,
25;      31:5;
34:4;      35:8;
38:23;     39:2;
40:7;      41:1;
42:2;      44:9;
46:7;      52:5;
55:6;      70:23;
73:2;      75:8;
98:5, 7;   117:7,
25;      119:1;
120:25;  123:20
irvin's     [1]
97:23
irving [1]  33:8
issue      [2]
87:19;   91:24

issued     [1]
96:19
it'll [1]  116:13
item [1]   43:2
itemize     [2]
82:23, 25
itemized    [1]
78:6
items [4]   53:6;
82:25;  83:3, 23

- J -

jail [13]   37:7;
47:13,  14,  17;
49:2;      50:11;
52:2,      14;
60:15;     72:7;
101:22;  123:16
jamie      [2]
105:22;  107:12
january     [4]
1:12;   61:5, 8;
128:20
jeff [1]  105:21
jeff's      [1]
106:25
jeopardy    [1]
110:14
jerk [1]  23:15
jerry      [2]
105:21;  107:4
jittery     [1]
86:24
jobs [1]   81:11
joint [2]  29:19,
24
joking     [2]
84:10;  123:25
josh      [3]
105:21;  106:5;
107:21
joshua     [1]
1:17
judge     [12]
38:1;   59:8, 14,
18;   60:4,  5;
61:24;     62:16,
19;      88:17;
124:17

jump [1]  90:17
jumping    [2]
13:21;  90:21
jurisdiction [5]
76:20;   77:3, 5;
87:15;   108:11
justice     [1]
87:4

- K -

keep [2]   43:3;
108:20
kept [2]  12:13;
15:9
keys      [6]
120:23;   121:3,
5, 6, 9, 11
kick [1]   85:1
kicked     [4]
37:7, 9;  119:4;
125:2
kidnapped   [4]
39:9;      40:14;
64:12;  99:18
kidnapper   [1]
40:14
kidnappers  [1]
118:13
kidnapping  [4]
39:12;     53:4;
72:20;  99:12
kill [1]  85:2
kind [38]   6:9,
12;   7:4;   9:6;
13:5, 11;   14:6,
7;      20:20;
21:5;     23:15;
33:23;     35:3;
39:7;      42:17;
43:19;     57:7;
70:20;     78:18;
81:17;     85:13;
87:8;      90:4;
99:2;   109:13;
110:4;   112:16;
113:19;
114:10,    15;
116:18;

118:25;    119:2,
11;  121:15, 23
kinds      [2]
78:17;  86:18
knew      [9]
11:19;     65:6;
67:10;     70:18;
113:19;   116:1;
123:14;  125:21
knowledge  [21]
35:12;     38:11,
13;      40:7;
42:2;      47:21;
49:6,      14;
50:18;     52:19;
53:15;     54:15;
56:3, 10;   69:4;
75:10,     15;
96:1, 21;   97:3;
101:9
known [1]  86:9
knows      [3]
36:15;     67:10;
88:23
kyle [8]   1:2, 9;
2:3;   3:10;  4:4;
124:14,    18;
128:6

- L -

lack [2]   43:12;
78:17
laid [1]  122:13
landlord    [2]
86:12;  111:7
landlord's  [1]
111:8
language    [1]
23:20
larger     [1]
92:16
last [23]   4:21;
5:2,  4,  6,  13;
25:7;      55:25;
56:1;      57:10;
74:13;     82:9,
21;      88:3;
105:23;   106:5,
12,  16,   25;

107:4, 8, 14; 126:9

**laugh** [2] 122:11, 12

**laughing** [2] 84:10; 123:25

**laughlin** [10] 1:23; 90:10, 12; 97:5; 103:11; 106:13; 111:3, 6; 124:5; 126:22

**lawsuit** [8] 68:1, 4; 69:18; 70:1; 73:24; 79:9; 89:19; 112:1

**lawyer** [11] 47:2, 6; 83:14, 22; 94:3, 6; 97:8; 99:22; 100:2; 104:20, 21

**laying** [3] 121:15; 122:19, 21

**lead** [1] 101:3

**lean** [1] 28:18

**learned** [1] 76:1

**lease** [1] 56:2

**least** [2] 53:18; 61:23

**leave** [4] 41:8; 45:10; 84:14; 120:14

**leaving** [1] 11:19

**left** [10] 13:21, 25; 16:10, 13; 38:12; 80:10; 88:14; 95:3; 116:10; 123:3

**legal** [5] 37:25; 83:14; 85:3; 93:14; 120:5

**lengths** [1] 99:3

**less** [3] 49:2; 51:3; 54:7

**letter** [3] 71:6; 96:8; 97:6

**letters** [1] 96:3

**letting** [1] 122:23

**level** [3] 80:12, 13

**lewisburg** [1] 126:12

**license** [20] 54:2, 5, 10, 18, 21, 22, 24; 55:12, 14; 58:14; 92:2, 4; 95:24; 96:4, 5, 6, 9, 13, 24; 126:13

**licenses** [1] 56:4

**life** [7] 8:20; 45:15; 51:5; 84:11; 85:9; 86:1; 120:18

**lift** [2] 43:12; 44:6

**light** [2] 12:13; 39:5

**limited** [1] 61:11

**line** [3] 20:17; 21:16, 20

**lines** [1] 118:3

**linhardt** [8] 38:1; 59:8, 14; 60:5; 61:24; 62:16, 19; 88:17

**linhardt's** [2] 59:18; 60:4

**list** [3] 48:22; 83:18, 23

**listed** [3] 53:6; 73:23; 75:1

**listen** [1] 78:23

**listening** [1] 103:9

**literally** [3] 84:22; 113:12; 116:2

**live** [8] 8:21, 23, 25; 76:20; 107:25; 108:11; 111:12, 15

**lived** [5] 76:21, 25; 77:1; 85:24; 120:17

**lives** [3] 108:1; 111:13; 126:12

**lobster** [1] 82:6

**local** [1] 5:5

**location** [2] 39:13; 91:8

**lock** [3] 84:13, 14, 15

**locked** [4] 84:21; 86:7; 122:2, 4

**locks** [1] 84:13

**lodged** [2] 66:13, 22

**longer** [2] 23:18; 98:20

**look** [8] 21:1; 66:10; 71:6; 97:15; 102:3; 109:4; 112:14; 122:19

**looked** [8] 10:25; 12:9, 10; 20:17; 21:2, 4; 112:13, 14

**looking** [16] 12:10; 15:8; 21:8, 11, 22; 22:8, 13, 16; 28:4; 42:19, 21, 23; 43:24; 45:21; 113:22; 124:13

**lopez** [28] 8:11; 12:18,

19; 14:3; 18:7; 20:8; 22:2, 15; 25:14; 29:2; 30:4; 37:15, 17; 38:9; 59:12; 60:10; 66:21; 89:18, 23; 98:5; 102:7; 112:3; 113:13; 115:10, 21; 118:10; 119:23; 120:4

**lopez's** [8] 16:18; 59:15; 62:20; 70:2; 104:15; 111:20; 121:6, 9

**loretta** [4] 1:11; 128:4, 15, 23

**lose** [1] 79:6

**losing** [9] 108:14, 18, 25; 109:8, 10, 18; 110:14; 121:24, 25

**loss** [3] 64:17; 82:25; 83:4

**lost** [1] 109:13

**lovecchio** [1] 124:17

**loved** [1] 81:4

**loyalsock** [2] 76:15, 16

**lycoming** [8] 48:25; 49:1; 50:21, 25; 51:16; 53:24; 59:8; 128:1

─────────────────

**- M -**

**majority** [1] 9:8

**makes** [3] 29:20; 61:18; 88:11

male [4] 75:6, 16; 76:9; 107:12

management [1] 4:19

manager [33] 5:5, 9, 11, 13, 16, 24; 6:13, 22, 23, 25; 7:2, 4, 7, 13, 14; 65:7; 79:17; 80:9, 11; 81:2, 3, 4; 82:10, 12, 14; 106:3; 107:18, 21

managers [6] 6:13; 7:12; 69:11; 70:15; 105:13; 107:19

mandate [1] 124:2

maneuver [1] 91:22

manipulate [6] 43:10, 11; 44:21, 22; 100:21; 101:4

manipulating [3] 44:3; 46:12; 101:1

marc [1] 124:17

march [2] 120:2; 124:15

marijuana [39] 25:3, 5, 8, 12, 14, 24; 26:2, 5, 9, 19, 23; 28:24, 25; 29:2, 8, 10, 13, 17; 30:1; 31:9, 14, 20; 39:16, 17; 40:24; 57:16; 61:20, 21; 62:1, 6; 63:9; 92:22, 25; 93:18, 22; 104:12; 120:5

mark [3] 27:5; 65:23; 66:5

marked [3] 2:14; 27:8; 66:7

market [6] 1:14, 18; 16:12, 13; 91:16, 17

marketplace [1] 73:20

mask [1] 124:1

massachusetts [6] 8:16, 19; 66:13, 23; 120:6, 20

material [1] 30:2

matter [3] 13:25; 62:13; 93:7

mccormick [1] 1:20

mean [51] 7:3, 11; 15:5; 25:17; 28:9; 29:6, 23; 30:24; 33:22; 36:6; 37:21; 39:11; 44:22; 51:5; 55:17; 59:1; 63:6, 16; 64:25; 65:4, 18; 69:20; 70:13, 25; 72:4; 74:17; 76:6; 78:13; 79:7; 84:2, 6, 21; 88:10, 18; 90:4; 94:24; 102:16, 17; 103:13; 105:22; 114:7, 9; 119:9, 25; 120:8; 121:25; 122:1, 4, 9, 10; 124:24

means [2] 100:14, 15

meant [2] 43:4; 77:5

media [2] 36:12; 89:17

medical [5] 73:4, 12, 15; 120:10, 15

medication [1] 73:24

meet [2] 97:16, 17

meeting [3] 18:11, 12; 91:19

member [1] 20:17

members [3] 69:11; 85:13; 105:14

mental [1] 74:3

mention [3] 57:8; 66:18, 25

mentioned [6] 17:10; 18:25; 44:3; 97:23; 100:20; 105:7

message [2] 89:22; 90:6

messages [3] 89:17, 18

messed [1] 12:25

meter [2] 11:15, 18

middle [5] 1:1; 4:6, 7; 36:1; 92:16

midst [1] 10:7

might [11] 24:8; 37:19; 66:1; 74:18, 23; 75:22, 24; 87:25; 90:19; 100:9; 119:19

mind [4] 39:6; 93:18; 108:8

minier [1] 3:16

minute [1] 40:6

minutes [5] 18:15; 43:22; 116:3; 117:21; 122:16

mischief [2] 58:20; 124:16

miscommunicat ion [1] 70:4

misdemeanor [3] 56:9; 57:2; 124:16

missed [1] 48:12

misses [2] 119:8, 23

mistakes [1] 71:23

moment [4] 20:11, 19; 32:8; 37:14

monday [2] 6:9; 7:23

month [3] 9:6; 29:7; 89:25

months [3] 25:9; 69:12; 105:2

montoursville [4] 87:14, 18; 88:2; 125:7

morning [3] 10:16; 16:22; 26:3

moser [1] 107:5

most [5] 8:20; 48:24; 53:24; 106:23; 118:1

motion [1] 105:3

mouth [1] 70:6

move [10] 4:1; 11:20; 43:13; 44:24; 45:1; 77:4; 85:24; 87:24; 113:24; 120:12

moved [8] 8:18; 9:3, 5; 45:9; 77:2;

79:16; 113:10; 120:9

moving [2] 99:12; 116:10

multiple [4] 6:13; 40:2; 65:21; 104:22

mussare [1] 97:17

must [1] 98:22

- N -

naked [4] 45:10; 52:10, 12; 101:8

name [28] 3:14; 4:3, 6, 7; 16:9; 17:25; 59:10; 65:8; 66:18, 25; 67:1; 90:12; 97:16; 105:8, 23; 106:5, 12, 16, 25; 107:4, 8, 14; 111:9, 10, 11; 125:18; 126:4, 9

named [1] 105:10

names [3] 105:15, 17, 20

narcotics [1] 112:15

need [5] 30:7; 59:20; 90:23; 117:4

needed [3] 19:4, 13; 91:25

needs [1] 120:6

negotiate [2] 118:13; 119:14

negotiating [2] 40:14; 119:22

neither [5] 44:9; 46:17; 49:22; 72:22; 103:2

neumann [1] 4:14

never [24] 12:6; 19:16; 31:11; 34:5; 54:18; 72:21; 74:2; 79:2, 4, 5; 80:4; 85:9, 11, 25; 86:2; 87:1; 98:23; 103:1; 109:1; 111:24; 112:2; 116:6; 118:9

newberry [5] 11:1; 13:1, 7, 15; 91:17

news [4] 20:23; 68:4, 24; 70:9

newspaper [3] 65:19; 66:14

next [9] 11:16; 12:11; 19:17; 30:6; 37:3; 82:23; 91:14; 98:7; 122:24

nice [3] 12:16; 102:25; 115:14

night [3] 120:19, 21, 22

nine [1] 10:14

nobody [6] 63:16, 18, 19, 20; 122:3; 123:6

none [2] 73:3; 89:20

nonrestricted [1] 92:2

noon [1] 6:17

nope [1] 89:12

normal [2] 101:12, 14

normally [3] 73:14, 15; 112:23

northcentral [1] 105:5

northcentral.co m [1] 105:1

notary [1] 128:5

notated [1] 110:7

notes [1] 89:10

nothing [14] 13:15; 15:6; 23:15; 27:13; 62:12; 93:2, 20; 95:18, 19; 112:21, 22; 122:20; 128:8

notice [1] 21:14

nude [3] 43:8, 18, 21

number [10] 27:20; 48:24; 53:23; 72:25; 74:22, 25; 78:5; 89:4; 102:3

numerous [1] 104:2

- O -

object [3] 97:1; 103:10; 111:2

objection [1] 31:16

objections [1] 3:5

observation [2] 29:9; 61:25

observe [5] 21:19; 22:4, 6, 17; 28:2

observed [11] 26:9, 14, 23; 28:15; 29:12; 31:20; 39:16, 17; 61:20; 65:3

obviously [2] 45:23; 70:18

occasions [1] 104:3

occur [1] 61:4

occurred [4] 11:5; 23:2; 41:6; 75:17

occurring [2] 48:25; 53:24

odor [1] 26:9

offense [3] 37:22; 77:21, 22

offenses [1] 37:18

offensive [1] 53:3

offer [1] 26:8

offered [1] 73:18

office [13] 10:22; 17:11, 21; 18:3, 4, 5, 6, 10, 19, 22; 91:7, 8; 110:3

officer [48] 3:16, 17; 11:7, 9; 20:2; 21:2, 7, 21; 22:3, 7, 9, 10, 16; 24:3, 9; 26:13, 18, 22; 31:2; 34:17; 37:7; 38:5; 39:15; 47:2, 6; 49:17; 61:19, 23, 25; 72:5; 75:20; 90:13; 94:7, 12; 97:8, 19; 98:1; 99:17, 19; 101:18; 103:6; 110:19, 24; 112:9, 14, 15; 118:6; 119:5

officers [25] 12:5; 20:13; 30:17; 43:6, 9, 10, 11; 52:23; 62:25; 64:19; 75:1; 78:11; 97:21; 99:6; 100:24;

101:12, 18; 103:2; 111:23; 112:24; 114:12; 115:4, 21, 24; 123:2
**officially** [1] 9:10
**once** [7] 14:25; 38:17; 41:7; 55:11; 98:17; 113:1; 114:18
**one's** [2] 68:19
**one-way** [4] 12:25; 13:2, 17, 23
**onto** [4] 16:10, 13, 14; 74:25
**open** [6] 27:23; 28:6; 94:25; 95:1; 121:19; 123:8
**opened** [2] 10:23; 121:22
**opener** [1] 6:14
**opinion** [2] 99:16; 108:12
**opportunity** [1] 83:9
**opposition** [1] 47:9
**options** [1] 87:20
**oral** [1] 128:8
**order** [1] 27:25
**ordered** [1] 31:5
**original** [1] 57:4
**originally** [2] 8:17; 23:6
**otto's** [1] 91:14
**outlook** [1] 87:3
**outside** [10] 7:14; 21:9, 23, 24; 22:4, 18; 23:5; 28:16; 34:19; 36:3

**oversight** [2] 71:25; 72:1
**overwhelming** [1] 60:8
**owned** [1] 56:1
**owns** [1] 111:15

---

**- P -**

**p.m.** [1] 127:3
**packages** [1] 81:19
**packet** [4] 27:2; 47:22, 24; 102:1
**page** [30] 27:20, 21; 28:23; 30:6, 9; 33:7; 47:23; 48:20, 22; 59:5, 13; 60:3; 63:22; 64:2, 6, 14; 74:22, 25; 78:5; 82:23, 24; 84:1; 89:1, 16; 102:2; 111:20, 23
**paid** [1] 125:11
**paper** [4] 29:23; 65:5, 9; 70:9
**paragraph** [4] 27:20, 21; 30:6, 9
**paragraphs** [1] 28:22
**paranoia** [1] 108:7
**paraphernalia** [9] 48:24; 57:8, 14, 15; 58:4, 8; 77:9; 104:2, 6
**paraphrasing** [1] 78:7
**park** [1] 19:17
**parked** [2] 11:14; 126:15

**parking** [5] 11:15; 37:5; 53:25; 119:7, 19
**part** [3] 44:12; 72:14; 102:16
**part-time** [3] 81:10, 12, 13
**participate** [1] 23:17
**particular** [5] 6:24; 47:10, 11; 48:18; 64:19
**parties** [3] 3:3; 35:5; 128:10
**parts** [3] 33:23; 44:21, 23
**pass** [1] 14:25
**passed** [2] 14:25; 110:19
**past** [4] 30:5; 37:6; 85:20; 110:24
**pasted** [2] 48:2; 63:25
**patched** [1] 48:9
**patted** [3] 33:25; 50:4, 6
**patting** [1] 34:21
**payroll** [1] 7:3
**peers** [3] 64:15; 68:9, 12
**penis** [1] 43:11
**penn** [5] 4:17, 22; 5:8, 18, 19
**penndot** [7] 55:7; 91:23, 24; 96:4, 5; 97:10, 11
**penndot's** [1] 97:12
**pennlive** [1] 105:6
**pennlive.com.** [1] 105:2

**pennsylvania** [14] 1:1, 14, 18, 21; 4:5; 8:18; 9:11; 59:9; 77:22; 88:14; 120:5; 124:14; 128:2, 16
**people** [26] 7:9; 10:12; 35:3; 36:3; 52:12; 65:3, 6; 67:4; 68:10; 70:6, 13, 16; 71:23; 78:14, 24; 85:18; 86:9, 14; 94:11, 20; 103:2, 7; 105:12, 22; 106:23; 120:2
**peoples** [1] 56:6
**performed** [2] 41:20; 47:18
**period** [3] 9:18; 55:20; 105:18
**perkins** [13] 5:10, 24; 70:17; 73:17; 81:5; 106:2, 14, 22, 24; 107:2, 6, 10, 16
**permission** [2] 99:13; 115:11
**person** [23] 7:12; 16:22; 33:10, 12, 21; 41:21; 42:9; 46:25; 52:16; 57:19; 75:7, 22, 23; 76:2, 3, 6, 8, 9; 80:13; 87:2; 99:12; 119:24; 125:18
**personal** [1] 64:17

personally [4] 21:18; 28:1; 78:14; 128:5

pertaining [1] 106:8

perverse [1] 46:25

phone [2] 89:25; 90:1

physically [3] 18:2; 28:10; 30:13

physician [2] 74:11, 14

piece [2] 42:15; 43:6

pipe [5] 29:15, 18; 57:16; 104:12, 14

place [6] 1:13; 81:1; 94:18; 95:2; 99:12

placed [4] 35:6, 7; 40:19; 62:11

places [2] 13:10; 82:4

plainclothes [1] 75:20

plaintiff [6] 1:3, 19; 30:12; 33:8; 78:8; 83:3

plan [1] 73:20

plane [1] 28:19

plea [2] 124:11, 15

plead [3] 56:24; 57:5; 58:8

pleaded [1] 56:11

pled [1] 56:9

pocket [1] 114:7

pockets [2] 33:11, 20

point [24] 11:2; 14:9; 15:15; 23:25;

30:7; 34:25; 35:17; 36:16; 43:8, 18, 25; 54:17; 56:14; 77:14; 95:8; 96:19; 113:20; 114:3, 14; 119:1, 4, 17; 120:24; 121:21

points [1] 121:14

poking [1] 34:15

police [76] 11:9; 14:10; 19:1; 20:9, 23, 24; 21:1, 2; 35:17; 38:8; 40:3; 47:2, 6; 49:23; 52:6, 22; 57:11; 64:19; 65:14; 66:12; 68:18; 69:17; 71:2, 14, 17, 18, 21; 72:5, 13; 73:12; 76:19; 77:3, 5, 11, 12, 23; 78:22; 84:17; 85:10, 15, 25; 86:1, 2; 87:4, 14, 18, 24; 88:2, 4, 5; 94:5, 7; 95:15; 97:8, 10, 21; 100:18; 101:12; 103:6; 104:2; 108:11; 110:17, 18, 23; 111:23; 112:14, 24; 113:5; 116:6, 17; 117:1, 4, 17; 118:6; 121:12; 125:7

polite [1] 102:24

position [5] 5:15; 44:17;

82:13, 14; 113:4

positions [1] 81:5

possession [5] 92:5, 24; 96:15, 17, 24

possessions [2] 33:12, 20

possible [1] 29:11

possibly [1] 58:21

posted [3] 111:19, 22, 25

preceded [1] 63:24

preceding [1] 26:6

prerelease [1] 50:22

prescribed [1] 73:24

present [3] 1:16; 100:24; 110:1

presently [1] 54:10

pretext [1] 61:21

pretty [8] 8:19; 22:1; 74:15; 76:13; 79:7; 81:21; 117:13, 14

previous [3] 5:7; 74:6; 97:21

previously [1] 120:4

primary [2] 74:11, 13

prison [3] 50:22, 25; 51:17

privacy [1] 94:23

private [1] 33:23

probable [9] 30:11; 31:7; 63:5, 7; 94:15; 99:25; 100:1, 8, 17

probation [3] 49:1; 50:13; 125:15

procedures [1] 52:5

proceedings [1] 59:7

process [3] 9:7; 13:12; 17:15

produced [2] 27:7; 66:6

professionals [1] 73:8

promoted [1] 5:22

pronounce [2] 59:10; 111:11

property [1] 124:17

propounded [1] 128:9

prove [1] 114:4

provide [2] 90:25; 104:4

provided [7] 48:17, 22; 55:5; 65:24; 73:1; 102:1

provider [3] 73:1, 12; 74:7

providers [1] 73:15

provoking [1] 23:9

psychiatrist [1] 73:7

public [6] 1:11; 94:18; 95:2, 10; 128:5, 24

publication [1] 70:1

pull [7] 19:11, 14, 17; 32:13, 16; 63:12; 86:23

pulled [16] 14:16, 17; 15:1; 16:4, 16; 19:7, 20; 20:9, 12, 14; 32:6, 20; 54:1; 57:25; 104:7, 9

pulling [1] 70:20

pump [7] 19:15, 17, 22, 23; 20:14; 65:1

pumps [2] 75:5, 7

punched [1] 125:2

punishment [1] 61:14

purposes [2] 39:18; 64:1

pushing [1] 34:15

putting [1] 34:20

### - Q -

questions [14] 3:21; 27:18; 48:19; 59:19; 64:22; 90:11, 15, 19; 109:14; 124:6; 126:21, 23; 128:9, 14

quick [1] 16:10

quite [2] 15:14; 54:6

### - R -

racing [1] 108:8

raised [1] 115:15

ranged [1] 48:25

rather [1] 13:21

reach [3] 17:16; 28:18; 88:12

reached [1] 27:22

reaching [3] 28:6; 33:11, 19

read [3] 30:13; 59:18; 65:5

reading [4] 8:17; 53:9; 60:4; 125:13

real [3] 20:25; 102:24, 25

realized [1] 11:2

really [24] 9:5; 12:1; 13:15, 24; 17:14, 22; 60:7; 72:1; 78:24; 81:23; 84:11; 86:25; 87:21; 91:23; 94:23; 95:5, 7; 117:16; 119:16, 18; 123:14, 17

realm [1] 101:12

reason [14] 14:16; 31:14; 63:11, 12, 14; 70:5; 85:3; 99:7; 100:8; 101:7, 9; 102:17; 113:22, 23

reasonable [3] 30:11; 31:8; 100:11

reasons [2] 86:3; 112:12

recanted [1] 57:7

receive [1] 50:11

received [5] 47:25; 73:4; 96:3, 8; 97:20

recently [1] 82:10

recess [2] 59:24; 60:1

recognize [1] 27:16

recollection [15] 4:23; 6:4; 7:17; 10:2; 23:2; 25:9, 15; 28:20; 34:23; 58:6; 60:11; 66:24; 93:15; 120:22; 124:19

record [5] 63:23; 67:23; 94:11, 12; 101:19

recreational [1] 120:11

recross [1] 2:2

redirect [2] 2:2; 124:7

reduced [1] 128:17

refer [1] 27:19

reference [4] 28:23; 48:9; 49:2; 64:1

referenced [2] 56:5; 69:24

referencing [2] 98:16, 17

referring [6] 46:2; 65:2; 66:14; 69:18, 19; 76:7

reflecting [2] 89:3, 11

reflects [1] 124:15

refresh [1] 124:18

refuse [2] 104:4; 114:13

refuses [1] 103:12

regard [4] 60:8; 61:24; 104:15; 108:6

regional [3] 7:13; 81:3, 4

regular [2] 5:21; 87:6

reinstill [1] 72:2

related [5] 56:24; 57:13; 73:24; 74:24; 99:24

relates [1] 100:17

relative [2] 67:11; 69:7

relaxed [1] 121:16

remember [24] 7:15, 22; 10:21; 12:14; 14:15, 20; 15:24; 16:9; 17:25; 28:9, 13; 35:11; 38:17; 42:10; 52:8; 53:12; 101:24; 113:15, 17; 117:25; 121:1; 124:2, 3; 125:18

remembered [1] 35:12

remove [1] 44:17

removed [2] 35:6; 120:25

rennie [4] 111:10, 12, 13, 14

repeat [1] 90:22

rephrase [3] 28:14; 29:12; 90:22

replied [1] 48:20

report [2] 7:7, 12

reporter [3] 17:5; 128:16, 18

reporter-notary [2] 1:11; 128:24

reporting [1] 7:9

represent [1] 90:13

representative [9] 10:22; 17:11, 17, 23; 91:21; 96:7, 16; 97:14, 15

representative's [6] 17:21; 18:3, 10, 19, 22; 91:7

representing [1] 3:15

reputation [4] 78:9, 12; 83:10; 110:15

request [2] 48:8; 89:16

requested [1] 8:2

requests [2] 48:1, 17

requires [1] 60:24

resentenced [1] 60:19

reserved [1] 3:6

resided [1] 8:20

residue [2] 61:20; 62:1

resisted [1] 113:25

resisting [1] 33:17

respective [2] 3:3; 128:10

respond [2] 89:19; 112:23

responded [1] 89:6

responding [1] 110:20

response [7] 48:7; 64:9; 69:24; 73:3; 74:25; 76:3; 78:8

responses [5] 47:24; 48:2, 17; 63:22, 25

restaurant [4] 5:5, 9; 7:6, 11

restricted [1] 92:4

restriction [2] 96:9, 14

result [5] 78:7, 10; 83:2; 118:21; 124:11

resulted [2] 77:20; 104:7

retaliated [3] 30:17; 93:24; 94:9

retaliation [6] 30:10, 20; 31:3; 64:19; 85:12; 87:12

revoke [1] 115:11

right [86] 11:14, 25; 13:18, 25; 14:1, 13, 24; 15:9; 16:5, 10, 14; 19:18; 20:18; 23:24; 24:18; 25:7, 22; 31:2, 21; 32:3, 14; 34:16, 19; 36:1; 37:18, 20; 38:21, 24; 40:12, 20; 41:3; 42:21; 51:17; 53:1; 61:7; 62:2, 17; 63:1, 16; 64:9;

65:11, 14, 17; 67:18; 68:20; 69:18; 70:16; 72:10, 13, 14; 73:25; 76:18; 77:18; 81:2; 87:15; 88:8, 19; 91:13; 92:10; 94:21, 24; 95:1, 4, 11, 13; 98:7; 102:10, 12; 104:11; 109:7; 112:17, 18, 20; 113:24; 114:5; 115:5, 7, 11; 116:10, 17; 121:16; 123:4; 125:8, 16; 126:24

rights [2] 119:8, 23

ring [3] 120:23; 121:1, 9

risk [2] 48:12; 109:18

roach [14] 23:24; 24:1, 4; 26:14; 28:23; 61:18, 21; 62:1; 93:12, 17; 118:1, 4, 7, 8

roaches [1] 26:23

road [6] 13:17; 16:7, 8, 9; 110:19, 25

robbers [1] 84:16

rodarmel [1] 111:10

roger [1] 107:24

roll [3] 29:19, 23, 25

rolling [2] 29:23; 30:1

room [9] 38:23; 41:22, 23; 45:9; 52:17; 74:19; 80:21; 123:10, 20

roundabout [2] 99:2; 100:4

route [1] 15:24

rude [1] 124:18

ruled [1] 60:5

ruling [2] 59:14, 19

running [3] 10:8, 17, 18

---

- S -

safe [3] 85:23; 87:9; 88:4

safely [1] 9:23

safety [1] 85:12

says [16] 30:9; 33:7; 37:6; 48:23; 53:10; 60:6; 61:17; 64:9, 14; 66:22; 68:25; 69:2; 78:6; 86:12; 87:11; 121:7

scared [10] 35:19; 71:3; 84:16, 17, 22; 112:13, 25; 113:11, 12

scary [1] 85:18

scheduled [1] 8:3

schemery [2] 1:13, 17

school [5] 4:9, 11, 13, 21; 9:19

scope [1] 7:6

scored [1] 4:13

seagraves [1] 106:12

sealing [1] 3:4

search [42] 23:6, 11; 26:24; 33:10, 19; 34:4, 12; 39:19; 40:8, 20; 41:2, 6, 11, 20; 42:4; 44:2, 13, 16; 45:12, 24; 46:1, 8; 47:10, 11, 18; 51:19, 23; 52:20; 58:7; 63:14; 100:20, 24; 101:13, 14, 22; 112:11, 20; 114:15, 16, 24; 115:1, 11

searched [12] 34:10; 41:9; 43:21; 45:15; 46:23; 47:4, 12, 15; 50:2, 4; 65:17; 101:8

searches [2] 46:2; 47:10

searching [2] 34:21; 43:7

seat [4] 27:24; 28:7; 121:15; 122:10

second [10] 14:25; 17:4; 27:21; 33:10; 46:7; 50:14; 59:20; 61:2, 4; 82:16

secretary [1] 18:1

security [1] 64:17

seeing [4] 11:7, 8; 19:10; 104:22

seeking [1] 83:6

seem [1] 76:13

sees [1] 118:7

seized [3] 33:8; 61:19; 102:4

seizing [3] 30:12; 33:12, 20

sense [2] 31:23; 94:23

sentence [2] 60:24; 104:17

sentenced [3] 51:20; 55:11; 58:24

sentences [1] 48:25

sentencing [1] 61:6

separated [2] 35:6; 36:23

separating [1] 69:23

serve [2] 60:15, 24

server [1] 79:18

service [3] 124:10; 125:10

seven [1] 10:15

seventh [2] 16:11

several [4] 26:23; 75:3; 93:6; 95:18

sexual [5] 45:11; 46:14, 18, 19, 22

sexually [3] 45:7; 46:25; 64:13

shake [4] 24:10, 11; 26:19; 39:17

shaking [1] 108:8

shawna [2] 1:23; 90:12

sheet [1] 53:10

shhh [3] 115:23; 116:4, 21

shift [3] 6:2, 5, 16

shifts [3] 6:11; 81:24, 25

shirt [1] 43:1

shoot [1] 36:15

shop [12] 10:23; 11:13, 17; 12:19, 22; 13:4; 14:10; 16:19, 24; 18:16, 17, 19

shops [1] 13:16

short [1] 81:23

shot [2] 36:21; 76:4

shoving [1] 34:15

show [2] 84:20; 98:25

shower [2] 103:21, 22

showered [1] 103:24

shutdown [1] 124:1

sick [2] 74:16, 18

side [11] 24:13; 26:14; 71:23; 76:15; 78:17; 92:11; 103:17, 19; 110:19, 24; 119:12

sides [2] 72:4; 87:5

sign [7] 14:17, 21, 22, 23; 16:5, 14

signing [1] 3:3

similar [1] 52:5

simple [4] 56:8; 57:3, 4; 109:15

single [3] 41:21; 72:20; 89:22

situation [13] 35:5; 37:12; 39:5; 45:7; 68:15; 69:19; 86:4; 88:22; 103:3, 7; 110:17; 117:14, 15

sixth [4] 14:14; 16:3, 6

sixty [4] 49:2; 50:20; 51:3, 11

size [1] 92:15

sized [1] 92:11

slam [1] 113:24

slammed [6] 33:9, 13; 34:5, 11; 36:13; 113:9

slamming [1] 34:7

slang [1] 114:10

slow [1] 12:1

slowly-moving [1] 9:7

small [5] 39:4, 7; 81:18; 88:12, 19

smaller [1] 56:11

smell [1] 39:16

smelled [1] 26:9

smoke [12] 24:23; 25:3, 12, 14, 24; 26:2, 5; 29:2, 4, 13; 112:3, 5

smoked [8] 25:5, 7; 29:5, 7, 10, 17; 93:12

smoker    [1]
29:8
smoking    [1]
29:12
snack    [2]
20:16; 22:20
snacks    [2]
20:3; 94:20
soccer    [1]
123:21
social    [1]
89:17
socks    [1]
43:23
soda [2] 22:21;
92:15
soldier    [1]
21:2
solely    [1]
62:13
someone    [9]
33:4;    36:20;
39:12;    80:10,
11;    91:19;
99:17; 125:21
something's [3]
72:10;    86:25;
88:8
sometime    [1]
124:11
sometimes   [4]
10:15;    82:1;
112:4, 7
somewhat    [1]
27:20
somewhere   [1]
13:10
soon [1]  37:2
sorry    [3]
16:25;    42:7;
82:24
sort [1] 60:24
sound    [4]
37:20;    38:24;
58:23; 125:16
sounds    [1]
123:7
south    [4]
57:22;    77:14,
15, 17

southside   [1]
108:1
space    [2]
27:23; 28:7
speaking    [1]
42:13
specific    [4]
30:19;    42:9;
53:19; 71:10
specifically [6]
11:13;    29:6;
31:3;    42:22;
50:16; 51:1
specifics   [5]
52:3, 7;   53:11;
101:25; 104:19
specify    [1]
9:22
speculate    [2]
24:7; 59:3
speech    [5]
30:10,    16;
31:4; 93:23, 24
speeding    [2]
53:25; 54:1
spell    [3]
105:25; 106:1;
126:6
spent    [1]
50:24
spills    [1]
74:25
spoke [1] 18:1
spoken    [1]
75:11
spot [1] 19:21
spread    [6]
43:15;    44:7,
24;    45:16;
52:9; 121:15
stall    [2]
103:23, 25
stamped    [2]
27:3, 11
stand    [4]
11:20;    43:19;
72:11; 116:12
standing    [5]
20:16;    21:16,
20; 43:9, 18

start [9]   3:24;
14:23;    17:6;
55:16;    83:20;
84:22;    102:16,
19; 108:12
started    [12]
5:21;    10:25;
11:4;    12:24;
13:3, 18;   19:2;
21:21;    23:13;
41:6;    102:18;
114:18
starting    [5]
48:1, 20;   64:5;
89:1, 3
startled    [1]
112:13
starts    [2]
27:14; 59:13
state [22]   4:2;
10:21;    17:10,
16,  20;   18:3,
10,  18,   21;
77:12,    22;
87:14,    18;
88:2;  91:6, 20;
96:7;    97:14,
15;    120:17;
125:7
statement   [1]
102:13
statements   [2]
103:17, 18
states [1]  1:1
station    [21]
14:15;    15:19;
16:17;    19:11;
28:3;    32:6;
38:15, 18, 21;
39:18,    23;
41:1;    49:23;
72:18;    81:16;
98:10, 15, 21;
99:1;    122:24;
123:9
stay [2]   6:17;
88:9
stayed    [3]
38:12;    98:14;
123:6

steering    [2]
27:24; 28:8
stenographical
ly [1] 128:15
stick    [2]
93:19, 21
still [30]  5:11;
9:6;    19:8;
40:10;    55:14;
61:1,  10,  13;
65:12;    76:4;
80:17;    88:11;
92:3, 5;   93:19;
98:19;    106:2,
14,  22,   23;
107:2,  6,  10,
16;  116:12, 16;
117:1;  119:17;
121:19
stimulate    [3]
43:14;    100:22,
23
stipulated  [1]
3:2
stipulation  [1]
3:1
stood    [4]
11:16;    12:12;
43:20, 21
stop    [25]
14:17,  21,  22;
15:15;    16:5,
14;  18:21, 24;
19:3;    31:11,
15;    32:3,  5;
63:8;    100:8;
110:20,    25;
115:23;    116:5,
21;    117:4;
118:21
stopped    [16]
10:20,    24;
12:13;    14:21;
31:22;    32:4;
40:21;    63:16,
19, 20;    72:5;
91:6;    94:16;
118:20, 24
stopping    [1]
72:19

store [13] 6:23; 20:15; 21:8, 9, 10, 11; 22:2, 3, 10; 25:21; 63:14; 95:4

story [4] 93:19; 103:17, 19; 114:3

straight [3] 14:24; 18:18; 32:21

stranger [1] 125:23

strangers [7] 64:15, 23; 65:2, 4; 67:6, 7; 68:11

straws [1] 70:19

street [19] 1:14, 18, 21; 11:24; 12:25; 13:2, 6, 19; 14:2, 14, 16; 16:6, 8, 12, 13; 91:11; 108:2, 3

streets [1] 95:10

strike [1] 56:20

strip [31] 11:3; 14:6; 39:18; 40:8; 41:2, 6, 8, 11, 20; 42:4; 45:15; 46:23; 47:3, 10, 11, 12, 15, 18; 50:4; 51:19, 23; 52:10, 12, 20; 65:17; 100:19, 24; 101:12, 14, 21

stroke [1] 44:24

struggling [1] 113:6

studies [1] 4:19

study [1] 4:18

stuff [7] 9:8; 13:5; 21:5; 65:1; 69:16; 105:17; 124:3

subject [2] 41:2; 104:23

subscribed [1] 128:20

sued [1] 119:25

suffered [7] 64:15, 23; 68:13; 70:22; 78:8, 11; 83:3

suffering [1] 73:10

suggesting [1] 61:19

suit [1] 90:13

summary [7] 37:17, 20, 22; 60:9; 77:21, 22

summer [2] 82:10, 22

sunday [1] 6:8

sunny [1] 12:16

supervise [1] 7:5

supervisor [3] 7:1; 94:13; 103:14

support [2] 89:7; 103:17

supported [1] 103:19

supporting [1] 89:2

supposed [15] 52:22, 23, 24; 60:17; 71:5; 72:8; 101:15, 16, 17, 19; 102:6; 103:6; 117:2

surprising [1] 117:16

suspected [1] 103:8

suspended [1] 56:4

suspicion [3] 30:11; 31:8; 100:12

swat [2] 20:17; 112:15

sweating [4] 84:23; 108:5, 7

switched [1] 6:10

sworn [3] 3:11; 128:7, 13

symptoms [1] 108:6

system [10] 52:22; 55:9, 10; 72:2, 12; 78:23; 79:1; 87:4; 95:21; 96:25

- T -

tactical [3] 21:4, 5; 112:15

taking [2] 122:24; 128:12

target [1] 86:7

team [2] 20:17; 112:15

telling [10] 26:11, 15, 20, 25; 87:17; 115:23; 116:4, 20; 118:6

tense [1] 20:25

term [7] 6:22; 43:12; 78:17; 83:14, 22; 100:11, 13

terminology [2] 37:25; 46:15

test [2] 4:12; 49:18

testified [11] 3:11; 24:9; 26:8, 13, 18, 22; 38:6;

88:24; 92:6; 98:8; 128:10

testify [1] 128:7

testifying [1] 75:8

testimony [16] 11:6; 26:15, 20, 24; 28:24; 31:9; 39:19, 24; 40:23; 54:20; 61:20, 23; 63:10; 76:14; 109:7; 128:19

text [2] 89:17; 90:1

thank [2] 90:16; 127:1

thankful [1] 85:23

themselves [1] 44:25

therapist [1] 73:8

there'd [1] 118:4

they've [1] 66:17

thinking [3] 11:1; 13:24; 36:13

third [2] 45:24; 46:1

thirty [4] 51:11; 61:1; 85:25; 117:21

thomas [3] 4:7; 107:1; 124:14

thought [16] 20:19; 37:19; 56:10; 57:5; 77:13; 85:8, 12; 86:6; 112:17, 19; 113:19; 116:13; 117:17, 19; 119:20; 125:11

thoughts [1] 85:11

threatened [1] 75:5

three [3] 14:23; 16:15; 55:21

threw [1] 37:5

through [23] 3:15; 6:8; 10:3; 17:1; 20:11; 27:23; 28:6; 35:16; 38:10; 42:1, 17; 65:7; 71:12; 75:6, 17; 76:9; 86:19; 89:4; 90:1; 91:22; 109:5; 122:9

throughout [1] 115:20

throw [1] 113:15

thursday [1] 6:8

tickets [1] 53:25

time's [1] 6:18

times [12] 17:19; 40:2; 48:21; 49:7, 9, 15, 20; 50:9; 54:3; 66:17; 95:18; 100:20

timing [2] 98:24; 99:8

title [1] 6:25

titled [1] 66:12

tobacco [3] 29:20, 21, 22

today [5] 3:17; 75:19; 76:1; 102:24; 108:5

toes [1] 43:10

together [4] 8:25; 9:4; 48:9; 70:19

tomorrow [1] 86:22

took [12] 4:12; 13:18; 14:13; 15:24; 16:5, 13, 14; 43:1; 49:17; 94:18; 98:18, 21

totally [1] 125:8

touch [4] 33:22; 44:12, 24; 91:18

touched [3] 44:9; 46:17; 113:11

touching [1] 46:20

tough [5] 89:25; 97:10; 108:21; 122:1, 7

towards [10] 11:1, 3; 13:1, 6, 19, 20; 14:6; 17:13; 91:16, 17

towed [1] 98:23

town [1] 11:8

township [1] 76:16

traffic [9] 31:10; 48:24; 53:23; 77:10; 104:2; 110:20, 25; 124:22; 125:3

transcript [3] 59:7; 60:4; 109:4

transported [2] 38:21; 50:1

treat [1] 53:8

treated [1] 102:5

treese [2] 106:17, 19

trial [9] 3:6; 37:23, 25; 38:1, 3; 59:15; 61:2, 4; 70:2

tried [2] 88:7; 114:24

trip [2] 25:25; 123:1

truck [2] 125:1, 2

trucks [2] 81:18

true [1] 29:1

trust [1] 73:11

truth [10] 26:11, 16, 20, 25; 59:4; 71:7; 93:21; 128:7, 8

truthful [1] 99:6

truthfully [1] 91:2

trying [19] 17:18; 20:1; 35:4; 37:13; 39:4, 5; 43:24; 45:22; 86:4, 5; 92:1; 103:4; 118:12, 14, 16, 18, 25; 119:10, 14

tuesday [2] 7:18, 19

turkey [25] 10:3, 19; 15:20; 18:24; 19:7, 14; 20:7; 25:21; 28:3, 16; 32:13, 17; 34:18; 35:24; 38:18; 40:10; 46:3; 94:17, 24; 95:10; 97:19; 98:9; 112:9; 113:2

turn [7] 11:4; 13:15; 14:1; 43:15; 59:4; 63:21; 100:19

turned [3] 20:14; 34:11; 104:11

turning [1] 43:23

twelve [1] 6:19

twenty [2] 60:19; 117:20

twice [1] 82:9

twist [3] 71:3; 116:8, 23

twisting [1] 36:9

two-year [2] 9:18; 105:18

type [15] 4:24; 6:24; 30:2; 32:12; 45:4; 57:11; 68:17; 70:23; 73:4; 74:2; 85:5; 100:7, 8; 116:11

types [1] 73:8

typewriting [1] 128:17

typically [1] 10:14

- U -

u-turn [4] 13:17; 15:1; 16:4; 63:11

uncomfortable [3] 19:2; 23:22; 108:9

under [7] 37:4; 40:4; 50:20; 62:11; 66:11; 88:17; 128:18

undersigned [1] 128:4

understand [11] 3:19, 25; 31:17; 35:19; 42:8; 47:4; 55:18; 62:16; 64:11; 69:22; 90:20

understands [1] 85:17

understood [1] 91:2

united [1] 1:1

unless [4] 8:2; 9:22; 33:21; 71:25

unnecessary [2] 62:15, 21

unpack [1] 81:17

unrestricted [4] 54:12, 14, 24; 126:14

unusual [2] 34:3, 12

unwillingly [1] 39:12

used [9] 33:18; 46:14; 64:22; 70:17; 71:14, 16, 21; 78:19; 88:18

using [3] 42:8; 46:15; 99:23

usual [2] 84:12; 85:17

usually [11] 6:6, 12, 14, 15, 16; 8:1; 10:11, 16; 74:16, 19; 105:4

- V -

valley [1] 108:3

various [1] 77:10

vehicle [32] 11:7; 21:8, 12, 18; 24:10, 11, 21; 25:16, 17; 26:3, 6, 10, 19, 24; 28:1; 56:1; 61:21; 63:19, 20; 92:7; 93:12, 19; 95:20, 25; 96:23; 97:25;

98:18; 115:11; 120:24; 121:13; 123:3

vehicles [1] 56:6

versus [1] 70:1

vest [1] 21:3

victim [1] 87:9

video [7] 28:9, 17; 34:24; 93:16; 99:10; 121:6, 7

videos [1] 93:6

violated [2] 119:9, 24

violations [1] 104:3

viral [1] 74:20

visually [1] 118:7

voice [1] 115:22

- W -

wait [5] 43:20; 55:16; 74:17; 108:22

waiting [5] 38:13, 14; 98:20; 121:13; 123:19

waived [1] 3:4

wake [3] 10:9, 14, 15

walk [5] 20:11; 22:7; 38:10; 63:13

walked [3] 20:15; 22:3, 9

walking [9] 21:18, 21; 28:4; 31:24; 37:6; 75:6, 16; 76:9; 113:1

wants [2] 21:24; 40:8

warehouse [1] 81:20

warrant [1] 85:3

warren [2] 105:21; 107:8

warren's [1] 107:8

washington [3] 15:22; 16:14; 25:21

watch [1] 93:5

watched [3] 42:2; 93:10; 98:23

watching [7] 21:12; 34:24; 38:5; 65:1; 117:5; 122:1, 5

water [1] 22:20

ways [1] 44:18

weapons [1] 42:25

wearing [1] 21:3

wednesday [1] 6:7

weed [1] 28:23

week [6] 7:16; 26:6; 74:17; 79:22; 81:22, 24

weekend [1] 8:5

weekends [2] 8:1, 3

weeks [1] 74:18

weigh [2] 87:20, 21

west [1] 1:21

westminster [3] 4:4; 76:12, 21

what'd [1] 80:7

wheel [2] 27:24; 28:8

whereof [1] 128:19

whirlwind [1] 35:3

whistling [1] 121:21

white [21] 1:20; 3:13, 14; 27:5, 10; 31:19; 48:5, 11, 15; 60:2; 65:23; 66:2, 5, 9; 67:24; 90:7, 18; 102:2; 124:8; 126:21; 127:1

whole [17] 10:4; 27:5; 36:8; 37:12; 51:4, 5; 68:15; 69:19; 70:6; 84:10; 85:9; 86:1; 87:3; 102:20; 120:18; 126:7; 128:7

william [1] 1:23

williamsport [22] 1:14, 18, 21; 4:5, 14; 5:10, 25; 52:6; 57:22; 76:13, 19; 77:3, 5, 11, 14, 16, 18, 25; 88:9; 107:25; 128:16

window [7] 21:12; 27:23; 28:7, 20; 95:3; 110:21; 123:7

within [1] 98:6

without [4] 32:11; 54:2, 4; 99:13

witness [9] 3:10; 31:18; 97:3; 103:17, 18; 106:12; 111:5; 128:6, 13

witnesses [5] 2:1; 64:16; 68:10; 75:4; 113:6

**woke** [2] 10:5, 12

**woman** [4] 66:13, 23; 75:9; 118:11

**women** [1] 118:17

**word** [7] 33:18; 34:4, 8; 46:14; 70:6; 78:25; 102:6

**words** [12] 30:18; 33:13; 48:12; 62:12; 64:22; 94:1, 2; 99:24; 102:6; 109:2; 110:21; 111:1

**worked** [6] 5:8, 20; 6:6; 8:6, 8; 65:6

**works** [1] 55:11

**worried** [13] 95:5, 7; 103:15; 110:16, 18, 23; 122:8, 11, 14, 19, 20, 21; 123:8

**worry** [1] 64:21

**worse** [2] 36:10; 87:25

**worth** [1] 87:22

**write** [1] 114:3

**writing** [1] 48:20

**written** [3] 67:25; 68:24; 69:25

**wrong** [33] 23:15; 32:12; 37:11, 15, 19; 52:25; 56:12; 62:12; 65:14; 67:14, 16; 71:16, 20; 75:20; 78:18;

79:2; 86:19; 95:18; 100:10; 103:25; 104:10; 111:11; 112:22; 114:17, 21; 115:6; 116:14, 19; 117:18, 22; 118:19; 119:19; 122:14

**wrote** [1] 62:22

---

- Y -

**year** [3] 4:21; 61:8; 125:16

**years** [24] 5:3, 4, 6, 7, 14, 17; 8:12; 9:15; 51:14; 54:15, 16; 55:21; 68:6; 69:13; 74:6; 76:23, 24, 25; 85:25; 86:9

**yelled** [2] 110:21, 25

**yelling** [3] 103:9; 115:16, 21

**younger** [1] 8:18

**yourself** [4] 103:24; 104:4; 114:12; 115:5

---

- Z -

**zicolello** [2] 1:13, 17

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KYLE BEATTY,
    Plaintiff

    v.

CLINTON GARDNER and CALVIN IRVIN,
    Defendants

:
:
:
:
:   NO.
:
:
:   CIVIL ACTION - LAW
:   JURY TRIAL DEMANDED

DEPOSITION EXHIBIT
Beatty 1
PENGAD 800-631-6989

## COMPLAINT

1. Plaintiff, Kyle Beatty, is an adult individual currently residing in Williamsport, Pennsylvania.

2. Defendant Clinton Gardner is an adult individual who, at all times relevant to this Complaint, was employed as a police officer by the City of Williamsport and would also work with the Lycoming County Narcotics Enforcement Unit. Defendant is being sued in his individual capacity.

3. Defendant Calvin Irvin is an adult individual who, at all times relevant to this Complaint, was employed as a detective by the Lycoming County Office of the District Attorney and would also work with the Lycoming County Narcotics Enforcement Unit. Defendant is being sued in his individual capacity.

4. This is an action at law to redress the deprivation under color of statute, custom or usage, of rights, privileges, and immunities secured to the Plaintiff by the First, Fourth and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. §1983, and the Common Law of Pennsylvania.

5. Federal District Court has jurisdiction over the claims asserted in this Complaint pursuant to the provisions of 28 U.S.C. § 1331, 1343, and 1367.

Beatty

6. Pursuant to the provisions of 28 US.C. §1391, venue lies in the Federal District Court for the Middle District of Pennsylvania.

7. At approximately 1:30 pm on the afternoon of August 31, 2021, Plaintiff drove the car owned and also occupied by his girlfriend, Anaise Lopez, to the Turkey Hill gas station located along Washington Boulevard in Williamsport, Pennsylvania and parked at the fuel pumps before entering the store to purchase a soda and gasoline.

8. Defendants arrived shortly thereafter and parked their marked police cruiser beside the vehicle, and Defendant Gardner exited the cruiser, approached the car, and reached through the open window and down into the space between the seat and the steering wheel with his flashlight in order to illuminate the interior of the vehicle so he could see inside it.

9. In attempting to observe the interior of the car, Defendant Gardner leaned his head inside the open window into the interior of the car in order to be able to see into the interior.

10. Defendants then spotted the car's owner, Ms. Lopez, exiting the store with a water she had purchased and approaching the fuel pumps for gas and intercepted her, detaining her near her car for alleged "marijuana in the car".

11. Defendant Gardner entered the store and immediately detained and searched Plaintiff, who was approaching the register to pay for his soda.

12. Defendant Gardner then took Plaintiff out to the car and placed him on the hood of the vehicle, while announcing that he wanted "to talk about the roach and weed in your car."

13. When Ms. Lopez denied having contraband in the car, Defendant Gardner

Beatty Deposition 002

claimed to have observed a roach in the driver's side cup holder and "scraps of bud on the driver's floor," evidently while his head and flashlight were inside the vehicle.

14. Defendant Gardner then informed Plaintiff and Ms. Lopez that they had two options: (1) they could give him consent to search the car or (2) he could tow the car and apply for a search warrant.

15. Plaintiff and Ms. Lopez agreed to permit a search of the vehicle since they had done nothing wrong, were trying to placate the aggressive officers, and just wanted to be released from police custody as quickly as possible to continue their day.

16. Plaintiff then attempted to step away from the car while the officers searched it, but Defendant Gardner, physically pushed Plaintiff back on the hood of the car.

17. Defendants then inquired of Plaintiff if he had an I.D. on him, and Plaintiff responded that he was not under arrest since he had not done anything wrong.

18. Believing that Defendants were harassing himself and Ms. Lopez, Plaintiff then suggested to Ms. Lopez that she not let the Defendants search the car.

19. In retaliation for his First Amendment speech and in the absence of probable cause and reasonable suspicion, Defendants immediately arrested Plaintiff by seizing him physically and handcuffing him.

20. Fearing for his safety, Plaintiff requested bystanders to record police actions.

21. Defendants also immediately seized, handcuffed, and arrested Ms. Lopez at this time, seizing the phone with which she had been attempting to record police actions.

22. Defendants again placed Plaintiff and Ms. Lopez against the hood of the car and requested additional officers be sent to the location.

23. Ms. Lopez, concerned with the officers' actions and aggression, requested that

Beatty Deposition 003

a sergeant and a female police officer be provided, a request that further angered the Defendants.

24. Ms. Lopez and Plaintiff again protested their innocence of the Defendants' allegations and any wrongdoing at all, to which assertion of their First Amendment rights, Defendant Irvin threatened to place them into the police vehicle.

25. Ms. Lopez, who was handcuffed, began to pace slowly back and forth in front of the car but, Defendant Gardner, physically seized her and forcefully put her bodily on the hood of the vehicle again.

26. Plaintiff, still handcuffed, then stood up off the hood and in a conversational tone of voice, asked the officers to stop touching Ms. Lopez.

27. At which point, Defendant Irvin seized Plaintiff forcefully and slammed him face first on the hood of the car, conducting a second and invasive search of his person, including reaching into his pockets and groin area and seizing all possessions on his person.

28. Defendant Irvin then took Plaintiff to the police vehicle, placing him in the back seat, where he remained for some time until he was transported to the police station and subjected to an invasive strip search of his person, which revealed no contraband.

29. Ms. Lopez, who was still handcuffed, was also seized at this time by Defendant Gardner and another officer, who had arrived, and dragged by her arms into a different police cruiser and flung bodily into the rear passenger compartment.

30. After Plaintiff and Ms. Lopez had been locked into the respective police

Beatty Deposition 004

cruisers, an African American female bystander attempted to ask police whether they were searching for her 12 year old daughter whom she had reported missing to police approximately one month before.

31. In response to these good faith queries by this bystander, Defendant Gardner approached her aggressively and several times threatened to arrest her for "obstructing" if she did not stop talking.

32. Ultimately, Plaintiff was finally released from police custody later that evening and no charges were ever filed against him as a result of this incident.

33. On September 2, 2021, Defendant Gardner conducted a search of the car owned by Ms. Lopez and found and seized no contraband. A copy of the Receipt/Inventory of Seized Property showing "Nothing Recovered" is attached as Exhibit A.

34. At all times relevant to this Complaint, Defendants were state actors acting under color of state law.


## COUNT I

### 42 U.S.C. §1983, Unreasonable Arrest

35. Paragraphs 1 through 34 are incorporated herein by reference.

36. As indicated earlier in this Complaint Defendants subjected Plaintiff to an unreasonable warrantless arrest conducted in the complete absence of probable cause.

37. Defendants knew that they possessed no probable cause to arrest Plaintiff and yet they still arrested, handcuffed, and strip searched Plaintiff without securing a valid Pennsylvania arrest warrant.

38. As a result of these actions, Plaintiff has suffered damages including harm to his reputation, fear, anxiety, anguish, and embarrassment.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment against Defendants together with costs, attorney's fees, punitive damages, and or any such other relief as the Court may deem appropriate.

## COUNT II

### 42 U.S.C. §1983, Unreasonable Stop

39. Paragraphs 1 through 38 are incorporated herein by reference.

40. As indicated earlier in this Complaint, Defendants unreasonably stopped and detained Plaintiff in the complete absence of reasonable suspicion to believe that he was engaged in criminal conduct or was armed and dangerous.

41. As a result of these actions, Plaintiff has suffered damages including harm to his reputation, fear, anxiety, anguish, and embarrassment.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment against Defendants together with costs, attorney's fees, punitive damages, and for any such other relief as the Court may deem appropriate.

## COUNT III

### 42 U.S.C. §1983, Unreasonable Search

42. Paragraphs 1 through 41 are incorporated herein by reference.

Beatty Deposition 006

43. As indicated earlier in this Complaint, Defendants unreasonably searched Plaintiff three times, first Defendant Gardner searched Plaintiff in the Turkey Hill store, second Defendant Irvin searched Plaintiff on the hood of the car after slamming him onto it bodily, and third Defendants both transported Plaintiff to the police station and subjected him to an invasive strip search of his person, all in the absence of probable cause and reasonable suspicion.

44. As a result of these actions, Plaintiff has suffered damages including harm to his reputation, fear, anxiety, anguish, and embarrassment.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment against Defendants together with costs, attorney's fees, punitive damages, and for any such other relief as the Court may deem appropriate.

## COUNT IV

### 42 U.S.C. §1983, First Amendment Retaliation

45. Paragraphs 1 through 44 are incorporated herein by reference.

46. As described throughout this Complaint, Plaintiff engaged in protected activity and Defendants retaliated against him for engaging in that protected activity by following him, harassing him, holding him against his will, laying hands on him multiple times, handcuffing, detaining, arresting, and searching him three separate times all in the complete absence of probable cause and reasonable suspicion.

47. Defendants were motivated to retaliate against Plaintiff because he and Ms. Lopez were engaging in protected activity that angered Defendants as described earlier.

Beatty Deposition 007

Appx764

48. As a result of these actions, Plaintiff has suffered damages including harm to his reputation, fear, anxiety, anguish, and embarrassment.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment against Defendant together with costs, attorney's fees, punitive damages, and for any such other relief as the Court may deem appropriate.

## COUNT V

### False Arrest/False Imprisonment (state law)

49. Paragraphs 1 through 48 are incorporated herein by reference.

50. As indicated throughout this Complaint, Defendants knowingly and intentionally unlawfully seized, held, detained, and arrested the Plaintiff against his will, in the complete absence of reasonable suspicion and probable cause.

51. As a result of these actions, Plaintiff has suffered damages including harm to his reputation, fear, anxiety, anguish, and embarrassment.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment against Defendants together with costs, attorney's fees, punitive damages, and for any such other relief as the Court may deem appropriate.

## COUNT VI

### Battery (state law)

52. Paragraphs 1 through 51 are incorporated herein by reference.

Beatty Deposition 008

53. As indicated throughout this Complaint, Defendants acted intending to put Plaintiff in reasonable and immediate fear of a harmful or offensive contact with his body and caused a harmful or offensive contact with Plaintiff's body by grabbing him, pushing him, slamming him on the hood of the car, handcuffing him, and invasively searching his clothing and his person, all in the absence of reasonable suspicion and probable cause.

54. As a result of these actions, Plaintiff has suffered damages including harm to his reputation, fear, anxiety, anguish, and embarrassment.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment against Defendants together with costs, attorney's fees, punitive damages, and for any such other relief as the Court may deem appropriate.

## COUNT VII

### Assault (state law)

55. Paragraphs 1 through 54 are incorporated herein by reference.

56. Defendants acted with the intent to cause a harmful or offensive contact with Plaintiff and in fact directly caused a reasonable fear of such a contact in Plaintiff through their actions as described in this Complaint.

57. As a result of these actions, Plaintiff has suffered damages including harm to his reputation, fear, anxiety, anguish, and embarrassment.

Beatty Deposition 009

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment against Defendant together with costs, attorney's fees, punitive damages, and for any such other relief as the Court may deem appropriate.

SCHEMERY ZICOLELLO

By: _s/Joshua J. Cochran_
     Joshua J. Cochran, Esquire
     ID No. 206807
     Attorney for Plaintiff
     333 Market Street
     Williamsport, PA 17701
     Phone: (570) 321-7554
     Email: josh@sz-law.com

Beatty Deposition 010

JS 44   (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Kyle Beatty | Clinton Gardner and Calvin Irvin |

| (b) County of Residence of First Listed Plaintiff | County of Residence of First Listed Defendant    Lycoming County |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Joshua J. Cochran, Esquire, Schemery Zicolello, 333 Market Street, Williamsport, PA 17701, (570) 321-7554 | |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. §1983

Brief description of cause:
Federal Civil Rights/State Intentional Tort

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE                     DOCKET NUMBER

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 02/28/2023 | |

**FOR OFFICE USE ONLY**

RECEIPT #        AMOUNT        APPLYING IFP        JUDGE        MAG. JUDGE

Beatty Deposition 012

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KYLE BEATTY | : | NO.  4:23-CV-00364 |
| | : | |
| v. | : | JUDGE BRANN |
| | : | |
| CLINTON GARDNER and CALVIN | : | CIVIL ACTION – LAW |
| IRVIN | : | JURY TRIAL DEMANDED |

### PLAINTIFF'S RULE 26 DISCLOSURE

A.   Witnesses likely to have discoverable information

| | |
|---|---|
| Kyle Beatty | Plaintiff |
| Anaise Lopez | Witness |
| Clinton Gardner | Defendant |
| Calvin Irvin | Defendant |
| Zachary Geary | Police Officer |
| Tyson Minier | Police Officer |
| Jordan Stoltzfus | Police Officer |

As yet unidentified witnesses depicted in body camera videos
Witnesses identified in Disclosures or in Discovery

B.   Documents which may be used to support claims or defenses
- 53 pages of file materials in criminal matter filed against Anaise Lopez
- Transcript of 8/3/22 non-jury summary trial
- 7 videos of the incident from officer body cameras
- Newspaper article
- 7/19/21 PennDOT letter
- Documents identified in the parties' disclosures and discovery

C.   Damages claimed by disclosing party
- General damages
- Pain and suffering
- Emotional Distress

SCHEMERY ZICOLELLO

By: _____
Joshua J. Cochran, Esquire
ID No. 206807
Attorney for Plaintiff
333 Market Street
Williamsport, PA 17701
Telephone: (570) 321-7554

Beatty Deposition 013

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KYLE BEATTY,
    Plaintiff

    v.

CLINTON GARDNER and CALVIN
IRVIN,
    Defendants

:   NO.   4:23-CV-00364
:
:
:
:   Judge Brann
:
:
:
:   CIVIL ACTION - LAW
:   JURY TRIAL DEMANDED
:

## CERTIFICATE OF SERVICE

Joshua J. Cochran certifies that Plaintiff's Rule 26 Disclosure has been served upon the following individual and in the manner indicated below on this ___15th___ day of June 2023:

### VIA EMAIL & UNITED STATES POSTAL SERVICE

Shawn Laughlin, Esquire
William J. Ferren & Associates
PO Box 2903
Hartford, CT 06104
slaughli@travelers.com

Austin White, Esquire
McCormick Law Firm
835 West Fourth Street
Williamsport, PA 17701
awhite@mcclaw.com

SCHEMERY ZICOLELLO

By: _____
Joshua J. Cochran
ID No. 206807
Attorney for Plaintiff
333 Market Street
Williamsport, PA 17701
Telephone: (570) 321-7554

Beatty Deposition 014

## POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: 08/31/2021 | OTN/LiveScan Number | | Complaint/Incident Number |
|---|---|---|---|---|
| Defendant Name | First: ANNAISE | Middle: MARGARITA | | Last: LOPEZ |

### . AFFIDAVIT of PROBABLE CAUSE

On 8/31/2021, DET IRVIN and I were on patrol in a marked police unit, and wearing marked police vests. While in the area of the TURKEY HILL on WASHINGTON BLVD we observed a black in color NISSAN ALTIMA bearing MASSACHUSETTS registration parked at the pumps. Two occupants, a white male and white female exited and went into the store. I parked the patrol unit as to not obstruct the vehicle's exit.

IRVIN and I had observed the vehicle earlier downtown, where the occupants made efforts to ignore our presence, and then observed it shortly after leaving a high narcotics trafficking area in the avenues. The vehicle did not appear to be overly personalized. We followed the vehicle and again the occuptants made clear efforts to act as tho the police were not following. The driver would occasionally look out his window as if looking in the distance, but was clearly checking for police presence. Once the vehicle parked and the two exited, we were directly behind them. They did not look in our direction once. I know from my experience that this TURKEY HILL is a high narcotics trafficking area.

Once I parked I exited the patrol vehicle and walked up to the sedan. I immediately detected the odor of marijuana emmitting from the vehicle. I observed in plain view a marijuana joint, and marjuana flakes in plain view in the vehicle. The female exited the store and immediately confronted us. I went into the store and the male threw his hands up and asked if I wanted to search him. I asked him to exit the store with me which he did.

I explained to the pair what I observed and I explained their options. Initially the female granted consent to search the car but then redacted after I asked the two for ID. IRVIN and I then handcuffed the two, and the female attempted to turn away. Once the two were handcuffed the female refused to listen to any orders, and tried to walk around and scream at officers. Once additional units arrived, PO GEARY and I attempted to place the female in the back of his patrol unit. She nearly had to be carried by GEARY and I to the patrol unit due to her resistance. The female planted her feet and pushed back into us. We had to force her into the back of the patrol unit.

I, PO GARDNER, BEING DULY SWORN ACCORDING TO THE LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

I CERTIFY THAT THIS FILING COMPLIES WITH THE PROVISIONS OF THE *CASE RECORDS PUBLIC ACCESS POLICY OF THE UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA* THAT REQUIRE FILING CONFIDENTIAL INFORMATION AND DOCUMENTS DIFFERENTLY THAN NON-CONFIDENTIAL INFORMATION AND DOCUMENTS.

(Signature of Affiant)

Sworn to me and subscribed before me this 3 1 day of August 2021

Date _____  Magisterial District Judge

My commission expires first Monday of January, 2021

AOPC 411C - Rev. 07/18

Beatty Deposition 015

Page 1 of 2

🏛 **POLICE CRIMINAL COMPLAINT**
AFFIDAVIT CONTINUATION PAGE

| Docket Number: | Date Filed:<br>8/31/2021 | OTN/LiveScan Number | Complaint/Incident Number<br>21-08506 |
|---|---|---|---|
| Defendant Name: | First:<br>ANAISE | Middle:<br>MARGARITA | Last:<br>LOPEZ |

## AFFIDAVIT of PROBABLE CAUSE CONTINUATION

Once she was in the vehicle she kicked PO GEARY twice. The first kick struck PO GEARY in the left hand, and the second struck PO GEARY on the inner portion of his right arm near his elbow. Due to the females actions a car full of individuals at the pumps were clearly riled up, and one of the occupants continuously yelled at officers and had to be ordered to stop.

At WBP headquarters LOPEZ initially refused to ID herelf and made racist, and demeaning comments towards officers.

Based on the facts and circumstances stated above, I respectfully request that ANAISE MARGARITA LOPEZ be brought before the court to answer to these charges.

_____
(Signature of Affiant)

AOPC 411C – Rev. 07/10

Page ___ of ___

Beatty Deposition 016

LYCOMING COUNTY DISTRICT ATTORNEY'S OFFICE  Inc. # WBP 21-08506

## SUPPLEMENTAL #1

On August 31, 2021, I, Detective Calvin Irvin, was partnered with Williamsport Bureau of Police Officer Gardner. We were on patrol in a marked police vehicle and wearing marked police vests.

We observed a black Nissan Altima with a Massachusetts registration in the area of 6th Avenue. This area is a high drug trafficking area. The driver and passenger intentionally did not look as us as we passed them. We then followed them to the area of the Turkey Hill, 700 Washington Boulevard, Williamsport. The vehicle parked at the southeast fuel pump. We pulled in and parked as not to obstruct the vehicle's exit. The male driver and female front seat passenger exited the vehicle and entered the store.

I stayed in the patrol car while Ofc. Gardner walked over to the black Nissan Altima. Ofc. Gardner informed me that he smelled the odor of marijuana coming from inside the vehicle and also observed a marijuana joint.

The female then exited the store and confronted us. Ofc. Gardner went inside to make contact with the male driver. The female then started walking to the store and I told her she could not go in and had to stay outside with me. The female then walked towards the black Nissan Altima. I told her that she was not allowed to go in the vehicle. I explained to her that there was marijuana in the vehicle and the she was under investigation.

Ofc. Gardner exited the store with the male, who had his hands placed behind the back of his head. Ofc. Gardner asked for consent to search the car. Initially consent was granted, but revoked after the two were asked for identification. They were both detained at approximately 13:50 hours. Ofc. Gardner asked that I search the male and place him in the rear of our patrol vehicle due to the female attempting to walk around and yelling at officers.

I spoke with the male in the rear of our patrol car. The male did give me his name, Kyle BEATTY. He said that his identification was inside his wallet. I retrieved his wallet that was placed inside the car by Ofc. Gardner. I noticed that his Pennsylvania Driver's License was a Limited License and required an ignition interlock. I heard BEATTY tapping on the window. He then said that he spoke to PennDOT and did not need an ignition interlock since PennDOT was so backed up.

While speaking to BEATTY, a female who was parked behind the black Nissan Altima became irate and was yelling at Officers. The female was then told to stop yelling and not to interject herself in things.

Ofc. Gardner informed me that the female identified as, Anaise LOPEZ, had kicked Ofc. Geary and that she was under arrest. LOPEZ was going to be transported to WBP Headquarters.

Ofc. Gardner and I did transport BEATTY to WBP Headquarters at approximately 14:09 hours. Upon arriving, BEATTY was strip searched and subsequently released. I did request his cell phone number so I could call him and inform him of the time of LOPEZ'S arraignment. BEATTY then left.

Ofc. Gardner did ask LOPEZ if she would be able to assure him that she would not hit him if she would be un-cuffed for fingerprinting purposes. LOPEZ could not guarantee that. LOPEZ was not fingerprinted.

| Signature of Reporting Officer | Badge # | Date | Supervisor | Date | Reviewed By | Date |
|---|---|---|---|---|---|---|
| | 509 | 9/9/2021 | | | | 09/09/21 |

Case Status
☐ Complete  ☐ Active  ☐ Arrest Cleared
☐ Unfounded  ☐ Inactive  ☐ Exceptionally Cleared

Page 1 of 2

Beatty Deposition 017

Case 2:25-cv-00364-DKM Document 16 Page: 390 Filed 04/25/21 Page 12/16/2022

LYCOMING COUNTY DISTRICT ATTORNEY'S OFFICE  Inc. # WBP 21-08506

LOPEZ was transported to MDJ Biichle and arraigned. LOPEZ was committed to the Lycoming County Prison.

A body camera was utilized during this interaction and was downloaded into the Axon Evidence system.

Nothing further.

[ATTACHMENTS – CFS REPORT]

| Signature of Reporting Officer | Badge # | Date | Supervisor | Date | Reviewed By | Date |
|---|---|---|---|---|---|---|
| | 509 | 9/9/2021 | | | | 09/09/21 |
| Case Status | | | | | | |
| ☑ Complete ☐ Active ☐ Unfounded ☐ Inactive ☐ Arrest Cleared ☐ Exceptionally Cleared | | | | | Page 2 of 2 | |

Beatty Deposition 018

Appx774

| Commonwealth of Pennsylvania | | APPLICATION FOR |
|---|---|---|
| | | **SEARCH WARRANT** |
| **COUNTY OF** LYCOMING | | AND AUTHORIZATION |

| Docket Number (Issuing Authority): | Police Incident Number: 21-08506 | Warrant Control Number: |
|---|---|---|

| PO GARDNER | WBP/NEU | (570) 327-8124 | 09/02/21 |
|---|---|---|---|
| AFFIANT NAME | AGENCY | PHONE NUMBER | DATE OF APPLICATION |

IDENTIFY ITEMS TO BE SEARCHED FOR AND SEIZED (Be as specific as possible):
Any and all illegal narcotics, and related packaging material, scales, means of ingestion and measuring devices. Specifically Marijuana and marijuana related paraphernalia.

SPECIFIC DESCRIPTION OF PREMISES AND/OR PERSON TO BE SEARCHED (Street and No., Apt. No., Vehicle, Safe Deposit Box, etc.):
Black in Color NISSAN ALTIMA currently stored at WBP IMPOUND
MASSACHUSETTS REG 3FNF89

NAME OF OWNER, OCCUPANT OR POSSESSOR OF SAID PREMISES TO BE SEARCHED (If proper name is unknown, give alias and/or description):
ANAISE MARGARITA LOPEZ

| VIOLATION OF (Describe conduct or specify statute): | DATE(S) OF VIOLATION: |
|---|---|
| ACT 64 | 8/31/21 |

☐ **Warrant Application Approved by District Attorney – DA File No.** _____
(If DA approval required per Pa.R.Crim.P. 202(A) with assigned File No. per Pa.R.Crim.P. 507)
☐ **Additional Pages Attached** (Other than Affidavit of Probable Cause)
☐ **Probable Cause Affidavit(s) MUST be attached (unless sealed below)** Total number of pages: _____

TOTAL NUMBER OF PAGES IS SUM OF ALL APPLICATION, PROBABLE CAUSE AND CONTINUATION PAGES EVEN IF ANY OF THE PAGES ARE SEALED

The below named Affiant, being duly sworn (or affirmed) before the Issuing Authority according to law, deposes and says that there is probable cause to believe that the items or property identified are evidence or the fruit of a crime, or are contraband, or are expected to be otherwise unlawfully possessed or subject to seizure, and that these items or property are or are expected to be located on the particular person or at the particular place described above. I certify that this filing complies with the provisions of the Case Records Public Access Policy of the Unified Judicial System of Pennsylvania that require filing confidential information and documents differently than non-confidential information and documents.

| | WBP/NEU | 14 |
|---|---|---|
| Signature of Affiant | Agency or Address if Private Affiant | Badge Number |

Sworn to and subscribed before me this __2__ day of __September__ 20__21__ Mag. Dist. No. __29-1-02__

| | 48 W Third St Williams___ |
|---|---|
| Signature of Issuing Authority | Office Address |

**SEARCH WARRANT**
TO LAW ENFORCEMENT OFFICER:

WHEREAS, facts have been sworn to or affirmed before me by written affidavit(s) attached hereto from which I have found probable cause, I do authorize you to search the premises or person described and to seize, secure, inventory and make return according to the Pennsylvania Rules of Criminal Procedure.

☑ This Warrant shall be served as soon as practicable and shall be served only between the hours of 6AM to 10PM but in no event later than:*

☐ This Warrant shall be served as soon as practicable and may be served any time during the day or night but in no event later than: **
__10:10__ __M, o'clock __Sept.__ __4__ __2021__

☑ This Warrant shall be returned to judicial officer __MDG Frey__

* The issuing authority should specify a date not later than two (2) days after the issuance. Pa.R.Crim.P. 205(4).
** If the issuing authority finds reasonable cause for issuing a nighttime warrant on the basis of additional reasonable cause set forth in the accompanying affidavit(s) and wishes to issue a nighttime warrant, then this block shall be checked. Pa.R.Crim.P. 206(7).

Issued under my hand this __2__ day of __September__, __2021__ at __10:10__ __M, o'clock.

| | 29-1-02 | | 1/__2026__ (SEAL) |
|---|---|---|---|
| Signature of Issuing Authority | Mag. Dist. or Judicial Dist. No. | Date Commission Expires | |

Title of Issuing Authority: ☑ Magisterial District Judge ☐ Common Pleas Judge ☐ _____

☐ **For good cause stated in the affidavit(s) the Search Warrant Affidavit(s) are sealed for** _____ **days by my certification and signature. (Pa.R.Crim.P. 211)**

| | (Date) (SEAL) |
|---|---|
| Signature of Issuing Authority (Judge of the Court of Common Pleas or Appellate Court Justice or Judge). | |

TO BE COMPLETED BY THE ISSUING AUTHORITY

1

Beatty Deposition 019

| Commonwealth of Pennsylvania | | AFFIDAVIT OF |
|---|---|---|
| COUNTY OF LYCOMING |  | PROBABLE CAUSE |

| Docket Number (Issuing Authority): | Police Incident Number: 21-08506 | Warrant Control Number: |
|---|---|---|

**PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:**

Your affiant is a Williamsport Bureau of Police Officer currently specially assigned to the Lycoming County Narcotics Enforcement Unit. My training and experience consists of the following: I have completed basic narcotics training in the police academy. I have completed additional trainings in mastering search and seizure, money laundering, identifying criminal vehicles and occupants, patrol interdiction, street gangs and narcotics, hidden compartments and deceptive behavior, interdiction mastermind, understanding the world of 1%'s, planning an undercover operation, interview and interrogation in relation to narcotics and I am Wiretap Class A certified. I am currently a member of the Williamsport Special Response team and have been since Nov. 2017. I have participated in countless search warrants in relation to narcotics and firearms in my duties on this team. I have hundreds of narcotics related arrests which include both misdemeanor and felony arrests. I have assisted in countless narcotics related investigations. I have participated in controlled purchases of narcotics, and have also have utilized confidential informants for the purchase of narcotics. I have served numerous search warrants in relation to narcotics and firearms on residence's, vehicles, cell phones and even body warrants. I have investigated and assisted in a large number of opiate related overdoses, and have utilized narcan on numerous individuals who have overdosed on opiates. Through my experience I have testified in court numerous times as a PWID expert not only in my own cases, but other officers as well.

Based on my aforementioned training and experience I am familiar with the following: Through my experience and training I am familiar with a wide array of narcotics, pricing, packaging, preparation/manufacturing, and street language in reference to narcotics. Also, through my experience and training, I have developed knowledge of the patterns of trafficking, means of trafficking, counter surveillance techniques, and workings of a residence, or "trap house" which distributes narcotics. I have developed knowledge of narcotics traffickers using more than one residence, or storage area, to traffic and store their narcotics from. I have developed knowledge through my training and experience of the use of firearms in the furtherance of narcotics trafficking. I have arrested numerous individuals for firearms violations, and assisted in numerous firearm related incidents including shootings. Traffickers frequently illegally possess firearms in order to defend from, or pursue and rob other traffickers of their narcotics and currency. I also know when specifically dealing with gangs, that gang members will commonly possess firearms to protect themselves and fellow members. Gang members will also possess firearms so they are prepared to fire upon rival gangs when an oppurtunity presents itself. I know through my experience that the most common form of communication amongst traffickers is through the utilization of cell phones. Traffickers utilize phones to both communicate to each other as well as to negotiate and arrange transactions with narcotics users. I know that narcotics traffickers commonly operate third party vehicles, when they traffic narcotics. This is to help further hinder efforts in identifying them, as well as the vehicle not being able to be forfeit if a trafficker is apprehended in it. While utilizing vehicles to further their trafficking efforts I know it is common for traffickers to use natural voids, or create voids within compartments of vehicles in order to conceal narcotics, currency and firearms. Traffickers will also illegally install "traps" in vehicles used to transport contraband, knowing that these types of installed aftermarket compartments are particularly difficult for law enforcement to detect. Also, in reference to concealing narcotics, due to more severe sentencing as opposed to simple possession, traffickers go to greater lengths to conceal narcotics on, or within their person, and will dispose of the narcotics immediately if given a chance. They are skilled in ways to conceal narcotics on their person, and deceiving officers in order to destroy evidence. I know that when dealing with currency, it is common for traffickers to possess large amounts of currency, specifically larger denominations, in multiple bundles of cash which can be easily accessed. The most common denomination used among traffickers is a twenty dollar bill. I am also familiar with various ways that traffickers will launder the proceeds or dirty money from trafficking firearms/narcotics into "clean money" or money that appears to be legitimate.

I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF. I certify that this filing complies with the provisions of the Case Records Public Access Policy of the Unified Judicial System of Pennsylvania that require filing confidential information and documents differently than non-confidential information and documents.

| Affiant Signature | Date 9/2/21 | Issuing Authority Signature | Date (SEAL) |
|---|---|---|---|

2

Beatty Deposition 020

| Commonwealth of Pennsylvania |  | AFFIDAVIT OF PROBABLE CAUSE CONTINUATION PAGE |
|---|---|---|
| COUNTY OF LYCOMING | | |

| Docket Number (Issuing Authority): | Police Incident Number: 21-08506 | Warrant Control Number: |
|---|---|---|

## AFFIDAVIT OF PROBABLE CAUSE CONTINUATION

On 8/31/2021, DET IRVIN and I were on patrol in a marked police unit, and wearing marked police vests. While in the area of the TURKEY HILL on WASHINGTON BLVD we observed a black in color NISSAN ALTIMA bearing MASSACHUSETTS registration parked at the pumps. Two occupants, a white male and white female exited and went into the store. I parked the patrol unit as to not obstruct the vehicle's exit.

IRVIN and I had observed the vehicle earlier downtown, where the occupants made efforts to ignore our presence, and then observed it shortly after leaving a high narcotics trafficking area in the avenues. The vehicle did not appear to be overly personalized. We followed the vehicle and again the occupants made clear efforts to act as tho the police were not following. The driver would occasionally look out his window as if looking in the distance, but was clearly checking for police presence. Once the vehicle parked and the two exited, we were directly behind them. They did not look in our direction once. I know from my experience that this TURKEY HILL is a high narcotics trafficking area.

Once I parked I exited the patrol vehicle and walked up to the sedan. I immediately detected the odor of marijuana emmitting from the vehicle. I observed in plain view a marijuana joint, and marjuana flakes in plain view in the vehicle. The joint was on top of a cigarette ash tray in the drivers door. This is not an approved means of ingestion, even with a medical marijuana card (NEITHER OCCUPANT made claims of possessing a medical card). The marijuana flakes were scattered throughout the drivers floor of the vehicle. Passenger KYLE BEATTY has prior criminal charges in relation to marijuana.

After observing the plain view contraband the female (Identified as ANAISE LOPEZ) exited the store and immediately confronted us. I went into the store and the male threw his hands up and asked if I wanted to search him. I asked him to exit the store with me which he did.

I explained to the pair what I observed and I explained their options. Initially the female granted consent to search the car but then redacted after I asked the two for ID. IRVIN and I then handcuffed the two, and the female attempted to turn away. Once the two were handcuffed the female refused to listen to any orders, and tried to walk around and scream at officers. Once additional units arrived, PO GEARY and I attempted to place LOPEZ in the back of his patrol unit. She nearly had to be carried by GEARY and I to the patrol unit due to her resistance. LOPEZ planted her feet and pushed back into us. We had to force her into the back of the patrol unit.

Once she was in the vehicle she kicked PO GEARY twice. The first kick struck PO GEARY in the left hand, and the second struck PO GEARY on the inner portion of his right arm near his elbow. Due to LOPEZ'S actions, a car full of individuals at the pumps were clearly riled up, and one of the occupants continuously yelled at officers and had to be ordered to stop.

Based on the facts and circumstances stated above I respectfully request that a search warrant be issued for the black in color NISSAN ALTIMA with MASSACHUSETT'S REG 3FNF69.

**Affiant Signature**

Beatty Deposition 021

A COPY OF THIS FORM, WHEN COMPLETED, IS TO BE ATTACHED TO EACH COPY OF THE SEARCH WARRANTS/AFFIDAVIT

| **Commonwealth of Pennsylvania** | **RECEIPT / INVENTORY** OF SEIZED PROPERTY |
|---|---|
| **COUNTY OF** Lycoming | |

| Docket Number (Issuing Authority): | Police Incident Number: 21-08506 | Warrant Control Number: |
|---|---|---|

| Date of Search: 9/2/21 | Time of Search: 1240 | Inventory Page Number: of Pages |
|---|---|---|

| Gardner | Williamsport Bureau of Police | 14 |
|---|---|---|
| Affiant | Agency or Address if private affiant | Badge No. |

The following property was taken / seized and a copy of this Receipt / Inventory with a copy of the Search Warrant and affidavit(s) (if not sealed) was

☐ personally served on (name of person) _____

☑ was left at (describe the location) in vehicle @ impound

| Item Number | Quantity | Item Description | Make, Model, Serial No., Color, etc. |
|---|---|---|---|
| | | Nothing Recovered | |

I/we do hereby state that this inventory is to the best of my/our knowledge and belief a true and correct listing of all items seized, and that I/we sign this Receipt / Inventory subject to the penalties and provisions of Title 18 Pa.C.S. 4904(b)--Unsworn Falsification to Authorities.

| | | | NEV | 14 |
|---|---|---|---|---|
| Signature of person issuing Receipt / Inventory | Gardner Printed Name | | Affiliation | Badge or Title |
| Signature of Witness | Dean Printed Name | | NEV Affiliation | 508 Badge or Title |
| Signature of person making Search | Gardner Printed Name | | NEV Affiliation | 14 Badge or Title |

AOPC 413B 12-06-08

ISSUING AUTHORITY- CANARY     TO WHOM RECEIPT ISSUED - GOLDENROD     REPORT COPY - PINK

IN THE COURT OF COMMON PLEAS OF
LYCOMING COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA: No. CR-1281-2021

V

ANAISE M. LOPEZ : SUMMARY TRIAL

RECEIVED

AUG 12 2022

DISTRICT ATTORNEY

TRANSCRIPT OF PROCEEDINGS
REQUESTED PORTION OF TRANSCRIPT

BEFORE : Honorable Eric R. Linhardt, Judge

DATE : August 3, 2022

PLACE : Courtroom No. 2
Lycoming County Courthouse
48 West Third Street
Williamsport, Pennsylvania 17701

APPEARANCES:

MATTHEW B. WELICKOVITCH, ESQUIRE
District Attorney's Office
Lycoming County Courthouse
48 West Third Street
Williamsport, Pennsylvania 17701
        FOR - COMMONWEALTH

 COPY

GEORGE E. LEPLEY, JR., ESQUIRE
Lepley, Engelman, Yaw & Wilk,
140 East Third Street
Williamsport, Pennsylvania 17701
        FOR - DEFENDANT

Reported and Transcribed by:
Camala Jordan
Official Court Reporter

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

Beatty Deposition 023

2

(The following is the requested portion of the transcript from the hearing held on August 3, 2022:)

THE COURT: The Court finds that the evidence is not only clear and credible, but really overwhelming of the Defendant's guilt with regard to both the summary disorderly conduct and the summary harassment.

The argument that Defense Counsel makes that no roach was seized somehow suggesting that Officer Gardner's testimony that he observed marijuana residue and a marijuana roach in the vehicle was somehow a pretext and a lie, the Court does not find credible in the least. The Court finds Officer Gardner's testimony to be credible in that regard.

In addition to which, Defense's argument that somehow the Defendant was cuffed and placed under arrest when they, in counsel's words, did nothing wrong, the Court disagrees with. This entire matter escalated solely because of the Defendant's behavior and her friend's behavior, all of which was unnecessary. The officers had every right to conduct an investigation; and had the Defendant cooperated in that investigation, I imagine that she would have been free to go on her way in probably less than five minutes, but instead, finds herself handcuffed, arrested, taken down to the police station, and charged with a felony. Her behavior, which she apparently still

3

fails to recognize -- not the police officer's behavior, but her behavior put not only her safety at risk, but the public's safety at risk, and the officers' safety at risk.

Ms. Lopez, you also need to understand that the Court considers all assaults on law enforcement officers to be a serious matter and our legislature finds all assaults on our police officers to be serious matters. That is why our legislature treats police officers as protected parties and enhances the grading for this type of behavior from a misdemeanor to a felony.

Further, the Court considers your utter lack of acceptance of any responsibility for your behavior that day -- you were offered, as reflected in the court file, a misdemeanor plea offer for six months of probation at the time of your preliminary hearing, which you declined. And then ultimately the Commonwealth dropped both the felony and misdemeanor charges and we're still proceeding with a trial on two summary offenses in the face of overwhelming evidence where you effectively offer no defense. Is there anything, Mr. Lepley, that you wish to say before the Court imposes sentence?

MR. LEPLEY: I point out that she -- to the best of my knowledge, I think that she has absolutely no prior record whatsoever, is gainfully employed here in town, has relocated. Mr. Beatty is one of the managers at

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

Beatty Deposition 025

4

the Perkins store, so they're not individuals that in general would be involved in criminal conduct and so we would ask the Court to not impose incarceration. If the Court did, to make it house arrest so she can continue to work.

THE COURT: Mr. Welickovitch.

MR. WELICKOVITCH: Yes, Your Honor. So this case obviously preceded my time in the District Attorney's Office. I played no part in any decisions on it. I have no real long history. I was handed the case and said, this is a summary trial. I looked at the evidence, I agreed with Your Honor that it was overwhelming evidence. And we prepared it, we displayed it here for you today. She was found guilty. And we conquer with Your Honor's sentiments with regard to lack of personal responsibility and would trust that Your Honor impose a proper sentence here given the facts, given the conviction.

THE COURT: So for the reasons the Court has already stated, the fact that it takes assaults on police officers seriously, the fact that the Defendant has refused to accept responsibility in the face of overwhelming evidence, the fact that her behavior on that day put herself, the public, and law enforcement officers at risk, the Court believes that any sentence less than some period of incarceration would fail to account for the

Beatty Deposition 026

5

seriousness of the Defendant's criminal behavior on that day. And for that reason, the Court will impose the following order:

And now this 3rd of August, 2022, at the time scheduled for summary trial, following trial, the Court finds the Defendant guilty of count three, harassment, a summary offense, and count four, disorderly conduct, a summary offense.

With regard to count three, harassment, the Court imposes a period of incarceration of 14 days in the Lycoming County Prison. The Defendant is eligible for work release/work crew, she is not eligible for electronic monitoring.

With regard to count four, disorderly conduct, the Court imposes a sentence of 14 days incarceration in the Lycoming County Prison. This sentence shall be served consecutively to count three for an aggregate sentence of 28 days incarceration. The Defendant is eligible for work release/work crew, she is not eligible for electronic monitoring.

The Defendant's report date is deferred until Monday, September 5, 2022, at 9:00 a.m. The Defendant shall self-report to the county prison at that time to begin serving her period of incarceration. Should the Defendant file an appeal of this sentence prior to

6

September 5th, the Defendant shall also file a motion for bail pending appeal so that the Court can consider that request. By the Court.

Any questions, Mr. Lepley?

MR. LEPLEY: No, Your Honor.

THE COURT: Any questions, Ms. Lopez?

THE DEFENDANT: No.

THE COURT: Any questions, Mr. Welickovitch?

MR. WELICKOVITCH: No, Your Honor.

THE COURT: Very good. We are adjourned.

(WHEREUPON, the hearing was concluded.)

(This concludes the requested portion of the transcript from the hearing held on August 3, 2022.)

CAMALA JORDAN
OFFICIAL COURT REPORTER, LYCOMING COUNTY

Beatty Deposition 028

## C E R T I F I C A T E

I hereby certify that the proceedings are contained fully and accurately in the notes taken by me on the hearing of the above case, and that this copy is the correct transcript of the same.

*Camala Jordan*
Camala Jordan
Official Court Reporter

The foregoing record of the proceedings upon the hearing of the above case is hereby approved and directed to be filed.

_____, Judge

_____
DATE                                    ERIC R. LINHARDT

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KYLE BEATTY,<br>    Plaintiff | : | NO.  4:23-CV-00364 |
| | : | |
| | : | |
| v. | : | Judge Munley |
| | : | |
| CLINTON GARDNER and CALVIN<br>IRVIN, | : | CIVIL ACTION - LAW |
|     Defendants | : | JURY TRIAL DEMANDED |

**RESPONSES to INTERROGATORIES of CALVIN IRVIN**

1. The Defendant police officer's actions on that day have made me feel as though I was assaulted and even sexually assaulted.  I was kidnapped by the officers and moved against my will and strip searched in a way that felt like a sexual assault.  At the time of the incident and subsequently up through the present, I have suffered embarrassment before strangers, my peers, witnesses and even my own girlfriend, and anxiety, and a loss of my own personal security and an intense and generalized fear of authority in general and police officers in particular. Fear of retaliation and continued harassment causes me intense daily anxiety and worry.

2. None.

3. None.

4. None.

5. None.

6. It is intended that any of these witnesses may be called for trial. Kyle Beatty—Plaintiff. Mr. Beatty would be aware of all aspects of the occurrence and his harm suffered.  All responsive documents in his possession have been turned over in Disclosures and in response to discovery requests. Clinton Gardner—Defendant.  Mr.

Gardner would be aware of all aspects of the occurrence. Calvin Irvin—Defendant. Mr. Irvin would be aware of all aspects of the occurrence. Anaise Lopez—Witness. Ms. Lopez would be aware of all aspects of the occurrence and would also be aware of aspects of the harm suffered by Plaintiff. Zachary Geary—Police officer. Mr. Geary would be aware of the occurrence once he arrived in person in response to being summoned by Defendants. Tyson Minier—Police officer. Mr. Minier would be aware of the occurrence once he arrived in person in response to being summoned by Defendants. Jordan Stoltzfus—Police officer. Mr. Stoltzfus would be aware of the occurrence once he arrived in person in response to being summoned by Defendants. There are several additional witnesses depicted in the videos who Plaintiff would intend to call as witnesses, including a female at the fuel pumps who was confronted and threatened by the Defendants and a male who was seen walking through the area where the incident occurred. But these individuals have not been identified so far. Additional witnesses may be identified during discovery.

7. No expert witness has been identified so far. Discovery is still ongoing and if that changes, this response will be updated as appropriate.

8. Plaintiff's protected speech and activity included stating his and Ms. Lopez's innocence, denying that there was any contraband in the car, stating that the Defendants seized, treated, and handled them in appropriately, advising Ms. Lopez that she could revoke her consent to search the vehicle, advising the officers of his and Ms. Lopez's Constitutional rights, requesting bystanders to record the officers' actions, stating that the officers had already seized his identification, and asking the Defendants to stop touching Ms. Lopez and to please release them. As a result of these actions

Plaintiff has suffered damages including harm to his reputation, fear, anxiety, anguish, and embarrassment.

9. To the best of my recollection and estimation, I have 2 DUI, 2 Disorderly Conduct, one paraphernalia, and a number of traffic citations, most occurring in Lycoming County. The sentences ranged from fines, probation, house arrest, or Lycoming County Jail for less than 60 days. These offenses are estimated to have occurred from 2004 to 2016.

10. To the best of my recollection and estimation, when I was 3 or 4 years old, my Father sued a hospital in connection with the death of my mother. I believe I may have been listed as a minor plaintiff on the suit.

11. I have lived at 921 Westminster Drive, Apartment 2a, in Williamsport, PA since 2018. Rennie Rodarmel is the landlord. I do not know any of my neighbors personally other than to say hello or wave.

12. To the best of my recollection and estimation, I was working 10 hour days. On the day before the incident, I went to work, went home, went to sleep and slept very well that night.

13. None.

14. None.

15. To the best of my recollection and estimation, that day started at my house with my regular morning routine. I drove downtown, visited the state representative's office, a downtown dress shop, and left downtown to drive to get food. Then the police incident happened.

16. Plaintiff has suffered general damages, emotional distress, harm to his

Beatty Deposition 032

reputation, fear, anxiety, anguish, and embarrassment as a result of the officers' actions.

17. Plaintiff has suffered no additional items of expense and loss.

SCHEMERY ZICOLELLO

By: _____
Joshua J. Cochran, Esquire
ID No. 206807
Attorney for Plaintiff
333 Market Street
Williamsport, PA 17701
(570) 321-7554

Beatty Deposition 033

## VERIFICATION

I hereby state and aver that I have read the foregoing document which has been drafted by counsel. The factual statements contained therein are true and correct to the best of my knowledge, information and belief although the language is that of counsel, and, to the extent that the content of the foregoing document is that of counsel, I have relied upon counsel in making this Verification.

This statement is made subject to penalties of 18 Pa.C.S. §4904 relating to unsworn falsification to authorities, which provides that if I make knowingly false statements, I may be subject to criminal penalties.

_____
Kyle Beatty

–7–

Beatty Deposition 034

Appx790

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KYLE BEATTY, | : | NO. 4:23-CV-00364 |
| Plaintiff | : | |
| | : | |
| v. | : | Judge Munley |
| | : | |
| CLINTON GARDNER and CALVIN | : | |
| IRVIN, | : | CIVIL ACTION - LAW |
| Defendants | : | JURY TRIAL DEMANDED |

## CERTIFICATE OF SERVICE

Joshua J. Cochran, Esquire hereby certifies that a true and correct copy of the

foregoing Plaintiff's Response to Interrogatories of Calvin Irvin has been served upon

the following individual and in the manner indicated below this 11th day of January,

2024:

### VIA EMAIL & UNITED STATES POSTAL SERVICE

Shawn Laughlin, Esquire
William J. Ferren & Associates
PO Box 2903
Hartford, CT 06104
slaughli@travelers.com

Austin White, Esquire
McCormick Law Firm
835 West Fourth Street
Williamsport, PA 17701
awhite@mcclaw.com

SCHEMERY ZICOLELLO

By: _____
Joshua J. Cochran, Esquire
ID No. 206807
Attorney for Plaintiff
333 Market Street
Williamsport, PA 17701
(570) 321-7554

Beatty Deposition 035

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KYLE BEATTY,<br>        Plaintiff | : | NO. 4:23-CV-00364 |
| | : | |
| v. | : | Judge Munley |
| | : | |
| CLINTON GARDNER and CALVIN<br>IRVIN,<br>        Defendants | :<br>:<br>: | CIVIL ACTION - LAW<br>JURY TRIAL DEMANDED |

## RESPONSES TO REQUESTS FOR PRODUCTION OF CALVIN IRVIN

1. See documents provided in response to Disclosures. No additional responsive documents are known.

2. See documents provided in response to Disclosures. No additional responsive documents are known.

3. See body cam videos provided by Defendants and disclosed in Disclosures. No additional responsive photos or videos are known.

4. None.

5. A decision has not yet been made as to an expert witness, but this response will be updated at an appropriate time if necessary.

6. None.

7. A decision on exhibits to be used for trial has not yet been made, so this response will be updated, if necessary, at an appropriate time. However, it is anticipated that, at a minimum, all items disclosed will be used as exhibits at trial.

8. None.

9. There are no documents of monetary losses.

10. None. The reputational harm incurred is supported by nondocumentary

Beatty Deposition 036

evidence.

11. None. The emotional harm incurred is supported by nondocumentary evidence.

12. None. The harm incurred is supported by nondocumentary evidence.

13. None. The harm incurred is supported by nondocumentary evidence.

14. None.

15. See Disclosures.

16. See Disclosures.

SCHEMERY ZICOLELLO

By: _____

Joshua J. Cochran, Esquire
ID No. 206807
Attorney for Plaintiff
333 Market Street
Williamsport, PA 17701
(570) 321-7554

Beatty Deposition 037

## VERIFICATION

I hereby state and aver that I have read the foregoing document which has been drafted by counsel.   The factual statements contained therein are true and correct to the best of my knowledge, information and belief although the language is that of counsel, and, to the extent that the content of the foregoing document is that of counsel, I have relied upon counsel in making this Verification.

This statement is made subject   to penalties of 18 Pa.C.S. §4904 relating to unsworn falsification to authorities, which provides that if I make knowingly false statements, I may be subject to criminal penalties.

_____
Kyle Beatty

--7--

Beatty Deposition 038

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KYLE BEATTY,<br>      Plaintiff | : | NO. 4:23-CV-00364 |
| | : | |
| v. | : | Judge Munley |
| | : | |
| CLINTON GARDNER and CALVIN<br>IRVIN,<br>      Defendants | : | CIVIL ACTION - LAW<br>JURY TRIAL DEMANDED |

## CERTIFICATE OF SERVICE

Joshua J. Cochran, Esquire hereby certifies that a true and correct copy of the foregoing Plaintiff's Response to Requests for Production of Calvin Irvin has been served upon the following individual and in the manner indicated below this 11th day of January, 2024:

### VIA EMAIL & UNITED STATES POSTAL SERVICE

Shawn Laughlin, Esquire
William J. Ferren & Associates
PO Box 2903
Hartford, CT 06104
slaughli@travelers.com

Austin White, Esquire
McCormick Law Firm
835 West Fourth Street
Williamsport, PA 17701
awhite@mcclaw.com

SCHEMERY ZICOLELLO

By: _____
Joshua J. Cochran, Esquire
ID No. 206807
Attorney for Plaintiff
333 Market Street
Williamsport, PA 17701
(570) 321-7554

Beatty Deposition 039

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KYLE BEATTY,                                    :        CIVIL ACTION
                                                :
                      Plaintiff,                :        NO.  4:23-CV-00364-MWB
                                                :
           v.                                   :        Complaint filed 02/28/2023
                                                :
CLINTON GARDNER, and                            :
CALVIN IRVIN,                                   :
                                                :        JURY TRIAL DEMANDED
                      Defendants.               :


## DEFENDANT CALVIN IRVIN'S FIRST SET OF INTERROGATORIES DIRECTED TO PLAINTIFF KYLE BEATTY

TO:   Plaintiff, Kyle Beatty
      c/o Joshua J. Cochran, Esquire
      Schemery Zicolello
      333 Market Street
      Williamsport, PA 17701


      Defendant, Calvin Irvin, pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, submit the following interrogatories to Plaintiff Kyle Beatty. Please comply fully with the requirements and deadlines of the above rules in responding.


## DEFINITIONS AND INSTRUCTIONS

      1.     "Plaintiff," "you," and "your," means and includes Kyle Beatty, his agents, representatives, and/or all persons acting on his behalf.

      2.     "Defendant" means Defendant Calvin Irvin, as well as any and all persons acting on his behalf; and, "Defendants" means Defendant Calvin Irvin and

Beatty Deposition 040

Defendant Clinton Gardner collectively, as well as any and all persons acting on their behalf.

3. The terms "writing" or "writings" are used broadly. The terms include written, typed, printed, recorded or graphic matter, however produced or reproduced, of any kind and description and whether an original, duplicate or copy, including, without limitation, papers, notes, accounts, books, advertisements, letters, memoranda, notes of conversations, contracts, agreements, drawings, telegrams, tape recordings, communications including inter-office and intra-office memoranda, reports, studies, working papers, corporate records, minutes of meetings, notebooks, canceled checks, diaries, diary entries, appointment books, desk calendars, photographs, transcriptions or negotiations, meetings or conferences or things similar to any of the foregoing, drafts of writings, and to include any data storage modules, tapes, discs or other memory devices, or other information retrievable from any storage systems, including, but not limited to, electronic mail or any form of computer-generated reports and printouts, and particularly storage on laptops, personal computers and including personal files retained by employees. The word "writing" also includes data compilations from which information can be obtained and translated into a reasonably usable form, if necessary, by the respondent, through the use of appropriate retrieval or translating devices. If any documents have been modified by the addition of notations or otherwise, or have been prepared in multiple copies, which are not identical, each modified or non-identical copy is a separate "writing."

4. The term "identify," when used with respect to a person, means to state that person's: (a) name; (b) employer; (c) position; (d) last known business or home address; and (e) phone number.

5. The term "identify," when used with respect to a writing, means to state: (a) the nature of the writing, e.g., letter, memo, note, email, etc.; (b) its date; (c) its author; (d) all addressees and recipient(s); and (e) its subject matter(s).

6. The term "communication" shall mean any oral or written utterance, notation, or statement of any nature whatsoever, by and to whomsoever made, including, but not limited to, correspondence, electronic communications or transmittals, conversations, dialogues, discussions, interviews, consultations, agreements and other understandings, by any means or manner, between or among two or more persons.

2

Beatty Deposition 041

7.    Where knowledge or information in possession of a party is requested, such request includes knowledge of the party's agents, representatives, and unless privileged, the party's attorneys, and includes knowledge obtained from other persons or sources, even if such knowledge would be hearsay or otherwise inadmissible under applicable law, and even if the person receiving such information did not believe it, failed to confirm its validity, disregarded it, or had other knowledge that cast doubt on the information.

8.    In the event that any writing or document to which you refer in your answers to these Interrogatories has been destroyed or disposed of, or has otherwise left your possession, custody, or control, set forth: (1) a general description of the writing including its size, length, form and subject matter; (2) the names and addresses of the person or persons involved in the creation of the writings; (3) the names and addresses of all persons who have had access to the writing from the time of its creation to the present; (4) the date on which the writing was created; (5) the name and address of the present custodian of the writing, and the names and addresses of all persons who have received copies, summaries, or explanations of the writing; (6) the date of destruction or discard, the manner of destruction or discard, and the reasons for destruction or discard; and (7) the names and addresses of persons authorizing and carrying out the destruction or discard of the writing.

9.    The term "or" appearing in any Interrogatory should not be read so as to eliminate any part of the Interrogatory, but, whenever applicable, it shall have the same meaning as the term "and." For example, an Interrogatory stating "support or refer" shall be read as "support and refer" if an answer that does both can be made.

10.    These Interrogatories are continuing in nature so as to require you to file supplementary answers if you obtain further or different information.

3

Beatty Deposition 042

## RULES OF CONSTRUCTION

In construing these interrogatories:

A.   The singular shall include the plural and the plural shall include the singular.

B.   A masculine, feminine, or neutral pronoun shall not exclude the other genders.

C.   Unless otherwise specified in the interrogatory, each interrogatory shall extend to all information and documents which have been available to, in the possession of, or subject to the control of Plaintiff. This paragraph does not limit Plaintiff's duty to supplement his response to Rule 26(e) of the Federal Rules of Civil Procedure.

D.   Interrogatories requesting a statement concerning the knowledge possessed or claimed to be possessed by certain persons require a complete and accurate factual summary of the specific facts within each person's knowledge as well as the source of that person's knowledge.

4

Beatty Deposition 043

# INTERROGATORIES

1.    Give a detailed description of your personal injury(ies) and/or conditions claimed to be a result of the August 31, 2021 incident that is the subject of this lawsuit, together with all present complaints. Describe how those injuries or conditions were caused by Defendant, or Defendants.

**ANSWER:**

1. The Defendant police officer's actions on that day have made me feel as though I was assaulted and even sexually assaulted. I was kidnapped by the officers and moved against my will and strip searched in a way that felt like a sexual assault. At the time of the incident and subsequently up through the present, I have suffered embarrassment before strangers, my peers, witnesses and even my own girlfriend, and anxiety, and a loss of my own personal security and an intense and generalized fear of authority in general and police officers in particular. Fear of retaliation and continued harassment causes me intense daily anxiety and worry.

2.    As a result of the August 31, 2021 incident, identify any health care provider who has provided care to you to treat injuries you allege were caused by Defendant or Defendants during the August 31, 2021 incident. For any such provider identified, identify the type of treatment, when you began treatment, and the frequency of treatment.

**ANSWER:**

Beatty Deposition 044

Appx800

2. None.

3.    Please list each and every medication you are currently taking, the physician who prescribed said medication, the reason (as best you understand) that the medication was prescribed, and when you were first prescribed said medication.

**ANSWER:**

   3. None.

4.    To the extent that you have ever been diagnosed with any mental health condition or illness, including, but not limited to, depression or any variation of bipolar disorder, please list the specific diagnosis, the date of the diagnosis, the physician or mental health care provider who diagnosed you, and the identities of any physicians (including, but not limited to, psychiatrists or psychologists) who have treated you for said condition(s) since being diagnosed.

**ANSWER:**

   4. None.

5.    Please list each and every medical care provider, including mental health providers, you saw for a five-year period prior to the incident giving rise to

Beatty Deposition 045

this lawsuit. For each provider, please provide the following information: (i) their name and address; (ii) the dates on which you saw said provider; (iii) the reasons for seeing said provider; (iv) any medications prescribed by said provider; and (v) with respect to each visit to each provider, please list the diagnosis of said provider.

**ANSWER:**

5. None.

6. Identify each individual whom you know or believe to have information relevant to the averments contained in your Complaint or any other pleading in this case and, as to each individual, describe the nature of the information he or she possesses, including any document which he or she is aware of or has in custody. For each person, state whether you intend to call that witness at trial. If you intend to call some other witness at trial, identify such persons and explain the nature of their expected testimony.

**ANSWER:**

6. It is intended that any of these witnesses may be called for trial. Kyle Beatty—Plaintiff. Mr. Beatty would be aware of all aspects of the occurrence and his harm suffered. All responsive documents in his possession have been turned over in Disclosures and in response to discovery requests. Clinton Gardner—Defendant. Mr.

7

Beatty Deposition 046

Gardner would be aware of all aspects of the occurrence. Calvin Irvin—Defendant. Mr. Irvin would be aware of all aspects of the occurrence. Anaise Lopez—Witness. Ms. Lopez would be aware of all aspects of the occurrence and would also be aware of aspects of the harm suffered by Plaintiff. Zachary Geary—Police officer. Mr. Geary would be aware of the occurrence once he arrived in person in response to being summoned by Defendants. Tyson Minier—Police officer. Mr. Minier would be aware of the occurrence once he arrived in person in response to being summoned by Defendants. Jordan Stoltzfus—Police officer. Mr. Stoltzfus would be aware of the occurrence once he arrived in person in response to being summoned by Defendants. There are several additional witnesses depicted in the videos who Plaintiff would intend to call as witnesses, including a female at the fuel pumps who was confronted and threatened by the Defendants and a male who was seen walking through the area where the incident occurred. But these individuals have not been identified so far. Additional witnesses may be identified during discovery.

7.    State the name and addresses of any and all proposed expert witnesses. Set forth in detail the qualifications of each expert named and attach a copy of each expert's current resume. Also attach true copies of all written reports provided to you by any such proposed expert witnesses.

**ANSWER:**

8

Beatty Deposition 047

9

7. No expert witness has been identified so far. Discovery is still ongoing and if that changes, this response will be updated as appropriate.

8.    With respect to your contention in the Complaint that you were retaliated against for "First Amendment Speech" or "protected activity" under the First Amendment, identify specifically what speech and/or protected activity was made by you that resulted in the retaliation, and itemize your damages pertaining to this contention.

**ANSWER:**

9

Beatty Deposition 048

8. Plaintiff's protected speech and activity included stating his and Ms. Lopez's innocence, denying that there was any contraband in the car, stating that the Defendants seized, treated, and handled them in appropriately, advising Ms. Lopez that she could revoke her consent to search the vehicle, advising the officers of his and Ms. Lopez's Constitutional rights, requesting bystanders to record the officers' actions, stating that the officers had already seized his identification, and asking the Defendants to stop touching Ms. Lopez and to please release them. As a result of these actions

Plaintiff has suffered damages including harm to his reputation, fear, anxiety, anguish, and embarrassment.

9. Please list each and every time you have been arrested by any law enforcement agency of Pennsylvania or any other State, or by any federal agency. For each instance listed, please provide the following information: (i) the date of the arrest; (ii) when and where committed (city, county, and state); (iii) under what name or names; (iv) the arresting agency; (v) the criminal charges (whether misdemeanor or felony) that were filed against you; and (vi) the disposition of said charges.

**ANSWER:**

10

9. To the best of my recollection and estimation, I have 2 DUI, 2 Disorderly Conduct, one paraphernalia, and a number of traffic citations, most occurring in Lycoming County. The sentences ranged from fines, probation, house arrest, or Lycoming County Jail for less than 60 days. These offenses are estimated to have occurred from 2004 to 2016.

10. Please list each and every time you have been a party to a lawsuit. For each instance listed, please provide the following information: (i) the court (state and county/city) in which the lawsuit was filed; (ii) the case number and the date on which the case was filed; (iii) the case caption (i.e. John Doe v. Jane Doe); (iv) whether you were the plaintiff or the defendant; (v) a detailed description of the allegations made in the lawsuit; and (vi) a description of the resolution of the lawsuit.

**ANSWER:**

10. To the best of my recollection and estimation, when I was 3 or 4 years old, my Father sued a hospital in connection with the death of my mother. I believe I may have been listed as a minor plaintiff on the suit.

11. Please list each and every address you have resided at for the past five (5) years. For each address listed, please provide the following information: (i) whether you owned or rented the property; (ii) if you rented, the name of your

11

Beatty Deposition 050

Appx806

landlord; (iii) the names of any of your neighbors; (iv) the dates at which you resided at said address; and (v) the reason you moved.

**ANSWER:**

11. I have lived at 921 Westminster Drive, Apartment 2a, in Williamsport, PA since 2018. Rennie Rodarmel is the landlord. I do not know any of my neighbors personally other than to say hello or wave.

12. Outline your work schedule, physical, social, and other activities for the 48-hour period immediately preceding the August 31, 2021 incident, and indicate how much sleep you had in the 48 hours preceding said incident, including when you had last gone to bed and arisen.

**ANSWER:**

12. To the best of my recollection and estimation, I was working 10 hour days. On the day before the incident, I went to work, went home, went to sleep and slept very well that night.

13. Did you-have anything to drink of an alcoholic nature within 24 hours before the August 31, 2021 incident? If so, state the type of each beverage, the quantity consumed, and the time and place of each drink, as well as the names, addresses and telephone numbers of all persons present during each drink.

12

Beatty Deposition 051

**ANSWER:**

13. None.

14. Did you take any drugs, tranquilizers, sedatives, sleeping pills, medicines, narcotics, pills, or injections within 24 hours before the August 31, 2021 incident?

     (a)    If so, describe each type and quantity, where procured, and the name and address of the doctor prescribing the same (if any); and

     (b)    State, as to each, the time, place and names, addresses and telephone numbers of all persons present when taken or where you were under the influence of any of the foregoing.

**ANSWER:**

14. None.

15. Explain your whereabouts for the 6 hours immediately prior to the August 31, 2021 incident. Identify specific places you were, who you were with, and what you were doing.

**ANSWER:**

13

Beatty Deposition 052

Appx808

15. To the best of my recollection and estimation, that day started at my house with my regular morning routine. I drove downtown, visited the state representative's office, a downtown dress shop, and left downtown to drive to get food. Then the police incident happened.

16. Itemize the damages you claim were incurred by you as a result of the incident herein sued upon, for which you ask compensation, including but not limited to

    a) General damages

    b) Pain and suffering

    c) Emotional distress

    d) Harm to reputation

    e) Fear

    f) Anxiety

    g) Anguish

    h) Embarrassment

**ANSWER:**

16. Plaintiff has suffered general damages, emotional distress, harm to his reputation, fear, anxiety, anguish, and embarrassment as a result of the officers' actions.

14

Beatty Deposition 053

17.    Itemize all other items of expense and loss which you claim were incurred by you or on your behalf as a result of the incident herein sued upon, and for which you ask compensation.

**ANSWER:**

17.  Plaintiff has suffered no additional items of expense and loss.

McCORMICK LAW FIRM

By:   _/s/ Austin White_
          Austin White
          PA I.D. No. 312789
          Stephen C. Hartley
          PA I.D. No. 331271
          Attorneys for Defendant
          Calvin Irvin

          835 West Fourth Street
          Williamsport, PA 17701
          (570) 326-5131
          (570) 326-5529 (fax)
          awhite@mcclaw.com

15

Beatty Deposition 054

Appx810

## CERTIFICATE OF SERVICE

I, AUSTIN WHITE, hereby certify that a true and correct copy of the forgoing *Defendant Calvin Irvin's First Set of Interrogatories Directed to Plaintiff, Calvin Irvin* was served this 30th day of November, 2023, upon the following, service as indicated:

### VIA E-MAIL:

Joshua J. Cochran, Esquire
Schemery Zicolello
333 Market Street
Williamsport, PA 17701
Josh@SZ-Law.com

*Attorney for Plaintiff*

Shawna Laughlin, Esquire
William J. Ferren & Associates
PO Box 2903
Hartford, CT 06104
slaughlin@travelers.com

*Attorney for Defendant Clinton Gardner*

McCORMICK LAW FIRM

By: /s/ Austin White
Austin White
PA I.D. No. 312789
Stephen C. Hartley
PA I.D. No. 331271
Attorneys for Defendant
Calvin Irvin

835 West Fourth Street
Williamsport, PA 17701
(570) 326-5131
(570) 326-5529 (fax)
awhite@mcclaw.com

16

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KYLE BEATTY, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO.  4:23-CV-00364-MWB |
| | : | |
| v. | : | Complaint filed 02/28/2023 |
| | : | |
| CLINTON GARDNER, and | : | |
| CALVIN IRVIN, | : | |
| | : | JURY TRIAL DEMANDED |
| Defendants. | : | |

**DEFENDANT CALVIN IRVIN'S FIRST REQUEST FOR PRODUCTION
OF DOCUMENTS DIRECTED TO PLAINTIFF KYLE BEATTY**

TO:   Plaintiff, Kyle Beatty
      c/o Joshua J. Cochran, Esquire
      Schemery Zicolello
      333 Market Street
      Williamsport, PA 17701

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendant Calvin Irvin hereby serves upon Plaintiff Kyle Beatty the following requests for production of documents.  Defendant Irvin hereby requests that within thirty (30) days after service of this request, you deliver to the offices of the McCormick Law Firm, 835 West Fourth Street, Williamsport, PA 17701, the items or documents listed and described below.

Beatty Deposition 056

## DEFINITIONS

1.    As used herein, "all documents" means every "document" (as that term is defined herein), whether an original or copy, known to any individual or business organization to which this request is addressed, or to any officer, director, managing agent, file supervisor, or record keeper for such individual or organization, and every document which can be located or discovered by such persons through reasonably diligent efforts.  The term "all documents" does not include multiple, identical copies.

2.    "Plaintiff," "you," and "your," means and includes Kyle Beatty, his agents, representatives, and/or all persons acting on his behalf.

3.    As used herein, "communication" means any oral, written, or electronic exchange or transmission of words, ideas, data, or information to another person or persons, including, without limitation, conferences, conversations, correspondence, directives, discussions, interviews, meetings, negotiations, proposals, questions, speeches, and any other form of written or verbal exchange, however transmitted.

4.    As used herein, the term "correspondence" includes any written transmission of words, ideas, or information, including, without limitation, e-mail, facsimile cover sheets, facsimile transmissions, letters, memoranda, notes, notes of personal or telephone conferences or communications, and any other document memorializing or evidencing a communication.

5.    The term "date" means the exact day, month, and year if ascertainable, and if not ascertainable, a description of the temporal relationship of the occurrence for which the date is sought to the closest dates which you can ascertain.

6.    As used herein, the term "documents" means without limitation: (a) any and all written, typed, printed, reproduced, filmed, electronic, or recorded material, or (b) any and all photographs, movies, videotapes, pictures, plans, drawings, or other representations of any kind, which pertain, describe, refer, or relate to the subject matter of a particular request, including, without limitation, the following specific items:

     (i)    abstracts, advertisements, agreements, appraisals, articles, audio tapes, bids, bills of lading, binders, books, blueprints, cables, calendars, certificates

2

Beatty Deposition 057

of title, charts, checks, contracts, correspondence, data, databases, desk calendars, diagrams, diaries, dictation, drafts, drawings, e-mail, estimates, facsimile transmissions, file folders (electronic), files (electronic or paper), films, graphic representations, graphs, hand held computers (Mobile devices running Android, iPhones, Ipads, etc.), illustrations, information, instructions, invoices, journals, learned treatises, ledgers, letters, letters of intent, lists, logs, manuals, memoranda, messages, minutes, money orders, notes, note pads, orders, organizers, pamphlets, papers, PDAs (personal desk assistants / personal digital assistants), photographs, pictures, PIMs (personal information managers), plans, proposals, publications (scientific and medical), quotes, receipts, recordings, releases, reports, resumes, settlement agreements, sketches, specifications, statements, summaries, telegrams, telexes, transcription of notes, transcriptions of tapes or recordings, work papers, worksheets, visual tapes, and any other writings, or tangible things in which any writing, typing, printing, photostatic, or other forms of communications are recorded or reproduced, as well as all notations on the foregoing;

(ii)     any electronic compilation of words or electronically stored information, including, but not limited to, data, files, or information, including e-mail, *.jpg, *.txt, *.tif, *.mpeg, *.wav, *.wpd, *.doc, *.xls files, which have been saved to a computer network, computer drive, or other medium regularly used to store such words, data, or electronic or digital information, and without regard to whether or not a copy exists in paper form;

(iii)     originals and all other copies not absolutely identical to originals;

(iv)     all drafts and notes (whether typed, handwritten, or otherwise) made or prepared in connection with the document, whether used or not; and

(v)     all file folders and envelopes containing documents.

7.     As used herein, the term "person" means without limitation, all human beings, associations, companies, corporations, general partnerships, joint ventures, limited liability companies, limited partnerships, limited liability partnerships, organizations, professional corporations, sole proprietorships, trusts and estates, or any other form of business entity recognized by law.

8.     The terms "relating to," "referring to," and "concerning" mean "relating to, reflecting, supporting, evidencing, discussing, showing, summarizing,

3

Beatty Deposition 058

analyzing, containing, pertaining to, involving, or concerning in any way, directly or indirectly."

9.　"Defendant" means Defendant Calvin Irvin, as well as any and all persons acting on his behalf; and, "Defendants" means Defendant Calvin Irvin and Defendant Clinton Gardner collectively, as well as any and all persons acting on their behalf.

## INSTRUCTIONS

1.　Pursuant to Rule 34(a), all documents and tangible things that are responsive to a request for production must be produced if they are in your possession, custody, or control.

(a)　You are instructed that possession, custody, or control includes constructive possession; therefore, your ability to produce the documents and tangible items requested herein is not affected by you not having actual physical possession of such items; and

(b)　As long as you have a right to possess the requested items or a right to compel the production of such items from a third party (including any person, entity, agent, governmental body or agency, or representative), you have possession, custody, or control.

2.　Pursuant to Rule 26(b)(5)(A), if you claim that material or information responsive to any request for discovery is privileged, you may withhold the privileged material or information from your response; however, you must state in your response, or in a separate document, that:

(a)　information or material responsive to the request has been withheld;

(b)　the request to which the information or material relates; and

(c)　the privilege or privileges asserted.

3.　Pursuant to Rule 26(e), you must supplement, by reasonable amendment, any response you give to include documents later drafted, acquired, or discovered by you.

4

Beatty Deposition 059

4. With respect to each item or category of items where applicable, you must state objections and assert privileges, if any, as required by the Federal Rules of Civil Procedure and further respond, as appropriate, that:

    (a) production, inspection, or other requested action will be permitted as requested;

    (b) the requested items are being served on the requesting party with your response;

    (c) production, inspection, or other requested action will take place at a specified time and place if you are objecting to the time and place specified by the requesting party; or

    (d) no items have been identified, after diligent search, that are responsive to the request.

5. Pursuant to Rule 34(a), the requests herein specifically include any documents, data, or information which may exist in electronic or magnetic form. Such documents, data, or information is requested in the form in which it is maintained by you in the ordinary course of your business or affairs.

6. Whenever documents exist in the form of computer tape, magnetic disks, or other electronic form, whether as separate files or a part of larger documents, the documents are to be produced in accurate and error-free computer-readable format with sufficient data file or data layout information to allow the documents to be read.

7. The request for production of documents includes the file or files in which the documents are contained or compiled. The request further includes all copies of any particular document that varies in any material way from the original, e.g., all documents with written notations, highlighting or marking thereon, or attached thereto, including the color of any such notations, markings or highlightings. Requests include all document drafts.

8. Pursuant to Rule 34(b)(i), you are instructed to either produce the documents and tangible things as they are kept in the usual course of business or organize and label them in such a manner so that they correspond to each specific request.

5

Beatty Deposition 060

(a) File folders with tabs or labels identifying documents called for should be produced intact with the document or documents.

(b) Selection and identification of documents from files or other sources should be performed in such a manner as to ensure that the source of each document may be determined.

(c) Documents attached to each other should not be separated unless sufficient records are kept to permit reconstruction of the groupings.

9. If any document requested was in your possession or control, but no longer is in your possession or subject to your control, state what disposition was made of it, the reason and date of such disposition.

10. The singular form of a word includes the plural form of that word and vice versa.

11. The conjunctions "and" and "or" shall each be individually interpreted in every instance as meaning "and/or" and shall not be interpreted disjunctively to exclude any information otherwise within the scope of any specification.

12. Unless otherwise specified, the time period applicable to any request is from January 1, 2020, through the present.

6

Beatty Deposition 061

Appx817

## REQUESTS FOR PRODUCTION

Please produce the following items and tangible things, as well as all documents related to the subject matter of each request:

1.   All statements, reports, notes or memoranda of interviews of any person, whether or not a party, that are relevant to the subject matter of this litigation.

**RESPONSE:**

1. See documents provided in response to Disclosures. No additional responsive documents are known.

2.   Copies of all correspondence relevant to the subject matter of the within litigation, exclusive of privileged material.

**RESPONSE:**

2. See documents provided in response to Disclosures. No additional responsive documents are known.

3.   Copies of all photographs and/or videotaped recordings of the August 31, 2021 incident, or of alleged injuries you sustained as a result of the August 31, 2021, incident.

**RESPONSE:**

7

3. See body cam videos provided by Defendants and disclosed in Disclosures. No additional responsive photos or videos are known.

4.      Copies of all medical reports and records reflecting the injuries allegedly sustained by you as a result of the August 31, 2021 incident.

**RESPONSE:**

4. None.

5.      Any and all expert reports whether or not intended for use at time of trial.

**RESPONSE:**

5. A decision has not yet been made as to an expert witness, but this response will be updated at an appropriate time if necessary.

6.      Any and all documents or correspondence submitted to or received by Plaintiff from anyone, concerning the subject matter of this litigation, excluding privileged material.

**RESPONSE:**

6. None.

8

Beatty Deposition 063

7.   Any and all documents which you intend to rely on at trial.

**RESPONSE:**

7. A decision on exhibits to be used for trial has not yet been made, so this response will be updated, if necessary, at an appropriate time. However, it is anticipated that, at a minimum, all items disclosed will be used as exhibits at trial.

8.   A complete copy of all records or documents obtained by Plaintiff through subpoena, if any.

**RESPONSE:**

8. None.

9.   Copies of all documents supporting all out-of-pocket monetary expenses for which you seek recovery in this lawsuit, including but not limited to documents establishing medical expenses, pharmacy expenses, and incidental expenses pertaining to the injuries which you allegedly suffered, or damages you alleged incurred, as a result of the incident in question.

**RESPONSE:**

9. There are no documents of monetary losses.

9

Beatty Deposition 064

10.     Copies of all documents reflecting damages incurred by you for the claim that Defendants' conduct resulted in harm to your reputation.

**RESPONSE:**

10.  None.  The reputational harm incurred is supported by nondocumentary evidence.

11.     Copies of all documents reflecting damages incurred by you for the claim within the Complaint that Defendants' conduct resulted in "fear, anxiety, anguish, and embarrassment" of Plaintiff.

**RESPONSE:**

11.  None.  The emotional harm incurred is supported by nondocumentary evidence.

12.     Copies of all documents reflecting the following damages identified in Plaintiff's Rule 26 disclosures: "General Damages," "Pain and suffering," and "Emotional Distress."

**RESPONSE:**

12.  None.  The harm incurred is supported by nondocumentary evidence.

10

Beatty Deposition 065

13.   Copies of any other document reflecting damages incurred by you and claimed as part of this lawsuit.

**RESPONSE:**

13.  None.  The harm incurred is supported by nondocumentary evidence.

14.   All instant messages, social media messages, social media posts, text messages, emails, or other electronic communications which you have exchanged with Annaise Lopez regarding this lawsuit, Ms. Lopez's criminal case and non-jury trial resulting from the August 31, 2021 incident, and/or the August 31, 2021 incident itself.

**RESPONSE:**

14.  None.

15.   All documents identified in response to Defendant Irvin's interrogatories directed to Plaintiff.

**RESPONSE:**

11

15. See Disclosures.

16. The following documents identified in Plaintiff's Rule 26 disclosures:

- 53 pages of file materials in criminal matter filed against Anaise Lopez

- Transcript of 8/3/22 non-jury summary trial

- 7 videos of the incident from officer body cameras

- Newspaper article

- 7/19/21 PennDOT letter

**RESPONSE:**

16. See Disclosures.

McCORMICK LAW FIRM

By:  /s/ Austin White
      Austin White
      PA I.D. No. 312789
      Stephen C. Hartley
      PA I.D. No. 331271
      Attorneys for Defendant
      Calvin Irvin

      835 West Fourth Street

12

Beatty Deposition 067

Williamsport, PA 17701
(570) 326-5131
(570) 326-5529 (fax)
awhite@mcclaw.com

Beatty Deposition 068

## CERTIFICATE OF SERVICE

I, AUSTIN WHITE, hereby certify that a true and correct copy of the forgoing *Defendant Calvin Irvin's First Requests for Production of Documents Directed to Plaintiff Kyle Beatty* was served this 30th day of November, 2023, upon the following, service as indicated:

**VIA E-MAIL:**

Joshua J. Cochran, Esquire
Schemery Zicolello
333 Market Street
Williamsport, PA 17701
Josh@SZ-Law.com

*Attorney for Plaintiff*

Shawna Laughlin, Esquire
William J. Ferren & Associates
PO Box 2903
Hartford, CT 06104
slaughlin@travelers.com

*Attorney for Defendant Clinton Gardner*

McCORMICK LAW FIRM

By: __/s/ Austin White_____
        Austin White
        PA I.D. No. 312789
        Stephen C. Hartley
        PA I.D. No. 331271
        Attorneys for Defendant
        Calvin Irvin

        835 West Fourth Street
        Williamsport, PA 17701
        (570) 326-5131
        (570) 326-5529 (fax)
        awhite@mcclaw.com

14

Beatty Deposition 069

DEPOSITION
EXHIBIT
Beatty 2
PENGAD 800-631-6389

**PHILIP A. HOLMES**
pholmes@sungazrette.com

### Homeless woman locked up on assault charges

When city police officers arrived at unit 251 at the Newberry Estates about 5 p.m. Wednesday, they could hear screaming coming from the apartment.

Bertha Brooks, an elderly woman who lived in the unit, was sitting on a couch with blood on her face and her shirt, police said. Sitting next to her was her homeless granddaughter, Ciera A. Johnson, whom she had allowed to move in with her three days prior, court records stated.

Through their investigation, police learned that Johnson, 21, allegedly punched and beat Brooks after Brooks had asked her to take out the garbage, police said.

"Johnson refused and stated she was going to continue to watch a movie. Brooks told her that if she won't help around the house, she needs to leave. Johnson then punched her in the face. The grandmother punched Johnson back and a fight then ensued," according to an affidavit.

"Johnson is significantly bigger than Brooks, and when her grandmother fell to the floor, Johnson continued to beat her," police alleged in the court document.

A 13-year-old granddaughter who also was in the room intervened and attempted to push her cousin off of Brooks, but Johnson grabbed her by the neck and attempted to choke her, police alleged.

Brooks grabbed hold of her walking cane and began hitting Johnson with it, but Johnson managed to disarm her and started to beat her grandmother with the cane, police were told. Police rushed to the complex at 2500 Federal Ave. after 911 received a telephone call from someone in an apartment who was yelling for help, court records stated. Before reaching the scene, officers were directed to Brooks' apartment.

Johnson was arrested without incident on charges of strangulation, aggravated and simple assault and possession of an instrument of crime. The last charge stems from Johnson allegedly threatening her grandmother with a knife minutes before police arrived on the scene.

Following her arraignment before District Judge Aaron Biichle, she was committed to the Lycoming County Prison in lieu of $50,000 bail.

### Assault charges lodged against Massachusetts woman

What began as a routine investigation into possible marijuana use on Tuesday afternoon resulted in a Massachusetts woman being locked up on charges of assaulting a city police officer, investigators alleged in an affidavit filed at Biichle's office.

Arrested at Washington Boulevard and Railway streets just before 2 p.m. was Anaise Lopez, 28, of Everett, who was charged with aggravated and simple assault, resisting arrest, disorderly conduct and harassment, following her alleged behavior that began with her screaming after she was handcuffed, the affidavit stated.

Police "had detected an odor of marijuana coming from their Nissan Altima and saw in plain view a marijuana joint and marijuana flakes in the vehicle," the affidavit stated.

Initially the couple was in a store, but Lopez "confronted" officers as she exited the business, police said.

Initially, Lopez gave permission for officers to search the car, but then changed her mind, police said, adding that at this point, both Lopez and the man were handcuffed as they were being detained.

Lopez then refused to listen to any orders so additional officers were dispatched to the scene. "Due to her resistance, Lopez nearly had to be carried by two officers to a police cruiser. They had to force her into the back seat," the affidavit stated. "Once she was in the car, she kicked one of the officers twice, first in his left hand and then in the inner portion of his right arm," the court document stated.

Following her arraignment before Biichle, Lopez was jailed in lieu of $25,000 bail. No charges were filed against the man, who was released.

### City man faces charges

Called to investigate a "report of a disturbance with a knife in the 600 block of Locust Street about 4:15 p.m. on June 3," city police were told to be on the lookout for a man in a red t-shirt carrying a backpack, according to an affidavit.

As an officer neared the area, he spotted a man fitting that description with "something bulging on the right side under his shirt," walking north on Locust Street, police said. "He was bleeding from the face," the affidavit stated.

The man, identified as Kyle Alan McDermott, 22, of 231 Campbell St., had to be told several times to stop before he actually did, police said. The officer frisked him for weapons and removed a large straight-blaze knife, the additive stated.

It was soon learned from a witness that McDermott and a second man had been fighting with one another and but were successfully separated, police said. However, McDermott allegedly pursued the second man as he held the knife in his hand, police added.

In addition to the knife, McDermott also was carrying a pair of brass knuckles, police said.

Charged with possession of a prohibitive offensive weapon, possession of an instrument of crime and disorderly conduct, he was released on bail after waiving his preliminary hearing before Biichle.

Additional charges

Beatty 2

# EXHIBIT C

Case 4:25-2360036 Document 6 Page:445 Filed Date 714 Filed: 12/16/2025 Page: 452 of 531

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KYLE BEATTY,                          :
                    Plaintiff
                                      :

        vs.                          :   NO. 4:23-CV-00364

                                      :

CLINTON GARDNER AND CALVIN
IRVIN,                               :
                    Defendants
                                      :


        Deposition of:  CLINTON GARDNER

        Taken by       :  Plaintiff

        Before         :  Loretta C. Berrigan
                            Reporter-Notary Public

        Beginning      :  January 22, 2024; 9:00 a.m.

        Place          :  Schemery Zicolello
                            333 Market Street
                            Williamsport, Pennsylvania


COUNSEL PRESENT:

    JOSHUA J. COCHRAN, ESQUIRE
    Schemery Zicolello
    333 Market Street
    Williamsport, Pennsylvania  17701
        For - Plaintiff

    AUSTIN WHITE, ESQUIRE
    McCormick Law Firm
    835 West Fourth Street
    Williamsport, Pennsylvania  17701
        For - Defendant Calvin Irvin

    SHAWNA LAUGHLIN, ESQUIRE
    William J. Ferren & Associates
    PO Box 2903
    Hartford, Connecticut  06104
        For - Defendant Clinton Gardner


ERVIN BLANK ASSOCIATES, INC.

2

<pre>
              INDEX TO WITNESSES

FOR - PLAINTIFF        DIRECT   CROSS   REDIRECT   RECROSS

Clinton Gardner           3      --        --        --
</pre>

<pre>
              INDEX TO EXHIBITS

FOR - PLAINTIFF                        MARKED   ADMITTED

Deposition Exhibit No. 1                 42       --

Deposition Exhibit No. 2                 43       --

Deposition Exhibit No. 3                 44       --

Deposition Exhibit No. 4                 46       --
</pre>

ERVIN BLANK ASSOCIATES, INC.

3

STIPULATION

It is hereby stipulated by and between counsel for the respective parties that signing, sealing, certification and filing are hereby waived; and that all objections except as to the form of the question are reserved to the time of trial.

                    *       *       *


CLINTON GARDNER, called as a witness, having been duly sworn or affirmed, testified as follows:

DIRECT EXAMINATION

BY MR. COCHRAN:

Q   Good morning, Officer Gardner.  We've just met very recently.  I'm Josh Cochran, I represent the Plaintiff, Kyle Beatty, in a case that he's filed against you and Calvin Irvin as well, who's here today.  I'm going to take your deposition.  Have you ever had your deposition taken before?

A   No, sir.

Q   All right.  It's a little bit like testifying in court, except there's no judge.  It's a question and answer session.  I ask the question, you provide the answer to the best of your ability.  If you don't hear or understand a question, I'm happy to rephrase

ERVIN BLANK ASSOCIATES, INC.

4

or repeat whatever it might be. When you do answer it, it is presumed that you understood it, heard it and are answering it to the best of your abilities. Now we don't want you to guess. Some of the events that we're talking about were two and a half years ago. But if you can give us a reasonable estimate to, you know, a fair amount of certainty, do so, but let us know when you're estimating, all right?

A    Yes, sir.

Q    One of us speaking at a time so the court reporter can make a record. And you know, one other thing, if you do need to take a break, you can. I would just ask that you have answered the question that I posed at that point in time. If you do need to talk to your attorney, you can do so. From time to time there may be an objection, and if there is let us discuss it. Typically you'll be allowed to answer, but if your attorney instructs you not to answer then don't answer. Can we agree to basically hold all objections except as to the form of the question?

MS. LAUGHLIN:  Yes, that's fine.

MR. WHITE:  Yes.

MR. COCHRAN:  Okay, thank you.

BY MR. COCHRAN:

Q    I guess we're ready to get started. Could

ERVIN BLANK ASSOCIATES, INC.

you give us your full name for the record.

A    Officer Clinton Gardner.

Q    And what is your business address?

A    Is it 245?

Q    I mean, this is a question that we constantly ask all the time.

A    No it's -- it's not.  It's 48 -- no, that's the courthouse.  It's right here on Third Street, third floor of the Community Theater League.

Q    Okay.  Trade and Transit?

A    Trade and Transit One.

Q    Okay.  All right.

A    That's not a good start.

Q    Now we're here to talk primarily about the events that occurred on August 31st of 2021, and a lot of it was captured on video and it is what it is.  But we're here to fill in the blanks.  Your thought processes, what happened before, what may have happened off screen, things like that.  Before we get there, did you know Kyle Beatty before that date?

A    I did not.

Q    All right.  Did you know the woman that he was with, Anaise Lopez, before that date?

A    No, sir.

Q    All right.  Now on that date you were working

ERVIN BLANK ASSOCIATES, INC.

with Detective Calvin Irvin, correct?

A    Yes, sir.

Q    And how long have you known him?

A    Detective Irvin?  My whole career, about.

Q    Okay.  Fair enough.  And how long have you worked with him?

A    At that point, over a year with the Narcotics Unit.  But he was not in the Narcotics Unit.  County detective.

Q    Okay.  And in terms of your working relationship with him, is either of you a supervisor of the other?

A    No, sir.

Q    Okay.  And do you consider him a personal friend?

A    A personal friend?

Q    Yes.

A    Yes.

Q    Okay.  How often do you guys get together outside of work?  And let's just say in a month.

A    I don't know if we've ever gotten together just the two of us other than like events that are held with law enforcement or whatnot.

Q    Okay.  Now let's talk about August 31st of 2021.  When did you start your shift on that date?

A    It would have been around 8:00 in the morning.

Q    And were you in uniform?

A    Uniform for me -- I was plainclothes, but the uniform would be a marked police vest.

Q    Okay.  And how would you -- and I think you answered part of it.  How would you have been identified as a police officer on that date?

A    Through my vest.  It was marked.  I believe I had my badge on.  It says police narcotics on the back, very clearly a police vest.  And then operating a marked police vehicle.

Q    And who was driving the police vehicle on this date, you or Detective Irvin?

A    I was.

Q    Okay.  Now take me through your shift until you first see Kyle Beatty.

A    I can't.  That's too --

Q    Well, can you tell me in general terms what you were doing on that date for your shift?

A    I really can't because our job, or I should say my job, I could go from -- the reason I wore plain clothes was because I could be utilized in the undercover capacity, help in the NEU with surveillance or doing controlled buys of my own.  Or when I would

throw my vest on it would be more of like a patrol-like function. I don't want to say patrol in the sense of like handling calls, but patrolling specifically for, like, narcotics offenses, firearms offenses, those types.

Q   So what type of offenses are you typically looking for while you're out on patrol?

A   As far as NEU function like I stated, narcotics offenses, firearms. Primarily those two really.

Q   And in terms of narcotics offenses, what kinds of offenses are you looking for there?

A   Anything from, you know, a marijuana roach to, you know, pounds. I've seized various amounts throughout my career.

Q   Do you recall when you would have first seen Kyle Beatty on that date?

A   It was downtown.

Q   Okay. And where abouts?

A   It was, I believe either Third or Fourth Street but I'm not sure a hundred percent estimate.

Q   What was he doing at that point?

A   He was with Ms. Lopez in the black Altima and they were operating the vehicle.

Q   And what were they doing at the time? Were

they driving?

A   No, we were at -- I do remember we were at an intersection. I don't remember which way we were facing because like I said, I can't even remember which street exactly. But I know we were stopped at an intersection and they were just, you know -- normally when I look over at people they kind of like either look in or, you know, side eyeing, or like, oh man, there's the police. But they were both just staring forward.

Q   So that was what drew your attention to them?

A   Could you say that again? Sorry.

Q   Was the fact that they were staring forward, was that what drew your attention to them?

A   Not initially. Obviously I was like, oh that's kind of weird, they won't even look over. But yep, it was a factor. Yes.

Q   What were the other factors?

A   It would be when I saw them later.

Q   Okay. But initially, what gets your attention is that you pull up beside them and they're not looking at you, correct?

A   Correct.

Q   Okay. So what happens next?

A   We went about our day and then sometime later

10

we ended up seeing them again.

Q    Where did you see them the second time?

A    To the best of my recollection it was around Williamsport Hospital, like High Street area.

Q    And were you still driving at this point?

A    Yes.

Q    Okay.  And what are they doing at this point that you see them again?

A    Traveling eastbound I believe.

Q    Do you recall which road?

A    Like I said, I think it was High Street where we initially saw them.  And then obviously they got to the boulevard, but I don't recall which streets in between High and the boulevard that they took.

Q    Okay.  And so are you following them at this point or are you just observing them?

A    We were following them yes, behind them.

Q    So when you first -- not first see them. When you see them the second time, are you traveling the same direction as them?

A    Correct.

Q    Okay.  And so are you in front of them or behind them?

A    Behind them.

Q    And just right behind them or are there cars

ERVIN BLANK ASSOCIATES, INC.

11

between you?

    A   I don't recall if there were cars between us at all.  I don't believe so.

    Q   So what happens next?

    A   They had pulled into the Turkey Hill on Washington Boulevard.

    Q   So did you follow them over from this High Street time that you see them?  Did you follow them the whole way over to the Turkey Hill?

    A   Yeah, from around the hospital area to the Turkey Hill.

    Q   Okay.  Why'd you follow them at this point?

    A   A couple of reasons.  So that initial, when we were downtown -- kind of that hundred yard stare is the best way to put it.  And then when we saw them again and got behind them, they were coming from the avenues, which from my experience is a high narcotics trafficking area.  I myself have made numerous arrests in that area.  I've assisted in numerous arrests and investigations.

        Then the vehicle itself, it was not a state tag.  Sometimes those can be affiliated with rental vehicles.  I don't recall if we ran the vehicle at the time to see if it was a rental or not.  The vehicle was kind of a plain Jane looking vehicle, it wasn't

overly personalized, which I know in my experience is common with narcotics trafficking. And then as we were following them, just kind of the -- looking out the window by Mr. Beatty kind of like, I'm not looking to see if the cops are here but I'm looking to see if the cops are here following us.

Q  Now did you discuss these kind of conclusions or factors in your mind with Detective Irvin during this drive?

A  I don't recall if I discussed them out loud on not.

Q  Was it your decision to follow them or did Detective Irvin participate in that at all?

A  I mean, he was in the car but I don't remember if there was a discussion between us.

Q  Now from the time that you first spotted it to the time you spot it again on High Street and then followed the vehicle over to the Turkey Hill, did you observe any vehicle code violations?

A  No vehicle code violations.

Q  So the vehicle that you're following arrives at the Turkey Hill and what happens next?

A  They exited the vehicle once they pulled into the gas pumps.

Q  Can you describe how they exited?

13

A    I would say it was a hasty manner.  When they exited we were close behind and they didn't look back at us at all.  They didn't look in our direction. They went right into the store.

Q    And did they pull up to a pump or did they park in a parking spot?

A    At a pump.

Q    Like they were going to pump gasoline?

A    I mean, I can't make assumptions of what they were doing.  I can just state where they were parked.

Q    Was it close enough that they could have pumped gasoline?

A    I would say yes.

Q    All right.  So what happens next after they park and walk into the store?

A    I exited my vehicle, walked over to theirs.

Q    What happens next?

A    The windows were down.  I immediately smelled the odor of marijuana emitting from the vehicle and observed a roach -- a spent marijuana roach -- which I know to be a roach from my experience.  I've dealt with numerous marijuana arrests, various forms of marijuana paraphernalia.  And then also like, some shake or flakes on the floor.

Q    Where was this roach that you saw?

14

A    It was in the driver's door.  Kind of one of those like, ashtrays I guess, like round.  It was on top of that.

Q    Can you describe it for us?

A    The ashtray?

Q    The ashtray.  The size of the roach, the condition.

A    I can't really give a size estimate of the -- just like a round ashtray that would fit in a cup holder kind of size.  And then the roach was small.  I can't give a precise estimate on the size.

Q    And then you said shake or flakes on the floor.  What are you referring to in terms of shake or flakes?

A    It's like residual marijuana from the bud. Just very minute pieces.

Q    And what did that look like?

A    Just speckles, I guess is the best way to put it.

Q    And where was that located precisely?

A    On the driver's floor.

Q    Now to observe -- and let's talk about the roach first.  Did you lean your head into the vehicle at any time to observe that roach?

A    I did lean at one point, I don't recall when.

ERVIN BLANK ASSOCIATES, INC.

15

But the roach could be observed from outside the
vehicle, from the front windshield.

Q    And did you in fact, at any point in time,
reach your flashlight and hand and arm down into the
car to observe either the roach or the shake or
flakes?

A    It crossed the plane of the window but I
don't know -- I can't remember how far into it.  I
can't give an estimate.

Q    But that answer would be yes, correct?

A    Yes.

Q    Okay.  All right.  So let's go back to when
you pull up and you observe them go into the store.
Did you have any conversation with Detective Irvin
about what you were going to do?

A    If I did, I don't recall it.

Q    Did you see anything else that appeared to be
contraband?

A    Other than the flakes and the roach?

Q    Correct.

A    No, sir.

Q    Okay.  Now at this point in time is Mr.
Beatty free to go?

A    From when I went into the store?

Q    From the point in time when you have

ERVIN BLANK ASSOCIATES, INC.

16

testified that you have seen a roach and shake or flakes on the floor, is he free to go?

A    Once I observed the paraphernalia my intention was to go get Mr. Beatty and bring him back to the vehicle to detain him to investigate.

Q    Okay.  So it's fair to say he was not free to go?

A    Correct.  Detained.

Q    And would that logic be the same with respect to Ms. Lopez?

A    Correct.

Q    And what's the basis of this detention?  If you could just describe it for us.

A    Well, probable cause in my mind.  The presence of marijuana paraphernalia, even if they had a medical card, which obviously would have been unknown at the time, that particular means of ingestion is not approved for medical marijuana.

Q    All right.  So what happens next?

A    Ms. Lopez came out, I think was enquiring what was going on.  She stayed with Mr. -- or detective Irvin, sorry.  And then I went into the store to find Mr. Beatty.

Q    And what happens when you get into the store?

A    I encountered him near the register.  When

17

you enter the store the register's kind of there.  It would have been like, to the right side of that.

Q    And what happens?

A    He throws his hands up immediately and said something along the lines of searching him.

Q    And did you search him?

A    I believe I performed a pat down, but I did not search him.

Q    And what did that pat down consist of?

A    What do you mean, consist of?

Q    What did it entail?  Was it -- which areas of his body were searched?  How what that search conducted?

A    Flat of my hand, it would -- I don't recall exactly the order in which I did it that day.  But my typical pat down, the flat of my hand and I'm checking areas common for weapons such as waistband, front and back, pockets, and then down the legs, around the ankles, and then groin area.

Q    Okay.  And did you find anything in that search?

A    No, sir.

Q    And so what happens next after that search?

A    I asked him to step out -- pat down.  I asked him to step outside with me.

ERVIN BLANK ASSOCIATES, INC.

18

Q    And did he?

A    Yes.

Q    Okay.  Now a lot of what happens after this for a period of time is captured on body cameras, correct?

A    Yes, sir.

Q    Okay.  Did one of them make an effort to record what was happening on their phone?

A    I believe Ms. Beatty initially -- and this is my recollection from watching the body cam because I can't recall if it was my camera or Detective Irvin's. But I believe Ms. Lopez did.

Q    Can you describe for me what happened when she did that?

A    I just remember her pulling her phone out, saying she was going to record.

Q    And was she permitted to?

A    No.

Q    Why not?

A    They were detained at that point.

Q    Now was there a conversation out there at the car about searching the vehicle?

A    With the Defendant?

Q    With either Mr. Beatty or Ms. Lopez?

A    Yes, both.  Yes.

ERVIN BLANK ASSOCIATES, INC.

19

Q    What can you tell me about that conversation?

A    I don't remember the exact verbiage, but it was explained to them what I observed in the vehicle, and had asked for permission to search.  Initially they had said, yeah, go ahead and search.

Q    And did you?

A    No.

Q    Why not?

A    Because then when I asked for IDs they refused to identify.

Q    And what happened after they refused to identify?

A    There was an escalation in their demeanor, specifically with Ms. Lopez and with Mr. Beatty to an extent when I asked about the identifications.  So ultimately they were handcuffed.

Q    Okay.  And can you describe -- by escalation and demeanor, can you tell me what exactly you were basing that impression on?

A    Her yelling.  Primarily her kind of moving about the area without listening to us.

Q    Anything that Mr. Beatty did that would have caused you to handcuff him?

A    He was also escalating in demeanor.  They were both -- I would say they best way to put it was

kind of riling each other up.

Q    And what do you recall of Mr. Beatty's involvement?

A    As far as?

Q    As far as participating -- you used the term riling.

A    His voice was also kind of escalating throughout.  And then also when I asked for IDs, I believe he was the one that said no.

Q    And did he say why he refused?

A    No.  Why he did?

Q    Yeah.

A    Sorry.  No.

Q    Okay.  And in terms of their voices escalating throughout, I mean, what were they saying?

A    I don't recall exactly what they were saying without, again, reviewing the body cam.

Q    And who handcuffs Kyle Beatty?

A    I don't recall if it was Detective Irvin or I.

Q    I believe I had asked you who had handcuffed him.  Was it you or Detective Irvin?

A    I don't recall which one of us it was that handcuffed.

Q    Okay.  Whose decision was it?

ERVIN BLANK ASSOCIATES, INC.

21

A    I would say that I took lead with that.

Q    All right.  So what happens after -- well, let me ask you this.  Was Ms. Lopez handcuffed at the same time?

A    They were, yeah.  I mean they were both handcuffed pretty close together from my recollection.

Q    All right.  And then what happens after they're handcuffed?

A    The yelling actually escalates, specifically from Ms. Lopez.  She's kind of pacing in front of the car and I'm asking her to stop pacing, sit on the hood of the car.  I believe she initially refused.  When I placed her on the hood of the car, Mr. Beatty became escalated with that.

Q    So as I understood your testimony, you placed Ms. Lopez on the hood of the car?

A    Yes.

Q    Okay.  And she's handcuffed at this time, correct?

A    Correct.

Q    All right.  And Mr. Beatty is handcuffed at this point in time, is that correct as well?

A    I believe he was.

Q    All right.  And where is he at this point that you place her on the car?

A    So she was like, kind of like, I think in the middle of the hood of the car, facing me.  And he was to her left.

Q    Was he on the hood or was he standing?

A    I don't recall if he was on the hood or standing.

Q    Was one of Ms. Lopez's concerns that she was being handled by a police officer who wasn't a female?

A    She was asking for a female officer, yes.

Q    And did you guys at any point try to get her one?

A    No.

Q    Why not?

A    There's nothing that requires us to do so.

Q    Did you ever consider that obtaining a female police officer might have deescalated the situation?

A    I don't think that was her real issue in my opinion.

Q    So did you think of that or didn't you think of that?

A    No.  I had no intention, unless I needed a female, of calling a female officer.

Q    So what happens next?

A    I don't remember at what point I called for backup.  And backup eventually comes.  And then we

attempt to place Ms. Beatty in the vehicle. Essentially --

MS. LAUGHLIN:  Do you mean Lopez?

MR. COCHRAN:  I was going to ask that.

THE WITNESS:  Yeah.  Sorry.  I apologize. Ms. Lopez in the vehicle.  She resisted and ended up kicking one of the Williamsport officers.

BY MR. COCHRAN:

Q    Okay.  Now you indicated that you had called for backup.  Why did you call for backup?

A    Just to the increasingly hostile situation. Ms. Lopez was screaming, and Mr. Beatty was also animated.

Q    And who arrived for backup and what -- where did they come from?

A    City officers.  I don't know where they would have come from.  They were patrol officers so they could have been anywhere.

Q    They were city police officers?

A    Yes.  Williamsport city, yes.

Q    All right.  And do you recall what the identities of those officers are?

A    Officer Minier was one.  Stoltzfus, I can't remember if he was a corporal or a sergeant at the time, I'm sorry.  And Officer Geary.

Q    And to your recollection, what was Officer Minier's involvement?

A    I know I had a conversation with him, but I don't recall what all his involvement is.  Or was, sorry.

Q    How about Stoltzfus.  Do you recall what his involvement was?

A    I don't.

Q    How about Officer Geary?

A    Officer Geary was the officer who was helping me with Ms. Lopez to the car.  And he was the one that was kicked.

Q    All right.  So at the time this is going on, the events with, it sounds like Officer Geary and you with Ms. Lopez, what is going on with Kyle Beatty?

A    I don't recall what was going on with him.  I believe that was -- I believe he was with Detective Irvin but I can't say for sure.

Q    All right.  Do you recall, at any point, telling Detective Irvin to search Kyle Beatty again and place him in the vehicle?

A    I do remember him being placed in the vehicle.  I don't recall if I said about searching or not.  I do know that he was searched though.

Q    And so why were -- let's talk about Kyle

Beatty.  Why was Kyle Beatty placed in the vehicle?

A    As this point, again, there -- so can I back up and kind of go through what's running through my mind?

Q    Certainly.

A    We had what I observed downtown with the hundred yard stare.  When we picked them back up around the hospital, my observations there with the, you know, are the police following me, are they not. Followed them into the lot, the distancing themselves from the vehicle.  Not looking at us.  The vehicle itself, with how I described it with, you know, being a plain Jane type vehicle, the out of state plate. His actions when I go into the store and he immediately throws his hands up and says, search me. That is not a typical reaction that I have with any person.

Their confrontational demeanor, both of them. Their refusal to ID.  And then the probable cause of marijuana paraphernalia being in an ashtray along with flakes on the driver's floor.  So I mean all that in conjunction, in my mind at the time, was more than enough to place him in a vehicle at a minimum.

Q    Was Kyle Beatty arrested at any point in time on that date?

26

A    I recall saying at one point or another, individuals were under arrest.  I know I said about Ms. Lopez with aggravated assault and disorderly conduct.  I don't recall specifically anything with Mr. Beatty.

Q    Now do you recall having a conversation with a bystander, an African American woman who was pumping gas, after Mr. Beatty and Ms. Lopez had been placed in vehicles?

A    I wouldn't call it a conversation, but I recall the interaction.

Q    Okay.  What can you tell me about that interaction?  What happened?

A    I believe that she was yelling as a result of Mr. Beatty and Ms. Lopez's actions.  And when I went to address it, she wasn't even concerned about the stop then.  And it was something about Williamsport police and her daughter, I believe.

Q    So when you first brought that up, you indicated that you believe she was yelling as a result of, in part at least, of Mr. Beatty's actions.  What indicated that to you?

A    There was no other reason for her to interject herself, other than directly after what had occurred with Mr. Beatty and Ms. Lopez.

ERVIN BLANK ASSOCIATES, INC.

27

Q    Did she discuss your actions or interaction with them at all with you?

A    I don't recall.

Q    So she may have but you don't recall?

A    Yeah, I don't recall.

Q    Don't believe she did.

A    The only thing I remember is her saying something about Williamsport police and trying to find her daughter or something along those lines.

Q    Okay.  And did you threaten to arrest her at that point in time?

A    In my mind she was obstructing.  She had no business interfering with our investigation and escalating a situation further.

Q    So the answer is yes, you did threaten to arrest her?

A    I don't recall if I directly, but as I just described, I believe she was interfering.

Q    And what did you say to her to let her know that she was interfering?

A    I can't give you my exact words.  I mean again, two and a half years ago.  I know I warned her, but I don't know what I specifically.

Q    And what -- with Mr. Beatty in the car and Ms. Lopez in the car, what are you still investigating

28

at this point in time?

A    I believe we were waiting for the tow for the vehicle.

Q    Anything else going on at this point?

A    Waiting for the tow.  Not to my recollection.

Q    Now how does having this conversation with this woman at the pumps, how does that interfere with you waiting for the tow?

A    Because I had -- because of her escalated demeanor and yelling in a public area, I had to go address that behavior.

Q    But the tow truck didn't arrive while you were on scene, did it?

A    I don't recall if we were there when it came or not.

Q    Now did you get this woman's identity?

A    I don't believe I did.

Q    Why not?

A    I just didn't.  It was not my primary concern.  She -- from my recollection, she stopped after I warned her and that was the issue resolved.

Q    Wouldn't she have been a witness to what had transpired between you, Detective Irvin, Mr. Beatty and Ms. Lopez?

A    I can't recall how long she would or wouldn't

ERVIN BLANK ASSOCIATES, INC.

29

have been on scene, so no, I didn't think of it.

Q    And so what crime would she have been committing that you would have had probable cause to arrest her for at that point?

MS. LAUGHLIN:  Objection to form.

MR. COCHRAN:  You can answer.

THE WITNESS:  Okay.

MS. LAUGHLIN:  If you can.

THE WITNESS:  Can you repeat that then? Sorry.

BY MR. COCHRAN:

Q    Yes.  At the time that you're having this conversation with this woman, what crime would you have had probable cause to arrest her for?

A    She would have been obstructing and interfering with an investigation by me having to divert my attention to her.

Q    And the investigation would have been what exactly?

A    The ongoing events with Mr. Beatty and Ms. Lopez.

Q    Now at some point you transport Kyle Beatty to the Williamsport Bureau of Police at City Hall Williamsport, correct?

A    I don't remember if I transported him or not,

ERVIN BLANK ASSOCIATES, INC.

30

but yes, he did ultimately end up there.

Q     All right.  And what was your intent in either transporting him or having him transported there?

A     To search him.

Q     Okay.  What kind of search?

A     Strip search.

Q     Why a strip search?

A     So this will be a little bit longer of an answer.  In my experience, specifically with narcotics, it is extremely commonplace for individuals to have something, you know, smaller, like smaller offense.  I've had guys and girls offer up, like, small amounts of marijuana to just essentially make me go away.  Or maybe the initial part of that investigation is just observing paraphernalia or something along those lines and then digging deeper into that.

Often times, in my experience, both traffickers and users, one of the most common places that they conceal narcotics is in their groin area. So as a result of that, it's common practice for both the Narcotics Unit and the city police, specifically when dealing with narcotics offenses, to strip search an individual to uncover if there are additional, you

ERVIN BLANK ASSOCIATES, INC.

31

know, narcotics or what not, like specifically within those areas. I've done body warrants on individuals that have concealed narcotics within their anus.

Q Would you agree with me that a strip search is an invasive form of search?

A I think that's semantics. I don't know -- for us that's standard. If you are committing a crime, specifically with narcotics, it's standard procedure for us to strip search you.

Q Would you agree with me that it would be an uncomfortable situation to be strip searched?

A I mean, I don't --

MS. LAUGHLIN: Object to form, but you can answer.

THE WITNESS: Okay. I don't enjoy strip searching people, if that's what you're inferring.

BY MR. COCHRAN:

Q It's not. I'm talking about the experience of being strip searched. Would you agree with me that that would be an uncomfortable situation?

A I can't speak on behalf of another individual's perception of a situation.

Q Have you ever been strip searched?

A I've been naked in plenty -- in front of a lot of people, and at this point I just -- it doesn't

bother me.

Q But I mean in terms of a strip search by police officers. Has that ever happened to you?

A No.

Q Okay. Now would you agree with me that the strip search is the third search of Mr. Beatty's person on that date by police?

A Can you tell me the other two?

MS. LAUGHLIN: Object to form, but you can answer.

BY MR. COCHRAN:

Q And the first would be the pat down inside the store, which you conducted. The second would be the search conducted by Detective Irvin as he's getting ready to put him in the car. And then the third would be the strip search.

A I would argue that a pat down is not necessarily a search, but yes, that would have been the third event in regards to that.

Q Okay. Who was present for the strip search?

A I don't recall. I don't know if I was or not.

Q So you don't know if you even observed it?

A I don't recall.

Q Okay. Do you know if you performed it?

33

A    I very well could have.

Q    Do you recall anything about the strip search?

A    No.  I have strip searched so many people over my career that there really are very few that stick out in my mind.

Q    Did you find any contraband in the strip search?

A    No, sir.

Q    Do you know if the search was filmed or recorded?

A    The search itself, I don't recall if it was filmed or recorded.

Q    Okay.  Are they ever filmed or recorded?

A    Not typically.  But I'm not sure if it was or not.

Q    Okay.  They are sometimes?

A    It depends.  So like, there's been times where we've had combative individuals in there and with that.  But for this specific one I can't recall if it was or not.

(Whereupon, a discussion was held off the record.)

BY MR. COCHRAN:

Q    So since -- is it fair to say you have no

ERVIN BLANK ASSOCIATES, INC.

34

recollection of the strip search?  No independent recollection.

A    Correct.

Q    All right.  Can you describe for me what your procedure for strip searches is in general terms?

A    In general terms.  Can I describe it how I typically do it?  Because it's not the same exact way every time.

Q    That's what I'm asking for, a typical search.

A    So typically I have the individual like, you know, remove jewelry or whatnot first.  And then shirts come first, followed by pants and socks.  I'll have an individual wiggle their toes so I can see the bottom of their feet.  I'll have an individual open their mouth, lift their tongue so I can check in their mouth.  And then underwear is typically the last thing to go usually.

And then, like with a male -- I obviously don't strip search females, I want to make that clear. With a male, I'll have them lift their genitalia so I can -- we can see underneath and then turn around so we see their buttocks.  And then usually squat and cough.

Q    You had mentioned lifting genitalia.  Is that penis and testicles?

ERVIN BLANK ASSOCIATES, INC.

A    Yes.

Q    All right.  And I believe you indicated seeing buttocks.  Do you require them to, pardon the expression, spread them?

A    Yes.

Q    All right.  And I believe you had also indicated that you have them bend over and cough?

A    Yeah.  Squat and cough.

Q    All right.  How long does one of these strip searches, and once again, I'm talking a typical strip search.  How long does it take in your experience? Let's put it this way.  From the time everyone's present in the room to the time the individual's allowed to leave.

A    To leave or --

MS. LAUGHLIN:  Object to form.

BY MR. COCHRAN:

Q    Leave the room.

A    Or clothe or --

Q    The room where they're strip searched.

A    Well, oftentimes they're strip searched where they're being held.  That's why I was asking.

Q    Okay.  Well let me ask it this way.  How long are they typically disrobed for?

A    Not long.  It's typically brief, but I can't

ERVIN BLANK ASSOCIATES, INC.

36

give a good time estimate on that.

Q    Five minutes?

A    I would say that would be on the extreme end.

Q    Long or short?

A    Long.

Q    All right.  After this strip search did you fill out any documents indicating date, time, place, individuals?  Who was present, anything like that?

A    For the strip search in particular?

Q    Yeah.

A    No, we don't have any forms or anything that we fill out for strip searches.

Q    So there would have been no written record of his strip search, is that correct?

A    Unless I -- other than putting it in a report, no, we don't have any forms that we fill out for strip searches.

Q    Now you never charged Mr. Beatty with any crime as a result of this incident, correct?

A    Correct.

Q    Okay.  Why not?

A    That boils down to what I believe is our power of discretion as a police officer.  There's been times where I've had individuals where I very well could have charged but I did not.  Or I've had

37

individuals that I did charge with a lesser offense than what they could have been charged with or charge individuals with charges like -- I'm trying to think of an example. We'll say with a PWID, possession with intent to deliver. There's been times where I only charged the felony and I don't charge the misdemeanors. With this particular case, my primary concern ended up being Ms. Lopez and the aggravated assault against an officer. So to me the other crimes were not as severe I guess. I'm -- my focus in the Narcotics Unit is large drug crimes. And there's often times where I get small amounts of paraphernalia that I never charge.

Q    Now this entire event took place in Williamsport, Pennsylvania, correct?

A    Yes.

Q    And it occurred at the Turkey Hill convenience store, is that correct?

A    The Turkey Hill on Washington Boulevard.

Q    Okay. And that's a convenience store which obviously sells gas and other personal items. Drinks, things like that, correct?

A    Yes.

Q    And that people routinely, in fact, stop there to either buy gas or other personal items such

38

as food and drink, is that correct?

     A    Correct.

     Q    Now the car that we've discussed in this case, it was impounded until it was searched, is that correct?

     A    Correct.

     Q    All right.  Were you present for the search of that car?

     A    Yes.

     Q    All right.  What happened from start to finish?  Take me through that search.

     A    I mean, I searched the car.  I searched it like I typically search a car.  I don't know what you're asking.

     Q    Okay.  Well, take me through it.  Where did you start, where did you finish, what happened in between?

     A    I usually compartmentalize the vehicle.  And I can't really even give a specific order in which I start.  Some vehicles I start in the trunk, other vehicles I start in the driver's side.  But typically I'll focus on a quadrant of the vehicle and I'll just very heavily search that quadrant, is the best way to put it.

     Q    Do you recall this vehicle search?

ERVIN BLANK ASSOCIATES, INC.

A    I recall searching the vehicle, but I don't recall specifically the manner in which I searched it.

Q    What can you tell me that you recall from the search of this vehicle?

A    Observing the roach and the flakes.  And I believe there were additional roaches within the cup holder -- or the ashtray I should say, where that roach was.  But outside of that, nothing.

Q    All right.  So you first said observing the roach.  Which roach are you referring to there?

A    The one I observed in plain view from the gas station.

Q    Okay.  Can you describe that for us?

A    A marijuana roach.  It's typically the last bit of what they were ingesting the marijuana with.

Q    Okay.  And the flakes.  Did you find flakes?

A    Yeah, they were just the flakes that I had observed earlier.

Q    Okay.  And you indicated additional roaches. What can you tell me about them?

A    Similar to the one I observed on top of the ashtray.

Q    And where were they?

A    In the ashtray.

Q    And where is the ashtray?

40

A    In the driver's door.

Q    Okay.  So these -- so I understand, these are under the one that you believe that you saw initially?

A    Yes.  So the ashtray, I believe, was one of those like, kind of cup looking ones.  I don't know a good way to describe it.  Where there's a little bit of depth to it.  The one that I saw was on top of that ashtray.

Q    Did you seize these items?

A    No.

Q    Why not?

A    It's extremely common for us, especially in the Narcotics Unit, to not seize paraphernalia.  If we seized every bit of paraphernalia our evidence locker would be insane because we find a lot.  So it's not uncommon to not seize paraphernalia.

Q    Okay.  So if it wasn't seized then I presume it wasn't tested for anything, correct?

A    Correct.

Q    All right.  Do you have any -- did you take video of the search, photos of the search, photos of the contraband?  I mean, was there any record made of it?

A    I don't recall.

Q    Do you typically photograph or video a search

ERVIN BLANK ASSOCIATES, INC.

41

where you expect to find contraband?

A    I don't typically video, but there are times I take photos.

Q    And so do you believe you took photos or did not take photos?

A    I don't recall.

Q    Where would those photos be if you had taken them?

A    They should be in -- if there are photos they should be in the evidence folder or whatever we have.

(Whereupon, a discussion was held off the record.)

BY MR. COCHRAN:

Q    How long was it from when you and Detective Irvin parked at the service station to when Kyle Beatty was released after the strip search?

A    The gas station?

Q    Yes.

A    I can't give an exact time.

Q    Can you give us an estimate to a reasonable degree of certainty?

A    I really can't.

Q    Okay.

A    That was a while ago.

Q    Now in discovery, and based upon my review of

ERVIN BLANK ASSOCIATES, INC.

the video, I see yourself, Calvin Irvin, Tyson Minier, Zachary Geary and Jordan Stoltzfus as law enforcement officers on site.  Is that correct?

A    Yes.

Q    All right.  Was there any other law enforcement officer on site?

A    I don't recall.

Q    There may have been, you just don't recall?

A    Correct.  Yeah, I don't recall.

Q    Now I saw a statement, I believe from Zachary Geary, in discovery.  Do you know if there were any other officers -- and I've seen one from you and one from Detective Irvin.  Are there any other statements that you're aware of in connection with this incident?

A    From other officers?

Q    From other officers or witnesses.

A    I -- no.  Nope.

MR. COCHRAN:  Okay.  All right.  Now I have here an exhibit which I would ask to be marked as 1.

(Whereupon, a document was produced and marked as Deposition Exhibit No. 1 for identification.)

BY MR. COCHRAN:

Q    Is this a copy of the search warrant that you would have obtained to search the vehicle?

A    Yes, sir.

Q    All right.  And is -- all right.  So as you look at that, does that give you any independent recollection of the search of this vehicle?

A    As far as searching it?

Q    Yes.

A    Yes.

Q    Okay.  And the information in that warrant, would that have been information that you put in to further your investigation?

A    Correct.

MR. COCHRAN:  Okay.  Nothing additional for that.  I have here another exhibit which I would ask to be marked as 2.

(Whereupon, a document was produced and marked as Deposition Exhibit No. 2 for identification.)

BY MR. COCHRAN:

Q    Now that is a receipt/inventory of property, is that correct?

A    Yes, sir.

Q    And would that be information that you would have put in?

A    Yes.

Q    All right.  And is this after you would have

44

searched the vehicle?

    A    Yes, sir.

    Q    Okay.  And is it fair to say that that return of search indicates nothing recovered?

    A    Correct.

    Q    Okay.  Now there's a reference on there to a badge, Number 508.  Who is that?

    A    Dent.

    Q    What's his full name?  Or her.

    A    Kevin Dent.

    Q    Kevin Dent.  And who is Mr. Dent?

    A    He is a narcotics officer.

    Q    Okay.  Do you know if he was present for that search?

    A    I don't recall if he was or not.

            MR. COCHRAN:  Okay.  Now another exhibit.  And this is something that we had gotten in discovery, which I would ask to be marked at the next exhibit.

            (Whereupon, a document was produced and marked as Deposition Exhibit No. 3 for identification.)

BY MR. COCHRAN:

    Q    All right.  Now this is entitled Officer Report for incident 21-08506 and it's under the heading Williamsport Bureau of Police.  Do you see

ERVIN BLANK ASSOCIATES, INC.

45

that?

A    Yes.

Q    Is this a document that you would have compiled?

A    I mean, I -- it's compiled through our system at the station.  But I mean, my report is in here, yes.

Q    Okay.  Who would have compiled this report at the station?

A    It could have been Records.  I don't know, it depends where the request came from.  So I mean, we can print these through our system and it kind of prints stuff related to the case.

Q    Now you're using the term system.  Is that a system owned and run by the Williamsport Bureau of Police?

A    I don't know if it's owned, but it's the system we use at the city.

Q    Okay.  And when you refer to the station, was that the Williamsport Bureau of Police?

A    Which time did I refer?  Sorry --

Q    You said that this was something that would be kept at the station.

A    Oh, yeah.  The Williamsport Police would maintain this document.

Q   Okay.  All right.  And as you look at the narrative on Page 3 of 11 and it stems over onto Page 4 of 11.  Does that -- is it fair to say that kind of describes what you recalled about the incident that we've been discussing involving Mr. Beatty?

A   Yes.  3 and 4?

Q   Correct, 3 and 4 of this exhibit.

A   Yes.

Q   Now on Page 4 there's a line for responsible LEO.  Does that mean responsible law enforcement officer?

A   Yes.

Q   Okay.  Why isn't that signed?

A   I don't know.

Q   Okay.  But that would have been you though, correct?

A   Correct.

MR. COCHRAN:  Okay.  All right.  Nothing further on that.  Now I have here a -- and this is a screen grab and I don't think I have a lot.  This will be the next exhibit.

(Whereupon, a document was produced and marked as Deposition Exhibit No. 4 for identification.)

BY MR. COCHRAN:

ERVIN BLANK ASSOCIATES, INC.

Q    This is from your body cam at the scene.  And this individual shows up in the police station in the morning, I believe, on Detective Irvin's body cam.  Then he shows up at the scene where he walks right through the scene and is not challenged.  And then he pops up later at the station.  Do you recognize that person?

A    Yes.

Q    Who is it?

A    Detective Anderson.

Q    Okay.  Why is he there?

A    I don't know.

Q    Okay.  Because his name hasn't popped up at any point in time before this.  I mean, what was his involvement?

A    With this incident, the -- none.

Q    Okay.

A    I mean, he was there but I don't know what his --

Q    Is he a supervisor of yours?

A    No.

Q    Okay.  To your knowledge, of Detective Irvin's?

A    Of Supervisor Irvin?

Q    Yes.

48

A    No.

Q    Okay.  And what's his full name, Detective Anderson?

MS. LAUGHLIN:  Just what you know.

BY MR COCHRAN:

Q    Yeah, it's just what you know.

A    Rob.

Q    Okay.  Robert Anderson?

A    I don't know if it's Rob, that's why I was --

Q    Okay.  All right.  So just to kind of recap on that, do you have any knowledge why he was there?

A    I can't speculate why.

Q    Do you know if he responded to your call for backup?

A    That's what I mean, I don't know.

MR. COCHRAN:  Let me talk with Kyle quickly. I may be largely done with you.

(Whereupon, a recess was taken from 10:04 a.m. until 10:06 a.m.)

                    AFTER RECESS

MR. COCHRAN:  All right.  I have nothing further.

THE WITNESS:  Okay.

MS. LAUGHLIN:  Austin, do you have any questions?

MR. WHITE:  No.

MS. LAUGHLIN:  I don't have any questions.

MR. COCHRAN:  Okay.  You're good.  Thank you for your time.

(Whereupon, the deposition was concluded at 10:07 a.m.)

Appx876

50

COUNTY OF LYCOMING        :

COMMONWEALTH OF PENNSYLVANIA :


          I, Loretta C. Berrigan, the undersigned
Notary Public, do hereby certify that personally
appeared before me, CLINTON GARDNER; the witness,
being by me first duly sworn to testify the truth, the
whole truth and nothing but the truth, in answer to
the oral questions propounded to him by the attorneys
for the respective parties, testified as set forth in
the foregoing deposition.

          I further certify that before the taking of
said deposition, the above witness was duly sworn,
that the questions and answers were taken down
stenographically by the said Loretta C. Berrigan,
court Reporter, Williamsport, Pennsylvania, approved
and agreed to, and afterwards reduced to typewriting
under the direction of the said Reporter.

          In testimony whereof, I have hereunto
subscribed my hand this 30th day of January, 2024.


                              _____
                              Loretta C. Berrigan
                              Reporter-Notary Public
                              My Commission Expires
                              December 7, 2026


ERVIN BLANK ASSOCIATES, INC.

- 0 -

06104 [1] 1:24

- 1 -

17701 [2] 1:18, 21

- 2 -

2021 [2] 5:15; 6:25
2024 [2] 1:12; 50:20
2026 [1] 50:25
21-08506 [1] 44:24
23-cv-00364 [1] 1:4
2903 [1] 1:24

- 3 -

30th [1] 50:20
31st [2] 5:15; 6:24

- A -

a.m. [4] 1:12; 48:19; 49:6
abilities [1] 4:3
ability [1] 3:24
abouts [1] 8:19
above [1] 50:13
actions [4] 25:14; 26:15, 21; 27:1
additional [4] 30:25; 39:6, 19; 43:12
address [3] 5:3; 26:16; 28:11

admitted [1] 2:14
affiliated [1] 11:22
affirmed [1] 3:11
african [1] 26:7
afterwards [1] 50:17
again [10] 9:12; 10:1, 8; 11:16; 12:17; 20:17; 24:20; 25:2; 27:22; 35:10
against [2] 3:17; 37:9
aggravated [2] 26:3; 37:8
agree [5] 4:19; 31:4, 10, 19; 32:5
agreed [1] 50:17
ahead [1] 19:5
allowed [2] 4:17; 35:14
along [4] 17:5; 25:20; 27:9; 30:17
altima [1] 8:23
american [1] 26:7
amount [1] 4:7
amounts [3] 8:14; 30:14; 37:12
anaise [1] 5:23
anderson [3] 47:10; 48:3, 8
animated [1] 23:13
ankles [1] 17:19
answer [13] 3:23, 24; 4:1, 17, 18, 19; 15:10; 27:15; 29:6; 30:10;

31:14; 32:10; 50:8
answered [2] 4:13; 7:7
answering [1] 4:3
answers [1] 50:14
anus [1] 31:3
apologize [1] 23:5
appeared [2] 15:17; 50:6
approved [2] 16:18; 50:16
area [8] 10:4; 11:10, 18, 19; 17:19; 19:21; 28:10; 30:21
areas [3] 17:11, 17; 31:2
argue [1] 32:17
arrest [5] 26:2; 27:10, 16; 29:4, 14
arrested [1] 25:24
arrests [3] 11:18, 19; 13:22
arrive [1] 28:12
arrived [1] 23:14
arrives [1] 12:21
ashtray [10] 14:5, 6, 9; 25:20; 39:7, 22, 24, 25; 40:4, 8
ashtrays [1] 14:2
assault [2] 26:3; 37:9
assisted [1] 11:19
associates [1] 1:23

assumptions [1] 13:9
attempt [1] 23:1
attention [4] 9:11, 14, 21; 29:17
attorney [2] 4:15, 18
attorneys [1] 50:9
august [2] 5:15; 6:24
austin [2] 1:20; 48:24
avenues [1] 11:17
aware [1] 42:14
away [1] 30:15

- B -

backup [6] 22:25; 23:10, 14; 48:14
badge [2] 7:10; 44:7
based [1] 41:25
basing [1] 19:19
basis [1] 16:12
beatty [34] 1:2; 3:16; 5:20; 7:17; 8:17; 12:4; 15:23; 16:4, 23; 18:9, 24; 19:14, 22; 20:18; 21:13, 21; 23:1, 12; 24:15, 20; 25:1, 24; 26:5, 8, 15, 25; 27:24; 28:24; 29:20, 22; 36:18; 41:16; 46:5

**beatty's** [3] 20:3; 26:21; 32:6
**became** [1] 21:13
**beginning** [1] 1:12
**behalf** [1] 31:21
**behavior** [1] 28:11
**behind** [6] 10:17, 23, 24, 25; 11:16; 13:2
**bend** [1] 35:7
**berrigan** [4] 1:11; 50:4, 15, 23
**beside** [1] 9:21
**best** [7] 3:24; 4:3; 10:3; 11:15; 14:18; 19:25; 38:23
**between** [7] 3:2; 10:14; 11:1, 2; 12:15; 28:23; 38:17
**black** [1] 8:23
**blanks** [1] 5:17
**body** [7] 17:12; 18:4, 10; 20:17; 31:2; 47:1, 3
**boils** [1] 36:22
**bother** [1] 32:1
**bottom** [1] 34:14
**boulevard** [4] 10:13, 14; 11:6; 37:19
**break** [1] 4:12
**brief** [1] 35:25
**bring** [1] 16:4
**brought** [1] 26:19
**bureau** [4] 29:23; 44:25; 45:15, 20

**business** [2] 5:3; 27:13
**buttocks** [2] 34:22; 35:3
**buys** [1] 7:25
**bystander** [1] 26:7

---

**- C -**

**calls** [1] 8:3
**calvin** [5] 1:6, 22; 3:17; 6:1; 42:1
**camera** [1] 18:11
**cameras** [1] 18:4
**capacity** [1] 7:24
**captured** [2] 5:16; 18:4
**card** [1] 16:16
**career** [3] 6:4; 8:15; 33:5
**cars** [2] 10:25; 11:2
**case** [4] 3:16; 37:7; 38:4; 45:13
**caused** [1] 19:23
**certainly** [1] 25:5
**certainty** [2] 4:7; 41:21
**certification** [1] 3:4
**certify** [2] 50:5, 12
**challenged** [1] 47:5
**charge** [4] 37:1, 2, 6, 13
**charged** [4] 36:18, 25; 37:2, 6
**charges** [1] 37:3

**check** [1] 34:15
**checking** [1] 17:16
**city** [6] 23:16, 19, 20; 29:23; 30:23; 45:18
**clear** [1] 34:19
**clearly** [1] 7:11
**clinton** [7] 1:6, 9, 25; 2:3; 3:10; 5:2; 50:6
**close** [3] 13:2, 11; 21:6
**clothe** [1] 35:19
**clothes** [1] 7:23
**cochran** [26] 1:17; 3:13, 15; 4:23, 24; 23:4, 8; 29:6, 11; 31:17; 32:11; 33:24; 35:17; 41:13; 42:18, 23; 43:12, 18; 44:16, 22; 46:18, 25; 48:5, 16, 21; 49:3
**code** [2] 12:19, 20
**combative** [1] 33:19
**coming** [1] 11:16
**commission** [1] 50:24
**committing** [2] 29:3; 31:7
**common** [5] 12:2; 17:17; 30:20, 22; 40:12
**commonplace** [1] 30:11
**commonwealth** [1] 50:2

**community** [1] 5:9
**compartmentalize** [1] 38:18
**compiled** [3] 45:4, 5, 8
**conceal** [1] 30:21
**concealed** [1] 31:3
**concern** [2] 28:20; 37:8
**concerned** [1] 26:16
**concerns** [1] 22:7
**concluded** [1] 49:5
**conclusions** [1] 12:7
**condition** [1] 14:7
**conduct** [1] 26:4
**conducted** [3] 17:13; 32:13, 14
**confrontational** [1] 25:18
**conjunction** [1] 25:22
**connecticut** [1] 1:24
**connection** [1] 42:14
**consider** [2] 6:14; 22:15
**consist** [2] 17:9, 10
**constantly** [1] 5:5
**contraband** [4] 15:18; 33:7; 40:22; 41:1
**controlled** [1] 7:25
**convenience** [2] 37:18, 20
**conversation** [8] 15:14;

18:21; 19:1; 24:3; 26:6, 10; 28:6; 29:13

**cops** [2] 12:5, 6

**copy** [1] 42:24

**corporal** [1] 23:24

**correct** [34] 6:1; 9:22, 23; 10:21; 15:10, 20; 16:8, 11; 18:5; 21:19, 20, 22; 29:24; 34:3; 36:14, 19, 20; 37:15, 18, 22; 38:1, 2, 5, 6; 40:18, 19; 42:3, 9; 43:11, 20; 44:5; 46:7, 16, 17

**cough** [3] 34:23; 35:7, 8

**counsel** [2] 1:16; 3:3

**county** [2] 6:8; 50:1

**couple** [1] 11:13

**court** [4] 1:1; 3:22; 4:10; 50:16

**courthouse** [1] 5:8

**crime** [4] 29:2, 13; 31:8; 36:19

**crimes** [2] 37:9, 11

**cross** [1] 2:2

**crossed** [1] 15:7

---

**- D -**

**date** [11] 5:20, 23, 25; 6:25; 7:8, 14, 20;

8:17; 25:25; 32:7; 36:7

**daughter** [2] 26:18; 27:9

**dealing** [1] 30:24

**dealt** [1] 13:21

**december** [1] 50:25

**decision** [2] 12:12; 20:25

**deeper** [1] 30:17

**deescalated** [1] 22:16

**defendant** [3] 1:22, 25; 18:23

**defendants** [1] 1:7

**degree** [1] 41:21

**deliver** [1] 37:5

**demeanor** [5] 19:13, 18, 24; 25:18; 28:10

**dent** [4] 44:8, 10, 11

**deposition** [14] 1:9; 2:15, 16, 17, 18; 3:18, 19; 42:21; 43:16; 44:20; 46:23; 49:5; 50:11, 13

**depth** [1] 40:7

**describe** [9] 12:25; 14:4; 16:13; 18:13; 19:17; 34:4, 6; 39:13; 40:6

**described** [2] 25:12; 27:18

**describes** [1] 46:4

**detain** [1] 16:5

**detained** [2] 16:8; 18:20

**detective** [21] 6:1, 4, 9; 7:14;

12:8, 13; 15:14; 16:22; 18:11; 20:19, 22; 24:17, 20; 28:23; 32:14; 41:14; 42:13; 47:3, 10, 22; 48:2

**detention** [1] 16:12

**digging** [1] 30:17

**direct** [2] 2:2; 3:12

**direction** [3] 10:20; 13:3; 50:18

**directly** [2] 26:24; 27:17

**discovery** [3] 41:25; 42:11; 44:17

**discretion** [1] 36:23

**discuss** [3] 4:17; 12:7; 27:1

**discussed** [2] 12:10; 38:3

**discussing** [1] 46:5

**discussion** [3] 12:15; 33:22; 41:11

**disorderly** [1] 26:3

**disrobed** [1] 35:24

**distancing** [1] 25:10

**district** [2] 1:1

**divert** [1] 29:17

**document** [6] 42:20; 43:15; 44:19; 45:3, 25; 46:22

**documents** [1] 36:7

**doesn't** [1] 31:25

**done** [2] 31:2; 48:17

**door** [2] 14:1; 40:1

**down** [11] 13:18; 15:4; 17:7, 16, 18, 24; 32:12, 17; 36:22; 50:14

**downtown** [3] 8:18; 11:14; 25:6

**drew** [2] 9:11, 14

**drink** [1] 38:1

**drinks** [1] 37:21

**drive** [1] 12:9

**driver's** [5] 14:1, 21; 25:21; 38:21; 40:1

**driving** [3] 7:13; 9:1; 10:5

**drug** [1] 37:11

**duly** [3] 3:11; 50:7, 13

**during** [1] 12:8

---

**- E -**

**eastbound** [1] 10:9

**effort** [1] 18:7

**either** [7] 6:11; 8:20; 9:8; 15:5; 18:24; 30:3; 37:25

**emitting** [1] 13:19

**encountered** [1] 16:25

**ended** [3] 10:1; 23:6; 37:8

enforcement [4] 6:23; 42:2, 6; 46:10

enjoy [1] 31:15

enquiring [1] 16:20

entail [1] 17:11

enter [1] 17:1

entire [1] 37:14

entitled [1] 44:23

escalated [2] 21:14; 28:9

escalates [1] 21:9

escalating [4] 19:24; 20:7, 15; 27:14

escalation [2] 19:13, 17

especially [1] 40:12

esquire [3] 1:17, 20, 23

essentially [2] 23:2; 30:14

estimate [7] 4:6; 8:21; 14:8, 11; 15:9; 36:1; 41:20

estimating [1] 4:8

event [2] 32:19; 37:14

events [5] 4:4; 5:15; 6:22; 24:14; 29:20

eventually [1] 22:25

everyone's [1] 35:12

evidence [2] 40:14; 41:10

exact [4] 19:2; 27:21; 34:7; 41:19

exactly [5] 9:5; 17:15;

19:18; 20:16; 29:19

examination [1] 3:12

example [1] 37:4

except [3] 3:5, 22; 4:20

exhibit [14] 2:15, 16, 17, 18; 42:19, 21; 43:13, 16; 44:16, 18, 20; 46:7, 21, 23

exhibits [1] 2:13

exited [4] 12:23, 25; 13:2, 16

expect [1] 41:1

experience [7] 11:17; 12:1; 13:21; 30:10, 19; 31:18; 35:11

expires [1] 50:24

explained [1] 19:3

expression [1] 35:4

extent [1] 19:15

extreme [1] 36:3

extremely [2] 30:11; 40:12

eyeing [1] 9:8

**- F -**

facing [2] 9:4; 22:2

fact [3] 9:13; 15:3; 37:24

factor [1] 9:17

factors [2] 9:18; 12:8

fair [6] 4:7; 6:5; 16:6;

33:25; 44:3; 46:3

feet [1] 34:14

felony [1] 37:6

female [5] 22:8, 9, 15, 22

females [1] 34:19

ferren [1] 1:23

filed [1] 3:16

filing [1] 3:4

fill [4] 5:17; 36:7, 12, 16

filmed [3] 33:10, 13, 14

fine [1] 4:21

finish [2] 38:11, 16

firearms [2] 8:4, 9

firm [1] 1:20

first [12] 7:17; 8:16; 10:18; 12:16; 14:23; 26:19; 32:12; 34:11, 12; 39:9; 50:7

five [1] 36:2

flakes [11] 13:24; 14:12, 14; 15:6, 19; 16:2; 25:21; 39:5, 16, 17

flashlight [1] 15:4

flat [2] 17:14, 16

floor [6] 5:9; 13:24; 14:13, 21; 16:2; 25:21

focus [2] 37:10; 38:22

folder [1] 41:10

follow [4] 11:7, 8, 12; 12:12

followed [3] 12:18; 25:10; 34:12

following [6] 10:15, 17; 12:3, 6, 21; 25:9

follows [1] 3:11

food [1] 38:1

foregoing [1] 50:11

form [7] 3:5; 4:20; 29:5; 31:5, 13; 32:9; 35:16

forms [3] 13:22; 36:11, 16

forth [1] 50:10

forward [2] 9:10, 13

fourth [2] 1:21; 8:20

free [3] 15:23; 16:2, 6

friend [2] 6:15, 16

front [5] 10:22; 15:2; 17:17; 21:10; 31:24

full [3] 5:1; 44:9; 48:2

function [2] 8:2, 8

**- G -**

gardner [8] 1:6, 9, 25; 2:3; 3:10, 14; 5:2; 50:6

gasoline [2] 13:8, 12

geary [6] 23:25; 24:9, 10, 14; 42:2, 11

general [3] 7:19; 34:5, 6
genitalia [2] 34:20, 24
girls [1] 30:13
good [5] 3:14; 5:13; 36:1; 40:6; 49:3
grab [1] 46:20
groin [2] 17:19; 30:21
guess [5] 4:4, 25; 14:2, 18; 37:10
guys [3] 6:19; 22:10; 30:13

**- H -**

half [2] 4:5; 27:22
hall [1] 29:23
hand [4] 15:4; 17:14, 16; 50:20
handcuff [1] 19:23
handcuffed [8] 19:16; 20:21, 24; 21:3, 6, 8, 18, 21
handcuffs [1] 20:18
handled [1] 22:8
handling [1] 8:3
hands [2] 17:4; 25:15
happening [1] 18:8
happy [1] 3:25
hartford [1] 1:24
hasty [1] 13:1
head [1] 14:23
heading [1] 44:25
hear [1] 3:25
heard [1] 4:2

heavily [1] 38:23
held [4] 6:23; 33:22; 35:22; 41:11
help [1] 7:24
helping [1] 24:10
hereby [3] 3:2, 4; 50:5
hereunto [1] 50:19
herself [1] 26:24
high [6] 10:4, 11, 14; 11:7, 17; 12:17
hill [7] 11:5, 9, 11; 12:18, 22; 37:17, 19
hold [1] 4:19
holder [2] 14:10; 39:7
hood [6] 21:11, 13, 16; 22:2, 4, 5
hospital [3] 10:4; 11:10; 25:8
hostile [1] 23:11
hundred [3] 8:21; 11:14; 25:7

**- I -**

identification [4] 42:22; 43:17; 44:21; 46:24
identifications [1] 19:15
identified [1] 7:8
identify [2] 19:10, 12
identities [1] 23:22

identity [1] 28:16
immediately [3] 13:18; 17:4; 25:15
impounded [1] 38:4
impression [1] 19:19
incident [5] 36:19; 42:14; 44:24; 46:4; 47:16
increasingly [1] 23:11
independent [2] 34:1; 43:3
index [2] 2:1, 13
indicated [6] 23:9; 26:20, 22; 35:2, 7; 39:19
indicates [1] 44:4
indicating [1] 36:7
individual [5] 30:25; 34:10, 13, 14; 47:2
individual's [2] 31:22; 35:13
individuals [8] 26:2; 30:11; 31:2; 33:19; 36:8, 24; 37:1
inferring [1] 31:16
information [3] 43:8, 9, 22
ingesting [1] 39:15
ingestion [1] 16:18
initial [2] 11:13; 30:15
insane [1] 40:15
inside [1] 32:12

instructs [1] 4:18
intent [2] 30:2; 37:5
intention [2] 16:4; 22:21
interaction [3] 26:11, 13; 27:1
interfere [1] 28:7
interfering [4] 27:13, 18, 20; 29:16
interject [1] 26:24
intersection [2] 9:3, 6
invasive [1] 31:5
inventory [1] 43:19
investigate [1] 16:5
investigating [1] 27:25
investigation [5] 27:13; 29:16, 18; 30:16; 43:10
investigations [1] 11:20
involvement [5] 20:3; 24:2, 4, 7; 47:15
involving [1] 46:5
irvin [20] 1:6, 22; 3:17; 6:1, 4; 7:14; 12:8, 13; 15:14; 16:22; 20:19, 22; 24:18, 20; 28:23; 32:14; 41:15; 42:1, 13; 47:24
irvin's [3] 18:11; 47:3, 23
issue [2] 22:17; 28:21

items        [3]
37:21, 25;  40:9
itself       [3]
11:21;    25:12;
33:12

- J -

jane [2]  11:25;
25:13
january     [2]
1:12;  50:20
jewelry      [1]
34:11
jordan [1]  42:2
josh [1]  3:15
joshua       [1]
1:17
judge [1]  3:22

- K -

kept [1]  45:23
kevin        [2]
44:10, 11
kicked       [1]
24:12
kicking      [1]
23:7
kind  [21]  9:7,
16;   11:14, 25;
12:3,  4,   7;
14:1, 10;  17:1;
19:20;  20:1, 7;
21:10;   22:1;
25:3;     30:6;
40:5;    45:12;
46:3;  48:10
kinds [1]  8:12
knowledge   [2]
47:22;  48:11
known [1]  6:3
kyle  [14]   1:2;
3:16;     5:20;
7:17;     8:17;
20:18;    24:15,
20,  25;   25:1,
24;      29:22;
41:15;  48:16

- L -

large [1]  37:11
largely      [1]
48:17
last [2]  34:16;
39:14
laughlin    [11]
1:23;     4:21;
23:3;   29:5, 8;
31:13;    32:9;
35:16;      48:4,
24;  49:2
lead [1]  21:1
league [1]  5:9
lean [2]  14:23,
25
least [1]  26:21
leave        [3]
35:14, 15, 18
left [1]  22:3
legs [1]  17:18
lesser [1]  37:1
lift [2]   34:15,
20
lifting      [1]
34:24
line [1]  46:9
lines [3]  17:5;
27:9;  30:17
listening    [1]
19:21
located      [1]
14:20
locker       [1]
40:14
logic [1]  16:9
longer [1]  30:9
look  [8]  9:7, 8,
16;    13:2,  3;
14:17;     43:3;
46:1
looking      [9]
8:7,  12;   9:22;
11:25;  12:3, 4,
5;  25:11;  40:5
lopez       [22]
5:23;      8:23;
16:10,    20;
18:12,    24;

19:14;     21:3,
10,  16;    23:3,
6,  12;    24:11,
15;    26:3,  8,
25;     27:25;
28:24;    29:21;
37:8
lopez's      [2]
22:7;  26:15
loretta      [4]
1:11;   50:4, 15,
23
loud [1]  12:10
lycoming     [1]
50:1

- M -

maintain    [1]
45:25
male [2]  34:18,
20
manner      [2]
13:1;  39:2
marijuana  [12]
8:13;     13:19,
20,   22,   23;
14:15;    16:15,
18;     25:20;
30:14;     39:14,
15
marked      [11]
2:14;   7:5, 12;
42:19,    21;
43:14,    16;
44:18,    20;
46:23
market      [2]
1:14, 18
mccormick   [1]
1:20
mean  [20]  5:5;
12:14;    13:9;
17:10;   20:15;
21:5;     23:3;
25:21;    27:21;
31:12;    32:2;
38:12;    40:22;
45:5,  6,   11;

46:10;    47:14,
18;  48:15
means        [1]
16:17
medical      [2]
16:16, 18
mentioned   [1]
34:24
middle [2]  1:1;
22:2
might  [2]   4:1;
22:16
mind  [6]   12:8;
16:14;     25:4,
22;      27:12;
33:6
minier       [2]
23:23;  42:1
minier's     [1]
24:2
minimum     [1]
25:23
minute       [1]
14:16
minutes      [1]
36:2
misdemeanors
[1]  37:7
month [1]  6:20
morning      [3]
3:14;      7:2;
47:3
most [1]  30:20
mouth        [2]
34:15, 16
moving       [1]
19:20

- N -

naked        [1]
31:24
name [4]   5:1;
44:9;     47:13;
48:2
narcotics  [18]
6:7, 8;   7:10;
8:4,  9,   11;
11:17;    12:2;
30:11,  21,  23,

24; 31:1, 3, 8; 37:11; 40:13; 44:12

**narrative** [1] 46:2

**near** [1] 16:25

**necessarily** [1] 32:18

**need** [2] 4:12, 14

**needed** [1] 22:21

**never** [2] 36:18; 37:13

**next** [10] 9:24; 11:4; 12:22; 13:14, 17; 16:19; 17:23; 22:23; 44:18; 46:21

**none** [1] 47:16

**nope** [1] 42:17

**normally** [1] 9:7

**notary** [1] 50:5

**nothing** [7] 22:14; 39:8; 43:12; 44:4; 46:18; 48:21; 50:8

**number** [1] 44:7

**numerous** [3] 11:18, 19; 13:22

**- O -**

**object** [3] 31:13; 32:9; 35:16

**objection** [2] 4:16; 29:5

**objections** [2] 3:5; 4:20

**observations** [1] 25:8

**observe** [5] 12:19; 14:22, 24; 15:5, 13

**observed** [9] 13:20; 15:1; 16:3; 19:3; 25:6; 32:23; 39:11, 18, 21

**observing** [4] 10:16; 30:16; 39:5, 9

**obstructing** [2] 27:12; 29:15

**obtained** [1] 42:25

**obtaining** [1] 22:15

**obviously** [5] 9:15; 10:12; 16:16; 34:18; 37:21

**occurred** [3] 5:15; 26:25; 37:17

**odor** [1] 13:19

**offense** [2] 30:13; 37:1

**offenses** [7] 8:4, 5, 6, 9, 11, 12; 30:24

**offer** [1] 30:13

**officer** [20] 3:14; 5:2; 7:8; 22:8, 9, 16, 22; 23:23, 25; 24:1, 9, 10, 14; 36:23; 37:9; 42:6; 44:12, 23; 46:11

**officers** [10] 23:7, 16, 17, 19, 22; 32:3; 42:3, 12, 15, 16

**often** [3] 6:19; 30:19; 37:12

**oftentimes** [1] 35:21

**once** [3] 12:23; 16:3; 35:10

**ones** [1] 40:5

**ongoing** [1] 29:20

**onto** [1] 46:2

**open** [1] 34:14

**operating** [2] 7:11; 8:24

**opinion** [1] 22:18

**oral** [1] 50:9

**order** [2] 17:15; 38:19

**outside** [4] 6:20; 15:1; 17:25; 39:8

**overly** [1] 12:1

**owned** [2] 45:15, 17

**- P -**

**pacing** [2] 21:10, 11

**page** [3] 46:2, 9

**pants** [1] 34:12

**paraphernalia** [9] 13:23; 16:3, 15; 25:20; 30:16; 37:12; 40:13, 14, 16

**pardon** [1] 35:3

**park** [2] 13:6, 15

**parked** [2] 13:10; 41:15

**parking** [1] 13:6

**part** [3] 7:7; 26:21; 30:15

**participate** [1] 12:13

**participating** [1] 20:5

**particular** [3] 16:17; 36:9; 37:7

**parties** [2] 3:3; 50:10

**patrol** [3] 8:2, 7; 23:17

**patrol-like** [1] 8:2

**patrolling** [1] 8:3

**penis** [1] 34:25

**pennsylvania** [7] 1:1, 14, 18, 21; 37:15; 50:2, 16

**people** [5] 9:7; 31:16, 25; 33:4; 37:24

**percent** [1] 8:21

**perception** [1] 31:22

**performed** [2] 17:7; 32:25

**period** [1] 18:4

**permission** [1] 19:4

**permitted** [1] 18:17

**person** [3] 25:17; 32:7; 47:7

**personal** [4] 6:14, 16; 37:21, 25

**personalized** [1] 12:1

**personally** [1] 50:5

**phone** [2] 18:8, 15

**photograph** [1] 40:25

**photos** [7] 40:21; 41:3, 4, 5, 7, 9

**picked** [1] 25:7

**pieces** [1] 14:16

**place** [7] 1:13; 21:25; 23:1; 24:21; 25:23; 36:7; 37:14

**placed** [5] 21:13, 15;

24:22; 25:1; 26:8

places [1] 30:20

plain [4] 7:22; 11:25; 25:13; 39:11

plainclothes [1] 7:4

plaintiff [6] 1:3, 10, 19; 2:2, 14; 3:16

plane [1] 15:7

plate [1] 25:13

plenty [1] 31:24

pockets [1] 17:18

point [27] 4:14; 6:7; 8:22; 10:5, 7, 16; 11:12; 14:25; 15:3, 22, 25; 18:20; 21:22, 24; 22:10, 24; 24:19; 25:2, 24; 26:1; 27:11; 28:1, 4; 29:4, 22; 31:25; 47:14

police [23] 7:5, 8, 10, 11, 12, 13; 9:9; 22:8, 16; 23:19; 25:9; 26:18; 27:8; 29:23; 30:23; 32:3, 7; 36:23; 44:25; 45:16, 20, 24; 47:2

popped [1] 47:13

pops [1] 47:6

posed [1] 4:14

possession [1] 37:4

pounds [1] 8:14

power [1] 36:23

practice [1] 30:22

precise [1] 14:11

precisely [1] 14:20

presence [1] 16:15

present [6] 1:16; 32:20; 35:13; 36:8; 38:7; 44:13

presume [1] 40:17

presumed [1] 4:2

pretty [1] 21:6

primarily [3] 5:14; 8:9; 19:20

primary [2] 28:19; 37:7

print [1] 45:12

prints [1] 45:13

probable [4] 16:14; 25:19; 29:3, 14

procedure [2] 31:9; 34:5

processes [1] 5:18

produced [4] 42:20; 43:15; 44:19; 46:22

property [1] 43:19

propounded [1] 50:9

provide [1] 3:23

public [4] 1:11; 28:10; 50:5, 24

pull [3] 9:21; 13:5; 15:13

pulled [2] 11:5; 12:23

pulling [1] 18:15

pump [3] 13:5, 7, 8

pumped [1] 13:12

pumping [1] 26:7

pumps [2] 12:24; 28:7

putting [1] 36:15

pwid [1] 37:4

-----

- Q -

quadrant [2] 38:22, 23

questions [4] 48:25; 49:2; 50:9, 14

quickly [1] 48:16

-----

- R -

reach [1] 15:4

reaction [1] 25:16

ready [2] 4:25; 32:15

real [1] 22:17

really [6] 7:21; 8:10; 14:8; 33:5; 38:19; 41:22

reason [2] 7:22; 26:23

reasonable [2] 4:6; 41:20

reasons [1] 11:13

recalled [1] 46:4

recap [1] 48:10

receipt [1] 43:19

recently [1] 3:15

recess [2] 48:18, 20

recognize [1] 47:6

recollection [9] 10:3; 18:10; 21:6; 24:1; 28:5, 20; 34:1, 2; 43:4

record [8] 4:11; 5:1; 18:8, 16; 33:23; 36:13; 40:22; 41:12

recorded [3] 33:11, 13, 14

records [1] 45:10

recovered [1] 44:4

recross [1] 2:2

redirect [1] 2:2

reduced [1] 50:17

refer [2] 45:19, 21

reference [1] 44:6

referring [2] 14:13; 39:10

refusal [1] 25:19

refused [4] 19:10, 11; 20:10; 21:12

regards [1] 32:19

register [1] 16:25

register's [1] 17:1

related [1] 45:13

relationship [1] 6:11

released [1] 41:16

remember [12] 9:2, 3, 4;

12:15; 15:8; 18:15; 19:2; 22:24; 23:24; 24:22; 27:7; 29:25

remove [1] 34:11

rental [2] 11:22, 24

repeat [2] 4:1; 29:9

rephrase [1] 3:25

report [4] 36:16; 44:24; 45:6, 8

reporter [3] 4:11; 50:16, 18

reporter-notary [2] 1:11; 50:24

represent [1] 3:15

request [1] 45:11

require [1] 35:3

requires [1] 22:14

reserved [1] 3:6

residual [1] 14:15

resisted [1] 23:6

resolved [1] 28:21

respect [1] 16:9

respective [2] 3:3; 50:10

responded [1] 48:13

responsible [2] 46:9, 10

result [4] 26:14, 20; 30:22; 36:19

return [1] 44:3

review [1] 41:25

reviewing [1] 20:17

right [40] 3:21; 4:8; 5:8, 12, 22, 25; 10:25; 13:4, 14; 15:12; 16:19; 17:2; 21:2, 7, 21, 24; 23:21; 24:13, 19; 30:2; 34:4; 35:2, 6, 9; 36:6; 38:7, 10; 39:9; 40:20; 42:5, 18; 43:2, 25; 44:23; 46:1, 18; 47:4; 48:10, 21

riling [2] 20:1, 6

roach [18] 8:13; 13:20, 21, 25; 14:6, 10, 23, 24; 15:1, 5, 19; 16:1; 39:5, 8, 10, 14

roaches [2] 39:6, 19

road [1] 10:10

robert [1] 48:8

room [3] 35:13, 18, 20

round [2] 14:2, 9

routinely [1] 37:24

running [1] 25:3

- S -

says [2] 7:10; 25:15

scene [5] 28:13; 29:1; 47:1, 4, 5

schemery [2] 1:13, 17

screaming [1] 23:12

screen [2] 5:19; 46:20

sealing [1] 3:4

search [50] 17:6, 8, 12, 21, 23; 19:4, 5; 24:20; 25:15; 30:5, 6, 7, 8, 24; 31:4, 5, 9; 32:2, 6, 14, 16, 18, 20; 33:3, 8, 10, 12; 34:1, 9, 19; 35:11; 36:6, 9, 14; 38:7, 11, 13, 23, 25; 39:4; 40:21, 25; 41:16; 42:24, 25; 43:4; 44:4, 14

searched [13] 17:12; 24:24; 31:11, 19, 23; 33:4; 35:20, 21; 38:4, 12; 39:2; 44:1

searches [4] 34:5; 35:10; 36:12, 17

searching [6] 17:5; 18:22; 24:23; 31:16; 39:1; 43:5

second [3] 10:2, 19; 32:13

seeing [2] 10:1; 35:3

seize [3] 40:9, 13, 16

seized [3] 8:14; 40:14, 17

sells [1] 37:21

semantics [1] 31:6

sense [1] 8:3

sergeant [1] 23:24

service [1] 41:15

session [1] 3:23

severe [1] 37:10

shake [5] 13:24; 14:12, 13; 15:5; 16:1

shawna [1] 1:23

shift [3] 6:25; 7:16, 20

shirts [1] 34:12

short [1] 36:4

shows [2] 47:2, 4

side [3] 9:8; 17:2; 38:21

signed [1] 46:13

signing [1] 3:3

similar [1] 39:21

site [2] 42:3, 6

situation [6] 22:16; 23:11; 27:14; 31:11, 20, 22

size [4] 14:6, 8, 10, 11

small [3] 14:10; 30:14; 37:12

smaller [2] 30:12

smelled [1] 13:18

socks [1] 34:12

sometime [1] 9:25

sometimes [2] 11:22; 33:17

sorry [8] 9:12; 16:22; 20:13;

Appx886

23:5, 25; 24:5; 29:10; 45:21

sounds [1] 24:14

speak [1] 31:21

speaking [1] 4:10

specific [2] 33:20; 38:19

specifically [10] 8:4; 19:14; 21:9; 26:4; 27:23; 30:10, 23; 31:1, 8; 39:2

speckles [1] 14:18

speculate [1] 48:12

spent [1] 13:20

spot [2] 12:17; 13:6

spotted [1] 12:16

spread [1] 35:4

squat [2] 34:22; 35:8

standard [2] 31:7, 8

standing [2] 22:4, 6

stare [2] 11:14; 25:7

staring [2] 9:10, 13

start [7] 5:13; 6:25; 38:10, 16, 20, 21

started [1] 4:25

state [3] 11:21; 13:10; 25:13

statement [1] 42:10

statements [1] 42:13

states [1] 1:1

station [9] 39:12; 41:15, 17; 45:6, 9, 19, 23; 47:2, 6

stayed [1] 16:21

stems [1] 46:2

stenographically [1] 50:15

step [2] 17:24, 25

stick [1] 33:6

still [2] 10:5; 27:25

stipulated [1] 3:2

stipulation [1] 3:1

stoltzfus [3] 23:23; 24:6; 42:2

stop [3] 21:11; 26:17; 37:24

stopped [2] 9:5; 28:20

store [11] 13:4, 15; 15:13, 24; 16:23, 24; 17:1; 25:14; 32:13; 37:18, 20

street [10] 1:14, 18, 21; 5:8; 8:21; 9:5; 10:4, 11; 11:8; 12:17

streets [1] 10:13

strip [29] 30:7, 8, 24; 31:4, 9, 11, 15, 19, 23; 32:2, 6, 16, 20; 33:2, 4, 7; 34:1, 5, 19; 35:9, 10, 20, 21; 36:6, 9,

12, 14, 17; 41:16

stuff [1] 45:13

subscribed [1] 50:20

such [2] 17:17; 37:25

supervisor [3] 6:11; 47:20, 24

surveillance [1] 7:24

sworn [3] 3:11; 50:7, 13

system [5] 45:5, 12, 14, 15, 18

- T -

taking [1] 50:12

telling [1] 24:20

term [2] 20:5; 45:14

terms [8] 6:10; 7:19; 8:11; 14:13; 20:14; 32:2; 34:5, 6

tested [1] 40:18

testicles [1] 34:25

testified [3] 3:11; 16:1; 50:10

testify [1] 50:7

testifying [1] 3:21

testimony [2] 21:15; 50:19

thank [2] 4:23; 49:3

theater [1] 5:9

theirs [1] 13:16

themselves [1] 25:10

third [6] 5:8, 9; 8:20; 32:6, 16, 19

thought [1] 5:17

threaten [2] 27:10, 15

through [9] 7:9, 16; 25:3; 38:11, 15; 45:5, 12; 47:5

throughout [3] 8:15; 20:8, 15

throw [1] 8:1

throws [2] 17:4; 25:15

times [6] 30:19; 33:18; 36:24; 37:5, 12; 41:2

today [1] 3:18

toes [1] 34:13

together [3] 6:19, 21; 21:6

tongue [1] 34:15

took [4] 10:14; 21:1; 37:14; 41:4

trade [2] 5:10, 11

traffickers [1] 30:20

trafficking [2] 11:18; 12:2

transit [2] 5:10, 11

transpired [1] 28:23

transport [1] 29:22

transported [2] 29:25; 30:3

transporting [1] 30:3

traveling [2] 10:9, 19

trial [1] 3:6

truck [1] 28:12

trunk [1] 38:20

truth [3]   50:7, 8
trying     [2] 27:8;  37:3
turkey     [7] 11:5,  9,  11; 12:18,    22; 37:17, 19
turn [1]  34:21
type [2]   8:6; 25:13
types [1]  8:5
typewriting [1] 50:17
typical     [4] 17:16;   25:16; 34:9;  35:10
typically   [13] 4:17;      8:6; 33:15;     34:7, 16;  35:24, 25; 38:13,    21; 39:14;   40:25; 41:2
tyson [1]  42:1

**- U -**

ultimately  [2] 19:16;  30:1
uncomfortable [2]  31:11, 20
uncommon  [1] 40:16
uncover     [1] 30:25
under [4]  26:2; 40:3;    44:24; 50:18
undercover  [1] 7:24
underneath  [1] 34:21
undersigned [1]  50:4
understand  [2] 3:25;  40:2
understood  [2] 4:2;  21:15

underwear   [1] 34:16
uniform     [3] 7:3, 4, 5
unit [5]   6:8; 30:23;   37:11; 40:13
united [1]  1:1
unknown    [1] 16:17
unless     [2] 22:21;  36:15
used [1]  20:5
users      [1] 30:20
using      [1] 45:14
usually     [3] 34:17,    22; 38:18
utilized    [1] 7:23

**- V -**

various     [2] 8:14;  13:22
vehicle     [37] 7:12, 13;  8:24; 11:21,  23,  24, 25;  12:18, 19, 20,  21,   23; 13:16,    19; 14:23;    15:2; 16:5;     18:22; 19:3;   23:1, 6; 24:21,    23; 25:1,  11,  13, 23;      28:3; 38:18, 22, 25; 39:1, 4;  42:25; 43:4;  44:1
vehicles    [4] 11:23;    26:9; 38:20, 21
verbiage    [1] 19:2
vest [4]  7:5, 9, 11;  8:1

video [5]  5:16; 40:21,    25; 41:2;  42:1
view [1]  39:11
violations   [2] 12:19, 20
voice [1]  20:7
voices      [1] 20:14

**- W -**

waistband   [1] 17:17
waiting     [3] 28:2, 5,  8
waived [1]  3:4
walk [1]  13:15
walked     [1] 13:16
walks [1]  47:4
warned     [2] 27:22;  28:21
warrant     [2] 42:24;  43:8
warrants    [1] 31:2
washington  [2] 11:6;  37:19
watching   [1] 18:10
weapons    [1] 17:17
weird [1]  9:16
west [1]  1:21
whatnot     [2] 6:23;  34:11
whereof    [1] 50:19
white [3]  1:20; 4:22;  49:1
whole [3]  6:4; 11:9;  50:8
why'd      [1] 11:12
wiggle      [1] 34:13
william     [1] 1:23

williamsport [16]   1:14,  18, 21;      10:4; 23:7,    20; 26:17;    27:8; 29:23,    24; 37:15;   44:25; 45:15,  20,  24; 50:16
window     [2] 12:4;  15:7
windows    [1] 13:18
windshield  [1] 15:2
within     [3] 31:1, 3;  39:6
without     [2] 19:21;  20:17
witness     [9] 3:10;    23:5; 28:22;  29:7, 9; 31:15;    48:23; 50:6, 13
witnesses   [2] 2:1;  42:16
woman     [4] 5:22;    26:7; 28:7;  29:13
woman's     [1] 28:16
words      [1] 27:21
wore [1]  7:22
worked [1]  6:6
written     [1] 36:13

**- Y -**

yard [2]  11:14; 25:7
year [1]  6:7
years [2]   4:5; 27:22
yelling     [5] 19:20;    21:9; 26:14,    20; 28:10

Case 4:25-cv-00364 Document 16 Filed 04/25/24 Page 6 of 9

**yours** [1]
47:20
**yourself** [1]
42:1

---

**- Z -**

**zachary** [2]
42:2, 10
**zicolello** [2]
1:13, 17

# Commonwealth of Pennsylvania

## COUNTY OF LYCOMING

### APPLICATION FOR SEARCH WARRANT AND AUTHORIZATION

| Docket Number (Issuing Authority): | Police Incident Number: 21-08506 | Warrant Control Number: |
|---|---|---|

| PO GARDNER | WBP/NEU | (570) 327-8124 | 09/02/21 |
|---|---|---|---|
| AFFIANT NAME | AGENCY | PHONE NUMBER | DATE OF APPLICATION |

**IDENTIFY ITEMS TO BE SEARCHED FOR AND SEIZED** *(Be as specific as possible):*
Any and all illegal narcotics, and related packaging material, scales, means of ingestion and measuring devices. Specifically Marijuana and marijuana related paraphernalia.

**SPECIFIC DESCRIPTION OF PREMISES AND/OR PERSON TO BE SEARCHED** *(Street and No., Apt. No., Vehicle, Safe Deposit Box, etc.):*
Black in Color NISSAN ALTIMA currently stored at WBP IMPOUND
MASSACHUSETTS REG 3FNF89

DEPOSITION EXHIBIT
1
PENGAD 800-631-6989

**NAME OF OWNER, OCCUPANT OR POSSESSOR OF SAID PREMISES TO BE SEARCHED** *(If proper name is unknown, give alias and/or description):*
ANAISE MARGARITA LOPEZ

| **VIOLATION OF** *(Describe conduct or specify statute):* | DATE(S) OF VIOLATION: |
|---|---|
| ACT 64 | 8/31/21 |

☐ **Warrant Application Approved by District Attorney – DA File No.** _____
(If DA approval required per Pa.R.Crim.P. 202(A) with assigned File No. per Pa.R.Crim.P. 507)

☐ **Additional Pages Attached (Other than Affidavit of Probable Cause)**

☐ **Probable Cause Affidavit(s) MUST be attached (unless sealed below)  Total number of pages:** _____

TOTAL NUMBER OF PAGES IS SUM OF ALL APPLICATION, PROBABLE CAUSE AND CONTINUATION PAGES EVEN IF ANY OF THE PAGES ARE SEALED

The below named Affiant, being duly sworn (or affirmed) before the Issuing Authority according to law, deposes and says that there is probable cause to believe that the items or property identified are evidence or the fruit of a crime, or are contraband, or are expected to be otherwise unlawfully possessed or subject to seizure, and that these items or property are or are expected to be located on the particular person or at the particular place described above. I certify that this filing complies with the provisions of the Case Records Public Access Policy of the Unified Judicial System of Pennsylvania that require filing confidential information and documents differently than non-confidential information and documents.

| | WBP/NEU | 14 |
|---|---|---|
| **Signature of Affiant** | **Agency or Address if Private Affiant** | **Badge Number** |

Sworn to and subscribed before me this __2__ day of __September__ 2021 Mag. Dist. No. __29-1-02__

**Signature of Issuing Authority**       **Office Address**       48 W Third St

## SEARCH WARRANT
**TO LAW ENFORCEMENT OFFICER:**

WHEREAS, facts have been sworn to or affirmed before me by written affidavit(s) attached hereto from which I have found probable cause, I do authorize you to search the premises or person described and to seize, secure, inventory and make return according to the Pennsylvania Rules of Criminal Procedure.

☑ This Warrant shall be served as soon as practicable and shall be served only between the hours of 6AM to 10PM but in no event later than:*

☐ This Warrant shall be served as soon as practicable and may be served any time during the day or night but in no event later than: **
__10:10__ M, o'clock __Sept.  4__, 2021.

☑ This Warrant shall be returned to judicial officer __MDJ Frey__

\* The issuing authority should specify a date not later than two (2) days after issuance. Pa.R.Crim.P. 205(4).
\*\* If the issuing authority finds reasonable cause for issuing a nighttime warrant on the basis of additional reasonable cause set forth in the accompanying affidavit(s) and wishes to issue a nighttime warrant, then this block shall be checked. Pa.R.Crim.P. 206(7).

Issued under my hand this __2__ day of __September__, 2021 at __10:10__ M, o'clock.

| | 29-1-02 | |
|---|---|---|
| **Signature of Issuing Authority** | **Mag. Dist. or Judicial Dist. No.** | **Date Commission Expires** |

(SEAL)

Title of Issuing Authority: ☑ Magisterial District Judge  ☐ Common Pleas Judge  ☐ _____

☐ **For good cause stated in the affidavit(s) the Search Warrant Affidavit(s) are sealed for** _____ **days by my certification and signature.** *(Pa.R.Crim.P. 211)*

_____   _____ (Date)   **(SEAL)**
**Signature of Issuing Authority** *(Judge of the Court of Common Pleas or Appellate Court Justice or Judge).*

TO BE COMPLETED BY THE ISSUING AUTHORITY

1



# Commonwealth of Pennsylvania

**COUNTY OF** LYCOMING

# AFFIDAVIT OF PROBABLE CAUSE

| Docket Number (Issuing Authority): | Police Incident Number: 21-08506 | Warrant Control Number: |
|---|---|---|

## *PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:*

Your affiant is a Williamsport Bureau of Police Officer currently specially assigned to the Lycoming County Narcotics Enforcement Unit. My training and experience consists of the following: I have completed basic narcotics training in the police academy. I have completed additional trainings in mastering search and seizure, money laundering, identifying criminal vehicles and occupants, patrol interdiction, street gangs and narcotics, hidden compartments and deceptive behavior, interdiction mastermind, understanding the world of 1%'s, planning an undercover operation, interview and interrogation in relation to narcotics and I am Wiretap Class A certified. I am currently a member of the Williamsport Special Response team and have been since Nov. 2017. I have participated in countless search warrants in relation to narcotics and firearms in my duties on this team. I have hundreds of narcotics related arrests which include both misdemeanor and felony arrests. I have assisted in countless narcotics related investigations. I have participated in controlled purchases of narcotics, and have also have utilized confidential informants for the purchase of narcotics. I have served numerous search warrants in relation to narcotics and firearms on residence's, vehicles, cell phones and even body warrants. I have investigated and assisted in a large number of opiate related overdoses, and have utilized narcan on numerous individuals who have overdosed on opiates. Through my experience I have testified in court numerous times as a PWID expert not only in my own cases, but other officers as well.

Based on my aforementioned training and experience I am familiar with the following: Through my experience and training I am familiar with a wide array of narcotics, pricing, packaging, preparation/manufacturing, and street language in reference to narcotics. Also, through my experience and training, I have developed knowledge of the patterns of trafficking, means of trafficking, counter surveillance techniques, and workings of a residence, or "trap house" which distributes narcotics. I have developed knowledge of narcotics traffickers using more than one residence, or storage area, to traffic and store their narcotics from. I have developed knowledge through my training and experience of the use of firearms in the furtherance of narcotics trafficking. I have arrested numerous individuals for firearms violations, and assisted in numerous firearm related incidents including shootings. Traffickers frequently illegally possess firearms in order to defend from, or pursue and rob other traffickers of their narcotics and currency. I also know when specifically dealing with gangs, that gang members will commonly possess firearms to protect themselves and fellow members. Gang members will also possess firearms so they are prepared to fire upon rival gangs when an oppurtunity presents itself. I know through my experience that the most common form of communication amongst traffickers is through the utilization of cell phones. Traffickers utilize phones to both communicate to each other as well as to negotiate and arrange transactions with narcotics users. I know that narcotics traffickers commonly operate third party vehicles, when they traffic narcotics. This is to help further hinder efforts in identifying them, as well as the vehicle not being able to be forfeit if a trafficker is apprehended in it. While utilizing vehicles to further their trafficking efforts I know it is common for traffickers to use natural voids, or create voids within compartments of vehicles in order to conceal narcotics, currency and firearms. Traffickers will also illegally install "traps" in vehicles used to transport contraband, knowing that these types of installed aftermarket compartments are particularly difficult for law enforcement to detect. Also, in reference to concealing narcotics, due to more severe sentencing as opposed to simple possession, traffickers go to greater lengths to conceal narcotics on, or within their person, and will dispose of the narcotics immediately if given a chance. They are skilled in ways to conceal narcotics on their person, and deceiving officers in order to destroy evidence. I know that when dealing with currency, it is common for traffickers to possess large amounts of currency, specifically larger denominations, in multiple bundles of cash which can be easily accessed. The most common denomination used among traffickers is a twenty dollar bill. I am also familiar with various ways that traffickers will launder the proceeds or dirty money from trafficking firearms/narcotics into "clean money" or money that appears to be legitimate.

I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF. I certify that this filing complies with the provisions of the Case Records Public Access Policy of the Unified Judicial System of Pennsylvania that require filing confidential information and documents differently than non-confidential information and documents.

| | | | |
|---|---|---|---|
| *Affiant Signature* | *Date* | *Issuing Authority Signature* | (SEAL) *Date* |

2

## Commonwealth of Pennsylvania

**COUNTY OF** LYCOMING



# AFFIDAVIT OF PROBABLE CAUSE
## CONTINUATION PAGE

| Docket Number (Issuing Authority): | Police Incident Number: 21-08506 | Warrant Control Number: |
|---|---|---|

### *AFFIDAVIT OF PROBABLE CAUSE CONTINUATION*

On 8/31/2021, DET IRVIN and I were on patrol in a marked police unit, and wearing marked police vests. While in the area of the TURKEY HILL on WASHINGTON BLVD we observed a black in color NISSAN ALTIMA bearing MASSACHUSETTS registration parked at the pumps. Two occupants, a white male and white female exited and went into the store. I parked the patrol unit as to not obstruct the vehicle's exit.

IRVIN and I had observed the vehicle earlier downtown, where the occupants made efforts to ignore our presence, and then observed it shortly after leaving a high narcotics trafficking area in the avenues. The vehicle did not appear to be overly personalized. We followed the vehicle and again the occuptants made clear efforts to act as tho the police were not following. The driver would occasionally look out his window as if looking in the distance, but was clearly checking for police presence. Once the vehicle parked and the two exited, we were directly behind them. They did not look in our direction once. I know from my experience that this TURKEY HILL is a high narcotics trafficking area.

Once I parked I exited the patrol vehicle and walked up to the sedan. I immediately detected the odor of marijuana emmitting from the vehicle. I observed in plain view a marijuana joint, and marjuana flakes in plain view in the vehicle. The joint was on top of a cigarette ash tray in the drivers door. This is not an approved means of ingestion, even with a medical marijuana card (NEITHER OCCUPANT made claims of possessing a medical card). The marijuana flakes were scattered throughout the drivers floor of the vehicle. Passenger KYLE BEATTY has prior criminal charges in relation to marijuana.

After observing the plain view contraband the female (Identified as ANAISE LOPEZ) exited the store and immediately confronted us. I went into the store and the male threw his hands up and asked if I wanted to search him. I asked him to exit the store with me which he did.

I explained to the pair what I observed and I explained their options. Initially the female granted consent to search the car but then redacted after I asked the two for ID. IRVIN and I then handcuffed the two, and the female attempted to turn away. Once the two were handcuffed the female refused to listen to any orders, and tried to walk around and scream at officers. Once additional units arrived, PO GEARY and I attempted to place LOPEZ in the back of his patrol unit. She nearly had to be carried by GEARY and I to the patrol unit due to her resistance. LOPEZ planted her feet and pushed back into us. We had to force her into the back of the patrol unit.

Once she was in the vehicle she kicked PO GEARY twice. The first kick struck PO GEARY in the left hand, and the second struck PO GEARY on the inner portion of his right arm near his elbow. Due to LOPEZ'S actions, a car full of individuals at the pumps were clearly riled up, and one of the occupants continuously yelled at officers and had to be ordered to stop.

Based on the facts and circumstances stated above I respectfully request that a search warrant be issued for the black in color NISSAN ALTIMA with MASSACHUSETT'S REG 3FNF89.

**Affiant Signature**

A COPY OF THIS FORM, WHEN COMPLETED, IS TO BE ATTACHED TO EACH COPY OF THE SEARCH WARRANTS/AFFIDAVIT

## Commonwealth of Pennsylvania

## RECEIPT / INVENTORY
OF SEIZED PROPERTY

**COUNTY OF** Lycoming

| Docket Number (Issuing Authority): | Police Incident Number: 21-08506 | Warrant Control Number: |
|---|---|---|

| Date of Search: 9/2/21 | Time of Search: 1240 | Inventory Page Number: of Pages |
|---|---|---|

| Gardner | Williamsport Bureau of Police | 14 |
|---|---|---|
| *Affiant* | *Agency or Address if private affiant* | *Badge No.* |

The following property was taken / seized and a copy of this Receipt / Inventory with a copy of the Search Warrant and affidavit(s) (if not sealed) was

☐ personally served on (name of person) _____

☑ was left at (describe the location) _in vehicle @ impound_

| Item Number | Quantity | Item Description | Make, Model, Serial No., Color, etc. |
|---|---|---|---|
| | | Nothing Recovered | |

DEPOSITION EXHIBIT
2

PENGAD 800-631-6989

I/we do hereby state that this inventory is to the best of my/our knowledge and belief a true and correct listing of all items seized, and that I/we sign this Receipt / Inventory subject to the penalties and provisions of Title 18 Pa.C.S. 4904(b)--Unsworn Falsification to Authorities.

| Signature of person issuing Receipt / Inventory | Printed Name Gardner | Affiliation NBV | Badge or Title 14 |
|---|---|---|---|
| Signature of Witness | Printed Name DEAT | Affiliation NEU | Badge or Title 508 |
| Signature of person making Search | Printed Name Gardner | Affiliation NEU | Badge or Title 14 |

AOPC 413B 12-09-98

ISSUING AUTHORITY- CANARY    TO WHOM RECEIPT ISSUED - GOLDENROD    REPORT COPY - PINK

# Williamsport Bureau of Police
## Officer Report for Incident 21-08506

083121125

| | |
|---|---|
| Nature: ASLT | Address: �a▬▬▬▬▬ |
| Location: WPE | WIL PA 17701 |

Offense Codes: ASPA

Received By:         How Received: O        Agency: WBP

Responding Officers: C Gardner, C Gardner, Z Geary, J R Stoltzfus, T Minier

Responsible Officer: C Gardner      Disposition: CAA 10/14/21

When Reported: 13:49:20 08/31/21    Occurred Between: 13:49:20 08/31/21 and 13:49:20 08/31/21

| | | |
|---|---|---|
| Assigned To: | Detail: | Date Assigned: **/**/** |
| Status: | Status Date: **/**/** | Due Date: **/**/** |

Complainant:

| | | |
|---|---|---|
| Last: | First: | Mid: |
| DOB: **/**/** | Dr Lic: | Address: |
| Race:    Sex: | Phone: | City: , |

## Offense Codes

Reported:                    Observed:

Additional Offense: ASPA Assault, Police, Agg Injury

## Circumstances

Responding Officers:        Unit :

     C Gardner              14

     C Gardner

     Z Geary

     J R Stoltzfus

     T Minier

Responsible Officer: C Gardner        Agency: WBP

Received By:               Last Radio Log: **:**:** **/**/**

How Received: O Another Agency        Clearance: CRO Cleared by Responding Officer

When Reported: 13:49:20 08/31/21        Disposition: CAA Date: 10/14/21

Judicial Status:             Occurred between: 13:49:20 08/31/21

Misc Entry:                and: 13:49:20 08/31/21

DEPOSITION EXHIBIT 3

PENGAD 800-631-6989

10/18/21

Case: 25-2860 Document: 16 Page: 452 Date Filed: 12/16/2025

| Modus Operandi: | Description : | Method : |
|---|---|---|

## Involvements

| Date | Type | Description | |
|---|---|---|---|
| 10/14/21 | Name | GEARY, ZACHARY | Victim |
| 10/14/21 | Name | LOPEZ, ANAISE MARGARITA | Suspect |
| 08/31/21 | Offense | Offense#: 25759 - F2 - 1 count | Charged With |
| 08/31/21 | Offense | Offense#: 25760 - M2 - 1 count | Charged With |
| 08/31/21 | Offense | Offense#: 25761 - SM - 1 count | Charged With |
| 08/31/21 | Offense | Offense#: 25762 - SM - 1 count | Charged With |
| 08/31/21 | Offense | Offense#: 25763 - M2 - 1 count | Charged With |
| 09/03/21 | Property | Cell phone 0 | Evidence |
| 09/13/21 | Evidence | cell phone | Evidence Incident |

10/18/21

## Narrative

PO GARDNER DATE OF INCIDENT 8/31/21

On 8/31/2021, DET IRVIN and I were on patrol in a marked police unit, and wearing marked police vests. While in the area of the TURKEY HILL on WASHINGTON BLVD we observed a black in color NISSAN ALTIMA bearing MASSACHUSETTS registration parked at the pumps. Two occupants, a white male and white female exited and went into the store. I parked the patrol unit as to not obstruct the vehicle's exit.

IRVIN and I had observed the vehicle earlier downtown, where the occupants made efforts to ignore our presence, and then observed it shortly after leaving a high narcotics trafficking area in the avenues. The vehicle did not appear to be overly personalized. We followed the vehicle and again the occupants made clear efforts to act as though the police were not following. The driver would occasionally look out his window as if looking in the distance, but was clearly checking for police presence. Once the vehicle parked and the two exited, we were directly behind them. They did not look in our direction once. I know from my experience that this TURKEY HILL is a high narcotics trafficking area.

Once I parked I exited the patrol vehicle and walked up to the sedan. I immediately detected the odor of marijuana emitting from the vehicle. I observed in plain view a marijuana joint, and marijuana flakes in plain view in the vehicle. The female exited the store and immediately confronted us. I went into the store and the male threw his hands up and asked if I wanted to search him. I asked him to exit the store with me which he did.

I explained to the pair what I observed and I explained their options. Initially the female granted consent to search the car but then redacted after I asked the two for ID. The female also admitting to smoking marijuana, but not recently. (Smoking is not an approved means of ingestion.) IRVIN and I then handcuffed the two, and the female attempted to turn away. Once the two were handcuffed the female refused to listen to any orders, and tried to walk around and scream at officers. Once additional units arrived, PO GEARY and I attempted to place the female in the back of his patrol unit. She nearly had to be carried by GEARY and I to the patrol unit due to her resistance. The female planted her feet and pushed back into us. We had to force her into the back of the patrol unit.

Once she was in the vehicle she kicked PO GEARY twice. The first kick struck PO GEARY in the left hand, and the second struck PO GEARY on the inner portion of his right arm near his elbow. Several other kicks missed GEARY, as she kicked her shoes off in the direction of officers. Due to the females actions a car full of individuals at the pumps were clearly riled up, and one of the occupants continuously yelled at officers and had to be ordered to stop.

At WBP headquarters LOPEZ initially refused to ID herself and made racist, and demeaning comments towards officers. LOPEZ also made the remark that she looked Caucasian when stating that she was Latino. Even when provided with a female officer to take her to the bathroom as she requested she refused to go. LOPEZ was arraigned before MDJ BITCHLE on felony AGG. ASSAULT and committed to LCP.

A search warrant was served on the vehicle and photos were taken of the joint observed, as well as other spent joints in a cigarette holder which was in the drivers door of the vehicle. Photos were taken.

10/18/21

BEATTY, who was the operator of the vehicle, was discovered to have an ignition interlock license. No interlock was present in the vehicle and a summons shall be sent to BEATTY for this violation. NOTHING FURTHER.

Responsible LEO:

Approved by:

Date

10/18/21

## Supplement

```
TimeDisp:  08/31/2021 13:49:20
TimeEnrt:  08/31/2021 13:49:20
TimeOnsc:  08/31/2021 13:49:20
TimeCmpl:  08/31/2021 14:31:02
TimeArch:  08/31/2021 14:31:03
Received by: jwinter
Complainant: 509
CurrPhone: WPSF-696
BusinessName: TURKEY HILL BLVD (570) 3279190
PrimaryUnit: 509
Dispatcher: jwinter
Summary: P SI
IncLatitude: 41.247330
IncLongitude: 76.990349
CompLatitude: -1.000000
CompLongitude: -1.000000
```

Comment: jwinter(08/31/2021 13:49:32): Address changed to 700 WASHINGTON BLVD at 13:49

Comment: jwinter(08/31/2021 13:50:18): Summary changed to P SI at 13:50

Comment: jwinter(08/31/2021 13:50:55): X2

Comment: jwinter(08/31/2021 13:51:02): #14 REQ ADDITIONAL UNITS

Comment: jwinter(08/31/2021 13:52:04): #14 - 2 DETAINED

Comment: jwinter(08/31/2021 13:54:50): #14 - REQ TOW FOR 1

Comment: jwinter(08/31/2021 13:56:01): TOW ASSOCIATION NOTIFIED

Comment: jwinter(08/31/2021 13:56:33): U 65,TO,SIGNAL 2 WITH 1 FEMALE RECORDING

Comment: jwinter(08/31/2021 13:56:42): U 69,TO,SIGNAL 2 FOLLOWING

Comment: jwinter(08/31/2021 14:00:12): U 65,AT,SIGNAL 2 WITH 1 FEMALE

Comment: jwinter(08/31/2021 14:00:15): U 69,AT,SIGNAL 2

Comment: jwinter(08/31/2021 14:09:00): U 509,TO,WBP SIGNAL 2 WITH 1 MALE

Comment: jwinter(08/31/2021 14:11:50): U 509,AT,SIGNAL 2 WITH 1 MALE

Comment: jwinter(08/31/2021 14:31:02): CFS Status changed to CMPL by jwinter.

Comment: jwinter(08/31/2021 14:31:03): CFS Status changed to ARCH by jwinter.

```
TimeChanged: 08/31/2021 13:49:20
UnitNumber: 509
NewStat: ONSC
Agency: LYCOMING COUNTY DETECTIVES
Zone: LCDET

TimeChanged: 08/31/2021 13:50:50
UnitNumber: 65
NewStat: DISP
Agency: WILLIAMSPORT POLICE
```

10/18/21

Zone: WPDC

TimeChanged: 08/31/2021 13:50:50
UnitNumber: 69
NewStat: DISP
Agency: WILLIAMSPORT POLICE
Zone: WPDR

TimeChanged: 08/31/2021 13:52:38
UnitNumber: 65
NewStat: ONSC
Agency: WILLIAMSPORT POLICE
Zone: WPDC

TimeChanged: 08/31/2021 13:56:33
UnitNumber: 65
NewStat: TO_OTH
Agency: WILLIAMSPORT POLICE
Zone: WPDC

TimeChanged: 08/31/2021 13:56:42
UnitNumber: 69
NewStat: TO_OTH
Agency: WILLIAMSPORT POLICE
Zone: WPDR

TimeChanged: 08/31/2021 13:56:45
UnitNumber: 91
NewStat: DISP
Agency: WILLIAMSPORT POLICE
Zone: WPDW

TimeChanged: 08/31/2021 13:56:45
UnitNumber: K9_WBP3
NewStat: DISP
Agency: WILLIAMSPORT POLICE
Zone: WPDW

TimeChanged: 08/31/2021 13:56:45
UnitNumber: 91
NewStat: ONSC
Agency: WILLIAMSPORT POLICE
Zone: WPDW

TimeChanged: 08/31/2021 13:56:45
UnitNumber: K9_WBP3
NewStat: ONSC
Agency: WILLIAMSPORT POLICE
Zone: WPDW

TimeChanged: 08/31/2021 14:00:12
UnitNumber: 65
NewStat: AT_OTH
Agency: WILLIAMSPORT POLICE
Zone: WPDC

TimeChanged: 08/31/2021 14:00:15
UnitNumber: 69

10/18/21

NewStat: AT_OTH
Agency: WILLIAMSPORT POLICE
Zone: WPDR

TimeChanged: 08/31/2021 14:09:00
UnitNumber: 509
NewStat: TO_OTH
Agency: LYCOMING COUNTY DETECTIVES
Zone: LCDET

TimeChanged: 08/31/2021 14:11:50
UnitNumber: 509
NewStat: AT_OTH
Agency: LYCOMING COUNTY DETECTIVES
Zone: LCDET

TimeChanged: 08/31/2021 14:31:00
UnitNumber: 509
NewStat: AVAIL
Agency: LYCOMING COUNTY DETECTIVES
Zone: LCDET

TimeChanged: 08/31/2021 14:31:00
UnitNumber: 91
NewStat: AVAIL
Agency: WILLIAMSPORT POLICE
Zone: WPDW

TimeChanged: 08/31/2021 14:31:00
UnitNumber: K9_WBP3
NewStat: AVAIL
Agency: WILLIAMSPORT POLICE
Zone: WPDW

TimeChanged: 08/31/2021 14:31:01
UnitNumber: 69
NewStat: AVAIL
Agency: WILLIAMSPORT POLICE
Zone: WPDR

TimeChanged: 08/31/2021 14:31:01
UnitNumber: 65
NewStat: AVAIL
Agency: WILLIAMSPORT POLICE
Zone: WPDC

ArmedDanger: 0
Year: 15
License: 3FNF89
State: MA
Make: NISSAN
Model: ALTIMA
Color: BLK
Vin: 1N4AL3APXFN399235
Misc: OWNER INFORMATION ---------------------------------------------------------------- LOPEZ,
ANAISE M            442 BROADWAY APT 1 EVERETT, MA 02149  REGISTRATION DETAILS
------------------------------------------------------------------ EFFECTIVE DATE: 2021-03-03
STATUS: ACTV/NONR JURISDICTION: MA   VEHICLE INFORMATION

10/18/21

```
------------------------------------------------------------------ LIC: 3FNF89        LIT:
PASSENGER NORMAL          EXPIRES: 2022-09-30 VMA: NISS      VYR: 2015      VST: SEDAN
VMD: ALTIMA VCL: BLACK        VIN: 1N4AL3APXFN399235 TLN:    LICENSE STATUS
------------------------------------------------------------------
Type: PC
LicYr: 2022
GIDBType: Other

ArmedDanger: 0
Name: BEATTY, KYLE
Ssn:
Sex: M
Dob:
Age: 35
Misc: OLN: 27675907 LIS: PA       VALIDATED: 2020-10-23.       EXPIRES: 2022-05-03. NAM:
BEATTY, KYLE        921 WESTMINSTER DRIVE APT 2A       WILLIAMSPORT PA. 17701
                    SEX: MALE.        EYE: BLUE.        HGT: 604. RESTRICTIONS: NONE
OPERATOR TYPE: IGTN INTRLOCK OPERATOR CLASS: C = SINGLE VEH <= 26,000    SUSPENSION: 0 = NO
VALID DUPLICATE LICENSE NUMBER: N/A NON COMMERCIAL CLASS: SINGLE VEH <= 26,000 CODE: C
NON-COMMERCIAL STATUS: Valid COMMERCIAL STATUS:   QUANT: 0
DrLic: 27675907
State: PA
GIDBType: Other

Agency: WILLIAMSPORT POLICE
NumberStr: WBP-2021-008506
```

10/18/21

## Supplement

PO Z Geary Tue Aug 31 15:04:15 EDT 2021

I responded to the above area for officer requesting assistance with a male and female who were subject of an investigation. Upon arrival PO Gardner and Det. Irvin had each in custody. I observed the female, later identified as Anaise Lopez, standing at the front of her vehicle in handcuffs. PO Gardner was standing in front of her attempting to communicate with her. Lopez was screaming about wanting a female officer. Lopez never stopped screaming while I was on scene and Gardner requested she be put in my unit (65) for transport.

PO Gardner asked her to walk to my car and she refused. I grabbed her right arm and PO Gardner her left arm. Lopez was nearly carried with little assistance from her to my unit. Once at the car Gardner opened the back door so she could be placed in. Lopez braced against the car and attempted to push back against officers. Lopez stated that she would not go in the car. Lopez was picked up and put into the car butt first. Lopez leaned back and began bicycle kicking at myself and officer Gardner. She did land one kick on my left hand / fingers area. Another kick hit me in the right arm in the area of my inner elbow region and pinned my arm against the C pillar. I only received redness on the inner portion of my arm as a result of the kick. During her kicks she lost both of her shoes (Crocs). She kicked at officers approx. 6 or more times.

Lopez was transported on recording back to City Hall for processing. PO Gardner did author charges and arraigned Lopez.

I had no further involvement.

10/18/21

## Property

Property Number: 33716

    Item: Cell phone              Owner Applied Nmbr:

    Brand:                         Model:

    Year: 0                   Quantity: 1

    Meas: DU                Serial Nmbr:

    Total Value: $0.00           Color:

    Owner: LOPEZ ANAISE MARGARITA 51968

    Agency: WBP Williamsport Bureau of Police     Tag Number: CG1

Accum Amt Recov: $0.00           Officer: R Anderson

    UCR: CPH Cell Phone        UCR Status:

    Local Status: REL         Storage Location:

Crime Lab Number:           Status Date: 09/03/21

    Date Released: **/**/**     Date Recov/Rcvd: 09/03/21

    Released By: J A Ananea       Amt Recovered: $0.00

    Released To: George Lepley       Custody: **:**:** **/**/**

    Reason:

    Comments: anaise lopez phone

10/18/21

## Name Involvements:

Victim : ▓▓▓▓
Last: ▓▓▓▓▓  First: ▓▓▓▓▓▓  Mid:
DOB: ▓▓▓▓▓  Dr Lic:  Address: ▓▓▓▓▓▓
Race: W  Sex: M  Phone: ( ) -  City: ▓▓▓▓▓▓▓▓

Suspect : 51968
Last: LOPEZ  First: ANAISE  Mid: MARGARITA
DOB: ▓▓▓▓▓  Dr Lic:  Address: 442 BROADWAY
Race: W  Sex: F  Phone: ( ) -  City: BOSTON, MA 02149

10/18/21

Appx904



# CERTIFICATE OF SERVICE

I, Joshua J. Cochran, hereby certify that I served a true and correct copy of the Brief of Appendix, Volume III via electronic mail on this 16th day of December, 2025:

**Electronically:**  electronic_briefs@ca3.uscourts.gov

slaughli@travelers.com

awhite@mcclaw.com

**SCHEMERY ZICOLELLO**

By: s/_Joshua J. Cochran_
Joshua J. Cochran
PA ID No. 206807
Attorney for Appellant
333 Market Street
Williamsport, PA 17701
(570) 321-7554
josh@sz-law.com